**Case # 16-1668**

# United States Court of Appeals

# for the Federal Circuit

RICKY KAMDEM-OUAFFO, PhD

*Plaintiff-Appellant*

V.

PEPSICO INC. AND ITS AFFILIATES, DR. PETER S. GIVEN JR, DR. NAIJIE

ZHANG, SCENTSATIONAL TECHNOLOGIES LLC, STEVEN M.

LANDAU, JOHN AND/OR JANE DOE

*Defendants-Appellees*

**Appeal From The United States District Court**

**For The Southern District Of New York**

**In Case No. 7 – 14 - CV – 00227 (KMK); Honorable Kenneth M. Karas**

## PLAINTIFF-APPELLANT'S BRIEF

Ricky Kamdem-Ouaffo, PhD
*Pro Se Plaintiff-Appellant*
1 Richmond Street # 2100
New Brunswick, NJ 08901
1 (732) 763 8622

**Dated:** 04/24/2016

**RECEIVED**

APR 26 2016

United States Court of Appeals
For The Federal Circuit

## CERTIFICATE OF INTEREST

Plaintiff-Appellant, Ricky Kamdem-Ouaffo, PhD., is *Pro Se*.

1

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................................1

TABLE OF CONTENTS.........................................................................................2

TABLE OF AUTHORITIES ...................................................................................5

STATEMENT OF RELATED CASES ......................................................................6

STATEMENT OF JURISDICTION..........................................................................7

STATEMENT OF THE ISSUES.......................................................................... 10

STATEMENT OF THE CASE........................................................ ...... 12

I.Preliminary                                                              Statement
..................................................................................................................... 12

II.Procedural                                                                History
..................................................................................................................... 13

STATEMENT OF FACTS RELEVANT TO THE ISSUES SUBMITTED.......... 14

SUMMARY OF ARGUMENTS ............................................................................ 16

THE ARGUMENT INCLUDING STANDARD OF REVIEW ............................ 17

I.Contract-Employment Intellectual Property Agreements Between a New Jersey Employment Agency and a Contractor Is Not Valid or Enforceable in the State of New for the Assignment of Patentable Intellectual Property Independently Created by the Contractor While He Carried Out Independent Research and Development in the State of New York at One of the New Jersey Employment Agency's Client's Facilities ................................................................................. 17

II.The United States District Court Erred in Lumping Together Four Different Agreements into One and in Doing so Imposed on the Plaintiff-Appellant a Factually Erroneous and Incorrect Meaning/Understanding that the Parties Signatories of the Said Agreements never Had at the time of Executing said Agreements and thus the US District Court Indeed Created Conflict with the Laws of the State of New York As to How Agreements Are Formed ................ 25

III.The United States District Court Erred in Reversing Decisions of the US Court of Appeals for the Federal Circuit in the Matters of *Shukh v. Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2, 2015)* and of *Chou v. University of Chicago 254 F.3d 1347 (Fed. Cir. 2001* Because Plaintiff

Sustained multiple *"Concrete and Particularized Reputational Injury"* As Result of PepsiCo Defendants' Actions............................................................................. 28

A.   Dr. Shukh Type *"Concrete and Particularized Reputational Injury"* Giving Rise to Article III Standing for the Plaintiff-Appellant........................ 29

   1)   Plaintiff-Appellant's Article III Standing Was Established In Light of the US Court of Appeals For the Federal Circuit's "Discussion Section I" and Ruling on *"Dr. Shukh's Reputation as an Inventor"* As Applied to the Plaintiff-Appellant. ...................................................................................... 29

   2)   Plaintiff-Appellant's Article III Standing Was Established in Light of the US Court of Appeals For the Federal Circuit's Discussion Section II on *"Dr. Shukh's Reputation for Seeking Credit for his invention"*................. 37

   3)   Plaintiff-Appellant's Article III Standing Was Established in Light of the US Court of Appeals For the Federal Circuit's Discussion Section III on *"Dr. Shukh's Unemployment"* ..................................................................... 44

B.   Additional *"Concrete and Particularized Reputational Injury"* Specific to Plaintiff-Appellant Resulting from PepsiCo Improper Omission of Plaintiff-Appellant's Name from His Inventions Because of Plaintiff-Appellant's Black Skin Color ............................................................................................................ 51

   1)   Dr. Kamdem's Reputation as a Black Skin Colored Inventor of Technologies Valuable Worldwide Including but not Limited in the United States, Canada, European Union, Japan, China, Russian Federation. ....... 52

   2)   Dr. Kamdem's Public and Mass Media Reputation Stolen by Defendants Dr. Peter Given and Dr. Naijie Zhang. ........................................................ 54

   3)   Dr. Kamdem's Public Reputation on Sexual Intercourse Morality at Work Place or in the Community ................................................................ 55

C.   Plaintiff-Appellant Has Also Established Article III Standing for Correction of Inventorship on WIPO Patent Publications" ............................... 56

IV.The US District Court Erred and Created a Conflict with the NY Supreme Court in holding that Plaintiff should have brought forth Certain causes of Actions at the State Court when The State Court Itself Declined Jurisdiction On Ground Plaintiff's Intellectual Property Matter Was not Relevant to the Whistle Blower Action Brought Against PepsiCo Inc. In September 2010................................... 61

3

V. The US District Court Erred in Not Giving Any Consideration to the Plaintiff-Appellant's Proposed Second Amended Complaint With More Definite Statements in Answer To ScentSational Technologies LLC and Steven M. Landau's Motion for A More definite Statement. ................................................. 63

VI. The Designation of Subex Technologies Inc. as a Co-Defendant in This Lawsuit Might Necessitate Some Discovery ...................................................................... 65

CONCLUSION AND STATEMENTS OF RELIEF SOUGHT ............................ 66

TABLE OF CONTENTS OF THE ADDENDUM ................................................ 69

A.    Opinion of the United States District Court, Dated 01/26/2016 ............... 69

B.    Final Judgment of the United States District Court, Dated 02/10/2016 ... 69

C.    United States Patent .................................................................................. 69

    1)    US Patent No. 8,474,637 B2: "Releasable Entrapment of Aroma Using Polymeric Matrix." ...................................................................................... 69

D.    The Patent Cooperation Treaty (PCT) Patent Applications And Their Corresponding World Intellectual Property (WIPO) Patent Publications (UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60) ........................................................ 69

    1)    PCT Application No. PCT/US2011/043042; WIPO Pub No. WO/2012/2006328: "Releasable Entrapment of Aroma Using Polymeric Matrix". ...................................................................................................... 69

    2)    PCT Application No. PCT/US2012/049503; WIPO Pub No. WO/2013/032631: "Releasably Encapsulated Aroma" ............................ 69

    3)    PCT Application No. PCT/US12/59992; WIPO Publication No. WO 2013/056075. "Complex Coacervates and Aqueous Dispersions of Complex Coacervates and Methods of Making Same." ............................ 69

    4)    PCT Application No. PCT/US12/43220; WIPO Publication No. WO 2013/006269. "Coacervates Complex, Methods And Food products." .... 69

    5)    PCT Application No. PCT/US12/4327; WIPO Publication No. WO 2013/006268: "Coacervates Complex, Methods And Food products." .... 69

CERTIFICATE OF SERVICE ............................................................................. 70

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32 ........................ 71

# TABLE OF AUTHORITIES

## Cases

*Chou v. University of Chicago 254 F.3d 1347 (Fed. Cir. 2001)* ......... 10, 51, 58, 60

*HIF Bio, Inc. V. Yung Shin Pharmaceutical, 600 F.3d 1347 (Fed. Cir. 2010)* 62, 63

*Shukh v. Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2, 2015)* .............8

## Statutes

28 U.S.C §1331 ............................................................................................... 7

28 U.S.C. §1295(a)(1) ...................................................................................... 9

NY GBS Article 11 §171(2) ............. ..................................................... 18

NY GBS Article 11 §172 ........................................................................ 18, 24

NY GBS Article 11 §185(10) ...................................................... 8, 19, 22

NY GBS Article 11 §185(4) ........................................................................ 21

NY GBS Article 11 §185(7) ................................................................... 22, 24

NY GBS Article 11 §190 ..................................................................... passim

## Rules

PCT Receiving Office Guidelines Ch. XVI ¶309 ................................... 58

PCT Receiving Office Guidelines Ch. XVI ¶311 ................................... 59

*Rule 92bis.1(a)(i)* ................................................................................... 58

*Rule 92bis.1(a)(ii)* .................................................................................. 58

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant provides as follows:

(a) There have been no previous appeal in this case.

(b) Plaintiff-Appellant is aware of no other case that will be directly affected by the Court's decision in this case.

## STATEMENT OF JURISDICTION

The Plaintiff-Appellant brought forth this action at the United States District Court for the Southern District of New York as Federal Question under 28 U.S.C §1331 to seek ownership and inventorship of the Plaintiff's patentable and now patented intellectual property that he independently created and invented during contract work at PepsiCo's Research and Development facility in Valhalla, New York from the period of about July 9th, 2008 to October 05th, 2009. The specific patents in question included a US Patent Number US 8,474,637 B2 issued on July 2, 2013 to Dr. Peter Given and Dr. Naijie Zhang as inventors and to PepsiCo Inc. as the sole Assignee. US Patent Number US 8,474,637 B2 has World Intellectual Property (WIPO) International Stage publication Number is Pub No. WO/2012/2006328. The United States District Court dismissed Plaintiff-Appellant's Second Amended Complaint on ground of lack of Article III standing, holding that Plaintiff-Appellant was under obligation to assign his inventions to PepsiCo Inc. and Affiliates. Plaintiff-Appellant Appeals from the Decision of the Unites States District Court on two main grounds:

7

1) As a result of PepsiCo Defendants' improper omission of Plaintiff-Appellant's name from his inventions, the Plaintiff-Appellant sustained *"concrete and particularized reputational injury"* identical to or if not worse than the ones that the United States Court of Appeals for the Federal Circuit determined in *Shukh v. Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2, 2015)* as being genuine disputed material facts establishing t and/or giving rise to Article III Standing in a patent Action.

2) Pursuant to NY GBS Article 11 §190 and NY GBS Article 11 §185(10), the United States District was obligated under the "General Business Law" of the State of New York "NY GBS" to void the pre-employment Agreements that PepsiCo Defendants relied on to claim Plaintiff's inventions because the Employment Agency (Subex Technologies Inc.) with whom Plaintiff-Appellant executed the pre-employment agreements was a New Jersey Employment Agency, whereas the entirety of the contract employment site where the inventions took place was in the State of New York. In addition, the percentage of "Gross Fees" approved and paid by PepsiCo to the said New Jersey Employment Agency criminally exceeded the statutory limits in the State of New York for a placement by an Employment Agency in "Class B" professional services.

This Appeal is from a final Decision of the United States District Court for the Southern District of New York in a civil Action arising under an Act of the United States Congress relating to Patents. Therefore the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction for this Appeal under 28 U.S.C. §1295(a)(1).

The final judgment dismissing Plaintiff-Appellants Second Amended Complaint was entered on 02/10/2016 and the Plaintiff-Appellant filed a Notice of Appeal on 03/08/2106 (See Addenda A and B).

## STATEMENT OF THE ISSUES

I.      Whether Contract Employment Intellectual Property Agreements Between a New Jersey Employment Agency and a Contractor Is Valid or Enforceable in the State of New York as Lawful Documents for the Assignment of Patentable Intellectual Property Independently Created by the Contractor While He Carried Out Independent Research and Development in the State of New York at one of the New Jersey Employment Agency's Client's Facilities?

II.     Whether the United States District Court Erred in Lumping Together Three Different Agreements into One and in Doing so Imposed on the Plaintiff-Appellant a Factually Erroneous and Incorrect Meaning/Understanding that the Parties Signatories of the Said Agreements never Had at the time of Executing said Agreements to the Extent the District Indeed Created Conflict with the Laws of the State of New York on How Agreements and Contracts Are Formed?

III.    Whether the District Court May Reverse Decisions of the United States Court of Appeals for the Federal Circuit Rulings in the Matters of *Shukh v. Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2, 2015)* and of *Chou v. University of Chicago 254 F.3d 1347 (Fed. Cir. 2001)?*

10

**IV.**    Whether the United States District Court Erred and Created a Conflict with the NY Supreme Court in holding that Plaintiff should have brought forth Certain Causes of Actions at the State Court although the State Court Itself Declined Jurisdiction On Ground Plaintiff-Appellant's Intellectual Property Matter Was not Relevant to the Whistle Blower Action Brought Against PepsiCo Inc. In September 2010?

**V.**    Whether The United States District Court Erred in Not Considering Plaintiff-Appellant's *"Proposed Second Amended Complaint With More Definite Statements"* Submitted to the United States District Court In Answer To ScentSational Technologies Defendants' Motion for a More Definite Statements Pursuant to the Fed. Rule Civ. Proc. Rule 12(e)?

**VI.**    Whether the New Jersey Employment Agency Named Subex Technologies Inc. Who Signed the Contract Employment Agreement With Plaintiff-Appellant is a Required Party in this Action in the meaning of the Fed. Rule Civ. Proc. Rule 19: "Required Joinders"?

11

## STATEMENT OF THE CASE

### I.      Preliminary Statement

Plaintiff-Appellant has adopted in its entirety the same *"Factual Background"* that the United States District Court Considered and assumed to be true in deciding Defendants-Appellees' motion to dismiss Plaintiff-Appellant's Second Amended Complaint ("SAC") [See Addendum A, USDC[1] Docket # 95, pp. 2 – 6]. Except that where the USDC inserted a contradictory or an insufficient meaning about the alleged fact such a numeric calculations on numbers alleged, the Plaintiff reserves the right to critique it in the Argument section of this Brief and/or of the Reply Brief:

In addition to the USDC "Factual Background", Plaintiff would like to highlight that he properly identified the PCT and WIPO publications corresponding to the United State National Phase patents and/or patent Applications. (See Appendix Vol. II, TAB 14, UDSC Docket # 52, SAC[2], pp. 12 ¶48 & 15 ¶60)

---

[1] "USDC": United States District Court.

[2] SAC: Second Amended Complaint.

12

## II.     Procedural History

The Plaintiff-Appellant has also fully adopted the *"Procedural History"* put forth by the USDC in its Opinion at *"Addendum A, USDC Docket # 95, pp. 6 – 9"*.

The Plaintiff-Appellant would like to add that the motion that ScentSational Technologies LLC and Steven M. Landau filed in response to Plaintiff-Appellant's SAC was also alternatively stated as a Rule 12(e) motion for a more definite statement. And because ScentSational Defendants' motion was a motion for a more definite statement, the Plaintiff-Appellant revised the SAC to address ScentSational Defendants' need for more a definite statement and the same was submitted to the USDC with the Plaintiff-Appellant's Opposition to Defendants' motion under the title *"Proposed Second Amended Complaint with More Definitive Statement"* (See Appendix Vol. II, TAB 26; USDC Docket # 81, 81-1, 81-2). But the USDC appeared to have interpreted that as to say that the Plaintiff-Appellant had filed *"A Second Amended Complaint with More Definitive Statement"* without permission when in reality the Plaintiff simply submitted a *"Proposed Second Amended Complaint with More Definitive Statement"* with his Opposition motion papers.

13

## STATEMENT OF FACTS RELEVANT TO THE ISSUES SUBMITTED

The evidence at "Appendix Vol. I, TAB 6; USDC Docket # 43(3), p. 34" shows that the work location in PepsiCo's internal Records was "100 Stevens Ave, Valhalla, NY United States, 10595" whereas Subex Technologies Inc. has its address in PepsiCo's internal records as: "Subex Technologies, Inc.; 255 Old Brunswick Road Suite S 240; Piscataway, NJ 08852" (See Appendix Vol. I, TAB 6; USDC Docket # 43(3), p. 33; See Vol. I TAB 7, UDSC Docket # 43(4), P. 1)). As stated in the "Factual Background" the entirety of the inventions work took place in Valhalla, New York (Addendum A, USDC Docket #95, P. 2).

PepsiCo's internal records showed and the USDC found that PepsiCo had paid $133,007.50 to Subex Technologies Inc. for Plaintiff-Appellant's work at its Valhalla work site in the State of New York (Appendix Vol. II, TAB 24; USDC Docket # 52, p.13 ¶¶52-53, p. 39 ¶148); The USDC also found that of the $133,007.50, Plaintiff only got $82,142.00 gross pay from Subex Technologies Inc. (See Addendum A, USDC Docket # 95, p. 3). The USDC then correctly calculated that the amount of $82,142.00 represented 61.76% of the total money that PepsiCo paid to Subex Technologies Inc. (See Addendum A, USDC Docket # 95, p. 3, Footnote 1). The detailed calculation would be "$82,142.00/$133,007.50 x 100 = 61.76%"). Using the same found by the USDC, one could also further

14

calculate that the difference "$133,007.50 − $82,142.00 = $50,865.50" was the amount paid by PepsiCo to Subex Technologies Inc. as "Gross Fees". The percentage of the "Gross Fees" thus paid to Subex Technologies Inc." with respect to the "wages" paid by Subex Technologies Inc. to the Plaintiff-Appellant was therefore "$50,865.50 : $82,142.00) x 100 = 61.92%". Plaintiff-Appellant contends that such a percentage ratio of "Gross Fees" criminally exceeded statutory limits for Employment Agency Fees in any category of Employment in the State of New York. Once the United States District ruled on what the numbers to use in calculations were, it should have also taken the next step to calculate whether the "Gross Fees" paid to the Employment Agency was compliant with the Statutes of the State of New because it is a crime under NY GBS Article 11 §190 to exceed the Employment Agency "Fees" limits.

Another fact relevant to this case is that the allegations of the SAC contained all of the elements of reputational injury that the United States Court of Appeals for the Federal Circuit previously determined to be genuine disputed material facts giving rise to Article III Standing in the matter of *Shukh v. Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2, 2015)*.

15

## SUMMARY OF ARGUMENTS

This Action automatically brought up for review the Employment Agency Agreements upon which PepsiCo asserted itself as assignee and owner of the Plaintiff-Appellant inventions (See Appendix Vol. I, TAB 5, UDSC Docket # 43(2), pp. 50 – 57). Under the General Business Law of the State of New York, the United States District Court had to either void the Employment Agency Agreements or at least find them unenforceable in the State of New York because they were agreements executed by a New Jersey Employment Agency in its own name and not as a direct representative of PepsiCo. Furthermore Under the laws of the State of New York, the "Gross Fees" paid by PepsiCo to the Employment Agency criminally exceeded the Statutory limits set forth in NY GBS Article 11 §185. Therefore the Agreements upon which PepsiCo relied to assert itself as Assignee and owner of Plaintiff's inventions were based on or derived from multi-facetted criminality identified in NY GBS Article 11 §190. PepsiCo Defendants fully shared in, participated in, facilitated, aided, helped and/or supported a multi-facetted criminality of the "Agency" and of the "Gross Fees" in business dealing with Subex Technologies Inc. PepsiCo Defendants have thus far been excessively enriched nationally (in the United States) and internationally through the obtaining of World Intellectual Property "WIPO" Patent Publications and of Patents in the

16

National Patent Offices of members of the patent Cooperation Treaty (PCT) [See
Patents and WIPO Publications at Addenda C, D(1), D(2), D(3), D(4), D(5)] .

Employment Agencies are regulated in the State of New York under
NY GBS Article 11. Failure to comply with the articles of NY GBS Article 11 is
criminality in the State of New York under NY GBS Article 11 §190.

. The doctrine of unclean demands that PepsiCo Defendants not be
allowed to retain that which  they obtained through criminality in which they fully
shared, participated, facilitated, aided, helped and/or supported.

None of the Defendants disputed whether Plaintiff-Appellant was
indeed the inventor of the inventions brought up in this Action.

## THE ARGUMENT INCLUDING STANDARD OF REVIEW

The following are Plaintiff-Appellant's arguments in answer to the
"STATEMENT OF THE ISSUES" presented above.

**I.    Contract-Employment Intellectual Property Agreements Between a
New Jersey Employment Agency and a Contractor Is Not Valid or
Enforceable in the State of New for the Assignment of Patentable Intellectual
Property Independently Created by the Contractor While He Carried Out
Independent Research and Development in the State of New York at One of
the New Jersey Employment Agency's Client's Facilities**

the determination of the USDC that Subex Technologies Inc. was an

"Employment Agency" (See Addendum A, USDC Document Docket # 95, p.3),

17

which in the New York State would be defined in NY GBS Article 11 §171(2), triggers the provisions of NY GBS Article 11 §172 – *"License required"* with respect to Subex Technologies Inc. being a New Jersey Employment Agency and the work location of the contract employee assigned to PepsiCo being in the State of New York.  The evidence at "Appendix Vol. I, TAB 6; USDC Docket # 43(3), p. 34" shows that the work location in PepsiCo's internal Record was "100 Stevens Ave, Valhalla, NY United States, 10595" whereas Subex Technologies Inc. has its address in PepsiCo's internal Records as: "Subex Technologies, Inc.; 255 Old Brunswick Road Suite S 240; Piscataway, NJ 08852" (See Appendix Vol. I, TAB 6; USDC Docket # 43(3), p. 33; See Vol. I TAB 7, UDSC Docket # 43(4), P. 1)).   Therefore there remains a question as to whether Subex Technologies Inc. was   a lawful New York entity through which PepsiCo may assert and enforce itself as sole assignee and owner of Plaintiff-Appellant's patented Intellectual Property created and developed independently by Plaintiff-Appellant during work done in the State of New York on New York soil. Plaintiff-Appellant contends that the correct answer to this question is "No".

NY GBS Article 11 §172 – "License required" states":

*"No person shall open, keep, maintain, own, operate or carry on any employment agency unless such person shall have first procured a license therefor as provided in this article. Such license shall be issued by the commissioner of*

18

*labor, except that if the employment agency is to be conducted in the city of New York such license shall be issued by the commissioner of consumer affairs of such city. Such license shall be posted in a conspicuous place in said agency."*

The USDC's ruling that PepsiCo was just a third party beneficiary

of the "Employment Agency" agreements signed by Subex Technologies Inc., a

New Jersey State Employment Agency, effectively criminalizes PepsiCo Inc.'s and

Subex Technologies Inc.'s dealings to the extent that PepsiCo relied only on those

Agreements signed by Subex Technologies Inc. to assert its ownership of patented

Intellectual Property independently created and developed by the Plaintiff-

Appellant during his work in the State of New York because NY GBS Article 11

§190 – *"Penalties for Violations"* states that:

*"Any person who violates and the officers of a corporation and stockholders holding ten percent or more of the stock of a corporation which is not publicly traded, who knowingly permit the corporation to violate sections one hundred seventy-two, <u>one hundred seventy-three, one hundred seventy-six, one hundred eighty-four, one hundred eighty-four-a, one hundred eighty-five, one hundred eighty-five-a, one hundred eighty-six, or one hundred eighty-seven of this article</u> shall be guilty of a misdemeanor and upon conviction shall be subject to a fine not to exceed one thousand dollars, or imprisonment for not more than one year, or both, by any court of competent jurisdiction... "*

Furthermore, NY GBS Article 11 §185(10) – "Fees" states:

*"Notwithstanding any other provision of law to the contrary, no fee may be charged or collected for services rendered by an employment agency not licensed pursuant to section one hundred seventy-two of this article at the*

19

*time such services were rendered. In an action to collect a fee, <u>the court shall void</u>* *<u>all or any part of an agreement or contract with an employment agency</u> that did* *not have a valid license at the  time the contract  was entered into or services were* *rendered;. "*

The inherent presence of elements of criminality that must be admitted to as PepsiCo relies only on Agreements executed by the New Jersey Employment Agency in order to assert itself as the Assignee and owner of Plaintiff's independently created Intellectual Property "IP" during work in the State of New York, dictates that the Court must for the least to speak find that the agreements relied onto by PepsiCo are not unenforceable in the State of New York, but more appropriately the said Agreements relied onto by PepsiCo must be voided as required under the laws of New York State when there is an underlying criminality.

PepsiCo produced documents showing that it had paid $133,007.50 to Subex Technologies accounted for as related to Plaintiff's work in the State of New York (Appendix Vol. II, TAB 24; USDC Docket # 52, p.13 ¶¶52-53, p. 39 ¶148); Of the $133,007.50 Plaintiff-Appellant only got $82,142.00 gross wages from Subex Technologies Inc. (See Addendum A, USDC Docket # 95). Therefore one could calculate that PepsiCo paid the remaining to Subex Technologies as "Fees" an amount of $133,007.50 − $82,142.00 = $50,865.50. The percentage

ratio of the "Gross Fees" paid to Subex Technologies Inc. as compared to the

gross wages paid to Plaintiff-Appellant is therefore ($50,865.50 : $82,142.00)*100

= 61.92%.

NY GBS Article 11 §185(4) – "Types of Employment" defines:

*"For the purpose of placing a ceiling over the*
*fees charged by persons conducting employment agencies, types*
*of employment shall be classified as follows:*
*Class "A"--domestics, household employees, unskilled or*
*untrained manual workers and laborers, including agricultural workers;*
*Class "A1"--non-professional trained or skilled industrial workers or*
*mechanics;*
*Class "B"--commercial, clerical, executive, administrative and*
*professional employment, all employment outside the continental*
*United*
*States, and all other employment not included in classes "A", "A1",*
*"C" and "D";*
*Class "C"--theatrical engagements;*
*Class "D"--nursing engagements as defined in article one*
*hundred*
*thirty-nine of the education law.*

Plaintiff was placed with PepsiCo under "*Class B ...professional*

*employment*" even as indicated by the Title of the Agreements that existed

between PepsiCo and Subex Technologies Inc. "*Staffing Supplier Agreement For*

*Professional Services*" of which the "*Attachments B, Attachment C and*

*attachment D*" were separately provided to the Plaintiff for signature by Subex:

21

(See Appendix Vol. I, TAB 5, UDSC Docket # 43(2), pp. 50 – 57); Appendix Vol.

II, TAB 14; USDC Docket # 52, pp. 36 – 38, SAC ¶¶132 – 141).

Pursuant to NY GBS Article 11 §185(7) – "Fees" Ceiling,

*"...For a placement in Class "B" employment the gross fee shall not*
*exceed, in percentage of the first full month's salary or wages, the following:*
*where such first full month's salary or wages is*

| | |
|---|---|
| *less than $750 ..............................................................* | *25 %* |
| *at least $ 750 but less than $ 950 ...........................  ....* | *35 %* |
| *at least $ 950 but less than $1150 .................................* | *40 %* |
| *at least $1150 but less than $1350 .................................* | *45 %* |
| *at least $1350 but less than $1500 .................................* | *50 %* |
| *at least $1500 but less than $1650 .................................* | *55 %* |
| *at least $1650 or more ..................................................* | *60 %"* |

Whereas the USDC performed calculation on the percentage that

Plaintiff's wages were as compared to the total disclosed by PepsiCo as being

81,142:133,007.50 x 100 = 61.76% (See Addendum A, USDC Docket # 95, p. 3,

footnote 1), the UDSC did not calculate what the percentage of the "gross fees"

paid to Subex Technologies Inc. was, but if the USDC had done the calculation it

would have found criminality in fees under the laws of the State of New York. As

can be seen in the schedule provided above in the Laws of New York, there is no

provision that allows to exceed 60% "*in percentage of the first full month's salary*

*or wages*". The violation of NY GBS Article 11 §185(10) – "*Fees*" is criminality

under NY GBS Article 11 §190.

Nevertheless regardless of whether one looks at this lawsuit as involving a "fees" aspect or as a pure attempt to recover patented intellectual property independently created by the Plaintiff-Appellant, the adjudication of this Action requires that the agreements through which PepsiCo asserted a Title as sole Assignee/Owner of Plaintiff's patented IP must be brought up for full judicial review, therefore this Action puts in direct review the contracts/agreements and the legality of the use of those agreements by PepsiCo for the enforcement of rights over Plaintiff-Appellant's inventions created during work done in the State of New York.

In brief, a careful examination of the context surrounding Plaintiff-Appellant's work at PepsiCo exposed a multi-facetted criminality in PepsiCo dealings with Subex Technologies Inc.: 1) the "Criminality of Fees" consisting of practicing excessive "Fees" to the benefit of Subex Technologies Inc. and 2) the "criminality of the Agency" PepsiCo hosting the New Jersey Employment in the State of New York in hope that it would rely solely on the agreements signed by the said New Jersey Agency to assert itself as the sole Assignee/Owner of Plaintiff's Intellectual property. Under such a situation where multi-facetted criminality existed for the sole benefit of the Employment Agency and the third

23

party beneficiary of the Employment Agreements signed by the Employment Agency who has been paid criminal "Fees", the Court has no choice but to void the agreements because none of the party that benefited was ignorant of the criminality they were involved in. As result when the Contract is voided and/or made unenforceable as required under the laws of the State of New York, there is no more assignment left either to PepsiCo and/or to Subex Technologies Inc. and the Plaintiff remains sole inventor of his inventions still unassigned.

In view of all the above, the United States District Court's Opinion at "Addendum A, USDC Docket #95 , p. 17 Section 2" concerning the "*Validity of the Agreement*" must be vacated on basis of the criminality of "Employment Agency" in the State of New York under NY GBS Article 11 §190 for violation of NY GBS Article 11 §172 and on the basis of criminality of "Agency Fees" under NY GBS Article 11 §190 for violation of NY GBS Article 11 §185(7). PepsiCo fully shared into the criminality, participated and facilitated the same obviously in order to benefit itself greedily.

24

**II.    The United States District Court Erred in Lumping Together Four Different Agreements into One and in Doing so Imposed on the Plaintiff-Appellant a Factually Erroneous and Incorrect Meaning/Understanding that the Parties Signatories of the Said Agreements never Had at the time of Executing said Agreements and thus the US District Court Indeed Created Conflict with the Laws of the State of New York As to How Agreements Are Formed**

The Plaintiff never understood the four separate *"Attachments to the Staffing Supplier Agreement..."* that he was provided by Subex Technologies to sign as constituting one single agreement because each *"Attachment"* was built to enforce be enforced on a different set of laws. The violation of one agreement is not necessarily the violation of the other, therefore each agreement could give rise to its enforcement at different time and in a different venue. For the same reason that the USDC decided not to void the agreements toward PepsiCo, the Court should also not accept arguments from PepsiCo for bundling the agreements as one because PepsiCo was not signatory of the agreements. Therefore the USDC erred in accepting arguments about the meaning and expectations of the agreements from PepsiCo Inc. because PepsiCo was not signatory of the Agreements.

A practical issue of Justice in lumping together such agreements is that now that there is an undisputed presence of elements of criminality that must

25

be admitted to when PepsiCo relied only on Agreements executed by the New Jersey Employment Agency Subex Technologies Inc. in order to assert itself as the Assignee and owner of Plaintiff's independently created Intellectual Property during work in the State of New York, a question arises as to which one of the agreements must be voided?

There were four *"Attachments"* signed separately by Plaintiff and Subex Technologies:

**1)** *"Attachment B – staffing supplier agreement regarding confidentiality and intellectual property".* [Appendix Vol. II, TAB 14, USDC Docket # 52 p. 37, SAC ¶135. Appendix Vol. I, TAB 5, USDC Docket # 43(2) p. 51 – 52].

**2)** *Attachment C to the staffing supplier agreement staffing - acknowledgment of temporary work assignment.* [Appendix Vol. I, TAB 5, USDC Docket # Dkt 43(2) p. 53].

**3)** *Attachment D to the staffing supplier agreement staffing - communication and information systems user agreement.* [Appendix Vol. I, TAB 5, USDC Docket # 43(2), pp. 54-56].

**4)** *PepsiCo code of conduct, signature page only.* [Appendix Vol. I, TAB 5, USDC Docket # 43(2) p. 57].

Concerning *"Attachment C to the staffing supplier agreement staffing - acknowledgment of temporary work assignment..."*, the Court has to make a decision on this Agreement but the Agreement did not say that the Plaintiff will be required to do his work in the State New York, and as matter of fact PepsiCo has facilities in New Jersey.

The Court must carefully assess the agreements that have been bundled together at the USDC, so as to clearly identify the ones that gave rise to or supported the multi-facetted criminality and then void them. The Plaintiff contends that the number one document that gave rise to or supported the multi-facetted criminality is primarily the *"Attachment B – staffing supplier agreement regarding confidentiality and intellectual property"*. [Appendix Vol. II, TAB 14, USDC Docket # 52 p. 37, SAC ¶135.  Appendix Vol. I, TAB 5, USDC Docket # 43(2) p. 51 – 52].

The bundling of the agreements by the USDC and making all the agreements to be secondary to the *"Attachment B"* provision of *"...I hereby assign..."* appeared to have blinded the USDC to the multi-facetted criminality inherent into how those agreements were conducted or implemented by PepsiCo so as to fully share in, participate in, facilitate, aide, help and/or support a multi-

27

facetted criminality of the "Agency" and of the "Gross Fees" under the laws of the

State of New York.

III.    The United States District Court Erred in Reversing Decisions of the
US Court of Appeals for the Federal Circuit in the Matters of *Shukh v.
Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2, 2015)* and of *Chou v.
University of Chicago 254 F.3d 1347 (Fed. Cir. 2001* Because Plaintiff
Sustained multiple *"Concrete and Particularized Reputational Injury"* As
Result of PepsiCo Defendants' Actions

In *Shukh v. Seagate Technology, LLC, No. 14-1406 (Fed. Cir. Oct. 2,

2015)*, the Federal Circuit held that:

> "*Today, we hold that concrete and particularized reputational injury
> can give rise to Article III standing*. As we noted in Chou, "being considered an
> inventor of important subject matter is a mark of success in one's field,
> comparable to being an author of an important scientific paper." 254 F.3d at
> 1359. We reasoned that "[p]ecuniary consequences may well flow from being
> designated as an inventor." Id. *This is particularly true when the claimed inventor
> is employed or seeks to be employed in the field of his or her claimed invention.*
> For example, if the claimed inventor can show that being named as an inventor on
> a patent would affect his employment, the alleged reputational injury likely has an
> economic component sufficient to demonstrate Article III standing."

> "...We find that there is a question of material fact as to whether Dr. Shukh's
> omission as a named inventor on the disputed patents caused him
> reputational injury. Dr. Shukh presented evidence such that a trier of fact
> could conclude that this omission injured his reputation in at least two
> ways: first, it harmed his reputation as an inventor in the field of
> semiconductor physics, and second, it contributed to his reputation for poor
> teamwork due in part to his accusations that others were stealing his work.
> Moreover, Dr. Shukh presented evidence from which a trier of fact could
> conclude that these reputational harms had economic consequences—
> namely, that Dr. Shukh was unable to find employment after he was
> terminated from Seagate..."

28

The Plaintiff-Appellant's Second Amended Complaint alleged several of the *"concrete and particularized reputational injury"* that the Federal Circuit specifically already identified and affirmed as being genuine disputed material facts in an Action that was granted Article III Standing. Furthermore this lawsuit has some other damn right <u>humiliating and degrading</u> *"concrete and particularized reputational injury"* that the Plaintiff would like the US Court of Appeals to consider whether such also *"can give rise to Article III standing..."*

## A. Dr. Shukh Type *"Concrete and Particularized Reputational Injury"* Giving Rise to Article III Standing for the Plaintiff-Appellant

Plaintiff-Appellant will follow the US Court of Appeals' Discussion in Dr. Shukh case's and on the basis of the same will highlight the Plaintiff-Appellant's *"Concrete and Particularized Reputational Injury"* alleged in the Second Amended Complaint that are similar or identical to Dr. Shukh' s *"concrete and particularized reputational injuries"*.

### 1) Plaintiff-Appellant's Article III Standing Was Established In Light of the US Court of Appeals For the Federal Circuit's "Discussion Section I" and Ruling on *"Dr. Shukh's Reputation as an Inventor"* As Applied to the Plaintiff-Appellant.

The US Court of Appeals for the Federal Circuit issued the following discussion and ruling:

29

*"First, a genuine dispute exists as to whether Dr. Shukh's omission as a named inventor on the disputed Patents harmed his reputation as an inventor. Dr. Shukh presented evidence supporting his contention that a scientist's professional reputation is influenced by the number of patents on which that scientist is named. He provided an expert report explaining that being named on a patent means that the inventor's "standing and reputation in the related technology community has*

*been enhanced, including among their employers or potential employers." J.A. 8817. The expert also wrote that "inventors take great pride in their inventorship abilities and accomplishments" and that named inventors' contributions on patents are "considered positively when a technology professional is being considered for a promotion." J.A. 8816; see also J.A. 5592 (expert report stating that adding the disputed patents to Dr. Shukh's portfolio would have "significantly strengthened" his claim to the Immigration and Naturalization Service that he was an "outstanding professor or researcher" and therefore merited permanent residency).....*

*Dr. Shukh also showed that Seagate itself valued the number of patents its employees were named on. For example, Seagate gave financial rewards, J.A. 5215, and enrolled employees in its Inventor's Hall of Fame, J.A. 5214, based on an employee's number of named patents. Dr. Shukh's Fiscal Year 2007 Performance Evaluation further reinforces this conclusion. In the performance evaluation, Dr. Shukh's manager wrote that Dr. Shukh "has a significant patent portfolio: However, I am concerned that the number of patent applications has been reduced over the last two years..."*

The Plaintiff-Appellant's case contained at least three Shukh "*concrete and particularized*" elements of reputation injury identified by the Federal Circuit's with respect to "*Dr. Shukh's reputation as an inventor*".

The first Shukh's element from the excerpt above is that Plaintiff is a

MS and PhD in Food Science who has chosen to pursue career in the Food and

30

Beverage as an Industry Scientist in private sector of "Food Product/Ingredient and Product and Process Development". The Plaintiff is a PhD from the graduate of the Food Science Program at Rutgers University in New Jersey and since graduation Plaintiff started his career as a Research Scientist for a Company in New Jersey and has since then continued on that track of industry Scientist for product and process development in Food and beverage companies, developing food products, ingredients and technologies for the market. Plaintiff has gone through and still does go through regular performance evaluation at each employer and those evaluations are considered toward promotions and future recommendations. The key focus of any evaluation plaintiff has gone through is always whether he has developed a new product or a new process from which the company could make money or gain competitive advantage. Therefore it is important that Plaintiff must be credited with his work properly so that he can be identified for promotions and be positioned for better job opportunities with better pay for himself.

The second Shukh *concrete and particularized* element from the excerpt above and this time with respect to the "*Immigration and Naturalization Services*" is that PepsiCo inquired and Subex Technologies communicated to PepsiCo in mid- September 2009 that Plaintiff-Appellant had a "*Permanent Resident Card*"

31

(Appendix Vol. I, TAB 8, Dkt # 43(5), p. 42). Although the record doesn't say anything about how Plaintiff obtained a United States *"Permanent Resident Card"*, Plaintiff indeed obtained it by establishing before the Office of the *"Immigration and Naturalization Service"* that he was an Advanced Degree Professional with Exceptional Industry Skills and *"therefore merited permanent residency"*. And upon the testimonials of US Employers who had seen Plaintiff at work and had benefitted from his work on their bottom line, the INS granted Plaintiff Permanent Residency in the United States. Ironically when PepsiCo saw Plaintiff's good work and the enormous benefit it will derive from Plaintiff's work, PepsiCo engaged in fabricating very uncharacteristic attributes to write to the United States government about the Plaintiff, directly discrediting and sabotaging Plaintiff's qualifications in his expertise such the example below:

> *"....That approach made particular sense because Complainant's performance was revealing that he did not have a sufficiently strong background and skill in Chemistry and polymer Science to be successful in his assigned work on the aroma Burst project. One example of this was manifest when Complainant attempted to use water to dissolve an insoluble polymer... " (*Appendix Vol. II, TAB 23, Docket # 77-4, p. 6).

First of all the Job description as seen at "Appendix Vol. I, TAB 5, Docket # 43(2), pp. 45-48" did not even list a *"polymer Scientist"* or a pure *"Chemist"* as qualified candidate for the job Plaintiff-Appellant was hired to do,

32

but the Job description does specifically asked for a "*Food Science*" and a "*proven record track record in product development*" none of which Naijie Zhang had because he is a polymer scientist and had no experience developing food and beverage products. Needless to say that Plaintiff-Appellant's PhD Concentration was "Food Chemistry" and Plaintiff-Appellant graduated from the Rutgers' PhD program with a GPA of above 3.9. PepsiCo's statement and depictions of Plaintiff-Appellant's to the United States government was fundamentally and purely defamatory and completely unsubstantiated. Furthermore it is quite obvious that a person's performance cannot be correctly assessed unless the person has been credited with his work to begin with. And since it is evident from the record that PepsiCo had credited Naijie Zhang and Peter Given with all of the Plaintiff-Appellant's inventions, there was obviously nothing left to be used to conduct a correct performance evaluation of Plaintiff-Appellant. Ironically the Plaintiff-Appellant's inventions credited to Naijie Zhang was done before he was hired by PepsiCo in May 2009.

On the Chemistry side, their statement that Plaintiff used water to dissolve an insoluble polymer is an unscientific statement that cannot be sufficiently addressed in a legal Brief, because indeed a person may use water to

33

disperse a water insoluble polymer. As a matter of fact there are commercial food and beverage ingredients on the market that are developed based on such technology of insoluble polymer in water. An Example of such technology which is well-known on the market and food and drugs ingredient is a product named "AquaCoat". It is a commercial ingredient of which the literature can be easily found online and it is a product comprising of a water insoluble polymer in water used as food ingredient and in drugs. But the problem is that if PepsiCo wanted to write such accusations to the United State Government to attack a scientist's performance in his field of expertise, it better be right because the government officials are necessary scientists and even if some of them are, there are different levels of understanding and expertise in Science.

And they wrote such a statement attacking Plaintiff's knowledge, skills and performance in Plaintiff's own field and expertise after having willfully expunged Plaintiff's name from his inventions so as to credit the same to Naijie Zhang and Peter Given. The Plaintiff does not know at this point how that PepsiCo statement will impact him when Plaintiff decided to go through the final Stage of Naturalization, needless to say that the US Government in its sovereignty may summon Plaintiff to answer Charges of perjury in connection with obtaining permanent residency card.

34

Somewhere else PepsiCo wrote the following to the United States Government:

*"The reasons that PepsiCo did not offer Complainant other full-time employment and permitted his contract to expire are numerous....Complainant was thought of as being overly deliberate, unable to multitask, unable to effectively communicate, unsuited for fast-paced environment, exhibited unprofessional and inappropriate behavior, and failed to follow directions...PepsiCo had clear legitimate reasons for not offering a permanent, full-time employment to complainant and not having complainant's contract renewed..."* [Appendix Vol. II, TAB 23, Docket # 77(4), P. 14].

Taken at face value these descriptors that PepsiCo wrote to the United States government against Plaintiff do not possibility fit the profile of a person who in 14 months of work had produced intellectual property that PepsiCo itself though was worth spending money on to apply for patents, nationally and internationally.

Nevertheless in terms of this litigation if the Plaintiff's should prevail and is properly credited with his inventions, for the least to speak it would *"significantly strengthened"* the representations that Plaintiff made to the US Government that he is an industry Food Scientist exceptionally skilled at creating useful inventions for businesses.

The third Dr. "Shukh" element present in Plaintiff's case is that there are deposition testimonies from a PepsiCo's Director of Human resources who

testified during the 22625/10 State Court proceeding that PepsiCo indeed values patents and actually seek those, but the Plaintiff has not had a chance to recover that testimony and introduce it in Court. But even if the Plaintiff had, it would not have made a difference because the District Court did not consider reputational injury in his analysis. However, on the basis of the above elements of *"concrete and particularized reputational injury"*, the Federal Circuit held that:

*"The evidence supports the conclusion that Dr. Shukh's reputation as an inventor would have been higher had he been named on the patents. Likewise, the testimony of Dr. Shukh's coworkers that additional patents would not change their impression of Dr. Shukh's technical abilities does not speak to whether additional patents would improve Dr. Shukh's reputation in the eyes of potential employers..... Dr. Shukh's coworkers had years of experience working directly with Dr. Shukh, unlike potential employers, who likely lack that first-hand knowledge and are therefore more likely to rely on their knowledge of Dr. Shukh's reputation in evaluating their impression of him. Considering all of the evidence, we find there is a genuine dispute of material fact as to whether Dr. Shukh's reputation as an inventor was harmed by his omission from the disputed patents."*

With respect to the discussion and argument about whether having additional Patents would have helped Dr. Shukh's reputation, the Plaintiff-Appellant's reputational injury might even be made further *"concrete and particularized"* in the fact that at the time PepsiCo expunged Plaintiff's name from his inventions, Plaintiff-Appellant had been employed in the Food and Beverage industry just for 7 seven years after his PhD graduation, therefore patents in his

36

name would have drastically increased his professional reputation in the industry and given him a boost for higher and better industry roles and wages. This is extremely important especially in the Food industry because food and beverage Companies largely prefer to hold discoveries as trade secrets or they just don't want to put money in patents, so when such a project like that at PepsiCo opens up and the Company actually wants Patents, it is very good opportunity for a young professional to show off his abilities and do good work that once patented will reflect well on his/her resume him/her to become like a Vice President of Research and Development. As a matter of fact Plaintiff took the project because it had that potential.

On the basis of the above "*Dr. Shukh's reputation as an inventor*" elements, Plaintiff has established that he should be granted Article III Standing.

## 2) Plaintiff-Appellant's Article III Standing Was Established in Light of the US Court of Appeals For the Federal Circuit's Discussion Section II on "*Dr. Shukh's Reputation for Seeking Credit for his invention*"

The US Court of Appeals of the Federal Circuit entered the following analysis and ruling which also very relevant to this case:

"...*There is also a genuine dispute of material fact as to whether Dr. Shukh's omission from the disputed patents worsened his reputation as an employee, and whether his reputation would improve if he prevailed in this lawsuit. The record shows that Dr. Shukh had a negative reputation at Seagate, in part*

37

*because he aggressively sought credit for his inventions. In his Fiscal Year 2007 Performance Evaluation, Dr. Shukh's manager wrote: We disagree with the district court's conclusions. First, we find there is a genuine dispute of material fact as to whether Dr. Shukh's negative reputation for seeking credit for his inventions is traceable to Seagate's omission of Dr. Shukh as an inventor from the disputed patents. In deciding that the harm was not traceable, the district... ... However, his disputes with Seagate over his omission from the patents and this subsequent lawsuit have likely significantlyworsened Dr. Shukh's reputation on this front... ... Moreover, the fact that Dr. Shukh did not know of his omission did not mean he was not responding (directly or indirectly) to Seagate's actions in not crediting him as an inventor... ...*

*And Dr. Shukh's omission from the disputed patents occurred before he developed this reputation—five of them were filed before 2005. Certainly, the record suggests that an element of Dr. Shukh's reputation arises from his own combative personality. But there is a genuine dispute of material fact as to whether*

*Dr. Shukh's negative reputation is traceable to Seagate's actions. In deciding to the contrary, the district court improperly made factual inferences in Seagate's favor... There is also a genuine dispute of material fact as to whether finding for Dr. Shukh on his § 256 claim would rehabilitate his reputation for accusing others of stealing his work. If Dr. Shukh prevails in this lawsuit, outsiders may conclude that Dr. Shukh's reputation on this point stemmed from Seagate's failure to properly credit him. His reputation could change from an inventor with a "reputation for accusing others of stealing his work in a manner that disrupts effective collaboration," Summary Judgment Order at \*11 n.13, to that of an inventor wronged by his employer, properly seeking credit for his own work. inferences in Seagate's favor when it found this harm was not redressable."*

The record shows that Dr. Given testified in depositions that they had had differences with Plaintiff over scientific matters [Appendix Vol. I, TAB 5, Docket # 43(2), p. 66, Depositions Transcript pp. 27 (line 18) to p. 28 (line 7)].

*"Q (former Plaintiff's attorney): Let me put it this way, Do you recall any*
*professional disagreements on issues with Kamdem?*
*A (Dr. Peter Given): Well there was one*
*Q: What was that?*
*A: Which was Dt. Kamdem was working in a couple of projects for me not*
*just one and we did have some disagreements into project encapsulating oil with a*
*protein called zein.*
*Q: What was the nature of this disagreement?*
*A: Well I felt that Dr. Kamdem should be – should have been using different*
*ratios of ingredient to achieve successful encapsulation and he disagreed with*
*me. "*

The issue indeed was that they wanted to use formaldehyde as ingredient in

the encapsulation of aroma for inhalation in human beverages, something the

Plaintiff objected while advocating the alternative technology of using the

technology that has now been patented in the "237 patent" at "Addendum C" and

which Plaintiff was actively reducing to practice at the time. Plaintiff-Appellant

advocated that his approach was safe, and commercially viable and therefore

Plaintiff-Appellant was actively recommending his approach instead of Given's

and Zhang's technologies that incorporated formaldehyde in aroma and flavor

mixture. In hindsight, it is Plaintiff's technology that has been patented not the

"Zein" and "formaldehyde" technology that Dr. Given testified about. As a matter

of fact the Material Safety Data Sheet (MSDS) of one of the formaldehyde flavor

capsules that they wanted to use is shown at "Appendix Vol. I, TAB 8, Docket #

43(5), p. 1" and it can be seen at "*Section 7 – Handling and Storage*" that the MSDS stated: "...*Avoid Breathing Vapors*...."

But the most problem relevant to this litigation is that when they finally got word from PepsiCo's patent Attorney that Plaintiff's work was indeed patentable (Appendix Vol. I, TAB 8, Docket #  43(5), P. 43 - 44), instead of properly crediting Plaintiff and recognizing Plaintiff for his accomplishments they decided to expel the Plaintiff from the Company so that they could seize Plaintiff's inventions and credit themselves with the same. As matter of fact Dr. Given made no secret of it and he wrote the following in PepsiCo e-mail:

> "*another hitch – His contract is terminating October 5, and he will be informed this week....more dram. Please do not distribute this info, but may impact our decision on inventorship*" (Appendix Vol. I, TAB 8, Docket # 43(5), P. 36).

The evidence shows and testimonial is available that before the PepsiCo's Patent attorneys came back with a finding that Plaintiff's work was worthy of Patent invention disclosures, Peter Given and others had already spread bad reputation about Plaintiff in the company for holding that his technology was the way to go for the Company. So Plaintiff was credited with bad reputation at PepsiCo because he was actively promoting his inventions as being the way the Company should go, and again in hindsight Plaintiff was right because one of the

40

Plaintiff's inventions is now patented even in the United States as the "237 patent"
(See Addendum C) and has also been patented in other countries members of the
PCT. As a matter shortly after Plaintiff was expelled from PepsiCo's facilities,
Plaintiff wrote a letter to PepsiCo management about his inventorship and claimed
on the technologies that he had developed (that letter is available but has been part
of the Motion record but it can be found in the Public domain of the Record of the
Supreme Court of the State of New York as well).

One key evidence that Plaintiff has to demonstrate that PepsiCo stained the
Plaintiff with bad reputation because of the Plaintiff's inventions is that PepsiCo
has not explained or reconciled the depictions that they wrote the US government
about Plaintiff with the following deposition testimony from Peter Given:

> "Q (A former Plaintiff's attorney): Did she talk to you about Dr. Kamdem?
> Mr. Hunter Objection to the form:
> Q: Did you have a conversation about Dr. Kamdem with her?
> A: Yes, yes, we talked about Dr. Kamdem.
> Q: You remember what she said or he said – she said about him, you know,
> I mean. Obviously it's a transfer, I would assume that she would fill you in about
> the people that are being transferred, did she fill you in about Dr. Kamdem, what
> she might have known about him?
>
> ....
>
> Q (former Plaintiff's attorney): Well whatever, I mean obviously you would
> want to be informed about the person entering your Group, did she inform you
> about Dr. Kamdem.
> A (Peter Given): Yes
> Q: Do you remember what she said?

41

*A: I don't remember any specifics but she gave Dr. Kamdem a good recommendation"*
*Q: Question do you remember her indicating that he had a personality problem?*
*A: No I don't.*
*Q: Do you remember her indicating that he had employment issues of some kind, disagreements on techniques, on things that were occurring under her supervision, did she say anything like?*
*A: No Idon't remember.*
[Appendix Vol. I, TAB 5, Docket # 43(2), P. 65, Dep trans p. 22 Line 5 to p. 23 line 22].

In view of the above deposition testimony, a question arises about when then did the Plaintiff's recommendation go from "*good recommendation*" to the one that PepsiCo depicted to the United States government, and also why did Plaintiff's reputation all of a sudden take such a bad turn all of a sudden within PepsiCo although Plaintiff had already established seven years of "*good recommendation*" in the industry. it becomes clearly that the disagreements that Peter Given felt was mainly related to the inventions Plaintiff had made and was actively trying to position as safe and more viable technology as compared to their "Zein" and "formaldehyde" technologies because until then there was no disagreements, Plaintiff had no issues, Plaintiff had "*good recommendation*" etc....The personality traits that PepsiCo painted concerning Plaintiff came as a result of Plaintiff recommending his inventions as safe and viable for the Company and PepsiCo's consumers.

Furthermore since Plaintiff found the Publications from the USPTO in 2012, Plaintiff had actively sought to be credited with work and the request was declined at the State Court etc... [Appendix Vol. I, TAB 10, Docket # 43(7), pp. 6 -36; Appendix Vol. I, TAB 12, Docket # 43(11), pp. 1 -16].

In view of all the above, there are at least two Shukh elements in this case with respect to *"Dr. Shukh's Reputation for Seeking Credit for his invention"*: Bad reputation for advocating that his inventions was the way for PepsiCo to go, something that they hypocritically viewed negatively; and bad reputation for the Plaintiff having sought credit for his inventions, obviously something some of them thought was unacceptable at PepsiCo that Plaintiff should be recommending his inventions, Aida Costello (PepsiCo Human Resources Director) actually told Plaintiff face to face that it was culturally unfit for Plaintiff to do so.

On the basis of the above and in view of the US Court of Appeals' Discussion and ruling on this aspect of the reputational injury, if this lawsuit was allowed to proceed and the Plaintiff prevailed to obtain correction of inventorship, Plaintiff's reputation could change from that of an employee whose *"....performance was revealing that he did not have a sufficiently strong background and skill in Chemistry and polymer Science to be successful in his*

43

*assigned work on the aroma Burst project...* " *(*Appendix Vol. II, TAB 23, Docket # 77-4, p. 6) "to that of an inventor wronged by his employer, properly seeking credit for his own work".*

Also the Plaintiff's reputation could change from the well-known racial clichés often used by racists against black skin colored people as "...*being overly deliberate, unable to multitask, unable to effectively communicate, unsuited for fast-paced environment, exhibited unprofessional and inappropriate behavior, and failed to follow directions*..." [Appendix Vol. II, TAB 23, Docket # 77(4), p. 14] to that of a black skin colored employee whose inventions were maliciously and criminally taken from him and patented by PepsiCo and its protégés.

On the basis of the above elements of "*concrete and particularized*" of "*Dr. Shukh's Reputation for Seeking Credit for his invention*", Plaintiff has established that he should be granted Article III Standing.

### 3) Plaintiff-Appellant's Article III Standing Was Established in Light of the US Court of Appeals For the Federal Circuit's Discussion Section III on "*Dr. Shukh's Unemployment*"

The Court issued the following analysis and ruling:

"...*Finally, Dr. Shukh presented evidence that his alleged reputational harm had an economic component. Dr. Shukh has been unemployed since 2009, and he seeks a job in the field of technology covered by the disputed patents. A trier of*

44

*fact could infer that the stronger Dr. Shukh's reputation as an inventor, the more likely he is to be hired. This is particularly true in light of his difficult personality. Furthermore, there is evidence tying Dr. Shukh's negative reputation at Seagate— including, one presumes, his reputation for seeking credit for his own inventions— to his unemployment. Summary Judgment Order at\*5 (writing that an engineer at a companyDr. Shukh interviewed with allegedly told Dr. Shukh that he would never get a job there because of his reputation at Seagate). Thus, a trier of fact could conclude that Dr. Shukh's employment prospects have been harmed by the impact of his alleged omission from the disputed patents on his reputation as an inventor and his reputation for seeking credit for his own ideas. Moreover, a trier of fact could infer that Dr. Shukh's employment prospects would improve if the inventorship of the disputed patents was corrected. Dr. Shukh's inability to obtain employment is a concrete and particularized financial harm that suffices to create Article III standing... "*

With Specific respect to unemployment, Plaintiff has provided evidence that following the termination of Plaintiff's contract, Plaintiff was unemployed for 12 months. The record of Plaintiff's Income tax return shows clearly that Plaintiff's Income dropped drastically in 2009 and that occurred as result of him not having any Income from September through December 2009 [Appendix Vol. I, TAB 6, Docket # 43(3), p. 35 – 42]. The 2010 Income Tax return shows also that Plaintiff did not have income for a big chunk of the year until September 2010. The facts are that Plaintiff had been told by PepsiCo Human resources Director that if a hiring manager came forth wanting to hire Plaintiff, PepsiCo would not recommend Plaintiff for work. Obviously one of the questions potential employer asked when a person is unemployed and is applying for a job is what happened at

45

the last job that the contract was not extended. The reasoning of employers is that if a product development scientist has taken a project and has conducted it successfully and resulted in a viable product or a viable technology, then the project is assigned a higher priority in the Company until its completion and in that process the scientist is given work for much longer term. So most employer look at the termination of a contract for a product development scientist as a sign that he did not do well on the project. Furthermore, the Record shows that, PepsiCo indeed planned to find a person to replace Plaintiff, although a lower grade scientist to continue carrying out the experiments Plaintiff had developed during his inventions. Apparently they wanted someone who would simply execute the instructions Plaintiff had developed so that Peter Given and Naijie Zhang could appear as the inventors, although the instructions were all conceptualized developed and implemented in the laboratory by the Plaintiff (Appendix Vol. II, TAB 7, Docket # 43(4) p. 39).

A trier of fact may find that since Plaintiff was the one who conceptualized and developed the technologies that are now patented, and implemented the related experiments in the laboratory, his contract should have been extended until the Plaintiff either finds another employment or at least until he had run all the

46

verification experiments that needed to further support the Patent inventions. As a matter of fact the first patent was not filed until July 7, 2010 (Addendum C), meaning 10 months after Plaintiff was expelled from PepsiCo's facilities. Therefore a trier of fact may find that 10 months of verification experiments and of perfecting of patent drafts were still needed for the patent inventions to be ready for filing, but instead of letting Plaintiff continue the work, PepsiCo chose to have someone else do those experiments that had been conceptualized and implemented by the Plaintiff rather than letting the Plaintiff do it because they wanted to seize inventorship of Plaintiff's work while damaging Plaintiff's reputation. As a matter of fact the evidence shows that PepsiCo itself could have provided Plaintiff with full-time employment or extended the contract if they will to do so even as can be seeing in their own testimony:

*"The reasons that PepsiCo did not offer Complainant other full-time employment and permitted his contract to expire are numerous ....Complainant was thought of as being overly deliberate, unable to multitask, unable to effectively communicate, unsuited for fast-paced environment, exhibited unprofessional and inappropriate behavior, and failed to follow directions...PepsiCo had clear legitimate reasons for not offering a permanent, full-time employment to complainant and not having complainant's contract renewed..."* (Appendix Vol. II, TAB 23, Docket # 77(4), P. 14).

In view of the above testimony that PepsiCo wrote to the United State government, a trier of fact my find that it does not appear like PepsiCo was

47

lacking jobs nor does it seem that PepsiCo was absolutely unable to extend Plaintiff's contract as they planned to get someone else to continue Plaintiff's verification experiments, but it appears very clearly that  they had some other things in mind that they needed to resolve and the only thing that is obvious are the Plaintiff's inventions that they were coveting to claim and own for themselves. There was no reason why Plaintiff could not have been allowed to continue the project that he had built from scratch. Therefore Plaintiff suffered unemployment because PepsiCo sought to remove him from the way of being inventor of his inventions and as a result it caused hardship and economic damages to Plaintiff.

The Plaintiff has on record evidence showing that following PepsiCo's refusal to renew his contract, he did indeed loose income for an extended amount of time [Appendix Vol. I, TAB 6, Docket # 43(3), pp. 35 – 42]. As a matter of fact Plaintiff struggled until September 2010 before he could find another industry role with another employer and in that time PepsiCo was investing its time defaming Plaintiff to the US Government rather than issuing letter of recommendation to acknowledge that Plaintiff had done work that PepsiCo found worthy of five Patent invention disclosures (one of which is now granted both Nationally and internationally as listed below:

48

1) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix." Was published at the World Intellectual property (WIPO) as Pub No. WO/2012/2006328 (Appendix Vol. I, TAB 9, Docket # 43-6, pp. 31 - 35).

2) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix" aka WIPO Pub No. WO/2012/2006328 was granted at the United States National Phase patenting as US 8,474,637 B2 on July 2, 2013, with Peter Given and Naijie Zhang being the named inventors PepsiCo Inc. being the sole Assignee (Addendum C).

3) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix" aka WIPO Pub No. WO/2012/2006328 was granted European Union as Patent number EP2590519, Peter Given and Naijie Zhang being the named inventors and PepsiCo Inc. being the sole Applicant.

4) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix" aka WIPO Pub No. WO/2012/2006328 was granted in Canada National Phase patenting as Canada Patent No. 2804513, with Peter Given and Naijie Zhang being the named inventors and PepsiCo Inc. being the sole Applicant and Owner.

49

5) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix" aka WIPO Pub No. WO/2012/2006328 given National Phase patenting 2013518800 in Japan, with Peter Given and Naijie Zhang being the named inventors and PepsiCo Inc. being the sole Applicant and Owner.

6) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix" aka WIPO Pub No. WO/2012/2006328 given National Phase patenting Number 2013104980 in the Russian Federation, with Peter Given and Naijie Zhang being the named inventors and PepsiCo Inc. being the sole Applicant and Owner.

7) The PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix" aka WIPO Pub No. WO/2012/2006328 given National Phase Number 201180038973.9 in China, with Peter Given and Naijie Zhang being the named inventors and PepsiCo Inc. being the sole Applicant and Owner.

On the basis of the above elements *"concrete and particularized"* *"Dr. Shukh's Unemployment"*, Plaintiff has established that he should be granted Article III Standing to proceed in Court with Section 256 correction of inventorship, and so that he can demonstrate his inventorship along with the

50

reputational damages and related economic consequences to the Plaintiff as a Food Science professional deprived from his reputation as inventor and industry leader in his field for the last seven years. The Plaintiff is also specifically requesting that the proceedings for correction of inventorship should also apply to the WIPO Publication WIPO Pub No. WO/2012/2006328 which is the International Stage for US Patent Number  US 8,474,637 B2 on July 2, 2013 on which Peter Given and Naijie Zhang are the named inventors PepsiCo Inc. being the sole Assignee. The Court should grant this request in view of prior ruling of the US Court of Appeals for the Federal Circuit in *Chou v. University of Chicago 254 F.3d 1347 (Fed. Cir. 2001)*.

## B. Additional *"Concrete and Particularized Reputational Injury"* Specific to Plaintiff-Appellant Resulting from PepsiCo Improper Omission of Plaintiff-Appellant's Name from His Inventions Because of Plaintiff-Appellant's Black Skin Color

In addition to the three major types of Concrete and particularized reputational injury" that the US Court of Appeals for the Federal Circuit determined in Dr. Shukh's case as establishing Article III Standing, there are some additional more concrete particularized reputational injury that Plaintiff-Appellant sustained in this case:

51

1) **Dr. Kamdem's Reputation as a Black Skin Colored Inventor of Technologies Valuable Worldwide Including but not Limited in the United States, Canada, European Union, Japan, China, Russian Federation.**

Plaintiff alleged that he was told that it was *"culturally unfit"* that as a black person he should have scientific views that were contrary to that of his peers of other skin color that PepsiCo considers to be supremacist. A trier of fact may find that crediting Dr. Kamdem with his invention will restored his dignity as a black skin color Scientist capable of creating inventions in his field that are valuable worldwide. Plaintiff was indeed employed in the same filed for which he obtained a Master Degree, then a PhD Degree, and went on to be employed in the Food/Beverage Industry for seven years prior to PepsiCo. The character stereotypes and code words PepsiCo Defendants to describe Plaintiff are well-established racists' code words for describing the "Niggas": ".....*unable to multitask, unable to effectively communicate, unsuited for fast-paced environment, exhibited unprofessional* and *inappropriate behavior,* and *failed to follow directions*..." [Appendix Vol. II, TAB 23, Docket # 77(4), p. 14]...."

Plaintiff has an MS and a PhD in Food Scientist was working a Project for which Food Scientist was needed (Appendix Vol. I, TAB 5, Docket # 43(2) p. 47), job Title was Food Scientist (Appendix Vol. I, TAB 6, Docket #

52

43(3), p. 33) and his inventions applied to Food and Beverages as can be seen in the patent inventions disclosures (Appendix Vol. I, TAB 9, Docket # 43(6), pp. 31-35; Appendix Vol. I, TAB 10, Docket # 43(7) pp. 45 – 50). Prior to taking the Project at PepsiCo, Plaintiff had worked for two major flavor companies and has perfected his skills in the science of food flavors and aromas and their applications in food products and on such basis PepsiCo chose the Plaintiff for the project. Neither Peter Given nor Naijie Zhang have expertise in Food Science and therefore have been unjustly enriched with credit for inventions that they could not have invented without the Plaintiff and they are positioned to reap the professional benefits in Place of Plaintiff. As a matter of fact they have been recognized in several media outlets already for the inventions that people look at as groundbreaking (Appendix Vol. I, TAB 9, Docket # 43(6), pp. 16 – 30).

Politicians talk about systemic racism in the country and the way it works is clearly seen in cases like this. One of the reason why PepsiCo could expunge the name of an inventor to credit the same to others and then defame the inventor as:"....*Complainant was thought of as being overly deliberate, unable to multitask, unable to effectively communicate, unsuited for fast-paced environment, exhibited unprofessional and inappropriate behavior, and failed to follow directions...PepsiCo had clear legitimate reasons for not*

53

*offering a permanent, full-time employment to complainant and not having complainant's contract renewed...*" is because such descriptors are very well engrained as being more likely for a black skin colored, and less likely associated with an asian looking person like Najie Zhang or a caucasian looking person like Peter Given. Talk about "*unable to effectively communicate*"? Naijie Zhang's English and sentence construction is horrible but yet, even though horrible PepsiCo finds it to still be supremacist than that of the Plaintiff-Appellant who is very fluent in English both spoken and written. Needless to say that descriptors like "...*unable to multitask, unable to effectively communicate, unsuited for fast-paced environment, exhibited unprofessional and inappropriate behavior, and failed to follow directions...*" are typical code words used to describe the "*nigga*" behind closed doors. It is no secret to anybody that there are companies who actually don't even hide that they would rather not hire a black skin colored person because of the kind of stereotype descriptors above that are common belief in some place.

## 2) Dr. Kamdem's Public and Mass Media Reputation Stolen by Defendants Dr. Peter Given and Dr. Naijie Zhang.

Appendix Vol. I, TAB 9, Docket # 43(6), pp. 17 – 30 shows public media coverage that was given to PepsiCo, Dr. Given and Dr. Zhang as soon as

54

the "237" patent was granted in the United States. The record shows that at least six internet websites were actively talking positively about the patent. This reputation should have been that of the Plaintiff-Appellant, but it was criminally taken by PepsiCo Defendants.

### 3) Dr. Kamdem's Public Reputation on Sexual Intercourse Morality at Work Place or in the Community

"Appendix Vol. I, TAB 5, Docket # 43(2), p. 46" shows that there was a "Yes" answer to "Background Check" on PepsiCo's internal record, which indeed Subex Technologies had conducted criminal background, academic and professional checks on the Plaintiff and record are available. The criminal background check did not return any criminal record for Plaintiff-Appellant, and as for professional background every background information on my resume was confirmed. Nevertheless the Plaintiff alleged that PepsiCo circulated rumors and communicated to the US Government that Plaintiff was going to work just for the opportunity of sexual intercourse with woman. As a matter of fact PepsiCo Defendants produced a document that they wrote to the United Sates government in which they described a scene directly to suggesting that Plaintiff was tried to rape women in their Offices at PepsiCo, and they even named female figures such as *"Ms. Granata"*, *"Aida Costello"* "Appendix Vol. II, TAB 23, Docket # 77(4),

p. 5". Such stories were completely false. Furthermore the Defendants used race as ground for believing that Plaintiff is not to be named on his inventions and they also falsely accused Plaintiff of being a person who goes to work just for opportunity of sexual intercourse (Appendix Vol. II, TAB 29, Docket # # 95, p. 5). PepsiCo itself wrote about some clichés that are well-known stereotypes that people who are racists against black skin colored people typically used in expressing their hatred of the people of the black skin color as can be seen below:

> "*The reasons that PepsiCo did not offer Complainant other full-time employment and permitted his contract to expire are numerous….Complainant was thought of as being overly deliberate, <u>unable to multitask</u>, <u>unable to effectively communicate</u>, <u>unsuited for fast-paced environment</u>, <u>exhibited unprofessional and inappropriate behavior</u>, and failed to follow directions…PepsiCo had clear legitimate reasons for not offering a permanent, full-time employment to complainant and not having complainant's contract renewed…*" (Appendix Vol. II, TAB 23, Docket # 77(4), P. 14).

## C. Plaintiff-Appellant Has Also Established Article III Standing for Correction of Inventorship on WIPO Patent Publications"

*In Chou v. University of Chicago 254 F.3d 1347 (Fed. Cir. 2001)* the

Federal Circuit held that:

> "*Chou claims entitlement to be named as an inventor on the foreign patent applications as well. Since inventorship on such applications normally follows the inventorship designation in the originating country, the district court, if it concludes on remand that Chou is properly an inventor of the disputed subject matter, can instruct the University to take appropriate action to change the inventorship designation on the foreign patent applications. See, e.g., PCT Receiving Office Guidelines, PCT Gazette Ch. XVI, ¶¶ 309-311 (World*

*Intellectual Property Organization Aug. 28, 1998) (setting forth the procedures for recording a change in the applicant or inventor of PCT applications)."*

Although the United States District Court discounted some of the some of the Unites States Patent Applications as having been abandoned by the PepsiCo Defendants in the United States, the equivalent WIPO Publications are final. Furthermore, those publications had given rise to foreign Patents in the Europe and other countries, so for the least to speak the WIPO publications of the patent Applications that defendants chose to abandon in at the United States National Stage were for the least to speak important scientific publications of which the Federal Circuit has a ruling that:

*"Today, we hold that concrete and particularized reputational injury can give rise to Article III standing. As we noted in Chou, "being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper." 254 F.3d at 1359"*

The WIPO Publications are legislated under 35 U.S.C. PART IV, and the WIPO Rule for correction of inventorship no longer require that the National Patent Office of the originating country must first grant a patent before the International Stage.

57

The "PCT Receiving Office Guidelines Ch. XVI ¶¶309-311 held by the

US Court of Appeals in *Chou v. University of Chicago 254 F.3d 1347 (Fed.*

*Cir. 2001)* states the fowling:

PCT Receiving Office Guidelines Ch. XVI ¶309 states:

"*309. The receiving Office may receive from the applicant a request for the*
*recording of a change in the person, name, residence, nationality or address of*
*the applicant (Rule 92bis.1(a)(i)) or a change in the person, name or address of*
*the inventor, the agent or the common representative (Rule 92bis.1(a)(ii)). The*
*International Bureau records those changes upon request of the applicant or the*
*receiving Office. The filing of a power of attorney appointing an agent or common*
*representative who is not yet recorded, ... "*

On the basis of the Provisions of the PCT Receiving Office

Guidelines Ch. XVI ¶309, it appears very clear that correction of inventorship on

PCT Publications no longer need any involvement of the USPTO nor does it

require that the National Stage patenting in the United States alone must be

completed, but it requires a mere request from the "*applicant of record*". And

since the Defendants have not been willing to do so of their own will as requested

by the Plaintiff, so as to name Plaintiff as the sole inventor of the PCT

Publications in dispute in this lawsuit, the Plaintiff is seeking to compel the same

by an Order of the Federal Court that the Defendants must comply with the "PCT

Receiving Office Guidelines, PCT Gazette Ch. XVI ¶309" to request change in the

name of the Inventor and of the Applicant. Regardless of whether the United

States has issued a National Stage Patent or not, the Plaintiff has to first obtain correction of Inventorship at the International Bureau.

The United States District Court may therefore issue a Judgment on the Plaintiff's rights to request change be recorded in the *"person of the applicant"* by the PCT Office on the Patent Publications pursuant to PCT Receiving Office Guidelines Ch. XVI ¶311.

> *"311. Where a person ("new applicant"), who is not the applicant of record, requests that a change be recorded in the person of the applicant, of the agent or common representative, <u>documentary evidence must be submitted regarding the right of that new applicant to the application or the right to request such a change on behalf of the applicant of record. Where such evidence has not been furnished, the receiving Office invites that person to furnish the required evidence before it proceeds with the request to record the change.</u> If the new applicant is to be represented by the same agent who represented the former applicant, a new power of attorney must be submitted signed by the new applicant. If the new applicant is to be represented by a new agent, a power of attorney must also be submitted. In both cases, if correspondence signed by the former or new agent is received but no power of attorney has been received, the receiving Office invites the new applicant to submit a power of attorney…"*

Furthermore 28 U.S.C. §1338(a) states that:

> *"The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights. For purposes of this subsection, the term "State" includes any State of the United States…"*

This matter is relating to Patents because patenting by Unites States Nationals or Residents through the PCT is legislated by an Act of Congress under the US Patent laws: 35 U.S.C. PART IV – PCT.

On the basis of the above elements *"concrete and particularized reputational injury"* that Plaintiff has already demonstrated in comparison to the US Court of Appeals rulings in Dr. Shukh's case, Plaintiff has established that he should be granted Article III Standing. The Plaintiff is also specifically requesting that the proceedings for correction of inventorship should also apply to the WIPO Publications WIPO Pub No. WO/2012/2006328 which is the International Stage for US Patent Number US 8,474,637 B2 on July 2, 2013 on which Peter Given and Naijie Zhang are the named inventors PepsiCo Inc. being the sole Assigne, and also to the other WIPO Publications at Addenda D(2), D(3), D(4), and D(5). The Court should grant this request in view of prior ruling of the US Court of Appeals for the Federal Circuit in *Chou v. University of Chicago 254 F.3d 1347 (Fed. Cir. 2001)*.

60

**IV.     The US District Court Erred and Created a Conflict with the NY Supreme Court in holding that Plaintiff should have brought forth Certain causes of Actions at the State Court when The State Court Itself Declined Jurisdiction On Ground Plaintiff's Intellectual Property Matter Was not Relevant to the Whistle Blower Action Brought Against PepsiCo Inc. In September 2010.**

Appendix Vol. II, TAB 27, Docket # 93, pp. 4-9, shows an

Affirmation of Richard M. Hunter, PepsiCo's attorney in the Appellate Division's

matter Kamdem-Ouaffo v PepsiCo Docket # 2013-08712 during the Appeals of

the NY Supreme Court Decision in matter Index # 22625/10. Mr. Hunter wrote:

*"18 - Appellant assertion's of patent rights is completely irrelevant. Such allegations were not in his complaint, and Justice Scheinkman, for obvious reasons properly denied his former attroney's request to amend the Complaint to assert the same.*
*19 – Appellant indeed has filed an action concerning his alleged intellectual property in the United States District Court, Southern District of New York, Docket #14 cv 0227 "* (Appendix Vol. II, TAB 27, Docket # 93, p. 8, ¶¶18-19).

In view of the fact the PepsiCo defendants attorneys testified that

Plaintiff had sought to amend his State Complaint to add a patent claim but was

properly denied for obvious reasons, the USDC cannot now say that the Plaintiff

should have filed additional patented related damage claims such as "Unjust

Enrichment" at the State Court. As a matter of fact the obvious reason was that the

State Court did not have original jurisdiction over patent matters, nor was the

resolution of a patent question necessary to resolve the toxic substances whistle

blower lawsuit at the State Court. Therefore the USDC Court erred in ruling that

Plaintiff should have filed additional claims at the State Court.

 The US Court of Appeals for the Federal Circuit held the following in

*HIF Bio, Inc. V. Yung Shin Pharmaceutical, 600 F.3d 1347 (Fed. Cir. 2010)*:

 *"While the district court has discretion not to exercise supplemental jurisdiction over state law claims, it has no discretion to remand claims arising under federal law. See Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1328 (Fed. Cir. 1998) overruled in part on separate grounds in Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356 (Fed. Cir. 1999); Gaming Corp. of Am. v. Dorsey Whitney, 88 F.3d 536, 542 (8th Cir. 1996) ("A district court has no discretion to remand a claim that states a federal question."); Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 787 (3d Cir. 1995) (same); Brockman v. Merabank, 40 F.3d 1013, 1017 (9th Cir. 1994) (same)".*

 In view of the above Opinion of the US Court of Appeals, the United

States District Court has no discretion as to any Plaintiff's claim that alleges a

Federal Patent Question. The US Court of Appeals also held the following in *HIF*

*Bio, Inc. V. Yung Shin Pharmaceutical, 600 F.3d 1347 (Fed. Cir. 2010)*:

 *"...An independent inventorship standard under state law would likely have different requirements and give rise to different remedies than federal patent law. A different state inventorship standard might grant property rights to an individual who would not qualify as an inventor under federal patent law, or might grant greater relief to inventors than is afforded by federal patent law. Either situation might frustrate the dual federal objectives of rewarding inventors and supplying uniform national patent law standards. Id.; see also Bd. of Regents, Univ. of Tex. Sys. v. Nippon Tel. Tel., 414 F.3d 1358, 1363 (Fed. Cir. 2005) ("[T]his court has held that issues of inventorship, infringement, validity and enforceability present sufficiently substantial questions of federal patent law to support jurisdiction under section 1338(a)."*

Therefore it is not possible for this USDC to dismiss my Complaint because I am seeking correction of inventorship, and inventorship is by law a substantial Federal Patent Question. Furthermore the US Court of Appeals held in *HIF Bio, Inc. V. Yung Shin Pharmaceutical, 600 F.3d 1347 (Fed. Cir. 2010) that:*

> "...*Because <u>inventorship is a unique question of patent law</u>, the cause of action arises under § 1338(a). See Christianson, 486 U.S. at 809, 108 S.Ct. 2166 (holding that § 1338(a) jurisdiction extends to a cause of action in which "patent law is a necessary element"); Bd. of Regents, Univ. of Tex. Sys., 414 F.3d at 1363. The district court's contrary finding is erroneous...*"

In view of the fact jurisdiction extends to a cause of Action in which "patent law is a necessary element, it logically follows that the Federal Jurisdiction of my inventorship claim must be extended to my State law Claims that have been properly framed with respect to my patentable Intellectual property, meaning almost the entire Amended Complaint.

## V.    The US District Court Erred in Not Giving Any Consideration to the Plaintiff-Appellant's Proposed Second Amended Complaint With More Definite Statements in Answer To ScentSational Technologies LLC and Steven M. Landau's Motion for A More definite Statement.

ScentSational LLC and Steven M. Landau Defendants were properly named in Plaintiff-Appellant's lawsuit because they have actually come forth with their own lawsuit claiming the same patents that Plaintiff has being complaining a about since 2012. They filed their lawsuit only on 12/05/2013 (Appendix Vol. II,

63

TAB 21, pp. 1-46). But the record shows that since 2012 Plaintiff has being claiming his inventorship on the PCT patent series # US2011/043042 Titled "Releasable Entrapment of Aroma Using Polymeric Matrix aka WIPO Pub No. WO/2012/2006328 now granted at the United States National Phase patenting as US 8,474,637 B2 on July 2, 2013. In their lawsuit ScentSational Technologies ¡LLC and Landau claimed that they had confidential Research and Development relationship with PepsiCo for almost a decade (Appendix Vol. II, TAB # 21, pp. 54 – 66) and that they had provided information to PepsiCo on the same subject matter. But it is undisputed that Plaintiff was an independent contractor and was never informed or even aware of a Company named ScentSational Technologies LLC and/or Steven Landau. ScentSational Defendants filed a motion to dismiss or in the alternative for a more definite Statement. In response Plaintiff prepared and proposed to the District Court a second Amended Complaint with more definite statement (Appendix Vol. II, TAB 26, Docket # 81,). But the District Court did not allow that Second Amended Complaint with more definite Statement to proceed because it had ruled that Plaintiff had no Standing to sue PepsiCo supposedly because of the Obligation to assign. But in view of the fact that Plaintiff has established Dr. Shukh's type reputation, the District Court was in error in dismissing PepsiCo Defendants and was also in error in Dismissing ScentSational

Technologies Defendants. ScentSational Defendants had claimed the same Patent that Plaintiff claimed and their Confidentiality agreements with PepsiCo was very clear on the fact that the parties were not restricted with regard to conduct their own independent research in the same field. The US District Court had also granted Plaintiff to formulate claims against ScentSational Defendants in its first Opinion to dismiss Plaintiff's First Amended Complaint (Appendix Vol. I, TAB 13, Docket # 50, pp. 4-9), so Plaintiff-Appellant properly sued them.

## VI.    The Designation of Subex Technologies Inc. as a Co-Defendant in This Lawsuit Might Necessitate Some Discovery

Whether Subex Technologies Inc. is joined as co-Plaintiff or as co-defendant, it would not change the fact that PepsiCo fully shared in, facilitated, aided, helped, and/or supported a multi-facetted criminality of the "Agency" and of "Employment Agency Fees" under the laws of the State of New York. The Agreements that it signed to benefit PepsiCo must be voided by the Court pursuant to NY GBS Article 11 §185(10 for "Agency Fees" and pursuant to NY GBS Article 11 §190 for "Employment Agency Criminality".

65

## CONCLUSION AND STATEMENTS OF RELIEF SOUGHT

As result of PepsiCo's willful and improper omission of Plaintiff-Appellant's name from his inventions, the Plaintiff-Appellant sustained *"concrete and particularized reputational injury"* of the same types as the ones that the United States Court of Appeals for the Federal Circuit already determined in Dr. Shukh's case to be genuine disputed material fact in a reputational injury based Article III Standing. In addition to Dr. Shukh's type reputational injury, Plaintiff-Appellant also sustained additional humiliating and degrading *"concrete and particularized reputational injury"* with respect to PepsiCo defendants' skin color and sexual morality based wrongful stereotyping of Plaintiff-Appellant.

The record of the case as is now before the US Court of Appeals also established very unambiguously that the Employment Agreements that PepsiCo relied on to assert itself as Assignee and Owner of Plaintiff's inventions were executed by a New Jersey Employment Agency and that the Contract work itself was totally carried out in the State of New York. Furthermore the "Gross Fees" paid by PepsiCo to the New Jersey Employment Agency criminally exceeded the percentages allowed in the State of New York and that the "Gross Fees" paid by PepsiCo to Subex Technologies criminally exceeded Statutory limits. Since this

Action put in review those Employment Agency Agreements tainted with a multi-facetted criminality of the "Agency" and of the "Gross Fees", the laws of the State of New York require that such Employment Agency Agreements must be voided by the Court.

On the basis of all the above, Plaintiff-Appellant asks that the United States Court of Appeals for the Federal Circuit to take the following actions:

1) Void the Subex Technologies Inc.'s "*Employment Agreements*" that PepsiCo relied on to assert itself as the Assignee and owner of Plaintiff-Appellant's inventions.

2) To Grant that the Plaintiff-Appellant's case must proceed on ground of Dr. Shukh's type "*concrete and particularized reputational injury reputational injury*" and also on the basis of skin color and sexual "*concrete and particularized reputational injury reputational injury*" inflicted upon Plaintiff-Appellant by PepsiCo defendants.

3) Grant the Plaintiff to file his "*Second Amended Complaint With More Definitite Statements*" or alternatively to file a Third Amended Complaint incorporating, if necessary, the ruling and decisions of the United States Court of Appeals for the Federal Circuit.

4)    Issue an Order that Defendant-Appellees must reimburse Plaintiff-

Appellant all Court fees, expenses, and costs associated with this Appeal.

Respectfully Submitted

**Dated:** April 24, 2016.

Ricky Kamdem-Ouaffo, PhD
Plaintiff-Appellant *Pro Se*
1 Richmond Street # 2100
E-mail: rickykamer@gmail.com
Tel: 1 732 763 8622

ADDENDUM
CONTENTS

## TABLE OF CONTENTS OF THE ADDENDUM

**A. Opinion of the United States District Court, Dated 01/26/2016**

**B. Final Judgment of the United States District Court, Dated 02/10/2016**

**C. United States Patents**

- US Patent No. 8,474,637 B2: "Releasable Entrapment of Aroma Using Polymeric Matrix."

**D. The Patent Cooperation Treaty (PCT) Patent Applications And Their Corresponding World Intellectual Property (WIPO) Patent Publications (Appendix Vol. II, TAB 14, UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

1) PCT Application No. PCT/US2011/043042; WIPO Pub No. WO/2012/2006328: "Releasable Entrapment of Aroma Using Polymeric Matrix".

2) PCT Application No. PCT/US2012/049503; WIPO Pub No. WO/2013/032631: "Releasably Encapsulated Aroma"

3) PCT Application No. PCT/US12/59992; WIPO Publication No. WO 2013/056075. "Complex Coacervates and Aqueous Dispersions of Complex Coacervates and Methods of Making Same."

4) PCT Application No. PCT/US12/43220; WIPO Publication No. WO 2013/006269. "Coacervates Complex, Methods And Food products."

5) PCT Application No. PCT/US12/4327; WIPO Publication No. WO 2013/006268: "Coacervates Complex, Methods And Food products."

ADDENDUM A

**ADDENDUM A**

**Opinion of the United States District Court On Plaintiff-Appellant's Second Amended Complaint. By Honorable Kenneth M. Karas. Issued 01/26/2016. (Appendix Vol. II, TAB 29, UDSC Docket # 95)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICKY KAMDEM-OUAFFO,

                              Plaintiff,

      v.

PEPSICO, INC. and ITS AFFILIATES, DR.
PETER S. GIVEN, JR., DR. NAIJIE
ZHANG, SCENTSATIONAL
TECHNOLOGIES LLC, STEVEN M.
LANDAU, JOHN DOE, and/or JANE DOE,

                              Defendants.

Case No. 14-CV-227 (KMK)

OPINION & ORDER

Appearances:

Ricky Kamdem-Ouaffo, PhD
New Brunswick, NJ
*Pro se Plaintiff*

Robert L. Maier, Esq.
Jennifer C. Tempesta, Esq.
Richard B. Harper, Esq.
Baker Botts LLP
New York, NY
*Counsel for Defendants Pepsico, Inc., Dr. Peter S. Given, Jr., and Dr. Naije Zhang*

Melvin C. Garner, Esq.
Cameron S. Reuber, Esq.
Lauren B. Sabol, Esq.
Leason Ellis LLP
White Plains, NY
*Counsel for Defendants ScentSational Technologies LLC and Steven M. Landau*

Joel B. Rothman, Esq.
Seiden, Alder & Matthewman, P.A.
Boca Raton, FL
*Counsel for Defendant ScentSational Technologies LLC*

KENNETH M. KARAS, District Judge:

Pro se Plaintiff Ricky Kamdem-Ouaffo ("Plaintiff") bring this Second Amended Complaint ("SAC") against Pepsico, Inc. ("PepsiCo"), Dr. Peter S. Given, Jr. ("Dr. Given"), Dr. Naijie Zhang ("Dr. Zhang"), ScentSational Technologies LLC ("ScentSational"), and Steven M. Landau ("Landau") (collectively, "Defendants"), asserting unenforceable contract, unjust enrichment, constructive trust, correction of inventorship, and defamation. (Dkt. No. 52). Before the Court are two Motions to Dismiss Plaintiff's Second Amended Complaint (collectively, "Motions"), one on behalf of ScentSational and Landau ("ScentSational Defendants") and one on behalf of PepsiCo, Dr. Given, and Dr. Zhang ("PepsiCo Defendants"). (Dkt. Nos. 72, 75.)  For the following reasons, Defendants' Motions are granted, and Plaintiff's Second Amended Complaint is dismissed with prejudice.

<div align="center">I.  Background</div>

A.  Factual Background

The factual allegations that follow are derived from Plaintiff's Second Amended Complaint, which the Court assumes to be true for the purpose of deciding the instant Motions.

Plaintiff, a resident of New Brunswick, New Jersey, "has many years of experience in the research and development, manufacturing, analysis[,] and application of flavors and aromas." (Pl.'s Second Am. Compl. ("SAC") ¶ 3 (Dkt. No. 52).) From July 14, 2008 to September 28, 2009, Plaintiff worked under contract as a "Food Scientist at . . . PepsiCo's Research and Development facility in Valhalla, New York." (*Id.* ¶ 22.)  In that capacity, Plaintiff was tasked with "provid[ing] leadership and strategy for developing [and] evaluating commercially viable Aroma Technology Delivery System[s] applicable to PepsiCo's commercial items." (*Id.* ¶ 27.)

<div align="center">2</div>

Prior to beginning his work at PepsiCo, Plaintiff signed a "Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property" ("Agreement") with PepsiCo through Subex Technologies, Inc. ("Subex") "as the [s]taffing [a]gency." (*Id.* ¶ 23 (internal quotation marks omitted).) Plaintiff signed the Agreement on July 9, 2008, at which time Subex managers explained that, pursuant to the Agreement, "Plaintiff in principle consented to assigning his future intellectual property to PepsiCo for commercial use in exchange [for] payment to be made to . . . Plaintiff in the future." (*Id.* ¶¶ 23–24.) Plaintiff alleges there was also "[a] common understanding" that should intellectual property created by Plaintiff during the period of his contract "be found patentable," PepsiCo would "credit" Plaintiff as the inventor. (*Id.* ¶ 25.)

During the period of his employment as a "Food Scientist[,]. . . Plaintiff pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques . . . that none of [PepsiCo's] employees [had] been able to do prior to . . . Plaintiff's work." (*Id.* ¶ 29.) Plaintiff received $82,142 in compensation for his work, or $56,384 in take-home pay, which amounted to only a percentage of the $133,007.50 Plaintiff alleges he is owed under an unsigned purchase order. (*Id.* ¶¶ 52–53, 186–87.)[1]

At some point prior to or on September 16, 2009, PepsiCo Defendants, at the direction of PepsiCo senior managers, "expunged . . . Plaintiff's name from" intellectual property Plaintiff created during his employment. (*Id.* ¶¶ 32, 34.) In subsequent patent applications, PepsiCo credited these inventions to Dr. Given and Dr. Zhang, though allegedly neither "contribute[d] to

---

[1] Plaintiff alleges that he received only 42.39% of the amount he alleges he is owed under an unsigned purchase order ("Purchase Order"), but by the Court's calculation, Plaintiff received 61.76%, as Plaintiff does not allege that the Purchase Order indicated that Plaintiff was to receive $133,007.50 *after* taxes. (SAC ¶ 53.) Nonetheless, Plaintiff alleges that he is the owner of the remaining percentage of his intellectual property. (*Id.*)

3

the creation and/or inventions of" that intellectual property. (*Id.* ¶ 32.) Specifically, Plaintiff

alleges that Dr. Given provided "no intellectual input or supervision" when "Plaintiff created and

conceptualized his inventions and reduced them to practice," and "Dr. Zhang was not even an

employee of PepsiCo" during that time period. (*Id.* ¶ 33.)

Plaintiff further alleges that the removal of his name from the intellectual property was

part of a coordinated attempt by PepsiCo to distance itself from Plaintiff. On the same day that

PepsiCo managers removed Plaintiff's name certain intellectual property, Dr. Given allegedly

sent an email to his colleagues that said: "'Another hitch – [Plaintiff's] contract is terminating

Oct[ober] 5, and he'll be informed this week . . . more drama! Please do not distribute this info,

but [it] may impact our decision on inventorship.'" (*Id.* ¶ 8 (italics omitted).)[2]  Dr. Zhang

allegedly sent a similar email, stating that "'[Plaintiff] is not [the] inventor. He is just involved

in the project . . . .'" (*Id.* ¶ 9 (third alteration in original) (italics omitted).)  Plaintiff contends

that around this time an unnamed PepsiCo employee secretly entered a notation in Plaintiff's

personnel file reading "Dept. not satisfied," which erroneously suggested Plaintiff's work had

been unsatisfactory. (*Id.* ¶ 38 (italics omitted).)

On or around September 23, 2009, five days before the expiration of Plaintiff's contract,

PepsiCo Human Resources Manager Aida Costello allegedly told Plaintiff that he was

"'culturally unfit'" for employment, "being a black male [with] an opinion on scientific matters

that was contrary to that of his peers of [another] skin color," and that he "needed to be

'coached.'" (*Id.* ¶ 64–66 (alteration omitted).)  Plaintiff likewise alleges that PepsiCo's decision

not to credit Plaintiff for his claimed inventions stemmed from "raw racism . . . directed against

---

[2] As outlined below, Plaintiff's contract was scheduled to terminate on September 28, 2009, not on October 5, 2009. (*See* SAC ¶¶ 35–36.)

people," like Plaintiff, "who are of the genetics . . . and appearance that [D]efendants don't like." (*Id.* ¶ 71.)

On September 28, 2009, Plaintiff's work assignment contract expired and was not renewed. (*Id.* ¶¶ 35–36.)[3] At that time, Plaintiff sent a letter to PepsiCo in which he made an "authorship claim on any current or future work resulting in . . . flavor encapsulates or . . . aroma delivery systems because [he] single-handedly demonstrated the need for such when no one at PepsiCo had [them] in mind . . . ." (*Id.* ¶ 62 (first and second alterations in original) (emphasis and internal quotation marks omitted).) A few months later, on December 18, 2009, PepsiCo Defendants allegedly wrote in a letter to the United States government that "Plaintiff was not able to do work, and was not creative . . . by comparison to his counter parts [sic] of . . . other skin color[s]." (*Id.* ¶ 67.) According to the SAC, PepsiCo also represented that Plaintiff went "to work at [its] facilities just for the pretense and opportunity of predatory sexual intercourse with women of . . . other [races]." (*Id.* ¶ 253; *see also id.* ¶¶ 68, 274, 311.)

Thereafter, PepsiCo filed for five patents with the United States Patent and Trademark Office ("USPTO") based on the intellectual property at issue, one of which, a patent application for "Releasable Entrapment of Aroma Using Polymeric Matrix," was granted on July 2, 2013 (US Patent No. 8,474,637 B2). (*See id.* ¶¶ 41, 47, 60.)[4] In connection with the patent

---

[3] Plaintiff alleges that his contract was allowed to expire "because in doing so the termination would then work synergistically with [PepsiCo's] evil desires to seize control of . . . Plaintiff's [intellectual property]." (SAC ¶ 118.) However, as outlined above, Plaintiff simultaneously suggests that there may have been a race-based motive behind the contract's expiration without renewal or offer of a permanent position.

[4] The other patent applications are as follows: one for "Releasably Encapsulated Aroma" (US Patent App. No. US 13/56,551 A1), one for "Complex Coacervates and Aqueous Dispersion of Complex Coacervates and Methods of [M]aking Same" (US Patent App. No. 13/272,270), and two for "Coacervates Complex, Methods [a]nd Food [P]roducts" (US Patent App. Nos. 13/175,508 and 13/175,451). (SAC ¶¶ 48, 60.)

5

applications, Dr. Given and Dr. Zhang allegedly each signed or cosigned "Inventor's Oath[s] or Declaration[s]," including a "Joint Inventor's Declaration," for the granted patent. (*Id.* ¶¶ 44–48.) Dr. Given and Dr. Zhang also allegedly executed and filed an assignment of the relevant intellectual property to PepsiCo. (*Id.* ¶¶ 49–50.)

On October 11, 2012, Plaintiff submitted a request to PepsiCo, asking that it amend the relevant "patent applications and patents thereof from which [it] . . . removed . . . Plaintiff's name" to credit him as the inventor. (*Id.* ¶ 55; *see also id.* ¶ 56.) PepsiCo did not reply to this request, nor did it "make the amendment and correction of inventorship requested." (*Id.* ¶ 59.) Nonetheless, Plaintiff alleges that he is the "true inventor" of both the patented property and the property described in the four pending patent applications. (*Id.* ¶ 93; *see also id.* ¶¶ 60, 107–08.)

B. Procedural History

Plaintiff commenced the instant Action on January 31, 2014 against PepsiCo, Dr. Given, and Dr. Zhang, alleging six causes of action arising out of his temporary work assignment for PepsiCo. (Dkt. No. 1.) On March 14, 2014, the same day that PepsiCo Defendants first requested a pre-motion conference, (Dkt. No. 8), Plaintiff filed his First Amended Complaint ("FAC"), alleging thirteen causes of action, specifically "breach of intellectual property agreement," "wrongful appropriation of plaintiff's intellectual property," "fraudulent obtaining of signature," "correction of inventorship," "unjust enrichment," "the necessity of constructive trusts," a "request for subpoenas," three causes of action relating to alleged false statements made to the USPTO, and three causes of action relating to other alleged criminal conduct. (Dkt. No. 9.) Pursuant to a scheduling order set at the pre-motion conference held on May 15, 2014, (Dkt. No. 31), PepsiCo Defendants filed their Motion To Dismiss and Memorandum of Law on June 6, 2014, (Dkt. Nos. 34–35) as well as an associated Declaration on June 9, 2014, (Dkt. No.

6

37).  On July 9, 2014, Plaintiff submitted a "Notice of Counterclaim . . . in Support of the Denial

of the Defendants' Motion to Dismiss," in addition to an Affidavit and Memorandum of Law in

support of that submission.  (Dkt. Nos. 41–43.)  Along with these papers, Plaintiff submitted a

"Proposed Amended Complaint" that added ScentSational and Landau as Defendants while

alleging virtually identical conduct as that laid out in his First Amended Complaint ("Revised

FAC").  (Pl.'s Mem. of Law in Supp. of Pl.'s Countercl. and in Supp. of Denial of Defs.' Mot.

To Dismiss Ex. 1 (Dkt. No. 43).)[5]  PepsiCo Defendants filed their Reply on August 8, 2014.

(Dkt. No. 46.)

      Without accepting the Revised FAC for filing but nonetheless considering its allegations,

the Court dismissed Plaintiff's FAC without prejudice on March 9, 2015.  (Dkt. No. 50.)[6]  In that

Opinion & Order, this Court granted Plaintiff leave to file a Second Amended Complaint "that

specifically addresses the deficiencies identified" as well as to "renew his request to join

[ScentSational] and [Landau] and file claims against them." *Kamdem-Ouaffo v. Pepsico, Inc.*,

No. 14-CV-227, 2015 WL 1011816, at *18 (S.D.N.Y. Mar. 9, 2015).

---

    [5] Plaintiff had previously filed a letter requesting permission to join ScentSational and
Landau as co-defendants in this Action, (*see* Letter from Plaintiff to Court (March 24, 2014)
(Dkt. No. 18)), after, according to PepsiCo Defendants, he "discover[ed] an unrelated action
involving . . . PepsiCo currently pending in this Court," (PepsiCo Defs.' Mem. of Law in Supp.
of Motion To Dismiss Pl.'s Second Am. Compl. ("PepsiCo Defs.' Mem.") 4 (Dkt. No. 76).)

    [6] Because PepsiCo Defendants reviewed and responded to Plaintiff's Revised FAC in
their Reply, (Dkt. No. 46), the Court chose to consider the claims contained therein, together
with those contained in the FAC, *see Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5
(S.D.N.Y. June 13, 2013) (considering "factual allegations made by [the] pro se [p]laintiff in [the
plaintiff's] opposition papers" because they were "consistent with those in the initial complaint
and amended complaints" (italics omitted)); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 448
(S.D.N.Y. 2012) ("[B]ecause a pro se plaintiff's allegations must be construed liberally[,] it is
appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition
memorandum, as long as the allegations are consistent with the complaint." (italics omitted)).

On March 25, 2015, Plaintiff filed his SAC, alleging five causes of action arising out of

his temporary work assignment at PepsiCo and joining ScentSational and Landau as additional

Defendants. (Dkt. No. 52.) Pursuant to a briefing schedule set by the Court on May 11, 2015,

(Dkt. No. 71), ScentSational Defendants filed their Motion to Dismiss Plaintiff's Second

Amended Complaint and supporting papers on June 15, 2015. (Dkt. Nos. 72–74.) Also on that

date PepsiCo Defendants filed their separate Motion to Dismiss Plaintiff's Second Amended

Complaint and supporting papers. (Dkt. Nos. 75–77.) On July 21, 2015, Plaintiff filed a

"Memorandum of Law in Support of the Denial of the PepsiCo Defendants' Motion to Dismiss,"

(Dkt. No. 86), along with a Motion to Intervene and/or Consolidate, (Dkt. Nos. 84–85).[7]

Without the Court's leave, he also submitted a Proposed Second Amended Complaint With More

Definitive Statements ("Revised SAC"). (Mot. to Am. Compl. Ex. 1–2 (Dkt. No. 81).)[8]

---

[7] On December 5, 2013, ScentSational commenced an action in this Court against
PepsiCo and some of its affiliates, alleging misappropriation of trade secrets, breach of contract,
unfair competition, unjust enrichment, constructive trusts, and correction of inventorship. (Dkt.
No. 1 (13-CV-8645 Dkt.).) Some of the allegations in that suit relate to PepsiCo's filing of
United States Patent No. 8,474,637 and United States Patent Application No. 13/223,834, both of
which Plaintiff addresses in the instant Action. (*See, e.g.*, SAC ¶¶ 96–113.) This other case is
currently pending before this Court under the caption, *ScentSational Technologies, LLC v.
PepsiCo, Inc., et al.*, No. 13-CV-8645.

[8] For the purposes of resolving the instant Motions, the Court does not consider
Plaintiff's Revised SAC. (Dkt. No. 81.) Pursuant to Federal Rule of Civil Procedure 15(a)(2), a
plaintiff may amend his or her complaint "only with the opposing party's written consent or the
court's leave." *See In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006) ("It
is within [the court's] discretion to deny leave to amend implicitly by not addressing the request
when leave is requested informally in a brief filed in opposition to a motion to dismiss."),
*abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013); *State Trading
Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) ("When the
moving party has had an opportunity to assert the amendment earlier . . . a court may exercise its
discretion more exactingly."). Here, however, Plaintiff received neither the Court's permission
nor Defendants' consent to amend the SAC. (*See* Dkt.) Rather, he simply elected to submit yet
another Proposed Amended Complaint, but this time doing so well after Defendants had filed
their Motions, a tactic that has no support in the law. *See Ansam Assocs., Inc. v. Cola Petroleum,
Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (denying leave to amend because "permitting the

Defendants submitted separate Reply Memoranda of Law in Support of their own Motions to

Dismiss on July 29, 2015, (Dkt. Nos. 87– 88), and PepsiCo Defendants filed their Memorandum

of Law in Opposition to Plaintiff's Motion to Intervene and/or Consolidate, (Dkt. No. 89). In a

separate opinion, the Court has denied Plaintiff's Motion to Intervene and/or Consolidate.

## II. Discussion

### A. Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations,

citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil

---

proposed amendment would have been especially prejudicial given the fact that . . . [the
defendant] had already filed a motion for summary judgment"); *PI, Inc. v. Quality Prods., Inc.*,
907 F. Supp. 752, 765 (S.D.N.Y. 1995) (denying the "plaintiff's motion to amend . . . because its
timing demonstrates that it is clearly a dilatory tactic to avoid the dismissal of this action"); *CL-
Alexanders Laing & Cruickshank v. Goldfeld*, 739 F. Supp. 158, 167 (S.D.N.Y. 1990) ("When
the motion [to amend] is made after discovery has been completed and a motion for summary
judgment has been filed, leave to amend is particularly disfavored because of the resultant
prejudice to [the] defendant."). Furthermore, the purportedly more definitive statements
contained in the Revised SAC ultimately offer "no clue as to how the [SAC]'s defects would be
cured." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir.
2015) ("Denial of leave might be proper . . . where the request gives no clue as to how the
complaint's defects would be cured." (citation and internal quotation marks omitted)). While
this Court previously did Plaintiff a courtesy in "consider[ing] the allegations and claims
contained in the [Revised SAC] together with those contained in [the FAC]" despite never
having granted him leave to amend, *Kamdem-Ouaffo*, 2015 WL 1011816, at *5, notions of fair
play require rejection of this untimely attempt to once again skirt proper procedure, *see In re
Gildan Activewear, Inc. Sec. Litig.*, No. 08-CV-5048, 2009 WL 4544287, at *5 (S.D.N.Y. Dec.
4, 2009) ("To the extent [the p]laintiffs argue that they should have yet another bite at the apple
after having had the additional benefit of the [c]ourt's explication of the shortcomings of the
complaint, such a position must be rejected, as it is by now well-established that plaintiffs are not
entitled to an advisory opinion from the [c]ourt informing them of the deficiencies in the
complaint and then an opportunity to cure those deficiencies." (internal quotation marks
omitted)).

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alterations and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true

. . . ." (alterations and internal quotation marks omitted)). Further, "[f]or the purpose of
resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the
plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014)
(citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a
complaint was filed pro se, it must be construed liberally with "special solicitude" and
interpreted to raise the strongest claims that it suggests. *Hill v. Curcione*, 657 F.3d 116, 122 (2d
Cir. 2011) (internal quotation marks omitted).

Additionally, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,]
. . . any written instrument attached to the complaint as an exhibit[,] or any statements or
documents incorporated in it by reference," as well as "matters of which judicial notice may be
taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had
knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y.
Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alteration and internal quotation marks
omitted); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In
adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated
on the face of the complaint, in documents appended to the complaint or incorporated in the
complaint by reference, and to matters of which judicial notice may be taken." (internal
quotation marks omitted)); *Hendrix v. City of N.Y.*, No. 12-CV-5011, 2013 WL 6835168, at *2
(E.D.N.Y. Dec. 20, 2013) (same).

## B. Unenforceable Contract, Unjust Enrichment, and Constructive Trust Claims

As in the FAC, Plaintiff alleges against PepsiCo Defendants several causes action arising

out of the Agreement. [9] The Court, once again, finds that these allegations of unenforceable

contract, unjust enrichment, and constructive trust fail to state a claim upon which relief may be

granted.

### 1. Res Judicata

First and foremost, Plaintiff's claims of unenforceable contract, unjust enrichment, and

constructive trust, all of which relate to the Agreement, are barred by res judicata because they

were or could have been raised by Plaintiff in a prior proceeding. Under the federal rules of res

judicata, a subsequent lawsuit will be barred where a party can show: (1) an adjudication on the

merits in the previous action; (2) that the previous lawsuit involved the same parties, or those in

privity with them; and (3) that the claims asserted in the subsequent suit were raised, or could

have been raised, in the prior proceeding. *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275,

285 (2d Cir. 2000).[10] "The rationale underlying this principle is that a party who has been given

---

[9] As Plaintiff himself affirms, these first three causes of action "do[] not include
ScentSational . . . and/or . . . Landau" since neither has made claims regarding "some sort of
enforceable contractual obligation" with Plaintiff. (SAC ¶¶ 155, 242, 263; *cf.* ScentSational
Defs.' Mem. of Law in Supp. of Motion To Dismiss Pl.'s Second Am. Compl. ("ScentSational
Defs.' Mem.") 6 n.3 (Dkt. No. 73).) Plaintiff further affirms that he never had "any
. . . interactions with ScentSational . . . during [his] work at PepsiCo." (SAC ¶ 81.)
Accordingly, the Court addresses his claims for unenforceable contract, unjust enrichment, and
constructive trust as to PepsiCo, Dr. Given, and Dr. Zhang only.

[10] New York state law governs the Agreement, (*see* Decl. of Jennifer C. Tempesta, Esq.
in Supp. of PepsiCo Defs.' Mot. To Dismiss ("Tempesta Decl.") Ex. 1 ("Agreement")
Attachment B ¶ K (Dkt. No. 76) ("THIS AGREEMENT SHALL BE GOVERNED BY THE
LAWS OF THE STATE OF NEW YORK . . . .")), and, given that federal and New York
doctrines of res judicata are "virtually identical," the Court applies the federal rules of res
judicata in this contract suit, *Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC*,
742 F. Supp. 2d 446, 452 (S.D.N.Y. 2010); *see also Marvel Characters, Inc. v. Simon*, 310 F.3d
280, 286 (2d Cir. 2002) (analyzing a res judicata claim under federal law because "there is no

12

a full and fair opportunity to litigate a claim should not be allowed to do so again." *In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005).

In September 2010, Plaintiff filed a lawsuit in the New York Supreme Court, alleging a number of causes of action against PepsiCo. *See Kamdem-Ouaffo v. PepsiCo, Inc.*, No. 22625/2010 (N.Y. Sup. Ct. 2010); *see also Kamdem-Ouaffo*, 2015 WL 1011816, at *4 n.9 (discussing this state court action). Most relevant here, Plaintiff's complaint alleged that PepsiCo breached the employment contract by terminating Plaintiff prior to the contract's end date and that PepsiCo violated New York's Whistle Blower statute by terminating him before the contract expired and by refusing to consider him for a permanent position. (*See* Tempesta Decl. Ex. 4 ("N.Y. Judgment") 3.)[11] Plaintiff not only readily acknowledges this prior proceeding, (*see, e.g.*, SAC ¶¶ 38, 71 n.1, 112), but also notes that "[t]he said [summary judgment] motion at the Supreme Court of the State of New York was granted in favor of PepsiCo," (*id.* ¶ 144). In fact, even prior to the state court's ruling on PepsiCo's motion for summary judgment, Plaintiff

___

discernible difference between federal and New York law concerning res judicata"); *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("Under both New York law and federal law, the doctrine of res judicata, or claim preclusion, provides that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." (italics, alteration, and internal quotation marks omitted)).

[11] In deciding PepsiCo's motion for summary judgment, the New York Supreme Court noted that the complaint arose "from Plaintiff's work as a Food Science Chemist in [PepsiCo]'s Research and Development [f]acility in Valhalla, New York . . . under a contract." (N.Y. Judgment 2.) The first and second causes of action concerned PepsiCo's alleged breach of that contract, (*id.*), and in resolving the instant Motion, the Court takes judicial notice of the fact that the prior lawsuit contained such information, *see Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." (internal quotation marks omitted)); *Corley v. Jahr*, No. 11-CV-9044, 2013 WL 265450, at *6 (S.D.N.Y. Jan. 24, 2013) (taking judicial notice of a state court decision in resolving a Rule 12(b)(6) motion), *adopted by* 2013 WL 1453367 (S.D.N.Y. Mar. 28, 2013); *Faulkner v. Verizon Commc'n, Inc.*, 156 F. Supp. 2d 384, 391 (S.D.N.Y. 2001) (explaining that a court "may take judicial notice of pleadings in other lawsuits attached to the defendants' motion to dismiss, as a matter of public record").

CRITICAL

agreed to the dismissal of his breach of contract claims. (*See* N.Y. Judgment 13.)[12]  With regard to Plaintiff's Whistle Blower allegations, PepsiCo argued, inter alia, that these claims should be dismissed because Plaintiff's termination resulted from the expiration of the temporary employment contract and not as a retaliatory measure by the defendant. (*See id.* (noting PepsiCo's argument that "the expiration of that agreement was not an adverse change").)  On July 8, 2013, the state court dismissed these claims, (*see id.* at 40), concluding "there is no triable issue of fact that [PepsiCo] did not engage in retaliation based on its failure to either renew Plaintiff's contract or offer Plaintiff another permanent position as a result of Plaintiff's Whistle Blower activity," (*see id.* at 32).

In addition to involving the same parties and thereby satisfying the second element of res judicata, the prior proceeding also satisfies the first, as the state court evaluated the merits of Plaintiff's contract claims against PepsiCo and found his allegations lacking. *See Kamdem-Ouaffo v. Pepsico, Inc.*, 21 N.Y.S.3d 150, 154 (App. Div. 2015) (affirming that PepsiCo "established its prima facie entitlement to judgment as a matter of law dismissing the remaining causes of action to recover damages for[, inter alia,] breach of contract").[13]  As to the third prong

---

[12] It bears noting that voluntary withdrawal of claims can constitute a final adjudication on the merits for res judicata purposes. *See Hughes v. Lillian Goldman Family, LLC*, 153 F. Supp. 2d 435, 449 (S.D.N.Y. 2001) (dismissing claims under doctrine of res judicata where the "plaintiff withdrew those very claims"); *Evangelical Alliance Mission/Nihon Domei Kirisuto Kyodan v. Lockman Found.*, No. 95-CV-7214, 1995 WL 688958, at *4 (S.D.N.Y. Nov. 21, 1995) (determining that res judicata applies where the party "voluntarily withdrew its claims" in a prior proceeding).

[13] Though Plaintiff indicates he has "appealed from the decision granting . . . PepsiCo's . . . motion," (SAC ¶ 145), such an appeal does not affect the judgment's finality under either New York or federal law, *see Arnold v. Beth Abraham Health Servs., Inc.*, No. 09-CV-6049, 2009 WL 5171736, at *4 (S.D.N.Y. Dec. 30, 2009) ("Under New York law, the pendency of an appeal does not deprive a challenged judgment of preclusive effect."), *aff'd sub nom. Arnold v. 1199 SEIU*, 420 F. App'x 48 (2d Cir. 2011); *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 737 (S.D.N.Y. 2007) ("Courts long have held that the pendency of an appeal ordinarily does not

14

of the test, in considering whether Plaintiff's claims asserted in a subsequent suit were, or could

have been, raised in a prior proceeding, the Court considers "whether the underlying facts are

'related in time, space, origin, or motivation;' whether they form a convenient trial unit; and

whether their treatment as a unit conforms to the parties' expectations." *Waldman v. Vill. of*

*Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*,

107 F.3d 86, 90 (2d Cir. 1997)). Notably, "[r]es judicata does not require the precluded claim to

actually have been litigated." *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 626

(2d Cir. 2007) (italics omitted); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394,

398 (1981) (affirming that res judicata extends to all claims that "*were or could have been* raised

in that [prior] action" (emphasis added)). In this way, the doctrine applies "not only as to what

was pleaded, but also as to what could have been pleaded." *In re Teltronics Servs., Inc.*, 762

F.2d 185, 193 (2d Cir. 1985); *see also Magi XXI, Inc. v. Stato Della Citá Del Vaticano*, 22 F.

Supp. 3d 195, 205 (E.D.N.Y. 2014) (same). Additionally, "the facts essential to the barred

second suit need not be the same as the facts that were necessary to the first suit. It is instead

enough that the facts essential to the second were [already] present in the first." *Waldman*, 207

F.3d at 110–11 (alteration in original) (emphasis and internal quotation marks omitted). "Even

claims based upon different legal theories are barred provided they arise from the same

transaction or occurrence [as the claims previously raised]." *L-Tec Elecs. Corp. v. Cougar Elec.*

*Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999); *see also Waldman*, 207 F.3d at 110 ("[A] plaintiff

cannot avoid the effects of res judicata by 'splitting' his claim into various suits, based on

different legal theories . . . ."); *Saud v. Bank of N.Y.*, 929 F.2d 916, 920 (2d Cir. 1991) ("[I]t is

---

suspend the preclusive effect of an otherwise final judgment."), *aff'd sub nom. Bondi v. Capital*
*& Fin. Asset Mgmt. S.A.*, 535 F.3d 87 (2d Cir. 2008); *Aaron v. Aaron*, 768 N.Y.S.2d 739, 741
(App. Div. 2003) ("[A]bsent a stay, the pendency of an appeal from [a] judgment does not alter
the finality or enforceability of that judgment.").

15

the *factual* predicate of the several claims asserted that determines whether res judicata will apply, not a litigant's ability to devise a new legal theory." (internal quotation marks and some italics omitted)).

In seeking to differentiate the two suits, Plaintiff underscores that the state court "declined to exercise jurisdiction over the matters related to [p]atent[s]." (Pl.'s Mem. of Law Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") 10–11 (Dkt. No. 86).) Yet, notwithstanding Plaintiff's insistence otherwise, (*see, e.g., id.* at 11 ("All causes of actions and the relief sought []in . . . Plaintiff's SAC are related to [a patent].")), this Court's original jurisdiction over such subject matter, pursuant to 28 U.S.C. § 1338(a), has no bearing on the three contract-related claims at issue here. Plaintiff's claims for unenforceable contract, unjust enrichment, and constructive trust pertain to the Agreement, not to patents also at issue in this case. (*See, e.g.,* SAC ¶ 14 ("Plaintiff alleges that the said [Agreement] was/is invalid and/or unenforceable and/or voidable.")). Considering that state courts are competent to entertain contract suits, *see Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir. 2006) (noting "state courts are courts of general jurisdiction"), it is clear Plaintiff could have, but did not, assert those claims in his prior suit against PepsiCo.

These claims "arise out of the same factual predicate as the original claims," *L-Tec Elecs.*, 198 F.3d at 88, namely Plaintiff's work assignment contract. It is well-settled that multiple claims based upon a single contract are considered part of the same transaction, unless the plaintiff could not have asserted a claim in the original action. *See Prime Mgmt. Co. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990) (explaining that, in a suit for breach of contract, "res judicata will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first suit"). As discussed above, Plaintiff *could have* raised these contract claims in

16

the state court since the underlying contract pre-dated that suit. For whatever reason he did not,

and instead he now puts forth allegations that similarly relate to the Agreement. Thus, because

the instant Action's claims for unenforceable contract, unjust enrichment, and constructive trust

"share a common nucleus of operative facts with the prior one," *Waldman*, 207 F.3d at 108, these

three causes of action are barred by res judicata.

### 2. Validity of the Agreement

Even if res judicata did not preclude Plaintiff from raising these claims here, the causes of

actions that arise out of the Agreement would fail nonetheless.

#### a. Unenforceable Contract Claim

In its prior Opinion dismissing Plaintiff's contract claim, this Court held that

"Attachment B is a clear and explicit assignment of all intellectual property from Plaintiff to

PepsiCo," *Kamdem-Ouaffo*, 2015 WL 1011816, at *11, thereby upholding the validity of the

Agreement, *see id.* at *13 (concluding that "the Agreement governs Plaintiff's rights to the

intellectual property at issue"); *id.* at *14 ("[B]y operation of Attachment B, Plaintiff has no

remaining ownership interest in the intellectual property at issue."). While "Plaintiff challenges

the validity and enforceability of Attachment B," (SAC ¶ 153), the SAC ultimately offers no new

factual allegations to alter the Court's prior conclusion. Plaintiff himself asserts that "[i]t is

substantially supported by the same factual background of the [FAC]." (*Id.* ¶ 153.) Indeed, his

bare allegations of "lack of [m]utual [a]ssent, failure to disclose material facts to . . . Plaintiff,

[and] ambiguity," (*id.* ¶ 159 (internal quotation marks omitted)), are no more than "naked

assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (alteration and internal

quotation marks omitted). As such, his unsubstantiated challenges to the validity of the

Agreement fail to establish any right to relief.

17

On one hand, Plaintiff alleges lack of mutual assent on the basis that "he was never given the opportunity to review the entire [Agreement]" and thus did not fully understand its content. (SAC ¶ 167; *see also* Pl.'s Opp'n 10 ("Plaintiff was never provided a copy of the executed agreements until during discovery of the [state court] lawsuit.").) However, under New York law, "[a] party's failure to read or understand a contract that it signs does not relieve it of its obligation to be bound by the contract." *In re Lehman Brothers Inc.*, 478 B.R. 570, 587 n.19 (S.D.N.Y. 2012), *aff'd sub nom. In re Leham Bros. Holdings Inc.*, 761 F.3d 303 (2d Cir. 2014); *see also Brandywine Pavers, LLC v. Bombard*, 970 N.Y.S.2d 653, 655 (App. Div. 2013) ("A party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a document on the ground that he or she did not read it or know its contents." (alterations and internal quotation marks omitted)); *Superior Officers Council Health & Welfare Fund v. Empire HealthChoice Assurance, Inc.*, 927 N.Y.S.2d 324, 326 (App. Div. 2011) ("[P]arties are presumed to know the contents of the agreements they have signed."), *aff'd*, 959 N.E.2d 511 (N.Y. 2011). Accordingly, Plaintiff's contention that he did not read or understand the entirety of the "voluminous document," (SAC ¶160), by itself, does not void the Agreement. Because Plaintiff provides no other reason to invalidate the Agreement, it should be enforced according to its terms. *See Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014) (enforcing an agreement against a party who claimed that "she did not read the entire . . . [a]greement" before signing it); *Martin v. Creative Mgmt. Grp., Inc.*, No. 10-CV-2214, 2010 WL 2629580, at *2 (S.D.N.Y. June 29, 2010) ("[A] person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms." (internal quotation marks omitted)).[14]

---

[14] Though "Plaintiff alleges that PepsiCo used an unfair advantage based on its financial

18

In addition, Plaintiff "seek[s] to have the contract voided by the Court and/or found to be unenforceable" due to an alleged breach of "an implied covenant of good faith and fair dealing between PepsiCo and . . . Plaintiff." (SAC ¶¶ 205, 208.) Yet, under New York law, only parties to a contract can be held liable for breach of the implied covenant of good faith and fair dealing. *See Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 727 (S.D.N.Y. 2014) (holding that "an action for breach of the implied covenant of good faith and fair dealing of [an] agreement cannot lie against" those who were not party to it); *Am.-European Art Assocs., Inc. v. Trend Galleries, Inc.*, 641 N.Y.S.2d 835, 836 (App. Div. 1996) (dismissing a "cause of action for breach of an implied duty of good faith and fair dealing by [the] defendants" due to the absence "of a valid and binding contract from which such a duty would arise"). The plain terms of the Agreement make clear that PepsiCo and its employees were *not* a party to the work assignment contract. (*See, e.g.*, Agreement, at Attachment B (referring to "my employer, the Staffing Supplier named below"); *id.* at Attachment C ¶ 1("I understand that I am an employee of the Staffing Supplier [Subex,] and I am not an employee of PepsiCo.").) This Court, in fact, has already determined that "under the plain terms of the Agreement, PepsiCo cannot be liable for any breach of contract under the Agreement, *to which it was not a party*." *Kamdem-Ouaffo*, 2015 WL 1011816, at *7 (emphasis added).[15] Furthermore, while Plaintiff accurately notes that

---

status and also used unfair assumptions to get the [Agreement] from the Plaintiff," (SAC ¶ 185), he provides no specific allegations to support that contention. Therefore, the Court need not accept that mere legal conclusion as true. *See Iqbal*, 556 U.S. at 678 (reaffirming that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

[15] Notwithstanding Plaintiff's allegation to the contrary, PepsiCo Defendants have no "burden of proving that they were mere passive third[-]party beneficiar[ies.]" (Pl.'s Opp'n 12.) Rather, the Agreement here speaks for itself. Moreover, Plaintiff acknowledges Subex was his employer, noting, for example, that "Subex . . . issued W-2s for . . . Plaintiff." (SAC ¶ 195.) *See also Kamdem-Ouaffo*, 2015 WL 1011816, at *7 (noting that, as an exhibit to his Revised FAC,

19

a valid contract requires "an intent to be bound," (SAC ¶ 157 (citing *Kowalchuk v. Stroup*, 873

N.Y.S.2d 43, 46 (App. Div. 2009))), there is no specific allegation that PepsiCo Defendants

manifested such intent that could impose contractual obligations on them.[16] Because they were

not parties to the Agreement, Plaintiff cannot state a contractual claim for breach of the implied

covenant of good faith and fair dealing against PepsiCo, Dr. Given, and Dr. Zhang.

Plaintiff also claims the Agreement is unenforceable because "there was no definiteness"

as to his compensation. (*Id.* ¶ 196.) However, this Court already determined that the Agreement

did indeed specify his compensation. *See Kamdem-Ouaffo*, 2015 WL 1011816, at *10

(recognizing the $82,142 that Plaintiff received "as compensation" to be "the consideration that

he was promised on the face of the Agreement"). Moreover, as this Court also previously held,

"[u]nder the Agreement, Plaintiff was clearly an employee of Subex, and not of PepsiCo." *Id.* at

*7. Precisely because the Agreement unambiguously indicates Plaintiff's employer as Subex,

not PepsiCo, (*cf.* SAC ¶ 208 (acknowledging that "PepsiCo did not directly sign . . . Attachment

---

"Plaintiff included a 2008 W–2[,] . . . which identifies Subex, rather than PepsiCo, as Plaintiff's
employer").

[16] Generally a party who is not a signatory to a contract cannot be held liable under the
contract, though "[a]n exception to this general rule exists when a non-signatory is found to have
manifested an intent to be bound by the contract." *MBIA Ins. Corp. v. Royal Bank of Can.*, 706
F. Supp. 2d 380, 396 (S.D.N.Y. 2009). As noted, Plaintiff has not alleged any conduct by
PepsiCo Defendants that calls for this exception. *See, e.g., D'Antonio v. Metro. Transp. Auth.*,
No. 06-CV-4283, 2008 WL 582354, at *7 (S.D.N.Y. Mar. 4, 2008) (concluding the non-
signatory was not liable under its subsidiary's contract where the plaintiffs did not sufficiently
allege that the parent manifested an intent to be bound); *ESI, Inc. v. Coastal Corp.*, 61 F. Supp.
2d 35, 73 (S.D.N.Y. 1999) (holding that a "non-signatory to a contract can be named as a
defendant in a breach of contract action" where the non-signatory "attended meetings . . . and
participated in the negotiations and drafting" of the contract); *Warnaco Inc. v. VF Corp.*, 844 F.
Supp. 940, 946 (S.D.N.Y. 1994) (noting that a non-signatory parent corporation can be bound by
a contract if it participates in the negotiations but has a subsidiary, which is a proxy of the parent,
sign the contract). Bare assertions like "PepsiCo was heavily involved in the process of
interviewing and selecting . . . Plaintiff" are simply not enough to bind Defendants under the
Agreement. (Pl.'s Opp'n 23.)

B")), no parol evidence is "admissible to suggest that PepsiCo promised that Plaintiff's name would remain on his inventions, or that PepsiCo owed him compensation *as his employer*," *Kamdem-Ouaffo*, 2015 WL 1011816, at \*9; *see also Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 436 (N.Y. 2013) (affirming that "evidence outside the four corners of the document" is admissible to modify or contradict a written agreement "only if a court finds an ambiguity in the contract"). For these reasons, the Court again rejects Plaintiff's attempt to challenge the definiteness of the Agreement.

Lastly, Plaintiff alleges that PepsiCo Defendants "voided the contract" through "either fraud in the execution or fraud in the inducement, with respect to []Attachment B." (SAC ¶¶ 212, 221.) Yet, such allegations once again fail to meet the heightened pleading standard required for fraud claims. *See Kamdem-Ouaffo*, 2015 WL 1011816, at \*12 ("It long has been clear that '[a]llegations of fraud are subject to a heightened pleading standard.'" (alteration in original) (quoting *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013))); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). To survive a motion to dismiss a fraud-based claim, "a party must state with particularity the circumstances constituting fraud, . . . which . . . requires the plaintiff to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata*, 723 F.3d at 197 (internal quotation marks omitted). Though he claims "the way Defendants worked the fraud was that they first expunged the Plaintiff's name from his inventions," (SAC ¶ 219), Plaintiff, for a second time, fails to satisfy the fourth prong of the pleading standard in not specifying any federal or state law that Defendants have violated, *see Kamdem-Ouaffo*, 2015 WL 1011816, at \*12 ("Plaintiff does

21

not explain how PepsiCo's actions were fraudulent given that an assignee of intellectual property is permitted to make a patent application" (citing 35 U.S.C. § 118 ("A person to whom the inventor has assigned . . . the invention may make an application for patent."))). Even had Plaintiff intended to allege common law fraud under New York law, he nonetheless fails to allege facts that establish the elements of such a claim, as the SAC, like the FAC, does not allege reliance on a misrepresentation of material fact or resulting economic detriment. *See id.* (noting that "the elements of a common law fraud claim are: (1) a misrepresentation of material fact, (2) made with fraudulent intent, (3) upon which the plaintiff reasonably relies to his (4) economic detriment" (internal quotation marks omitted)).

Given these considerations, Plaintiff cannot sustain a claim for an unenforceable contract even if it were not barred by res judicata.

### b. Unjust Enrichment Claim

Having reaffirmed the enforceability of the Agreement in the absence of any new factual allegations, the Court again rejects Plaintiff's unjust enrichment claim. *See id.* at *13 (dismissing Plaintiff's unjust enrichment claim). The SAC alleges that "Defendants[,] or at least some of . . . Defendants, have been and continue to be unjustly enriched by asserting . . . they own and/or are inventors of Plaintiff[']s [i]ntellectual [p]roperty." (SAC ¶ 261.) Yet, as previously noted by this Court, the remedy of "[u]njust enrichment is not available where there is a valid contract between the parties covering the same subject matter." *Arbitron, Inc. v. Kiefl*, No. 09-CV-4013, 2010 WL 3239414, at *7 (S.D.N.Y. Aug. 13, 2010); *see also Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-CV-2800, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) ("[D]ecisions both in New York state courts and in [the Southern District of New York] have consistently held that claims for unjust enrichment may be precluded by the existence of a

22

contract governing the subject matter of the dispute . . . ."). As discussed above and in its prior

decision by this Court, the Agreement "contractually transferred [Plaintiff's] intellectual property

to PepsiCo." *Kamdem-Ouaffo*, 2015 WL 1011816, at *11. This valid contract thus governs

Plaintiff's rights to the subject matter at issue and precludes this second cause of action,

regardless of the applicability of res judicata.

### c. Constructive Trust Claim

Plaintiff repeats his earlier claim that he is entitled to a constructive trust related to

certain patents outlined in the SAC.[17] Yet, as with the remedy of unjust enrichment, it is well-

settled that a constructive trust cannot be imposed where a valid agreement covers the subject

matter of the dispute. *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004)

("[W]here a valid agreement controls the rights and obligations of the parties, an adequate

remedy at law typically exists" such that "a constructive trust should not be imposed." (internal

quotation marks omitted)); *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94,

107 (S.D.N.Y. 2013) (dismissing a claim for constructive trust because "[the plaintiff] has a

contractual claim against [the defendant]"); *Spanierman Gallery, PSP v. Love*, No. 03-CV-3188,

2003 WL 22480055, at *4 (S.D.N.Y. Oct. 31, 2003) (dismissing a constructive trust claim

because, under New York law, the "existence of a valid and enforceable written contract

governing a particular subject matter ordinarily precludes recovery in quasi contract for events

---

[17] It is not helpful to Plaintiff that the vast majority of his allegations in support of this cause of action are simply copied from the bare assertions he sought to use to establish his unjust enrichment claim. (*Compare* SAC ¶¶ 244–60, *with id.* ¶¶ 265–82.) Indeed, Plaintiff repeats the exact claims he put forth in the FAC, which this Court has already dismissed. *See Kamdem-Ouaffo*, 2015 WL 1011816, at *13–15 (dismissing Plaintiff's claims for unjust enrichment and constructive trust).

23

arising out of the same subject matter" (internal quotation marks omitted)).[18] The equitable

remedy of a constructive trust is unavailable in the instant Action precisely because of the

Agreement. (*See* Agreement, at Attachment B ¶ A (assigning to PepsiCo any "right, title[,] and

interest in and to *all* . . . 'Intellectual Property' . . . conceived . . . during the period of such work

or performance of assignments" (emphasis added)).) Therefore, res judicata aside, Plaintiff's

constructive trust claim fails. *See Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d

222, 235 (E.D.N.Y. 2013) (rejecting a constructive trust claim because "[i]t is well established

that the existence of a contract precludes a claim for a constructive trust").

## C. Correction of Inventorship

Repeating yet another claim from the dismissed FAC, Plaintiff seeks correction of

ownership for at least two intellectual property items outlined in the SAC.[19] He alleges that,

"[i]n view of . . . 35 U.S.C § 261, . . . Plaintiff still has interest in the patents and patent

applications of . . . Plaintiff[']s [intellectual property] that he created at PepsiCo." (SAC ¶ 212.)

Even taking as true that "it is undisputed . . . Plaintiff is the true inventor of the two patents" at

---

[18] It also bears noting that "a claim of constructive trust under New York law requires
[p]laintiffs to show unjust enrichment." *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 581
(S.D.N.Y. 2015); *see also Turner v. Temptu Inc.*, No. 11-CV-4144, 2013 WL 4083234, at *10
n.3 (S.D.N.Y. Aug. 13, 2013) ("Under New York law, a constructive trust will not be imposed
absent a finding of unjust enrichment."), *aff'd*, 586 F. App'x 718 (2d Cir. 2014).

[19] Plaintiff asserts that "[t]his cause of action definitely applies to all parties, including
ScentSational . . . and . . . Landau." (SAC ¶ 284; *cf.* ScentSational Defs.' Mem. 1 ("The only
claims asserted against ScentSational and . . . Landau relate to the correction of inventorship of a
PepsiCo patent and patent application.").) While doubting that Plaintiff's speculation can give
rise to a plausible claim for relief against ScentSational or Landau, (*see, e.g.*, SAC ¶ 289
("Plaintiff alleges that ScentSational . . . and . . . Landau would have to prove that . . . Landau
meets the requirement to be inventor of the 'processes' and 'methods' of the patents in
dispute.")), the Court nonetheless addresses the claim for correction of inventorship as to all
named Defendants. It bears noting that the analysis is the same in dismissing this cause of action
against any Defendant; Plaintiff cannot correct a pending or abandoned patent, and he must have
an interest in order to challenge a granted patent.

issue, (*id.* ¶ 108), the Court, for the same reasons as before, dismisses this cause of action, *see Kamdem-Ouaffo*, 2015 WL 1011816, at *14 (dismissing correction of inventorship claim on the basis that § 256 "does not provide a private right of action to challenge inventorship of a pending patent application" and because Plaintiff assigned his intellectual property rights to PepsiCo, he lacks standing to make a claim" as to the single issued patent (internal quotation marks omitted)).

To the extent that Plaintiff seeks to once again bring a correction of inventorship claim for any patent application referenced in the SAC, (*see, e.g.*, SAC ¶¶ 48, 60), such an attempt must be denied. As this Court has already emphasized, there is no "private right of action to challenge inventorship of a pending patent application." *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010); *see also Kamdem-Ouaffo*, 2015 WL 1011816, at *14 ("Plaintiff cannot bring a cause of action for a correction of inventorship for the four pending patent applications."). This is equally true for abandoned patents, as "a district court lacks jurisdiction to review the inventorship of an unissued patent." *Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 335 (5th Cir. 2014) (alteration and internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1162 (2015); *see also E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578, 584 (6th Cir. 2003) (same). [20] Accordingly, Plaintiff cannot bring a

---

[20] ScentSational Defendants note that one referenced "[a]pplication was deemed abandoned by the [USPTO] on February 24, 2015." (ScentSational Defs.' Mem. 6; *cf.* Decl. of Melvin C. Garner, Esq. in Supp. of ScentSational Defs.' Mot. To Dismiss Ex. B ("Notice of Abandonment") (Dkt. No. 74).) In this context, "abandoned" means that the application is no longer pending and thus cannot mature into registration, *see Abandoned Applications*, United States Patent and Trademark Office, http://www.uspto.gov/trademarks-application-process/abandoned-applications (last visited Jan. 18, 2016), a fact of which the Court may take judicial notice, *see Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) ("The [c]ourt may properly take judicial notice of official records of the [USPTO] and the United States Copyright Office.").

Because "abandonment to the public . . . destroy[s] the plaintiff's right to take a patent," *Kendall v. Winsor*, 62 U.S. 322, 327 (1858), Plaintiff cannot seek correction of ownership over the pending application, *see* 35 U.S.C. § 133 ("Upon failure of the applicant to prosecute the

correction of inventorship claim for *any* of the referenced patent applications, whether pending or otherwise.

While 35 U.S.C. § 256 "provides a private right of action to challenge inventorship" for *issued* patents, *Kamdem-Ouaffo*, 2015 WL 1011816, at *14 (internal quotation marks omitted), "a plaintiff seeking correction of inventorship under § 256 can pursue that claim in federal court only if the requirements for constitutional standing—namely injury, causation, and redressability—are satisfied," *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009). As before, the Court finds that Plaintiff lacks standing to make such a claim because, pursuant to the Agreement, he assigned his patent rights to PepsiCo. (*See generally* Attachment B.) Plaintiff thus has no remaining ownership interest in the disputed intellectual property, including the "patent from . . . Plaintiff's intellectual property [that] was granted on July 2, 2013 as US Patent No. 8,474,637 B2." (SAC ¶ 41; *cf. id.* ¶ 18 ("Defendants have already been granted a utility patent by the [USPTO] as Patent No. US 8,474,637 B2.").)

Furthermore, Plaintiff's conclusory allegations of "damages in terms of the loss of the ownership, inventorship, recognition, and the honor for his valuable, marketable, confidential, patentable and now patented [i]ntellectual [p]roperty" do not suffice, (SAC ¶ 304), as the Agreement unmistakably leaves Plaintiff with none of the requisite interests for standing, *see Larson*, 569 F.3d at 1327 (concluding that the plaintiff "has no financial interest in the patents sufficient for him to have standing to pursue a § 256 claim"); *Jim Arnold Corp. v. Hydrotech*

application within six months after any action therein . . . or within such shorter time, . . . as fixed by the Director in such action, the application shall be regarded as abandoned by the parties thereto."). As ScentSational Defendants note, "[i]t is well-established that this Court cannot correct inventorship on a patent application, particularly when the application has been abandoned and its subject matter is part of the public domain." (ScentSational Defs.' Mem. 1; *see also id.* at 7 ("There is no means or mechanism by which the Court can 'revive' an abandoned patent application for any purpose, including to correct inventorship.").)

26

*Sys., Inc.,* 109 F.3d 1567, 1572 (Fed. Cir. 1997) (finding the plaintiff lacked standing to pursue a patent infringement claim where he had assigned away all his patent rights and thus did not have an ownership interest in the patents); *Swanson v. ALZA Corp.,* No. 12-CV-4579, 2013 WL 968275, at *4 (N.D. Cal. Mar. 12, 2013) ("Where an inventor assigns all of his interest in an invention to others, he retains no financial interest in the patents and therefore no interest sufficient for him to have standing to pursue a § 256 claim." (internal quotation marks omitted)). In light of this principle, Plaintiff's correction of inventorship claim is dismissed.

### D. Defamation

As the one fresh cause of action presented in the SAC, Plaintiff alleges that "[PepsiCo] Defendants knowingly and willfully made written false statements against . . . Plaintiff to attack . . . Plaintiff's performance on his job and profession, and to attack . . . Plaintiff's moral character." (SAC ¶ 308.)[21] However, his defamation action comes too late and, furthermore, fails to state a viable claim.

#### 1. Statute of Limitations

According to Plaintiff, "[t]he said written defamatory statements were made [by PepsiCo Defendants] to the United States government in a document dated 12/18/2009." (*Id.*; *see also id.* ¶ 39 ("PepsiCo and its protégés publically and deceitfully made representation[s] . . . in a letter dated 12/18/2009.").) New York Civil Practice Law and Rules ("CPLR") § 215(3) requires that an action for defamation "be commenced within one year," that is, within one year of the original

---

[21] Plaintiff notes that "[t]his cause of action does not include ScentSational . . . and/or . . . Landau," as neither "make[s] use anywhere of the job performance and sexual defamation that PepsiCo and its protégés wrote to the US government." (SAC ¶ 306; *cf.* ScentSational Defs.' Mem. 6 n.3 ("To the extent that such information exists, ScentSational has no knowledge of it, had not made any use of it, and does not intend to make any such use of this information").) The Court accordingly addresses the defamation claim only as to PepsiCo, Dr. Given, and Dr. Zhang.

27

publication of the statements. *See Melious v. Besignano*, 4 N.Y.S.3d 228, 229 (App. Div. 2015)

("A cause of action alleging defamation is governed by a one-year statute of limitations . . . [that]

accrues at the time the alleged statements are originally uttered."); *see also Tucker v. Wyckoff*

*Heights Med. Ctr.*, 52 F. Supp. 3d 583, 596–97 (S.D.N.Y. 2014) ("Under CPLR § 215(3), a

claim for libel must be asserted within one year of the date on which the libelous material first

was published, that is, displayed to a third party." (internal quotation marks omitted)), *appeal*

*dismissed* (Feb. 26, 2015). Notwithstanding that Plaintiff allegedly "discovered in 2012 that on

12/18/2009 [PepsiCo] Defendants had written to the United States government," (SAC ¶ 67; *see*

*also* Pl's Opp'n 26 (stating that the document "was discovered as part of a judicial proceeding

[before] the State Supreme Court")), any action for defamation accrued when the alleged

statements were first *published* such that he needed to commence suit within one year of

December 18, 2009. [22] A later discovery of defamatory material does not toll the one-year

statute of limitations. *See Teneriello v. Travelers Cos.*, 641 N.Y.S.2d 482, 483 (App. Div. 1996)

("Contrary to [the] plaintiff's contention, the action accrued when the statements were originally

published . . . , not upon [the] plaintiff's discovery of the statements two years later."); *Karam v.*

*First Am. Bank of N.Y.*, 593 N.Y.S.2d 640, 642 (App. Div. 1993) ("In an action for slander, the

[s]tatute of [l]imitations runs from the time of the utterance, not the discovery of the slanderous

matter.").

---

[22] Though Plaintiff repeatedly refers to December 18, 2009 as "the day that [D]efendants falsely accused [him] before the US government," (SAC ¶ 203; *see also id.* ¶ 201 ("PepsiCo acted corruptly against the Plaintiff by falsely accusing . . . Plaintiff to the US government on 12/18/2009")), the SAC at one point suggests that the "document . . . was received by the United States government no later than 01/05/2010," (*id.* ¶ 308). Even if the Court accepted the later date as tolling the statute of limitations, the action would still be barred as commenced well beyond the one year permitted under CPLR § 215(3). *See Tucker*, 52 F. Supp. 3d at 596 (holding "defamation claims are barred by the statute of limitations insofar as they are based on communications made more than one year before this action was commenced").

Attempting to keep alive his defamation claim, Plaintiff asserts that, pursuant to "CPLR [§] 203(g), Plaintiff has two years from the date of imputation to commence action." (Pl's Opp'n 26.) This reliance on CPLR § 203(g) is misplaced, however, as § 215 does not provide that the statute of limitations for defamation accrues from discovery.[23] Again, the case law is clear: a defamation claim has a one-year statute of limitation that "accrues on the date of the first publication." *Gelbard v. Bodary*, 706 N.Y.S.2d 801, 802 (App. Div. 2000); *see also E.B. v. Liberation Publ'ns, Inc.*, 777 N.Y.S.2d 133, 134 (App. Div. 2004) ("The accrual of a cause of action for libel occurs upon the 'publication' of the offending material, which has been repeatedly defined as the date on which the offending material was placed on sale or became generally available to the public."); *Kilbourne v. State*, 443 N.Y.S.2d 538, 540 (N.Y. Ct. Cl. 1980) ("It is not disputed that a cause of action in defamation accrues on the dates of publication of the alleged libelous statement or the date the allegedly slanderous matter is uttered."). Moreover, Plaintiff cannot seek to evade the statute of limitations through allegations that "[u]p to this date, . . . [D]efendants continued to defame . . . Plaintiff in written documents." (SAC ¶ 254.) Under New York law, "a cause of action for defamation accrues immediately upon the occurrence of the tortious act and thus, is not appropriate for the continuing violation exception." *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 205 (E.D.N.Y. 1998); *see also Nussenzweig v.*

---

[23] CPLR § 203(g) provides, in relevant part, that "where the time within which an action must be commenced is computed from the time when facts were discovered . . . the action must be commenced within two years after such actual or imputed discovery. . . ." The rule, therefore, merely "provides the general method of computing periods of limitation." *Bluefin Wear, Inc. v. Tuesday's Child Boutique, Inc.*, 946 N.Y.S.2d 65, at *3 (N.Y. Sup. Ct. 2011) (unreported table opinion); *see also Patten v. Hamburg OB/GYN Grp., P.C.*, 856 N.Y.S.2d 748, 750 (App. Div. 2008) (reaffirming that "CPLR [§] 203 is not a tolling or extension provision" (internal quotation marks omitted)). In doing so, it "operates in tandem with those statutes of limitation that provide for accrual of the cause of action on discovery; it does not operate alone to create a new standard of measure." *Huebner v. Caldwell & Cook, Inc.*, 526 N.Y.S.2d 356, 359 (N.Y. Sup. Ct. 1988). CPLR § 203(g) thus does not supplant the single publication rule of § 215. *See Melious*, 4 N.Y.S.3d at 229.

*diCorcia*, 878 N.E.2d 589, 590 (N.Y. 2007) ("[T]he single publication rule ... states that a cause of action for defamation accrues on the date the offending material is first published").[24] It is thus clear that Plaintiff's defamation action accrued on December 18, 2009.

Plaintiff filed the SAC on March 25, 2015, meaning that any claims for defamation prior to March 25, 2014 are time barred. Because Plaintiff's allegations here all rest on "the same 12/18/2009 letter to the United States government," (SAC ¶ 68), the Court dismisses this final cause of action.

### 2. Failure to State a Claim

In addition to being time barred, Plaintiff's defamation action fails to state a viable claim. "To establish a claim for defamation under New York law, a plaintiff must prove that: (1) the defendant published a defamatory statement of fact to a third party, (2) that the statement of fact was false, (3) the false statement of fact was made with the applicable level of fault, and (4) either the false statement was defamatory per se or caused the plaintiff special harm." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 485 (S.D.N.Y. 2013).

In the instant Action, Plaintiff cannot satisfy these elements because the document to which Plaintiff refers as containing "the job performance and sexual defamations" does not actually contain such statements. (SAC ¶ 306.)[25] The SAC alleges that PepsiCo defamed him

---

[24] Moreover, Plaintiff does not identify any particular defamatory statement made after December 2009. *See Germain v. M & T Bank Corp.*, —F. Supp. 3d—, 2015 WL 3825198, at *21 (S.D.N.Y. June 19, 2015) (holding that, under the federal notice pleading standard, a "complaint must at least identify the allegedly defamatory statements" (internal quotation marks omitted)); *In re Residential Capital, LLC*, No. 12-CV-12020, 2015 WL 1087746, at *4 (Bankr. S.D.N.Y. Mar. 9, 2015) (noting that "a complaint for defamation must, on its face, specifically identify what alleged defamatory statements were made, by whom, and to whom" (internal quotation marks omitted)).

[25] After the conclusion of his temporary work assignment in September 2009, Plaintiff instituted administrative proceeding against PepsiCo with the Occupational Safety & Health Administration ("OSHA"), alleging unlawful retaliation. In response to Plaintiff's allegations,

30

"by stating . . . that . . . Plaintiff is a Food Scientist with 'unsatisfactory performance,'" (*id.* ¶ 181 (italics omitted)), and by "represent[ing] in the same 12/18/2009 letter to the United States government that . . . Plaintiff was going to work . . . only for the purpose of predatory sexual intercourse," (*id.* ¶ 68 (italics omitted)). In fact, the referenced letter merely articulates PepsiCo's "legitimate, non-retaliatory reasons for not offering a permanent, full-time position to [Plaintiff]." (PepsiCo's Letter 13.)[26] "A statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts is protected as a statement of opinion and thus not a false statement of fact." *Medcalf*, 938 F. Supp. 2d at 486 (alteration and internal quotation marks omitted) (quoting *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1168 (N.Y. 1993)). Describing in detail Plaintiff's work history, (*see* PepsiCo's Letter 2–7), PepsiCo's Letter never "implies a basis in facts which are not disclosed to the reader or listener," *Gross*, 623 N.E.2d at 1168; *see also Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact."). Examining the statements in context, it is clear that "the unfavorable assessment of his work performance in the letter amounted to a nonactionable expression of opinion." *Ott v. Automatic Connector, Inc.*, 598 N.Y.S.2d 10, 11 (App. Div. 1993); *see also id.* ("An employer has the right to assess an employee's performance on the job without judicial

---

PepsiCo submitted a statement of position to OSHA on December 18, 2009. (*See* Tempesta Decl. Ex. 3 ("PepsiCo's Letter").)

[26] Specifically, PepsiCo's Letter notes that "[Plaintiff] was thought of as being overly deliberate, unable to successfully multi-task, unable to effectively communicate, unsuited for a fast-paced environment, exhibited unprofessional and inappropriate behavior, and failed to follow directions." (PepsiCo's Letter 13.) While Plaintiff repeatedly alleges that PepsiCo labeled him a "sexual predator" in that document, (SAC ¶ 317), PepsiCo's Letter contains no such statement.

31

interference."). For that reason, Plaintiff's defamation claim would fail regardless of its

untimeliness, and the Court thus dismisses this final cause of action. [27]

### III. Conclusion

For the foregoing reasons, Defendants' Motions To Dismiss are granted, and Plaintiff's

Second Amended Complaint is dismissed with prejudice.[28] The Clerk of the Court is

_____

[27] PepsiCo Defendants additionally note that, even if Plaintiff's claim were timely and did in fact state a claim for defamation, the statements at issue would be subject to "the absolute privilege that affords protection to statements 'made prior to, in the institution of, or during the course of a proceeding'" because they were made to OSHA. (*See* PepsiCo Defs.' Mem. 15 (citing *Arya v. Ensil Technical Servs., Inc.*, No. 12-CV-925S, 2012 WL 6690326, at *4 (W.D.N.Y. Dec. 19, 2012) (applying absolute privilege to OSHA proceedings)).) The Court has no need to consider the merits of this argument.

[28] Had the Court considered Plaintiff's Revised SAC, the outcome here would be the same. The repetitive nature of the supposedly more definitive statements (many of which were copied directly from earlier paragraphs in the SAC) does nothing "to cure those deficiencies" that led to this dismissal. *In re Gildan Activewear*, 2009 WL 4544287, at *5.

Along these lines, the Court dismisses Plaintiff's SAC with prejudice because "[t]he problem with [his] causes of action is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *9 (S.D.N.Y. Jan. 3, 2012) (dismissing with prejudice a pro se complaint that was "not simply 'inadequately or inartfully pleaded,' but rather contain[ed] substantive problems such that an amended pleading would be futile"), *aff'd*, 523 F. App'x 32 (2d Cir. 2013). Moreover, the Court has given Plaintiff two bites at the apple, and there is no need for a third bite. *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2nd Cir. 1988) (noting that a complaint may be dismissed with prejudice "where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible"); *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) (dismissing an amended complaint with prejudice where the "[p]laintiff has already been given one opportunity to amend his complaint . . . , and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity"); *Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff] has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"); *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his initial complaint despite "being given ample opportunity to do so"); *Treppel v. Biovail Corp.*, No. 03-CV-3002, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) (finding "that leave to amend

32

respectfully requested to terminate the pending Motions, (*see* Dkt. Nos. 72, 75), and close the case.

SO ORDERED.

DATED:     January 26, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

would be futile because [the] plaintiff has already had two bites at the apple and they have proven fruitless.").

33

ADDENDUM B

**ADDENDUM B**

**Final Judgment of the United States District Court on Plaintiff-Appellant's Second Amended Complaint. Issued 02/10/2016.**

(Appendix Vol. II, TAB 31, UDSC Docket # 98, 98-1, 98-2)

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED 02/10/2016

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

RICKY KAMDEM-OUAFFO,

Plaintiff,

-v-

PEPSICO, INC. and ITS AFFILIATES, DR.
PETER S. GIVEN, JR., DR. NAIJIE
ZHANG, SCENTSATIONAL
TECHNOLOGIES LLC, STEVEN M.
LANDAU, JOHN DOE, and/or JANE DOE,
                                Defendants.
-------------------------------------------------------------X

14 **CIVIL** 227 (KMK)

## **JUDGMENT**

Pro se Plaintiff Ricky Kamdem-Ouaffo ("Plaintiff") having brought this Second Amended

Complaint ("SAC") against PepsiCo, Inc. ("PepsiCo"), Dr. Peter S. Given Jr. ("Dr. Given"), Dr.

Najie Zhang ("Dr. Zhang"), ScentSational Technologies LLC ("ScentSational"), and Steven M.

Landau ("Landau") (collectively, "Defendants"), asserting unenforceable contract, unjust

enrichment, constructive trust, correction of inventorship, and defamation, and before the Court are

two Motions to Dismiss Plaintiff's Second Amended Complaint (collectively, "Motions"), one on

behalf of ScentSational and Landau ("ScentSational Defendants") and on behalf of PepsiCo, Dr.

Given, and Dr. Zhang ("PepsiCo Defendants"), and the matter having come before the Honorable

Kenneth M. Karas, United States District Judge, and the Court, on January 26, 2016, having

rendered its Opinion & Order granting Defendants' Motions to Dismiss and dismissing Plaintiff's

Second Amended Complaint with prejudice; and directing the Clerk of the Court to respectfully

terminate the pending Motions, (see Dkt. Nos. 72, 75), and close the case, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion & Order dated January 26, 2016, Defendants' Motions to Dismiss are granted, and

Plaintiff's Second Amended Complaint is dismissed with prejudice; accordingly, the case is closed.

**Dated:** New York, New York
February 10, 2016

**RUBY J. KRAJICK**

BY:

**Clerk of Court**

K. mango

**Deputy Clerk**

**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis,* but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at http://www.ca2.uscourts.gov/.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (    )(    )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the   ☐ judgment   ☐ order   entered on: _____

(date that judgment or order was entered on docket)

that: _____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

| Dated | Signature* |
|---|---|

| Name (Last, First, MI) | | | |
|---|---|---|---|

| Address | City | State | Zip Code |
|---|---|---|---|

| Telephone Number | E-mail Address (if available) |
|---|---|

_____

*Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

____CV_____ (    )(    )

-against-

**MOTION FOR EXTENSION
OF TIME TO FILE NOTICE
OF APPEAL**

_____

(List the full name(s) of the defendant(s)/respondent(s).)

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appearance within the required
                            date

time period because:

_____

_____

(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

| Dated: | | Signature | |
|---|---|---|---|

**Name (Last, First, MI)**

| Address | City | State | Zip Code |
|---|---|---|---|

| Telephone Number | | E-mail Address (if available) | |
|---|---|---|---|

Rev. 12/23/13

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____CV_____ (    )(    )

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

**MOTION FOR LEAVE TO
PROCEED IN FORMA
PAUPERIS ON APPEAL**

(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma*

*pauperis* on appeal. This motion is supported by the attached affidavit.

Dated                                          Signature

Name (Last, First, MI)

Address              City          State              Zip Code

Telephone Number                     E-mail Address (if available)

Rev. 12/23/13

## Application to Appeal In Forma Pauperis

_____v. _____          Appeal No. _____

                                            District Court or Agency No. _____

| **Affidavit in Support of Motion** | **Instructions** |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.) | Complete all questions in this application and then sign it. Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number. |
| Signed: _____ | Date: _____ |

My issues on appeal are: (<u>required</u>):




I.      *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

| Interest and dividends | $ | $ | $ | $ |
|---|---|---|---|---|
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

4.    *How much cash do you and your spouse have?* $\$$_____

> *Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| **Financial Institution** | **Type of Account** | **Amount you have** | **Amount your spouse has** |
|---|---|---|---|
| | | $\$$ | $\$$ |
| | | $\$$ | $\$$ |
| | | $\$$ | $\$$ |

*If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.*

5.    *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $\$$ | (Value) $\$$ | (Value) $\$$ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $\$$ | (Value) $\$$ | (Value) $\$$ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

6.    *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |

7.    *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.    *Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

|  | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>Are real estate taxes included?    Yes ☐ No ☐<br>Is property insurance included?    Yes ☐ No ☐ | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| Homeowner's or renter's: | $ | $ |
| Life: | $ | $ |
| Health: | $ | $ |
| Motor vehicle: | $ | $ |
| Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
| Motor Vehicle: | $ | $ |
| Credit card (name): | $ | $ |
| Department store (name): | $ | $ |
| Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9. *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

☐ Yes   ☐ No   If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

*If yes, how much?* $ _____

- 5 -

11. *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12. *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____

- 6 -

United States District Court
Southern District of New York

## HOW TO APPEAL YOUR CASE TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at http://www.ca2.uscourts.gov/.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

ADDENDUM C

# ADDENDUM C

US Patent No. 8,474,637 B2: *"Releasable Entrapment of Aroma Using Polymeric Matrix."* (Appendix Vol. II, TAB 14, UDSC Docket # 52, p. 11, SAC ¶41)

.

US008474637B2

(12) **United States Patent**
Zhang et al.

(10) **Patent No.:**  **US 8,474,637 B2**
(45) **Date of Patent:**  **Jul. 2, 2013**

(54) **RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX**

(75) Inventors: **Naijie Zhang**, Ridgefield, CT (US); **Peter Given**, Ridgefield, CT (US)

(73) Assignee: **PepsiCo, Inc.**, Purchase, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 80 days.

(21) Appl. No.: **12/831,683**

(22) Filed: **Jul. 7, 2010**

(65) **Prior Publication Data**

US 2012/0006909 A1      Jan. 12, 2012

(51) **Int. Cl.**
*B65D 53/06*      (2006.01)
*B32B 3/02*      (2006.01)

(52) **U.S. Cl.**
USPC .......... 215/344; 215/347; 523/102; 428/35.7; 428/905

(58) **Field of Classification Search**
USPC .................. 523/102; 215/344, 347; 428/905
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,599,859 A | 8/1971 | Maierson | |
| 4,874,129 A | 10/1989 | DiSapio | |
| 5,249,676 A | 10/1993 | Ashcraft | |
| 5,355,551 A | * | 10/1994 | Schechter et al. ............. 16/87.2 |
| 5,635,229 A | 6/1997 | Ray | |
| 5,736,595 A | 4/1998 | Gunther | |
| 5,779,519 A | * | 7/1998 | Oliver ............................ 451/28 |
| 6,102,224 A | 8/2000 | Sun | |
| 6,394,264 B2 | * | 5/2002 | Riviello, Jr. ............... 206/213.1 |
| 6,511,726 B1 | 1/2003 | Kinigakis | |
| 2004/0166063 A1 | 8/2004 | Siegel | |
| 2006/0039958 A1 | 2/2006 | Fuisz | |
| 2007/0104902 A1 | * | 5/2007 | Popplewell et al. ......... 428/34.2 |

| | | |
|---|---|---|
| 2007/0114142 A1 | 5/2007 | Sine |
| 2007/0262165 A1 | 11/2007 | Landau |
| 2009/0258812 A1 | 10/2009 | Sengupta |
| 2010/0055245 A1 | 3/2010 | Havekotte |
| 2010/0104715 A1 | 4/2010 | Norris |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101179955 | 5/2008 |
| EP | 1466833 | 10/2004 |
| GB | 1206047 | 9/1970 |
| GB | 2255555 | 11/1992 |
| WO | 9218601 | 10/1992 |
| WO | 9964323 | 12/1999 |
| WO | 2004034819 | 4/2004 |
| WO | 2006084572 | 8/2006 |
| WO | 2006127935 | 11/2006 |

OTHER PUBLICATIONS

Beeswax, 5 pages, Downloaded from Wikipedia.com on Feb. 7, 2013.*
International Search Report and Written Opinion for PCT/US2011/043042 mailed Oct. 7, 2011.
International Search Report and Written Opinion for PCT/US2009/055601 mailed Dec. 18, 2009 (15 pages).
Communication from the European Patent Office mailed May 4, 2011 for related European Patent Application No. 09792134.0.
Russian Federation Office Action for Russian Patent Application No. 2011112812 dated Feb. 22, 2012.
Office Action dated Apr. 4, 2012 for CN Application No. 200980140532.2 and English translation (13 pages).
D. Valentin, et al., Taste-Odour Interactions in Swet Taste Perception:, Optimizing Sweet Taste in Foods (Ed.) W.J. Spillange Woodhead Publishing, 2006, Chapter 5 (18 pages).
Canadian office Action for Patent Application No. 2,735,858 dated Jun. 27, 2012 (2 pages).
Chinese Office Action for Chinese Application No. 200980140532.2 mailed Dec. 4, 2012 (14 pages).

* cited by examiner

*Primary Examiner* — Tae H Yoon
(74) *Attorney, Agent, or Firm*    Banner & Witcoff, Ltd.

(57)      **ABSTRACT**

An aroma delivery system comprising aroma compound entrapped in a polymeric matrix.

**8 Claims, 2 Drawing Sheets**



FIG. 1A



FIG. 1B



FIG. 1C



FIG. 2A



FIG. 2B



FIG. 2C

US 8,474,637 B2

1                                                          2

## RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

### FIELD OF THE INVENTION

The invention relates to an aroma delivery system. In particular, the invention relates to a water-resistant aroma delivery system comprising entrapped polar, non-polar, and volatile aroma compounds.

### BACKGROUND OF THE INVENTION

Consumers evaluate many products by the aroma emitted from the product or the container in which the product is made available. Both edible and inedible products are evaluated in the way. Edible products such as juices and coffee are expected to have a fresh aroma that replicates or evokes memory of the expected flavor of the product. Inedible consumer products such as personal care products also are evaluated by the aroma. For example, consumers seek mouthwashes that provide a 'fresh' aroma and deodorants, for example, that provide a selected effect, such as 'fresh' or 'sport'. Also, laundry detergents and fabric softeners also may provide such an effect.

Consumer satisfaction with edible products often rests on the aroma perceived when a package is first opened. For example, a consumer expects a strong aroma of coffee when a package is opened, whether the package is opened for the first time and is full, or has been opened before and is not full. Typically, the intensity of the aroma decreases as a container is emptied of product. However, consumers prefer to perceive a characteristic odor each time the package is opened.

The food industry, and particularly the beverage segment of that industry, is highly competitive. Manufacturers take great care and make substantial efforts to formulate their products for quality, to differentiate their products from one another, and to make consumption of a given beverage more enjoyable for their consumers.

An important contribution to the overall beverage experience is the taste of the beverage. Consumers' judgments about taste often are influenced by a beverage's aroma. When a beverage container is first opened and the beverage is poured or consumed from a container, the consumer perceives the aroma of the beverage. Because a beverage's ingredients usually determine its aroma, those ingredients are selected to provide a pleasant aroma, as well as the desired taste characteristics.

Although aroma can have a tremendous impact on the sensation of flavor, it often is difficult to make use of this phenomenon without modifying the ingredients to include aromatic compounds. However, such compounds often adversely affect the taste of the beverage. Therefore, packagers have attempted to design containers that, for example, release an aromatic substance when the container is opened.

Packaging for edible products that release aroma is subject to limitations, including inability to retain the aroma for the life of the package or to design a secure package. For example, aroma delivery systems often preclude incorporation of tamper-resistant features, add significant expense to typical container cost, and do not resist conditions in the retail and consumers' environments that degrade the packaging.

Similarly, other consumer products require adequate aroma release. For example, because the aroma of the product is a significant factor used by consumers when selecting personal care products, consumers commonly attempt to open personal care products to smell the fragrance of the product before deciding to purchase. The quality or impression created often leads to an immediate decision on whether to purchase a product.

However, aroma released from the product typically is the sole source of fragrance experienced by the consumer when opening the cap. The aroma of a product often is not revealed when the consumer opens the container because the orifice through which a product is dispensed is small, or a safety film is used under the cap to protect the integrity of the product. Additionally, it often is difficult to deliver adequate aroma that comes from the beverage itself, and not from the container, to the headspace of a container.

Therefore, overwraps that release aroma and strips on the outside of the container that release aroma, also known as 'scratch and sniff' strips, have been used to deliver aroma. Overwraps, once breached, may present an unsatisfactory appearance to the consumer. Also, a breached overwrap typically is not effective in retaining an aroma.

Repeated use of 'scratch-and-sniff' devices results in decreased efficacy. Also, consumers often do not have confidence that these and other devices accurately portray the aroma of the product. Therefore, consumers tend to open the cap to determine the actual aroma. Also, devices placed on the outside of packages are also not adequate for a consumer who expects to perceive the aroma when the container is opened and that the aroma emanate from the vicinity of the product in the container, and not from the outside of the container.

Typically, these devices are more suitable for inedible items for which the consumer seeks to evaluate a fragrance. Solutions that are suitable for inedible items often are not suitable for edible items, however. In particular, opening the cap cannot reasonably be used to evaluate edible products. Similarly, open overwrap presents a shopworn appearance and will cause a consumer to question the safety or quality of a product.

Providing aroma in a headspace inside a container also does not been satisfactory. Previous attempts to provide closures that release aroma into the headspace have resulted in cumbersome, costly, and aesthetically unattractive executions while failing to meet the needs of either manufacturers or consumers. Additionally, many products have little or no headspace in the container. This lack of headspace greatly reduces the opportunities to use such an aroma delivery system.

Many of these devices and methods rely on microcapsulation technologies, such as gelatin or melamine/formaldehyde microcapsules. However, such devices and methods, and particularly microcapsulation technologies, are suitable only for microcapsulation of non-polar, hydrophobic, or non-volatile aroma material.

Thus, there exists a need for an aroma delivery system for consumer products of diverse types. In particular, there exists a need form an aroma delivery system for delivery of aroma materials that are polar or hydrophilic, or more volatile than materials that can be microcapsulated.

### BRIEF SUMMARY OF THE INVENTION

A first embodiment of the invention is directed to an aroma delivery system. Another embodiment of the invention is directed to a water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In other embodiments of the invention, the polymeric matrix is covered by a secondary protecting film.

Embodiments of the invention are directed to a water-resistant aroma delivery system for volatile, hydrophobic,

3

and hydrophilic aromas. Embodiments of the invention also are directed to containers comprising the delivery system.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows embodiments of the invention on a threaded closure.

FIG. 2 shows embodiments of the invention on a snap closure.

## DETAILED DESCRIPTION OF THE INVENTION

A first embodiment of the invention is directed to an aroma delivery system. Another embodiment of the invention is directed to a water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In other embodiments of the invention, the polymeric matrix is covered by a secondary protecting film.

Embodiments of the invention are directed to a durable, water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In embodiments of the invention, the aroma delivery system typically is applied on the outside of a container in the area under the closure of the container. In particular embodiments of the invention, the system is not exposed, but rather is disposed in a protected area under the closure. In other embodiments of the invention, the aroma delivery system is placed in a location in the container that is torn, broken, or abraded when the container is opened.

Embodiments of the system of the invention are applied in a manner that causes release of aroma compound, and hence the desired aroma, essentially each time the package is opened. In embodiments of the invention, aroma is released when the polymer matrix and the secondary protecting film, if present, are breached or broken and aroma compound in the matrix is exposed to the atmosphere. Thus, embodiments of the invention can be applied to a screw-top container, to a flip-top container, or to any friction-type closure that, upon opening, will breach or break the polymer matrix and the secondary film, if present, expose the aroma compound, and allow release of aroma.

Certain exemplary embodiments of the beverage package products include ready-to-drink beverages, beverage concentrates, syrups, shelf-stable beverages, refrigerated beverages, frozen beverages, and the like; carbonated and non-carbonated soft drinks, liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy drinks, fortified/enhanced water drinks, soy drinks, vegetable drinks, grain-based drinks (e.g., malt beverages), fermented drinks (e.g., yogurt and kefir), coffee beverages, tea beverages, dairy beverages, and mixtures thereof. Beverage package products include bottle, can, and carton products and fountain syrup applications. Embodiments of the invention can be useful for food packages for foods other than beverages including snacks, cakes, cookies, baked goods, fermented food products, yogurt, sour cream, cheese, salsa, ranch dip, fruit sauces, fruit jellies, fruit jams, and fruit preserves.

Any aroma compound suitably is entrapped in polymeric matrix. The aroma compound typically is selected to provide the aromatic experience expected by the user by providing an aroma that is representative of and congruent with the product in the container. The polymeric matrix is selected to entrap the aroma compound, protect the aroma compound from degradation and premature or unintended release, yet release aroma when the polymeric matrix is breached or broken.

The precise aroma used with a product will vary. For example, products that have a manufactured aroma, such as a

4

'fresh' or 'sport' aroma, likely will have that aroma entrapped for delivery from a delivery system embodiment of the invention. Similarly, edible products typically will have an aroma delivery system that enhances or compliments the natural aroma, such as a coffee aroma, a fresh fruit aroma, or a beverage flavor aroma.

Any aroma compound that is sufficiently volatile to release an aroma or scent upon exposure to the atmosphere is suitably used in embodiments of the invention. Embodiments of the invention are directed to delivery of aroma compounds that are more volatile than materials that can be delivered by known techniques, such as encapsulation in gelatin or melamine/formaldehyde microcapsules.

Both polar and non-polar aroma compounds can be entrapped in delivery system embodiments of the invention. Embodiments of the invention are directed to an aroma delivery system in which the aroma compound is polar, hydrophilic, non-polar, hydrophobic, or volatile. The skilled practitioner recognizes that an aroma delivery system capable of delivering polar, hydrophilic, and more volatile compounds also is capable of delivering a non-polar or hydrophobic aroma compound. Other embodiments of the invention are directed to release of aroma from volatile or polar (or hydrophilic) aroma compounds. Still other embodiments of the invention are directed to aroma delivery systems applied to containers used for food and beverage packaging applications. Typically, embodiments are directed to entrapment of volatile polar aroma compounds.

Suitable aroma compounds include perfumes of any type, including natural perfumes such as, for example, frankincense, and manufactured perfumes. Embodiments of the invention incorporate essential oils, such as valencia, lemon, lime, grapefruit, tangerine, orange, and sandalwood. Suitable aroma compounds also are selected from components of essential oils, such as limonene, citral, furaneol, vanillin, and other terpenes, sesquiterpenes, diterpenes, and oxygenated forms of these terpene compounds. Other fruit essences or aromas, such as cherry, pineapple, apple, and mango also are suitable for use in embodiments of the invention.

Similarly, embodiments of the invention incorporate aroma compound that provides coffee aroma, including any of the many aliphatic, acyclic, aromatic benzenoids, heterocyclics, and other compound types known to be present in coffee or coffee aroma.

Aroma compounds can be used in combination. If the delivery system is used for an edible product, each of the components must be food-safe.

With the guidance provided herein, the skilled practitioner will be able to identify and select suitable aroma compound to be incorporated into polymeric matrix for use with various products.

In embodiments of the invention, aroma compound is entrapped in polymeric matrix. The polymeric matrix protects the aroma compound from degradation and premature release. The polymeric matrix releases aroma in response to a breach or breaking of the polymeric matrix, most typically when the container is opened. In embodiments of the invention, this breach or breaking is occasioned by contact between parts of the closure.

Polymeric matrix is selected for a particular usage to resist environmental circumstances that will degrade the polymeric matrix or the aroma compound. For example, polymeric matrix used in food service is selected to be resistant, as required, to moisture, food acids, or any other compound in the product in the container. Shellac, polyvinyl acetate, and zein protein/ethanol (40 percent) solution often are used in food containers. Similarly, a delivery system used in a con-

5

tainer for a product that emits a vapor, such as a solvent, must be resistant to that vapor. With the guidance provided herein, the skilled practitioner will be able to select a suitable polymeric matrix.

Polymer matrix is selected from any polymer that can be prepared containing entrapped aroma compound and providing extended release of the aroma compound from the polymer-aroma film of the aroma delivery system. Polymer matrix is chosen for compatibility with the physical and chemical properties of the aroma compound which, in embodiments of the invention, is polar or hydrophilic, volatile, or non-polar or hydrophobic, or has other properties. Polymer matrix also is selected to protect the aroma compound entrapped therein against heat, moisture, light, especially ultraviolet light, and other deleterious conditions. Polymer matrix is selected from both natural and synthetic polymers.

Various types of natural polymers are suitable for the polymer matrix, including beeswax, plant waxes, and biopolymers. Such natural polymers include shellac, carnauba wax, candellila wax, and zein (corn) protein.

Synthetic polymers typically are prepared by polymerization of suitable ethylenically unsaturated monomers. Suitable synthetic polymers for the polymer matrix include polymers prepared from linear, branched, or cyclic alkyl esters of (meth)acrylic acid; hydroxyalkyl esters of (meth)acrylic acid; alkoxyalkyl(meth)acrylate; (meth)acrylamide; styrene; alpha-methyl styrene; vinyl esters, such as vinyl acetate and vinyl versatate. Suitable mixtures of addition polymers include (meth)acrylic (co)polymers, vinyl acetate polymer, vinyl/acrylic copolymers, styrene/acrylic copolymers, ethylene/vinyl acetate copolymer, and polyvinyl alcohol. Suitable synthetic matrix polymers also include condensation polymers, such as polyesters, polyurethanes, polyureas, polysiloxanes, melamine/formaldehyde resins, and silicones.

Typically, polymeric matrix is selected from natural biopolymers and synthetic polymers. In embodiments of the invention, the polymeric matrix typically is shellac, polyvinyl acetate, zein protein/ethanol (30-40 percent) solution, shellac/ethanol (30-40 percent) solution, or another polymer solution. Combinations of polymeric matrix materials also may be used.

Some embodiments of the invention also include a secondary protective film. A secondary protective film may be included, depending upon the characteristics of the aroma compound and the nature of the polymeric matrix. For example, a secondary protective film may be used in particular with an aroma compound that is particularly volatile or sensitive to degradation, or has any tendency to becoming unstable during storage. In such embodiments of the invention, the secondary protective film helps retain the integrity of the aroma compound and the delivery system. A primary role of a secondary protective film of embodiments of the invention is to provide additional resistance to moisture, and so the film typically is selected to be moisture resistant. Other embodiments of the invention include a secondary protective film primarily to provide additional protection to the aroma compound, for example, in a severe environment. Thus, a secondary protective film can serve different purposes, and the composition of the film thus can be selected to serve those purposes.

In embodiments of the invention, secondary protective films can comprise bio-polymers, polysaccharides such as pectin, agar, carrageenan, alginate, guar gum, xanthan gum, gellan gum, acacia gum, locust bean gum, gum ghatti, starch, modified starch, cellulose, and carboxymethylcellulose; synthetic polymers, such as polyvinyl alcohol, polyvinyl acetate, polyacrylates, polystyrene-acrylate, polyesters, polyure-

6

thanes, polyureas, melamine/formaldehyde resins, and polysiloxanes; natural waxes, beeswax such as carnauba wax, candellila wax, shellac, and natural film formers such as natural shellac and corn zein protein; or any combination thereof.

As with other components of delivery system embodiments of the invention, the secondary protective film comprises food-safe materials for food service packaging.

Delivery systems in accordance with embodiments of the invention are made by mixing aroma compound and polymeric matrix, and applying the combination to a container, where it dries to form a film. In some embodiments of the invention, aroma compound is entrapped in a solution of polymeric matrix in a solvent. In other embodiments of the invention, a dispersion, and particularly a nano-aqueous dispersion, is formed in an aqueous carrier, and the dispersion is applied to the container. For example, an aroma compound in a liquid form is added into a nano-aqueous dispersion such as polyvinyl acetate. Since a nano-particle has a high specific surface area, the aroma compound is efficiently absorbed and entrapped into the nano-particle matrix. Nano-particles of the dispersion then can form a strong, impermeable film, which prevents aroma compound from leaking, degradation, and oxidation when the film is dried. These nano-particles efficiently absorb and entrap the aroma compounds such as polar, hydrophilic, high volatile aromas, whereas a conventional microcapsulation technique would not.

An example of a simple mixture embodiment of the invention is mixture of aroma compound, such as lemon oil, with a food-safe beeswax, plant wax, a protein such as shellac or zein (corn) protein in alcohol solution, or a wax, such as carnauba wax or candellila wax. The mixture then is applied to the closure of a container and allowed to dry to form a film. The film is located on the closure so that the closure will abrade, breach, or break the polymeric matrix and allow aroma compound to escape when the container is opened.

In some embodiments of the invention, it may be preferred to prepare a solution of shellac, such as plasticized shellac, made by dissolving shellac in ethanol at 60° C. to form a solution having between about 30 and about 40 percent shellac. After the shellac is completely dissolved, a plasticizer, such as sucrose, glucose, propylene glycol, glycerol, or polyethylene glycol having a molecular weight of between about 200 and about 1000, is added to the solution and thoroughly mixed with the shellac matrix solution. Plasticized shellac improves film flexibility, strength, and oxygen permeability. Then, aroma compound such as furaneol is thoroughly mixed into and entrapped in the plasticized polymeric matrix solution. The solution then is applied to the container and allowed to dry to form a delivery system embodiment of the invention.

In some embodiments of the invention, aroma compound is dispersed into aqueous polymeric dispersion, such as a 30 percent solution of polyvinyl acetate in water, to form a nano-dispersion, which then is applied to the container and allowed to dry to form a delivery system.

If aroma compound is in a liquid form, such as lemon oil, aroma compound can be directly added into a nano-polymeric aqueous dispersion under vigorous mixing at room temperature. If aroma compound is in powder or solid form, such as furaneol or vanillin, aroma compound is melted by heating prior to adding it into a polymer dispersion. It is important to ensure that aroma compound is homogeneously dispersed into polymer matrix. The aroma concentration in polymer matrix is from about 1 to about 90 percent w/w, typically between about 10 and about 40 percent w/w, and more typically between about 20 and about 30 percent w/w.

7

Other formats also may be suitably employed in forming the aroma compound-containing polymeric matrix. For example, emulsions and other types of dispersions may be formed and applied to the container. The skilled practitioner will, with the guidance provided herein, be able to form a suitable aroma compound-containing polymeric matrix combination for application to a container in accordance with embodiments of the invention.

Any of the embodiments of aroma compound in polymeric matrix applied to a container can be coated with a secondary protective film. Secondary protective film is formed by application of a film-forming material, such as those secondary protective film materials described above, to cover at least part of, and typically all of, the aroma compound/polymeric matrix combination already applied to the container. The secondary protective film also may cover part of the container, for example, to ensure that the edges of the aroma compound-containing polymeric matrix are sealed against degradation.

The surface of the container may be treated or prepared to ensure that the delivery system adheres sufficiently to the container. For example, it may be necessary to roughen the surface of a container formed from polyethylene terephthalate, or to apply an appropriate surface primer. Suitable primers are selected from polyvinyl alcohol and polyvinyl acetate. Any suitable method of surface preparation may be employed to ensure sufficient adhesion of the applied aroma compound-containing polymeric matrix.

Delivery system embodiments of the invention typically are applied to the closure, such as the cap, of the container. The delivery system typically is applied to a portion of the closure that is on the outside of the container but under or within the closure. This placement causes breaching, breaking, scraping, or abrading of the delivery system to expose the aroma compound to the atmosphere and liberate aroma so that the aroma is perceived by the consumer. The placement also protects the delivery system from contact with external entities and ensures that the film is protected and not damaged by, for example, contact with other containers. Aroma delivery system embodiments of the invention also can be applied to the inside of a container that has a closure that is torn open or may be crushed or crumpled upon opening, thus breaching, breaking, scraping, or abrading of the delivery system to expose the aroma compound to the atmosphere and liberate aroma so that the aroma is perceived by the consumer.

Some embodiments of the invention incorporate a threaded cap on a neck, such as on a bottle. In such embodiments, the delivery system is applied to the outside of the neck, typically in the area of the threads that holds the cap on. The delivery system also is located under the cap, so that the cap protects the film, yet abrades, scrapes, breaches, or breaks the film when the cap is removed.

Drawing FIGS. 1A-1C illustrate an embodiment of the invention on a threaded cap. Container 100, such as a bottle, has neck 101 with spiral threads 102 formed on the outside thereof. Annular ring 103 also may be formed on neck 101 below threads 102. Flange 104 may be present to provide the used with support for pouring from the container.

Container 100 is closed by cap 110, which has interior threads 111 complementary to threads 102. Threads 111 cooperate with thread 102 to securely close container 100.

Cap 110 also may have a security feature 105 incorporating flange 113 that cooperates with ring 103. Security feature 105 may include a separation point at 112, so that cap 110 detaches from security feature 105 when the container is opened, or may otherwise indicate that container 100 has been opened, perhaps by deforming flange 113.

8

Delivery system 109 is applied to neck 101 in the area of threads 102 and 103 at a point where cap 110, and particularly threads 111, flange 113, or any combination thereof, rub against neck 101 and delivery system 109 thereon with force sufficient to release aroma from delivery system 109.

Drawing FIGS. 2A-2C illustrate embodiments of the invention for a snap-type closure having delivery system 109 applied thereto. Cap 200 has top 201 and body 205, and may be attached to each other by hinge 203. To close the container, top 201 is retained on body 205 by a friction or interference fit with ridge 210. Top edge 202 typically contacts rim 206 and the top of ridge 210 contacts the interior of top 201 when the container is closed. Interior edge 204 of top 201 thus rubs outside edge 211 with force sufficient to break or breach delivery system 109 applied to outside edge 211 to release aroma therefrom. Delivery system 109 may be attached to all of or to any portion of outside edge 211.

In these embodiments of the invention, the delivery system also can be applied to inside portion 121 at locations where cap 110 rubs on threads 102, or on interior edge 204.

Delivery system embodiments of the invention protect the aroma compound from oxidation or other degradation, prevent leakage, and maintain the aroma character. Embodiments of the invention have a number of advantages over other delivery systems, including easy handling and an easy manufacturing process. The materials, i.e., the aroma compound, the polymeric matrix, and the secondary protective film, used to construct the films are food contact- or food-approved materials, as appropriate. Other advantages include the fact that the film delivery system is moisture-proof, transparent, and colorless, and does not present any issues relating to kosher status and microbial growth

While the invention has been described with respect to specific examples including presently preferred modes of carrying out the invention, those skilled in the art will appreciate that there are numerous variations and permutations of the above described systems and techniques that fall within the spirit and scope of the invention as set forth in the appended claims. For example, embodiments of the aroma delivery system can be applied to other closures of any type, including a threaded closure having the threads on the inside of the neck of the bottle; a slide-in closure such as a cork or a stopper of metal, glass, or rubber, and including a stopper retained by a bail (a "Lightning" closure), or a "Baltimore loop;" or a snap-on or a slide-on cap or cover. Embodiments of the invention also can be applied to the inside of a container which is torn or otherwise disturbed or crushed when opened.

We claim:

1. A container having an openable closure and an aroma delivery system positioned between the closure and container wherein the aroma delivery system comprises:

an aroma compound entrapped within a polymeric matrix; and

a non-replaceable secondary covering film impermeable to the aroma compound, wherein the secondary covering film is in contact with the polymeric matrix; and wherein said aroma compound is released upon initial abrasion of the secondary covering film.

2. The container of claim 1, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophilic compound, and blends thereof.

3. The container of claim 1, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.

US 8,474,637 B2

9

4. The container of claim 1, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, and blends thereof.

5. The container of claim 4, wherein the polymer matrix is a natural wax.

6. The container of claim 1, wherein the container is a beverage container.

7. The container of claim 1, wherein the container is a beverage container having a neck, and the closure comprises a threaded cap.

8. The container of claim 7, wherein the aroma delivery system is located on the neck of the beverage container and initial abrasion of the secondary covering film occurs when the threaded cap is removed from the beverage container.

* * * * *

10

ADDENDUM D(1)

## ADDENDUM D(1)

### (See UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)

- PCT   Application   No.   PCT/US2011/043042;   WIPO   Pub   No. WO/2012/2006328: *"Releasable Entrapment of Aroma Using Polymeric Matrix"*.

**ADDENDUM D(1)**

**(Appendix Vol. II, TAB 14, UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

1) PCT Application No. PCT/US2011/043042; WIPO Pub No. WO/2012/2006328: *"Releasable Entrapment of Aroma Using Polymeric Matrix"*.

Case: 16-1668   Document: 26   Page: 135   Filed: 04/26/2016

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
12 January 2012 (12.01.2012)



PCT

(10) International Publication Number
WO 2012/006328 A1

(51) International Patent Classification:
*A23L 1/22* (2006.01)

(21) International Application Number:
PCT/US2011/043042

(22) International Filing Date:
6 July 2011 (06.07.2011)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
12/831,683   7 July 2010 (07.07.2010)   US

(71) Applicant *(for all designated States except US)*: PEPSI-CO, INC. [US/US]; 700 Anderson Hill Road, Purchase, NY 10577 (US).

(72) Inventors; and

(75) Inventors/Applicants *(for US only)*: ZHANG, Naijie [US/US]; 31 Charter Oak Court, Ridgefield, CT 06877 (US). GIVEN, Peter [US/US]; 16 O'Neill Court, Ridgefield, CT 06877 (US).

(74) Agent: ROKOS, Rebecca, P.; Banner & Witcoff, LTD., 10 South Wacker Drive, Suite 3000, Chicago, IL 60606-7407 (US).

(81) Designated States *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, RO, RS, RU, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) Designated States *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LR, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European (AL, AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

Declarations under Rule 4.17:

— *as to applicant's entitlement to apply for and be granted a patent (Rule 4.17(ii))*

— *as to the applicant's entitlement to claim the priority of the earlier application (Rule 4.17(iii))*

Published:

— *with international search report (Art. 21(3))*

WO 2012/006328 A1

(54) Title: RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

(57) Abstract: An aroma delivery system comprising aroma compound entrapped in a polymeric matrix.

## RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

### CROSS-REFERENCE TO RELATED APPLICATIONS

[01]   This application claims priority to U.S. Application Serial No. 12/831,683, filed on July 7, 2010, which is incorporated herein in its entirety.

### FIELD OF THE INVENTION

[02]   The invention relates to an aroma delivery system. In particular, the invention relates to a water-resistant aroma delivery system comprising entrapped polar, non-polar, and volatile aroma compounds.

### BACKGROUND OF THE INVENTION

[03]   Consumers evaluate many products by the aroma emitted from the product or the container in which the product is made available. Both edible and inedible products are evaluated in the way. Edible products such as juices and coffee are expected to have a fresh aroma that replicates or evokes memory of the expected flavor of the product. Inedible consumer products such as personal care products also are evaluated by the aroma. For example, consumers seek mouthwashes that provide a 'fresh' aroma and deodorants, for example, that provide a selected effect, such as 'fresh' or 'sport'. Also, laundry detergents and fabric softeners also may provide such an effect.

[04]   Consumer satisfaction with edible products often rests on the aroma perceived when a package is first opened. For example, a consumer expects a strong aroma of coffee when a package is opened, whether the package is opened for the first time and is full, or has been opened before and is not full. Typically, the intensity of the aroma decreases as a container is emptied of product. However, consumers prefer to perceive a characteristic odor each time the package is opened.

[05]   The food industry, and particularly the beverage segment of that industry, is highly competitive. Manufacturers take great care and make substantial efforts to formulate their products for quality, to differentiate their products from one another, and to make consumption of a given beverage more enjoyable for their consumers.

[06]    An important contribution to the overall beverage experience is the taste of the beverage. Consumers' judgments about taste often are influenced by a beverage's aroma. When a beverage container is first opened and the beverage is poured or consumed from a container, the consumer perceives the aroma of the beverage. Because a beverage's ingredients usually determine its aroma, those ingredients are selected to provide a pleasant aroma, as well as the desired taste characteristics.

[07]    Although aroma can have a tremendous impact on the sensation of flavor, it often is difficult to make use of this phenomenon without modifying the ingredients to include aromatic compounds. However, such compounds often adversely affect the taste of the beverage. Therefore, packagers have attempted to design containers that, for example, release an aromatic substance when the container is opened.

[08]    Packaging for edible products that release aroma is subject to limitations, including inability to retain the aroma for the life of the package or to design a secure package. For example, aroma delivery systems often preclude incorporation of tamper-resistant features, add significant expense to typical container cost, and do not resist conditions in the retail and consumers' environments that degrade the packaging.

[09]    Similarly, other consumer products require adequate aroma release. For example, because the aroma of the product is a significant factor used by consumers when selecting personal care products, consumers commonly attempt to open personal care products to smell the fragrance of the product before deciding to purchase. The quality or impression created often leads to an immediate decision on whether to purchase a product.

[10]    However, aroma released from the product typically is the sole source of fragrance experienced by the consumer when opening the cap. The aroma of a product often is not revealed when the consumer opens the container because the orifice through which a product is dispensed is small, or a safety film is used under the cap to protect the integrity of the product. Additionally, it often is difficult to deliver adequate aroma that comes from the beverage itself, and not from the container, to the headspace of a container.

[11]  Therefore, overwraps that release aroma and strips on the outside of the container that
      release aroma, also known as 'scratch and sniff' strips, have been used to deliver aroma.
      Overwraps, once breached, may present an unsatisfactory appearance to the consumer.
      Also, a breached overwrap typically is not effective in retaining an aroma.

[12]  Repeated use of 'scratch-and-sniff' devices results in decreased efficacy.  Also,
      consumers often do not have confidence that these and other devices accurately portray
      the aroma of the product.  Therefore, consumers tend to open the cap to determine the
      actual aroma.  Also, devices placed on the outside of packages are also not adequate for a
      consumer who expects to perceive the aroma when the container is opened and that the
      aroma emanate from the vicinity of the product in the container, and not from the outside
      of the container.

[13]  Typically, these devices are more suitable for inedible items for which the consumer
      seeks to evaluate a fragrance.  Solutions that are suitable for inedible items often are not
      suitable for edible items, however.  In particular, opening the cap cannot reasonably be
      used to evaluate edible products.  Similarly, open overwrap presents a shopworn
      appearance and will cause a consumer to question the safety or quality of a product.

[14]  Providing aroma in a headspace inside a container also does not been satisfactory.
      Previous attempts to provide closures that release aroma into the headspace have resulted
      in cumbersome, costly, and aesthetically unattractive executions while failing to meet the
      needs of either manufacturers or consumers.  Additionally, many products have little or
      no headspace in the container.  This lack of headspace greatly reduces the opportunities
      to use such an aroma delivery system.

[15]  Many of these devices and methods rely on microcapsulation technologies, such as
      gelatin or melamine/formaldehyde microcapsules.  However, such devices and methods,
      and particularly microcapsulation technologies, are suitable only for microcapsulation of
      non-polar, hydrophobic, or non-volatile aroma material.

[16]  Thus, there exists a need for an aroma delivery system for consumer products of diverse
      types.  In particular, there exists a need form an aroma delivery system for delivery of

aroma materials that are polar or hydrophilic, or more volatile than materials that can be microcapsulated.

## BRIEF SUMMARY OF THE INVENTION

[17] A first embodiment of the invention is directed to an aroma delivery system. Another embodiment of the invention is directed to a water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In other embodiments of the invention, the polymeric matrix is covered by a secondary protecting film.

[18] Embodiments of the invention are directed to a water-resistant aroma delivery system for volatile, hydrophobic, and hydrophilic aromas. Embodiments of the invention also are directed to containers comprising the delivery system.

## BRIEF DESCRIPTION OF THE DRAWINGS

[19] Figure 1 shows embodiments of the invention on a threaded closure.

[20] Figure 2 shows embodiments of the invention on a snap closure.

## DETAILED DESCRIPTION OF THE INVENTION

[21] A first embodiment of the invention is directed to an aroma delivery system. Another embodiment of the invention is directed to a water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In other embodiments of the invention, the polymeric matrix is covered by a secondary protecting film.

[22] Embodiments of the invention are directed to a durable, water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In embodiments of the invention, the aroma delivery system typically is applied on the outside of a container in the area under the closure of the container. In particular embodiments of the invention, the system is not exposed, but rather is disposed in a protected area under the closure. In other embodiments of the invention, the aroma delivery system is placed in a location in the container that is torn, broken, or abraded when the container is opened.

[23]    Embodiments of the system of the invention are applied in a manner that causes release
        of aroma compound, and hence the desired aroma, essentially each time the package is
        opened. In embodiments of the invention, aroma is released when the polymer matrix
        and the secondary protecting film, if present, are breached or broken and aroma
        compound in the matrix is exposed to the atmosphere. Thus, embodiments of the
        invention can be applied to a screw-top container, to a flip-top container, or to any
        friction-type closure that, upon opening, will breach or break the polymer matrix and the
        secondary film, if present, expose the aroma compound, and allow release of aroma.

[24]    Certain exemplary embodiments of the beverage package products include ready-to-
        drink beverages, beverage concentrates, syrups, shelf-stable beverages, refrigerated
        beverages, frozen beverages, and the like; carbonated and non-carbonated soft drinks,
        liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy
        drinks, fortified/enhanced water drinks, soy drinks, vegetable drinks, grain-based drinks
        (e.g., malt beverages), fermented drinks (e.g., yogurt and kefir), coffee beverages, tea
        beverages, dairy beverages, and mixtures thereof. Beverage package products include
        bottle, can, and carton products and fountain syrup applications. Embodiments of the
        invention can be useful for food packages for foods other than beverages including
        snacks, cakes, cookies, baked goods, fermented food products, yogurt, sour cream,
        cheese, salsa, ranch dip, fruit sauces, fruit jellies, fruit jams, and fruit preserves.

[25]    Any aroma compound suitably is entrapped in polymeric matrix. The aroma compound
        typically is selected to provide the aromatic experience expected by the user by
        providing an aroma that is representative of and congruent with the product in the
        container. The polymeric matrix is selected to entrap the aroma compound, protect the
        aroma compound from degradation and premature or unintended release, yet release
        aroma when the polymeric matrix is breached or broken.

[26]    The precise aroma used with a product will vary. For example, products that have a
        manufactured aroma, such as a 'fresh' or 'sport' aroma, likely will have that aroma
        entrapped for delivery from a delivery system embodiment of the invention. Similarly,
        edible products typically will have an aroma delivery system that enhances or
        compliments the natural aroma, such as a coffee aroma, a fresh fruit aroma, or a beverage
        flavor aroma.

[27]   Any aroma compound that is sufficiently volatile to release an aroma or scent upon
exposure to the atmosphere is suitably used in embodiments of the invention.
Embodiments of the invention are directed to delivery of aroma compounds that are
more volatile than materials that can be delivered by known techniques, such as
encapsulation in gelatin or melamine/formaldehyde microcapsules.

[28]   Both polar and non-polar aroma compounds can be entrapped in delivery system
embodiments of the invention. Embodiments of the invention are directed to an aroma
delivery system in which the aroma compound is polar, hydrophilic, non-polar,
hydrophobic, or volatile. The skilled practitioner recognizes that an aroma delivery
system capable of delivering polar, hydrophilic, and more volatile compounds also is
capable of delivering a non-polar or hydrophobic aroma compound. Other embodiments
of the invention are directed to release of aroma from volatile or polar (or hydrophilic)
aroma compounds. Still other embodiments of the invention are directed to aroma
delivery systems applied to containers used for food and beverage packaging
applications. Typically, embodiments are directed to entrapment of volatile polar aroma
compounds.

[29]   Suitable aroma compounds include perfumes of any type, including natural perfumes
such as, for example, frankincense, and manufactured perfumes. Embodiments of the
invention incorporate essential oils, such as valencia, lemon, lime, grapefruit, tangerine,
orange, and sandalwood. Suitable aroma compounds also are selected from components
of essential oils, such as limonene, citral, furaneol, vanillin, and other terpenes,
sesquiterpenes, diterpenes, and oxygenated forms of these terpene compounds. Other
fruit essences or aromas, such as cherry, pineapple, apple, and mango also are suitable
for use in embodiments of the invention.

[30]   Similarly, embodiments of the invention incorporate aroma compound that provides
coffee aroma, including any of the many aliphatic, acyclic, aromatic benzenoids,
heterocyclics, and other compound types known to be present in coffee or coffee aroma.

[31]   Aroma compounds can be used in combination. If the delivery system is used for an
edible product, each of the components must be food-safe.

[32]  With the guidance provided herein, the skilled practitioner will be able to identify and select suitable aroma compound to be incorporated into polymeric matrix for use with various products.

[33]  In embodiments of the invention, aroma compound is entrapped in polymeric matrix. The polymeric matrix protects the aroma compound from degradation and premature release. The polymeric matrix releases aroma in response to a breach or breaking of the polymeric matrix, most typically when the container is opened. In embodiments of the invention, this breach or breaking is occasioned by contact between parts of the closure.

[34]  Polymeric matrix is selected for a particular usage to resist environmental circumstances that will degrade the polymeric matrix or the aroma compound. For example, polymeric matrix used in food service is selected to be resistant, as required, to moisture, food acids, or any other compound in the product in the container. Shellac, polyvinyl acetate, and zein protein/ethanol (40 percent) solution often are used in food containers. Similarly, a delivery system used in a container for a product that emits a vapor, such as a solvent, must be resistant to that vapor. With the guidance provided herein, the skilled practitioner will be able to select a suitable polymeric matrix.

[35]  Polymer matrix is selected from any polymer that can be prepared containing entrapped aroma compound and providing extended release of the aroma compound from the polymer-aroma film of the aroma delivery system. Polymer matrix is chosen for compatibility with the physical and chemical properties of the aroma compound which, in embodiments of the invention, is polar or hydrophilic, volatile, or non-polar or hydrophobic, or has other properties. Polymer matrix also is selected to protect the aroma compound entrapped therein against heat, moisture, light, especially ultraviolet light, and other deleterious conditions. Polymer matrix is selected from both natural and synthetic polymers.

[36]  Various types of natural polymers are suitable for the polymer matrix, including beeswax, plant waxes, and biopolymers. Such natural polymers include shellac, carnauba wax, candellila wax, and zein (corn) protein.

[37] Synthetic polymers typically are prepared by polymerization of suitable ethylenically unsaturated monomers. Suitable synthetic polymers for the polymer matrix include polymers prepared from linear, branched, or cyclic alkyl esters of (meth)acrylic acid; hydroxyalkyl esters of (meth)acrylic acid; alkoxyalkyl (meth)acrylate; (meth)acrylamide; styrene; alpha-methyl styrene; vinyl esters, such as vinyl acetate and vinyl versatate. Suitable mixtures of addition polymers include (meth)acrylic (co)polymers, vinyl acetate polymer, vinyl/acrylic copolymers, styrene/acrylic copolymers, ethylene/vinyl acetate copolymer, and polyvinyl alcohol. Suitable synthetic matrix polymers also include condensation polymers, such as polyesters, polyurethanes, polyureas, polysiloxanes, melamine/formaldehyde resins, and silicones.

[38] Typically, polymeric matrix is selected from natural biopolymers and synthetic polymers. In embodiments of the invention, the polymeric matrix typically is shellac, polyvinyl acetate, zein protein/ethanol (30-40 percent) solution, shellac/ethanol (30-40 percent) solution, or another polymer solution. Combinations of polymeric matrix materials also may be used.

[39] Some embodiments of the invention also include a secondary protective film. A secondary protective film may be included, depending upon the characteristics of the aroma compound and the nature of the polymeric matrix. For example, a secondary protective film may be used in particular with an aroma compound that is particularly volatile or sensitive to degradation, or has any tendency to becoming unstable during storage. In such embodiments of the invention, the secondary protective film helps retain the integrity of the aroma compound and the delivery system. A primary role of a secondary protective film of embodiments of the invention is to provide additional resistance to moisture, and so the film typically is selected to be moisture resistant. Other embodiments of the invention include a secondary protective film primarily to provide additional protection to the aroma compound, for example, in a severe environment. Thus, a secondary protective film can serve different purposes, and the composition of the film thus can be selected to serve those purposes.

[40] In embodiments of the invention, secondary protective films can comprise bio-polymers, polysaccharides such as pectin, agar, carrageenan, alginate, guar gum, xanthan gum, gellan gum, acacia gum, locust bean gum, gum ghatti, starch, modified starch, cellulose,

and carboxymethylcellulose; synthetic polymers, such as polyvinyl alcohol, polyvinyl acetate, polyacrylates, polystyrene-acrylate, polysters, polyurethanes, polyureas, melamine/formaldehyde resins, and polysiloxanes; natural waxes, beeswax such as carnauba wax, candellila wax, shellac, and natural film formers such as natural shellac and corn zein protein; or any combination thereof.

[41]  As with other components of delivery system embodiments of the invention, the secondary protective film comprises food-safe materials for food service packaging.

[42]  Delivery systems in accordance with embodiments of the invention are made by mixing aroma compound and polymeric matrix, and applying the combination to a container, where it dries to form a film. In some embodiments of the invention, aroma compound is entrapped in a solution of polymeric matrix in a solvent. In other embodiments of the invention, a dispersion, and particularly a nano-aqueous dispersion, is formed in an aqueous carrier, and the dispersion is applied to the container. For example, an aroma compound in a liquid form is added into a nano-aqueous dispersion such as polyvinyl acetate. Since a nano-particle has a high specific surface area, the aroma compound is efficiently absorbed and entrapped into the nano-particle matrix. Nano-particles of the dispersion then can form a strong, impermeable film, which prevents aroma compound from leaking, degradation, and oxidation when the film is dried. These nano-particles efficiently absorb and entrap the aroma compounds such as polar, hydrophilic, high volatile aromas, whereas a conventional microcapsulation technique would not.

[43]  An example of a simple mixture embodiment of the invention is mixture of aroma compound, such as lemon oil, with a food-safe beeswax, plant wax, a protein such as shellac or zein (corn) protein in alcohol solution, or a wax, such as carnauba wax or candellila wax. The mixture then is applied to the closure of a container and allowed to dry to form a film. The film is located on the closure so that the closure will abrade, breach, or break the polymeric matrix and allow aroma compound to escape when the container is opened.

[44]  In some embodiments of the invention, it may be preferred to prepare a solution of shellac, such as plasticized shellac, made by dissolving shellac in ethanol at 60°C to form a solution having between about 30 and about 40 percent shellac. After the shellac is

completely dissolved, a plasticizer, such as sucrose, glucose, propylene glycol, glycerol, or polyethylene glycol having a molecular weight of between about 200 and about 1000, is added to the solution and thoroughly mixed with the shellac matrix solution. Plasticized shellac improves film flexibility, strength, and oxygen permeability. Then, aroma compound such as furaneol is thoroughly mixed into and entrapped in the plasticized polymeric matrix solution. The solution then is applied to the container and allowed to dry to form a delivery system embodiment of the invention.

[45]    In some embodiments of the invention, aroma compound is dispersed into aqueous polymeric dispersion, such as a 30 percent solution of polyvinyl acetate in water, to form a nano-dispersion, which then is applied to the container and allowed to dry to form a delivery system.

[46]    If aroma compound is in a liquid form, such as lemon oil, aroma compound can be directly added into a nano-polymeric aqueous dispersion under vigorous mixing at room temperature. If aroma compound is in powder or solid form, such as furaneol or vanillin, aroma compound is melted by heating prior to adding it into a polymer dispersion. It is important to ensure that aroma compound is homogeneously dispersed into polymer matrix. The aroma concentration in polymer matrix is from about 1 to about 90 percent w/w, typically between about 10 and about 40 percent w/w, and more typically between about 20 and about 30 percent w/w.

[47]    Other formats also may be suitably employed in forming the aroma compound-containing polymeric matrix. For example, emulsions and other types of dispersions may be formed and applied to the container. The skilled practitioner will, with the guidance provided herein, be able to form a suitable aroma compound-containing polymeric matrix combination for application to a container in accordance with embodiments of the invention.

[48]    Any of the embodiments of aroma compound in polymeric matrix applied to a container can be coated with a secondary protective film. Secondary protective film is formed by application of a film-forming material, such as those secondary protective film materials described above, to cover at least part of, and typically all of, the aroma compound/polymeric matrix combination already applied to the container. The

secondary protective film also may cover part of the container, for example, to ensure that the edges of the aroma compound-containing polymeric matrix are sealed against degradation.

[49] The surface of the container may be treated or prepared to ensure that the delivery system adheres sufficiently to the container. For example, it may be necessary to roughen the surface of a container formed from polyethylene terephthalate, or to apply an appropriate surface primer. Suitable primers are selected from polyvinyl alcohol and polyvinyl acetate. Any suitable method of surface preparation may be employed to ensure sufficient adhesion of the applied aroma compound-containing polymeric matrix.

[50] Delivery system embodiments of the invention typically are applied to the closure, such as the cap, of the container. The delivery system typically is applied to a portion of the closure that is on the outside of the container but under or within the closure. This placement causes breaching, breaking, scraping, or abrading of the delivery system to expose the aroma compound to the atmosphere and liberate aroma so that the aroma is perceived by the consumer. The placement also protects the delivery system from contact with external entities and ensures that the film is protected and not damaged by, for example, contact with other containers. Aroma delivery system embodiments of the invention also can be applied to the inside of a container that has a closure that is torn open or may be crushed or crumpled upon opening, thus breaching, breaking, scraping, or abrading of the delivery system to expose the aroma compound to the atmosphere and liberate aroma so that the aroma is perceived by the consumer.

[51] Some embodiments of the invention incorporate a threaded cap on a neck, such as on a bottle. In such embodiments, the delivery system is applied to the outside of the neck, typically in the area of the threads that holds the cap on. The delivery system also is located under the cap, so that the cap protects the film, yet abrades, scrapes, breaches, or breaks the film when the cap is removed.

[52] Drawing Figures 1A – 1C illustrate an embodiment of the invention on a threaded cap. Container 100, such as a bottle, has neck 101 with spiral threads 102 formed on the outside thereof. Annular ring 103 also may be formed on neck 101 below threads 102.

Flange 104 may be present to provide the used with support for pouring from the container.

[53]    Container 100 is closed by cap 110, which has interior threads 111 complementary to threads 102. Threads 111 cooperate with thread 102 to securely close container 100.

[54]    Cap 110 also may have a security feature 105 incorporating flange 113 that cooperates with ring 103. Security feature 105 may include a separation point at 112, so that cap 110 detaches from security feature 105 when the container is opened, or may otherwise indicate that container 100 has been opened, perhaps by deforming flange 113.

[55]    Delivery system 109 is applied to neck 101 in the area of threads 102 and 103 at a point where cap 110, and particularly threads 111, flange 113, or any combination thereof, rub against neck 101 and delivery system 109 thereon with force sufficient to release aroma from delivery system 109.

[56]    Drawing Figures 2A – 2C illustrate embodiments of the invention for a snap-type closure having delivery system 109 applied thereto. Cap 200 has top 201 and body 205, and may be attached to each other by hinge 203. To close the container, top 201 is retained on body 205 by a friction or interference fit with ridge 210. Top edge 202 typically contacts rim 206 and the top of ridge 210 contacts the interior of top 201 when the container is closed. Interior edge 204 of top 201 thus rubs outside edge 211 with force sufficient to break or breach delivery system 109 applied to outside edge 211 to release aroma therefrom. Delivery system 109 may be attached to all of or to any portion of outside edge 211.

[57]    In these embodiments of the invention, the delivery system also can be applied to inside portion 121 at locations where cap 110 rubs on threads 102, or on interior edge 204.

[58]    Delivery system embodiments of the invention protect the aroma compound from oxidation or other degradation, prevent leakage, and maintain the aroma character. Embodiments of the invention have a number of advantages over other delivery systems, including easy handling and an easy manufacturing process. The materials, i.e., the aroma compound, the polymeric matrix, and the secondary protective film, used to construct the films are food contact- or food-approved materials, as

appropriate. Other advantages include the fact that the film delivery system is moisture-proof, transparent, and colorless, and does not present any issues relating to kosher status and microbial growth

[59]     While the invention has been described with respect to specific examples including presently preferred modes of carrying out the invention, those skilled in the art will appreciate that there are numerous variations and permutations of the above described systems and techniques that fall within the spirit and scope of the invention as set forth in the appended claims. For example, embodiments of the aroma delivery system can be applied to other closures of any type, including a threaded closure having the threads on the inside of the neck of the bottle; a slide-in closure such as a cork or a stopper of metal, glass, or rubber, and including a stopper retained by a bail (a "Lightning" closure), or a "Baltimore loop;" or a snap-on or a slide-on cap or cover. Embodiments of the invention also can be applied to the inside of a container which is torn or otherwise disturbed or crushed when opened.

We Claim:

1.        An aroma delivery system comprising a film of aroma compound releasably entrapped in a polymeric matrix.

2.        The aroma delivery system of claim 1, wherein the matrix has a surface and further comprising a secondary covering film covering the surface.

3.        The aroma delivery system of claim 1, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophilic compound, and blends thereof.

4.        The aroma delivery system of claim 2, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophilic compound, and blends thereof.

5.        The aroma delivery system of claim 1, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof.

6.        The aroma delivery system of claim 2, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof.

7.        The aroma delivery system of claim 3, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof.

8.        The aroma delivery system of claim 4, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof.

15

9.      The aroma delivery system of claim 2, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.

10.      The aroma delivery system of claim 4, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.

11.      The aroma delivery system of claim 6, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.

12.      The aroma delivery system of claim 8, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.

13.      A container having an openable closure and comprising an aroma delivery system that releases aroma when the closure is opened, the aroma delivery system comprising a film of aroma compound releasably entrapped in a polymeric matrix.

14.      The container of claim 13, wherein the matrix has a surface and further comprising a secondary covering film covering the surface.

15.      The container of claim 13, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophilic compound, and blends thereof.

16.      The container of claim 14, wherein the aroma compound is selected from the group consisting of a natural wax, a volatile compound, a polar compound, a hydrophilic compound, and blends thereof.

17.      The container of claim 13, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof.

18.      The container of claim 14, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof.

19.      The container of claim 15, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.

20.      The container of claim 16, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.



FIG. 1A



FIG. 1B



FIG. 1C

WO 2012/006328                                    PCT/US2011/043042

2/2



FIG. 2A



FIG. 2B



FIG. 2C

International application No

PCT/US2011/043042

**A. CLASSIFICATION OF SUBJECT MATTER**
INV. A23L1/22
ADD.

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
A23L  B65D

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

EPO-Internal, FSTA, WPI Data

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | US 6 102 224 A (SUN RICKSON [US] ET AL)<br>15 August 2000 (2000-08-15)<br>column 4, lines 48-53<br>claims 4, 5<br>----- | 1-20 |
| X | US 5 249 676 A (ASHCRAFT CHARLES R [US] ET<br>AL) 5 October 1993 (1993-10-05)<br>example 1<br>----- | 1-20 |
| X | US 2007/262165 A1 (LANDAU STEVEN M [US])<br>15 November 2007 (2007-11-15)<br>page 4, right-hand column, paragraph 0044<br>- paragraph 0045<br>----- | 1,3 |
| X | US 3 599 859 A (MAIERSON THEODORE)<br>17 August 1971 (1971-08-17)<br>example 1<br>----- | 1,3,7,8,<br>13,15,17 |
| | -/-- | |

[X] Further documents are listed in the continuation of Box C.    [X] See patent family annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 29 September 2011 | 07/10/2011 |

| Name and mailing address of the ISA/ | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2<br>NL - 2280 HV Rijswijk<br>Tel. (+31-70) 340-2040,<br>Fax: (+31-70) 340-3016 | Delorenzi, Sibilla |

Form PCT/ISA/210 (second sheet) (April 2005)

| C(Continuation). DOCUMENTS CONSIDERED TO BE RELEVANT | | |
|---|---|---|
| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| X | US 2006/039958 A1 (FUISZ RICHARD C [US] ET AL) 23 February 2006 (2006-02-23) paragraph [0123] - paragraph [0124] ----- | 1-12 |
| A | GB 2 255 555 A (TOYO SEIKAN KAISHA LTD [JP]) 11 November 1992 (1992-11-11) example 4 ----- | 1-20 |
| A | WO 2006/084572 A1 (UNILEVER PLC [GB]; UNILEVER NV [NL]; LEVER HINDUSTAN LTD [IN]; DROSOS) 17 August 2006 (2006-08-17) claims 1, 3, 5 ----- | 1-20 |
| A | US 2010/055245 A1 (HAVEKOTTE MARGARET [US] ET AL) 4 March 2010 (2010-03-04) claims 1, 2, 12 paragraph [0018] ----- | 1-20 |
| A | US 2010/104715 A1 (NORRIS JOSEPH T [US] ET AL) 29 April 2010 (2010-04-29) claims 1, 9 ----- | 1-20 |

INTERNATIONAL SEARCH REPORT

Information on patent family members

International application No

PCT/US2011/043042

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| US 6102224 | A | 15-08-2000 | NONE | | |
| US 5249676 | A | 05-10-1993 | NONE | | |
| US 2007262165 | A1 | 15-11-2007 | EP | 2125555 A2 | 02-12-2009 |
| | | | WO | 2007133438 A2 | 22-11-2007 |
| US 3599859 | A | 17-08-1971 | AR | 196973 A1 | 08-03-1974 |
| | | | BE | 758391 A1 | 16-04-1971 |
| | | | CH | 521899 A | 30-04-1972 |
| | | | ES | 197812 Y | 01-11-1975 |
| | | | FR | 2072223 A5 | 24-09-1971 |
| | | | GB | 1303305 A | 17-01-1973 |
| | | | ZA | 7004824 A | 28-04-1971 |
| US 2006039958 | A1 | 23-02-2006 | US | 2011200715 A1 | 18-08-2011 |
| GB 2255555 | A | 11-11-1992 | JP | 4339772 A | 26-11-1992 |
| | | | US | 5381914 A | 17-01-1995 |
| WO 2006084572 | A1 | 17-08-2006 | NONE | | |
| US 2010055245 | A1 | 04-03-2010 | AR | 073489 A1 | 10-11-2010 |
| | | | CA | 2735858 A1 | 11-03-2010 |
| | | | CN | 102186361 A | 14-09-2011 |
| | | | EP | 2339931 A1 | 06-07-2011 |
| | | | WO | 2010027969 A1 | 11-03-2010 |
| US 2010104715 | A1 | 29-04-2010 | WO | 2011043889 A2 | 14-04-2011 |

ADDENDUM D(2)

# ADDENDUM D(2)

## (See UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)

- PCT Application No. PCT/US2012/049503; WIPO Pub No. WO/2013/032631: *"Releasably Encapsulated Aroma"*

# ADDENDUM D(2)

**(Appendix Vol. II, TAB 14, UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

**2)** PCT   Application   No.   PCT/US2012/049503;   WIPO   Pub   No. WO/2013/032631: *"Releasably Encapsulated Aroma"*

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property
Organization
International Bureau



**WIPO | PCT**

(43) International Publication Date
7 March 2013 (07.03.2013)

(10) International Publication Number
**WO 2013/032631 A1**

(51) International Patent Classification:
*A23L 1/22* (2006.01)     *B01J 13/10* (2006.01)
*A23L 2/56* (2006.01)     *B65D 51/24* (2006.01)

(21) International Application Number:
PCT/US2012/049503

(22) International Filing Date:
3 August 2012 (03.08.2012)

(25) Filing Language:          English

(26) Publication Language:     English

(30) Priority Data:
13/223,834     1 September 2011 (01.09.2011)     US

(71) Applicant *(for all designated States except US)*: PEP-SICO, INC. [US/US]; 700 Anderson Hill Road, Purchase, NY 10577 (US).

(72) Inventors; and
(75) Inventors/Applicants *(for US only)*: ZHANG, Naijie [US/US]; 31 Charter Oak Court, Ridgefield, CT 06877 (US). GIVEN, Peter, S. [US/US]; 16 O'Neill Court, Ridgefield, CT 06877 (US).

(74) Agent: ROKOS, Rebecca, P.; Banner & Witcoff, Ltd., Ten South Wacker Drive, Suite 3000, Chicago, IL 60606-7407 (US).

(81) Designated States *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BN, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, QA, RO, RS, RU, RW, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) Designated States *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LR, LS, MW, MZ, NA, RW, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, RU, TJ, TM), European (AL, AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

Declarations under Rule 4.17:

— *as to applicant's entitlement to apply for and be granted a patent (Rule 4.17(ii))*

*[Continued on next page]*

(54) Title: RELEASABLY ENCAPSULATED AROMA



FIG. 1A

(57) Abstract: Gelatin capsules encapsulating an aroma material including at least one aroma compound may be applied to product packaging, such as food packaging, container (100) etc., with a secondary protective coating, e.g., at the interface of a container and its closure device. The gelatin capsules can be ruptured or broken when the container is opened, thereby releasing the aroma compound and causing a favorable aroma for the consumer. The secondary protective coating can reduce or prevent degradation of the gelatin capsules during product packaging, transport, and storage, thereby enhancing their performance.

WO 2013/032631 A1

# WO 2013/032631 A1 |IIIII IIIIIIII IIIIII IIIIIIIIIIIII IIII IIIII IIIII IIIIIIIIIIII IIIII IIIIIIIIIIIIII

— *as to the applicant's entitlement to claim the priority of the earlier application (Rule 4.17(iii))*

**Published**:

— *with international search report (Art. 21(3))*

— *before the expiration of the time limit for amending the claims and to be republished in the event of receipt of amendments (Rule 48.2(h))*

### RELEASABLY ENCAPSULATED AROMA

#### PRIORITY CLAIM

[01]    This application claims priority to U.S. Utility Patent Application No. 12/223,834,
filed September 1, 2011, titled "*Releasably Encapsulated Aroma*", the entire
disclosure of which is herein incorporated by reference.

#### FIELD OF THE INVENTION

[02]    The invention relates to an aroma delivery system. In particular, the invention relates
to an aroma delivery system comprising one or more polar, non-polar and/or volatile
aroma compounds encapsulated in gelatin capsules. Product packages and the like
comprising such releasable aroma also are provided.

#### BACKGROUND OF THE INVENTION

[03]    Consumers evaluate many products by the aroma emitted from the product or the
container in which the product is made available. Some consumers prefer to perceive
a characteristic product odor each time the package is opened. Edible products, such
as juices and coffee, are expected to have a fresh aroma that replicates or evokes
memory of the expected flavor of the product. Research has shown that aromas can in
some instances have substantial impact on consumer perception of the taste of a
beverage or other food, trigger a favorable emotional response, elicit a favorable
memory, and/or otherwise improve overall product performance. Inedible consumer
products such as personal care products also are evaluated by the aroma. For
example, consumers seek mouthwashes that provide a 'fresh' aroma and deodorants.
for example, that provide a selected effect. such as 'fresh' or 'sport'. Laundry
detergents and fabric softeners also may provide such an effect.

[04]    When a beverage or other food container is first opened, it is often desirable that the
consumer perceives the aroma of the food. Because the food's ingredients usually
determine its aroma, those ingredients can be selected to provide a pleasant aroma, as
well as the desired taste characteristics. In some cases it may be problematic,
however, to make use of this phenomenon without modifying the ingredients to

1

include aromatic compounds that would adversely affect the taste of the food or beverage. Therefore, packagers have attempted to design containers that, for example, release an aromatic substance when the container is opened. Similar aroma release may be necessary or useful for other consumer products as well. For example, because the aroma of the product is a significant factor used by consumers when selecting personal care products, consumers commonly attempt to open personal care products to smell the fragrance of the product before deciding to purchase. The quality or impression created often leads to an immediate decision on whether to purchase a product.

[05]    The aroma of a product often is not adequately revealed when the consumer opens the container because the orifice through which a product is dispensed is small, or a safety film is used under the cap to protect the integrity of the product. Additionally, it often is difficult to deliver adequate aroma to a headspace of a container that comes from the beverage itself, and not from the container. Therefore, overwraps that release aroma and strips on the outside of the container that release aroma, also known as "scratch and sniff" strips, have been used to deliver aroma to consumers. However, overwraps, once breached, may present an unsatisfactory appearance to the consumer and typically are not effective in retaining an aroma. Devices placed on the outside of packages are also not always satisfactory for a consumer who expects to perceive the aroma from the product itself when the container is opened, rather than from the outside of its container. Also, consumers often do not have confidence that "scratch-and-sniff" devices accurately portray the aroma of the product. Therefore, consumers tend to open the cap or closure of a product's packaging, seeking to experience the product's aroma.

[06]    Thus, there exists a need for an aroma delivery system for consumer products of diverse types. In particular, there exists a need for an aroma delivery system for delivery of aroma materials that are polar, hydrophilic, or volatile.

## BRIEF SUMMARY OF THE INVENTION

[07]    A first aspect of the invention is directed to an aroma delivery system that comprises gelatin capsules each having a surface and formed of material comprising gelatin. An aroma material comprising an aroma compound (i.e., at least one compound effective

2

to create an aroma when released into the air) is releasably encapsulated in the gelatin capsules. A secondary protective coating is provided on the surface of the gelatin capsules to protect the capsules and the aroma compounds encapsulated in them from degradation, e.g., due to exposure to moisture, oxygen, etc. The gelatin capsules can be disposed on product packaging, e.g., on a beverage bottle, other food container, etc., to be ruptured or broken open during opening of the package. The secondary protective coating can be provided on the surface of the gelatin capsules after applying the capsules to the packaging. The capsules are ruptured or broken open during opening of the package, typically, for example, by friction or impact contact between surfaces of the packaging, e.g., between the surface of a container and an adjacent surface of a closure device for the container, which closure device is moved relative to the container to open the container. In certain embodiment, for example, the gelatin capsules with secondary protective coating are applied at the interface of a bottle cap and the neck of the bottle such that pulling or twisting the cap off ruptures at least some of the gelatin capsules and releases aroma compounds to be favorably perceived by the consumer at that point of consumption.

[08]    In certain exemplary embodiments, the aroma material includes at least a compound selected from the group consisting of a volatile compound, a polar compound, a hydrophobic compound, and combinations of any of them. The aroma compounds typically are volatile, and encapsulating in the gelatin capsules applied to a product package can preserve them for release when the package is opened by the consumer. However, gelatin capsules are moisture sensitive and lose their performance associated aroma character change when the capsule is stored under high humidity conditions, e.g., the high relative humidity conditions often existing during transport or storage of food packages. In accordance with this disclosure, the performance of gelatin capsules containing aroma material, e.g., their stability, is improved by a secondary protective polymer coating on the surface of the gelatin capsules. The secondary protective coating of the aroma delivery systems disclosed here can reduce or eliminate degradation of the aroma material during use, storage, shipment, etc., e.g., when the gelatin capsules are on product packaging. In certain exemplary embodiments, the secondary protective coating comprises or consists essentially of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, other suitable material of or a combination of any of them.

3

[09]    In another aspect, a container is provided having an openable closure, for example a
        hand-openable closure, e.g., a beverage bottle with a threaded or otherwise removable
        and re-closable cap, and an aroma delivery system as disclosed above. The delivery
        system is on a surface of the closure or is otherwise associated with the closure to
        release at least a portion of the encapsulated aroma when the closure is opened. In
        certain exemplary embodiments, a sufficient quantity of the delivery system is
        disposed at the interface of a beverage bottle and its threaded or otherwise removable
        and re-closable cap, that a portion of the delivery system is released each of multiple
        times (e.g., at least the first two times) the cap is removed from the bottle.

[10]    These and other aspects, advantages and features of the technology disclosed here will
        become further apparent from the following more detailed description of certain
        exemplary embodiments or versions of the delivery systems and product packaging
        It should be understood that the various alternative embodiments or versions and
        optional features of the various embodiments described here, and others that are
        apparent from such description are not mutually exclusive. Rather, all embodiments
        having any or all compatible combination or permutation of those features are
        contemplated as within the scope of this invention.

                        BRIEF DESCRIPTION OF THE DRAWINGS

[11]    Figure 1 shows embodiments of the invention on a threaded closure.

[12]    Figure 2 shows embodiments of the invention on a snap closure.

[13]    Figures 3A and 3B are micrographs demonstrating improved stability for gelatin
        capsules having a secondary coating in accordance with one embodiment of the
        invention disclosed here.

                        DETAILED DESCRIPTION OF THE INVENTION

[14]    Various examples and embodiments of the inventive subject matter disclosed here are
        possible and will be apparent to the person of ordinary skill in the art, given the
        benefit of this disclosure. In this disclosure reference to "certain exemplary
        embodiments" (and similar phrases) means that those embodiments are merely non-
        limiting examples of the inventive subject matter and that there likely are other

                                        4

alternative embodiments which are not excluded. Unless otherwise indicated or unless otherwise clear from the context in which it is described, alternative elements or features in the embodiments and examples below and in the Summary above are interchangeable with each other. That is, an element described in one example may be interchanged or substituted for one or more corresponding elements described in another example. Similarly, optional or non-essential features disclosed in connection with a particular embodiment or example should be understood to be disclosed for use in any other embodiment of the disclosed subject matter. More generally, the elements of the examples should be understood to be disclosed generally for use with other aspects and examples of the devices and methods disclosed herein. A reference to a component or ingredient being operative, i.e., able to perform one or more functions, tasks and/or operations or the like, is intended to mean that it can perform the expressly recited function(s), task(s) and/or operation(s) in at least certain embodiments, and may well be operative to perform also one or more other functions, tasks and/or operations. While this disclosure includes specific examples, including presently preferred modes or embodiments, those skilled in the art will appreciate that there are numerous variations and modifications within the spirit and scope of the invention as set forth in the appended claims. Each word and phrase used in the claims is intended to include all its dictionary meanings consistent with its usage in this disclosure and/or with its technical and industry usage in any relevant technology area. Indefinite articles, such as "a," and "an" and the definite article "the" and other such words and phrases are used in the claims in the usual and traditional way in patents, to mean "at least one" or "one or more." The word "comprising" is used in the claims to have its traditional, open-ended meaning, that is, to mean that the product or process defined by the claim may optionally also have additional features, elements, etc. beyond those expressly recited.

[15]   In certain exemplary embodiments, an aroma delivery system comprises an aroma compound releasably encapsulated in gelatin capsules. The gelatin capsules have a coating, referred to here as a secondary protective coating.

[16]   In certain exemplary embodiments, the aroma delivery system is associated with product packaging in a manner that it at least a portion of the encapsulated aroma is released when the package is opened. For example, the delivery system can be

5

associated with a cap, plug, seal or other type of closure of a package. In certain exemplary embodiments the closure is openable and re-closable. In certain exemplary embodiments the delivery system is associated with the product packaging by being carried on a surface of the container and/or of the closure device, e.g., at the interface between them, in a manner that causes release of the encapsulated aroma material (and, so, of the aroma compound(s) included in the aroma material), thereby releasing the desired aroma to be perceived by the consumer. Optionally a sufficient quantity of the delivery system is provided such that aroma is released each time the container is opened, multiple times, e.g., two or more times, three or more times, etc. In certain exemplary embodiments of the invention, the aroma is released when the gelatin capsule and the secondary protective coating are breached or broken and the aroma compound in the gelatin capsule is exposed to the atmosphere. Thus, embodiments of the invention can be applied to a screw-top container, to a flip-top container, or to any friction-type closure that, upon opening, will breach or break at least some of the gelatin capsules and the secondary protective coating to expose the aroma compound, and allow the release of the aroma. The delivery system can be applied, e.g., to the threads of a screw-on cap, to the contact area of a snap-on closure, to the surface of a plug that contacts the inside walls of a container opening upon being inserted or removed.

[17] Also, multiple different embodiments of the delivery systems disclosed here can be applied to a product's packaging, whereby a different aroma is achieved upon one opening of the package and a different aroma is achieved upon a subsequent opening. In such embodiments, for example, the different delivery systems can be layered one on another, spatially separated, or other associated with the packaging.

[18] Certain exemplary embodiments of the beverage container products include ready-to-drink beverages, beverage concentrates, syrups, shelf-stable beverages, refrigerated beverages, frozen beverages, and the like; carbonated and non-carbonated soft drinks, liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy drinks, fortified/enhanced water drinks, soy drinks, vegetable drinks, grain-based drinks (e.g., malt beverages), fermented drinks (e.g., yogurt and kefir), coffee beverages, tea beverages, dairy beverages, and mixtures thereof. Beverage container products include bottles, cans, and carton products and fountain syrup applications.

Embodiments of the invention can be useful for food containers for foods other than beverages including, e.g., snacks, cakes, cookies, baked goods, fermented food products, yogurt, sour cream, cheese, salsa, ranch dip, fruit sauces, fruit jellies, fruit jams, and fruit preserves.

[19]    In certain exemplary embodiments, an aroma compound is entrapped in a gelatin capsule.    The aroma compound typically is selected to provide the aromatic experience expected by the user by providing an aroma that is representative of, and congruent with, the product in the container. The gelatin capsule is selected to entrap the aroma compound, protect the aroma compound from degradation and premature or unintended release, and release the aroma when the gelatin capsule is breached or broken.

[20]    The precise aroma used with a product will vary, depending on the intended effect. For example, products that desireably have a 'fresh' or 'sport' aroma, likely will have that type of aroma encapsulated for delivery from an aroma delivery system embodiment of the invention. Similarly, edible products typically will have an aroma delivery system that enhances or compliments the natural aroma of the edible product, such as a coffee aroma, a fresh fruit aroma, or a beverage flavor aroma.

[21]    Polar and non-polar aroma compounds can be encapsulated in the aroma delivery system of the invention.  Certain exemplary embodiments of the invention are directed to an aroma delivery system in which the aroma compound is polar, hydrophilic, non-polar, hydrophobic, or volatile.  The aroma material in certain embodiments is a solid or a powder. The skilled practitioner will recognize from this disclosure that an aroma delivery system capable of delivering polar, hydrophilic, and more volatile compounds may in at least certain embodiments also be capable of delivering a non-polar or hydrophobic aroma compound. Other embodiments of the invention are directed to the release of an aroma from volatile or polar (or hydrophilic) aroma compounds. Still other embodiments of the invention are directed to aroma delivery systems applied to containers used for food and beverage packaging applications.  Certain exemplary embodiments are directed to the entrapment of volatile polar aroma compounds.

[22]    In certain exemplary embodiments, the aroma compound (or at least one of them if multiple aroma compounds is included in the encapsulated aroma material) is polar or non-polar, hydrophobic or hydrophilic, and/or has other properties. In certain exemplary embodiments, the aroma compounds comprise perfumes of any type, including natural perfumes such as, for example, frankincense, and manufactured perfumes; essential oils, such as, for example, valencia, lemon, lime, grapefruit, tangerine, orange, and sandalwood; components of essential oils, such as, for example, limonene, citral, furaneol, vanillin, and other terpenes, sesquiterpenes, diterpenes, and oxygenated forms of these terpene compounds; and other fruit essences or aromas, such as, for example, cherry, pineapple, apple, and mango; or combinations of any of them. In certain embodiments of the invention, the aroma compound comprises a coffee aroma, comprising any one or more of the many aliphatic, acyclic, aromatic benzenoids, heterocyclics, and other compound types known to be present in coffee or coffee aroma. In certain embodiments, the aroma compounds may be used in combination.

[23]    Without wishing to be bound by theory, it is currently understood that the gelatin capsules with the secondary protective coating protect the aroma material and its aroma compound(s) from degradation and premature release. The gelatin capsules will then release the aroma in response to being breached or broken open, most typically by the action of opening the container. In certain exemplary embodiments of the invention, this breach or breaking is occasioned by contact between the product container and a surface of the closure device of the container, e.g., by friction during sliding contact between their surfaces or impact contact, etc.

[24]    In certain exemplary embodiments, the diameter of the gelatin capsules is in the range of 10 microns to 50 microns. It will be understood by those skilled in the art given the benefit of this disclosure, that suitable sizing for the capsules will be determined in part by the nature of the packaging and the manner in which the capsules are associated with the packaging.

[25]    In certain exemplary embodiments, the gelatin capsules are selected for a particular usage to resist environmental conditions or circumstances that would degrade the gelatin capsules or the aroma compounds. For example, gelatin capsules used in food packaging typically should be selected to be resistant to moisture, food acids, and

8

WO 2013/032631

other ingredients in the container. Similarly, an aroma delivery system used in a container for a product that emits a vapor, such as a solvent, typically should be adequately resistant to that vapor. The gelatin capsule also may be chosen for compatibility with the physical and chemical properties of the aroma material, including the one or more aroma compounds, any solvents, diluents, carriers and other materials of the aroma material. The gelatin capsule also may be selected to protect the aroma compound encapsulated therein against heat, moisture, light, especially ultraviolet light, and other deleterious conditions.

[26] In certain exemplary embodiments, i.e., non-limiting examples or version of the delivery systems disclosed here, the gelatin capsules encapsulating the aroma material are gelatin-hydrocolloid capsules. They can be formed, e.g., of a coacervate material comprising one or more gelatin and one or more anionic compounds, optionally with a cross-linking agent and/or other auxiliary materials. In certain embodiments the at least one anionic polymer may be selected from gum arabic, modified starch, pectin, alginate, and combinations of any of them. The complex coacervates of the gelatin capsules can be formed in accordance with known techniques. For example, they can be formed by combining a solution of the gelatin with the aroma material to form an oil-in-water emulsion, and then adding anionic polymer(s) to form the complex coacervate capsules, i.e., the gelatin capsules, encapsulating the aroma compounds. The gelatin capsules may be, for example, gelatin-pectin, gelatin-alginate, gelatin-gum arabic, gelatin-carboxymethyl cellulose, etc. Combinations of any one or more types of gelatin capsules may be used.

[27] As disclosed above, the aroma delivery systems further comprise a secondary protective coating on the surface of the gelatin capsules. Such secondary protective coating is especially advantageous, for example, in certain embodiments with an aroma compound that is particularly volatile or sensitive to degradation, or has a tendency to becoming unstable during storage. In such embodiments, it is believed that the secondary protective coating inhibits or prevents aroma material leaking from the capsules and/or moisture or oxygen penetration into the capsules. In this way, the secondary coating on the capsules helps to prevent or reduce oxidation and, to maintain aroma character. The secondary protective coating helps to retain the integrity of the aroma compound and the aroma delivery system. In certain

9

embodiments, the secondary protective coating provides additional resistance to moisture, and so is moisture resistant. Thus, the secondary protective coating may serve different purposes, and the composition of the coating thus can be selected to serve particular intended purposes.

[28]  In certain exemplary embodiments of the invention, secondary protective coatings comprise bio-polymers, polysaccharides such as pectin, agar, carrageenan, alginate, guar gum, xanthan gum, gellan gum, acacia gum, locust bean gum, gum ghatti, starch, modified starch, cellulose, and carboxymethylcellulose; synthetic polymers, such as polyvinyl alcohol, polyvinyl acetate, polyacrylates, polystyrene-acrylate, polysters, polyurethanes, polyureas, melamine/formaldehyde resins, and polysiloxanes; natural waxes, beeswax such as carnauba wax, candelilla wax, shellac, and natural film formers such as natural shellac and corn zein protein; or combinations of any of them.

[29]  In certain embodiments, the secondary protective coating may be applied to a portion of the surface of the gelatin capsules. In alternative embodiments, the secondary protective coating may be applied to the entire surface of the gelatin capsules. In certain embodiments, the secondary protective coating may be applied to the gelatin capsules before they have been applied to the container, or alternatively, the secondary protective coating may be applied to the gelatin capsules after they have been applied to the container. In certain embodiments, the secondary protective coating may additionally cover a portion of the container, for example, to ensure that the edges of the gelatin capsules are sealed against degradation. The secondary protective coating may be applied to the gelatin capsules by spray coating, painting on, etc. In certain embodiments, the aroma delivery system comprising the secondary protective coating may be applied to a container for an edible product. In such embodiments, the secondary protective coating typically should comprise food-safe materials.

[30]  The delivery system is formed by encapsulating aroma material, e.g., aroma material comprising or consisting essentially of one or more aroma compounds, in the gelatin capsules and applying the secondary coating. Delivery systems in accordance with certain embodiments of the invention are made by encapsulating the aroma material in the gelatin capsules, for example, by mixing the aroma material with gelatin and an anionic polymer. The resulting capsules can be applied to a container, e.g., to the

main body of the container and/or to its cap or other closure device. After drying, the secondary coating is applied to the surface of gelatin capsules. The capsules can be applied, optionally with or without other materials, e.g., a binder or carrier, such as water or other liquid, a film forming material, a paste, adhesive, etc. In certain embodiments the aroma delivery system is applied as a liquid, powder, paste or other suitable form. In certain embodiments the aroma delivery system dries after being applied, to form a film on the surface(s) of the container. In certain embodiments the aroma delivery system is disposed on flat surface areas, in grooves, threads, nooks or crevices or the like, or a combination of any of those, on one or more surfaces of the container, optionally including one or more closure surfaces. Suitable binders, (alternatively referred to here as a carrier) for applying the gelatin capsule to a product package prior to applying the protective secondary coating will depend, at least in part, on the particular application, including, e.g., the packaging material, its shape and/or intended usage. Exemplary binders suitable for various applications include vinylic or vinyl-containing polymers, e.g., polyvinyl alcohol, polyvinyl acetate, etc., and natural film forming polymers or bio-polymers, e.g., starch or other polysaccharides. In, some embodiments, edible or food safety approved materials may be used. Other suitable binders will be apparent to those skilled in the art given the benefit of this disclosure

[31]    In certain exemplary embodiments, an aroma delivery system as disclosed here is applied to the closure of a container and allowed to dry to form a film. The secondary coating is added after the gelatin capsules are on the closure and dried.   In such embodiments the film is located on the closure so that removing the closure will abrade, breach, or break at least some of the gelatin capsules of the aroma delivery system and allow the aroma compound to escape when the container is opened. In certain embodiment the aroma-containing gelatin capsules are provided as an emulsion, such as an oil-in-water emulsion or slurry. Typically such oil-in-water emulsion embodiments can be applied onto the package by coating, spraying, printing, brushing, etc. Such methods of application will be suitable for other embodiments as well. Other suitable methods of application will be apparent to those skilled in the art given the benefit of this disclosure.

11

[32]    In alternative embodiments, a powder or solid aroma compound, such as furaneol or vanillin, may be melted by heating prior to adding and encapsulated into the gelatin capsules. In certain exemplary embodiments, the aroma material consists essentially of only one or more volatile aroma compounds. In other embodiments the aroma material may include aroma compounds in a solvent, carrier, diluent or the like. In such embodiments the combined, i.e., total concentration of the one or more aroma compounds in the aroma material encapsulated in the gelatin capsules may be, e.g.. from about 1 to about 50 percent w/w, e.g., from 1 to 40 percent w/w, typically between about 10 and about 40 percent w/w, and more typically between about 20 and about 30 percent w/w.

[33]    In certain exemplary embodiments, the surface of the container may be treated or prepared to ensure that the aroma delivery system adheres sufficiently to the container. For example, it may be necessary in some applications to roughen the surface of a container formed from polyethylene terephthalate, or to apply an appropriate surface primer. Suitable primers for at least some embodiments can be selected from polyvinyl alcohol and polyvinyl acetate. Any suitable method of surface preparation may be employed to ensure sufficient adhesion of the applied aroma delivery system.

[34]    In certain exemplary embodiments, the aroma delivery system is applied to the closure, such as the cap, of the container. The aroma delivery system may be applied to a portion of the closure that is on the outside of the container, but under or within the closure. This placement causes breaching, breaking, scraping, or abrading of the delivery system to expose the aroma compound to the atmosphere and liberate the aroma so that the aroma is perceived by the consumer. The placement also protects the aroma delivery system from contact with external entities and ensures that the film is protected and not damaged by, for example, contact with other containers. In alternative embodiments, the aroma delivery system is applied to the inside of a container that has a closure that is torn open or may be crushed or crumpled upon opening, thus breaching, breaking, scraping, or abrading of the aroma delivery system to expose the aroma compound to the atmosphere and liberate the aroma so that the aroma is perceived by the consumer.

12

[35] In certain embodiments, the container comprises a threaded cap on a neck, such as on a bottle. In such embodiments, the aroma delivery system can be applied to the outside of the neck and/or the inside of the cap, typically in the area of the threads that hold the cap on. The aroma delivery system will in such embodiments be located under the cap, so that the cap protects the delivery system during storage and transport, yet abrades, scrapes, breaches, or breaks the capsules when the cap is removed, thus releasing aroma.

[36] In alternative embodiments, the aroma delivery system may be applied to a container having a closure, including a threaded closure having the threads on the inside of a neck of the container; a slide-in closure such as a cork or a stopper of metal, glass, or rubber, and including a stopper retained by a bail (a "Lightning" closure), or a "Baltimore loop;" or a snap-on or a slide-on cap or cover.

[37] Drawing Figures 1A – 1C illustrate an embodiment of the invention on a threaded cap. Container 100, such as a bottle, has neck 101 with spiral threads 102 formed on the outside thereof. Annular ring 103 also may be formed on neck 101 below threads 102. Flange 104 may be present to provide the used with support for pouring from the container.

[38] Container 100 is closed by cap 110, which has interior threads 111 complementary to threads 102. Threads 111 cooperate with thread 102 to securely close container 100.

[39] Cap 110 also may have a security feature 105 incorporating flange 113 that cooperates with ring 103. Security feature 105 may include a separation point at 112, so that cap 110 detaches from security feature 105 when the container is opened, or may otherwise indicate that container 100 has been opened, perhaps by deforming flange 113.

[40] Delivery system 109 is applied to neck 101 in the area of threads 102 and 103 at a point where cap 110, and particularly threads 111, flange 113, or any combination thereof, when the cap is twisted off the container, rub against neck 101 and delivery system 109 thereon with force sufficient to release aroma from delivery system 109.

[41] Drawing Figures 2A – 2C illustrate embodiments of the invention for a snap-type closure having delivery system 109 applied thereto. Cap 200 has top 201 and body

205, and may be attached to each other by hinge 203. To close the container, top 201
is retained on body 205 by a friction or interference fit or snap fit with ridge 210. Top
edge 202 typically contacts rim 206 and the top of ridge 210 contacts the interior of
top 201 when the container is closed. Interior edge 204 of top 201 thus rubs outside
edge 211 with force sufficient to break or breach delivery system 109 applied to
outside edge 211 to release aroma therefrom. Delivery system 109 may be attached to
all of or to any portion of outside edge 211.

[42]    In the examples provided, the delivery system may also be applied to inside portion
121 at locations where cap 110 rubs on threads 102, or on interior edge 204.

[43]    Figures 3A and 3B are micrographs showing improved stability for gelatin capsules
having a secondary coating in accordance with an embodiment of this disclosure.
Fig. 3A shows gelatin capsules containing liquid aroma material applied to a surface
and then exposed to 92% relative humidity (RH) at room temperature (rt) for three
days. Capsules are broken and areas of leaked liquid are evident, such that it can be
seen that many of the capsules have ruptured, allowing the formerly encapsulated
aroma material to escape. In contrast, Fig. 3B shows approximately the same density
of the same gelatin capsules containing the same liquid aroma material (i.e., a second
portion of the same batch of gelatin capsules) applied to the same surface (i.e., a
different area of the same material) and then exposed to 92% relative humidity (RH)
at room temperature (rt) for ten days. It can be seen that essentially all of the gelatin
capsules are intact, i.e., they have not ruptured and they have not allowed the
encapsulated aroma material to escape. Essentially no leaked liquid is present.
Accordingly, the advantageous protection of the gelatin capsules and the encapsulated
aroma material is demonstrated by the results this comparison shown in Figs. 3A and
3B.

[44]    Examples. The following Table 1 shows the results of testing of gelatin capsules
containing aroma material in accordance with this disclosure, and comparative results
for otherwise identical gelatin capsules having no secondary protective coating on the
surface of the capsules. In each case the gelatin capsules were the same, being
formed of gelatin complex coacervates with the encapsulated aroma material
consisting essentially of lemon oil. The storage conditions in each case were the

same, being 90 percent relative humidity at 25°C. The aroma intensity was judged by releasing the aroma material from the then-remaining gelatin capsules of the delivery system, by breaching or rupturing the capsules. It can be seen from the results in Table 1, that the secondary protective coating improved the performance of the aroma delivery systems. Those delivery systems that had a secondary protective coating in accordance with this disclosure are seen to have delivered greater aroma intensity than the delivery system without a secondary protective coating, even though the delivery system without a secondary protective coating was subjected to a much shorter storage duration of only 3 days instead of the two weeks storage of the invention embodiments.

[45]        Table 1.    Gelatin Capsule Performance

| Secondary Coating | Storage Duration | Aroma Intensity |
| --- | --- | --- |
| None | 3 days | very weak, not perceivable |
| Polyvinyl acetate | 2 weeks | strong, perceivable |
| Shellac wax | 2 weeks | strong, perceivable |
| Polyacrylate | 2 weeks | strong, perceivable |
| Polystyrene-acrylate | 2 weeks | strong, perceivable |
| Melamine-formaldehyde resin | 2 weeks | strong, perceivable |
| Pectin | 2 weeks | medium-strong, perceivable |
| Carboxymethylcellulose | 2 weeks | medium-strong, perceivable |
| Polyvinyl alcohol | 2 weeks | medium-strong, perceivable |
| Zein | 2 weeks | medium-strong, perceivable |

[46]    It is believed that the aroma delivery system protects the aroma compound from oxidation or other degradation, prevents leakage, and maintains the aroma character. Various embodiments of the invention can provide a number of advantages over other aroma delivery systems, including easy handling and an easy manufacturing process, and good protection for the aroma material. The materials, i.e., the aroma compound(s), the gelatin capsule, and the secondary protective coating, used to

construct the aroma delivery system optionally are food contact- or food-approved materials, as appropriate. Other advantages of at least some embodiment of the delivery system disclosed here include that the aroma delivery system is moisture resistant or even, in some cases, moisture-proof, colorless and/or transparent.

[47]    The invention has been described with reference to the preferred embodiments. Obviously, modifications and alterations will occur to others upon reading and understanding the preceding detailed description. It is intended that the invention be construed as including all such modifications and alterations insofar as they come within the scope of the appended claims or the equivalents thereof.

We Claim:

1.    An aroma delivery system comprising:
      gelatin capsules each having a surface and formed of material comprising gelatin;
      an aroma material comprising an aroma compound that is releasably encapsulated in
the gelatin capsules; and
      a secondary protective coating on the surface of the gelatin capsules.

2.    The aroma delivery system of claim 1, wherein the gelatin capsules comprise complex
coacervates formed of gelatin and anionic hydrocolloid polymer.

3.    The aroma delivery system of claim 1, wherein the gelatin capsules are formed of
materials comprising gelatin-pectin complex coacervates, gelatin-alginate complex
coacervates, gelatin-gum arabic complex coacervates or gelatin-carboxymethyl cellulose
complex coacervates.

4.    The aroma delivery system of claim 1, wherein the aroma compound is selected from
a volatile compound, a polar compound, a hydrophobic compound, and combinations of any
of them.

5.    The aroma delivery system of claim 1, wherein the aroma compound is selected from
an essential oil, a component of an essential oil, a fruit essence, a fruit aroma, a perfume, or
combinations thereof.

6.    The aroma delivery system of claim 1, wherein the secondary protective coating
comprises a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a
natural film former, or combinations thereof.

7.    The aroma delivery system of claim 1, wherein the gelatin capsule has a diameter in
the range of 10 microns to 50 microns.

8.    The aroma delivery system of claim 1, wherein the combined concentration of the one
or more aroma compounds in the aroma material encapsulated in the gelatin capsule is in the
range of 1 to 50 percent w/v.

9.    A product package comprising:

a container;

an openable closure for the container, and

an aroma delivery system associated with the closure to release aroma when the closure is removed from the container, the aroma delivery system comprising:

gelatin capsules each having a surface and formed of material comprising gelatin;

an aroma material comprising an aroma compound that is releasably encapsulated in the gelatin capsules; and

a secondary protective coating on the surface of the gelatin capsules.

10.    The product package of claim 9, wherein the gelatin is selected from gelatin-pectin, gelatin-alginate, gelatin-gum arabic, gelatin-carboxymethyl cellulose or any gelatin-anionic hydrocolloid capsules.

11.    The product package of claim 9, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophobic compound, and combinations of any of them.

12.    The aroma delivery system of claim 9, wherein the aroma compound is selected from an essential oil, a component of an essential oil, a fruit essence, a fruit aroma, a perfume, or combinations thereof.

13.    The product package of claim 9, wherein the secondary protective coating consists essentially of one or more natural materials.

14.    The product package of claim 13, wherein the secondary protective coating consists essentially of at least one natural biopolymer.

15.    The product package of claim 9, wherein the secondary protective coating comprises a natural film forming material.

16.    The product package of claim 9, wherein the secondary protective coating comprises polyvinyl   alcohol,   polyvinyl   acetate,   polyacrylate,   polystyrene-acrylate,   polyster,

18

polyurethane,   polyurea.   melamine/formaldehyde   resin,   polysiloxane.   biopolymer.
polysaccharide; natural wax, bees wax, carnauba wax, candellila wax, shellac natural shellac,
corn zein protein, or a combination of any of them.

17.     The product package of claim 9, wherein the secondary protective coating comprises
polysaccharide selected from pectin, agar. carrageenan, alginate, guar gum, xanthan gum.
gellan gum, acacia gum, locust bean gum, gum ghatti. cellulose, carboxymethylcellulose and
a combination of any of them.

18.     The product package of claim 9, wherein at least a majority of the gelatin capsules
each has a diameter in the range of 10 microns to 50 microns.

19.     The product package of claim 9, wherein the concentration of the aroma compound in
the gelatin capsule is in the range of 1 to 50 percent w/w.

20.     The product package of claim 9, wherein the closure is a removable and re-closeable.
hand-openable closure.

21.     The product package of claim 9, wherein the closure has a surface having, an interface                    f
with a surface of the container and at least a portion of the aroma delivery system is
positioned at the interface.

22.     The product package of claim 9, wherein the closure comprises a threaded cap, a
slide-in closure, a snap-on cap, or a slide-on cap.

23.     The product package of claim 9, wherein the container is a bottle and wherein the
closure is a threaded cap.

24.     The product package of claim 23, wherein a portion of the aroma delivery system is
released each of multiple times the threaded cap is removed from the bottle.

WO 2013/032631                                                    PCT/US2012/049503

1/3



FIG. 1A

FIG. 1B

FIG. 1C



FIG. 2A



FIG. 2B

FIG. 2C

Case: 16-1668    Document: 26    Page: 183    Filed: 04/26/2016

Figure 3A



Figure 3B



**INTERNATIONAL SEARCH REPORT**

| | International application No |
|---|---|
| | PCT/US2012/049503 |

**A. CLASSIFICATION OF SUBJECT MATTER**
INV. A23L1/22      A23L2/56      B01J13/10      B65D51/24
ADD.

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
B01J  A23L  B65D

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)

EPO-Internal, WPI Data, FSTA

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | US 2006/039934 A1 (NESS JEREMY N [GB] ET AL NESS JEREMY NICHOLAS [GB] ET AL) 23 February 2006 (2006-02-23) | 1-8 |
| Y | paragraph [0002] - paragraph [0004]; claims 1-6 paragraph [0034] - paragraph [0040]; examples 2,8-11 ----- | 9-24 |
| Y | US 6 102 224 A (SUN RICKSON [US] ET AL) 15 August 2000 (2000-08-15) column 4, line 1 - line 6; claims ----- | 9-24 |

☐ Further documents are listed in the continuation of Box C.      ☒ See patent family annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier application or patent but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 4 January 2013 | 22/01/2013 |

| Name and mailing address of the ISA/ | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+31-70) 340-2040, Fax: (+31-70) 340-3016 | Leprêtre, François |

Form PCT/ISA/210 (second sheet) (April 2005)

# INTERNATIONAL SEARCH REPORT

Information on patent family members

International application No

PCT/US2012/049503

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| US 2006039934 | A1 | 23-02-2006 | AU | 2003251377 A1 | 03-03-2004 |
| | | | AU | 2009243427 A1 | 24-12-2009 |
| | | | BR | 0305777 A | 05-10-2004 |
| | | | JP | 4865225 B2 | 01-02-2012 |
| | | | JP | 2006501219 A | 12-01-2006 |
| | | | MX | PA05001686 A | 16-08-2005 |
| | | | US | 2006039934 A1 | 23-02-2006 |
| | | | WO | 2004016234 A1 | 26-02-2004 |
| US 6102224 | A | 15-08-2000 | NONE | | |

ADDENDUM D(3)

**ADDENDUM D(3)**

**(See UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

- PCT Application No.   PCT/US12/59992; WIPO Publication No. WO 2013/056075. *"Complex Coacervates and Aqueous Dispersions of Complex Coacervates and Methods of Making Same."*

## ADDENDUM D(3)

**(Appendix Vol. II, TAB 14, UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

**3)** PCT Application No.  PCT/US12/59992; WIPO Publication No. WO 2013/056075. "Complex Coacervates and Aqueous Dispersions of Complex Coacervates and Methods of Making Same."

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property
Organization
International Bureau

(43) International Publication Date
18 April 2013 (18.04.2013)



WIPO I PCT

(10) International Publication Number
WO 2013/056075 A1

(51) International Patent Classification:
A23L 1/00 (2006.01)     A23L 2/52 (2006.01)
A23L 1/05 (2006.01)     A23P 1/04 (2006.01)
A23L 1/22 (2006.01)     B01J 13/10 (2006.01)

(21) International Application Number:
PCT/US2012/059992

(22) International Filing Date:
12 October 2012 (12.10.2012)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
13/272,270     13 October 2011 (13.10.2011)     US

(71) Applicant (for all designated States except US): PEP-
SICO, INC. [US/US]; 700 Anderson Hill Road, Purchase,
New York 10577 (US).

(72) Inventors; and
(71) Applicants (for US only): ZHANG, Naijie [US/US]; 31
Charter Oak Court, Rigdefield, Connecticut 06877 (US).
MUTILANGI, William [US/US]; 43 Bleakey Drive,
Peekskill, New York 10566 (US).

(74) Agent: ROKOS, Rebecca P.; Banner & Witcoff Ltd., Ten
South Wacker Drive, Suite 3000, Chicago, Illinois 60606-
7407 (US).

(81) Designated States (unless otherwise indicated, for every
kind of national protection available): AF, AG, AL, AM,
AO, AT, AU, AZ, BA, BB, BG, BH, BN, BR, BW, BY,
BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM,
DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT,
HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP,
KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD,
ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI,
NO, NZ, OM, PA, PE, PG, PH, PL, PT, QA, RO, RS, RU,
RW, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ,
TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA,
ZM, ZW.

(84) Designated States (unless otherwise indicated, for every
kind of regional protection available): ARIPO (BW, GH,
GM, KE, LR, LS, MW, MZ, NA, RW, SD, SL, SZ, TZ,
UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, RU, TJ,
TM), European (AL, AT, BE, BG, CH, CY, CZ, DE, DK,
EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV,
MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM,
TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW,
ML, MR, NE, SN, TD, TG).

Published:
— with international search report (Art. 21(3))
— before the expiration of the time limit for amending the
claims and to be republished in the event of receipt of
amendments (Rule 48.2(h))

(54) Title: COMPLEX COACERVATES AND AQUEOUS DISPERSIONS OF COMPLEX COACERVATES AND METHODS OF MAKING SAME

(57) Abstract: Edible complex coacervates and aqueous dispersions of complex coacervates are disclosed, that may be utilized to
protect a sensitive substance, e.g., fish oil or omega-3 fatty acids or other hydrophobic substances or sensitive hydrophilic sub-
stances. The complex coacervates and aqueous dispersions may be utilized in food products. Methods for producing the complex co-
acervates and aqueous dispersions are also disclosed.

## COMPLEX COACERVATES AND AQUEOUS DISPERSIONS OF COMPLEX COACERVATES AND METHODS OF MAKING SAME

### TECHNICAL FIELD OF THE INVENTION

[0001]    The present invention relates to the field of protecting a hydrophobic substance from hydrolysis and oxidation, more particularly complex coacervates containing sensitive substances in an aqueous dispersion such as food products.

### BACKGROUND OF THE INVENTION

[0002]    Certain sensitive substances are desirable as ingredients in food products, such as in, for example, beverages. Such sensitive substances may be hydrophobic substances or hydrophilic substances. In some cases such a hydrophobic substance does not have an acceptable taste or taste profile or is not sufficiently stable in an acidic environment. Examples of such hydrophobic substances include omega-3 fatty acids, water-insoluble flavorants, water-insoluble vitamins, etc. Certain hydrophobic substances have been discovered to have beneficial health effects. For example, omega-3 and omega-6 fatty acids form an important part of the human diet. Eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA), long-chain forms of omega-3 fatty acids, are understood in many cases to support brain and cardiovascular health and functions, amongst other health benefits. It has been suggested that consumption of omega-3 fatty acids should be increased.

[0003]    Previously, sensitive substances were incorporated directly into an aqueous system as a solution (with a compatible solvent), an extract, an emulsion, or a micellular dispersion (a so-called microemulsion). While all of these approaches serve to disperse the sensitive substance in an aqueous system, they do not provide extended protection against hydrolysis and oxidation. Commercially available fish oils can be high in omega-3 fatty acids, and in some cases are "encapsulated," but these commercially available fish oils have not proven adequately stable in all food contexts, e.g., physically or taste-stable in acidic food products. This can result in negative changes to the food product, such as unpleasant fishy flavors and aromas after ingestion, particularly a fishy aftertaste caused by belching fish oil from the stomach. Additionally, omega-3 fatty acids, as well as many water-

1

insoluble flavorants, water-insoluble vitamins, etc. are unstable to degradation, e.g., by oxidation or hydrolysis, when exposed to air, water and/or light.

[0004]    It would be desirable to provide edible compositions suitable for use in food products, which compositions incorporate one or more sensitive substances in a stable form, e.g., sensitive hydrophobic substances in a form that is shelf stable in an aqueous beverage, syrup, etc. It also would be desirable to provide food products incorporating such edible compositions.    At least certain of the embodiments of the new compositions disclosed below can reduce or eliminate the unpleasant taste and odor of the one or more incorporated sensitive substances when used as an ingredient in a food product suitable for consumption by a human or animal. At least certain of the embodiments of the new compositions disclosed below provide sensitive substances in a stable form for use in aqueous systems such as beverages or other food products. In at least some embodiments the sensitive substance is stable to oxidation and hydrolysis during the shelf life of the food product. In at least some embodiments the sensitive substance is stable to oxidation and hydrolysis in an acidic food product, e.g. a food product at pH less than pH 5.0 and in some cases less than pH 3.5. Additional features and advantages of some or all of the food products disclosed here will be apparent to those who are skilled in food technology given the benefit of the following summary and description of exemplary, non-limiting examples.

## SUMMARY

[0005]    Aspects of the invention are directed to delivery systems for sensitive substances, for example hydrophobic substances, e.g., fish oil, and/or hydrophilic substances, substances prone to oxidation or other degradation when included as an ingredient in a food product, e.g., in a beverage or a beverage concentrate (the latter being alternatively referred to here as a syrup). The delivery systems disclosed here protect or preserve the sensitive substance and in some cases can be itself edible and in some cases suitable for being incorporated into food products, for example, acidic food products.    In certain embodiments the sensitive substances are sensitive to acidity, oxygen or other agents or conditions. In certain embodiments the delivery systems provide a mixture of hydrophobic sensitive substances and/or hydrophilic sensitive substances.

2

[0006]    In accordance with one aspect, complex coacervates are provided, that are suitable
for consumption as an ingredient in a food product and, in at least certain
embodiments, "as is," i.e., without other ingredients. A complex coacervate in
accordance with this disclosure can be formed by combining a sensitive substance
wax-in-water emulsion with one or more cationic polymers.    The sensitive
substance wax-in-water emulsion can be prepared by combining a sensitive
substance as described above with a wax solution to form a sensitive substance
wax solution. The "wax solution" may be wax alone or with other ingredients, for
example, melted wax (also referred to here as a melted wax solution), liquid wax,
a liquid mixture or slurry of wax with one or more other ingredients, e.g., diluents,
solvents, etc. The "sensitive substance" may be one or more sensitive substances
alone or with other ingredients, e.g., a mixture of multiple sensitive substances
alone or with one or more other ingredients, e.g., diluents, solvents, etc. The
sensitive substance is combined with the wax solution. For example, the sensitive
substance can be added into the wax solution or they can be otherwise combined.
As used in this disclosure, unless otherwise specified, the term "added" or
"combined" and like terms means that the multiple ingredients or components
(e.g., one or more sensitive substances and a melted wax solution) are combined
in any manner and in any order, with or without stirring or the like, with or
without heating, etc. For example, one or more ingredients can be dissolved into
one or more other ingredients, or sprayed together, etc. Combining the sensitive
substance and wax solution forms a sensitive substance wax solution, alternatively
referred to here as a wax mixture or a sensitive substance-in-wax solution, which
may be a true solution, slurry, suspension, mixture or other form of liquid or
flowable material.    In certain embodiments, for example, fish oil is mixed with
melted natural wax to form a homogenous solution. As used here, the term
"homogenous" means commercially adequately homogenous for the intended use,
e.g., as a stand-alone consumable or as an ingredient in a beverage or other food
product.

[0007]    The sensitive substance wax solution is combined with at least one anionic
polymer emulsifier to form an emulsion, specifically, the sensitive substance wax-
in-water emulsion referred to above, in some cases referred to here as a sensitive
substance wax-in-water emulsion. In at least certain embodiments the emulsion is

a nano solid lipid particle emulsion. Some exemplary (i.e., non-limiting)
examples or embodiments of such emulsions are oil-in-water emulsions. Some
exemplary embodiments of the emulsions disclosed here can be prepared by
mixing melted wax with at least one sensitive substance, e.g., fish oil, to form a
sensitive substance wax solution and then combining the sensitive substance wax
solution with at least one anionic polymer, e.g., pectin, to form a sensitive
substance wax-in-water emulsion.

[0008]    Cationic polymer is combined with the sensitive substance wax-in-water
emulsion, typically with mixing for a suitable period of time, e.g., from 1 to 5
minutes, to form complex coacervates. In at least certain embodiments, the
complex coacervates are provided as an aqueous dispersion. In at least certain
embodiments, the aqueous dispersion of complex coacervates is homogenized.
For example, the aqueous dispersion can be agitated at room temperature for a
period of time, e.g., from 15 minutes to an hour, e.g., for 30 min., followed by
homogenizing at high pressure, e.g., at 3000 psi to 4000 psi.

[0009]    By encapsulating the sensitive substance(s) in such complex coacervates, certain
negative effects, e.g., oxidation, off flavor and/or unpleasant aroma, can be
reduced or eliminated for at least a period of time, for example, during shipping
and storage. Optionally, other ingredients may be included with the complex
coacervates in an aqueous dispersion, e.g., a preservative, such as sodium
benzoate. In at least certain embodiments the pH of the aqueous dispersion is
adjusted, for example by the addition of acid, e.g., citric acid and/or other edible
acids. The pH can be adjusted to a level suitable for the intended application,
typically, for example, to a value of from pH 2.5 to pH 5.5, e.g., from pH 3.5 to
pH 4.5.

[0010]    In at least certain embodiments, an emulsion is provided having a core-shell
capsule structure, wherein the core comprises sensitive substance and the shell
comprises wax within a complex coacervate formed at least in part by cationic
polymer and anionic polymer, whereby fish oil or other sensitive material is
microencapsulated and protected. In at least certain embodiments, a nano solid
lipid particle emulsion is provided, wherein the wax component is solid at room
temperature. For example, stable and odourless emulsions of fish oil that are

4

highly dispersible in an acidic beverage can be prepared according to certain exemplary embodiments of this disclosure, by dissolving the fish oil into melted natural wax to form a homogenous solution that is added into a solution of pectin and/or other emulsifier anionic polymer under high mixing to form a nano solid lipid particle emulsion; the emulsion capsules are further protected by adding whey protein and/or other cationic polymer with mixing for 2-4 minutes (e.g., for 3 minutes) to form complex coacervates; sodium benzoate and/or other preservative is added; citric acid and/or other edible acid is added to adjust the pH to a value of pH 3 to pH 5 (e.g., pH 4); and the emulsion is agitated at room temperature for 20 to 40 minutes (e.g., for 30 minutes) and then homogenised at 3000 psi to 4000 psi. Exemplary beverages containing such exemplary fish oil emulsions, having a pH value of pH 2.5 to pH 3.5 (e.g., pH 2.9) and providing 50.0 mg EPA/DHA per 15.0 oz. to 25.0 oz. (e.g., per 19.6 oz.) can be prepared and in at least some embodiments have no detectable fish taste or odor after storage at elevated temperature, e.g., at 90°F for 3 weeks.

[0011]    In another aspect, food products are provided comprising complex coacervates as disclosed above, e.g., comprising an aqueous dispersion of the complex coacervates, together with one or more other edible ingredients.    In some exemplary embodiments the food product comprises the complex coacervates together with one or more nutritional ingredients, e.g., grain component(s), protein, fruit juice or other juice component(s), vegetable juice and/or vegetable component(s), minerals, vitamins, combinations of any of them, etc. As used here, a food product comprises an aqueous dispersion of complex coacervates where the food product comprises one or more such aqueous dispersions. The food product comprises such aqueous dispersion notwithstanding that some or all of the water or other diluent or solvent, and/or other expendable ingredient(s) of the aqueous dispersion have been removed from the final food product after addition of the aqueous dispersion. For example, some or all of the water of the aqueous dispersion may be removed prior to, during or after mixing with other ingredients of the food product. In certain exemplary embodiments, the food products are beverages, e.g., fruit juice beverages, carbonated soft drinks etc., wherein the aqueous dispersion is from 0.05 to 3.0 weight percent (wt. %) of the finished beverage, e.g., from 0.1 to 2.0 wt. %.

[0012]   These and other aspects, advantages and features of the present invention herein
         disclosed will become apparent through reference to the following detailed
         description. Furthermore, it is to be understood that the features of the various
         embodiments described herein are not mutually exclusive and exist in various
         combinations and permutations in other embodiments.

                    DETAILED DESCRIPTION OF CERTAIN EMBODIMENTS

[0013]   Various examples and embodiments of the inventive subject matter disclosed here
         are possible and will be apparent to the person of ordinary skill in the art, given
         the benefit of this disclosure. In this disclosure reference to "some embodiments,"
         "certain exemplary embodiments" and similar phrases means that those
         embodiments are merely non-limiting examples of the inventive subject matter
         and that there likely are other, alternative embodiments which are not excluded.
         Unless otherwise indicated or unless otherwise clear from the context in which it
         is described, alternative elements or features in the embodiments and examples
         below and in the Summary above are interchangeable with each other. That is, an
         element described in one example may be interchanged or substituted for one or
         more corresponding elements described in another example. Similarly, optional
         or non-essential features disclosed in connection with a particular embodiment or
         example should be understood to be disclosed for use in any other embodiment of
         the disclosed subject matter. More generally, the elements of the examples should
         be understood to be disclosed generally for use with other aspects and examples of
         the devices and methods disclosed herein. A reference to a component or
         ingredient being operative, i.e., able to perform one or more functions, tasks
         and/or operations or the like, is intended to mean that it can perform the expressly
         recited function(s), task(s) and/or operation(s) in at least certain embodiments, and
         may well be operative to perform also one or more other functions, tasks and/or
         operations. While this disclosure includes specific examples, including presently
         preferred modes or embodiments, those skilled in the art will appreciate that there
         are numerous variations and modifications within the spirit and scope of the
         invention as set forth in the appended claims. Each word and phrase used in the
         claims is intended to include all its dictionary meanings consistent with its usage
         in this disclosure and/or with its technical and industry usage in any relevant
         technology area. Indefinite articles, such as "a," and "an" and the definite article

                                             6

"the" and other such words and phrases are used in the claims in the usual and traditional way in patents, to mean "at least one" or "one or more." The word "comprising" is used in the claims to have its traditional, open-ended meaning, that is, to mean that the product or process defined by the claim may optionally also have additional features, elements, etc. beyond those expressly recited.

[0014]   As disclosed above, aspects of the invention relate to complex coacervates (also referred to here as wax complex coacervates) for delivering, storing and/or protecting sensitive substances. For example, complex coacervates disclosed here can provide a stable composition suitable for inclusion in food products. That is, at least certain embodiments of the complex coacervates disclosed here are stable for shelf-storage and/or for use in making food products, e.g., for shelf-storage when included in acidic food products. At least certain embodiments of the complex coacervates disclosed here can reduce or eliminate an unpleasant taste or odor of a sensitive substance, such as, e.g., of fish oil, and/or can reduce degradation, e.g., by oxidation or hydrolysis of sensitive substances. Certain embodiments of the complex coacervates disclosed here can be incorporated into a food product associated with health benefits, for example orange juice, to provide enhanced nutritional value.   Additionally, certain of the complex coacervates are suitable to be incorporated into food products such as acidic soft drinks, e.g., carbonated soft drinks. By encapsulating such sensitive substances in wax complex coacervates as disclosed here, negative visual and physical changes to the food product may be reduced or avoided for a more appealing food product.

[0015]   In certain exemplary embodiments, wax complex coacervates as disclosed above are provided in an aqueous dispersion. As used here, an aqueous dispersion comprises, consists essentially of, or consists of particles distributed throughout a medium of liquid water, e.g., as a suspension, a colloid, an emulsion, a sol, etc. The medium of liquid water may be pure water or may be a mixture of water with at least one water-miscible solvent or diluent, such as, for example, ethanol or other alcohols, propylene glycol, glycerin, etc. In some exemplary embodiments there may be a substantial concentration of water-miscible solvent in the aqueous dispersion of the wax complex coacervates, such as, between about 1% and about 20% by volume, for example from 5% to 15% by volume, e.g., from 10% to 15%.

7

In other exemplary embodiments, the wax complex coacervates are diluted into a food product and the amount or concentration of water-miscible solvent is negligible.

[0016]    As used here, a "complex coacervate" or "wax complex coacervate" is a clearly identifiable discrete particle containing one or more sensitive substances, e.g. fish oil and/or other oil, water-insoluble vitamins, water-insoluble vitamins, flavors, etc., enveloped by a shell comprising at least two oppositely charged polymers, that is, cationic polymer of at least one type and anionic polymer of at least one type, that envelopes or separates the sensitive substance from the environment surrounding the particle. Such polymers include not only traditional polymers, but also oligomers and the like. In certain exemplary embodiments the complex coacervates are substantially non-agglomerated, but comprise a single shell encapsulating a single core. In other embodiments some or all of the complex coacervates are agglomerated. Such agglomerations of complex coacervates may be referred to as aggregates of complex coacervates or simply as aggregates. Such aggregates in some exemplary embodiments include other material(s), e.g., other emulsified materials, etc.

[0017]    In some embodiments of the food products disclosed here, essentially all of the sensitive substance is incorporated into the wax complex coacervates. As used here, "essentially all of the sensitive substance" means that the concentration or amount of the sensitive substance not incorporated into the wax complex coacervates is less or lower than the taste or smell threshold for most people in the food product in question. In some other embodiments the aqueous dispersion includes a perceptible concentration of the sensitive substance in addition to the portion incorporated into the wax complex coacervates and/or wax emulsion.

[0018]    In certain exemplary embodiments the "sensitive substance" comprises, consists essentially of, or consists of a water immiscible material, e.g., fish oil or other nutritional oil, a lipid, a water-insoluble vitamin (c.g., α-tocopherol or other tocopherol), a water-insoluble sterol, a water-insoluble flavonoid, a flavor, an essential oil or a combination of any of them. It should be understood that the term "fish oil," unless stated otherwise, is broad enough to include fish oil comprising other ingredients, e.g., preservatives, diluents, solvents, etc. In other

8

embodiments the "sensitive substance" comprises, consists essentially of, or consists of a water miscible material, e.g., a water-soluble vitamin, a water-soluble sterol, a water-soluble flavonoid, mineral, extracts from plants, herbs, DNA, amino acid, water soluble organic compounds or a combination of any of them. The sensitive substance may be a solid, a liquid or a mixture of both in the emulsions and complex coacervates disclosed here. In some embodiments the sensitive substance is a combination of water immiscible material and water soluble material. As used here the term "lipid" encompasses any substance that contains one or more fatty acid residues, including free fatty acids. Thus, the term "lipid" encompasses, for instance, triglycerides, diglycerides, monoglycerides, free fatty acids, phospholipids or a combination of any of them. As used here the term "fatty acid" encompasses free fatty acids as well as fatty acid residues. Whenever reference is made herein to a weight percentage of fatty acids, this weight percentage includes free fatty acids as well as fatty acid residues (e.g. fatty acid residues contained in triglycerides). Further, as used herein a "polyunsaturated fatty acid" (PUFA) encompasses any fatty acid containing 2 or more double bonds in the carbon chain.

[0019]   At least some exemplary embodiments of the complex coacervates disclosed here can be characterized as having a core-shell capsule structure. A core-shell structure is believed to be produced in such embodiments by combining the wax solution with the core substance, i.e., the sensitive substance to be protected. For example, solid wax to be mixed with the sensitive substance can be heated to or beyond its melting temperature, typically to a temperature within the range of 30°C to 150°C, e.g., within the range of 70°C to 80°C, for at least a period of time long enough to melt or pre-melt the wax. Mixing and/or heating optionally can be continued during forming of the homogeneous wax solution or wax mixture with the sensitive substance. The duration of mixing and/or heating, if any, in producing the wax mixture will in at least some embodiments depend in part on the solubility of the sensitive substance in the wax. In certain embodiments the resulting wax mixture is an aqueous solution comprising from 0.05 wt. % to 5.0 wt. % wax, e.g., from 0.5 wt. % to 2.0 wt. % wax.

[0020]   In exemplary embodiments the wax is a natural wax, for example, bees wax

9

and/or plant wax (i.e., a wax derived from plant material). In certain embodiments the natural wax is selected from the group including, for example, candelilla wax, carnauba wax, palm oil, shellac, fatty acid, fatty acid salts, fatty acid ester, fatty alcohol, fatty triglyceride, lecithin, and combinations of any of them. In certain exemplary embodiments, the natural wax comprises candelilla wax or carnauba wax. In certain exemplary embodiments the wax is a synthetic wax, e.g., a paraffin wax. In some exemplary embodiments the wax and/or resulting wax mixture is solid at room temperature, e.g., at any or alternatively at all temperatures within the range of 20°C to 25°C.

[0021]   In certain embodiments an antioxidant is added to the wax with or prior to the addition of sensitive substance(s), e.g., antioxidant selected from butylated hydroxytoluene, butylated hydroxyanisole, tert-butyhydroquinone, quercetin, tocopherol, vitamin C, water soluble polyphenols, water soluble plant extracts (e.g., extracts from herbs, other botanicals or other plants) and combinations of any of them. In certain exemplary embodiments the antioxidant is vitamin C.

[0022]   In certain embodiments the sensitive substance-in-wax solution comprising melted wax and sensitive substance, e.g., fish oil, as described above, is cooled to room temperature (e.g., 68°F -75°F, e.g., 70°F, or 20°C - 24°C). It is currently understood that as the temperature of the wax cools to room temperature the sensitive substance is encapsulated or microencapsulated with the wax, thereby forming wax balls containing the sensitive substance. In at least certain embodiments such "wax balls" form the core of the complex coacervates. It is understood that the wax forms a layer that separates the sensitive substance(s) from the environment surrounding the wax ball.

[0023]   In certain embodiments the sensitive ingredient may be selected from the group including, for example, omega-3 fatty acids, flavor oils, and lipophilic nutrients and combinations of any of them. In certain exemplary embodiments the sensitive ingredient is fish oil. In certain embodiments of the sensitive substance wax-in-water emulsions described here, e.g., emulsions formed by dissolving fish oil into melted natural wax, the at least one sensitive substance is present in an amount of 0.1 wt. % to 40 wt. %, e.g., from 1.0 wt. % to 10 wt. % of the sensitive substance wax-in-water emulsion. In certain embodiments of the aqueous dispersions of

10

complex coacervates described here, e.g., dispersions formed by adding cationic polymer to a sensitive substance wax-in-water emulsion followed by homogenizing, as described above, e.g., those formed of emulsion made with fish oil in melted natural wax, the at least one sensitive substance is present in an amount of 0.1 wt. % to 40.0 wt. %, e.g., from 1.0 wt. % to 10.0 wt. % of the aqueous dispersion of complex coacervates.

[0024]    In certain exemplary embodiments where the the sensitive ingredient comprises one or more lipophilic nutrients, it may, e.g., include fat soluble vitamins, (e.g., vitamins A, D, E, and K), tocotrienols, carotenoids, xanthophylls, (e.g., lycopene, lutein, astaxanthin, and zeazanthin), fat-soluble nutraceuticals including phytosterols, stanols and esters thereof, Coenzyme Q10 and ubiquinol, hydrophobic amino acids and peptides, essential oils and extracts, and fatty acids. Fatty acids may include, for example, conjugated linolenic acid (CLA), omega-6 fatty acids, and omega-3 fatty acids. Suitable omega-3 fatty acids include, e.g., short-chain omega-3 fatty acids such as alpha-linolenic acid (ALA), which are derived from plant sources, for example flaxseed, and long-chain omega-3 fatty acids such as eicosapentaenoic acid (EPA), steradonic acid and docosahexaenoic acid (DHA). The long-chain omega-3 fatty acids can be derived from, for example, marine or fish oils. Such oils can be extracted from various types of fish or marine animals, such as anchovies, capelin, cod, herring, mackerel, menhaden, salmon, sardines, shark and tuna, or from marine vegetation, such as micro-algae, or a combination of any of them. Other sources of omega-3 fatty acids include liver and brain tissue and eggs.

[0025]    In certain exemplary embodiments where the the sensitive ingredient comprises one or more water-insoluble flavorants, they may include, for example, any substance that provides a desired flavor to a food or beverage product, which does not substantially dissolve in water (e.g., non-polar, hydrophobic substances such as lipids, fats, oils, etc.). The flavorant may be a liquid, gel, colloid, or particulate solid, e.g., an oil, an extract, an oleoresin, or the like. Exemplary water-insoluble flavorants include, but are not limited to, citrus oils and extracts, e.g. orange oil, lemon oil, grapefruit oil, lime oil, citral and limonene, nut oils and extracts, e.g. almond oil, hazelnut oil and peanut oil, other fruit oils and extracts, e.g. cherry oil,

11

apple oil and strawberry oil, botanical oils and extracts, e.g., coffee oil, mint oil, vanilla oil, and combinations of any of them.

[0026]    As disclosed above, an anionic polymer (meaning, as used here, at least one anionic polymer and optionally a mixture of anionic polymers) is combined with a sensitive substance-in-wax solution to form the sensitive substance wax-in-water emulsion, also referred to here as a wax oil-in-water emulsion. In at least certain exemplary embodiments, homogenizing is used in forming the wax oil-in-water emulsion. The anionic polymer comprises, for example, gum arabic, modified starches, pectin,          Q-200 (available from National Starch), carrageenan, alginate, xanthan gum, modified celluloses, carboxymethylcellulose or carboxyl methyl cellulose (CMC), gum acacia, gum ghatti, gum karaya, gum tragacanth, locust bean gum, guar gum, psyllium seed gum, quince seed gum, larch gum (arabinogalactans), stractan gum, agar, furcellaran, gellan gum, or a combination of any of them. In some exemplary embodiments the anionic polymer is gum arabic. In certain exemplary embodiments, the oil-in-wax solution is added to the emulsifier solution under high-shear mixing conditions to make an oil-in-water emulsion, followed by homogenizing (e.g., at 3000 psi to 4000 psi) to achieve small particle size. In certain embodiments the anionic polymer is present in an amount of 5.0 wt. % to 40.0 wt. % of the final coacervate emulsion, e.g., from 10.0 wt. % to 15.0 wt. %.

[0027]    As disclosed above, cationic polymer (meaning, as used here, at least one cationic polymer and optionally a mixture of cationic polymers) is combined with the sensitive substance-in-wax emulsion.    Optionally, in some embodiments an antioxidant and/or a stabilizer is also included.    In certain exemplary embodiments, the at least one cationic polymer is added to the sensitive substance-in-wax emulsion under high-shear mixing conditions followed by homogenization under 4000-4500 psi to form coacervate complex. In certain embodiments the at least one cationic polymer is present in an amount up to 20.0 wt. % of the aqueous dispersion of complex coacervates, e.g., from 1.0 wt. % to 15.0 wt. %. The cationic polymer may comprise, consist essentially of or consist of, for example, proteins, such as dairy proteins, including whey proteins, caseins and fractions thereof, gelatin, vegetable and other plant proteins, e.g., corn zein

12

protein, grain protein extracts, e.g. protein from wheat, barley, rye, oats, etc.,
legume proteins and other vegetable proteins, proteins from tree nuts, proteins
from ground nuts, bovine serum albumin, egg albumin, microbial proteins,
chitosan, and the like, and combinations of any of them. It is recognized that the
above categories of cationic polymers are in part overlapping or redundant. In an
exemplary embodiment the cationic polymer is whey protein.   In certain
embodiments whey protein may be used, selected for example from beta-
lactoglobulin (BLG), whey protein isolate (WPI), whey protein concentrate,
peptides, amino acids, soy proteins or a combination of any of them. In some
exemplary embodiments the whey protein is BLG and pectin is used as the
anionic polymer for forming the sensitive substance wax-in-water emulsion.

[0028]     In certain embodiments the complex coacervates have a negative zeta potential,
           that is, the outside of the complex coacervate shell displays a net negative charge.
           In certain exemplary embodiments the shell includes a net positive charged
           (cationic) polymer and a net negative charged (anionic) polymer.  It is currently
           believed that the net charge of each polymer is dependent on the pH of the
           environment and the isoelectric point of each polymer, which is in turn dependent
           on the density of ionizable groups in each polymer and the pKa values of those
           groups.   Thus, disclosure here of complex coacervates comprising anionic and
           cationic polymers refers to the charge of the polymers in the environment or
           reaction conditions used for formation of the complex coacervates.  Complex
           coacervates of the type used here are presently understood to be stabilized at least
           in part by the electrostatic attraction between the oppositely charged polymers.

[0029]     In certain embodiments a stabilizer is added to the sensitive substance-in-wax
           solution before the at least one cationic polymer is added. The stabilizer may be
           selected from sucrose ester, triglycerides, lecithin, ester gum, and combinations of
           any of them.   In an exemplary embodiment the stabilizer is sucrose ester
           containing triglycerides or ester gum.

[0030]     In certain exemplary embodiments, the complex coacervates comprise, for
           example, 0.05 wt.% - 5.0 wt.% wax, e.g., from 0.5 wt.% - 5.0 wt.% wax ; 0.1
           wt.% - 40.0  wt.% sensitive substance (meaning here and in other similar usages,
           the combined total weight percent of the one or more sensitive substances

13

included in the complex coacervates), e.g., from 10.0 wt. % to 15.0 wt. % sensitive substance(s); 5.0 wt. % to 40.0 wt.% anionic polymer, e.g., from 10.0 wt. % to 15.0 wt. %; and up to 20.0 wt.% cationic polymer, e.g., from 5.0 wt. % to 15 wt. % cationic polymer. In some embodiments, the complex coacervates comprise, for example, 0.05 wt. % to 5.0 wt.% wax; 0.1 wt.% to 40.0 wt.% of the at least one sensitive substance; 1.0 wt.% to 3.0 wt.% of antioxidant; 5.0 wt.% to 40.0 wt.% of the at least one of the anionic polymer; 0.5 wt.% to 5.0 wt.% of the at least one of the cationic polymer; and 0.1 wt.% to 5.0 wt.% of stabilizer. In certain exemplary embodiments, the coacervate complexes contain, for example, at least 1.0 wt.%, e.g., up to 10.0 wt.%, of one or more polyunsaturated fatty acids selected from omega-3 fatty acids, omega-6 fatty acids and combinations of any of them. In certain embodiments, the one or more polyunsaturated fatty acids are selected from DHA, EPA, CLA, and combinations of any of them.

[0031]    In certain exemplary embodiments, at least a majority of the complex coacervates of the present invention have a volume weighted average diameter in the range of, for example, 0.1 μm to 20.0 μm, e.g., a diameter in the range of 0.3 μm to 1.5 μm. As used here, the "diameter" is the largest dimension of the particle, and the particle need not be spherical.

[0032]    In certain exemplary embodiments, the aqueous dispersion of the present invention may contain other dispersed components in addition to the complex coacervates. In certain embodiments, the dispersion contains less than 20 wt. % of one or more dispersed edible components, including the dispersed complex coacervates. In certain exemplary embodiments some or all of the complex coacervates (alone or as an aqueous dispersion and/or as included in a food product) are substantially stabilized, for example by substantial gelling or substantial hardening of the complex coacervates, aggregation, etc. In other embodiments the complex coacervates or aqueous dispersion are not substantially stabilized.

[0033]    In certain exemplary embodiments, the aqueous dispersion of complex coacervates is maintained as an aqueous dispersion. In alternative embodiments, the aqueous dispersion of complex coacervates is, for example, spray dried, freeze dried, drum dried, or bed dried. If maintained as an aqueous dispersion, in certain

embodiments, the aqueous dispersion of complex coacervates is treated to inhibit microbiological growth. In certain embodiments, the aqueous dispersion of complex coacervates is, for example, pasteurized, aseptically packaged, treated with chemical preservatives, e.g., sodium benzoate, potassium sorbate, lauric alginate, polylysine, natamycin, velvorin, etc., and/or treated with acid, e.g., citric acid, phosphoric acid, etc. In some exemplary embodiments, the aqueous dispersion of complex coacervates has minimized contact with air during production, is pasteurized after production, and is stored in a refrigerator with limited exposure to light, e.g., sunlight and/or artificial light. .

[0034]    In certain exemplary embodiments, a desired amount of sensitive substance, e.g. fish oil or other hydrophobic substance in the form of the above-described complex coacervates is included in a food product in the form of complex coacervates as disclosed here. The amount of complex coacervates, and hence the amount of hydrophobic substance included in the food product may vary depending on the application and desired taste characteristics and nutrition of the food product. The complex coacervates may be added to the food product in any number of ways, as would be appreciated by those of ordinary skill in the art given the benefit of this disclosure. In certain exemplary embodiments, the complex coacervates are sufficiently mixed in the food product to provide a substantially uniform distribution, for example a stable dispersion. Mixing should be accomplished such that the complex coacervates are not destroyed, i.e., the encapsulation of the wax-protected sensitive substance is left largely intact. If the complex coacervates are destroyed, oxidation of the hydrophobic substance may result. Suitable mixer(s) can be selected for a specific application based, at least in part, on the type and amount of ingredients used, the viscosity of the ingredients used, the amount of product to be produced, the flow rate, and the sensitivity of ingredients, such as the complex coacervates, to shear forces or shear stress.

[0035]    Encapsulation of sensitive substance, e.g. fish oil or other hydrophobic substances using complex coacervates as disclosed here can in at least certain embodiments stabilizes the substance by protecting it from degradation by, for example, oxidation and hydrolysis. When included in an acidic food product, the complex coacervates can provide a stable dispersion of hydrophobic substances over the

shelf life of the food product. Factors that may affect the shelf-life of a food product comprising complex coacervates disclosed here typically include, e.g., the level of processing the product undergoes, the type of packaging, and the materials used for packaging the product. Additional factors that may affect the shelf life of the product include, for example, the nature of the base formula (e.g., an acidic beverage sweetened with sugar has a longer shelf-life than an acidic beverage sweetened with aspartame) and environmental conditions (e.g., exposure to high temperatures and sunlight is deleterious to ready-to-drink beverages).

[0036]    In certain exemplary embodiments of the food products disclosed here comprising complex coacervates, the food product is a beverage product. In certain embodiments, the beverage products are ready-to-drink beverages, beverage concentrates, syrups, shelf-stable beverages, carbonated soft drinks, refrigerated beverages, frozen beverages, or the like. In some exemplary embodiments the beverage product is acidic, e.g. having a pH within the range below about pH 5.0, e.g., a pH value within the range of about pH 1.0 to about pH 4.5, or in certain exemplary embodiments a pH value within the range of about pH 1.5 to about pH 3.8. In an exemplary embodiment the beverage product has a pH of 3.0. Beverage products comprising complex coacervates disclosed here include, but are not limited to, e.g., colas, lemon-lime and other carbonated and non-carbonated soft drinks, fountain beverages, liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy drinks, fortified/enhanced water drinks such as so called near waters, soy drinks, vegetable drinks, grain-based drinks (e.g. malt beverages), fermented drinks (e.g., yogurt drinks, smoothies, kefir drinks and the like), coffee beverages, tea beverages, dairy beverages, and mixtures thereof. Exemplary fruit juice sources include citrus fruit, e.g. orange, grapefruit, lemon and lime, berry, e.g. cranberry, raspberry, blueberry and strawberry, apple, grape, pineapple, prune, pear, peach, cherry, mango, and pomegranate. Beverage products include bottle, can, and carton products and fountain syrup applications.

[0037]    Certain embodiments of other food products comprising complex coacervates disclosed here include fermented food products, yogurt, sour cream, cheese, salsa,

16

ranch dip, fruit sauces, fruit jellies, fruit jams, fruit preserves, and the like. In certain exemplary embodiments, the food product is acidic, e.g. having a pH value within the range below about pH 5.0, in certain exemplary embodiments, a pH value within the range of about pH 1.0 to about pH 4.5, or in certain exemplary embodiments, a pH value within the range of about pH 1.5 to about pH 3.8. In an exemplary embodiment the food product has a pH of 3.0.

[0038]   The food products disclosed here may optionally include other additional ingredients. In certain embodiments, such additional ingredients may include, for example, vitamins, minerals, sweeteners, water-soluble flavorants, colorings, thickeners, emulsifiers, acidulants, electrolytes, antifoaming agents, proteins, carbohydrates, preservatives, water-miscible flavorants, edible particulates, and mixtures thereof.       In certain embodiments, other ingredients are also contemplated. In at least some exemplary embodiments, the ingredients can be added at various points during processing, including before or after pasteurization, and before or after addition of the complex coacervates.

[0039]   In at least certain exemplary embodiments, food products disclosed here may be pasteurized.    The pasteurization process may include, for example, ultra high temperature (UHT) treatment and/or high temperature-short time (HTST) treatment.  The UHT treatment includes subjecting the food or beverage product to high temperatures, such as by direct steam injection or steam infusion, or by indirect heating in a heat exchanger. Generally, after the product is pasteurized, the product can be cooled as required by the particular product composition/configuration and/or the package filling application. For example, in one embodiment, the food or beverage product is subjected to heating to about 185°F (85°C) to about 250°F (121°C) for a short period of time, for example, about 1 to 60 seconds, then cooled quickly to about 36°F (2.2°C) +/10°F (5°C) for refrigerated products, to ambient temperature for shelf stable or refrigerated products, and to about 185°F (85°C) +/- 10°F (5°C) for hot-fill applications for shelf-stable products.  The pasteurization process is typically conducted in a closed system, so as not to expose the food product to atmosphere or other possible sources of contamination.       In alternative embodiments, other pasteurization or sterilization techniques may also be useful, such as, for example,

17

aseptic or retort processing. In addition, multiple pasteurization processes may be carried out in series or parallel, as necessitated by the food product or ingredients.

[0040]    Some food products in accordance with this disclosure optionally may, in addition, be post processed. In exemplary embodiments, post processing is typically carried out following addition of the complex coacervates. Post processing can include, for example, cooling the product solution and filling it into a container for packaging and shipping. In certain embodiments, post processing may also include deaeration of the food product to less than 4.0 ppm oxygen, preferably less than 2.0 ppm and more preferably less than 1.0 ppm oxygen. In alternative embodiments deaeration and other post processing tasks may be carried out prior to processing, prior to pasteurization, prior to mixing with the complex coacervates and/or at the same time as adding the complex coacervates. In addition, in certain embodiments, an inert gas (e.g., nitrogen or argon) headspace may be maintained during the intermediary processing of the product and final packaging. Additionally/alternatively, an oxygen or UV radiation barriers and/or oxygen scavengers could be used in the final packaging.

[0041]    EXAMPLES.    The following are examples of specific embodiments of the present invention, but are not intended to limit it.

[0042]    Example 1

In a 50 ml round flask with a stirring bar, 0.8 g carnauba wax melted at 86 °C and then 9.4 g (40% EPA/DHA) omega-3 oil was added and mixed until an homogeneous wax solution ("Omega-3 wax solution") was obtained. The Omega-3 wax solution was added under high shear mixing to 230 g gum arabic solution (20%) containing 6 g ascorbic acid to form a wax oil-in-water emulsion. Subsequently, 60 g solution of β-Lactoglobulin (15%) was added slowly to form a coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under 3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3. The pH was about 3.0. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 1. High-Acid Omega-3 Beverage

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Wax Emulsion | 0.5-1.5% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

[0043]    Example 2

In a 50 ml round flask with a stirring bar, 2.0 g candelilla wax melted at 75 °C and then 15 g (22% EPA/DHA) fish oil and 8 g sucrose ester (SAIB-MCT) were added and mixed until an homogeneous wax solution ("Omega-3 wax solution") was obtained. To 225 g gum arabic solution (20%) containing 0.5 g ascorbic acid the Omega-3 wax solution was added under high shear mixing to form a wax oil-in-water emulsion. The emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under 3000-4500 psi. Sodium

benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00.

[0044]    Example 3

In a 50 ml round flask with a stirring bar, 2.0 g candelilla wax melted at 75 °C and then 15 g (22% EPA/DHA) fish oil and 8 g sucrose ester (SAIB-MCT) were added and mixed until an homogeneous wax solution ("Omega-3 wax solution") was obtained. To 225 g gum arabic solution (20%) containing 1.5 g ascorbic acid the Omega-3 wax solution was added under high shear mixing to form a wax oil-in-water emulsion. Subsequently, 60 g solution of β-Lactoglobulin (5%) was added slowly to form an aqueous dispersion of coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under 3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00.

[0045]    Example 4

In a 50 ml round flask with a stirring bar, 3.2 g carnauba wax melted at 86 °C and then 16 g (22% EPA/DHA) fish oil was added and mixed until an homogeneous wax solution ("Omega-3 wax solution") was obtained. To 225 g gum arabic solution (20%) containing 1.65 g ascorbic acid the Omega-3 wax solution was added under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of β-Lactoglobulin (5%) was added slowly to form an aqueous dispersion of coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under 3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00.

[0046]    Example 5

In a 50 ml round flask with a stirring bar, 9 g palm oil wax melted at 45 °C and then 15 g (22% EPA/DHA) fish oil was added and mixed until an homogeneous wax solution ("Omega-3 wax solution") was obtained. To 225 g gum arabic solution (20%) the Omega-3 wax solution was added under high shear mixing to form a wax oil-in-water emulsion.    Subsequently, 60 g solution of β-Lactoglobulin (5%) was added slowly to form an aqueous dispersion of coacervate complex emulsion at pH 3-5.    The coacervate emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under

20

3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00.

[0047]    Example 6

In a 50 ml round flask with a stirring bar, 3.0 g candelilla wax melted at 75 °C and then 20 g citral was added and mixed until an homogeneous wax solution ("citral wax solution") was obtained. To 225 g gum arabic solution (20%) the citral wax solution was added under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of β-Lactoglobulin (5%) was added slowly to form an aqueous dispersion of coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under 3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00.

[0048]    Example 7

In a 50 ml round flask with a stirring bar, 5.0 g candelilla wax melted at 75 °C and then 3.0 g ferrous lactate was added and mixed to form a ferrous lactate wax mixture. To 225 g gum arabic solution (20%) the ferrous lactate wax mixture was added under high shear mixing to form a wax-in-water emulsion. Subsequently, 60 g solution of β-Lactoglobulin (5%) was added slowly to form an aqueous dispersion of coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes at room temperature and then homogenized by 1-2 pass under 3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.00.

[0049]    Example 8

In a 50 ml round flask with a stirring bar, 5.0 g candelilla wax melted at 75 °C and then 3.0 g magnesium oxide was added and mixed to form a magnesium oxide wax mixture. To 225 g gum arabic solution (20%) the magnesium oxide wax mixture was added under high shear mixing to form a wax-in-water emulsion. Subsequently, 60 g solution of β-Lactoglobulin (5%) was added slowly to form an aqueous dispersion of coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes at room temperature and then

21

homogenized by 1-2 pass under 3000-4500 psi. Sodium benzoate (0.3 g) was added to the emulsion and pH adjusted 4.0.

[0050]    Example Test Results.    The following table shows the results of sensory tests performed on the samples prepared according to the forgoing examples, following storage at 70-75 °F for the time periods indicated.

Table 2.  Omega-3 Stability in High-Acid Beverage

| Example | Stability (70-75 °F) |
|---------|----------------------|
| 1 | at lcast 2 months ( no fish odor and tastc) |
| 2 | at least 1 month ( no fish odor and taste) |
| 3 | at lcast 2 months ( no fish odor and tastc) |
| 4 | at least 2 months ( no fish odor and taste) |
| 5 | at lcast 1 month ( no fish odor and tastc) |

[0051]    The invention has been described with reference to the preferred embodiments. Obviously, modifications and alterations will occur to others upon reading and understanding the preceding detailed description.  It is intended that the invention bc construcd as including all such modifications and altcrations insofar as thcy come within the scope of the appended claims or the equivalents thereof.

22

What is claimed is:

1.   An emulsion having a core-shell capsule structure, wherein the core comprises sensitive
     substance and the shell comprises a complex coacervate of wax, anionic polymer and
     cationic polymer.

2.   The emulsion of claim 1 wherein the wax is selected from the group consisting of
     carnauba wax,  candelilla wax, palm oil, shellac and fatty acid, fatty acid ester, fatty
     alcohol, fatty triglyceride, lecithin, paraffin and combinations of any of them.

3.   The emulsion of claim 1 wherein the sensitive substance comprises a hydrophobic
     substance selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-
     insoluble flavonoids, flavours, and essential oils and combinations of any of them.

4.   The emulsion of claim 1 wherein the sensitive substance comprises a fatty acid selected
     from an omega-3 fatty acid, an omega-6 fatty acid, and combinations of any of them.

5.   The emulsion of claim 1 wherein the sensitive substance is ascorbic acid, ferrous
     lactate, magnesium oxide, zinc oxide, calcium oxide, extracts from plants, herbs or
     botanicals, or a combination of any of them.

6.   The emulsion of claim 1 wherein the anionic polymer is selected from gum arabic,
     pectin, xanthan gum, modified cellulose, carrageenan, gum acacia, ghatti gum, xanthan
     gum, gum karaya, gum tragacanth, locust bean gum, guar gum, psyllium seed gum,
     quince seed gum, larch gum (arabinogalactans), stractan gum, agar, furcellaran, gellan
     gum, modified starch, alginate, carboxyl methyl cellulose, and combinations of any of
     them.

7.   The emulsion of claim 1 wherein the cationic polymer is selected from whey protein,
     beta-lactoglobulin (BLG), whey protein isolate (WPI) whey protein concentrate,
     peptides, amino acids, soy proteins, plant proteins, caseins and fractions thereof, other
     dairy proteins,  gelatin, corn zein protein, bovine serum albumin, egg albumin, wheat
     protein extracts, barley protein extracts, rye protein extracts, oat protein extracts, other
     grain protein extracts vegetable proteins, microbial proteins, chitosan, legume proteins,

23

tree nut proteins, ground nut protein, and combinations of any of them.

8.    The emulsion of claim 1 further comprising antioxidant selected from butylated hydroxytoluene, butylated hydroxyanisole, tert-butylhydroquinone, quercetin, tocopherol, vitamin C, water soluble polyphenols, water soluble plant extracts, and combinations of any of them.

9.    The emulsion of claim 1 further comprising a stabilizer selected from sucrose ester, triglycerides, lecithin, ester gum, fatty acids, fatty esters and combinations of any of them.

10.   A food product comprising the emulsion of claim 1 and a second food ingredient.

11.   A food product comprising an aqueous dispersion of the emulsion of claim 1 and a second food ingredient.

12.   An aqueous dispersion of complex coacervates, prepared by:

    a.  providing a wax solution;

    b.  forming a sensitive substance wax solution, comprising combining a sensitive substance with the wax solution;

    c.  forming a sensitive substance wax-in-water emulsion, comprising combining the sensitive substance wax solution with at least one anionic polymer; and

    d.  forming an aqueous dispersion of complex coacervates, comprising combining at least one cationic polymer with the sensitive substance wax-in-water emulsion.

13.   The aqueous dispersion of complex coacervates of claim 12 wherein the aqueous dispersion of complex coacervates is homogenized.

14.   The aqueous dispersion of complex coacervates of claim 1 wherein a stabilizer is added to the sensitive substance-in-wax emulsion before combining with the cationic polymer.

15.   The aqueous dispersion of complex coacervates of claim 1 wherein:

- the wax solution consists essentially of melted wax, the anionic polymer comprises gum Arabic, the sensitive substance comprises fish oil, the cationic polymer comprises whey protein, and

- antioxidant is added to one of the sensitive substance-in-wax solution and the anionic polymer before the anionic polymer and the sensitive substance-in-wax solution are combined.

16. The aqueous dispersion of complex coacervates of claim 15 wherein a stabilizer is added to the sensitive substance-in-wax emulsion before combining with the cationic polymer.

17. The aqueous dispersion of complex coacervates of claim 16 wherein the stabilizer is selected from sucrose ester, triglycerides, lecithin, ester gum, fatty acids, fatty esters and combinations of any of them

18. The aqueous dispersion of complex coacervates of claim 17 wherein the anionic polymer comprises gum arabic, the sensitive substance comprises omega-3 fatty acid, the cationic polymer comprises whey protein, the antioxidant comprises vitamin C, and the stabilizer comprises ester gum.

19. The aqueous dispersion of complex coacervates of claim 12 wherein the sensitive substance is combined with wax solution where the wax solution is at a temperature between 40°C and 150°C.

20. The aqueous dispersion of complex coacervates of claim 12 wherein the anionic polymer is added to the sensitive substance-in-wax solution where both the anionic polymer and the sensitive substance-in-wax solution are at room temperature.

21. A food product comprising the aqueous dispersion of complex coacervates of claim 12 and a second food ingredient.

22. The food product of claim 21 wherein the food product is a beverage beverage having a pH value of pH 2.5 to pH 5.5.

23.  A method for preparing an aqueous dispersion of complex coacervates comprising:

   a. providing a wax solution;

   b. forming a sensitive substance-in-wax solution, comprising combining the wax solution with at least one sensitive substance;

   c. forming a sensitive substance-in-wax emulsion, comprising combining the sensitive substance-in-wax solution with at least one anionic polymer;

   d. forming an aqueous dispersion, comprising dispersing the sensitive substance-in-wax emulsion in an aqueous medium; and

   e. forming an aqueous dispersion of complex coacervates, comprising combining at least one cationic polymer with the sensitive substance-in-wax emulsion.

24.  The method for preparing an aqueous dispersion of complex coacervates of claim 23 further comprising homogenizing aqueous dispersion of complex coacervates.

25.  The method for preparing an aqueous dispersion of complex coacervates of claim 23 further comprising adding an antioxidant to the sensitive substance-in-wax solution before adding the at least one anionic polymer.

26.  The method for preparing an aqueous dispersion of complex coacervates of claim 23 further comprising adding a stabilizer to the sensitive substance-in-wax emulsion before adding the at least one cationic polymer.

# INTERNATIONAL SEARCH REPORT

| | International application No |
|---|---|
| | PCT/US2012/059992 |

**A. CLASSIFICATION OF SUBJECT MATTER**
INV. A23L1/00    A23L1/05    A23L1/22    A23L2/52    A23P1/04
B01J13/10
ADD.

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
A23L  A23P  B01J

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)

EPO-Internal, WPI Data

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | WO 2009/029407 A1 (PEPSICO INC [US]; GIVEN PETER [US]) 5 March 2009 (2009-03-05) paragraphs [0004] - [0008], [0016]; examples 1-7 | 1-26 |
| X | WO 2009/029406 A1 (PEPSICO INC [US]; KOHANE DANIEL S [US]; YEO YOON [US]; GIVEN PETER [US]) 5 March 2009 (2009-03-05) paragraph [0004]; examples 1-10 | 1-26 |
| | -/-- | |

[X] Further documents are listed in the continuation of Box C.    [X] See patent family annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier application or patent but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art

"&" document member of the same patent family

Date of the actual completion of the international search

18 March 2013

Date of mailing of the international search report

27/03/2013

Name and mailing address of the ISA/
European Patent Office, P.B. 5818 Patentlaan 2
NL - 2280 HV Rijswijk
Tel. (+31-70) 340-2040,
Fax: (+31-70) 340-3016

Authorized officer

Graham, Judith

Form PCT/ISA/210 (second sheet) (April 2005)

page 1 of 2

**INTERNATIONAL SEARCH REPORT**

International application No

PCT/US2012/059992

C(Continuation).   DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | PONGSAWATMANIT ET AL:  "Influence of alginate, pH and ultrasound treatment on palm oil-in-water emulsions stabilized by beta-lactoglobulin", COLLOIDS AND SURFACES. A, PHYSICACHEMICAL AND ENGINEERING ASPECTS, ELSEVIER, AMSTERDAM, NL, vol. 287, no. 1-3, 15 September 2006 (2006-09-15), pages 59-67, XP005597785, ISSN: 0927-7757, DOI: 10.1016/J.COLSURFA.2006.03.022 paragraph [2.3.1] - paragraph [2.3.3] ----- | 1-26 |
| X | WO 2004/041251 A1 (OCEAN NUTRITION CANADA LTD [CA]; YAN NIANXI [US]; JIN YULAI [CA]; MOUL) 21 May 2004 (2004-05-21) examples 4,5 ----- | 1-26 |
| X | EP 2 292 102 A1 (LIPOFOODS S L [ES]) 9 March 2011 (2011-03-09) examples 1, 4 ----- | 1-26 |

1

Form PCT/ISA/210 (continuation of second sheet) (April 2005)

**INTERNATIONAL SEARCH REPORT**

Information on patent family members

International application No

PCT/US2012/059992

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| WO 2009029407 | A1 | 05-03-2009 | AR | 068042 A1 | 28-10-2009 |
| | | | AU | 2008293780 A1 | 05-03-2009 |
| | | | CN | 101790325 A | 28-07-2010 |
| | | | EP | 2182816 A1 | 12-05-2010 |
| | | | KR | 20100032933 A | 26-03-2010 |
| | | | US | 2010272859 A1 | 28-10-2010 |
| | | | WO | 2009029407 A1 | 05-03-2009 |
| WO 2009029406 | A1 | 05-03-2009 | AR | 068041 A1 | 28-10-2009 |
| | | | AT | 547012 T | 15-03-2012 |
| | | | AU | 2008293779 A1 | 05-03-2009 |
| | | | CN | 101790323 A | 28-07-2010 |
| | | | DK | 2180795 T3 | 18-06-2012 |
| | | | EP | 2180795 A1 | 05-05-2010 |
| | | | EP | 2457451 A1 | 30-05-2012 |
| | | | ES | 2381416 T3 | 28-05-2012 |
| | | | KR | 20100033429 A | 29-03-2010 |
| | | | US | 2009061048 A1 | 05-03-2009 |
| | | | WO | 2009029406 A1 | 05-03-2009 |
| WO 2004041251 | A1 | 21-05-2004 | AT | 470436 T | 15-06-2010 |
| | | | AU | 2003283101 A1 | 07-06-2004 |
| | | | BR | 0315977 A | 20-09-2005 |
| | | | CA | 2471821 A1 | 21-05-2004 |
| | | | CN | 1731983 A | 08-02-2006 |
| | | | DK | 1575561 T3 | 20-09-2010 |
| | | | EP | 1575561 A1 | 21-09-2005 |
| | | | ES | 2347045 T3 | 25-10-2010 |
| | | | HK | 1084054 A1 | 20-05-2010 |
| | | | JP | 4833553 B2 | 07-12-2011 |
| | | | JP | 2006506410 A | 23-02-2006 |
| | | | KR | 20050084683 A | 26-08-2005 |
| | | | KR | 20110112481 A | 12-10-2011 |
| | | | MX | PA05004859 A | 05-12-2005 |
| | | | NZ | 539777 A | 29-02-2008 |
| | | | US | 2005067726 A1 | 31-03-2005 |
| | | | US | 2010092571 A1 | 15-04-2010 |
| | | | US | 2011111020 A1 | 12-05-2011 |
| | | | WO | 2004041251 A1 | 21-05-2004 |
| EP 2292102 | A1 | 09-03-2011 | CA | 2771131 A1 | 10-03-2011 |
| | | | CN | 102481001 A | 30-05-2012 |
| | | | EP | 2292102 A1 | 09-03-2011 |
| | | | JP | 2013503611 A | 04-02-2013 |
| | | | US | 2012156288 A1 | 21-06-2012 |
| | | | WO | 2011026612 A1 | 10-03-2011 |

ADDENDUM D(4)

## ADDENDUM D(4)

### (See UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)

- PCT Application No. PCT/US12/43220; WIPO Publication No. WO 2013/006269. *"Coacervates Complex, Methods And Food products."*

## ADDENDUM D(4)

**(Appendix Vol. II, TAB 14, UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

*4)* PCT Application No. PCT/US12/43220; WIPO Publication No. WO 2013/006269. *"Coacervates Complex, Methods And Food products."*

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property
Organization
International Bureau

(43) International Publication Date
10 January 2013 (10.01.2013)



WIPO|PCT

(10) International Publication Number
WO 2013/006269 A1

(51) International Patent Classification:
*A23L 1/30* (2006.01)      *A23L 2/00* (2006.01)
*A23L 1/302* (2006.01)     *B01J 13/10* (2006.01)
*A23L 1/303* (2006.01)

(21) International Application Number:
PCT/US2012/043220

(22) International Filing Date:
20 June 2012 (20.06.2012)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
13/175,451    1 July 2011 (01.07.2011)    US

(71) Applicant *(for all designated States except US)*: PEP-SICO, INC. [US/US]; 700 Anderson Hill Road, Purchase, NY 10577 (US).

(72) Inventors; and

(75) Inventors/Applicants *(for US only)*: ZHANG, Naijie [US/US]; 31 Charter Oak Court, Ridgefield, CT 06877 (US). MUTILANGI, William [US/US]; 43 Bleakley Drive, Peekskill, NY 10566 (US).

(74) Agent: ROKOS, Rebecca, P.; Banner & Witcoff, LTD., Ten South Wacker Drive, Suite 3000, Chicago, IL 60606-7407 (US).

(81) Designated States *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, QA, RO, RS, RU, RW, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) Designated States *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LR, LS, MW, MZ, NA, RW, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, RU, TJ, TM), European (AL, AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

[Continued on next page]

(54) Title: COACERVATE COMPLEXES, METHODS AND FOOD PRODUCTS



Coacervate Complex

FIG. 1

(57) Abstract: Complex coacervates incorporating one or more hydrophobic substances are provided, that are stable in certain aqueous systems and food products. The coacervates may be used as an ingredient in food products. e.g., in beverages, dry foods, and semi-moist foods. Methods for producing the complex coacervates and food products are also disclosed herein.

WO 2013/006269 A1

# WO 2013/006269 A1 |||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

**Declarations under Rule 4.17:**

— *as to applicant's entitlement to apply for and be granted a patent (Rule 4.17(ii))*

— *as to the applicant's entitlement to claim the priority of the earlier application (Rule 4.17(iii))*

**Published:**

— *with international search report (Art. 21(3))*

1

## COACERVATE COMPLEXES, METHODS AND FOOD PRODUCTS

### PRIORITY CLAIM

[0001]  This application claims priority to U.S. Utility Patent Application No. 13/175,451, filed July 1, 2011, titled "*Coacervate Complexes, Methods and Food Products*", the entire disclosure of which is herein incorporated by reference.

### TECHNICAL FIELD OF THE INVENTION

[0002]  The present invention relates to the field of food products and protecting an edible hydrophobic substance from hydrolysis and oxidation in a food product, more particularly to complex coacervates containing hydrophobic substances and to food products comprising such complex coacervates.

### BACKGROUND OF THE INVENTION

[0003]  Certain hydrophobic substances are desirable as ingredients in food products, such as in, for example, beverages. In some cases the hydrophobic substance does not have an acceptable taste or taste profile or is not sufficiently stable in the intended food, e.g., in an acidic environment. Examples of such hydrophobic substances include omega-3 fatty acids, water-insoluble flavorants, water-insoluble vitamins, etc. Certain hydrophobic substances have been discovered to have beneficial health effects. For example, omega-3 fatty acids form an important part of the human diet. Eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA), long-chain forms of omega-3 fatty acids, are believed in many cases to offer health benefits and it has been suggested that consumption of omega-3 fatty acids should be increased.

[0004]  Hydrophobic substances have been incorporated directly into an aqueous system as a solution (with a compatible solvent), extract, emulsion, or micellular dispersion (a so-called microemulsion). All of these approaches can serve to disperse a hydrophobic substance in an aqueous system and in a food product, such as a beverage or semi-moist food, e.g., a snack bar. They may not, however, provide adequate protection against hydrolysis and oxidation of the hydrophobic

2

substance. Commercially available fish oils can be high in omega-3 fatty acids, and in some cases are "encapsulated," but these commercially available fish oils have not proven adequately stable in all food contexts, e.g., physically or taste-stable in acidic beverage products. This can result in negative changes to the food product, such as unpleasant fishy flavors and aromas after ingestion, particularly a fishy aftertaste caused by belching fish oil from the stomach. Additionally, omega-3 fatty acids, as well as many water-insoluble flavorants, water-insoluble vitamins, etc. are unstable to degradation, e.g., by oxidation or hydrolysis, when exposed to air, water and/or light.

[0005]     It would be desirable to provide edible compositions suitable for use in food products, which compositions incorporate one or more desirable hydrophobic substances, e.g., one or more omega-3 fatty acids, water-insoluble flavorants, water-insoluble vitamins, etc. It also would be desirable to provide food products incorporating such edible compositions. At least certain of the embodiments of the new compositions disclosed below can reduce or eliminate the unpleasant taste and odor of the one or more incorporated hydrophobic substances when used as an ingredient in a food product suitable for consumption by a human or animal. At least certain of the embodiments of the new compositions disclosed below provide hydrophobic substances in a stable form suitable for use in foods, e.g., beverage products such as beverage concentrates or syrups, ready to drink beverages, etc., and semi-moist foods such as snack bars. In at least some embodiments the hydrophobic substance is stable to oxidation and hydrolysis during the shelf life of the food product. In at least some embodiments the hydrophobic substance is stable to oxidation and hydrolysis in an acidic food product at pH values down to pH 5.0, and in some embodiments down to pH 4.0, and in some embodiments down to pH 3.0. Additional features and advantages of some or all of the products and methods disclosed here will be apparent to those who are skilled in food technology given the benefit of the following summary and description of exemplary, non-limiting examples.

## SUMMARY

[0006]   A first aspect of the invention is directed to edible delivery systems for
hydrophobic substances, which delivery systems may be incorporated into food
products, such as, for example, an acidic beverage, dairy, or juice product. The
delivery systems comprise a hydrophobic substance (which should be understood
to comprise essentially only one or a combination of substances) encapsulated in
complex coacervates.   The complex coacervates are formed by combining a
solution of anionic polymer with the hydrophobic substance to form an emulsion,
and subsequently adding a cationic polymer to form complex coacervates. Water
soluble antioxidant is added prior to forming the first emulsion. For example,
water soluble antioxidant can be added to the anionic polymer solution after or
prior to adding the hydrophobic substance, but water soluble antioxidant can be
added, also or instead, to the hydrophobic substance before the hydrophobic
substance is added to the solution of anionic polymer. The edible delivery systems
for hydrophobic substances disclosed here can reduce or eliminate oxidation of
the hydrophobic substances, e.g., in acidic beverages or other acidic food
products, and negative organoleptic effects of the encapsulated hydrophobic
substance(s), e.g., off flavor, unpleasant aroma, etc.

[0007]   In another aspect, an aqueous dispersion of complex coacervates is provided. The
aqueous dispersion of complex coacervates is prepared by preparing a solution of
at least one anionic polymer, adding at least one hydrophobic substance to the
solution of anionic polymer, high shear mixing to form an emulsion, adding at
least one cationic polymer to the emulsion, and high shear mixing to form an oil-
in-water emulsion of complex coacervates. Water soluble antioxidant is added
prior to forming the first emulsion. For example, antioxidant can be added to the
anionic polymer solution after or prior to adding the hydrophobic substance, but
water soluble antioxidant can be added, also or instead, to the hydrophobic
substance before the hydrophobic substance is added to the solution of anionic
polymer. Optionally, stabilizer is included in the emulsion of complex
coacervates. For example, stabilizer may be added to the hydrophobic substance
before the hydrophobic substance is combined with the anionic polymer.
Stabilizer may be added, instead or also, to the anionic polymer before combining

4

with the hydrophobic substance. In certain exemplary embodiments, i.e., non-limiting examples or embodiments, of the emulsion of complex coacervates disclosed here, the at least one hydrophobic substance may be selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-insoluble flavonoids, flavors, essential oils, and combinations thereof. In certain embodiments the at least one anionic polymer may be selected from gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or any combination thereof. In certain embodiments the at least one cationic polymer may be selected from whey protein, hydrolyzed protein, lauric arginate, polylysine, casein or any combination thereof. In certain exemplary embodiments a water soluble antioxidant may be added to the solution of the anionic polymer prior to emulsifying with the at least one hydrophobic substance. In certain exemplary embodiments a water soluble antioxidant may be added to the hydrophobic substance before it is combined with the anionic polymer solution. In certain exemplary embodiments a stabilizer may be added to the hydrophobic substance before combining it with the at least one anionic polymer. In certain exemplary embodiments the at least one hydrophobic substance is omega-3 fatty acid (either alone or with other hydrophobic substances), the anionic polymer is gum arabic (either alone or with other anionic polymers), and the cationic polymer is whey protein (either alone or with other cationic polymers). In certain exemplary embodiment the at least one hydrophobic substance is omega-3 fatty acid, the at least one anionic polymer is gum arabic, and the at least one cationic polymer is whey protein. The water soluble antioxidant can be, e.g., plant derived antioxidants, such as those derived from blackberries, water soluble polyphenols, vitamin C, or any combination thereof. Stabilizers can be, e.g., sucrose ester, triglycerides, lecithin, ester gum, or any combination thereof.

[0008]    In another aspect, a food product is provided comprising an aqueous dispersion of complex coacervates as disclosed above. In certain exemplary embodiments the aqueous dispersion of complex coacervates is provided by preparing a solution of at least one anionic polymer, adding at least one hydrophobic substance to the anionic polymer, high shear mixing to form an emulsion, adding at least one cationic polymer to the emulsion, and high shear mixing to form an aqueous

dispersion of complex coacervates. Water soluble antioxidant is added prior to forming the first emulsion. For example, water soluble antioxidant can be added to the anionic polymer solution after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the solution of anionic polymer. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the anionic polymer. Stabilizer may be added, instead or also, to the anionic polymer before combining with the hydrophobic substance. The food product is provided by combining a second food ingredient with the aqueous dispersion of complex coacervates.

[0009]   In certain exemplary embodiments the food product is a beverage. e.g., a carbonated soda beverage. In certain embodiments the food product has a pH of 3.0 to pH 7.0, e.g., a pH less than 3.5.

[0010]   In another aspect, a method for preparing an aqueous dispersion of complex coacervates is provided, comprising preparing a solution of at least one anionic polymer, adding at least one hydrophobic substance to the anionic polymer solution, high shear mixing to form an emulsion, adding at least one cationic polymer to the emulsion, and high shear mixing to form an aqueous dispersion of complex coacervates. Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to the anionic polymer solution after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the solution of anionic polymer. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the anionic polymer. Stabilizer may be added, instead or also, to the anionic polymer before combining with the hydrophobic substance.

[0011]   In certain embodiments of the methods disclosed here for preparing an aqueous dispersion of complex coacervates, the at least one hydrophobic substance may be selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-insoluble flavonoids, flavors, and essential oils. In certain embodiments the at

6

least one anionic polymer may be selected from gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or the combination thereof. In certain embodiments the at least one cationic polymer may be selected from whey protein, hydrolyzed protein, lauric arginate, polylysine, casein combinations. In certain exemplary embodiments an antioxidant is added to the anionic polymer solution prior to adding the hydrophobic substance, e.g., any one or more of the antioxidants mentioned above. In certain exemplary embodiments stabilizer is added to the hydrophobic substance before adding the at least one anionic polymer, e.g., any one or more of the stabilizers mentioned above. In an exemplary embodiment the at least one hydrophobic substance is omega-3 fatty acid, the at least one anionic polymer is gum arabic, and the at least one cationic polymer is whey protein. In another exemplary embodiment the at least one hydrophobic substance is omega-3 fatty acid, the anionic polymer is gum arabic, the cationic polymer is whey protein, the antioxidant is vitamin C, and the stabilizer is sucrose ester containing triglycerides.

[0012]    In another aspect, a method is provided for preparing a food product comprising an aqueous dispersion of complex coacervates. A solution of at least one anionic polymer is prepared. At least one hydrophobic substance is added to the solution of the at least one anionic polymer. High shear mixing forms an emulsion. At least one cationic polymer is added to the emulsion. High shear mixing forms an aqueous dispersion of complex coacervates. The aqueous dispersion of complex coacervates is combined with at least one other food ingredient to form the food product. Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to the anionic polymer solution after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the solution of anionic polymer. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the anionic polymer. Stabilizer may be added, instead or also, to the anionic polymer before combining with the hydrophobic substance.

[0013]   In at least certain exemplary embodiments the complex coacervates disclosed here
(also referred to here in the alternative and interchangeable as oil-containing
complex coacervates, complex coacervates containing hydrophobic substance,
etc.) and food products incorporating them as an ingredient have been found to
have unanticipated, desirable properties.     For example, in certain such
embodiments, the complex coacervates can remain suspended in aqueous systems,
e.g., beverages, beverage concentrates, etc., for a surprisingly long period of time.
In certain such embodiments the complex coacervates can remain suspended in
acidic aqueous systems, e.g., beverages, beverage concentrates, etc., having a pH
value less than pH 5.0, and in some cases less than pH 4.0, and in some cases less
than pH 3.5, for a surprisingly long period of time. Furthermore, it was found that
in at least some embodiments the complex coacervates effectively protect the
hydrophobic substance against oxidation and/or hydrolysis, etc.

[0014]   In another aspect an edible aqueous dispersion of complex coacervates is prepared
by mixing an aqueous anionic polymer solution, water soluble antioxidant, and
hydrophobic substance comprising omega 3 fatty acid including at least one of
EPA and DHA, to form an emulsion. The mixing comprises high shear mixing
below 40 °C. In some embodiments the temperature is kept below 30 °C and in
some embodiments it is kept below 25 °C. The water soluble antioxidant is added
prior to the high shear mixing forming the emulsion.     The water soluble
antioxidant and the controlled temperature can help to protect the EPA and DHA
against oxidation during the process. Cationic polymers are added to the emulsion
and high shear mixing below 40 °C forms an aqueous dispersion of complex
coacervates.  In some embodiments the temperature is kept below 30 °C during
the high shear mixing to form the aqueous dispersion of complex coacervates, and
in some embodiments the temperature is kept below 25 °C.   The aqueous
dispersion of complex coacervates is homogenized below 40 °C to reducing
average particle size of the complex coacervates to less than 10 microns, e.g., to
an average size between 0.1 micron and 10 microns. In some embodiments of the
process and resulting aqueous dispersion, the average particle size of the complex
coacervates after homogenization is less than 3.0 microns, e.g., between 0.1
micron and 3 microns, e.g., between 1.0 micron and 3 microns.   The anionic

8

polymers may be one type of polymer or a mixture of different anionic polymers,
and provide from 1.0 wt. % to 40.0 wt. % of the dispersion of complex
coacervates (i.e., before it is added to other food ingredients, such as to make a
beverage, beverage concentrate (syrup), semi-moist food products such as a snack
bar, etc.). Some exemplary embodiments of the aqueous dispersions of complex
coacervates disclosed here and of the disclosed methods for their preparation
employ only or essentially only natural ingredients.

[0015]    The anionic polymers may be one type of polymer or a mixture of different
anionic polymers, and in some embodiments the anionic polymers provide from
1.0 wt. % to 40.0 wt. % of the dispersion of complex coacervates, e.g., from 10.0
wt. % to 20.0 wt. % of the dispersion of complex coacervates (e.g., immediately
after homogenization prior to the dispersion being incorporated into a beverage or
other food). The cationic polymers may be one type of polymer or a mixture of
different cationic polymers and in some embodiments provide from 0.05 wt. % to
20.0 wt. % of the dispersion of complex coacervates (again meaning before the
addition to other food ingredients), e.g., from 1.0 wt. % to 10.0 wt. % of the
dispersion of complex coacervates. The water soluble antioxidant may be one
antioxidant or a mixture of different antioxidants and provides from 0.1 wt. % to
20.0 wt. % of the dispersion of complex coacervates, e.g., from 1.0 wt. % to 5 wt.
%. In some embodiments the water soluble antioxidant provides from 1.0 wt. %
to 5.0 wt. % of the dispersion of complex coacervates. The hydrophobic
substance may be one or a mixture of different hydrophobic substances and
provides from 0.5 wt. % to 20.0 wt. % of the dispersion of complex coacervates.
In some embodiments the hydrophobic substance provides from 5.0 wt. % to 10.0
wt. % of the dispersion of complex coacervates. In some embodiments the
hydrophobic substance comprises water insoluble antioxidant, e.g., butylated
hydroxytoluene, butylated hydroxyanisole, tert-butyhydroquinone, quercetin,
tocopherol, or any combination thereof. The hydrophobic substance may contain
omega-3 fatty acids (sometimes referred to here as "O3FA"), e.g., flax seed,
linseed oil, or other seed oil, fish oil, algae oil, seaweed oil, etc. or any
combination of such oils. In certain exemplary embodiments the hydrophobic
substance contains 20.0 wt. % to 35.0 wt. % combined of the O3FAs EPA and
DHA. In some embodiments the hydrophobic substance contains EPA and/or

DHA in combined amount providing less than 5.0 wt. % EPA and DHA combined in the dispersion of complex coacervates, e.g., from 1.0 wt. % up to 3.0 wt. % EPA and DHA combined in the dispersion of complex coacervates.

[0016]    In some embodiments the temperature is kept below 40 °C, or below 30 °C or even below 25 °C during preparation of the complex coacervates, e.g., at all times during the preparation of the edible aqueous dispersion of complex coacervates. Homogenising the aqueous dispersion of complex coacervates can be done in accordance with known techniques and equipment, e.g., at pressure greater than 3000 psig. Homogenising the aqueous dispersion of complex coacervates reduces average particle size of the complex coacervates, e.g., to more than 0.1 micron, e.g., to less than 10.0 microns, e.g., to 0.3 to 1.0 microns.

[0017]    In certain exemplary embodiments of the aqueous dispersion of complex coacervates in accordance with this aspect of the disclosure, the hydrophobic substance consists essentially of fish oil or other natural oil containing at least 10.0 wt. % EPA and DHA, e.g., at least 20.0 wt. %, e g., up to 35.0 wt. % or even up to 40.0 wt. % EPA and DHA combined. and optionally also containing water insoluble antioxidant, where the EPA and DHA collectively provide from 0.1 wt. % to 5.0 wt. % of the dispersion of complex coacervates, e.g., from 1.0 wt. % to 3.0 wt. % of the dispersion of complex coacervates. In certain exemplary embodiments, the dispersion of complex coacervates has less than 0.05 wt. % free oil, e.g., less than 0.01 wt. % free oil. As used here, the term "free oil" means oil in the dispersion of complex coacervates that is not encapsulated.

[0018]    In certain exemplary embodiments the cationic polymers are selected from alpha-lactoglobulin, beta-lactoglobulin, whey protein isolate, whey protein isolate and any combination thereof, collectively providing from 0.05 wt. % to 10.0 wt. % of the dispersion of complex coacervates.

[0019]    In accordance with another aspect, the aqueous dispersions of complex coacervates disclosed here are employed in a food product, e.g., a beverage, semi-moist snack bar, etc. The aqueous dispersion of complex coacervates can be mixed with one or more other food ingredients, including, e.g., water, flavoring, carbonation, preservative, vitamins, minerals, electrolytes, fruit juice, vegetable

juice, flavour modifiers, acidulants, clouding agents, weighting agents, or any combination of such other ingredients (meaning one or more of each or any such ingredients).    Advantageously, at least certain embodiments of the aqueous dispersions of complex coacervates disclosed here do not require a weighting agent. Typically, weighting agents are used, for example, to help keep a lighter-than water ingredient (e.g., an oil or oil-containing ingredient) in suspension in a beverage. At least certain embodiments of the aqueous dispersions of complex coacervates disclosed here are found to remain in suspension in a beverage without the aid of a weighting agent.    Thus, at least certain embodiments of the beverages disclosed here comprising certain embodiments of the aqueous dispersions of complex coacervates disclosed here contain no weighting agent for the aqueous dispersion of complex coacervates, and in some cases no weighting agent at all.    Advantageously, at least certain embodiments of the aqueous dispersions of complex coacervates disclosed here are found to serve as a clouding agent in certain beverage formulations.    The cost and complexity of adding a separate clouding agent can therefore be avoided where such embodiments of the aqueous dispersions of complex coacervates disclosed here are used in such beverages.    Thus, at least certain embodiments of the beverages disclosed here comprising certain embodiments of the aqueous dispersions of complex coacervates disclosed here contain no clouding agent other than such aqueous dispersion of complex coacervates.

[0020]    These and other aspects, advantages and features of the present invention herein disclosed will become apparent through reference to the following detailed description.    Furthermore, it is to be understood that the features of the various embodiments described herein are not mutually exclusive and exist in various combinations and permutations in other embodiments.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0021]    In the drawings, like reference characters generally refer to the same parts throughout the different views.    Also, the drawing is not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the

invention. In the following description, various embodiments of the present invention are described with reference to the following drawing, in which:

[0022]   Figure 1 depicts a schematic of a coacervate complex exemplary of at least certain embodiments of those disclosed here.

## DETAILED DESCRIPTION OF CERTAIN EMBODIMENTS

[0023]   Various examples and embodiments of the inventive subject matter disclosed here are possible and will be apparent to the person of ordinary skill in the art, given the benefit of this disclosure. In this disclosure reference to "certain exemplary embodiments" (and similar phrases) means that those embodiments are merely non-limiting examples of the inventive subject matter and that there likely are other alternative embodiments which are not excluded. Unless otherwise indicated or unless otherwise clear from the context in which it is described, alternative elements or features in the embodiments and examples below and in the Summary above are interchangeable with each other. That is, an element described in one example may be interchanged or substituted for one or more corresponding elements described in another example. Similarly, optional or non-essential features disclosed in connection with a particular embodiment or example should be understood to be disclosed for use in any other embodiment of the disclosed subject matter. More generally, the elements of the examples should be understood to be disclosed generally for use with other aspects and examples of the devices and methods disclosed herein. A reference to a component or ingredient being operative, i.e., able to perform one or more functions, tasks and/or operations or the like, is intended to mean that it can perform the expressly recited function(s), task(s) and/or operation(s) in at least certain embodiments, and may well be operative to perform also one or more other functions, tasks and/or operations. While this disclosure includes specific examples, including presently preferred modes or embodiments, those skilled in the art will appreciate that there are numerous variations and modifications within the spirit and scope of the invention as set forth in the appended claims. Each word and phrase used in the claims is intended to include all its dictionary meanings consistent with its usage in this disclosure and/or with its technical and industry usage in any relevant technology area. Indefinite articles, such as "a," and "an" and the definite article

"the" and other such words and phrases are used in the claims in the usual and traditional way in patents, to mean "at least one" or "one or more." The word "comprising" is used in the claims to have its traditional, open-ended meaning, that is, to mean that the product or process defined by the claim may optionally also have additional features, elements, etc. beyond those expressly recited.

[0024]   As used here, an "aqueous solvent" is a solvent for the polymers and/or coacervates of the dispersion, that either (i) comprises water together with any other consumable (i.e., edible) solvent, e.g., comprising primarily (i.e., at least 50 wt. %) water, e.g., at least 80 wt. % water, at least 90 wt. % water or at least 99 wt. % water, or (ii) consists essentially of water (e.g., potable spring water, distilled or purified water, tap water or the like).

[0025]   As used here, the term "high shear mixing" has its ordinary meaning to those skilled in the art. In the case of the high shear mixing of the hydrophobic substance(s) with the initial aqueous polymer solution, it means at least mixing at such speed(s) and/or force level(s) as are effective to form an emulsion of such ingredients. In the case of the high shear mixing with the oppositely charged polymer, it means at least mixing at such speed(s) and/or force level(s) as are effective to form the aqueous dispersion of complex coacervates.

[0026]   As used here, the term "hydrophobic substance" means either a single hydrophobic substance or multiple different hydrophobic substances, e.g., a mixture of hydrophobic substances. As noted above, the hydrophobic substance may in some embodiments of the aqueous dispersion of complex coacervates be fish oil, seed oil, algae oil, seaweed oil or any combination of them.

[0027]   As used here, "fish oil" has its ordinary meaning and includes, at least any oily hydrophobic substance obtained from fish. Similarly, seed oil has its ordinary meaning and includes, at least any oily hydrophobic substance obtained from plant seeds, e.g., flax seed oil. Algae oil includes at least any oily hydrophobic substance obtained from algae.   Seaweed oil includes at least any oily hydrophobic substance obtained from seaweed.

[0028]   As used here, the term "clouding agent" has its ordinary meaning to those skilled in the art. In general, it means a beverage ingredient that provides cloudiness or

13

opacity or the like to the beverage. It is an advantage of at least certain beverages in accordance with this disclosure, that are intended to be clouded or non-clear, that the dispersion of complex coacervates can provide the desired clouding effect. Thus, in such embodiments the cost and complexity of adding a separate clouding agent is advantageously avoided. It is an advantage of at least certain beverages in accordance with this disclosure, that the cost and complexity of a weighting agent is advantageously avoided. That is, in at least certain embodiments the complex coacervates remain homogenously dispersed or suspended in the beverage without a weighting agent.

[0029] As used here, the term "weighting agent" has its ordinary meaning to those skilled in the art. In general, it means an ingredient combined with a second ingredient in a beverage to aid in keeping such second ingredient homogenously dispersed or suspended in the beverage. As used here, the term "natural ingredient" means an ingredient that is natural as that term is defined by the applicable regulations of the Food and Drug Administration of the government of the United States of America on the effective filing date (i.e., the priority date) of this application. In some case, reference is made to "at least one" of a particular ingredient, such as at least one hydrophobic substance or at least one antioxidant or at least one cationic polymer. In all such cases, the term "at least one" is used to emphasize that one or more such species may be used. Such uses are not intended to mean, and should not be construed as implying, that a reference elsewhere to any such ingredient without the prefatory "at least one" means one and only one species of such ingredient.

[0030] As used herein, "complex coacervate" is defined as an identifiable discrete particle containing one or more hydrophobic substances, e.g., oil, water-insoluble vitamins, flavors, etc., that are enveloped by a shell comprising at least two oppositely charged polymers (that is, cationic polymers of at least one type and anionic polymers of at least one type) that substantially coats and protects the particles of hydrophobic substance from hydrolysis, oxidation, and degradation. Suitable polymers include not only traditional polymers, but also oligomers and the like. In certain exemplary embodiments, the complex coacervates are substantially non-agglomerated, but comprise a single shell encapsulating a single

core. Fig. 1 shows an exemplary, simplified complex coacervate having a hydrophobic substance, e.g., fish oil or purified or concentrated omega 3 fatty acids in an inner shell or layer formed primarily by anionic polymer, and an outer shell or layer formed primarily by cationic polymer.

[0031] As used herein, a "hydrophobic substance" refers to a water immiscible material such as an oil, a lipid, a water-insoluble vitamin (e.g. á-tocopherol), a water-insoluble sterol, a water-insoluble flavonoid, a flavor or an essential oil. The oil employed in accordance with the present invention can be a solid, a liquid or a mixture of both.

[0032] As used herein a "lipid" encompasses any substance that contains one or more fatty acid residues, including free fatty acids. Thus, the term "lipid" encompasses, for instance, triglycerides, diglycerides, monoglycerides, free fatty acids, phospholipids or a combination of any of them.

[0033] As used herein a "fatty acid" encompasses free fatty acids as well as fatty acid residues. Whenever reference is made herein to a weight percentage of fatty acids, this weight percentage includes free fatty acids as well as fatty acid residues (e.g. fatty acid residues contained in triglycerides). Further, as used herein a "polyunsaturated fatty acid" (PUFA) encompasses any fatty acid containing 2 or more double bonds in the carbon chain.

[0034] Aspects of the edible delivery systems disclosed here for hydrophobic substances relate to complex coacervates. The delivery systems provide a stable composition suitable for inclusion in food products. That is, the complex coacervates in at least certain embodiments of the delivery systems are sufficiently stable for shelf-storage prior to use in food, e.g., for storage as long as 3 months, or even 9 months prior to use in making food products. In at least certain embodiments, acidic food products comprising the complex coacervates are shelf-storage for storage as long as 3 months, or even 9 months prior to consumption. The complex coacervates can reduce or eliminate the unpleasant taste and odor of many hydrophobic substances, such as fish oil, and reduce degradation, e.g. by oxidation or hydrolysis, of some otherwise unstable hydrophobic substances. The complex coacervates may be incorporated into a food product associated with health

15

benefits, for example orange juice, dairy, to provide enhanced nutritional value.
Additionally, the complex coacervates may be incorporated into other food
products, for example carbonated soft drinks. By encapsulating such hydrophobic
substances in complex coacervates, possible negative visual and physical changes
to the food product may be reduced or avoided during a storage period. The
resulting food product is appealing to the consumer, as well as being stable and
having an adequate shelf life.

[0035]    In certain exemplary embodiments, complex coacervates are provided in an
aqueous dispersion. As used herein, an "aqueous dispersion" is defined as
particles distributed throughout a liquid water medium, e.g., as a suspension, a
colloid, an emulsion, a sol, etc. The liquid water medium may be pure water or
may be a mixture of water with at least one water-miscible solvent, such as, for
example, ethanol or other alcohols. propylene glycol, glycerin etc. In certain
exemplary embodiments, there may be a substantial concentration of water-
miscible solvent in the aqueous dispersion of the complex coacervates, such as,
between about 1% and about 20% by volume, for example 5%, 10%, or 15%. In
other exemplary embodiments, the complex coacervates are diluted into a food
product wherein the concentration of water-miscible solvent is negligible. In
other exemplary embodiments, the complex coacervates are combined with one or
more solid food ingredients, wherein there is little or no free water, e.g., a snack
bar, etc. In certain exemplary embodiments an aqueous solution is prepared
comprising at least one anionic polymer. The at least one anionic polymer
comprises, for example, gum arabic, modified starches. pectin, Q-200,
carrageenan, alginate, xanthan gum, modified celluloses, carboxymethylcellulose,
gum acacia, gum ghatti, gum karaya, gum tragacanth, locust bean gum, guar gum,
psyllium seed gum, quince seed gum, larch gum (arabinogalactans), stractan gum,
agar, furcellaran, gellan gum, or a combination of any of them. In an exemplary
embodiment the anionic polymer comprises gum arabic. In certain embodiments
the solution of at least one anionic polymer comprises a solution of gum arabic.
In certain exemplary embodiments, the solution of the at least one anionic
polymer is subjected to high shear mixing. In certain embodiments the high shear
mixing may occur for 2-5 minutes at a temperature maintained within the range of
5 °C to 25 °C.

[0036] In certain exemplary embodiments at least one hydrophobic substance is added to the solution of the at least one anionic polymer under high shear mixing at a temperature between 5-25 °C, followed by adding whey protein to form an oil-in-water coacervate complex emulsion. Subsequently, the coacervate emulsion is homogenized. In certain exemplary embodiments the coacervate emulsion is homogenized at a pressure maintained within the range of 3000-4500 psi. In certain exemplary embodiments the coacervate emulsion is homogenized at 10-30 °C. In certain exemplary embodiments the coacervate emulsion is homogenized for 1-2 passes to form a fine, homogeneous emulsion. The final coacervate emulsion contains, e.g., 3-15 wt. % hydrophobic substance. In certain embodiments the hydrophobic substance is, for example, an oil droplet. In exemplary embodiments the oil droplet is a lipophilic nutrient, e.g., fish oil or omega-3 fatty acids or a water-insoluble flavorant.

[0037] In certain exemplary embodiments, the lipophilic nutrients include fat soluble vitamins, (e.g., vitamins A, D, E, and K), tocotrienols, carotenoids, xanthophylls, (e.g., lycopene, lutein, astaxanthin, and zeaxanthin), fat-soluble nutraceuticals including phytosterols, stanols and esters thereof, Coenzyme Q10 and ubiquinol, hydrophobic amino acids and peptides, essential oils and extracts, and fatty acids. Fatty acids may include, for example, conjugated linolenic acid (CLA), omega-6 fatty acids, and omega-3 fatty acids. Suitable omega-3 fatty acids include, e.g., short-chain omega-3 fatty acids such as alpha-linolenic acid (ALA), which are derived from plant sources, for example flaxseed, and long-chain omega-3 fatty acids such as eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA). The long-chain omega-3 fatty acids can be derived from, for example, marine or fish oils. Such oils can be extracted from various types of fish or marine animals, such as anchovies, capelin, cod, herring, mackerel, menhaden, salmon, sardines, shark and tuna, or from marine vegetation, such as micro-algae, or a combination of any of them. Other sources of omega-3 fatty acids include liver and brain tissue and eggs.

[0038] In certain exemplary embodiments, the water-insoluble flavorant is any substance that provides a desired flavor to a food or beverage product, which does not substantially dissolve in water (e.g., non-polar, hydrophobic substances such as

17

lipids, fats, oils, etc.). The flavorant may be a liquid, gel. colloid, or particulate solid, e.g., an oil, an extract, an oleoresin, or the like. Exemplary water-insoluble flavorants include, but are not limited to, citrus oils and extracts, e.g. orange oil, lemon oil, grapefruit oil, lime oil, citral and limonene, nut oils and extracts, e.g. almond oil, hazelnut oil and peanut oil, other fruit oils and extracts, e.g. cherry oil, apple oil and strawberry oil, botanical oils and extracts, e.g., coffee oil, mint oil, vanilla oil, and combinations of any of them.

[0039]    In certain embodiments a water soluble antioxidant is added to the solution of the anionic polymer prior to the addition of the at least one hydrophobic substance. In certain embodiments the water soluble antioxidant can be, e.g., plant derived antioxidants, such as those derived from blackberries, water soluble polyphenols, vitamin C, or any combination thereof. In certain embodiments the hydrophobic substance may further comprise a water insoluble antioxidant. In certain embodiments the water insoluble antioxidant may be selected from butylated hydroxytoluene, butylated hydroxyanisole, tert-butylhydroquinone, quercetin, tocopherol.

[0040]    In certain embodiments a stabilizer is added to the emulsion containing the at least one hydrophobic substance and the at least one anionic polymer before the at least one cationic polymer is added. The stabilizer may be selected from sucrose ester, triglycerides, lecithin, ester gum, and combinations of any of them.    In an exemplary embodiment the stabilizer is sucrose ester containing triglycerides.

[0041]    In certain exemplary embodiments at least one cationic polymer is added to the emulsion containing the at least one hydrophobic substance and the at least one anionic polymer, and in alternative embodiments, an antioxidant and/or a stabilizer. The final coacervate emulsion may contain, for example, 0.1-10 wt. % cationic polymer. The mixture of the at least one cationic polymer and the emulsion containing the at least one hydrophobic substance and the at least one anionic polymer can be homogenized using high pressure to form an aqueous solution of complex coacervates. The homogenization proceeds, for example, at 3000 to 4500 psi for 1-2 passes. The at least one cationic polymer comprises, for example, proteins such as dairy proteins, including whey proteins, caseins and fractions thereof, gelatin, corn zein protein, bovine serum albumin, egg albumin,

18

grain protein extracts, e.g. protein from wheat, barley, rye, oats, etc., vegetable proteins, microbial proteins, chitosan, legume proteins, proteins from tree nuts, proteins from ground nuts, hydrolyzed protein, lauric arginate, polylysine and the like, or combinations of any of them. In an exemplary embodiment the cationic polymer is whey protein. In certain embodiments whey protein may be selected from $\beta$-lactoglobulin ($\beta$-LG), whey protein isolate (WPI), whey protein concentrated, hydrolyzed protein, lauric arginate, polylysine or combinations thereof. $\beta$-lactoglobulin ($\beta$-LG) provides good performance and good emulsion stability in certain embodiments. $\beta$-lactoglobulin ($\beta$-LG) is the major whey protein of ruminant species. Its amino-acid sequence and 3-dimensional structure can efficiently bind small hydrophobic molecules such as omega-3 fatty acid, resulting in good protection against hydrolysis and oxidation.

[0042]  In certain embodiments the complex coacervates have a negative zeta potential, that is, the outside of the complex coacervate shell displays a net negative charge. In certain exemplary embodiments the shell includes a net positive charged (cationic) polymer and a net negative charged (anionic) polymer. It is currently believed that the net charge of each polymer is dependent on the pH of the environment and the isoelectric point of each polymer, which is in turn dependent on the density of ionizable groups in each polymer and the pKa values of those groups. Thus, disclosure here of complex coacervates comprising cationic and anionic polymers refers to the charge of the polymers in the environment or reaction conditions used for formation of the complex coacervates. Complex coacervates of the type used here are presently understood to be stabilized at least in part by the electrostatic attraction between the oppositely charged polymers.

[0043]  In certain exemplary embodiments, the complex coacervates comprise, for example, 3-15 wt.% of the at least one hydrophobic substance; 5-30 wt.% of the at least one anionic polymer; and 0.1-10 wt.% of the at least one cationic polymer. In alternative embodiments, the complex coacervates comprise, for example, 3-15 wt.% of the at least one hydrophobic substance; 0.05-5 wt.% of the antioxidant; 5-30 wt.% of the at least one of the anionic polymer; 0.1-10 wt.% of the at least one of the cationic polymer; and 0.1-5 wt.% of the stabilizer.

19

[0044]   In certain exemplary embodiments, the oil droplets contain, for example, at least 3 wt.% or, alternatively 10 wt.%, of one or more polyunsaturated fatty acids selected from omega-3 fatty acids, omega-6 fatty acids and combinations of any of them. In certain embodiments, the one or more polyunsaturated fatty acids contain ALA, DHA, EPA, CLA, and combinations of any of them. In alternative embodiments, the oil droplets contain, for example, at least 50 wt.%, at least 70 wt.%, or at least 80 wt.% of lipids.

[0045]   In certain exemplary embodiments, the particle size of complex coacervates of the present invention has an average diameter in the range of, for example, 0.3-1.2 μm. In certain embodiments, the oil droplets in the complex coacervates have a diameter in the range of, for example, 1.0 μm or 3.0 μm.

[0046]   In certain exemplary embodiments, the aqueous dispersion of the present invention may contain other dispersed components in addition to the complex coacervates. In certain embodiments, the dispersion contains less than 20 wt.% of one or more dispersed edible components, including the dispersed complex coacervates.

[0047]   In certain exemplary embodiments, the complex coacervates are not substantially additionally stabilized, for example by substantial gelling or substantial hardening of the complex coacervates.

[0048]   In certain exemplary embodiments, the aqueous dispersion of complex coacervates is maintained as an aqueous dispersion. In alternative embodiments, the aqueous dispersion of complex coacervates is, for example, spray dried, freeze dried, drum dried, or bed dried. If maintained as an aqueous dispersion, in certain embodiments, the aqueous dispersion of complex coacervates is treated to protect from microbiological growth. In certain embodiments, the aqueous dispersion of complex coacervates is, for example, pasteurized, aseptically packaged, treated with chemical preservatives, e.g., benzoates, sorbates, etc., treated with acid, e.g., citric acid, phosphoric acid, etc., treated at high temperature and/or carbonated. In an exemplary embodiment, the aqueous dispersion of complex coacervates has minimized contact with air during production, is pasteurized after production, and is stored in a refrigerator with limited contact with light.

[0049] In certain exemplary embodiments, a desired amount of hydrophobic substance in the form of the above-described complex coacervates is included in a food product. The amount of complex coacervates, and hence the amount of hydrophobic substance included in the food product, may vary depending on the application and desired taste and nutrition characteristics of the food product. The complex coacervates may be added to the food product in any number of ways, as would be appreciated by those of ordinary skill in the art given the benefit of this disclosure. In certain exemplary embodiments, the complex coacervates are sufficiently mixed in the food product to provide a substantially uniform distribution, for example a stable dispersion. Mixing should be accomplished such that the complex coacervates are not destroyed. If the complex coacervates are destroyed, oxidation of the hydrophobic substance may result. The mixer(s) can be selected for a specific application based, at least in part, on the type and amount of ingredients used, the viscosity of the ingredients used, the amount of product to be produced, the flow rate, and the sensitivity of ingredients, such as the complex coacervates, to shear forces or shear stress.

[0050] Encapsulation of hydrophobic substances using the above-described complex coacervates stabilizes the hydrophobic substance by protecting it from degradation by, for example, oxidation and/or hydrolysis. When included in an acidic food product, the complex coacervates can provide a stable dispersion of hydrophobic substances over the shelf life of the food product. Factors that may affect the shelf-life of the complex coacervates include the level of processing the product undergoes, the type of packaging, and the materials used for packaging the product. Additional factors that may affect the shelf life of the product include, for example, the nature of the base formula (e.g., an acidic beverage sweetened with sugar has a longer shelf-life than an acidic beverage sweetened with aspartame) and environmental conditions (e.g., exposure to high temperatures and sunlight is deleterious to ready-to-drink beverages).

[0051] In certain exemplary embodiments, the food product is a beverage product. In certain embodiments, the beverage products include ready-to-drink beverages, beverage concentrates, syrups, shelf-stable beverages, refrigerated beverages, frozen beverages, and the like. In exemplary embodiments, the beverage product

is acidic, e.g. having a pH within the range below about pH 5.0, in certain exemplary embodiments, a pH value within the range of about pH 1.0 to about pH 4.5, or in certain exemplary embodiments, a pH value within the range of about pH 1.5 to about pH 3.8. In an exemplary embodiment the beverage product has a pH of 3.0. Beverage products include, but are not limited to, e.g., carbonated and non-carbonated soft drinks, fountain beverages, liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy drinks, fortified/enhanced water drinks, soy drinks, vegetable drinks, grain-based drinks (e.g. malt beverages), fermented drinks (e.g., yogurt and kefir) coffee beverages, tea beverages, dairy beverages, and mixtures thereof. Exemplary fruit juice sources include citrus fruit, e.g. orange, grapefruit, lemon and lime, berry, e.g. cranberry, raspberry, blueberry and strawberry, apple, grape, pineapple, prune, pear, peach, cherry, mango, and pomegranate. Beverage products include bottle, can, and carton products and fountain syrup applications.

[0052]  Certain embodiments of other food products include fermented food products, yogurt, sour cream, cheese, salsa, ranch dip, fruit sauces, fruit jellies, fruit jams, fruit preserves, and the like. In certain exemplary embodiments, the food product is acidic, e.g. having a pH value within the range below about pH 5.0, in certain exemplary embodiments, a pH value within the range of about pH 1.0 to about pH 4.5, or in certain exemplary embodiments, a pH value within the range of about pH 1.5 to about pH 3.8. In an exemplary embodiment the food product has a pH of 3.0.

[0053]  The food product may optionally include other additional ingredients. In certain embodiments, additional ingredients may include, for example, vitamins, minerals, sweeteners, water-soluble flavorants, colorings, thickeners, emulsifiers, acidulants, electrolytes, antifoaming agents, proteins, carbohydrates, preservatives, water-miscible flavorants, edible particulates, and mixtures thereof. In certain embodiments, other ingredients are also contemplated. In exemplary embodiments, the ingredients can be added at various points during processing, including before or after pasteurization, and before or after addition of the complex coacervates.

[0054]  In at least certain exemplary embodiments, food products disclosed here may be pasteurized. The pasteurization process may include, for example, ultra high

temperature (UHT) treatment and/or high temperature-short time (HTST) treatment. The UHT treatment includes subjecting the food or beverage product to high temperatures, such as by direct steam injection or steam infusion. or by indirect heating in a heat exchanger. Generally, after the product is pasteurized, the product can be cooled as required by the particular product composition/configuration and/or the package filling application. For example, in one embodiment, the food or beverage product is subjected to heating to about 185°F (85°C) to about 250°F (121°C) for a short period of time, for example, about 1 to 60 seconds, then cooled quickly to about 36°F (2.2°C) +/10°F (5°C) for refrigerated products, to ambient temperature for shelf stable or refrigerated products, and to about 185°F (85°C) +/- 10°F (5°C) for hot-fill applications for shelf-stable products. The pasteurization process is typically conducted in a closed system, so as not to expose the food product to atmosphere or other possible sources of contamination.   In alternative embodiments, other pasteurization or sterilization techniques may also be useful, such as, for example, aseptic or retort processing. In addition, multiple pasteurization processes may be carried out in series or parallel, as necessitated by the food product or ingredients.

[0055]    Food products may, in addition, be post processed. In exemplary embodiments, post processing is typically carried out following addition of the complex coacervates.   Post processing can include, for example, cooling the product solution and filling it into a container for packaging and shipping. In certain embodiments, post processing may also include deaeration of the food product to less than 4.0 ppm oxygen, preferably less than 2.0 ppm and more preferably less than 1.0 ppm oxygen. In alternative embodiments deaeration and other post processing tasks may be carried out prior to processing, prior to pasteurization, prior to mixing with the complex coacervates and/or at the same time as adding the complex coacervates. In addition, in certain embodiments, an inert gas (e.g., nitrogen or argon) headspace may be maintained during the intermediary processing of the product and final packaging.   Additionally/alternatively, an oxygen or UV radiation barriers and/or oxygen scavengers could be used in the final packaging.

[0056]    The following examples are specific embodiments of the present invention, but
          are not intended to limit it.

## EXAMPLES

### Example 1

[0057]    To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (30%
          EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to
          form an oil-in-water emulsion. Subsequently, 60 g solution of $\beta$-lactoglobulin
          (20%) was added slowly to form coacervate complex emulsion at pH 3-5. The
          coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-
          2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage
          and dispersed in the beverage.    Additional ingredients were added in the
          concentrations (w/w) listed below to make an isotonic beverage containing
          omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic
          beverage may be about 2.5-4.5.

Table 1.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.59% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.89% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

24

Example 2

[0058]    To 225 g gum arabic solution (20%) 1.5 g vitamin C was added. Fish oil 15 g
(22% EPA/DHA) containing dissolved 9 g sucrose ester (SAIB-MCT) was added
and emulsified at 10-25 °C under high shear mixing to form an oil-in-water
emulsion. Subsequently, 60 g solution of beta-lactoglobulin (5%) was added
slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion
was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-
4500 psi. The coacervate emulsion was added to the beverage and dispersed in the
beverage.  Additional ingredients were added in the concentrations (w/w) listed
below to make an isotonic beverage containing omega-3 fish oil.  The pH was
about 2.9.  The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 2.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.24% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 3

[0059]    To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (22%
EPA/DHA) containing dissolved 10 g sucrose ester (SAIB-MCT) was added and
emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion.
Subsequently, 60 g solution of beta-lactoglobulin (11%) was added slowly to form
coacervate complex emulsion at pH 3-5. The coacervate emulsion was further
mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The
coacervate emulsion was added to the beverage and dispersed in the beverage.
Additional ingredients were added in the concentrations (w/w) listed below to make

an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 3.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Concervate Emulsion | 1.24% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 4

[0060]   To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 25.4 g (22% EPA/DHA) dissolved in 17 g sucrose ester (SAIB-MCT) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 102 g solution of beta-lactoglobulin (11%) was added slowly to form concervate complex emulsion at pH 3-5. The concervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The concervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 4.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.59% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |

26

| Ingredient | Amount (% by wt.) |
|---|---|
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.89% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

## Example 5

[0061]   To 225 g gum arabic solution (20%) 2 g vitamin C was added and dissolved. Fish oil 15 g (22% EPA/DHA) containing dissolved 2 g ester gum was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 35 g solution of beta-lactoglobulin (10%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 5.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.37% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.11% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 6

[0062]    To 225 g gum arabic solution (20%) with dissolved 6 g vitamin C fish oil 15 g (30% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of whey protein concentrate (20%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 6.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.55% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.93% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 7

[0063]    To 225 g gum arabic solution (20%) with dissolved 6 g vitamin C fish oil 15 g (30% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of hydrolyzed whey protein (20%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The

pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 7.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.55% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.93% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

### Example 8 (Dairy)

[0064]   To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (22% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of beta-lactoglobulin (20%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the protein and dispersed in the protein. Additional ingredients were added in the concentrations (w/w) listed below to make dairy products containing omega-3 fish oil. The pH was about 3.5 and 7.0.

Table 8.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 89.77% |
| Dry Sucrose | 5% |
| Stabilizers | 0.92% |

29

| Ingredient | Amount (% by wt.) |
|---|---|
| Orange Flavor | 0.500% |
| Concervate Emulsion | 1.21% |
| Protein Blend | 2.6% |
| Total | 100% |
| pH = 3.3 ; 7.0 | |

## Example 9

[0065] To 225 g gum arabic solution (20%) 1.5 g vitamin C was added. Fish oil 15 g (30% EPA/DHA) containing dissolved 9 g canola oil was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of beta-lactoglobulin (5%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 9.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.56% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.92% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 10

[0066]  To 225 g gum arabic solution (20%) 3 g vitamin C was added. Fish oil 15 g (22%
        EPA/DHA) containing dissolved 9 g palm oil was added and emulsified at 10-25 °C
        under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g
        solution of beta-lactoglobulin (5%) was added slowly to form coacervate complex
        emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and
        then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was
        added to the beverage and dispersed in the beverage. Additional ingredients were
        added in the concentrations (w/w) listed below to make an isotonic beverage
        containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant
        isotonic beverage may be about 2.5-4.5.

Table 10.

| Ingredient | Amount (% by wt.) |
| --- | --- |
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.25% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 11

[0067]  To 75 g gum arabic solution (20%) 0.3 g vitamin C was added. Fish oil 7 g (22%
        EPA/DHA) containing dissolved 3 g SAIB-MCT and 0.19 g butylated
        hydroxytoluene was added and emulsified at 10-25 °C under high shear mixing to
        form an oil-in-water emulsion. Subsequently, 20 g solution of beta-lactoglobulin
        (10%) was added slowly to form coacervate complex emulsion at pH 3-5. The
        coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2
        pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and
        dispersed in the beverage. Additional ingredients were added in the concentrations

(w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 11.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.59% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.89% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 12

[0068]   To 225 g gum arabic solution (20%) fish oil 15 g (22% EPA/DHA) containing dissolved 9 g SAIB-MCT was added. The mixture was emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution (5%) of whey protein isolate (WPI) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 12.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.24% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |

32

| Ingredient | Amount (% by wt.) |
|---|---|
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.24% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

## Example 13

[0069]   To 225 g gum arabic solution (20%) orange oil 30 g was added. The mixture was emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution (20%) of beta-lactoglobulin was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 13.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 97.43% |
| Dry Sucrose | 2.0 % |
| Citric Acid | 0.19% |
| Sodium Citrate | 0.133 |
| Coacervate Emulsion | 0.100% |
| Yellow #6 Color (10% solution) | 0.060% |
| Vitamin C (Ascorbic Acid) | 0.06% |
| Sodium Benzoate | 0.02% |
| Total | 100.000% |

Example 14

[0070] To 225 g gum arabic solution (20%) orange oil 15 g containing 15 g palm oil was added. The mixture was emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution (20%) of beta-lactoglobulin was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 14.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 97.43% |
| Dry Sucrose | 2.0 % |
| Citric Acid | 0.19% |
| Sodium Citrate | 0.133 |
| Coacervate Emulsion | 0.100% |
| Yellow #6 Color (10% solution) | 0.060% |
| Vitamin C (Ascorbic Acid) | 0.06% |
| Sodium Benzoate | 0.02% |
| Total | 100.000% |

Example 15

[0071] To 225 g gum arabic solution (20%) citral (30 g) was added. The mixture was emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution (20%) of beta-lactoglobulin was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 15.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 97.43% |
| Dry Sucrose | 2.0 % |
| Citric Acid | 0.19% |
| Sodium Citrate | 0.133 |
| Coacervate Emulsion | 0.100% |
| Yellow #6 Color (10% solution) | 0.060% |
| Vitamin C (Ascorbic Acid) | 0.06% |
| Sodium Benzoate | 0.02% |
| Total | 100.000% |

Table16.  Omega-3 Fish Oil Stability in Beverage

| Example | Stability (70-75 °F) | Stability (90 °F) |
|---|---|---|
| 1 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 2 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 3 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 4 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 5 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 6 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 7 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |

Table 17.  Stability of Omega-3 Fish Oil in Dairy

| Example | Stability (70-75 °F) | Stability (90 °F) |
|---|---|---|
| 8 (smoothie, pH 3.5) | at least 3 month (no fish odor and taste) | at least 1 month (no fish odor and taste) |
| 8 (shake, pH 7.0) | at least 3 month (no fish odor and taste) | at least 1 month (no fish odor and taste) |

Table 18.   Coacervate-Containing Beverage Stability without Conventional Weighting Agent

| Example | Stability (70-75 °F) | Stability (90 °F) |
|---|---|---|
| 1 | at least 3 months ( no ringing and creaming) | at least 1 month ( no ringing and creaming) |
| 6 | at least 3 months ( no ringing and creaming) | at least 1 month ( no ringing and creaming) |
| 7 | at least 3 months ( no ringing and creaming) | at least 1 month ( no ringing and creaming) |
| 13 | at least 1 month ( no ringing and creaming) | at least 1 month ( no ringing and creaming) |
| 14 | at least 1 month ( no ringing and creaming) | at least 1 month ( no ringing and creaming) |
| 15 | at least 1 month ( no ringing and creaming) | at least 1 month ( no ringing and creaming) |

[0072]    The invention has been described with reference to the preferred embodiments. Obviously, modifications and alterations will occur to others upon reading and understanding the preceding detailed description. It is intended that the invention be construed as including all such modifications and alterations insofar as they come within the scope of the appended claims or the equivalents thereof.

What is claimed is:

1. An aqueous dispersion of complex coacervates prepared by a method comprising:

   a. providing an aqueous solution of at least one anionic polymer selected from the group consisting of gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or combinations thereof;

   b. adding water soluble antioxidant and hydrophobic substance to the aqueous polymer solution and high shear mixing to form an emulsion, wherein the water soluble antioxidant is added prior to the high shear mixing;

   c. adding to the emulsion at least one cationic polymer selected from the group consisting of whey protein, beta-lactoglobulin, alpha-lactalbumin, whey protein isolate (WPI), whey protein concentrated, hydrolyzed protein, gelatin, corn zein protein, bovine serum albumin, egg albumin, grain protein extracts, e.g., protein from wheat, barley, rye, oats, etc., vegetable proteins, microbial proteins, chitosan, legume proteins, hydrolyzed protein, lauric arginate, polylysine, casein or combinations thereof;

   d. high shear mixing to form an aqueous dispersion of complex coacervates.

2. The aqueous dispersion of complex coacervates of claim 1 wherein the at least one hydrophobic substance is selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-insoluble flavonoids, flavours, and essential oils.

3. The aqueous dispersion of complex coacervates of claim 1 wherein the at least one hydrophobic substance comprises fish oil comprising omega-3 fatty acid including at least one of EPA and DHA.

4. The aqueous dispersion of complex coacervates of claim 1 wherein the at least one hydrophobic substance comprises docosahexaenoic acid, eicosapentaenoic aid, stearidonic acid, alpha-linolenic acid, conjugated linoleic acid, or combinations thereof.

5. The aqueous dispersion of complex coacervates of claim 3 wherein the content of EPA/DHA combined in the emulsion is in the range of 0.1-10 wt. %.

6. The aqueous dispersion of complex coacervates of claim 5 wherein the content of EPA/DHA combined in the emulsion is in the range of 1 to 3 wt. %.

7. The aqueous dispersion of complex coacervates of claim 1 wherein the at least one anionic polymer comprises gum arabic.

8. The aqueous dispersion of complex coacervates of claim 7 wherein the concentration of gum arabic is in the range of 1-40 wt. %.

9. The aqueous dispersion of complex coacervates of claim 8 wherein the concentration of gum arabic is in the range of 10 to 20 wt. %.

10. The aqueous dispersion of complex coacervates of claim 1 wherein the at least one cationic polymer comprises beta-lactoglobulin.

11. The aqueous dispersion of complex coacervates of claim 10 wherein the concentration of beta-lactoglobulin is in the range of 0.05-10 wt. %.

12. The aqueous dispersion of complex coacervates of claim 11 wherein the concentration of beta-lactoglobulin is in the range of 1 to 5 wt. %.

13. The aqueous dispersion of complex coacervates of claim 1 wherein the water soluble antioxidant is added to the solution of the at least one anionic polymer before adding at least one hydrophobic substance.

14. The aqueous dispersion of complex coacervates of claim 1 wherein the water soluble antioxidant comprises plant derived antioxidants, such as those derived from blackberries, water soluble polyphenols, or vitamin C.

15. The aqueous dispersion of complex coacervates of claim 14 wherein the water soluble antioxidant comprises vitamin C

16. The aqueous dispersion of complex coacervates of claim 15 wherein the concentration of vitamin C is in the range of 0.01-20 wt. %.

17. The aqueous dispersion of complex coacervates of claim 16 wherein the concentration of vitamin C is in the range of 0.5 to 5 wt. %.

18. The aqueous dispersion of complex coacervates of claim 1 wherein the hydrophobic substance further comprises a water insoluble antioxidant.

19. The aqueous dispersion of complex coacervates of claim 18 wherein the water insoluble antioxidant is selected from butylated hydroxytoluene, butylated hydroxyanisole, tert-butyhydroquinone, quercetin, tocopherol, or combinations thereof.

20. The aqueous dispersion of complex coacervates of claim 1 wherein a stabilizer is added to the hydrophobic substance.

21. The aqueous dispersion of complex coacervates of claim 20 wherein the stabilizer is selected from sucrose ester, triglycerides, lecithin, ester gum, palm oil, vegetable oil or combinations thereof.

22. The aqueous dispersion of complex coacervates of claim 21 wherein the stabilizer comprises ester gum and sucrose ester containing triglycerides.

23. The aqueous dispersion of complex coacervates of claim 1 wherein the at least one anionic polymer is gum arabic, the at least one hydrophobic substance is omega-3 fatty acid, and the at least one cationic polymer is whey protein.

24. The aqueous dispersion of complex coacervates of claim 1 wherein the water soluble antioxidant is added to the solution of the at least one anionic polymer before adding the at least one hydrophobic substance, and wherein a stabilizer is added to the hydrophobic substance before adding the at least one cationic polymer.

25. The aqueous dispersion of complex coacervates of claim 20 wherein the at least one anionic polymer is gum arabic, the at least one hydrophobic substance is omega-3 fatty acid, the at least one cationic polymer is whey protein, the water soluble antioxidant is vitamin C, and the stabilizer is sucrose ester containing triglycerides.

26. A food product comprising:

an aqueous dispersion of complex coacervates combined with at least one additional food ingredient, wherein the aqueous dispersion of complex coacervates is prepared by:

   a. providing an aqueous solution of at least one anionic polymer selected from the group consisting of gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or combinations thereof;

   b. adding water soluble antioxidant and hydrophobic substance to the aqueous polymer solution and high shear mixing to form an emulsion, wherein the water soluble antioxidant is added prior to the high shear mixing;

   c. adding to the emulsion at least one cationic polymer selected from the group consisting of whey protein, beta-lactoglobulin, alpha-lactalbumin, whey protein isolate (WPI), whey protein concentrated, hydrolyzed protein, gelatin, corn zein protein, bovine serum albumin, egg albumin, grain protein extracts, e.g., protein from wheat, barley, rye, oats, etc., vegetable proteins, microbial proteins, chitosan,

legume proteins, hydrolyzed protein, lauric arginate, polylysine, casein or combinations thereof;

d. high shear mixing to form an aqueous dispersion of complex coacervates.

27. The food product of claim 26 wherein the food product is a beverage.

28. The food product of claim 26 wherein the food product is a carbonated soda beverage.

29. The food product of claim 26 wherein the food product has a pH of 2.5 to pH 5.5.

30. A method for preparing an aqueous dispersion of complex coacervates comprising:

   a. providing an aqueous solution of at least one anionic polymer selected from the group consisting of gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or combinations thereof;

   b. adding water soluble antioxidant and hydrophobic substance to the aqueous polymer solution and high shear mixing to form an emulsion, wherein the water soluble antioxidant is added prior to the high shear mixing;

   c. adding to the emulsion at least one cationic polymer selected from the group consisting of whey protein, beta-lactoglobulin, alpha-lactalbumin, whey protein isolate (WPI), whey protein concentrated, hydrolyzed protein, gelatin, corn zein protein, bovine serum albumin, egg albumin, grain protein extracts, e.g., protein from wheat, barley, rye, oats, etc., vegetable proteins, microbial proteins, chitosan, legume proteins, hydrolyzed protein, lauric arginate, polylysine, casein or combinations thereof;

   d. high shear mixing to form an aqueous dispersion of complex coacervates.

31. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the water soluble antioxidant is added to the solution of the at least one anionic polymer before adding at least one hydrophobic substance.

32. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the hydrophobic substance further comprises a water insoluble antioxidant.

33. The method for preparing an aqueous dispersion of complex coacervates of claim 32 wherein the water insoluble antioxidant is selected from butylated hydroxytoluene, butylated hydroxyanisole, tert-butylhydroquinone, quercetin, tocopherol, or combinations thereof.

34. The method for preparing an aqueous dispersion of complex coacervates of claim 30 further comprising adding a stabilizer to the emulsion prior to adding the at least one cationic polymer.

35. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the at least one hydrophobic substance is selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-insoluble flavonoids, flavours, and essential oils.

36. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the at least one hydrophobic substance comprises a fatty acid selected from an omega-3 fatty acid, an omega-6 fatty acid, and combinations of any of them.

37. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the at least one hydrophobic substance comprises docosahexaenoic acid, eicosapentaenoic aid, stearidonic acid, alpha-linolenic acid, conjugated linoleic acid, vitamin A, vitamin E, citral, limonene, and extract or oil of orange, lemon, lime, grapefruit, almond, hazelnut, peanut, cherry, apple, strawberry, coffee, mint, vanilla, and any combination thereof.

38. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the at least one anionic polymer is gum arabic.

39. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the water soluble antioxidant is vitamin C.

40. The method for preparing an aqueous dispersion of complex coacervates of claim 34 wherein the stabilizer is selected from sucrose ester, triglycerides, lecithin, and ester gum or the combination thereof.

41. The method for preparing an aqueous dispersion of complex coacervates of claim 40 wherein the stabilizer is sucrose ester containing triglycerides.

42. The method for preparing an aqueous dispersion of complex coacervates of claim 30 wherein the at least one anionic polymer is gum arabic, the at least one hydrophobic substance is omega-3 fatty acid, and the at least one cationic polymer is whey protein.

43. A method for preparing a food product comprising an aqueous dispersion of complex coacervates comprising:

   a. providing an aqueous solution of at least one anionic polymer selected from the group consisting of gum arabic, pectin, carrageenan, ghatti gum, xanthan gum,

agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or combinations thereof ;

b. adding water soluble antioxidant and hydrophobic substance to the aqueous polymer solution and high shear mixing to form an emulsion, wherein the water soluble antioxidant is added prior to the high shear mixing;

c. adding to the emulsion at least one cationic polymer selected from the group consisting of whey protein, beta-lactoglobulin, alpha-lactalbumin, whey protein isolate (WPI), whey protein concentrated, hydrolyzed protein, gelatin, corn zein protein, bovine serum albumin, egg albumin, grain protein extracts, e.g., protein from wheat, barley, rye, oats, etc., vegetable proteins, microbial proteins, chitosan, legume proteins, hydrolyzed protein, lauric arginate, polylysine, casein or combinations thereof;

d. high shear mixing to form an aqueous dispersion of complex coacervates; and

e. combining the aqueous dispersion of complex coacervates with a second food ingredient.

44. The method for preparing a food product comprising an aqueous dispersion of complex coacervates of claim 43 wherein the food product is a beverage, dairy, juice, food bar.

45. The method for preparing a food product comprising an aqueous dispersion of complex coacervates of claim 43 wherein the water soluble antioxidant is added to the solution of the at least one anionic polymer before adding at least one hydrophobic substance..

46. The method for preparing a food product comprising an aqueous dispersion of complex coacervates of claim 43 wherein the hydrophobic substance further comprises a water insoluble antioxidant.

47. The method for preparing a food product comprising an aqueous dispersion of complex coacervates of claim 43 further comprising adding a stabilizer to hydrophobic substance prior to adding the cationic polymer.

48. A beverage comprising an aqueous dispersion of complex coacervates in accordance with claim 43, wherein all ingredients are natural.

49. A shelf stable beverage comprising an aqueous dispersion of complex coacervates in accordance with claim 43, wherein the beverage comprises no clouding agent other than aqueous dispersion of complex coacervates in accordance with claim 43.

50. A shelf stable beverage comprising an aqueous dispersion of complex coacervates in accordance with claim 43, wherein the beverage comprises no weighting agent.

WO 2013/006269

PCT/US2012/043220

1/1



FIG. 1

## INTERNATIONAL SEARCH REPORT

| | International application No |
|---|---|
| | PCT/US2012/043220 |

**A. CLASSIFICATION OF SUBJECT MATTER**
INV. A23L1/30    A23L1/302    A23L1/303    A23L2/00    B01J13/10
ADD.

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
A23L    B01J

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)
EPO-Internal, WPI Data, FSTA, BIOSIS

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | WO 2009/029407 A1 (PEPSICO INC [US]; GIVEN PETER [US]) 5 March 2009 (2009-03-05) * paragraph 04; examples 1-8; claims 1-32 * | 1-50 |
| X | WO 2009/029406 A1 (PEPSICO INC [US]; KOHANE DANIEL S [US]; YEO YOON [US]; GIVEN PETER [US]) 5 March 2009 (2009-03-05) * paragraph 05; examples 10-11; claims 1-36 * | 1-50 |
| A | DATABASE WPI Week 198630 Thomson Scientific, London, GB; AN 1986-193350 XP002682433, & JP 61 126016 A (TOA GOSEI CHEM IND LTD) 13 June 1986 (1986-06-13) abstract | 1-50 |

☐ Further documents are listed in the continuation of Box C.    ☒ See patent family annex.

\* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier application or patent but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 28 August 2012 | 06/09/2012 |

| Name and mailing address of the ISA/ | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+31-70) 340-2040, Fax: (+31-70) 340-3016 | Georgopoulos, N |

Form PCT/ISA/210 (second sheet) (April 2005)

1

## INTERNATIONAL SEARCH REPORT
Information on patent family members

| International application No |
|---|
| PCT/US2012/043220 |

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| WO 2009029407 | A1 | 05-03-2009 | AR | 068042 A1 | 28-10-2009 |
| | | | AU | 2008293780 A1 | 05-03-2009 |
| | | | CN | 101790325 A | 28-07-2010 |
| | | | EP | 2182816 A1 | 12-05-2010 |
| | | | KR | 20100032933 A | 26-03-2010 |
| | | | US | 2010272859 A1 | 28-10-2010 |
| | | | WO | 2009029407 A1 | 05-03-2009 |
| WO 2009029406 | A1 | 05-03-2009 | AR | 068041 A1 | 28-10-2009 |
| | | | AT | 547012 T | 15-03-2012 |
| | | | AU | 2008293779 A1 | 05-03-2009 |
| | | | CN | 101790323 A | 28-07-2010 |
| | | | DK | 2180795 T3 | 18-06-2012 |
| | | | EP | 2180795 A1 | 05-05-2010 |
| | | | EP | 2457451 A1 | 30-05-2012 |
| | | | ES | 2381416 T3 | 28-05-2012 |
| | | | KR | 20100033429 A | 29-03-2010 |
| | | | US | 2009061048 A1 | 05-03-2009 |
| | | | WO | 2009029406 A1 | 05-03-2009 |
| JP 61126016 | A | 13-06-1986 | NONE | | |

ADDENDUM D(5)

## ADDENDUM D(5)

**(See UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

- PCT Application No.   PCT/US12/4327; WIPO Publication No. WO 2013/006268: *"Coacervates Complex, Methods And Food products."*

## ADDENDUM D(5)

**(Appendix Vol. II, TAB 14, UDSC Docket # 52, pp. 12 & 15 , SAC ¶¶48, 60)**

5) PCT Application No.   PCT/US12/4327; WIPO Publication No. WO 2013/006268: *"Coacervates Complex, Methods And Food products."*

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property
Organization
International Bureau

(43) International Publication Date
10 January 2013 (10.01.2013)   **WIPO | PCT**

(10) International Publication Number
**WO 2013/006268 A1**

(51) International Patent Classification:
- *A23L 1/00* (2006.01)   *A23L 1/304* (2006.01)
- *A23L 1/22* (2006.01)   *A23L 2/00* (2006.01)
- *A23L 1/30* (2006.01)

(21) International Application Number:
PCT/US2012/043217

(22) International Filing Date:
20 June 2012 (20.06.2012)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
13/175,508   1 July 2011 (01.07.2011)   US

(71) Applicant *(for all designated States except US)*: PEP-SICO, INC. [US/US]; 700 Anderson Hill Road, Purchase, NY 10577 (US).

(72) Inventors; and

(75) Inventors/Applicants *(for US only)*: ZHANG, Naijie [US/US]; 31 Charter Oak Court, Ridgefield, CT 06877 (US). MUTILANGI, William [US/US]; 43 Bleakley Drive, Peekskill, NY 10566 (US).

(74) Agent: ROKOS, Rebecca, P.; Banner & Witcoff, LTD., Ten South Wacker Drive, Suite 3000, Chicago, IL 60606-7407 (US).

(81) Designated States *(unless otherwise indicated, for every kind of national protection available)*: AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, QA, RO, RS, RU, RW, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) Designated States *(unless otherwise indicated, for every kind of regional protection available)*: ARIPO (BW, GH, GM, KE, LR, LS, MW, MZ, NA, RW, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, RU, TJ, TM), European (AL, AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Declarations under Rule 4.17:**

— *as to applicant's entitlement to apply for and be granted a patent (Rule 4.17(ii))*

— *as to the applicant's entitlement to claim the priority of the earlier application (Rule 4.17(iii))*

*[Continued on next page]*

(54) Title: COMPLEX COACERVATES, METHODS AND FOOD PRODUCTS

Coacervate Complex



FIG. 1

(57) Abstract: Complex coacervates incorporating one or more hydrophobic substances are provided, that are stable in certain aqueous systems and food products. The coacervates may be used as as ingredient in food products, e.g., in beverages, dry foods, and semi-moist foods. Methods for producing the complex coacervates and food products are also disclosed herein.

**WO 2013/006268 A1** |||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

**Published:**
— *with international search report (Art. 21(3))*

WO 2013/006268                                                                 PCT/US2012/043217

COMPLEX COACERVATES, METHODS AND FOOD PRODUCTS

PRIORITY CLAIM

[0001]    This application claims priority to U.S. Utility Patent Application No. 13/175,508, filed July 1, 2011, titled "*Complex Coacervates, Methods and Food Products*", the entire disclosure of which is herein incorporated by reference.

TECHNICAL FIELD OF THE INVENTION

[0002]    The present invention relates to the field of food products and protecting an edible hydrophobic substance from hydrolysis and oxidation in a food product, more particularly to complex coacervates containing hydrophobic substances and to food products comprising such complex coacervates.

BACKGROUND OF THE INVENTION

[0003]    Certain hydrophobic substances are desirable as ingredients in food products, such as in, for example, beverages. In some cases the hydrophobic substance does not have an acceptable taste or taste profile or is not sufficiently stable in the intended food, e.g., in an acidic environment. Examples of such hydrophobic substances include omega-3 fatty acids, water-insoluble flavorants, water-insoluble vitamins, etc. Certain hydrophobic substances have been discovered to have beneficial health effects. For example, omega-3 fatty acids form an important part of the human diet. Eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA), long-chain forms of omega-3 fatty acids, are believed in many cases to offer health benefits and it has been suggested that consumption of omega-3 fatty acids should be increased.

[0004]    Hydrophobic substances have been incorporated directly into an aqueous system as a solution (with a compatible solvent), extract, emulsion, or micellular dispersion (a so-called microemulsion). All of these approaches can serve to disperse a hydrophobic substance in an aqueous system and in a food product, such as a beverage or semi-moist food, e.g., a snack bar. They may not, however, provide adequate protection against hydrolysis and oxidation of the hydrophobic

1

substance. Commercially available fish oils can be high in omega-3 fatty acids, and in some cases are "encapsulated," but these commercially available fish oils have not proven adequately stable in all food contexts, e.g., physically or taste-stable in acidic beverage products. This can result in negative changes to the food product, such as unpleasant fishy flavors and aromas after ingestion, particularly a fishy aftertaste caused by belching fish oil from the stomach. Additionally, omega-3 fatty acids, as well as many water-insoluble flavorants, water-insoluble vitamins, etc. are unstable to degradation, e.g., by oxidation or hydrolysis, when exposed to air, water and/or light.

[0005]    It would be desirable to provide edible compositions suitable for use in food products, which compositions incorporate one or more desirable hydrophobic substances, e.g., one or more omega-3 fatty acids, water-insoluble flavorants, water-insoluble vitamins, etc. It also would be desirable to provide food products incorporating such edible compositions. At least certain of the embodiments of the new compositions disclosed below can reduce or eliminate the unpleasant taste and odor of the one or more incorporated hydrophobic substances when used as an ingredient in a food product suitable for consumption by a human or animal. At least certain of the embodiments of the new compositions disclosed below provide hydrophobic substances in a stable form suitable for use in foods, e.g., beverage products such as beverage concentrates or syrups, ready to drink beverages, etc., and semi-moist foods such as snack bars. In at least some embodiments the hydrophobic substance is stable to oxidation and hydrolysis during the shelf life of the food product. In at least some embodiments the hydrophobic substance is stable to oxidation and hydrolysis in an acidic food product at pH values down to pH 5.0, and in some embodiments down to pH 4.0, and in some embodiments down to pH 3.0. Additional features and advantages of some or all of the products and methods disclosed here will be apparent to those who are skilled in food technology given the benefit of the following summary and description of exemplary, non-limiting examples.

## SUMMARY

[0006]    In a first aspect an edible aqueous dispersion of complex coacervates is prepared by mixing an aqueous polymer solution comprising charged polymer, water

WO 2013/006268                                      PCT/US2012/043217

soluble antioxidant, and hydrophobic substance comprising omega-3 fatty acid including at least one of EPA and DHA, to form an oil-in-water emulsion. The mixing comprises high shear mixing below 40 °C. In some embodiments the temperature is kept below 30 °C and in some embodiments it is kept below 25 °C. The water soluble antioxidant is added prior to the high shear mixing forming the emulsion. The water soluble antioxidant and the controlled temperature can help to protect the EPA and DHA against oxidation during the process. The aqueous polymer solution may be an anionic polymer solution comprising charged polymers in aqueous solvent, where the charged polymers consist essentially of anionic polymers. Alternatively, the aqueous polymer solution may be a cationic polymer solution comprising charged polymers in aqueous solvent, where the charged polymers consist essentially of cationic polymers. Oppositely charged polymers are added to the emulsion and high shear mixing below 40 °C forms an aqueous dispersion of complex coacervates.    In some embodiments the temperature is kept below 30 °C during the high shear mixing to form the aqueous dispersion of complex coacervates, and in some embodiments the temperature is kept below 25 °C. The oppositely charged polymers consist essentially of anionic polymers where the aqueous polymer solution is a cationic polymer solution, and the oppositely charged polymers consist essentially of cationic polymers where the aqueous polymer solution is an anionic polymer solution.    The aqueous dispersion of complex coacervates is homogenized below 40 °C to reducing average particle size of the complex coacervates to less than 10 microns, e.g., to an average size between 0.1 micron and 10 microns. In some embodiments of the process and resulting aqueous dispersion, the average particle size of the complex coacervates after homogenization is less than 3.0 microns, e.g., between 0.1 micron and 3 microns, e.g., between 1.0 micron and 3 microns. The anionic polymers may be one type of polymer or a mixture of different anionic polymers, and provide from 1.0 wt. % to 40.0 wt. % of the dispersion of complex coacervates (i.e., before it is added to other food ingredients, such as to make a beverage, beverage concentrate (syrup), semi-moist food products such as a snack bar, etc.). Some exemplary embodiments of the aqueous dispersions of complex coacervates disclosed here and of the disclosed methods for their preparation employ only or essentially only natural ingredients.

3

Case: 16-1668    Document: 26    Page: 277    Filed: 04/26/2016

[0007]  The anionic polymers may be one type of polymer or a mixture of different anionic polymers, and in some embodiments the anionic polymers provide from 1.0 wt. % to 40.0 wt. % of the dispersion of complex coacervates, e.g., from 10.0 wt. % to 20.0 wt. % of the dispersion of complex coacervates (e.g., immediately after homogenization prior to the dispersion being incorporated into a beverage or other food). The cationic polymers may be one type of polymer or a mixture of different cationic polymers and in some embodiments provide from 0.05 wt. % to 20.0 wt. % of the dispersion of complex coacervates (again meaning before the addition to other food ingredients), e.g., from 1.0 wt. % to 10.0 wt. % of the dispersion of complex coacervates. The water soluble antioxidant may be one antioxidant or a mixture of different antioxidants and provides from 0.05 wt. % to 20.0 wt. % of the dispersion of complex coacervates, e.g., from 1.0 wt. % to 5 wt. %. In some embodiments the water soluble antioxidant provides from 1.0 wt. % to 5.0 wt. % of the dispersion of complex coacervates. The hydrophobic substance may be one or a mixture of different hydrophobic substances and provides from 0.5 wt. % to 20.0 wt. % of the dispersion of complex coacervates. In some embodiments the hydrophobic substance provides from 5.0 wt. % to 10.0 wt. % of the dispersion of complex coacervates. In some embodiments the hydrophobic substance comprises water insoluble antioxidant, e.g., butylated hydroxytoluene, butylated hydroxyanisole, tert-butyhydroquinone, quercetin, tocopherol, or any combination thereof. The hydrophobic substance may contain omega-3 fatty acids (sometimes referred to here as "O3FA"), e.g., flax seed, linseed oil, or other seed oil, fish oil, algae oil, seaweed oil, etc. or any combination of such oils. In certain exemplary embodiments the hydrophobic substance contains 20.0 wt. % to 35.0 wt. % combined of the O3FAs EPA and DHA. In some embodiments the hydrophobic substance contains EPA and/or DHA in combined amount providing less than 5.0 wt. % EPA and DHA combined in the dispersion of complex coacervates, e.g., from 1.0 wt. % up to 3.0 wt. % EPA and DHA combined in the dispersion of complex coacervates.

[0008]  In some embodiments the temperature is kept below 40 °C, or below 30 °C or even below 25 °C during preparation of the complex coacervates, e.g., at all times during the preparation of the edible aqueous dispersion of complex coacervates. Homogenising the aqueous dispersion of complex coacervates can be done in

accordance with known techniques and equipment, e.g., at pressure greater than 3000 psig. Homogenising the aqueous dispersion of complex coacervates reduces average particle size of the complex coacervates, e.g., to more than 0.1 micron, e.g., to less than 10.0 microns, e.g., to 0.3 to 1.0 microns.

[0009]    In certain exemplary embodiments of the aqueous dispersion of complex coacervates in accordance with this aspect of the disclosure, the hydrophobic substance consists essentially of fish oil or other natural oil containing at least 10.0 wt. % EPA and DHA, e.g., at least 20.0 wt. %, e.g., up to 35.0 wt. % or even up to 40.0 wt. % EPA and DHA combined, and optionally also containing water insoluble antioxidant, where the EPA and DHA collectively provide from 0.1 wt. % to 5.0 wt. % of the dispersion of complex coacervates, e.g., from 1.0 wt. % to 3.0 wt. % of the dispersion of complex coacervates. In certain exemplary embodiments, the dispersion of complex coacervates has less than 0.05 wt. % free oil, e.g., less than 0.01 wt. % free oil. As used here, the term "free oil" means oil in the dispersion of complex coacervates that is not encapsulated.

[0010]    In certain exemplary embodiments the cationic polymers are selected from alpha-lactalbumin, beta-lactoglobulin, whey protein isolate, whey protein concentrate, and any combination thereof, collectively providing from 0.05 wt. % to 10.0 wt. % of the dispersion of complex coacervates.

[0011]    In accordance with another aspect, the aqueous dispersions of complex coacervates disclosed here are employed in a food product, e.g., a beverage, semi-moist snack bar, etc. The aqueous dispersion of complex coacervates can be mixed with one or more other food ingredients, including, e.g., water, flavoring, carbonation, preservative, vitamins, minerals, electrolytes, fruit juice, vegetable juice, flavour modifiers, acidulants, clouding agents, weighting agents, or any combination of such other ingredients (meaning one or more of each or any such ingredients). Advantageously, at least certain embodiments of the aqueous dispersions of complex coacervates disclosed here do not require a weighting agent. Typically, weighting agents are used, for example, to help keep a lighter-than water ingredient (e.g., an oil or oil-containing ingredient) in suspension in a beverage. At least certain embodiments of the aqueous dispersions of complex coacervates disclosed here are found to remain in suspension in a beverage

5

without the aid of a weighting agent.   Thus, at least certain embodiments of the beverages disclosed here comprising certain embodiments of the aqueous dispersions of complex coacervates disclosed here contain no weighting agent for the aqueous dispersion of complex coacervates, and in some cases no weighting agent at all.   Advantageously, at least certain embodiments of the aqueous dispersions of complex coacervates disclosed here are found to serve as a clouding agent in certain beverage formulations.   The cost and complexity of adding a separate clouding agent can therefore be avoided where such embodiments of the aqueous dispersions of complex coacervates disclosed here are used in such beverages.   Thus, at least certain embodiments of the beverages disclosed here comprising certain embodiments of the aqueous dispersions of complex coacervates disclosed here contain no clouding agent other than such aqueous dispersion of complex coacervates.

[0012]    Another aspect of the invention is directed to edible delivery systems for hydrophobic substances, which delivery systems may be incorporated into food products, such as, for example, an acidic beverage dairy, or juice product.   The delivery systems comprise a hydrophobic substance (which should be understood to comprise essentially only one or a combination of substances) encapsulated in complex coacervates.   A polymer solution is prepared, specifically, either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer.   The complex coacervates are formed by combining the polymer solution with the hydrophobic substance to form an emulsion, and subsequently adding an oppositely charged polymer to form complex coacervates.   Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the solution of either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer. The edible delivery systems for hydrophobic substances disclosed here can reduce or

6

eliminate oxidation of the hydrophobic substances, e.g., in acidic beverages or other acidic food products, and negative organoleptic effects of the encapsulated hydrophobic substance(s), e.g., off flavor, unpleasant aroma, etc.

[0013]    In another aspect, an aqueous dispersion of complex coacervates is provided. The aqueous dispersion of complex coacervates is prepared by preparing a solution of either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer, adding at least one hydrophobic substance to the solution of either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer, high shear mixing to form an emulsion, adding at least one oppositely charged polymer to the emulsion, and high shear mixing to form an oil-in-water emulsion of complex coacervates. Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to the either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the polymer solution. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the polymer solution. Stabilizer may be added, instead or also, to the either anionic polymer solution, i.e., a solution of at least one anionic polymer, or cationic polymer solution, i.e., a solution of at least one cationic polymer before combining with the hydrophobic substance. In certain exemplary embodiments, i.e., non-limiting examples or embodiments, of the emulsion of complex coacervates disclosed here, the at least one hydrophobic substance may be selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-insoluble flavonoids, flavors, essential oils, and combinations thereof. In certain embodiments the at least one anionic polymer may be selected from gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or any combination thereof. In certain embodiments the at least one cationic polymer may be selected from whey

7

WO 2013/006268                                                      PCT/US2012/043217

protein, hydrolyzed protein, lauric arginate, polylysine, casein or any combination thereof. In certain exemplary embodiments an antioxidant may be added to the solution of the anionic polymer prior to emulsifying with the at least one hydrophobic substance. In certain exemplary embodiments a water insoluble antioxidant may be added to the hydrophobic substance before it is combined with the polymer solution. In certain exemplary embodiments a stabilizer may be added to the hydrophobic substance before combining it with the polymer solution. In certain exemplary embodiments the at least one hydrophobic substance is omega-3 fatty acid (either alone or with other hydrophobic substances), the anionic polymer is gum arabic (either alone or with other anionic polymers), and the cationic polymer is whey protein (either alone or with other cationic polymers). In certain exemplary embodiment the at least one hydrophobic substance is omega-3 fatty acid, the at least one anionic polymer is gum arabic, and the at least one cationic polymer is whey protein. The water soluble antioxidant can be, e.g., plant derived antioxidants, such as those derived from blackberries, water soluble polyphenols, vitamin C, or combinations thereof. Stabilizers can be, e.g., sucrose ester, triglycerides, lecithin, ester gum, or any combination thereof.

[0014]   In another aspect, a food product is provided comprising an aqueous dispersion of complex coacervates as disclosed above. In certain exemplary embodiments the aqueous dispersion of complex coacervates is provided by preparing a solution of either an anionic polymer, i.e., a solution of at least one anionic polymer, or a cationic polymer, i.e., a solution of at least one cationic polymer, adding at least one hydrophobic substance to the polymer solution, high shear mixing to form an emulsion, adding at least one oppositely charged polymer to the emulsion, and high shear mixing to form an aqueous dispersion of complex coacervates. Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to the polymer solution after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the polymer solution. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the polymer solution. Stabilizer may be added, instead or also, to the polymer solution before

8

combining with the hydrophobic substance. The food product is provided by combining a second food ingredient with the aqueous dispersion of complex coacervates.

[0015]    In certain exemplary embodiments the food product is a beverage, e.g., a carbonated soda beverage. In certain embodiments the food product has a pH of 3.0 to pH 7.0, e.g., a pH less than 3.5.

[0016]    In another aspect, a method for preparing an aqueous dispersion of complex coacervates is provided, comprising preparing a solution of either an anionic solution, i.e., a solution of at least one anionic polymer, or a cationic polymer, i.e., a solution of at least one cationic polymer, adding at least one hydrophobic substance to the polymer solution, high shear mixing to form an emulsion, adding at least one oppositely charged polymer to the emulsion, and high shear mixing to form an aqueous dispersion of complex coacervates. Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to the polymer solution after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the polymer solution. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the polymer solution. Stabilizer may be added, instead or also, to the polymer solution before combining with the hydrophobic substance.

[0017]    In certain embodiments of the methods disclosed here for preparing an aqueous dispersion of complex coacervates, the at least one hydrophobic substance may be selected from lipids, water-insoluble vitamins, water-insoluble sterols, water-insoluble flavonoids, flavors, and essential oils. In certain embodiments the at least one anionic polymer may be selected from gum arabic, pectin, carrageenan, ghatti gum, xanthan gum, agar, modified starch, alginate, carboxyl methyl cellulose (CMC), Q-200 (National Starch) or the combination thereof. In certain embodiments the at least one cationic polymer may be selected from hydrolyzed whey protein, lauric arginate, polylysine, casein, or the combinations thereof. In certain exemplary embodiments an antioxidant is added to the anionic or cationic

9

polymer solution prior to adding the hydrophobic substance, e.g., any one or more of the antioxidants mentioned above. In certain exemplary embodiments stabilizer is added to the hydrophobic substance before adding the at least one anionic or cationic polymer, e.g., any one or more of the stabilizers mentioned above. In an exemplary embodiment the at least one hydrophobic substance is omega-3 fatty acid, the at least one anionic polymer is gum arabic, and the at least one cationic polymer is whey protein. In another exemplary embodiment the at least one hydrophobic substance is omega-3 fatty acid, the anionic polymer is gum arabic, the cationic polymer is whey protein, the antioxidant is vitamin C, and the stabilizer is sucrose ester containing triglycerides.

[0018]   In another aspect, a method is provided for preparing a food product comprising an aqueous dispersion of complex coacervates. A polymer solution is prepared, specifically, either an anionic polymer solution, i.e., a solution of at least one anionic polymer, or a cationic polymer solution, i.e., a solution of at least one cationic polymer. At least one hydrophobic substance and water soluble antioxidant is added to the polymer solution. High shear mixing forms an emulsion. At least one oppositely charged polymer is added to the emulsion. High shear mixing forms an aqueous dispersion of complex coacervates. The aqueous dispersion of complex coacervates is combined with at least one other food ingredient to form the food product. Water soluble antioxidant is added prior to forming the first emulsion. For example, antioxidant can be added to the polymer solution after or prior to adding the hydrophobic substance, but water soluble antioxidant can be added, also or instead, to the hydrophobic substance before the hydrophobic substance is added to the polymer solution. Optionally, stabilizer is included in the emulsion of complex coacervates. For example, stabilizer may be added to the hydrophobic substance before the hydrophobic substance is combined with the polymer solution. Stabilizer may be added, instead or also, to the polymer solution before combining with the hydrophobic substance.

[0019]   In at least certain exemplary embodiments the complex coacervates disclosed here (also referred to here in the alternative and interchangeable as oil-containing complex coacervates, complex coacervates containing hydrophobic substance,

etc.) and food products incorporating them as an ingredient have been found to have unanticipated, desirable properties.    For example, in certain such embodiments, the complex coacervates can remain suspended in aqueous systems, e.g., beverages, beverage concentrates, etc., for a surprisingly long period of time. In certain such embodiments the complex coacervates can remain suspended in acidic aqueous systems, e.g., beverages, beverage concentrates, etc., having a pH value less than pH 5.0, and in some cases less than pH 4.0, and in some cases less than pH 3.5, for a surprisingly long period of time. Furthermore, it was found that in at least some embodiments the complex coacervates effectively protect the hydrophobic substance against oxidation and/or hydrolysis, etc.

[0020]    These and other aspects, advantages and features of the present invention herein disclosed will become apparent through reference to the following detailed description.    Furthermore, it is to be understood that the features of the various embodiments described herein are not mutually exclusive and exist in various combinations and permutations in other embodiments.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0021]    In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawing is not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention.    In the following description, various embodiments of the present invention are described with reference to the following drawing, in which Figure 1 depicts a schematic of a coacervate complex exemplary of at least certain embodiments of those disclosed here.

## DETAILED DESCRIPTION OF CERTAIN EMBODIMENTS

[0022]    Various examples and embodiments of the inventive subject matter disclosed here are possible and will be apparent to the person of ordinary skill in the art, given the benefit of this disclosure. In this disclosure reference to "certain exemplary embodiments" (and similar phrases) means that those embodiments are merely non-limiting examples of the inventive subject matter and that there likely are other alternative embodiments which are not excluded.    Unless otherwise indicated or unless otherwise clear from the context in which it is described,

11

alternative elements or features in the embodiments and examples below and in
the Summary above are interchangeable with each other. That is, an element
described in one example may be interchanged or substituted for one or more
corresponding elements described in another example. Similarly, optional or non-
essential features disclosed in connection with a particular embodiment or
example should be understood to be disclosed for use in any other embodiment of
the disclosed subject matter. More generally, the elements of the examples should
be understood to be disclosed generally for use with other aspects and examples of
the devices and methods disclosed herein. A reference to a component or
ingredient being operative, i.e., able to perform one or more functions, tasks
and/or operations or the like, is intended to mean that it can perform the expressly
recited function(s), task(s) and/or operation(s) in at least certain embodiments, and
may well be operative to perform also one or more other functions, tasks and/or
operations. While this disclosure includes specific examples, including presently
preferred modes or embodiments, those skilled in the art will appreciate that there
are numerous variations and modifications within the spirit and scope of the
invention as set forth in the appended claims. Each word and phrase used in the
claims is intended to include all its dictionary meanings consistent with its usage
in this disclosure and/or with its technical and industry usage in any relevant
technology area. Indefinite articles, such as "a," and "an" and the definite article
"the" and other such words and phrases are used in the claims in the usual and
traditional way in patents, to mean "at least one" or "one or more." The word
"comprising" is used in the claims to have its traditional, open-ended meaning,
that is, to mean that the product or process defined by the claim may optionally
also have additional features, elements, etc. beyond those expressly recited.

[0023]    As used here, an "aqueous solvent" is a solvent for the polymers and/or
coacervates of the dispersion, that either (i) comprises water together with any
other consumable (i.e., edible) solvent, e.g., comprising primarily (i.e., at least 50
wt. %) water, e.g., at least 80 wt. % water, at least 90 wt. % water or at least 99
wt. % water, or (ii) consists essentially of water (e.g., potable spring water,
distilled or purified water, tap water or the like). As used here, the term "high
shear mixing" has its ordinary meaning to those skilled in the art. In the case of
the high shear mixing of the hydrophobic substance(s) with the initial aqueous

WO 2013/006268                                                    PCT/US2012/043217

polymer solution, it means at least mixing at such speed(s) and/or force level(s) as are effective to form an emulsion of such ingredients. In the case of the high shear mixing with the oppositely charged polymer, it means at least mixing at such speed(s) and/or force level(s) as are effective to form the aqueous dispersion of complex coacervates.

[0024] As used here, the term "hydrophobic substance" means either a single hydrophobic substance or multiple different hydrophobic substances, e.g., a mixture of hydrophobic substances. As noted above, the hydrophobic substance may in some embodiments of the aqueous dispersion of complex coacervates be fish oil, seed oil, algae oil, seaweed oil or any combination of them. As used here, fish oil has its ordinary meaning and includes, at least any oily hydrophobic substance obtained from fish. Similarly, seed oil has its ordinary meaning and includes, at least any oily hydrophobic substance obtained from plant seeds, e.g., flax seed oil. Algae oil includes at least any oily hydrophobic substance obtained from algae. Seaweed oil includes at least any oily hydrophobic substance obtained from seaweed.

[0025] As used here, the term "clouding agent" has its ordinary meaning to those skilled in the art. In general, it means a beverage ingredient that provides cloudiness or opacity or the like to the beverage. It is an advantage of at least certain beverages in accordance with this disclosure, that are intended to be clouded or non-clear, that the dispersion of complex coacervates can provide the desired clouding effect. Thus, in such embodiments the cost and complexity of adding a separate clouding agent is advantageously avoided. It is an advantage of at least certain beverages in accordance with this disclosure, that the cost and complexity of a weighting agent is advantageously avoided. That is, in at least certain embodiments the complex coacervates remain homogenously dispersed or suspended in the beverage without a weighting agent.

[0026] As used here, the term "weighting agent" has its ordinary meaning to those skilled in the art. In general, it means an ingredient combined with a second ingredient in a beverage to aid in keeping such second ingredient homogenously dispersed or suspended in the beverage.

13

[0027]    As used here, the term "natural ingredient" means an ingredient that is natural as that term is defined by the applicable regulations of the Food and Drug Administration of the government of the United States of America on the effective filing date (i.e., the priority date) of this application. In some case, reference is made to "at least one" of a particular ingredient, such as at least one hydrophobic substance or at least one antioxidant or at least one cationic polymer. In all such cases, the term "at least one" is used to emphasize that one or more such species may be used. Such uses are not intended to mean, and should not be construed as implying, that a reference elsewhere to any such ingredient without the prefatory "at least one" means one and only one species of such ingredient.

[0028]    As used herein, "complex coacervate" is defined as an identifiable discrete particle containing one or more hydrophobic substances, e.g., oil, water-insoluble vitamins, flavors, etc., that are enveloped by a shell comprising at least two oppositely charged polymers (that is, cationic polymers of at least one type and anionic polymers of at least one type) that substantially coats and protects the particles of hydrophobic substance from hydrolysis, oxidation, and degradation. Suitable polymers include not only traditional polymers, but also oligomers and the like. In certain exemplary embodiments, the complex coacervates are substantially non-agglomerated, but comprise a single shell encapsulating a single core. Fig. 1 shows an exemplary, simplified complex coacervate having a hydrophobic substance, e.g., fish oil or purified or concentrated omega 3 fatty acids in an inner shell or layer formed primarily by anionic polymer, and an outer shell or layer formed primarily by cationic polymer.

[0029]    As used herein, a "hydrophobic substance" refers to a water immiscible material such as an oil, a lipid, a water-insoluble vitamin (e.g. $\alpha$-tocopherol), a water-insoluble sterol, a water-insoluble flavonoid, a flavor or an essential oil. The oil employed in accordance with the present invention can be a solid, a liquid or a mixture of both.

[0030]    As used herein a "lipid" encompasses any substance that contains one or more fatty acid residues, including free fatty acids. Thus, the term "lipid" encompasses, for instance, triglycerides, diglycerides, monoglycerides, free fatty acids, phospholipids or a combination of any of them.

14

[0031]    As used herein a "fatty acid" encompasses free fatty acids as well as fatty acid residues. Whenever reference is made herein to a weight percentage of fatty acids, this weight percentage includes free fatty acids as well as fatty acid residues (e.g. fatty acid residues contained in triglycerides). Further, as used herein a "polyunsaturated fatty acid" (PUFA) encompasses any fatty acid containing 2 or more double bonds in the carbon chain.

[0032]    Aspects of the edible delivery systems disclosed here for hydrophobic substances relate to complex coacervates. The delivery systems provide a stable composition suitable for inclusion in food products. That is, the complex coacervates in at least certain embodiments of the delivery systems are sufficiently stable for shelf-storage prior to use in food, e.g., for storage as long as 3 months, or even 9 months prior to use in making food products. In at least certain embodiments, acidic food products comprising the complex coacervates are shelf-storage for storage as long as 3 months, or even 9 months prior to consumption. The complex coacervates can reduce or eliminate the unpleasant taste and odor of many hydrophobic substances, such as fish oil, and reduce degradation, e.g. by oxidation or hydrolysis, of some otherwise unstable hydrophobic substances. The complex coacervates may be incorporated into a food product associated with health benefits, for example orange juice, dairy, to provide enhanced nutritional value. Additionally, the complex coacervates may be incorporated into other food products, for example carbonated soft drinks. By encapsulating such hydrophobic substances in complex coacervates, possible negative visual and physical changes to the food product may be reduced or avoided during a storage period. The resulting food product is appealing to the consumer, as well as being stable and having an adequate shelf life.

[0033]    In certain exemplary embodiments, complex coacervates are provided in an aqueous dispersion. As used herein, an "aqueous dispersion" is defined as particles distributed throughout a liquid water medium, e.g., as a suspension, a colloid, an emulsion, a sol, etc. The liquid water medium may be pure water or may be a mixture of water with at least one water-miscible solvent, such as, for example, ethanol or other alcohols, propylene glycol, glycerin etc. In certain exemplary embodiments, there may be a substantial concentration of water-

15

WO 2013/006268                                     PCT/US2012/043217

miscible solvent in the aqueous dispersion of the complex coacervates, such as, between about 1% and about 20% by volume, for example 5%, 10%, or 15%. In other exemplary embodiments, the complex coacervates are diluted into a food product wherein the concentration of water-miscible solvent is negligible. In other exemplary embodiments, the complex coacervates are combined with one or more solid food ingredients, wherein there is little or no free water, e.g., a snack bar, etc.

[0034]   In certain exemplary embodiments an aqueous solution is prepared comprising at least one anionic polymer. The at least one anionic polymer comprises, for example, gum arabic, modified starches, pectin, Q-200, carrageenan, alginate, xanthan gum, modified celluloses, carboxymethylcellulose, gum acacia, gum ghatti, gum karaya, gum tragacanth, locust bean gum, guar gum, psyllium seed gum, quince seed gum, larch gum (arabinogalactans), stractan gum, agar, furcellaran, gellan gum, or a combination of any of them. In an exemplary embodiment the anionic polymer comprises gum arabic. In certain embodiments the solution of at least one anionic polymer comprises a solution of gum arabic. In certain exemplary embodiments, the solution of the at least one anionic polymer is subjected to high shear mixing. In certain embodiments the high shear mixing may occur for 2-5 minutes at a temperature maintained within the range of 5 °C to 25 °C.

[0035]   In certain exemplary embodiments at least one hydrophobic substance is added to the solution of the at least one anionic polymer under high shear mixing at a temperature between 5-25 °C, followed by adding whey protein to form an oil-in-water coacervate complex emulsion. Subsequently, the coacervate emulsion is homogenized. In certain exemplary embodiments the coacervate emulsion is homogenized at a pressure maintained within the range of 3000-4500 psi. In certain exemplary embodiments the coacervate emulsion is homogenized at 10-30 °C. In certain exemplary embodiments the coacervate emulsion is homogenized for 1-2 passes to form a fine, homogeneous emulsion. The final coacervate emulsion contains, e.g., 3-15 wt. % hydrophobic substance. In certain embodiments the hydrophobic substance is, for example, an oil droplet. In

16

WO 2013/006268                                                        PCT/US2012/043217

exemplary embodiments the oil droplet is a lipophilic nutrient, e.g., fish oil or omega-3 fatty acids or a water-insoluble flavorant.

[0036]    In certain exemplary embodiments, the lipophilic nutrients include fat soluble vitamins, (e.g., vitamins A, D, E, and K), tocotrienols, carotenoids, xanthophylls, (e.g., lycopene, lutein, astaxanthin, and zeaxanthin), fat-soluble nutraceuticals including phytosterols, stanols and esters thereof, Coenzyme Q10 and ubiquinol, hydrophobic amino acids and peptides, essential oils and extracts, and fatty acids. Fatty acids may include, for example, conjugated linolenic acid (CLA), omega-6 fatty acids, and omega-3 fatty acids. Suitable omega-3 fatty acids include, e.g., short-chain omega-3 fatty acids such as alpha-linolenic acid (ALA), which are derived from plant sources, for example flaxseed, and long-chain omega-3 fatty acids such as eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA). The long-chain omega-3 fatty acids can be derived from, for example, marine or fish oils. Such oils can be extracted from various types of fish or marine animals, such as anchovies, capelin, cod, herring, mackerel, menhaden, salmon, sardines, shark and tuna, or from marine vegetation, such as micro-algae, or a combination of any of them. Other sources of omega-3 fatty acids include liver and brain tissue and eggs.

[0037]    In certain exemplary embodiments, the water-insoluble flavorant is any substance that provides a desired flavor to a food or beverage product, which does not substantially dissolve in water (e.g., non-polar, hydrophobic substances such as lipids, fats, oils, etc.). The flavorant may be a liquid, gel, colloid, or particulate solid, e.g., an oil, an extract, an oleoresin, or the like. Exemplary water-insoluble flavorants include, but are not limited to, citrus oils and extracts, e.g. orange oil, lemon oil, grapefruit oil, lime oil, citral and limonene, nut oils and extracts, e.g. almond oil, hazelnut oil and peanut oil, other fruit oils and extracts, e.g. cherry oil, apple oil and strawberry oil, botanical oils and extracts, e.g., coffee oil, mint oil, vanilla oil, and combinations of any of them.

[0038]    In certain embodiments a water soluble antioxidant is added to the solution of the anionic polymer prior to the addition of the at least one hydrophobic substance. In certain embodiments the water soluble antioxidant may be selected from, e.g., plant derived antioxidants, such as those derived from blackberries, water soluble

WO 2013/006268                                                    PCT/US2012/043217

polyphenols, vitamin C, or combinations thereof. In an exemplary embodiment the antioxidant is vitamin C.

[0039]    In certain embodiments a stabilizer is added to the emulsion containing the at least one hydrophobic substance and the at least one anionic polymer before the at least one oppositely charged polymer is added. The stabilizer may be selected from sucrose ester, triglycerides, lecithin, ester gum, and combinations of any of them. In an exemplary embodiment the stabilizer is sucrose ester containing triglycerides.

[0040]    In certain exemplary embodiments at least one cationic polymer is added to the emulsion containing the at least one hydrophobic substance and the at least one anionic polymer, and in alternative embodiments, an antioxidant and/or a stabilizer. The final coacervate emulsion may contain, for example, 0.05-10 wt% cationic polymer. The mixture of the at least one cationic polymer and the emulsion containing the at least one hydrophobic substance and the at least one anionic polymer can be homogenized using high pressure to form an aqueous solution of complex coacervates. The homogenization proceeds, for example, at 3000 to 4500 psi for 1-2 passes. The at least one cationic polymer comprises, for example, proteins such as dairy proteins, including whey proteins, caseins and fractions thereof, gelatin, corn zein protein, bovine serum albumin, egg albumin, grain protein extracts, e.g. protein from wheat, barley, rye, oats, etc., vegetable proteins, microbial proteins, chitosan, legume proteins, proteins from tree nuts, proteins from ground nuts, hydrolyzed protein, lauric arginate, polylysine and the like, or combinations of any of them. In an exemplary embodiment the cationic polymer is whey protein. In certain embodiments whey protein may be selected from beta-lactoglobulin, alpha-lactalbumin whey protein isolate (WPI), whey protein concentrated (WPC), hydrolyzed protein, lauric arginate, polylysine or combinations thereof. Beta-lactoglobulin provides good performance and good emulsion stability in certain embodiments. Beta-lactoglobulin is the major whey protein of ruminant species. Its amino-acid sequence and 3-dimensional structure can efficiently bind small hydrophobic molecules such as omega-3 fatty acid, resulting in good protection against hydrolysis and oxidation.

WO 2013/006268

PCT/US2012/043217

[0041] In certain embodiments the complex coacervates have a negative zeta potential, that is, the outside of the complex coacervate shell displays a net negative charge. In certain exemplary embodiments the shell includes a net positive charged (cationic) polymer and a net negative charged (anionic) polymer. It is currently believed that the net charge of each polymer is dependent on the pH of the environment and the isoelectric point of each polymer, which is in turn dependent on the density of ionizable groups in each polymer and the pKa values of those groups. Thus, disclosure here of complex coacervates comprising cationic and anionic polymers refers to the charge of the polymers in the environment or reaction conditions used for formation of the complex coacervates. Complex coacervates of the type used here are presently understood to be stabilized at least in part by the electrostatic attraction between the oppositely charged polymers.

[0042] In certain exemplary embodiments, the complex coacervates comprise, for example, 3-15 wt.% of the at least one hydrophobic substance; 5-30 wt.% of the at least one anionic polymer; and 0.1-10 wt.% of the at least one cationic polymer. In alternative embodiments, the complex coacervates comprise, for example, 3-15 wt.% of the at least one hydrophobic substance; 0.05-5 wt.% of the antioxidant; 5-30 wt.% of the at least one of the anionic polymer; 0.1-10 wt.% of the at least one of the cationic polymer; and 0.1-5 wt.% of the stabilizer.

[0043] In certain exemplary embodiments, the oil droplets contain, for example, at least 3 wt.% or, alternatively 10 wt.%, of one or more polyunsaturated fatty acids selected from omega-3 fatty acids, omega-6 fatty acids and combinations of any of them. In certain embodiments, the one or more polyunsaturated fatty acids contain ALA, DHA, EPA, CLA, and combinations of any of them. In alternative embodiments, the oil droplets contain, for example, at least 50 wt.%, at least 70 wt.%, or at least 80 wt.% of lipids.

[0044] In certain exemplary embodiments, the particle size of complex coacervates of the present invention has an average diameter in the range of, for example, 0.3-1.2 μm. In certain embodiments, the oil droplets in the complex coacervates have a diameter in the range of, for example, 1.0 μm or 3.0 μm.

[0045]    In certain exemplary embodiments, the aqueous dispersion of the present invention may contain other dispersed components in addition to the complex coacervates. In certain embodiments, the dispersion contains less than 20 wt.% of one or more dispersed edible components, including the dispersed complex coacervates.

[0046]    In certain exemplary embodiments, the complex coacervates are not substantially additionally stabilized, for example by substantial gelling or substantial hardening of the complex coacervates.

[0047]    In certain exemplary embodiments, the aqueous dispersion of complex coacervates is maintained as an aqueous dispersion. In alternative embodiments, the aqueous dispersion of complex coacervates is, for example, spray dried, freeze dried, drum dried, or bed dried. If maintained as an aqueous dispersion, in certain embodiments, the aqueous dispersion of complex coacervates is treated to protect from microbiological growth. In certain embodiments, the aqueous dispersion of complex coacervates is, for example, pasteurized, aseptically packaged, treated with chemical preservatives, e.g., benzoates, sorbates, etc., treated with acid, e.g., citric acid, phosphoric acid, etc., treated at high temperature and/or carbonated. In an exemplary embodiment, the aqueous dispersion of complex coacervates has minimized contact with air during production, is pasteurized after production, and is stored in a refrigerator with limited contact with light.

[0048]    In certain exemplary embodiments, a desired amount of hydrophobic substance in the form of the above-described complex coacervates is included in a food product. The amount of complex coacervates, and hence the amount of hydrophobic substance included in the food product, may vary depending on the application and desired taste and nutrition characteristics of the food product. The complex coacervates may be added to the food product in any number of ways, as would be appreciated by those of ordinary skill in the art given the benefit of this disclosure. In certain exemplary embodiments, the complex coacervates are sufficiently mixed in the food product to provide a substantially uniform distribution, for example a stable dispersion. Mixing should be accomplished such that the complex coacervates are not destroyed. If the complex coacervates are destroyed, oxidation of the hydrophobic substance may result. The mixer(s)

can be selected for a specific application based, at least in part, on the type and amount of ingredients used, the viscosity of the ingredients used, the amount of product to be produced, the flow rate, and the sensitivity of ingredients, such as the complex coacervates, to shear forces or shear stress.

[0049]    Encapsulation of hydrophobic substances using the above-described complex coacervates stabilizes the hydrophobic substance by protecting it from degradation by, for example, oxidation and/or hydrolysis. When included in an acidic food product, the complex coacervates can provide a stable dispersion of hydrophobic substances over the shelf life of the food product. Factors that may affect the shelf-life of the complex coacervates include the level of processing the product undergoes, the type of packaging, and the materials used for packaging the product. Additional factors that may affect the shelf life of the product include, for example, the nature of the base formula (e.g., an acidic beverage sweetened with sugar has a longer shelf-life than an acidic beverage sweetened with aspartame) and environmental conditions (e.g., exposure to high temperatures and sunlight is deleterious to ready-to-drink beverages).

[0050]    In certain exemplary embodiments, the food product is a beverage product. In certain embodiments, the beverage products include ready-to-drink beverages, beverage concentrates, syrups, shelf-stable beverages, refrigerated beverages, frozen beverages, and the like. In exemplary embodiments, the beverage product is acidic, e.g. having a pH within the range below about pH 5.0, in certain exemplary embodiments, a pH value within the range of about pH 1.0 to about pH 4.5, or in certain exemplary embodiments, a pH value within the range of about pH 1.5 to about pH 3.8. In an exemplary embodiment the beverage product has a pH of 3.0. Beverage products include, but are not limited to, e.g., carbonated and non-carbonated soft drinks, fountain beverages, liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy drinks, fortified/enhanced water drinks, soy drinks, vegetable drinks, grain-based drinks (e.g. malt beverages), fermented drinks (e.g., yogurt and kefir) coffee beverages, tea beverages, dairy beverages, and mixtures thereof. Exemplary fruit juice sources include citrus fruit, e.g. orange, grapefruit, lemon and lime, berry, e.g. cranberry, raspberry, blueberry and strawberry, apple, grape, pineapple, prune, pear, peach, cherry,

21

mango, and pomegranate. Beverage products include bottle, can, and carton products and fountain syrup applications.

[0051]   Certain embodiments of other food products include fermented food products, yogurt, sour cream, cheese, salsa, ranch dip, fruit sauces, fruit jellies, fruit jams, fruit preserves, and the like. In certain exemplary embodiments, the food product is acidic, e.g. having a pH value within the range below about pH 5.0, in certain exemplary embodiments, a pH value within the range of about pH 1.0 to about pH 4.5, or in certain exemplary embodiments, a pH value within the range of about pH 1.5 to about pH 3.8. In an exemplary embodiment the food product has a pH of 3.0.

[0052]   The food product may optionally include other additional ingredients. In certain embodiments, additional ingredients may include, for example, vitamins, minerals, sweeteners, water-soluble flavorants, colorings, thickeners, emulsifiers, acidulants, electrolytes, antifoaming agents, proteins, carbohydrates, preservatives, water-miscible flavorants, edible particulates, and mixtures thereof. In certain embodiments, other ingredients are also contemplated. In exemplary embodiments, the ingredients can be added at various points during processing, including before or after pasteurization, and before or after addition of the complex coacervates.

[0053]   In at least certain exemplary embodiments, food products disclosed here may be pasteurized. The pasteurization process may include, for example, ultra high temperature (UHT) treatment and/or high temperature-short time (HTST) treatment. The UHT treatment includes subjecting the food or beverage product to high temperatures, such as by direct steam injection or steam infusion, or by indirect heating in a heat exchanger. Generally, after the product is pasteurized, the product can be cooled as required by the particular product composition/configuration and/or the package filling application. For example, in one embodiment, the food or beverage product is subjected to heating to about 185°F (85°C) to about 250°F (121°C) for a short period of time, for example, about 1 to 60 seconds, then cooled quickly to about 36°F (2.2°C) +/10°F (5°C) for refrigerated products, to ambient temperature for shelf stable or refrigerated products, and to about 185°F (85°C) +/- 10°F (5°C) for hot-fill applications for

shelf-stable products. The pasteurization process is typically conducted in a closed system, so as not to expose the food product to atmosphere or other possible sources of contamination. In alternative embodiments, other pasteurization or sterilization techniques may also be useful, such as, for example, aseptic or retort processing. In addition, multiple pasteurization processes may be carried out in series or parallel, as necessitated by the food product or ingredients.

[0054]    Food products may, in addition, be post processed. In exemplary embodiments, post processing is typically carried out following addition of the complex coacervates. Post processing can include, for example, cooling the product solution and filling it into a container for packaging and shipping. In certain embodiments, post processing may also include deaeration of the food product to less than 4.0 ppm oxygen, preferably less than 2.0 ppm and more preferably less than 1.0 ppm oxygen. In alternative embodiments deaeration and other post processing tasks may be carried out prior to processing, prior to pasteurization, prior to mixing with the complex coacervates and/or at the same time as adding the complex coacervates. In addition, in certain embodiments, an inert gas (e.g., nitrogen or argon) headspace may be maintained during the intermediary processing of the product and final packaging. Additionally/alternatively, an oxygen or UV radiation barriers and/or oxygen scavengers could be used in the final packaging.

[0055]    The following examples are specific embodiments of the present invention, but are not intended to limit it.

## EXAMPLES

### Example 1

To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (30% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g of $\beta$-lactoglobulin (20%) solution was added slowly to form a coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in the beverage shown in Table 1, below, to make an isotonic beverage

containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 1

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.59% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.89% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 2

To 225 g gum arabic solution (20%) 1.5 g vitamin C was added. Fish oil 15 g (22% EPA/DHA) containing dissolved 9 g sucrose ester (SAIB-MCT) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g of beta-lactoglobulin (5%) solution was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in the beverage shown in Table 2, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 2

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.24% |

WO 2013/006268                                                      PCT/US2012/043217

| Ingredient | Amount (% by wt.) |
|---|---|
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

## Example 3

To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (22% EPA/DHA) containing dissolved 10 g sucrose ester (SAIB-MCT) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g of beta-lactoglobulin (11%) solution was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in the beverage shown in Table 3, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 3

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.24% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

## Example 4

To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 25.4 g (22% EPA/DHA) dissolved in 17 g sucrose ester (SAIB-MCT) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 102 g of beta-lactoglobulin (11%) solution was added slowly to form coacervate complex emulsion at pH

WO 2013/006268                                          PCT/US2012/043217

3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in the beverage shown in Table 4, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 4

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.59% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.89% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 5

To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (22% EPA/DHA) containing dissolved 2 g ester gum was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 35 g of beta-lactoglobulin (10%) solution was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in the beverage shown in Table 5, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 5

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.37% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |

WO 2013/006268                                                    PCT/US2012/043217

| Ingredient | Amount (% by wt.) |
|---|---|
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.11% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 6

To 70 g solution of beta-lactoglobulin (20%) containing 3 g ascorbic acid, fish oil 15 g (30% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 225 g solution of gum arabic with 3 g dissolved ascorbic acid was added slowly under high shear mixing to form a coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 6.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.52% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.96% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

WO 2013/006268                                                    PCT/US2012/043217

Example 7

To 225 g gum arabic solution (20%) with dissolved 6 g vitamin C fish oil 15 g (30% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of whey protein concentrate (20%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 7.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.55% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.93% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 8

To 225 g gum arabic solution (20%) with dissolved 6 g vitamin C fish oil 15 g (30% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of hydrolyzed whey protein (20%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was added to the beverage and dispersed in the beverage. Additional ingredients were added in the concentrations (w/w) listed below to make an isotonic beverage containing

WO 2013/006268                                             PCT/US2012/043217

omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 8.

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.55% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.93% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 9 (Dairy)

To 225 g gum arabic solution (20%) 2 g vitamin C was added. Fish oil 15 g (22% EPA/DHA) was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g of beta-lactoglobulin (20%) solution was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion dispersed in whey protein with other ingredients in the concentrations (w/w) listed in Table 6, below, to make a dairy product containing omega-3 fish oil. The pH was about 3.5 and 7.0.

Table 9

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 89.77% |
| Dry Sucrose | 5% |
| Stabilizers | 0.92% |
| Orange Flavor | 0.500% |
| Coacervate Emulsion | 1.21% |
| Whey Protein | 2.6% |
| Total | 100% |
| pH = 3.3 ; 7.0 | |

WO 2013/006268                                    PCT/US2012/043217

Example 10

To 225 g gum arabic solution (20%) 1.5 g vitamin C was added. Fish oil 15 g (30% EPA/DHA) containing dissolved 9 g canola oil was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g of beta-lactoglobulin (5%) solution was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in a beverage with ingredients in the concentrations (w/w) listed in Table 7, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 10

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.56% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.92% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 11

To 225 g gum arabic solution (20%) 3 g vitamin C was added. Fish oil 15 g (22% EPA/DHA) containing dissolved 9 g palm oil was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution of beta-lactoglobulin (5%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in a beverage with ingredients in the

concentrations (w/w) listed in Table 8, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 11

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.23% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.25% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

Example 12

To 75 g gum arabic solution (20%) 0.3 g vitamin C was added. Fish oil 7 g (22% EPA/DHA) containing dissolved 3 g SAIB-MCT and 0.19 g butylated hydroxytoluene was added and emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 20 g solution of beta-lactoglobulin (10%) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in a beverage with ingredients in the concentrations (w/w) listed in Table 9, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 12

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.59% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |

WO 2013/006268                                                PCT/US2012/043217

| Ingredient | Amount (% by wt.) |
|---|---|
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 0.89% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

### Example 13

To 225 g gum arabic solution (20%) fish oil 15 g (22% EPA/DHA) containing dissolved 9 g SAIB-MCT was added. The mixture was emulsified at 10-25 °C under high shear mixing to form an oil-in-water emulsion. Subsequently, 60 g solution (5%) of whey protein isolate (WPI) was added slowly to form coacervate complex emulsion at pH 3-5. The coacervate emulsion was further mixed for 2 minutes and then homogenized by 1-2 pass under 3000-4500 psi. The coacervate emulsion was dispersed in a beverage with ingredients in the concentrations (w/w) listed in Table 9, below, to make an isotonic beverage containing omega-3 fish oil. The pH was about 2.9. The pH range of the resultant isotonic beverage may be about 2.5-4.5.

Table 13

| Ingredient | Amount (% by wt.) |
|---|---|
| Water | 95.24% |
| Dry Sucrose | 1.96% |
| Salt Blend | 0.11% |
| Citric Acid | 0.27% |
| Mango Flavor | 0.100% |
| Yellow #6 Color 10% solution | 0.060% |
| Coacervate Emulsion | 1.24% |
| Reb A | 0.015% |
| Vitamin C (Ascorbic Acid) | 0.105% |
| Erythritol | 0.90% |
| Total | 100.000% |

The stability of the products made in Examples 1-10 was tested. The results are shown in Tables A and B, below.

PCT/US2012/043217

Table A.  Stability of Omega-3 Fish Oil Beverage

| Example | Stability (70-75 °F) | Stability (90 °F) |
|---------|----------------------|-------------------|
| 1 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 2 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 3 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 4 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 5 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 6 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 7 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |
| 8 | at least 2 months ( no fish odor and taste) | at least 1 month ( no fish odor and taste) |

Table B.  Stability of Omega-3 Fish Oil in Dairy Products

| Example | Stability (70-75 °F) | Stability (90 °F) |
|---------|----------------------|-------------------|
| 9 (smoothie, pH 3.5) | at least 1 month (no fish odor and taste) | at least 1 month (no fish odor and taste) |
| 9 (shake, pH 7.0) | at least 1 month (no fish odor and taste) | at least 1 month (no fish odor and taste) |

[0056]    The invention has been described with reference to the preferred embodiments.
Obviously, modifications and alterations will occur to others upon reading and
understanding the preceding detailed description. It is intended that the invention
be construed as including all such modifications and alterations insofar as they
come within the scope of the appended claims or the equivalents thereof.

WO 2013/006268                                                    PCT/US2012/043217

What is claimed is:

1. An aqueous dispersion of complex coacervates prepared by a process comprising:
    a. providing an aqueous polymer solution;
    b. adding water soluble antioxidant and hydrophobic substance comprising omega-3 fatty acid including at least one of EPA and DHA, to the aqueous polymer solution and mixing to form an oil-in-water emulsion, wherein the mixing comprises high shear mixing below 40 °C, and wherein the water soluble antioxidant is added prior to the high shear mixing;

wherein the aqueous polymer solution is -
        - an anionic polymer solution comprising charged polymers and aqueous solvent, the charged polymers consisting essentially of anionic polymers, or
        - a cationic polymer solution comprising charged polymers and aqueous solvent, the charged polymers consisting essentially of cationic polymers;
    c. adding oppositely charged polymers to the emulsion and mixing to form an aqueous dispersion of complex coacervates, wherein the oppositely charged polymers consist essentially of anionic polymers where the aqueous polymer solution is a cationic polymer solution and the oppositely charged polymers consist essentially of cationic polymers where the aqueous polymer solution is an anionic polymer solution, and wherein the mixing comprises high shear mixing below 40 °C; and
    d. reducing average particle size of the complex coacervates to less than 10 microns, comprising homogenising the aqueous dispersion of complex coacervates below 40 °C;

wherein the anionic polymers provide from 1.0 wt. % to 40.0 wt. % of the dispersion of complex coacervates, the cationic polymers collectively provide from 0.05 wt. % to 20.0 wt. % of the dispersion of complex coacervates, the water soluble antioxidant provides from 0.01 wt. % to 20.0 wt. % of the emulsion of complex coacervates, the hydrophobic substance provides from 0.1 wt. % to 20.0 wt. % of the dispersion of complex coacervates, with EPA and DHA collectively providing from 0.1 wt. % to 5.0 wt. % of the dispersion of complex coacervates.

2. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the entire process is carried out at temperatures always less than 40 °C.

WO 2013/006268                                                        PCT/US2012/043217

3. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the entire process is carried out at temperatures always less than 30 °C.

4. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the hydrophobic substance comprises water insoluble antioxidant.

5. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein homogenising the aqueous dispersion of complex coacervates is done at pressure greater than 3000 psig.

6. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein homogenising the aqueous dispersion of complex coacervates reduces average particle size of the complex coacervates to less than 1.0 microns.

7. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the hydrophobic substance provides from 5.0 wt. % to 10.0 wt. % of the dispersion of complex coacervates.

8. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the anionic polymers provide from 10.0 wt. % to 20.0 wt. % of the dispersion of complex coacervates.

9. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the cationic polymers collectively provide from 1.0 wt. % to 10.0 wt. % of the dispersion of complex coacervates.

10. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the water soluble antioxidant provides from 1.0 wt. % to 5.0 wt. % of the dispersion of complex coacervates.

11. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein:
    - the hydrophobic substance consists essentially of oil and optionally water insoluble antioxidant;

- the oil comprises at least one of EPA and DHA collectively providing from 0.1 wt. % to 5.0 wt. % of the dispersion of complex coacervates; and

- the dispersion of complex coacervates has less than 0.01 wt. % free oil.

12. The aqueous dispersion of complex coacervates in accordance with claim 11 wherein EPA and DHA collectively provide from 1.0 wt. % to 3.0 wt. % of the dispersion of complex coacervates.

13. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the cationic polymers are selected from beta-lactoglobulin, alpha-lactalbumin, whey protein isolate, hydrolyzed whey protein, and any combination thereof, collectively providing from 0.05 wt. % to 10.0 wt. % of the dispersion of complex coacervates.

14. The aqueous dispersion of complex coacervates in accordance with claim 1 wherein the hydrophobic substance is selected from fish oil, seed oil, algae oil, seaweed oil and any combination thereof.

15. The aqueous dispersion of complex coacervates in accordance with claim 1 consisting essentially of only natural ingredients.

16. A food product comprising an aqueous dispersion of complex coacervates in accordance with claim 1.

17. A beverage comprising an aqueous dispersion of complex coacervates in accordance with claim 1, wherein the beverage is all natural.

18. A beverage comprising an aqueous dispersion of complex coacervates in accordance with claim 1, wherein the beverage comprises no clouding agent other than aqueous dispersion of complex coacervates in accordance with claim 1.

19. A beverage comprising an aqueous dispersion of complex coacervates in accordance with claim 1, wherein the beverage comprises no weighting agent.



FIG. 1

Coacervate Complex

**INTERNATIONAL SEARCH REPORT**

| | International application No |
|---|---|
| | PCT/US2012/043217 |

| A. CLASSIFICATION OF SUBJECT MATTER | | | | |
|---|---|---|---|---|
| INV. A23L1/00 | A23L1/22 | A23L1/30 | A23L1/304 | A23L2/00 |
| ADD. | | | | |

According to International Patent Classification (IPC) or to both national classification and IPC

| B. FIELDS SEARCHED |
|---|
| Minimum documentation searched (classification system followed by classification symbols) |
| A23L |

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

| Electronic data base consulted during the international search (name of data base and, where practicable, search terms used) |
|---|
| EPO-Internal, WPI Data, FSTA, BIOSIS |

| C. DOCUMENTS CONSIDERED TO BE RELEVANT | | |
|---|---|---|
| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| X | WO 2008/085997 A2 (OCEAN NUTRITION CANADA LTD [CA]; YAN CUIE [CA]; ZHANG WEI [CA]; JIN YU) 17 July 2008 (2008-07-17) * examples 1-5; claims 1-201 * | 1,7,8, 14-19 |
| Y | WO 2009/029407 A1 (PEPSICO INC [US]; GIVEN PETER [US]) 5 March 2009 (2009-03-05) * example 1; claims 1-32 * | 1-19 |
| X | WO 2009/029406 A1 (PEPSICO INC [US]; KOHANE DANIEL S [US]; YEO YOON [US]; GIVEN PETER [US]) 5 March 2009 (2009-03-05) | 1,16-19 |
| Y | * examples 1-11; claims 1-36 * | 1-19 |

| ☐ Further documents are listed in the continuation of Box C. | ☒ See patent family annex. |
|---|---|

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier application or patent but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 6 August 2012 | 17/08/2012 |

| Name and mailing address of the ISA/ European Patent Office, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+31-70) 340-2040, Fax: (+31-70) 340-3016 | Authorized officer Georgopoulos, N |
|---|---|

Form PCT/ISA/210 (second sheet) (April 2005)

**INTERNATIONAL SEARCH REPORT**

Information on patent family members

International application No

PCT/US2012/043217

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| WO 2008085997 | A2 | 17-07-2008 | AR | 064846 A1 | 29-04-2009 |
| | | | AU | 2008205325 A1 | 17-07-2008 |
| | | | CA | 2675123 A1 | 17-07-2008 |
| | | | CL | 632008 A1 | 18-08-2008 |
| | | | EP | 2124905 A2 | 02-12-2009 |
| | | | JP | 2010515455 A | 13-05-2010 |
| | | | KR | 20090117731 A | 12-11-2009 |
| | | | PE | 16842008 A1 | 19-11-2008 |
| | | | US | 2011117180 A1 | 19-05-2011 |
| | | | WO | 2008085997 A2 | 17-07-2008 |
| WO 2009029407 | A1 | 05-03-2009 | AR | 068042 A1 | 28-10-2009 |
| | | | AU | 2008293780 A1 | 05-03-2009 |
| | | | CN | 101790325 A | 28-07-2010 |
| | | | EP | 2182816 A1 | 12-05-2010 |
| | | | KR | 20100032933 A | 26-03-2010 |
| | | | US | 2010272859 A1 | 28-10-2010 |
| | | | WO | 2009029407 A1 | 05-03-2009 |
| WO 2009029406 | A1 | 05-03-2009 | AR | 068041 A1 | 28-10-2009 |
| | | | AT | 547012 T | 15-03-2012 |
| | | | AU | 2008293779 A1 | 05-03-2009 |
| | | | CN | 101790323 A | 28-07-2010 |
| | | | DK | 2180795 T3 | 18-06-2012 |
| | | | EP | 2180795 A1 | 05-05-2010 |
| | | | EP | 2457451 A1 | 30-05-2012 |
| | | | ES | 2381416 T3 | 28-05-2012 |
| | | | KR | 20100033429 A | 29-03-2010 |
| | | | US | 2009061048 A1 | 05-03-2009 |
| | | | WO | 2009029406 A1 | 05-03-2009 |

## CERTIFICATE OF SERVICE

I, Ricky Kamdem-Ouaffo, PhD, hereby certify that, on April 24, 2016,

one copy of my Plaintiff-Appellant's Opening Brief, along with one copy of the

Appendix to the Briefs were sent by Federal Express mail to the following

Defendant-Appellees' attorneys:

Mr. Robert L. Maier                          M. Melvin C. Garner
Baker Botts L.L.P.                           Leason Ellis LLP
30 Rockefeller Plaza                         1 Barker Avenue, Fifth Floor
New York, NY 10112-4498                      White Plains, NY 10601
Tel: 1 212 408 2538                          Tel: 1 914 288 0022

On the same date, three copies of the Appendix to the Briefs along with

Three Copies of my Plaintiff-Appellant's Opening Brief were sent to the Clerk

of the United States Court of Appeals for the Federal Circuit via FedEx mail to:

The Clerk of the Court
US Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439
Tel: 1 202 275-8000

**Dated:** 04/24/2016

Ricky Kamdem-Ouaffo, PhD
Plaintiff-Appellant *Pro Se*
1 Richmond Street # 2100
E-mail: rickykamer@gmail.com
Tel: 1 732 763 8622

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32**

I, Ricky Kamdem-Ouaffo, PhD, certify as follows:

Plaintiff-Appellant's Opening Brief complies with the page limitation of Fed. R. App. P. 32(a)(7)(B) because it contains no more than 13,981 words, 1252 Lines on a total of 62 pages including textboxes, footnotes and endnotes but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Plaintiff-Appellant's Opening Brief was prepared with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

**Date:** April 24, 2016

Ricky Kamdem-Ouaffo, PhD
Plaintiff-Appellant *Pro Se*
1 Richmond Street # 2100
E-mail: rickykamer@gmail.com
Tel: 1 732 763 8622