**Case # 16-1668**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

RICKY KAMDEM-OUAFFO, PhD

*Appellant*

V.

PEPSICO INC. AND ITS AFFILIATES

DR. PETER S. GIVEN JR

DR. NAIJIE ZHANG

SCENTSATIONAL TECHNOLOGIES LLC

STEVEN M. LANDAU

JOHN AND/OR JANE DOE

*Appellees*

---

**APPEAL**

United States District Court for the Southern District of New York

Case No. 7 14 - CV 00227 (KMK)

---

**APPENDIX TO THE BRIEFS**

**Volume I of II**

RECEIVED

APR 26 2016

United States Court of Appeals
For The Federal Circuit

**Dated:** 04/10/2016

# TABLE OF CONTENTS

## VOLUME I OF II

**TAB 1:** USDC SDNY[1] Docket sheet from the proceedings below, Kamdem-Ouaffo v. PepsiCo Inc. et al, No. 14-cv-00227 (KMK). 16 pages

**TAB 2:** USDC SDNY Docket Document # 31 - Complaint: *ScentSational v. PepsiCo et al.*, No. 13-cv-8645 (KMK). 60 pages

**TAB 3:** USDC SDNY Docket Document # 32 – Transcript of pre-motion conference (2014-06-05). 23 pages.

**TAB 4:** USDC SDNY Docket Document # 42: Affidavit of Ricky Kamdem, Sworn July 05, 2014. 30 pages.

**TAB 5:** USDC SDNY Docket Document # 43(2), pages 45 to 66 - Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 22 pages.

**TAB 6:** USDC SDNY Docket Document # 43(3), Pages 1 to 5, and 28 to 44 - Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 21 Pages.

[1] United States District Court for the Southern District of New York.

**TAB 7:** USDC SDNY Docket Document # 43(4), Pages 1 to 4, 16 to 17, and 34 to 42. Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 15 Pages.

**TAB 8:** USDC SDNY Docket Document # 43(5), Pages 1 to 25, and 35 to 80 - Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 71 Pages.

**TAB 9:** USDC SDNY Docket Document # 43(6), Pages 16 to 35 - Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 20 Pages.

**TAB 10:** USDC SDNY Docket Document # 43(7), Pages 6 to 50 - Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 45 Pages.

**TAB 11:** USDC SDNY Docket Document # 43(8): Pages 1 to 19, and 33 to 88 - Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 75 pages.

**TAB 12:** USDC SDNY Docket Document # 43(11), Exhibits to the Affidavit of Ricky Kamdem, Sworn July 05, 2014. 95 pages.

**TAB 13:** USDC SDNY Docket Document # 50, Opinion of Honorable Kenneth M. Karas, USDJ, on Plaintiff's First Amended Complaint. Dated 03/09/2015. 38 pages.

## VOLUME II OF II

**TAB 14:** USDC SDNY Docket Document # 52, Second Amended Complaint. 84 pages

**TAB 15:** USDC SDNY Docket Document # 52-1, Second Amended Complaint (continued). 10 pages.

**TAB 16:** USDC SDNY Docket Document # 53, Kamdem-Ouaffo v. PepsiCo Inc. et. al, No. 14-cv-00227 (S.D.N.Y.), Letter from Plaintiff to Hon. Karas, Memo Endorsed. 4 Pages.

**TAB 17:** USDC SDNY Docket Document # 68-1, Kamdem-Ouaffo v. PepsiCo Inc. et. al, No. 14-cv-00227 (S.D.N.Y.), Exhibit A to ScentSational Technologies LLC and Steven M. Landau's Pre-Motion Letter (2015-04-30). 2 Pages.

**TAB 18:** USDC SDNY Docket Document # 68-2, Kamdem-Ouaffo v. PepsiCo Inc. et. al., No. 14-cv-00227 (S.D.N.Y.), Exhibit B to ScentSational Technologies LLC and Steven M. Landau's Pre-Motion Letter (2015-04-30). 9 Pages.

**TAB 19:** USDC SDNY Docket Document # 68-3, Kamdem-Ouaffo v. PepsiCo Inc. et. al, No. 14-cv-00227 (S.D.N.Y.), Exhibit to ScentSational Technologies LLC and Steven M. Landau's Pre-Motion Letter (2015-04-30). 13 Pages.

**TAB 20:** USDC SDNY Docket Document # 68-4, Kamdem-Ouaffo v. PepsiCo Inc. et. al, No. 14-cv-00227 (S.D.N.Y.), Exhibit D to ScentSational Technologies LLC and Steven M. Landau's Pre-Motion Letter (2015-04-30).16 Pages.

**TAB 21:** USDC SDNY Docket Document # 70, Pages 7 to 29; ScentSational Technologies LLC's Confidentiality Agreements with PepsiCo Inc. and Affiliates. 23 Pages.

**TAB 22:** USDC SDNY Docket Document # 77(1): Subex Technologies Pre-employment Agreements with Plaintiff as produced by PepsiCo during whistleblower State Court Action and during this Federal Action. 8 Pages.

**TAB 23:** USDC SDNY Docket Document # 77(4): PepsiCo Inc.'s Motion EXHIBIT as produced by PepsiCo Inc. and Affiliates during this Federal Action and during discovery of the State Court whistleblower Action: A Letter to the United States Government. 15 pages.

**TAB 24:** USDC SDNY Docket Document # 77(5): State Court Matter of Kamdem-Ouaffo v PepsiCo, Index # 22625/10 - State Court's Ruling on PepsiCo's Motion for Summary Judgment. 42 Pages.

**TAB 25:** USDC SDNY Docket Document # 79, Pages 1 to 23, 39 to 42, and 48. Affidavit of Ricky Kamdem sworn July 11th, 2015; Proposed Second Amended Complaint with More Definitive Statement. 34 Pages.

**TAB 26:** USDC SDNY Docket Documents # 81(1) to 81(3), Kamdem-Ouaffo v. PepsiCo Inc. et al, No. 14-cv-00227 (S.D.N.Y.). Proposed Second Amended Complaint With More Definitive Statement. 134 pages.

**TAB 27:** USDC SDNY Docket Documents # 93: Affirmation of Richard M. Hunter, Esq. Attorney for PepsiCo Inc. in the State Court whistle blower matter Kamdem v. PepsiCo Index # 22625/10. 11 Pages.

**TAB 28:** USDC SDNY Docket Documents # 94: Opinion and Order of Hon. Kenneth M. Karas on Plaintiff's Motion to intervene and/or to consolidate. 14 Pages.

**TAB 29:** USDC SDNY Docket Documents # 95: Opinion and Order of Hon. Kenneth M. Karas on Defendants' motion to dismiss Second Amended Complaint. 33 Pages.

**TAB 30:** USDC SDNY Docket Documents # 96, Kamdem-Ouaffo v. PepsiCo Inc. et Al., No. 14-cv-00227 (S.D.N.Y.). Internet Citation Note (2016-02-02) (01440353). 4 pages.

**TAB 31:** USDC SDNY Docket Documents # 98: Judgment of the USDC SDNY in the matter of Kamdem-Ouaffo v PepsiCo et al, 14 Civil 227 (KMK) dated 02/10/2016. 2 Pages.

**TAB 32:** USDC SDNY Docket Documents # 99: NOTICE OF APPEAL. 1 Page.

**TAB 33:** Akande v. U.S. Postal Serv., No. 12-cv-6034, 2013 WL 587204 (S.D.N.Y. Feb. 13, 2013). 3 Pages.

**TAB 34:** Lastra v. Barnes and Noble Bookstore, No. 11-cv-2173, 2012 WL 12876 (S.D.N.Y. Jan. 3, 2012). 8 pages.

**TAB 35:** Martinez v. O'Connell, No. 06-cv-0887, 2007 WL 189335 (N.D.N.Y. Jan. 22, 2007). 2 Pages.

**TAB 36:** Vlad-Berindan v. MTA New York City Transit, No. 14-cv-675, 2014 WL 6982929 (S.D.N.Y. Dec. 10, 2014). 10 pages.

TAB 1

CLOSED,APPEAL,ECF,PRO-SE

# U.S. District Court
# Southern District of New York (White Plains)
# CIVIL DOCKET FOR CASE #: 7:14-cv-00227-KMK

| | |
|---|---|
| Kamdem-Ouaffo v. Pepsico Inc. et al | Date Filed: 01/31/2014 |
| Assigned to: Judge Kenneth M. Karas | Date Terminated: 01/26/2016 |
| Case in other court: U.S. Court of Appeals, Federal Circuit, 16-01668 | Jury Demand: Plaintiff |
| Cause: 28:1331 Fed. Question: Other | Nature of Suit: 830 Patent |
| | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **PhD Ricky Kamdem-Ouaffo** | represented by | **Ricky Kamdem-Ouaffo**<br>1 Richmond Street<br>#2100<br>New Brunswick, NJ 08901<br>732-763-8622<br>Email: rickykamer@gmail.com<br>PRO SE |

V.

**Defendant**

| | | |
|---|---|---|
| **Pepsico Inc.**<br>*a Corporation* | represented by | **Robert Lawrence Maier**<br>Baker Botts LLP (NY)<br>30 Rockefeller Plaza<br>44th Floor<br>New York, NY 10112<br>Email: robert.maier@bakerbotts.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jennifer Cozeolino Tempesta**<br>Baker Botts LLP (NY)<br>30 Rockefeller Plaza<br>44th Floor<br>New York, NY 10112<br>(212)-408-2571<br>Fax: (212)-259-2571<br>Email:<br>jennifer.cozeolino@bakerbotts.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard Benjamin Harper**<br>Baker Botts L.L.P(NYC)<br>30 Rockefeller Plaza<br>New York, NY 10112 |

Fax: 212 259-2475
Email: richard.harper@bakerbotts.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Peter S. Given, Jr.** represented by **Robert Lawrence Maier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Cozeolino Tempesta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Benjamin Harper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Naijie Zhang** represented by **Robert Lawrence Maier**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Cozeolino Tempesta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Benjamin Harper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe and/or Jane Doe**

**Defendant**

**ScentSational Technologies LLC** represented by **Melvin C. Garner**
Leason Ellis LLP
One Barker Ave., Fifth Floor
White Plains, NY 10601
(914) 288-0022
Fax: (914) 288-0023
Email: garner@leasonellis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Sean Reuber**
Leason Ellis LLP
One Barker Ave., Fifth Floor

White Plains, NY 10601
(914) 288-0022
Fax: (914) 288-0023
Email: reuber@leasonellis.com
*ATTORNEY TO BE NOTICED*

**Joel Benjamin Rothman**
Seiden, Alder & Matthewman, P.A.
2300 Glades Road, Ste 340w
Boca Raton, FL 33431
(561)-416-0170
Fax: (561)-416-0171
Email: joel.rothman@sriplaw.com
*ATTORNEY TO BE NOTICED*

**Lauren Brette Sabol**
Leason Ellis LLP
One Barker Ave., Fifth Floor
White Plains, NY 10601
914-821-3088
Fax: 914-288-0023
Email: sabol@leasonellis.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven M. Landau** represented by **Melvin C. Garner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Sean Reuber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Brette Sabol**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2014 | 1 | COMPLAINT against Peter S. Given, Jr, John Doe and/or Jane Doe, Pepsico Inc., Naijie Zhang. (Filing Fee $ 350.00.)Document filed by Ricky Kamdem-Ouaffo. (laq) (laq). (Entered: 02/10/2014) |
| 01/31/2014 | | Case Designated ECF. (laq) (Entered: 02/10/2014) |
| 01/31/2014 | | Mailed notice to Commissioner of Patents and Trademarks to report the filing of this action. (laq) (Entered: 03/21/2014) |
| 01/31/2014 | | Case Eligible for Patent Pilot Program. (ky) (Entered: 06/04/2015) |

| | | |
|---|---|---|
| 02/13/2014 | 2 | LETTER from Ricky Kamdem-Ouaffo dated 2/10/2014 re: Please find enclosed three Summons that I prepared for the new complaint that has been assigned the above Civil Action No. Document filed by Ricky Kamdem-Ouaffo.(sac) (Entered: 02/13/2014) |
| 02/13/2014 | | SUMMONS ISSUED as to Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (sac) (Entered: 02/13/2014) |
| 03/05/2014 | | NOTICE OF CASE ASSIGNMENT to Judge Kenneth M. Karas. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 03/05/2014) |
| 03/05/2014 | | Magistrate Judge Lisa M. Smith is so designated. (pgu) (Entered: 03/05/2014) |
| 03/06/2014 | | Mailed notice re: Notice of Case Assignment/Reassignment to the Plaintiff(s) of record. (sbr) (Entered: 03/06/2014) |
| 03/14/2014 | 4 | NOTICE OF APPEARANCE by Robert Lawrence Maier on behalf of Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Maier, Robert) (Entered: 03/14/2014) |
| 03/14/2014 | 5 | NOTICE OF APPEARANCE by Richard Benjamin Harper on behalf of Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Harper, Richard) (Entered: 03/14/2014) |
| 03/14/2014 | 6 | NOTICE OF APPEARANCE by Jennifer Cozeolino Tempesta on behalf of Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Tempesta, Jennifer) (Entered: 03/14/2014) |
| 03/14/2014 | 7 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Pepsico Inc..(Maier, Robert) (Entered: 03/14/2014) |
| 03/14/2014 | 8 | LETTER MOTION for Conference addressed to Judge Kenneth M. Karas from Robert L. Maier dated March 14, 2014. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang.(Maier, Robert) (Entered: 03/14/2014) |
| 03/14/2014 | 9 | AMENDED COMPLAINT amending 1 Complaint against Peter S. Given, Jr, John Doe and/or Jane Doe, Pepsico Inc., Naijie Zhang with JURY DEMAND.Document filed by Ricky Kamdem-Ouaffo. Related document: 1 Complaint filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 03/17/2014) |
| 03/14/2014 | 10 | SUMMONS RETURNED EXECUTED. Summons and Complaint served. Pepsico Inc. served on 2/20/2014, answer due 3/13/2014. Service was accepted by Ms. M. Keeports. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 03/17/2014) |
| 03/14/2014 | 11 | SUMMONS RETURNED EXECUTED. Summons and Complaint served. Naijie Zhang served on 2/24/2014, answer due 3/17/2014. Service was accepted by Dr. Jaije Zhang. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 03/17/2014) |
| 03/14/2014 | 12 | AFFIRMATION OF SERVICE of Summons and Amended Complaint. Pepsico Inc. served on 3/13/2014, answer due 4/3/2014. Service was made by Overnight Express Mail. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 03/17/2014) |
| 03/18/2014 | 14 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, PhD dated 3/17/14 re: Plaintiff requests that the Court allow the judicial process to |

| | | |
|---|---|---|
| | | continue its normal course to the next step of discovery, interrogatories, depositions etc., so that the Court may have enough materials upon which to formulate just and equitable rulings or issue orders if need be. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 03/19/2014) |
| 03/20/2014 | 15 | PRO SE CONSENT TO RECEIVE ELECTRONIC SERVICE. The following party: Ricky Kamdem-Ouaffo, PhD consents to receive electronic service via the ECF system. Document filed by Ricky Kamdem-Ouaffo.(man) (Entered: 03/21/2014) |
| 03/20/2014 | 17 | AFFIDAVIT OF SERVICE of Summons & Complaint served on Dr. Peter S. Given, Jr. on 3/5/14 and 3/6//14. Service was made by Nail & Mail. On 3/6/14,deponent enclosed a copy of the Summons & Complaint to Dr. Peter S. Given Jr. at said defendant's actual place of residence/actual place of business, at 16 O'Neil Court, Ridgefield, CT 06877 in a 1st Class postpaid properly addressed envelope not indicating that the mailing was from an attorney or concerned legal action and marked "Personal & Confidential" in an official depository under the exclusive care and custody of the United States Post Office(signed by William Constantino). Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 03/21/2014) |
| 03/21/2014 | 16 | LETTER from Ricky Kamdem-Ouaffo, PhD dated 3/19/2014 re: I am writing this letter to bring to your attention that you made too many mistakes in entering the case information on the docket. Document filed by Ricky Kamdem-Ouaffo.(man) (Entered: 03/21/2014) |
| 03/24/2014 | 18 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 3/21/14 re: REQUEST FOR PERMISSION TO JOIN SCENTSATIONAL TECHNOLOGIES LLC AND STEVEN M. LANDAU OF SCENTSATIONAL TECHNOLOGIES LLC AS CO-DEFENDANTS IN THIS LAWSUIT. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 03/24/2014) |
| 03/26/2014 | 19 | LETTER MOTION for Conference re: 9 Amended Complaint addressed to Judge Kenneth M. Karas from Robert L. Maier dated March 26, 2014. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang.(Maier, Robert) (Entered: 03/26/2014) |
| 03/26/2014 | 20 | LETTER MOTION for Conference re: 18 Letter, addressed to Judge Kenneth M. Karas from Robert L. Maier dated March 26, 2014. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang.(Maier, Robert) (Entered: 03/26/2014) |
| 03/27/2014 | 21 | MEMO ENDORSEMENT on 19 LETTER MOTION for Conference re: 9 Amended Complaint addressed to Judge Kenneth M. Karas from Robert L. Maier dated March 26, 2014. ENDORSEMENT: The Court will hold a pre-motion conference on May 15, 2014, at 2:00. SO ORDERED. Pre-Motion Conference set for 5/15/2014 at 02:00 PM before Judge Kenneth M. Karas. (Signed by Judge Kenneth M. Karas on 3/27/2014) (lnl) (Entered: 03/28/2014) |
| 03/27/2014 | 22 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 3/27/14 re: SUPPLEMENTAL ANSWER TO THE DEFENDANT'S MARCH 14TH & 26TH 2014 LETTERS. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 03/31/2014) |

| | | |
|---|---|---|
| 03/31/2014 | 23 | SUMMONS RETURNED EXECUTED. Summons and Complaint served. Peter S. Given, Jr served on 3/17/2014, answer due 4/7/2014. Service was accepted by Erica Greenberg, Sr. Legal Assistant. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 04/02/2014) |
| 03/31/2014 | 24 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 3/28/14 re: REQUEST FOR THE UNITED STATES JUDGE'S PERMISSION TO INTRODUCE TO THE JUDGE "ACCUSATORY EVIDENCE" IN SUPPORT OF ANY JUDGE'S ORDER PURSUANT TO FRCP RULE 64 FOR THE ARREST OF DR. GIVEN AND DR. ZHANG BY THE FBI IN THE STATE OF CONNECTICUT OR ANY OTHER FEDERAL LAW ENFORCEMENT AUTHORITIES SO AS TO CAUSE THE DEFENDANTS' APPEARANCE BEFORE THE UNITED STATES COURT TO ANSWER THE COURT ABOUT ALLEGED OFFENSES COMMITTED IN THE MATTER WITHIN THE JURISDICTION OF THE EXECUTIVE BRANCH OF THE UNITED STATES. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 04/02/2014) |
| 04/03/2014 | 25 | LETTER addressed to Judge Kenneth M. Karas from Robert L. Maier dated April 3, 2014 re: Defendants Response to Plaintiffs March 28, 2014 Letter. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang.(Maier, Robert) (Entered: 04/03/2014) |
| 04/07/2014 | 26 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated, 4/4/14 re: REQUEST PURSUANT TO THE FEDERAL RULES OF CRIMINAL PROCEDURES RULE 3 & RULE 4.1 FOR THE APPOINTMENT OF A MAGISTRATE JUDGE TO HANDLE THE CRIMINAL ALLEGATIONS OF THE PLAINTIFF'S AMENDED COMPLAINT. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 04/09/2014) |
| 04/14/2014 | 28 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 4/11/2014 re: Plaintiff's Prima Facie Showing that the Defendants have no ground to argue "Res Judicata" in this Patent 35 U.S.C. lawsuit in regard to the occupational safety action brought against Pepsico under the labar laws of the State of New York. Document filed by Ricky Kamdem-Ouaffo.(sac) (Entered: 04/18/2014) |
| 04/16/2014 | 27 | CALENDAR NOTICE RESCHEDULING CONFERENCE: Please take notice that the action has been scheduled for a pre-motion conference before the Honorable Kenneth M. Karas, United States District Judge, on Thursday, May 15, 2014 at 2:00p.m. in Courtroom 521, U.S. District Court, 300 Quarropas Street, White Plains, New York 10601. The conference scheduled for Monday, April 21, 2014 is cancelled. Any scheduling difficulties must be brought to the attention of the Court in writing at least five business days beforehand. SO ORDERED. (Pre-Motion Conference set for 5/15/2014 at 02:00 PM in Courtroom 521, 300 Quarropas Street, White Plains, NY 10601 before Judge Kenneth M. Karas.) (Signed by Judge Kenneth M. Karas on 4/16/2014) (mml) (Entered: 04/16/2014) |
| 04/16/2014 | 29 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 4/15/2014 re: Additional Plaintiff's Prima Facie Showings that the Defendants have no ground to argue "Res Judicata" in this 35 U.S.C. - Patent Lawsuit in regard to the Occupational Safety and Labor Law action brought against PepsiCo under the Labor Laws of the State of New York. Document filed |

| | | |
|---|---|---|
| | | by Ricky Kamdem-Ouaffo.(sac) (Entered: 04/23/2014) |
| 04/24/2014 | 30 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 4/23/2014 re: Plaintiff's Pre-Motion Conference Concluding Remarks. Document filed by Ricky Kamdem-Ouaffo.(sac) (Entered: 04/28/2014) |
| 05/15/2014 | | Minute Entry for proceedings held before Judge Kenneth M. Karas: Pre-Motion Conference held on 5/15/2014. Plaintiff, pro se, appeared on his own behalf. Richard Harper, Robert Maier, Shannon Turner, and Charles Biener appeared on behalf of Defendants. The Court set a briefing schedule. See Order. (Court Reporter Angela O'Donnell) (lnl) (Entered: 05/21/2014) |
| 05/16/2014 | 31 | MOTION SCHEDULING ORDER: At the Pre-Motion Conference held before the Court on May 15, 2014, the Court adopted the following scheduling order: Defendants shall file their Motion To Dismiss no later than June 6, 2014. Plaintiff shall file his opposition papers no later than July 18, 2014. Defendants shall file their reply memorandum no later than August 8, 2014. Sur-reply papers will not be accepted unless prior permission of the Court is given. Counsel are reminded that there is a strict page limit, which will be extended only in extreme circumstances. Any pending deadlines found in the Federal Rules of Civil Procedure or in any applicable statute are hereby stayed until the date the motion is due. Courtesy copies are to be served upon counsel by the assigned date. One courtesy copy of all papers also shall be sent to this Court at the time they are served upon opposing counsel. If oral argument is requested, it may be scheduled by the Court. Please wait to hear from the Court to schedule argument. SO ORDERED. Motions due by 6/6/2014. Responses due by 7/18/2014. Replies due by 8/8/2014. (Signed by Judge Kenneth M. Karas on 5/16/2014) (lnl) (Entered: 05/16/2014) |
| 05/16/2014 | | Transmission to Docket Assistant Clerk. Transmitted re: 31 MOTION SCHEDULING ORDER, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 05/16/2014) |
| 05/16/2014 | | Mailed a copy of 31 Scheduling Order, to Ricky Kamdem-Ouaffo 1 Richmond Street #3038 New Brunswick, NJ 08901. (ca) (Entered: 05/16/2014) |
| 06/05/2014 | 32 | TRANSCRIPT of Proceedings re: premotion conference held on 5/15/2014 before Judge Kenneth M. Karas. Court Reporter/Transcriber: Angela O*Donnell, (914) 390-4025. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/30/2014. Redacted Transcript Deadline set for 7/10/2014. Release of Transcript Restriction set for 9/8/2014.(O'Donnell, Angela) (Entered: 06/05/2014) |
| 06/05/2014 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a premotion conference proceeding held on 05/15/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(O'Donnell, Angela) (Entered: 06/05/2014) |

| | | |
|---|---|---|
| 06/06/2014 | 34 | MOTION to Dismiss *for Failure to State a Claim*. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Attachments: # 1 Text of Proposed Order) (Maier, Robert) (Entered: 06/06/2014) |
| 06/06/2014 | 35 | MEMORANDUM OF LAW in Support re: 34 MOTION to Dismiss *for Failure to State a Claim*. . Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Maier, Robert) (Entered: 06/06/2014) |
| 06/06/2014 | | *****STRICKEN DOCUMENT. Deleted document number 36 from the case record. The document was stricken from this case pursuant to 38 Endorsed Letter,,. (lnl)** (Entered: 06/10/2014) |
| 06/09/2014 | 37 | DECLARATION of Jennifer C. Tempesta in Support re: 34 MOTION to Dismiss *for Failure to State a Claim*.. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Attachments: # 1 Exhibit 1 to Tempesta Declaration, # 2 Exhibit 2 to Tempesta Declaration, # 3 Exhibit 3 to Tempesta Declaration)(Tempesta, Jennifer) (Entered: 06/09/2014) |
| 06/09/2014 | 38 | ENDORSED LETTER addressed to Judge Kenneth M. Karas from Robert L. Maier, dated 6/9/2014, re: Counsel for the Defendants PepsiCo., Inc., Dr. Peter Given and Dr. Naijie Zhang writes to request that the entire declaration (and exhibits) be removed from the docket. Defendants plan to re-filed via ECF the declaration in support of Defendants' motion, with a redacted version of Exhibit 1, a copy of which is enclosed. ENDORSEMENT: Granted. So Ordered. (Signed by Judge Kenneth M. Karas on 6/9/2014) (lnl) (Entered: 06/10/2014) |
| 06/09/2014 | | Transmission to Docket Assistant Clerk. Transmitted re: 38 Endorsed Letter, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 06/10/2014) |
| 06/10/2014 | | Mailed a copy of 38 Endorsed Letter, to Ricky Kamdem-Ouaffo 1 Richmond Street #3038 New Brunswick, NJ 08901 (nt) (Entered: 06/10/2014) |
| 07/02/2014 | 39 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 7/2/14 re: Plaintiff writes to the Court that, in case it happens that the Court has a limit on the number of pages for an Affidavit, he requests that it would accept this letter as his request to file an affidavit of about thirty(30) pages; and that he would like to inform the Court that he has come to a final conclusion that he has to sue ScentSational Technologies LLC and Steven Landau. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 07/07/2014) |
| 07/08/2014 | 40 | MEMO ENDORSEMENT on 39 LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 7/2/14 re: Plaintiff writes to the Court that, in case it happens that the Court has a limit on the number of pages for an Affidavit, he requests that it would accept this letter as his request to file an affidavit of about thirty(30) pages; and that he would like to inform the Court that he has come to a final conclusion that he has to sue ScentSational Technologies LLC and Steven Landau. ENDORSEMENT: Plaintiff may submit his 30-page affidavit, if that is what he believes is necessary. As for the Joinder issue, the Court will not tell Plaintiff how to litigate his case. So Ordered. (Signed by Judge Kenneth M. Karas on 7/8/2014) (lnl) (Entered: 07/09/2014) |
| 07/08/2014 | | Transmission to Docket Assistant Clerk. Transmitted re: 40 Memo Endorsement, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 07/09/2014) |

| | | |
|---|---|---|
| 07/09/2014 | | Mailed a copy of 40 Memo Endorsement, to Ricky Kamdem-Ouaffo 1 Richmond Street #3038 New Brunswick, NJ 08901 (nt) (Entered: 07/09/2014) |
| 07/09/2014 | 41 | NOTICE OF COUNTERCLAIM PURSUANT TO THE FED. RULE CIV. PROC. RULE 13(C) IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS. Document filed by Ricky Kamdem-Ouaffo. (sac) (Entered: 07/16/2014) |
| 07/09/2014 | 42 | AFFIDAVIT of Ricky Kamdem-Ouaffo in Support re: 41 NOTICE OF COUNTERCLAIM PURSUANT TO THE FED. RULE CIV. PROC. RULE 13(C) IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS. Document filed by Ricky Kamdem-Ouaffo. (sac) (Entered: 07/16/2014) |
| 07/09/2014 | 43 | MEMORANDUM OF LAW in Support re: 41 NOTICE OF COUNTERCLAIM PURSUANT TO THE FED. RULE CIV. PROC. RULE 13(C) IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS. Document filed by Ricky Kamdem-Ouaffo. (sac) (Additional attachment(s) added on 7/16/2014: # 1 Proposed Amended Complaint, # 2 Exhibit No. 5 Part 1, # 3 Exhibit No. 5 Part 2, # 4 Exhibit No. 5 Part 3, # 5 Exhibit No. 5 Part 4, # 6 Exhibit No. 5 Part 5, # 7 Exhibit No. 6 Part 1, # 8 Exhibit No. 6 Part 2, # 9 Exhibit No. 6 Part 3, # 10 Exhibit No. 6 Part 4, # 11 Exhibit No. 7 Part 1, # 12 Exhibit No. 7 Part 2) (sac). (Entered: 07/16/2014) |
| 07/10/2014 | 44 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 7/9/2014 re: Please find enclosed for ECF filing the Plaintiff's Proposed Order granting the Plaintiff's Counterclaim. Document filed by Ricky Kamdem-Ouaffo. (Attachments: # 1 Proposed Order)(sac) (Entered: 07/16/2014) |
| 07/18/2014 | 45 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 7/14/2014 re: Pursuant to your pre-motion conference Order and to your Individual rule of practice, enclosed are the papers that I have prepared to counterclaim and to oppose the Defendants' motion to dismiss. Document filed by Ricky Kamdem-Ouaffo.(sac) (Entered: 07/21/2014) |
| 08/08/2014 | 46 | REPLY MEMORANDUM OF LAW in Support re: 34 MOTION to Dismiss *for Failure to State a Claim*. . Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Maier, Robert) (Entered: 08/08/2014) |
| 08/14/2014 | 47 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 8/11/2014 re: Plaintiff's proposed talking points in case of Court Ordered oral argument on the Plaintiff's Counterclaim to Defendants' Motion to dismiss. Document filed by Ricky Kamdem-Ouaffo.(sac) (Entered: 08/18/2014) |
| 12/01/2014 | 48 | ENDORSED LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 11/19/2014, re: Plaintiff writes to disclose the name of the FBI investigator. ENDORSEMENT: The Clerk of the Court is respectfully requested to docket this letter. So Ordered. (Signed by Judge Kenneth M. Karas on 12/1/2014) (lnl) (Entered: 12/01/2014) |
| 12/01/2014 | | Transmission to Docket Assistant Clerk. Transmitted re: 48 Endorsed Letter, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 12/01/2014) |

| | | |
|---|---|---|
| 12/01/2014 | | Mailed a copy of 48 Endorsed Letter, to Ricky Kamdem-Ouaffo 1 Richmond Street #3038 New Brunswick, NJ 08901. (soh) (Entered: 12/01/2014) |
| 12/05/2014 | 49 | SEALED DOCUMENT placed in vault.(Clark, Walter) (Entered: 12/05/2014) |
| 03/09/2015 | 50 | OPINION & ORDER: Defendants' Motion To Dismiss is granted. Plaintiff's First Amended Complaint is dismissed without prejudice. Plaintiff may file a Second Amended Complaint within thirty days that specifically addresses the deficiencies identified in this Opinion. Also, Plaintiff may renew his request to join Scentsational Technologies LLC and Steven M. Landau and file claims against them. The Clerk of the Court is respectfully requested to terminate the pending Motion (Dkt. No. 34). SO ORDERED. (Signed by Judge Kenneth M. Karas on 3/9/2015) (lnl) (Entered: 03/09/2015) |
| 03/09/2015 | | Transmission to Docket Assistant Clerk. Transmitted re: 50 OPINION & ORDER, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 03/09/2015) |
| 03/09/2015 | | Mailed a copy of 50 Memorandum & Opinion, to Ricky Kamdem-Ouaffo 1 Richmond Street #3038 New Brunswick, NJ 08901. (soh) (Entered: 03/09/2015) |
| 03/09/2015 | 97 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 50 Memorandum & Opinion. (Attachments: # 1 Citation 1, # 2 Citation 2) (vf) (Entered: 02/02/2016) |
| 03/25/2015 | 51 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo dated 3/23/2015 re: with Plaintiff's Second Amended Complaint Pursuant to Court 3/9/2015 Court Order - Pleading in the Alternative Pursuant to Fed. R. Civ. P. Rule 8(d). Document filed by Ricky Kamdem-Ouaffo.(sac) (Entered: 03/26/2015) |
| 03/25/2015 | 52 | SECOND AMENDED COMPLAINT amending 9 Amended Complaint against Peter S. Given, Jr, John Doe and/or Jane Doe, Pepsico Inc., Naijie Zhang, ScentSational Technologies LLC, Steven M. Landau with JURY DEMAND.Document filed by Ricky Kamdem-Ouaffo. Related document: 9 Amended Complaint filed by Ricky Kamdem-Ouaffo. (Attachments: # 1 Main Document)(sac) (Entered: 03/26/2015) |
| 03/25/2015 | | SUMMONS ISSUED as to Steven M. Landau, ScentSational Technologies LLC. (sac) (Entered: 03/26/2015) |
| 04/03/2015 | 53 | MEMO ENDORSEMENT on re: 51 Letter, filed by Ricky Kamdem-Ouaffo. ENDORSEMENT: Defendants are directed to respond to this letter by April 16, 2015. (Signed by Judge Kenneth M. Karas on 4/3/2015) (rj) (Entered: 04/03/2015) |
| 04/03/2015 | | Transmission to Docket Assistant Clerk. Transmitted re: 53 Memo Endorsement, to the Docket Assistant Clerk for case processing. (rj) (Entered: 04/03/2015) |
| 04/08/2015 | 54 | SUMMONS RETURNED EXECUTED. Summons and Amended Complaint served. ScentSational Technologies LLC served on 4/3/2015, answer due 4/24/2015. Service was accepted by Steven M. Landau, Company. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 04/13/2015) |
| 04/08/2015 | 55 | SUMMONS RETURNED EXECUTED. Summons and Amended Complaint served. Steven M. Landau served on 4/3/2015, answer due 4/24/2015. Service was accepted by Steven M. Landau, personally. Document filed by Ricky Kamdem- |

| | | |
|---|---|---|
| | | Ouaffo. (sc) (Entered: 04/13/2015) |
| 04/13/2015 | 56 | LETTER MOTION for Conference re: 53 Memo Endorsement addressed to Judge Kenneth M. Karas from Robert L. Maier dated April 13, 2015. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang.(Maier, Robert) (Entered: 04/13/2015) |
| 04/15/2015 | 57 | LETTER MOTION for Conference re: 53 Memo Endorsement addressed to Judge Kenneth M. Karas from Melvin C. Garner dated 04/15/2015. Document filed by Steven M. Landau, ScentSational Technologies LLC.(Garner, Melvin) (Entered: 04/15/2015) |
| 04/15/2015 | 58 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamden-Ouaffo dated 4/13/15 re: REPLY TO THE DEFENDANTS' 4/13/15 LETTER REQUESTING A PRE-MOTION CONFERENCE. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 04/17/2015) |
| 04/15/2015 | 59 | LETTER from Ricky Kamden-Ouaffo dated 4/14/15 re: REQUEST FOR JUDICIAL NOTICE PURSUANT TO THE FEDERAL RULES OF EVIDENCE RULE 201. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 04/17/2015) |
| 04/20/2015 | 60 | MEMO ENDORSEMENT granting ( 57 in Case No. 14-cv-227) LETTER MOTION for Conference re: 53 Memo Endorsement addressed to Judge Kenneth M. Karas from Melvin C. Garner dated 04/15/2015. ENDORSEMENT: Those who wish to move to dimiss Mr. Kamdem-Ouaffo's Second Amended Complaint may file, if they have not already, a pre-motion letter by April 30, 2015. Mr. Kamdam-Ouaffo is to respond by May 7, 2015. The Court will hold a pre-motion conference on May 14, 2015, at 3:30. So Ordered. (Pre-Motion Conference set for 5/14/2015 at 03:30 PM before Judge Kenneth M. Karas) (Signed by Judge Kenneth M. Karas on 4/17/2015) (lnl) (Entered: 04/20/2015) |
| 04/20/2015 | 61 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, PhD, dated 4/15/15 re: REQUEST FOR JUDICIAL NOTICE OF NY CPLR 203(g) PURSUANT TO THE FED. RULES OF EVIDENCE RULE 201. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 04/21/2015) |
| 04/20/2015 | | Transmission to Docket Assistant Clerk. Transmitted re: 60 MEMO ENDORSEMENT, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 04/21/2015) |
| 04/21/2015 | 62 | NOTICE OF APPEARANCE by Joel Benjamin Rothman on behalf of ScentSational Technologies LLC. (Rothman, Joel) (Entered: 04/21/2015) |
| 04/21/2015 | 63 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, PhD., dated 4/15/15 re: RESPONSE & OPPOSITION TO SCENTSATIONAL TECHNOLOGIES DEFENDANTS 4/15/2015 LETTER. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 04/22/2015) |
| 04/22/2015 | 64 | NOTICE OF APPEARANCE by Lauren Brette Sabol on behalf of Steven M. Landau, ScentSational Technologies LLC. (Sabol, Lauren) (Entered: 04/22/2015) |
| 04/22/2015 | 65 | NOTICE OF APPEARANCE by Cameron Sean Reuber on behalf of Steven M. Landau, ScentSational Technologies LLC. (Reuber, Cameron) (Entered: 04/22/2015) |

| | | |
|---|---|---|
| 04/22/2015 | 66 | LETTER addressed to Judge Kenneth M. Karas from Robert L. Maier dated 4.22.2015 re: Opposition to Plaintiff's Request for Judicial Notice of 28 U.S.C. § 1338(a). Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang.(Maier, Robert) (Entered: 04/22/2015) |
| 04/24/2015 | 67 | ENDORSED LETTER addressed to Dawn Bordes from Ricky Kamden-Ouaffo, dated 4/24/2015, re: Counsel writes to request to appear by phone at the May 14, 2015 pre-motion conference; for the reasons set forth in this letter. ENDORSEMENT: Plaintiff may appear by telephone, this one time, at the May 14 conference. So Ordered. (Signed by Judge Kenneth M. Karas on 4/24/2015) (lnl) (Entered: 04/27/2015) |
| 04/24/2015 | | Transmission to Docket Assistant Clerk. Transmitted re: 67 Endorsed Letter, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 04/27/2015) |
| 04/30/2015 | 68 | LETTER addressed to Judge Kenneth M. Karas from Melvin C. Garner dated April 30, 2015 re: Pre-Motion Letter re Dismissing Second Amended Complaint. Document filed by Steven M. Landau, ScentSational Technologies LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Garner, Melvin) (Entered: 04/30/2015) |
| 05/05/2015 | 69 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 5/1/15 re: PLAINTIFF'S RESPONSE TO THE PEPSICO DEFENDANTS' PRE-MOTION LETTERS AND REQUEST FOR ADJUDICATION OF PLAINTIFF'S FIRST CAUSE OF ACTION OF THE PLAINTIFF'S SAC AS IF UNOPPOSED. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 05/08/2015) |
| 05/05/2015 | 70 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 5/2/15 re: PLAINTIFF'S RESPONSE TO SCENTSATIONAL DEFENDANTS' PRE-MOTION LETTERS & AGREEMENTS. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 05/08/2015) |
| 05/11/2015 | 71 | ENDORSED LETTER addressed to Dawn Bordes from Ricky Kamden-Ouaffo, dated 5/10/2015, re: Plaintiff writes : I am the Plaintiff in the above caption case. I writing with respect to the May 14th 2015 pre-motion conference that Hon. Karas recently Ordered. In response to my April 14th 2015 letter, the Judge Ordered that Plaintiff may appear by phone for the pre-motion conference (see Dkt # 67). Unfortunately one of my co-coworkers in the Quality Control Unit has been called earlier for a scheduled surgery and the Company asked me to fill in for him for the next six weeks. The work flow in that Unit would not allow me to have more than 15 minutes for a quiet break where I could argue my points on the Phone. Because of this new development it is not realistic for me to think that I will be able appear by phone in the May 14th, 2015 conference. It is my understanding from our Phone conversation last Friday that the Judge would want each party to appear and that I might have to ask for an adjournment. In case that is the only option left, then please consider this letter as my request for a 3 months adjournment. ENDORSEMENT: Because of Mr. Kamdem-Ouaffo's unavailability for a pre-motion conference for the next several months, the Court will set a briefing schedule. Movant's motion to dismiss is due June 15, 2015, Mr. Kamdem-Ouaffo's response is due July 15, 2015; Movants' reply is due by July 29, 2015. No extensions will be granted. The pre-motion conference is canceled. So Ordered. |

| | | |
|---|---|---|
| | | (Motions due by 6/15/2015. Responses due by 7/15/2015. Replies due by 7/29/2015.) (Signed by Judge Kenneth M. Karas on 5/11/2015) (lnl) (Entered: 05/11/2015) |
| 05/11/2015 | | Transmission to Docket Assistant Clerk. Transmitted re: 71 Endorsed Letter, to the Docket Assistant Clerk for case processing. (lnl) (Entered: 05/11/2015) |
| 06/15/2015 | 72 | MOTION to Dismiss *Plaintiff's Second Amended Complaint*. Document filed by Steven M. Landau, ScentSational Technologies LLC. Responses due by 7/15/2015(Garner, Melvin) (Entered: 06/15/2015) |
| 06/15/2015 | 73 | MEMORANDUM OF LAW in Support re: 72 MOTION to Dismiss *Plaintiff's Second Amended Complaint*. . Document filed by Steven M. Landau, ScentSational Technologies LLC. (Garner, Melvin) (Entered: 06/15/2015) |
| 06/15/2015 | 74 | DECLARATION of Melvin C. Garner in Support re: 72 MOTION to Dismiss *Plaintiff's Second Amended Complaint*.. Document filed by Steven M. Landau, ScentSational Technologies LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Garner, Melvin) (Entered: 06/15/2015) |
| 06/15/2015 | 75 | MOTION to Dismiss *Plaintiff's Second Amended Complaint*. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Attachments: # 1 Text of Proposed Order)(Maier, Robert) (Entered: 06/15/2015) |
| 06/15/2015 | 76 | MEMORANDUM OF LAW in Support re: 75 MOTION to Dismiss *Plaintiff's Second Amended Complaint*. . Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Maier, Robert) (Entered: 06/15/2015) |
| 06/15/2015 | 77 | DECLARATION of Jennifer C. Tempesta in Support re: 75 MOTION to Dismiss *Plaintiff's Second Amended Complaint*.. Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Attachments: # 1 Exhibit 1 to Tempesta Declaration, # 2 Exhibit 2 to Tempesta Declaration (Part 1 of 2), # 3 Exhibit 2 to Tempesta Declaration (Part 2 of 2), # 4 Exhibit 3 to Tempesta Declaration, # 5 Exhibit 4 to Tempesta Declaration)(Tempesta, Jennifer) (Entered: 06/15/2015) |
| 07/15/2015 | 78 | NOTICE of Cross Motion Pursuant to the Fed. Rule Civ. Proc. Rule 24(a) & 42 (a) and in Support of the Denial of the Defendants' Motion to Dismiss. Document filed by Ricky Kamdem-Ouaffo. (rdz) (Entered: 07/20/2015) |
| 07/15/2015 | 79 | AFFIDAVIT of Ricky Kamden in Support 1)the Denial of Defendants Motion 2) Application for Intervention Pursuant to the Fed. R. Civ. P. Rule 24. Document filed by Ricky Kamdem-Ouaffo. (Attachments: # 1 Exhibit, # 2 Exhibit)(rdz) (Entered: 07/20/2015) |
| 07/20/2015 | 80 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamden-Ouaffo dated 7/12/2015 re: Pursuant to your pre-motion conference Order and to your Individual rule of practice, enclosed are the papers that I have prepared to oppose and cross motion the Defendants' motion to dismiss Plaintiff's SAC.. Document filed by Ricky Kamdem-Ouaffo.(rdz) (Entered: 07/20/2015) |
| 07/21/2015 | 81 | MOTION to Amend Complaint. Document filed by Ricky Kamdem-Ouaffo. (Attachments: # 1 Proposed Amended Complaint pt. 1, # 2 Proposed Amended Complaint pt 2, # 3 Proposed Order)(rdz) (Entered: 07/22/2015) |
| 07/21/2015 | 82 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, |

| | | |
|---|---|---|
| | | Ph.D., dated 7/12/15 re: PLAINTIFF'S CROSS-MOTION AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 07/22/2015) |
| 07/21/2015 | 83 | AFFIDAVIT OF RICK KAMDEM IN SUPPORT OF 1)THE DENIAL OF DEFENDANTS MOTION TO DISMISS PLAINTIFF'S SAC, 2) APPLICATION FOR INTERVENTION PURSUANT TO THE FED.R.CIV.P. RULE 24 AND/OR CONSOLIDATION PURSUANT TO FED.R.CIV. RULE 42 IN ACTION DOCKET #13-CV-08645. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 07/22/2015) |
| 07/21/2015 | 84 | NOTICE OF CROSS-MOTION PURSUANT TO THE FED.RULE CIV.PROC. RULE 24(a) & 42(a) AND IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 07/22/2015) |
| 07/21/2015 | 85 | MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR INTERVENTION PURSUANT TO THE FED.R.CIV.P. RULE 24(a) AND/OR CONSOLIDATION PURSUANT TO FED.R.CIV. RULE 42(a)IN ACTION DOCKET # 13-CVI-08645. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 07/22/2015) |
| 07/21/2015 | 86 | MEMORANDUM OF LAW IN SUPPORT OF THE DENIAL OF THE PEPSICO DEFENDANTS' MOTION TO DISMISS. Document filed by Ricky Kamdem-Ouaffo. (sc) (Entered: 07/22/2015) |
| 07/29/2015 | 87 | REPLY MEMORANDUM OF LAW in Support re: 72 MOTION to Dismiss *Plaintiff's Second Amended Complaint*. . Document filed by Steven M. Landau, ScentSational Technologies LLC. (Garner, Melvin) (Entered: 07/29/2015) |
| 07/29/2015 | 88 | REPLY MEMORANDUM OF LAW in Support re: 75 MOTION to Dismiss *Plaintiff's Second Amended Complaint*. . Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Maier, Robert) (Entered: 07/29/2015) |
| 07/29/2015 | 89 | MEMORANDUM OF LAW in Opposition re: 84 MOTION PURSUANT TO THE FED.RULECIV.PROC. RULE 24(a) & 42(a) AND IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS. . Document filed by Peter S. Given, Jr, Pepsico Inc., Naijie Zhang. (Maier, Robert) (Entered: 07/29/2015) |
| 08/04/2015 | 90 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 8/1/15 re: REQUEST FOR JUDICIAL NOTICE OF THE 35:118 WITH RESPECT TO PEPSICO DEFENDANTS' VILE, CONFUSED & SELF-DEFEATING MOTION ARGUMENTS/ REQUEST FOR JUDICIAL NOTICE FOR THE FED.R.CIV.PROC. RULE 12(e) WITH RESPECT TO SCENTSATIONAL TECHNOLOGIES DEFENDANTS' FAILING LEGAL STRATEGIES. Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 08/05/2015) |
| 08/05/2015 | 91 | PRO SE MEMORANDUM(Letter) dated 8/1/15 re: CHANGE OF ADDRESS for Ricky Kamdem-Ouaffo. New Address: 1 Richmond Street, #2100, New Brunswick, New Jersey, 08901. (sc) (Entered: 08/06/2015) |
| 10/05/2015 | 93 | ENDORSED LETTER addressed to Ms. Dawn Bordes Courtroom Deputy |

| | | |
|---|---|---|
| | | Clerkfrom Ricky Kamdem-Ouaffo dated 10/4/2015 re: I apologize for any inconvenience but this is a time for sensitive material that I should have submitted to Hon. Karas in Support of my opposition to Defendants' motion to dismiss. ENDORSEMENT: The Clerk of the Court is respectfully requested to docket this letter. (Signed by Judge Kenneth M. Karas on 10/5/2015) (rj) (Entered: 10/16/2015) |
| 10/07/2015 | 92 | LETTER addressed to Judge Kenneth M. Karas from Ricky Kamdem-Ouaffo, dated 10/4/15 re: REQUEST FOR JUDICIAL NOTICE DEFENDANTS ATTORNEYS "AFFIRMATION IN OPPOSITION TO THE CROSS-MOTION OF THE APPELLANT TO STRIKE PLEADINGS ETC. WITH ATTORNEY CERTIFICATION." Document filed by Ricky Kamdem-Ouaffo.(sc) (Entered: 10/09/2015) |
| 01/26/2016 | 94 | OPINION & ORDER re: 84 MOTION PURSUANT TO THE FED.RULE CIV.PROC. RULE 24(a) & 42(a) AND IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS. filed by Ricky Kamdem-Ouaffo. Plaintiff's Motion to Intervene and/or Consolidate is denied.The Clerk of the Court is respectfully requested to terminate the pending Motion. (Dkt. No. 84.) So Ordered. (Signed by Judge Kenneth M. Karas on 1/26/16) (yv) (Entered: 01/26/2016) |
| 01/26/2016 | 95 | OPINION & ORDER re: 72 MOTION to Dismiss *Plaintiff's Second Amended Complaint*. filed by ScentSational Technologies LLC, Steven M. Landau, 75 MOTION to Dismiss *Plaintiff's Second Amended Complaint*. filed by Peter S. Given, Jr., Naijie Zhang, Pepsico Inc. Defendants' Motions To Dismiss are granted, and Plaintiff's Second Amended Complaint is dismissed with prejudice. The Clerk of the Court is respectfully requested to terminate the pending Motions, (see Dkt. Nos. 72, 75), and close the case. So Ordered. (Signed by Judge Kenneth M. Karas on 1/26/16) (yv) (Entered: 01/27/2016) |
| 01/26/2016 | 96 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 95 Memorandum & Opinion. (vf) (Entered: 02/02/2016) |
| 02/10/2016 | | Transmission to Judgments and Orders Clerk. Transmitted re: 95 Memorandum & Opinion, to the Judgments and Orders Clerk. (yv) (Entered: 02/10/2016) |
| 02/10/2016 | 98 | CLERK'S JUDGMENT: It is, ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated January 26, 2016, Defendants' Motions to Dismiss are granted, and Plaintiff's Second Amended Complaint is dismissed with prejudice; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 02/10/2016) (Attachments: # 1 Right to Appeal, # 2 Right to Appeal) The Clerks Office Has Mailed Copies. (km) (Entered: 02/10/2016) |
| 03/08/2016 | 99 | NOTICE OF APPEAL TO THE FEDERAL CIRCUIT from 98 Clerk's Judgment. Form 7 and Form 22 are due within 14 days. Document filed by Ricky Kamdem-Ouaffo. (tp) (Entered: 03/09/2016) |
| 03/08/2016 | | Appeal Fee Due: for 99 Notice of Appeal to the Federal Circuit. Appeal fee due by 3/22/2016. (tp) (Entered: 03/09/2016) |
| 03/09/2016 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US |

| | | |
|---|---|---|
| | | Court of Appeals re: 99 Notice of Appeal to the Federal Circuit. (tp) (Entered: 03/09/2016) |
| 03/09/2016 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 99 Notice of Appeal to the Federal Circuit filed by Ricky Kamdem-Ouaffo were transmitted to the U.S. Court of Appeals. (tp) (Entered: 03/09/2016) |
| 03/09/2016 | 100 | NOTICE OF DOCKETING & USCA Case Number 16-1668 from the U.S. Court of Appeals, Federal Circuit assigned to 99 Notice of Appeal to the Federal Circuit filed by Ricky Kamdem-Ouaffo. (nd) (Entered: 03/09/2016) |
| 03/22/2016 | | USCA Federal Circuit Appeal Fees received $ 505.00 receipt number 465401148637 on 3/16/2016 at 10:27am re: 99 Notice of Appeal to the Federal Circuit filed by Ricky Kamdem-Ouaffo. (tp) (Entered: 03/22/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/07/2016 11:36:04 | | | |
| **PACER Login:** | le1982:3428528:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:14-cv-00227-KMK |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

TAB 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SCENTSATIONAL TECHNOLOGIES, LLC,

*Plaintiff,*

-v-

PEPSICO, INC., PEPSI-COLA TECHNICAL OPERATIONS, INC., THE QUAKER OATS COMPANY, STOKELY-VAN CAMP, INC., and TROPICANA PRODUCTS, INC.,

*Defendants.*

Civil Action No.: 13-cv-8645

**AMENDED COMPLAINT**

For its Amended Complaint against Defendants, PepsiCo, Inc., Pepsi-Cola Technical Operations, Inc., The Quaker Oats Company, Stokely-Van Camp, Inc., and Tropicana Products, Inc. (collectively, "Defendants" or "PepsiCo"), Plaintiff, ScentSational Technologies, LLC ("Plaintiff" or "ScentSational"), by and through its undersigned counsel, hereby alleges as follows:

**NATURE OF THE CASE**

1. This action is for (i) misappropriation of trade secrets; (ii) breach of contract; (iii) unfair competition; (iv) unjust enrichment; (v) the imposition of constructive trusts upon certain patent applications and an issued patent; and (vi) the correction of inventorship of an issued patent.

2. This action arises from Defendants' misappropriation, disclosure and use of Plaintiff's trade secrets and other confidential information to pursue and obtain patents for Defendants' benefit, thereby violating Defendants' duties of trust and confidence arising from

the parties' nearly decade-long confidential relationship, as well as in derogation of Defendants' contractual obligations arising from the parties' written confidentiality agreements.

**THE PARTIES**

3. Plaintiff ScentSational is a limited liability company organized and existing under the laws of the State of Pennsylvania, with its principal place of business in Jenkintown, Pennsylvania. All of ScentSational's members are citizens of the State of Pennsylvania.

4. Defendant PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its headquarters in Purchase, New York.

5. Defendant Pepsi-Cola Technical Operations, Inc. ("PepsiCo Tech") is a Delaware corporation and a subsidiary of PepsiCo, with its headquarters in Purchase, New York.

6. Defendant The Quaker Oats Company ("Quaker") is a New Jersey corporation and a subsidiary of PepsiCo, with its headquarters in Chicago, Illinois.

7. Defendant Stokely-Van Camp, Inc. ("Stokely") is an Indiana corporation and a subsidiary of PepsiCo, with its headquarters in Chicago, Illinois.

8. Defendant Tropicana Products, Inc. ("Tropicana") is a Delaware corporation and a subsidiary of PepsiCo, with its headquarters in Bradenton, Florida.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over the federal patent claim alleged in this action pursuant to 28 U.S.C. § 1331 and 1338(a).

10. This Court has subject matter jurisdiction over the non-federal claims alleged in this action, pursuant to 28 U.S.C. § 1367(a), because such claims are so related to the federal claim alleged in this action that they form part of the same case or controversy.

11. In the alternative, this Court has subject matter jurisdiction over the non-federal claims alleged in this action, pursuant to 28 U.S.C. § 1332(a), because complete diversity of

citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over PepsiCo, pursuant to NY CPLR § 301, because PepsiCo conducts business within the State of New York on a regular, systematic, and continuous basis from its corporate headquarters in this judicial district.

13. This Court has personal jurisdiction over PepsiCo Tech, pursuant to NY CPLR § 301, because PepsiCo Tech conducts business within the State of New York on a regular, systematic, and continuous basis from its corporate headquarters in this judicial district.

14. This Court has personal jurisdiction over Quaker, pursuant to NY CPLR § 302(a), because Quaker transacts and solicits business within the State of New York, including within this judicial district.

15. This Court has personal jurisdiction over Stokely, pursuant to NY CPLR § 302(a), because Stokely transacts and solicits business within the State of New York, including within this judicial district.

16. This Court has personal jurisdiction over Tropicana, pursuant to NY CPLR § 302(a), because Tropicana transacts and solicits business within the State of New York, including within this judicial district.

17. Venue is proper in this district, pursuant 28 U.S.C. § 1391(b)(2), because the collective wrongful acts of Defendants, as discussed, *infra*, occurred, in substantial part, in this judicial district.

18. In the alternative, venue is proper in this district, pursuant 28 U.S.C. § 1391(b)(3), because, as discussed, *supra*, Defendants are subject to personal jurisdiction in this judicial district.

19. The assignment of this action to the White Plains Courthouse is proper, pursuant to Rule 18(a)(i) of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, because (i) the causes of action asserted herein arose in whole or in major part in the State of New York, County of Westchester (*i.e.*, a "Northern County") and (ii) Defendants PepsiCo and PepsiCo Tech reside in Westchester County, as their corporate headquarters are located in Purchase, New York.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

**A. ScentSational's Business and Trade Secrets**

20. In 1997, Steven M. Landau ("Landau"), an inventor and successful entrepreneur, began extensive research and development to determine whether aromas could be applied to, or incorporated in, product packaging. Among other things, Landau wanted to determine whether it was possible to infuse a product's closure with aroma so that when a consumer drank from the closure, the release of aroma would cause the consumer to perceive the product as being sweeter and more flavorful than it actually was.

21. In 1997, Landau invented the concept of flavor modification using aroma delivery systems including, but not limited to, manufacturing aromatic product packaging for food and beverages ("Landau's 1997 Invention").

22. Landau incorporated ScentSational Products, Inc. on March 13, 1997, which is the predecessor corporation to Plaintiff ScentSational Technologies, LLC.

23. On or about August 6, 2002, Landau and Barry M. Edelstein ("Edelstein"), an investor and successful entrepreneur, formed Plaintiff, ScentSational Technologies, LLC. ScentSational owns all right, title, and interest in and to Landau's inventions including, but not limited to, Landau's 1997 Invention.

24. Together, Landau and Edelstein, on behalf of ScentSational, invested extensive time, research and development, skill, and labor to build upon Landau's 1997 Invention. Their efforts resulted in ScentSational's trade secret, proprietary technologies for the application, manufacture, and use of scented packaging to enhance a product's aroma and taste, thereby improving the consumer's experience.

25. ScentSational's trade secrets relevant to this action include, *inter alia*, proprietary methods for using (i) sweet aromas to convey the experience of sweetness to the consumer; (ii) fresh smelling top notes to convey freshness to the consumer; (iii) specific aromatic compounds to offset bitter and other unappealing tastes that the consumer would otherwise experience; (iv) aromatic flavors to enhance the overall consumer experience prior to and during consumption; and (v) scent on a package to allow aroma sampling at the shelf to influence consumer preference and purchasing behavior.

26. The illustrations below depict two examples of the general methodology underlying ScentSational's trade secret, encapsulated technologies:

27. ScentSational's trade secrets are highly valuable to ScentSational. Indeed, ScentSational is recognized as the industry leader with a proven track record of developing encapsulated aroma packaging technologies for food and beverage packaging.

28. The proprietary manufacturing processes, technologies, methodologies, consumer studies, and other commercial knowhow underlying ScentSational's trade secret encapsulated aroma technologies for food and beverage packaging used to induce olfactory enhancement in persons purchasing or consuming liquids or solids from a package or receptacle (including, but not limited to, beverages), discussed in paragraphs 20-26, *supra*, that existed prior to Defendants' unlawful disclosure and breach of contract will hereinafter be collectively referred to as "ScentSational's Trade Secret(s)."

29. The subset of ScentSational's Trade Secrets that Defendants unlawfully disclosed will hereinafter be collectively referred to as "ScentSational's Disclosed Trade Secret(s)."

30. ScentSational's Trade Secrets that have not been disclosed and remain proprietary, confidential and trade secrets of ScentSational will hereinafter be collectively referred to as "ScentSational's Current Trade Secret(s)."

31. At all times relevant to the instant action, ScentSational has maintained extensive safeguards to protect the secrecy of ScentSational's Trade Secrets including, but not limited to, requiring third-parties to execute detailed confidentiality agreements before disclosing its trade secrets.

32. ScentSational's Current Trade Secrets are unknown, both within and outside the relevant industry, and cannot be duplicated or acquired by third parties, unless disclosed by ScentSational pursuant to a written confidentiality agreement. As such, ScentSational's Current Trade Secrets will only be disclosed in the instant action pursuant to a protective order executed by the parties and any agreed-upon third parties, and So Ordered by the Court.

**B. ScentSational's Relationship With PepsiCo**

33. Articles have been published in the press about ScentSational's unique approach to enhancing the aroma and taste of foods and beverages with scented packaging (albeit without disclosing ScentSational's Trade Secrets or other confidential information).

34. These articles attracted the attention of consumer-packaged goods companies ("CPGs"). Indeed, following publication of the articles, ScentSational received a number of requests from CPGs to give presentations concerning the incorporation of ScentSational's Trade Secrets into certain CPGs' mass-produced goods. If a CPG showed interest, ScentSational and the CPG would sign a written confidentiality agreement prior to engaging in further discussions or development agreements.

35. One such CPG was PepsiCo. Unlike ScentSational, PepsiCo had achieved only limited success, if any, harnessing the power of smell. Among other things, PepsiCo's method of aroma release using encapsulates applied under a product's cap caused manufacturing challenges, along with unwanted premature release when the cap was applied.

36. Thus, beginning in or about 2001, PepsiCo turned to ScentSational to discuss, what PepsiCo led ScentSational to believe, was the commercialization and incorporation of ScentSational's Trade Secrets into PepsiCo's packaged products. In particular, beginning in January of 2001 ScentSational provided PepsiCo with samples of its trade secret aromas and held meetings with PepsiCo at which the secrets were discussed.

37. From 2001 to 2003 these contacts were governed by oral agreements before the meetings and before the samples were provided that the information was confidential to ScentSational and represented ScentSational's trade secrets, and were also governed by confidentiality agreements between ScentSational's strategic manufacturing and flavor house partners and PepsiCo.

38. For approximately the next decade, PepsiCo and ScentSational developed a confidential relationship, wherein PepsiCo presented ScentSational with at least six separate and distinct projects that proposed commercializing and incorporating ScentSational's Trade Secrets into PepsiCo's consumer packaged beverages including, but not limited to, coffee, sports drinks and orange juice. Over this period of time, there were more than 70 instances in which ScentSational provided PepsiCo with Trade Secret information and Trade Secret aroma samples, as well as many other communications between the parties.

39. As proposed by PepsiCo, the projects required ScentSational to disclose its Trade Secrets and other confidential information to PepsiCo and certain PepsiCo suppliers. Thus, PepsiCo and its subsidiaries, including Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana, entered into four written confidentiality agreements (the "CAs") with ScentSational (all of which were provided to ScentSational by PepsiCo) in order to obtain ScentSational's Trade Secrets and other confidential information with a view towards incorporating them into the aforementioned projects.

**i. The 2003 Confidentiality Agreement**

40. The first written confidentiality agreement was entered into on December 29, 2003, between "PEPSICO, INC., on behalf of Quaker, Stokely-Van Camp, Inc. and Tropicana Products, Inc., its affiliates and subsidiaries ('PEPSICO') and SCENTSATIONAL TECHNOLOGIES, LLC ('COMPANY')" (the "'03 CA"). A true and correct copy of the '03 CA is attached hereto as **Exhibit A**.

41. Pursuant to its essential terms:

> PEPSICO and COMPANY desire to work together to develop prototypes for applications using COMPANY'S technology for flavor incorporation in plastic materials for release in head space (the 'Project'). Both PEPSICO and COMPANY have certain information which they consider to be confidential

> and proprietary regarding the subject matter of the Project and it will be necessary for each party to disclose its confidential information to the other during the course of the Project. Exhibit A at ¶ 2.

42. Pursuant to its essential terms, "Confidential Information" under the '03 CA was defined as "any and all information disclosed by one party to the other in connection with the Project, whether disclosed in writing, orally, visually or by samples [...]." *Id.* at ¶ 3.

43. Pursuant to its essential terms, the parties agreed under the '03 CA that "[t]he recipient of Confidential Information agrees that Confidential Information disclosed to it hereunder shall be retained in confidence in the same manner used to protect its own confidentiality and trade secret rights and shall not be disclosed to others or used for purposes other than the Project." *Id.* at ¶ 4. [emphasis added].

44. The parties also agreed under the '03 CA that they would "limit disclosure of Confidential Information to those employees who are needed to accomplish the purpose stated above." *Id.* at ¶ 5.

45. Pursuant to its essential terms, the parties' obligations regarding Confidential Information under the '03 CA "survive[d] termination of th[e] Agreement." Specifically, the "recipient's obligations of confidentiality and non-use relating to product formulae, ingredients, trade secret or manufacturing know-how, will survive termination of this Agreement." *Id.* at ¶ 6. [emphasis added].

**ii. The 2004 Confidentiality Agreement**

46. The second written confidentiality agreement was entered into on December 8, 2004, between "PepsiCo, Inc. on behalf of itself and its subsidiaries and affiliates [...] and ScentSational Technologies, LLC" (the "'04 CA"). A true and correct copy of the '04 CA is attached hereto as **Exhibit B.**

47. The purpose of the '04 CA was for PepsiCo and ScentSational "to discuss matters respecting and to share data, information and materials regarding certain development initiatives and/or business plans and objectives, including specifically (but not limited to) Frappuccino and related products." Exhibit B at p.1.

48. Under the '04 CA, each party agreed that it would "accept in strict confidence any and all information disclosed or made available to it by the disclosing party, and w[ould] not disclose it to any third party or otherwise violate the terms hereof, directly or indirectly, without first obtaining the written consent of the disclosing party [...]." *Id.* at ¶ 1.

49. The parties also agreed under the '04 CA that they would "disclose the Information only to [their] employees on a need-to-know-basis who require the Information for the performance of their duties in connection with work or possible work together [...]." *Id.* at ¶ 3(ii).

50. Under the '04 CA, each party agreed "that no remedy at law for damages [would be] adequate to compensate for a breach of the provisions set forth in this Agreement and that the party injured by such breach shall be entitled to temporary or permanent injunctive relief against any such breach." *Id.* at ¶ 4.

51. Pursuant to the '04 CA:

> Each receiving party acknowledges that the <u>Information disclosed by a disclosing party is the confidential and proprietary information and property of the disclosing party, and that the receiving party does not have, and nothing herein shall be construed to imply, any claim, right, title, property or other interest or license of any kind or nature in the Information</u>. <u>Each receiving party shall hold and maintain the Information disclosed by the disclosing party hereunder in confidence and trust for the sole and exclusive benefit of the disclosing party, and shall not use the Information for its own benefit or for the benefit of any third party</u>.

*Id.* at ¶ 5 [emphasis added].

52. Pursuant to the '04 CA, "[t]he obligations undertaken under this Agreement shall be effective retroactively to the date any Information was first disclosed, made available or provided by a disclosing party to the receiving party." *Id.* at ¶ 7.

**iii. The 2005 Confidentiality Agreement**

53. The third written confidentiality agreement was entered into on July 26, 2005, between "Pepsi-Cola Technical Operations, Inc. ('PEPSI') and ScentSational Technologies, LLC [....] ('Company')" (the "'05 CA"). A true and correct copy of the '05 CA is attached hereto as **Exhibit C**.

54. The '05 CA indicated that that:

> PEPSI is in the business of developing, packaging for manufacture and marketing food products, including, without limitation, beverage, snack, cereal, grain and other food products. PEPSI and Company are interested in working together during the development of aroma releasing packaging components for the ready-to-drink coffee products ('the Project').

Exhibit C at p. 1.

55. Pursuant to the '05 CA:

> In order to have meaningful discussions, PEPSI and Company, at their respective sole discretion, may, from time to time, disclose to the other certain information that is considered confidential by the disclosing party. Both PEPSI and Company are willing to do so provided that the other observes certain requirements to assure that such confidential information is kept confidential and not used in any way, except as authorized herein.

*Id.*

56. As defined in the '05 CA, ScentSational's "Confidential Information" was:

> [I]nformation and data relative to the research, development, production, packaging, control, sale and marketing of foods including, but not limited to, know-how, economic information, business and technical development plans, marketing strategy, data, technical information, know-how, process and product information, methods of manufacture, intangible assets, and derivative works made by the receiving party that are based on Confidential Information disclosed to it by the other [....].

*Id.*

57. Pursuant to the '05 CA, the parties "agree[d] not to disclose either orally or in writing to any third party or to use in any way except as expressly granted herein (i) any of the Confidential Information received from the other and (ii) any information developed by the receiving party that is based on Confidential Information received from the other [...]." *Id.* [emphasis added].

58. According to the '05 CA, the parties agreed to "maintain the Confidential Information disclosed to it by the other in a manner at least as equal to the degree of care it uses to protect its own Confidential Information, but in any event, not less than a reasonable degree of care." *Id* at p. 2.

59. Under the '05 CA, each party agreed that "Confidential Information which is specific, such as Confidential Information pertaining to materials, samples, processes and/or equipment shall not be deemed to be within the exceptions specified above merely because it is embraced by more general published or available information." *Id.*

60. The '05 CA states that "[e]ach party agrees to limit dissemination of Confidential Information to employees having a need-to-know [...]." *Id.*

61. Pursuant to the '05 CA,

> A party receiving Confidential Information acknowledges that the Confidential Information is the confidential and proprietary information and property of the other and that the receiving party does not have any claim, right, title, property or other interest or license of any kind or nature in the Confidential Information. The receiving party shall hold and maintain the Confidential Information in strict confidence and in trust for the sole and exclusive benefit of the disclosing party.

*Id.* [emphasis added].

62. The '05 CA states that "[e]ach party understands and acknowledges that any disclosure or misappropriation of any of the other party's Confidential Information in violation of this Agreement may cause the other party irreparable harm, the amount of which may be difficult to ascertain [...]." *Id.*

63. Under the '05 CA, "the obligations accepted under [the] Agreement shall be effective retroactively to the date Confidential Information was first disclosed, made available or shared between the parties, Affiliates and/or related companies." *Id.* at p. 3.

64. The '05 CA further states that: "[e]ach party's obligations of confidentiality and non-use for Confidential Information received hereunder [...] relating to formula, ingredients, trade secrets or manufacturing know-how shall not expire unless it is subject to one or more of the above-recited exceptions." *Id.* [emphasis added].

**iv. The 2005 Development Agreement**

65. In 2005, ScentSational entered into a Development Agreement with Frito-Lay North America, a division of PepsiCo, to manufacture prototype packaging components that utilized ScentSational's Trade Secrets (the "'05 Development Agreement").

66. ScentSational was compensated by Frito-Lay North America, a division of PepsiCo, for its work under the '05 Development Agreement.

67. During the nearly decade long relationship between ScentSational and PepsiCo, numerous other Development Agreements were requested by PepsiCo, drafted by ScentSational, provided to PepsiCo, but never executed by PepsiCo. Rather, PepsiCo would string along ScentSational with the prospects of Development Agreements and huge commercialization opportunities only to elicit even more of Trade Secrets from ScentSational.

**v. The 2010 Confidentiality Agreement**

68. The fourth written confidentiality agreement, "Agreement No. 2010-NDA-03004," was entered into on February 22, 2010, between "PepsiCo, Inc. ('PEPSI') [...] and ScentSational Technologies, Inc. ('Company') (the "'10 CA"). A true and correct copy of the '10 CA is attached hereto as **Exhibit D**.

69. As a result of the '10 CA, the parties agreed "that any disclosed Confidential Information, as defined below, provided by the disclosing party, (as 'Owner'), to the receiving party (as 'Recipient'), provided for the limited purpose stated in the Confidential Information Transfer Record ('CITR'), as more fully described herein shall be treated in accordance with the following provisions." Exhibit D at 1.

70. Pursuant to the '10 CA, the purpose of disclosing confidential information was:

> PEPSI and/or one or more of its affiliates (as defined herein) and COMPANY are interested in discussing and potentially conducting research, pursuant to the Project as described in the CITR. In order to have meaningful discussions and carry out any agreed upon research, certain information related to the Project may be disclosed that is considered confidential. In consideration of the attendant opportunity for mutual benefit, the sufficiency of which is acknowledged and agreed, The Parties agree that PEPSI and/or its Affiliates and PEPSI CITR Entity (as defined in the CITR) ('PEPSI GROUP') and COMPANY, as the circumstances and terms of the CITR dictate, may disclose and receive Confidential Information (as defined hereunder) related to the Project, provided that the recipient observes the requirements set forth herein to ensure that such Confidential Information is kept confidential and not used in any way, except as expressly authorized herein."

*Id.* at ¶ 1.

71. The '10 CA stated that, under a "Two-Way CITR [...] 'Confidential Information,' as used in this Agreement and any relevant CITR means any and all information disclosed, obtained, developed, and/or information that the Recipient is exposed to under the Project whether disclosed in writing, orally, visually or by samples." *Id.* at ¶ 2(a).

72. PepsiCo agreed under the '10 CA that, in the event of a Two-Way CITR, "it [would] limit disclosure of Confidential Information only to those having a need to know and who are needed to accomplish the purpose of a Project[,] … use Confidential Information solely in connection with the Project[, and] … take reasonable steps to limit its disclosure of Confidential Information only to that which is deemed necessary." *Id.* at ¶ 3. [emphasis added]. The parties also agreed that "nothing contained in [the '10 CA] gives one Party the right to file any patent applications for or otherwise disclose or use any intellectual property containing the Confidential Information of the other Party." *Id.* [emphasis added].

73. Furthermore, under the '10 CA, the parties agreed that the "Owner hereby grants to the Recipient the right to use the Owner's Confidential Information for the sole purpose of the Project and not for any other purpose whatsoever." *Id.* [emphasis added].

74. Pursuant to the '10 CA, the parties' obligations with respect to (i) Confidential Information disclosed thereunder was "effective retroactively from the date Confidential Information was first disclosed, made available or shared by the Owner or anyone acting on its behalf [….]" and (ii) "each Party's obligations of confidentiality and non-use relating to product formulae, ingredients, trade secrets or manufacturing know-how [did] not expire unless subject to one or more of the exceptions recited below." *Id.* at ¶ 4. [emphasis added].

75. The '10 CA states that "Confidential Information supplied by the Owner to the Recipient pursuant to this Agreement will not be deemed to be publicly available or already in the possession of the Recipient merely because disclosures concerning the same general subject matter are in the public domain or in the prior possession of the Recipient." *Id.* at ¶ 5.

76. Under the '10 CA, "Affiliate [...] with respect to PEPSI" is defined as "any company or other legal entity [....] ii) controlled by PEPSI and/or iii) is under control of the same entity that controls PEPSI [....]." *Id.* at ¶ 8.

77. On February 22, 2010, PepsiCo and ScentSational executed a Two-Way CITR, pursuant to which the parties agreed that:

> Confidential Information being disclosed under this CITR is to be used solely for the purpose of sharing openly the details behind aroma-based technologies for possible use and application in and/or relating to the LRB portfolio, Protein containing beverages, Carbonated beverages, Water/enhanced water, Sports drinks, Energy drinks, Dairy based drinks, Juices/juices-containing beverages, Coffee products, and Tea products (the "Project").

*Id.* at p. 6.

78. Pursuant to the Two-Way CITR, the parties agreed that <u>the "Recipient of any Confidential Information under this CITR may not use that Confidential Information for any purpose other than the Project</u>." *Id.* [emphasis added].

79. The Two-Way CITR explicitly "govern[ed] disclosures of Confidential Information commencing on the CITR Effective Date and continuing thereafter for a period of twenty-four (24) months." *Id.*

**C. <u>Disclosures by ScentSational to PepsiCo During the Parties' Confidential Relationship</u>**

80. During their relationship, ScentSational confidentially disclosed numerous ScentSational Trade Secrets and other confidential information to PepsiCo and PepsiCo's Center of Excellence (the "COE").

81. At all times relevant to this action, the COE, upon information and belief, was a senior, centralized group within PepsiCo that disseminated information and technology to all of PepsiCo's brands including, but not limited to, Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana.

82. Upon information and belief, the COE routinely disseminated ScentSational's Trade Secrets throughout PepsiCo's brands and subsidiaries including, but not limited to, Defendants, PepsiCo Tech, Quaker, Stokely, and Tropicana.

83. During their relationship, the parties discussed ScentSational's confidential method of flavor modification using aroma delivery systems including, but not limited to, placing an aroma on the outside of product packaging.

84. PepsiCo's prior unsuccessful attempts at flavor modification in general caused it to doubt the feasibility of ScentSational's flavor modification method. Thus, PepsiCo asked ScentSational to substantiate its flavor modification method.

85. In reliance on the trust stemming from the parties' confidential relationship, as well as PepsiCo's strict non-disclosure obligations under the CAs, ScentSational disclosed to PepsiCo the results of confidential consumer studies conducted by a major United States university proving, *inter alia*, that packaging incorporating ScentSational's flavor modification method and other confidential information delivered an improved flavor experience, including the ability to impact the perception of sweetness, and increased product value (the "Consumer Study Trade Secret").

86. In addition to its flavor modification method and Consumer Study Trade Secrets, ScentSational confidentially disclosed to PepsiCo its Trade Secrets concerning packaged orange juice. ScentSational proposed that PepsiCo incorporate ScentSational's Trade Secrets and other confidential information concerning various methods of applying specially formulated aroma to the bottle closure, fitment, or packaging to its Tropicana products to give consumers the perception that Tropicana juice smelled and tasted more like fresh squeezed juice (the "Orange Juice Trade Secrets").

87. At the request of PepsiCo, ScentSational created and provided product samples (including, but not limited to, bottle closures and fitments) to PepsiCo that incorporated ScentSational's Orange Juice Trade Secrets.

88. During the parties' confidential relationship, ScentSational also disclosed its Trade Secret concerning proprietary methodologies in the manufacture, curing, and use of scented liners and coating materials in food and beverage packaging (the "Scented Liner Trade Secret").

89. PepsiCo believed ScentSational's Scented Liner Trade Secret was commercially viable. For example, PepsiCo requested that ScentSational submit to PepsiCo a development timeline that would allow the parties to commercialize PepsiCo products incorporating the Scented Liner Trade Secret by January 1, 2010.

90. Moreover, throughout the parties' confidential relationship, PepsiCo made numerous requests for product samples and presentations concerning the utilization of ScentSational's Trade Secrets and other confidential information. In response, ScentSational representatives often traveled, at their own expense, to PepsiCo's facilities in Illinois, Florida, Texas, and New York.

91. For example, as early as 2001, PepsiCo requested flavored beverage closures from ScentSational that incorporated ScentSational's Trade Secret methods of enhancing the consumer experience by applying an aroma to the outside of beverage packaging.

92. For example, in 2003, ScentSational had at least two meetings with PepsiCo regarding the utilization of ScentSational's Trade Secrets and other confidential information.

93. Also in 2003, upon PepsiCo's request, ScentSational sent PepsiCo scented closure samples that incorporated ScentSational's Trade Secrets on at least two occasions.

94. For example, in 2004, ScentSational continued to send PepsiCo samples that incorporated ScentSational's Trade Secrets at PepsiCo's request.

95. In 2004, ScentSational and PepsiCo continued to meet, exchange emails, and have telephone calls regarding ScentSational's Trade Secrets. In particular, during this time ScentSational conducted at least four Technology Presentations at PepsiCo, disclosed confidential information relating to ScentSational's Trade Secrets, including its Orange Juice Trade Secret, Scented Liner Trade Secret and Consumer Study Trade Secret, and provided samples incorporating ScentSational's Trade Secrets to PepsiCo, some of which were used for testing on Tropicana Orange Juice. At least some of these samples were provided to PepsiCo in response to it asking ScentSational to substantiate its flavor modification method.

96. For example, in 2005, ScentSational continued to correspond, meet, share samples with and disclose its Trade Secrets to PepsiCo.

97. Also in 2005, pursuant to the parties' Confidentiality Agreements, ScentSational gave a presentation to PepsiCo's Frito-Lay division in Texas where ScentSational disclosed its Trade Secrets.

98. In 2005, ScentSational and Frito-Lay North American, a division of PepsiCo, entered into the '05 Development Agreement, under which ScentSational made scented packaging for PepsiCo.

99. For example, in 2006 and 2007, ScentSational continued to correspond, meet, share samples with and disclose its Trade Secrets to PepsiCo and Tropicana.

100. For example, in January 2008, ScentSational conducted a Technology Presentation at PepsiCo in Chicago where it disclosed its Trade Secrets and other confidential information.

101. For example, in 2009, ScentSational provided PepsiCo with samples, disclosed its Trade Secrets, and provided Development Agreements to PepsiCo and Tropicana at their request.

102. As recent as March 22, 2010, ScentSational received an urgent request from PepsiCo for more of the aforementioned product samples incorporating ScentSational's Trade Secrets to present to PepsiCo's then-Chairperson and Chief Executive Officer (the "March 22, 2010 Request").

103. On March 25, 2010, ScentSational met with members of PepsiCo's "Innovation Team" for a presentation at PepsiCo's corporate headquarters in Valhalla, New York (the "March 25, 2010 Presentation").

104. During the March 25, 2010 Presentation, ScentSational provided PepsiCo's Innovation Team with product samples implementing ScentSational's Trade Secrets and confidentially disclosed Trade Secrets concerning, *inter alia*:

a. proprietary methods concerning the application and use of both oil-based (hydrophobic) and water-based (hydrophilic) flavors in a polymeric base with food and beverage packaging (the "Oil and Water Polymeric Base Trade Secret");

b. proprietary methods of using different polymer blends including, but not limited to, waxes, on food and beverage packaging to enhance the aroma and taste of products (the "Polymer Blend Trade Secret"); and

c. details of methods of using aroma delivery systems comprised of entrapping aromas in a polymer matrix used in food and beverage packaging to enhance the aroma and/or taste of the product (the "Polymer Entrapped Flavor Trade Secret").

105. ScentSational's confidential disclosures of its Trade Secrets to PepsiCo and, upon information and belief, the COE's confidential dissemination of said Trade Secrets throughout PepsiCo's brands and subsidiaries, resulted in numerous proposed development agreements to incorporate ScentSational's Trade Secrets into various PepsiCo products. Examples of such

PepsiCo products include, but are not limited to, Tropicana orange juice, Quaker Oats oatmeal, Frito-Lay dips, Propel water, and Starbucks Frappuccino drinks.

106. The ScentSational Trade Secrets included in the proposed development agreements included, *inter alia*, the Consumer Study Trade Secret and Orange Juice Trade Secrets.

107. At least ScentSational and PepsiCo's nearly-decade long confidential relationship, proposed development agreements and executed development agreement created a legal duty independent of their contracts.

108. However, at the end of the parties' nearly-decade long confidential relationship, PepsiCo informed ScentSational that PepsiCo was not interested in scent-enhanced packaging, while upon information and belief, it covertly, without ScentSational's knowledge, was actually hiring staff, conducting research and consumer testing, and filing patent applications on the subject matter.

**D. PepsiCo Used and Disclosed ScentSational's Trade Secrets to Pursue Patents for PepsiCo's Sole Commercial Benefit**

109. At no time during the course of their relationship did anyone working for PepsiCo or its subsidiaries, including Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana, advise ScentSational that ScentSational's Trade Secrets or other confidential information confidentially disclosed by ScentSational were the property of PepsiCo or its subsidiaries, or that they had ever invented such concepts independently. Indeed, as set forth in the CAs, ScentSational's Trade Secrets and other confidential information remained ScentSational's property, and PepsiCo never challenged title to same.

110. Nonetheless, PepsiCo, in violation of its duties under the parties' confidential and contractual relationships, misappropriated ScentSational's Trade Secrets by using and disclosing

said Trade Secrets to file and prosecute at least three United States patent applications for PepsiCo's sole commercial benefit.

**i. PepsiCo's U.S. Patent Application No. 12/548,549**

111. On August 27, 2009, (*i.e.*, during the parties' confidential relationship), PepsiCo filed U.S. Patent Application No. 12/548,549 (the "'549 Application"), entitled "Modifying Flavor Experience via Aroma Delivery." Margaret Havekotte of Fairfield, Connecticut, and Marco Covarrubias, of White Plains, New York, both of whom were employees of PepsiCo at the time, were identified as the inventors, and PepsiCo was identified as the assignee, of the '549 Application. A true and correct copy of the '549 Application is attached hereto as **Exhibit E**.

112. The '549 Application was published on March 4, 2010 (*i.e.*, during the parties' confidential relationship) as U.S. Patent Application Publication No. US 2010-0055245 A1 (the "'245 Publication"), a mere 18 days before PepsiCo's urgent March 22, 2010 Request for product samples from ScentSational that incorporated the very encapsulated aroma technologies claimed by PepsiCo in the '245 Publication, and weeks after ScentSational and PepsiCo executed the '10 CA. A true and correct copy of the '245 Publication is attached hereto as **Exhibit F**.

113. The '245 Publication claimed a method for modifying flavor experience via aroma delivery, including applying at least one aroma to a comestible's packaging.

114. In paragraph 0023 of the '245 Publication, PepsiCo claimed "a new aroma-focused packaging/product innovation for orange juice was developed to enhance the overall product experience. It was discovered that the aroma experience was enhanced which compensated for the fresh orange juice characteristics lost during processing. In addition taste perception was enhanced through aroma-taste interaction."

115. In paragraphs 0024-0026 of the '245 Publication, PepsiCo claimed that "Consumer testing was performed as follows: [e]ach respondent was served one control (current shelf-stable orange juice product) and one test sample. Test samples consisted of chilled shelf-stable juice […] [e]ncapsulated aromas were pre-applied to the cap prior to testing [….]."

116. In paragraph 0028 of the '245 Publication, PepsiCo claimed "it was found that the test product was significantly preferred compared to the control […] the test product was judged by consumers to be significantly healthier, more natural, hand-squeezed, higher quality and energizing compared to the control product."

117. The foregoing paragraphs demonstrate that, rather than use ScentSational's Trade Secrets (including, but not limited to, the Consumer Study Trade Secret and Orange Juice Trade Secrets) to pursue the projects set forth in the CAs, PepsiCo misappropriated, disclosed and used (and continues to misappropriate and use) ScentSational's Trade Secrets to prepare and conduct PepsiCo's own consumer studies concerning orange juice and flavor modification via aroma delivery.

118. PepsiCo, in turn, used the results of its own consumer studies (designed and conducted using ScentSational's Trade Secrets) to support its claimed method of flavor modification via aroma delivery in the '549 Application and '245 Publication.

119. The chart below (referencing the '245 Publication) includes ScentSational's Trade Secrets that PepsiCo misappropriated, disclosed and used in violation of its duties under the parties' confidential and contractual relationships to file and prosecute the '549 Application. In particular, in the chart the claims and paragraphs of the description indicated as "Used" represent ScentSational's Current Trade Secrets used by PepsiCo to support or develop the information in the publication. The claims and paragraphs of the description indicated as "Disclosed" are

ScentSational's Disclosed Trade Secrets, *i.e.*, Trade Secrets that are actually disclosed by PepsiCo in the publication. Claims and paragraphs indicated as "Used and Disclosed" are Trade Secrets where the general concept is disclosed, but the details are ScentSational's Current Trade Secrets used by PepsiCo to support the patent application.

| ScentSational's Disclosed Trade Secret | '245 Publication Claim(s) # | '245 Publication Description(s) # |
|---|---|---|
| The **Consumer Study** Trade Secret. Formal testing of consumer reaction to prove aroma concepts. | Used: 2, 6, 11 | Used: 0014<br>Disclosed: 0012, 0024-0028<br>Used & Disclosed: 0017, 0021, 0025 |
| The **Orange Juice** Trade Secrets. The concept and various methods of applying specially formulated aromas to the bottle closure, fitment, or packaging of orange juice to give consumers the perception the juice smells and tastes more like fresh squeezed juice. | Used & Disclosed: 3, 12, 17<br>Used: 1, 3-12, 14-20 | Used & Disclosed: 0011, 0015, 0016, 0019, 0023, 0024-0028<br>Used: 0001, 0003-0005, 0007-0021, 0023-0028 |
| The **Polymer Entrapped or Encapsulated** Flavor Trade Secret. Methods of using aroma delivery systems comprised of entrapping aromas in a polymer matrix used in food and beverage packaging to enhance the aroma and/or taste of the product. | Used: 1, 3-12, 14-20<br>Disclosed: 13, 21 | Used & Disclosed: 0021, 0026<br>Used: 0001, 0003-0005, 0007-0021, 0023 |
| The **Sweet Aroma** Trade Secret. A method of applying a sweet aroma on food and beverage product packaging to drive an enhanced perception of sweetness of taste to consumers during consumption | Used & Disclosed: 2, 6, 11<br>Used: 1 | Used & Disclosed: 0004, 0005, 0008, 0012, 0013, 0014, 0028<br>Used: 0001-0004, 0007-0009, 0011, 0013, 0015-0017, 0019, 0023, 0028 |

| ScentSational's Disclosed Trade Secret | '245 Publication Claim(s) # | '245 Publication Description(s) # |
|---|---|---|
| The **Bitter Modification** Trade Secret. A method of applying aroma to food and beverage packaging to modify or mitigate the bitter taste of the package's contents | Used & Disclosed: 7, 11<br>Used: 7, 14, 11 | Used & Disclosed: 0004, 0008, 0015<br>Used: 0001, 0003, 0008-0009, 0011, 0014, 0016, 0024-0029 |
| The **Application Method** Trade Secret. A method of applying aroma only on the outside of food or beverage product packaging to enhance the consumer experience while not impacting the chemical composition of the product | Used & Disclosed: 4, 10, 13, 14, 20, 21<br>Used: 1, 4, 6-8, 10, 14-16, 18-19, 20 | Used & Disclosed: 0007, 0018, 0021<br>Used: 0001, 0003-0005, 0007-0011, 0013-0017, 0021, 0023-0029 |
| The **Freshness** Trade Secret. Details of methodologies for prolonging fresh notes from the products by identifying fresh notes and keeping them stable by applying them to packaging and keeping them fresher from manufacture to end of shelf life | Used: 1-8, 11-12, 14, 17, 20 | Used & Disclosed: 0004, 0008, 0014, 0016, 0023, 0028<br>Used: 0001, 0004-0005, 0007-0021, 0023-0029 |
| The **Extended Shelf Life** Trade Secret. Details of methods and knowhow related to extending product shelf life by applying flavors to food and beverage packaging | Used, 1, 5-6, 8, 10-11, 14, 16 | Used: 0001, 0004, 0008, 0010, 0014, 0016-0017, 0025-0026 |
| The **Dosing** Trade Secret. Method of application and dosing during the flavor application to food and beverage packaging | Used: 1, 4, 10, 12 | Used: 0001, 0003, 0010, 00170019, 0021, 0024-0029<br>Disclosed: 0003, 0019, 0020<br>Used & Disclosed: 0003 |
| The **Modify, No Masking** Trade Secret. Methods, knowhow and approach for developing aromas to work in concert with or modify the bad smell of a product, instead of attempting to mask the bad smell when applying to food and beverage packaging | Used and Disclosed: 1<br>Used: 1-12, 14-16 | Used: 0001, 0007-0008, 0013-0014, 0016-0018, 0021, 0023<br>Used and Disclosed: 0004, 0005, 0008 |

| ScentSational's Disclosed Trade Secret | '245 Publication Claim(s) # | '245 Publication Description(s) # |
|---|---|---|
| The **Cost Reduction** Trade Secret. Methodologies, strategic placement and use of aromas to minimize costs with, maximum effect when, applying aromas to food and beverage packaging | Used: 4, 5, 10 | Used: 0005, 0007, 0010, 0013, 0017-0018, 0021, 0023-0029 |
| The **Scented Liner** Trade Secret. Methodologies in the manufacturing, curing and use of scented liners and coating materials in food and beverage packaging, along with a secondary coating, to maintain the longevity of the aroma. | Used: 1, 5-9, 14-16 | Used: 0001, 0003-0005, 0008-0009, 0012-0019 |
| The **Secondary Cover** Trade Secret. A method of using a secondary covering to protect aroma applied to food and beverage packaging | Used: 5, 15, 16 | Used: 0007, 0026 |
| The **Coffee** Trade Secret. Proprietary method of applying aroma to coffee packaging to enhance the aroma and taste of coffee | Used and disclosed: 9, 12, 17, 19<br>Used: 1, 4-12, 14-20 | Used and disclosed: 0011, 0012, 0019, 0021<br>Used: 0001, 0003-0005, 0007-0021, 0023-0029 |
| The **Formulation** Trade Secret. Proprietary formulation methods for flavors applied to food and beverage packaging to enhance the aroma  and taste of product | Used: 2, 3, 6, 7, 8, 11, 12, 17<br>Used and Disclosed: 2, 3, 12, 17 | Used: 0005, 0008, 0011, 0013, 0014, 0015, 0016<br>Used and Disclosed: 0011, 0013-0016 |
| The **Improved Consumer Experience** Trade Secret. Methodologies and knowhow in driving improved consumer experience by applying aroma to food and beverage packaging | Used: 1, 10-21<br>Used: 1, 4-11, 14-16, 20-21 | Used and Disclosed: Abstract, 0001, 0007, 0009, 0014 - 0017, 0020, 0024 - 0028<br>Used: 0001, 0003-0005, 0007-0009, 0013-0021, 0023 |

| ScentSational's Disclosed Trade Secret | '245 Publication Claim(s) # | '245 Publication Description(s) # |
|---|---|---|
| The **Labeling** Trade Secret. Proprietary method of delivering certain ingredients and experience without having to re-label the product packaging | | Used and Disclosed: 0003, 0008, 0010 |

120. In violation of its duties arising out of the parties' confidential and contractual relationships, PepsiCo continues to misappropriate and use ScentSational's Trade Secrets to prosecute the '549 Application. For example, on June 2, 2011, PepsiCo filed its Information Disclosure Statement with the United States Patent and Trademark Office (the "USPTO") and, on January 21, 2013, PepsiCo filed a Request for Continued Examination with the USPTO.

121. While certain ScentSational Trade Secrets are disclosed within the '549 Application, and the file history thereof (including the '245 Publication), the '549 Application does not expressly disclose ScentSational's Current Trade Secrets that relate to and provide details with respect to the Disclosed Trade Secrets in the chart above. Indeed, upon information and belief, PepsiCo chose not to disclose ScentSational's Current Trade Secrets in order to maintain their secrecy and to prevent PepsiCo's competitors from having access to such valuable information.

122. PepsiCo misappropriated, used and disclosed ScentSational's Trade Secrets in connection with the '549 Application.

123. Upon information and belief, PepsiCo's misappropriation, use and disclosure of ScentSational's Trade Secrets in connection with the '549 Application was on behalf of, or for the benefit of, Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana.

**ii. PepsiCo's '637 Patent**

124. Upon information and belief, an individual named Peter Given ("Given") was present during meetings and presentations between ScentSational and Defendants in which ScentSational's Trade Secrets and other confidential information were disclosed.

125. Specifically, Peter Given was among those known to be present during the March 25, 2010 Presentation. As discussed, *supra*, ScentSational's Oil and Water Polymeric Base, Polymer Blend, and Polymer Entrapped Flavor Trade Secrets were among those ScentSational Trade Secrets which ScentSational confidentially disclosed to PepsiCo during the March 25, 2010 Presentation.

126. On July 7, 2010, Given and one Naijie Zhang ("Zhang") filed U.S. Patent Serial Number 12/831,683 entitled "Releasable Entrapment of Aroma Using a Polymeric Matrix" (the "'683 Application"). PepsiCo was identified as the assignee of the '683 Application. A true and correct copy of the '683 Application is attached hereto as **Exhibit G**.

127. In the '683 Application, PepsiCo claimed to invent "an aroma delivery system [that] [...] related to a water-resistant aroma delivery system comprising polar, non-polar, and volatile compounds." Exhibit G at ¶ 01.

128. In Claim 3 of the '683 Application, PepsiCo claimed the "aroma delivery system of claim 1, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophilic compounds, and blends thereof." [emphasis added].

129. In Claim 17 of the '683 Application, PepsiCo claimed the "container of claim 13, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof." [emphasis added].

130. On January 12, 2012, the '683 Application was published as U.S. Patent Application Publication No. 2012-0006909 A1 ("the '"909 Publication"). A true and correct copy of the '909 Publication is attached hereto as **Exhibit H**.

131. The chart below (referencing the '909 Publication) includes ScentSational's Trade Secrets (including those confidentially disclosed during the March 25, 2010 Presentation) that PepsiCo misappropriated, disclosed and used in violation of its duties under the parties' confidential and contractual relationships to file and prosecute the '683 Application. In particular, in the chart the claims and paragraphs of the description indicated as "Used" represent ScentSational's Current Trade Secrets used by PepsiCo to support or develop the information in the publication. The claims and paragraphs of the description indicated as "Disclosed" are ScentSational's Disclosed Trade Secrets, *i.e.*, Trade Secrets that are actually disclosed by PepsiCo in the publication. Claims and paragraphs indicated as "Used and Disclosed" are Trade Secrets where the general concept is disclosed, but the details are ScentSational's Current Trade Secrets used by PepsiCo to support the patent application.

| ScentSational's Disclosed Trade Secret | '909 Publication Claim(s) # | '909 Publication Description # |
|---|---|---|
| The **Orange Juice** Trade Secrets. The concept and various methods of applying specially formulated aromas to the bottle closure, fitment, or packaging of orange juice to give consumers the perception the juice smells and tastes more like fresh squeezed juice. | Used: 1-20 | Used: 0001, 0006, 0016-0017, 0020, 0023-0030, 0032-0040<br>Disclosed: 0028 |

| ScentSational's Disclosed Trade Secret | '909 Publication Claim(s) # | '909 Publication Description # |
|---|---|---|
| The **Oil and Water Polymeric Base** Trade Secret. The method concerning the application and use of both oil based (hydrophobic) and water based (hydrophilic) flavors in a polymeric base with food and beverage packaging. | Used and Disclosed: 1- 20 | Used and Disclosed: 0044 |
| The **Polymer Blend** Trade Secret. The method of applying different polymer blends to food and beverage packaging to enhance the aroma of taste of products. | Used and Disclosed: 1-20 | Used and Disclosed: 0032 - 0035, 0039, 0042, 0047, 0057 |
| The **Polymer Entrapped or Encapsulated Flavor** Trade Secret. Methods of using aroma delivery systems comprised of entrapping aromas in a polymer matrix used in food and beverage packaging to enhance the aroma and/or taste of the product. | Used and Disclosed 1 - 30 | Used and Disclosed: 0001, 006, 0016-0017, 0020- 0022, 0024-0025, 0027, 0031-0038, 0041-0048, 0057 |
| The **Bitter Modification** Trade Secret. A method of applying aroma to food and beverage packaging to modify or mitigate bitter taste of contents of package | Used 1-20 | Used: 0001, 0006, 0016, 0017, 0020, 0023-0030, 0032-0035, 0037-0039, 0041, 0042, 0046, 0047, 0049, 0055, 0057, 0058 |
| The **Application Method** Trade Secret. A method of applying aroma only on the outside of food or beverage product packaging to enhance consumer experience while not impacting the chemical composition of the product | Used: 1-20 | Used: 0001, 0006, 0016, 0017, 0020, 0023-0030, 0032-0035, 0037-0039, 0041, 0042, 0046, 0047, 0057, 0058<br>Disclosed: 0010, 0011, 0021, 0049, 0050, 0051, 0055 |

| ScentSational's Disclosed Trade Secret | '909 Publication Claim(s) # | '909 Publication Description # |
|---|---|---|
| The **Wax** Trade Secret. A method of applying different flavored polymer blends, including waxes, to food and beverage packaging to enhance the aroma and taste of product | Used and Disclosed: 5-12, 16-20 | Used and Disclosed: 0035, 0039, 0042 |
| The **Aroma Containment** Trade Secret. Methods of containing cross contamination in packaging manufacturing plants when applying aromas to food and beverage packaging | | Use: 0014-0015, 0025-0026, 0041 |
| The **Freshness** Trade Secret. Details of methodologies for prolonging fresh notes from the products, by identifying fresh notes and keeping them stable by applying them to packaging and keeping them fresher from manufacture to end of shelf life | Used: 1-20 | Used: 0001, 0006, 0016, 0020, 0023-0024, 0026-0030, 0032-0042, 0045-0047, 0049, 0055, 0057-0058<br>Disclosed: 0002, 0025 |
| The **Extended Shelf Life** Trade Secret. Details of methods and knowhow related to extending product shelf life by applying flavors to food and beverage packaging | Used: 1-20 | Used: 0001, 0006, 0016-0017, 0020, 0023-0030, 0032-0042, 0045-0047, 0049, 0055, 0057, 0058 |
| The **Modify, No Masking** Trade Secret. Methods, knowhow and approach for developing aroma's to work in concert with or modify a bad smell of a product to correct it, instead of attempting to mask the unwanted aroma, when applying to food and beverage packaging | | Used: 0025 |

| ScentSational's Disclosed Trade Secret | '909 Publication Claim(s) # | '909 Publication Description # |
|---|---|---|
| The **Small Orifice** Trade Secret. A method of applying aroma to beverage packaging in order to deliver improved aroma and /or taste experience when the orifice in the container lid is small and otherwise limiting the aroma release of the product | | Used: 0009 |
| The **Improved Consumer Experience** Trade Secret. Methodologies and knowhow in driving improved consumer experience by applying aroma to food and beverage packaging | Used: 1-20 | Used: 0001, 0006, 0016-0017, 0020, 0023-0030, 0032-0042, 0045 |
| The **Secondary Cover** Trade Secret. Method of using a secondary covering to protect aroma applied to food and beverage packaging, including the methods and knowhow related to the use of barrier and non-barrier secondary protective coatings on the surface of flavor scented polymer matrix blends and flavored microencapsulates used in food and beverage packaging | Used: 1, 5-20<br>Disclosed: 2, 9-12, 14, 19, 20 | Used: 0006, 0016, 0017, 0020, 0038, 0039, 0040,<br>Disclosed: 0016, 0020, 0022, 0038-0040, 0047, 0057 |
| The **Coffee** Trade Secret. Proprietary method of applying aroma to coffee packaging to enhance the aroma and taste of coffee | Used: 1-20 | Used: 0001, 0006, 0016, 0017, 0020, 0023-0030, 0032-0035, 0037-0039, 0041, 0042, 0045-0046, 0047, 0049, 0055, 0057, 0058<br>Disclosed: 0002, 0003, 0023, 0025, 0029 |

| ScentSational's Disclosed Trade Secret | '909 Publication Claim(s) # | '909 Publication Description # |
|---|---|---|
| The **Encapsulated Aroma** Trade Secret. A proprietary method, use, and placement of encapsulated aromatic flavors to keep them stable and protected in applying them to food and beverage packaging prior to consumption | Used: 1-20<br>Disclosed: 1, 13 | Used & Disclosed: 0016, 0020-0021, 0024, 0025, 0027, 0032, 0034, 0041, 0043 |

132. On July 2, 2013, the '683 Application issued as U.S. Patent No. 8,474,637, (the "'637 Patent"). Messrs. Given and Zhang are identified as the inventors, and PepsiCo is identified as the Assignee of, the '637 Patent. A true and correct copy of the '637 Patent, as issued, is attached hereto as **Exhibit I**.

133. In Claim 1 of the '637 Patent, PepsiCo claimed a "container having an openable closure and an aroma delivery system positioned between the closure and container wherein the aroma delivery system comprises: an aroma compound entrapped within a polymeric matrix […]." [emphasis added].

134. In Claim 2 of the '637 Patent, PepsiCo claimed the "container of claim 1, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a hydrophilic compound, and blends thereof." [emphasis added].

135. In Claims 3- 5 of the '637 Patent, PepsiCo claimed:

> 3. The container of claim 1, wherein the secondary covering film is selected from the group consisting of a polysaccharide, a synthetic polymer, a natural wax, a natural biopolymer, a natural film former, and blends thereof.
>
> 4. The container of claim 1, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, and blends thereof.
>
> 5. The container of claim 4, wherein the polymer matrix is a natural wax. [emphasis added].

136. Landau, not Given and/or Zhang, is the true inventor of at least some of the invention(s) claimed in the '637 Patent.

137. While certain ScentSational Trade Secrets are disclosed within the '637 Patent, and file history thereof (including the '683 Application and '909 Publication), the '637 Patent does not expressly disclose ScentSational's Current Trade Secrets. Indeed, upon information and belief, PepsiCo chose not to disclose ScentSational's Current Trade Secrets in order to maintain their secrecy and to prevent PepsiCo's competitors from having access to such valuable information.

138. PepsiCo misappropriated, used and disclosed ScentSational's Trade Secrets in connection with the '637 Patent.

139. Upon information and belief, PepsiCo's misappropriation, use and disclosure of ScentSational's Trade Secrets in connection with the '637 Patent was on behalf of, or for the benefit of, Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana.

**iii. PepsiCo's '834 Application**

140. On September 2, 2011, Messrs. Given and Zhang filed another patent application, namely, U.S. Patent Application No. 13/223,834, entitled "Releasably Encapsulated Aroma" (the "'834 Application"). PepsiCo is identified as the assignee in the '834 Application. A true and correct copy of the '834 Application is attached hereto as **Exhibit J**.

141. On March 7, 2013, the '834 Application was published, namely, U.S. Patent Application Publication No. 2013-0056551 Al (the "'551 Publication"). A true and correct copy of the '551 Publication is attached hereto as **Exhibit K**.

142. The chart below (referencing the '551 Publication) includes ScentSational's Trade Secrets that PepsiCo misappropriated, disclosed and used (including those confidentially

disclosed during the March 25, 2010 Presentation) in violation of its duties under the parties' confidential and contractual relationships to file and prosecute the '834 Application. In particular, in the chart the claims and paragraphs of the description indicated as "Used" represent ScentSational's Current Trade Secrets used by PepsiCo to support or develop the information in the publication. The claims and paragraphs of the description indicated as "Disclosed" are ScentSational's Disclosed Trade Secrets, *i.e.*, Trade Secrets that are actually disclosed by PepsiCo in the publication. Claims and paragraphs indicated as "Used and Disclosed" are Trade Secrets where the general concept is disclosed, but the details are ScentSational's Current Trade Secrets used by PepsiCo to support the patent application.

| **ScentSational's Disclosed Trade Secret** | **'551 Publication Claim(s) #** | **'551 Publication Description #** |
|---|---|---|
| The **Oil and Water Polymeric Base** Trade Secret The method concerning the application and use of both oil based (hydrophobic) and water based (hydrophilic) flavors in a polymeric base with food and beverage packaging. | | Used and Disclosed: 0025, 0029, 0030 |
| The **Polymer Blend** Trade Secret. The method of applying different polymer blends to food and beverage packaging to enhance the aroma of taste of products. | Used and Disclosed: 2, 6, 14, 16 | Used and Disclosed: 0007, 0025, 0027, 0029, 0043 |
| The **Orange Juice** Trade Secret. The concept and various methods of applying specially formulated aromas to the bottle closure, fitment, or packaging of orange juice to give consumers the perception the juice smells and tastes more like fresh squeezed juice. | Used: 1-5, 9-12, 14, 20-24 | Used: 0005-0008, 0010-0012, 0014-0015, 0017-0023, 0026, 0028, 0029, 0033-0035, 0044 |

| ScentSational's Disclosed Trade Secret | '551 Publication Claim(s) # | '551 Publication Description # |
|---|---|---|
| The **Scented Liner** Trade Secret. Methodologies in the manufacturing, curing and use of scented liners and coating materials in food and beverage packaging, along with a secondary coating, to maintain the longevity of the aroma. | Used: 1-5, 9-11, 12, 14, 20-24<br>Disclosed: 1, 6, 9, 13-17 | Used: 0005-0008, 0010-0011, 0012, 0014-0015, 0017-0023, 0026, 0028-0029, 0033-0035, 0044<br>Used and disclosed: 0006, 0007, 0012, 0014-0015, 0022, 0026-0030, 0042-0044 |
| The **Polymer Entrapped or Encapsulated Flavor** Trade Secret. Methods of using aroma delivery systems comprised of entrapping aromas in a polymer matrix used in food and beverage packaging to enhance the aroma and/or taste of the product. | Used and Disclose: 1, 8, 9<br>Used: 2-5, 10-12, 14, 20-24 | Used and Disclose: 0001, 0006 - 0008, 0014, 0015, 0018 - 0021, 0024, 0025, 0029, 0031, 0042-0043 |
| The **Sweet Aroma** Trade Secret. A method of applying a sweet aroma on food and beverage product packaging, to drive an enhanced perception of sweetness of taste to consumers during consumption | Disclosed: 6, 17<br>Used: 1-24 | Used: 0005-0008, 0010-0012, 0014-0015, 0017-0023, 0026, 0028, 0033-0035, 0044<br>Disclosed: 0007, 0027 |
| The **Application Method** Trade Secret. The details of the method, use, and placement of scented encapsulated coatings on the outside of food and beverage packaging to drive consumer experience | Used: 1, 8, 9 | Used and Disclosed: 0004, 0018, 0031, 0033, 0034, 0036, 0042. 0043 |
| The **Let Down Ratio** Trade Secret. The discovery through testing that different Let Down Ratio's (LDRs) should be used depending on the aromatics of the flavor and product itself when applying them to food and beverage packaging | Used: 19 | |

| ScentSational's Disclosed Trade Secret | '551 Publication Claim(s) # | '551 Publication Description # |
|---|---|---|
| The **Coffee** Trade Secret. Proprietary method of applying aroma to coffee packaging to enhance the aroma and taste of coffee | Used: 1-5, 9-12, 14, 20-24 | Used and Disclosed: 0002, 0017, 0019, 0021 |
| The **Protective Coating** Trade Secret. Methods and knowhow related to the use of barrier and non-barrier secondary protective coatings on the surface of flavor scented polymer matrix blends and flavored microencapsulates used in food and beverage packaging | Used: 1-5, 9-12, 14, 20-24 | Used: 0005-0008, 0010-0012, 0014-0015, 0017-0023, 0026-0030,0033-0035, 0042-0044 |
| The **Wax** Trade Secret. A method of applying different flavored polymer blends, including waxes to food and beverage packaging to enhance the aroma and taste of product | Used: 6, 16 | Used: 0007, 0027, 0043 |
| The **Freshness** Trade Secret. Details of methodologies for prolonging fresh notes from the products, by identifying fresh notes and keeping them stable by applying them to packaging and keeping them fresher from manufacture to end of shelf life | Used: 1-5, 9-12, 14, 20-24 | Used: 0002, 0005-0007, 0010-0012, 0015, 0017, 0019, 0023, 0026, 0028-0029, 0033-0035, 0044<br>Disclosed: 0004, 0008, 0014, 0016,0028 |
| The **Improved Consumer Experience** Trade Secret. Methodologies and knowhow in driving improved consumer experience by applying aroma to food and beverage packaging | Used: 1, 3-5, 9-12, 14, 20-24 | Used: 0001, 0003, 0004, 0005-0008, 0010-0012, 0014, 0015, 0017-0023, 0026, 0028, 0029, 0033-0035, 0044 |
| The **Extended Shelf Life** Trade Secret. Details of methods and knowhow related to extending product shelf life by applying flavors to food and beverage packaging | Used: 1, 3-5, 9-12, 14, 20-24 | Used: 0005-0008, 0010-0012, 0014-0015, 0017, 0023, 0026, 0028-0029, 0033-0035, 0044 |

| ScentSational's Disclosed Trade Secret | '551 Publication Claim(s) # | '551 Publication Description # |
|---|---|---|
| The **Aroma Containment** Trade Secret. Methods of containing cross contamination in packaging manufacturing plants when applying aromas to food and beverage packaging | | Used: 0005-0008, 0012, 0014, 0015, 0017-0023, 0026, 0028-0029, 0033-0035, 0044 |
| The **Bitter Modification** Trade Secret. Methods, knowhow and approach for developing aromas to work in concert with or modify a bad smell of a product to correct it, instead of attempting to mask the unwanted aroma, when applying to food and beverage packaging | Disclosed: 7, 11<br>Used: 1-5, 9, 10-12, 14, 20-24 | Used: 0005-0008, 0010-0012, 0014, 0015, 0017-0023, 0026, 0028-0029, 0033-0035, 0044<br>Disclosed: 0015 |
| The **Small Orifice** Trade Secret. A method of applying aroma to beverage packaging in order to deliver improved aroma and /or taste experience when the orifice in the container lid is small and otherwise limiting the aroma release of the product | | Used: 0003-0004 |
| The **Secondary Cover** Trade Secret. A method of using a secondary covering to protect aroma applied to food and beverage packaging | Used: 1, 6, 9, 13-16 | Used: 0012, 0014, 0015, 0022, 0026-0030, 0042-0044 |
| The **Encapsulated Aroma** Trade Secret. A proprietary method, use, and placement of encapsulated aromatic flavors to keep them stable and protected in applying them to food and beverage packaging prior to consumption | Used: 1-5, 9-12, 14, 20-24 | Used: 0005-0008, 0010-0012, 0014-0015, 0017-0023, 0026, 0028-0029, 0031, 0033-0035, 0042, 0043-0044 |

143. While certain ScentSational Trade Secrets are disclosed within the '834 Application, and the file history thereof (including the '551 Publication), the '834 Application

does not expressly disclose ScentSational's Current Trade Secrets. Indeed, upon information and belief, PepsiCo chose not to disclose ScentSational's Current Trade Secrets in order to maintain their secrecy and to prevent PepsiCo's competitors from having access to such valuable information.

144. PepsiCo misappropriated, used and disclosed ScentSational's Trade Secrets in connection with the '834 Application.

145. Upon information and belief, PepsiCo's misappropriation, use and disclosure of ScentSational's Trade Secrets in connection with the '834 Application was on behalf of, or for the benefit of, Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana.

**E. ScentSational's Relationship With Coca-Cola**

146. None of the CAs prohibited ScentSational from offering its technologies to other companies, including to PepsiCo's direct competitors. In fact, at all relevant times, PepsiCo was aware that ScentSational was cultivating business relationships with other major CPGs, including some that competed directly with PepsiCo.

147. As ScentSational's nearly decade-long relationship with PepsiCo was nearing its end, ScentSational's discussions with Coca-Cola concerning the use of, *inter alia*, ScentSational's Orange Juice Trade Secrets and confidential information with Coca-Cola-owned packaged orange beverages, accelerated.

148. Coca-Cola believed that ScentSational's Trade Secrets were commercially viable. Accordingly, Coca-Cola entered into an exclusive agreement with ScentSational, wherein ScentSational was to develop scented packaging technologies for Coca-Cola-owned packaged orange beverages using, *inter alia*, ScentSational's Orange Juice Trade Secrets (the "Coca-Cola Project").

149. In addition to the Coca-Cola Project, ScentSational was actively involved with Coca-Cola on a project concerning the incorporation of ScentSational's Trade Secrets into the packaging of one of Coca-Cola's global, carbonated soft drinks (the "CSD Project").

150. The Coca-Cola and CSD Projects were extremely important to ScentSational. Indeed, based upon the pre-negotiated, per unit pricing and projected volumes provided to ScentSational by Coca-Cola, the Coca-Cola Project would have resulted in an annual profit for ScentSational of approximately of $18 million, with expectations by both Coca-Cola and ScentSational for future annual revenues to meet or exceed this amount. The CSD Project would have resulted in an annual profit for ScentSational of approximately $3 million.

151. Due to the exclusive and lucrative nature of its opportunities with Coca-Cola, ScentSational focused the majority of its time and resources in late 2010 and 2011 on successfully completing the Coca-Cola and CSD Projects.

152. With respect to the Coca-Cola Project, focus group testing by Coca-Cola revealed that a significant percentage of respondents preferred its orange juice beverage incorporating ScentSational's Trade Secrets and confidential information over the identical product without them. Indeed, according to Coca-Cola, the focus group testing results were extraordinarily high and uncommon for an established brand. Accordingly, the Coca-Cola Project was one of Coca-Cola's top global juice-packaging initiatives for 2011 and 2012.

153. Because of the Coca-Cola Project's initial success, ScentSational and Coca-Cola began working to manufacture product samples to be presented to the Board of Directors of Coca-Cola at its January 22, 2012 meeting.

154. At the same time, ScentSational was developing and delivering product samples in furtherance of the CSD Project. In anticipation of commercializing the CSD Project, Coca-Cola began designing product labels with images depicting the release of aromatic flavors.

**F. <u>ScentSational's Damages Caused by PepsiCo's Wrongful Acts</u>**

155. On October 28, 2011, while Coca-Cola and ScentSational were accelerating Phase II of the Coca-Cola Project (which readied the technology for commercialization), an attorney in the office of the General Counsel at Coca-Cola discovered the file history for PepsiCo's '549 Application, and immediately suspended the Coca-Cola Project.

156. Due to PepsiCo's claimed ownership to the method of "applying an aroma to packaging" in the file history of '549 Application, and specific references to the use of scented packaging on orange juice, including the consumer studies, Coca-Cola believed the '549 Application (and its file history) presented a risk inconsistent with Coca-Cola's intellectual property policies.

157. Thus, on November 16, 2011, Coca-Cola notified ScentSational that, because of the '549 Application and its file history, Coca-Cola would not move forward with ScentSational on the Coca-Cola Project.

158. The CSD Project was also cancelled because of the '549 Application and its file history.

159. ScentSational also stood to benefit from other projects and future opportunities with Coca-Cola, the world's largest beverage company with an excess of 500 packaged brands.

160. As a result of the '549 and '834 Applications, and the '637 Patent, as well as the file histories thereof, ScentSational has lost business opportunities and credibility with Coca-Cola and other CPGs, as well as other customers due to the mistaken belief that PepsiCo, and not ScentSational, owns the technologies claimed therein.

161. ScentSational is aware of at least one instance of actual confusion wherein a consumer contacted ScentSational expressing the mistaken belief that PepsiCo, and not ScentSational, owned the technologies claimed in the '549 and '834 Applications, and the '637 Patent, as well as the file histories thereof.

## CAUSES OF ACTION

### COUNT I
### Misappropriation of Trade Secrets
### (Against All Defendants)

162. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

163. In reliance on the trust and confidence stemming from the parties' confidential relationship, as well as PepsiCo's strict non-disclosure obligations under the CAs, ScentSational disclosed its Trade Secrets to Defendants.

164. Rather than use ScentSational's Trade Secrets in furtherance of the goals and/or projects set forth in their confidential relationship as well as the CAs, PepsiCo and its affiliates and subsidiaries, including Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana, misappropriated, and continue to misappropriate, ScentSational's Current Trade Secrets by using them to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent.

165. Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana further misappropriated ScentSational's Disclosed Trade Secrets by disclosing them during the filing and prosecution of the '834 Application and the '637 Patent.

166. By misappropriating ScentSational's Trade Secrets, PepsiCo and its affiliates and subsidiaries, including Defendants PepsiCo Tech, Quaker, Stokely, and Tropicana, violated their duties of trust and confidentiality arising out of the parties' confidential relationship, as well as their contractual duties under the CAs.

167. By misappropriating ScentSational's Trade Secrets, Defendants obtained immediate, direct, and substantial commercial benefits including, but not limited to, (i) not having to invest extensive time, labor, research and development, or skill into developing them; (ii) preventing PepsiCo's direct competitors from commercializing the Trade Secrets; and (iii) preventing ScentSational from using the Trade Secrets to pursue opportunities with, *inter alia*, Defendants' competitors.

168. As a result of Defendants' past and continuing misappropriation of ScentSational's Trade Secrets, ScentSational was damaged, and continues to suffer damages including, but not limited to, cancellation of the Coca-Cola and CSD Projects, as well as other similar financially lucrative opportunities.

169. The damages caused to ScentSational by Defendants' misappropriation of ScentSational's Trade Secrets are ongoing, irreparable, and, permanent.

170. Based on the foregoing, ScentSational prays that PepsiCo, PepsiCo Tech, Quaker, Stokely, and Tropicana be enjoined from further use of ScentSational's Current Trade Secrets for any purpose whatsoever, and that ScentSational be awarded damages in an amount that, upon information and belief, is in excess of $100 million, for Defendants' disclosure of ScentSational's Disclosed Trade Secrets in the '834 Application and the '637 Patent.

**COUNT II**
**Breach of Contract: the '03 CA**
**(Against All Defendants)**

171. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

172. On December 29, 2003, PepsiCo, on behalf of PepsiCo Tech, Quaker, Stokely, and Tropicana, and ScentSational, entered into, duly executed, and agreed to be bound by, the '03 CA.

173. Pursuant to the '03 CA, the purpose of the agreement was so that PepsiCo, on behalf of PepsiCo Tech, Quaker, Stokely, and Tropicana, and ScentSational, could "work together to develop prototypes for applications using [ScentSational's] technology for flavor incorporation in plastic materials for release in head space ('Project')." Exhibit A at ¶ 2.

174. Pursuant to the '03 CA, PepsiCo agreed that, *inter alia*, "Confidential Information disclosed [to them] hereunder shall be retained in confidence in the same manner used to protect [their] own confidentiality and trade secrets rights and shall not be disclosed to others or used for purposes other than the Project." *Id.* at ¶ 4.

175. Pursuant to the '03 CA, PepsiCo agreed that it would, *inter alia*, "limit disclosure of Confidential Information to those employees who are needed to accomplish the purpose stated above." *Id.* at ¶ 5.

176. ScentSational relied upon PepsiCo's promises and disclosed its "Confidential Information," as defined in the '03 CA, to PepsiCo, which consisted of, *inter alia*, ScentSational's Orange Juice Trade Secrets.

177. PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana breached, and continue to breach, their obligations under the '03 CA by, *inter alia*, using ScentSational's Trade Secrets to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent.

178. PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana breached, and continue to breach, their obligations under the '03 CA by, *inter alia*, disclosing ScentSational's Disclosed Trade Secrets during the filing and prosecution of the '549 and '834 Applications, and the '637 Patent.

179. Specifically, the use and disclosure of ScentSational's Trade Secrets by PepsiCo to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent, for the exclusive commercial benefit of Defendants was not the purpose of the Project under the '03 CA.

180. Thus, by using and disclosing ScentSational's Trade Secrets in order to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent, Defendants breached their obligations to (i) retain them "in confidence in the same manner used to protect [their] own confidentiality and trade secret rights"; (ii) not "disclose[] to others or use[] [ScentSational's Trade Secrets] for purposes other than the Project"; and (iii) "limit disclosure of Confidential Information to those employees who are needed to accomplish the purpose" of the '03 CA. *Id.* at ¶¶ 4-5.

181. ScentSational fully performed and discharged all of its obligations under the '03 CA.

182. As a direct result of the breach of the '03 CA by PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana, ScentSational has suffered, and continues to suffer, damages including, but not limited to, cancellation of the Coca-Cola and CSD Projects.

183. The damages caused by PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana's breach of the '03 CA are ongoing, irreparable, and permanent.

184. Based on the foregoing, ScentSational prays that PepsiCo, PepsiCo Tech, Quaker, Stokely, and Tropicana be enjoined from further use or disclosure of ScentSational's Trade Secrets for any purpose whatsoever, and that ScentSational be awarded damages in an amount that, upon information and belief, is in excess of $100 million.

**COUNT III**
**Breach of Contract: the '04 CA**
**(Against All Defendants)**

185. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

186. On December 8, 2004, PepsiCo, "on behalf of itself and its subsidiaries and affiliates," which necessarily includes PepsiCo Tech, Quaker, Stokely, and Tropicana, on the one hand, and ScentSational, on the other hand, entered into, duly executed, and agreed to be bound by the '04 CA.

187. Pursuant to the '04 CA, the purpose of the agreement was so that PepsiCo, on behalf of itself and its subsidiaries and affiliates, and ScentSational could "discuss matters respecting and to share data, information and materials regarding certain development initiatives and/or business plans and objectives, including specifically (but not limited to) Frappuccino and related products." Exhibit B at p. 1.

188. Pursuant to the '04 CA, PepsiCo agreed to, *inter alia*, "accept in strict confidence any and all information disclosed or made available to it by the disclosing party, and w[ould] not disclose it to any third party or otherwise violate the terms hereof, direct or indirectly, without first obtaining the written consent of the disclosing party […]." *Id.* at ¶ 1.

189. Pursuant to the '04 CA, PepsiCo agreed to, *inter alia*, "disclose the Information only to [their] employees on a need-to-know-basis and who require the Information for the performance of their duties in connection with work or possible work together […]." *Id.* at ¶ 3(ii).

190. Pursuant to the '04 CA, PepsiCo agreed to, *inter alia*, "hold and maintain the information disclosed by the disclosing party hereunder in confidence and trust for the sole and

exclusive benefit of the disclosing party, and shall not use the information for its own benefit or for the benefit of any third party." *Id.* at ¶ 5.

191. In reliance on PepsiCo's promises, ScentSational disclosed "Information," as defined in the '04 CA, to PepsiCo, which consisted of, *inter alia*, ScentSational's Orange Juice Trade Secrets.

192. PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana breached their obligations arising under the '04 CA by, *inter alia*, using ScentSational's Trade Secrets "for [PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana's] own benefit" to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent.

193. PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana breached their obligations arising under the '04 CA by, *inter alia*, disclosing ScentSational's Disclosed Trade Secrets "for [PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana's] own benefit" to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent.

194. Specifically, the use and disclosure of ScentSational's Trade Secrets by PepsiCo to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent, for the exclusive commercial benefit of Defendants was not the purpose of the Project under the '04 CA.

195. Specifically, by using and disclosing ScentSational's Trade Secrets to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent, Defendants breached their obligations to (i) "accept in strict confidence any and all information disclosed or made available to it by [ScentSational], and [] not disclose it to any third party"; (ii) "disclose the Information only to [their] employees on a need-to-know-basis who require the Information for the performance of their duties in connection with work or possible work together"; (iii) "hold and maintain information disclosed by [ScentSational] [...] hereunder in confidence for the sole

and exclusive benefit of [ScentSational]; and (iv) to "not use the [Trade Secrets] for [Defendants'] own benefit or the benefit of any third party."

196. ScentSational fully performed and discharged all of its obligations under the '04 CA.

197. As a direct result of the breach of the '04 CA by PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana, ScentSational has suffered, and continues to suffer, damages including, but not limited to, cancellation of the Coca-Cola and CSD Projects.

198. The damages caused by PepsiCo, PepsiCo Tech, Quaker, Stokely, and/or Tropicana breach of the '04 CA are ongoing, irreparable, and permanent. Indeed, pursuant to the express terms of paragraph 4 of the '04 CA, the parties acknowledged that:

> "[N]o remedy at law for damages is adequate to compensate for a breach of the provisions set forth in this Agreement and that the party injured by such breach shall be entitled to temporary or permanent injunctive relief against any such breach, without the necessity of proving actual damages. The award of permanent or temporary injunctive relief shall in no way limit any other remedies to which the injury party may be entitled as a result of any such breach."

199. Based on the foregoing, ScentSational prays that PepsiCo, PepsiCo Tech, Quaker, Stokely, and Tropicana be enjoined from further use and disclosure of ScentSational's Trade Secrets for any purpose whatsoever, and that ScentSational be awarded damages in an amount that, upon information and belief, is in excess of $100 million.

**COUNT IV**
**Breach of Contract: the '05 CA**
**(Against PepsiCo Tech)**

200. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

201. On July 26, 2005, PepsiCo Tech and ScentSational entered into, duly executed, and agreed to be bound by the'05 CA.

202. Pursuant to the '05 CA, the purpose of the agreement was for PepsiCo Tech and ScentSational to "work[] together during the development of aroma releasing packaging components for the ready-to-drink coffee products ('the Project')." Exhibit C at p. 1.

203. Pursuant to the '05 CA, PepsiCo Tech agreed to, *inter alia*, "observe[] certain requirements to assure that [ScentSational's] confidential information is kept confidential and not used in any way, except as authorized herein." *Id.*

204. Pursuant to the '05 CA, PepsiCo Tech agreed to, *inter alia*, "use the other's Confidential Information for the sole purpose of the Project," and "not to disclose either orally or in writing to any third party or to use in any way except as expressly granted herein (i) any of the Confidential Information received from the other and (ii) any information developed by the receiving party that is based on Confidential Information received from the other." *Id.*

205. Pursuant to the '05 CA, PepsiCo Tech agreed to, *inter alia*, "maintain the Confidential Information disclosed to it by the other in a manner at least as equal to the degree of care it uses to protect its own Confidential Information, but in any event, not less than a reasonable degree of care." *Id.* at p. 2.

206. Pursuant to the '05 CA, PepsiCo Tech agreed to, *inter alia*, "limit dissemination of Confidential Information to employees having a need-to-know [...]." *Id.*

207. Pursuant to the '05 CA, PepsiCo Tech agreed to, *inter alia*, "hold and maintain the Confidential Information in strict confidence and in trust for the sole and exclusive benefit of the disclosing party." *Id.*

208. In reliance on PepsiCo Tech's promises, ScentSational disclosed "Confidential Information," as defined in the '05 CA, to PepsiCo Tech which included, *inter alia*, ScentSational's Orange Juice Trade Secrets.

209. PepsiCo Tech breached its obligations arising under the '05 CA by using and disclosing ScentSational's Trade Secrets to assist PepsiCo in its filing and prosecution of the '549 and '834 Applications, and to obtain the '637 Patent.

210. Specifically, the use and disclosure of ScentSational's Trade Secrets to assist PepsiCo in its filing and prosecuting of the '549 and '834 Applications, and obtaining the '637 Patent, was not the purpose of the Project under the '05 CA.

211. Thus, by disclosing and using ScentSational's Trade Secrets to assist PepsiCo in its filing and prosecution of the '549 and '834 Applications, and obtaining the '637 Patent, PepsiCo Tech breached its obligations to (i) "observe[] certain requirements to assure that such confidential information is kept confidential and not used in any way"; (ii) only use ScentSational's Trade Secrets "for the sole purpose of the Project"; (iii) not "disclose [ScentSational's Trade Secrets] either orally or in writing to any third party or to use [same] in any way except as expressly granted herein"; (iv) "maintain the Confidential Information disclosed to it by [ScentSational] in a manner at least as equal to the degree of care it uses to protect its own Confidential Information, but in any event, not less than a reasonable degree of care"; (v) "limit dissemination of Confidential Information to employees having a need-to-know; and (vi) "hold and maintain the Confidential Information in strict confidence and in trust for the sole and exclusive benefit of the disclosing party."

212. ScentSational fully performed and discharged all of its obligations arising under the '05 CA.

213. As a direct result of the breach of the '05 CA by PepsiCo Tech, ScentSational has suffered, and continues to suffer, damages including, but not limited to, cancellation of the Coca-Cola and CSD Projects.

214. The damages caused by PepsiCo Tech's breach of the '05 CA are ongoing, irreparable, and permanent. Indeed, pursuant to the express terms of page 2 of the '05 CA, the parties acknowledged that "any disclosure or misappropriation of any of the other party's Confidential Information in violation of this Agreement may cause the other party irreparable harm."

215. Based on the foregoing, ScentSational prays that PepsiCo Tech be enjoined from further use and disclosure of ScentSational's Trade Secrets for any purpose whatsoever, and that ScentSational be awarded damages in amount that, upon information and belief, is in excess of $100 million.

**COUNT V**
**Breach of Contract: the '10 CA**
**(Against PepsiCo)**

216. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

217. On February 2, 2010, PepsiCo and ScentSational entered into, duly executed, and agreed to be bound by, the '10 CA.

218. Pursuant to the '10 CA, the purpose of the agreement was so that PepsiCo and ScentSational could "discuss[] and potentially conduct[] research, pursuant to the Project as described in the CITR." Exhibit D at ¶ 1.

219. Pursuant to the February 22, 2010 Two-Way CITR executed by PepsiCo and ScentSational, the purpose of disclosures under the CITR was "to be used solely for the purpose of sharing openly the details behind aroma-based technologies for possible use and application in and/or relating to the LRB portfolio, Protein containing beverages, Carbonated beverages, Water/enhanced water, Sports drinks, Energy drinks, Dairy based drinks, Juices/juices-containing beverages, Coffee products, and Tea products (the 'Project')." *Id.* at p. 6.

220. Pursuant to the '10 CA, PepsiCo agreed that, *inter alia*, "it [would] limit disclosure of Confidential Information only to those having a need to know and who are needed to accomplish the purpose of a Project." *Id.* at ¶ 3.

221. Pursuant to the '10 CA, PepsiCo agreed that, *inter alia*, "it w[ould] use Confidential Information solely in connection with the Project." *Id.*

222. Pursuant to the '10 CA, PepsiCo agreed that, *inter alia*, it would "take reasonable steps to limit its disclosure of Confidential Information only to that which is deemed necessary." *Id.*

223. Pursuant to the '10 CA, PepsiCo agreed that, *inter alia*, "nothing contained in [the '10 CA] gives one Party the right to file any patent applications for or otherwise disclose or use any intellectual property containing the Confidential Information of the other Party." *Id.*

224. Pursuant to the '10 CA, PepsiCo agreed that, *inter alia*, ScentSational "grant[ed PepsiCo] the right to use [ScentSational's Trade Secrets] for the sole purpose of the Project and not for any other purpose whatsoever." *Id.*

225. Pursuant to the February 22, 2010 Two-Way CITR, PepsiCo agreed that, *inter alia*, it would not use the Confidential Information disclosed to it by ScentSational "for any purpose other than the Project." *Id.* at p. 6.

226. In reliance on PepsiCo's promises, ScentSational disclosed "Information," as defined in the '10 CA, to PepsiCo and its Affiliates, which consisted of, *inter alia*, ScentSational's Orange Juice Trade Secrets.

227. PepsiCo breached its obligations arising under the '10 CA by using and disclosing ScentSational's Trade Secrets to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent.

228. Specifically, PepsiCo's use and disclosure of ScentSational's Trade Secrets to file and prosecute the '549 and '834 Applications, and to obtain the '637 Patent, for PepsiCo's exclusive commercial benefit, was not "in connection with the Project," let alone "solely in connection with the Project."

229. Thus, by disclosing and using ScentSational's Trade Secrets to assist PepsiCo in its filing and prosecution of the '549 and '834 Applications, and obtaining the '637 Patent, PepsiCo Tech breached its obligations to (i) "limit disclosure of Confidential Information only to those having a need to know and who are needed to accomplish the purpose of a Project"; (ii) "use [ScentSational's] Confidential Information solely in connection with the Project"; (iii) "take reasonable steps to limit its disclosure of Confidential Information only to that which is deemed necessary"; (iv) not "file any patent applications for or otherwise disclose or use any intellectual property containing the Confidential Information of [ScentSational]"; (v) "to use [ScentSational's Trade Secrets] for the sole purpose of the Project and not for any other purpose whatsoever"; and (vi) not use ScentSational's Trade Secrets "for any purpose other than the Project."

230. ScentSational fully performed and discharged all of its obligations arising under the '10 CA.

231. As a direct result of the breach of the '10 CA by PepsiCo, ScentSational has suffered, and continues to suffer, damages including, but not limited to, cancellation of the Coca-Cola and CSD Projects.

232. The damages caused to ScentSational by PepsiCo's breach of the '10 CA, are ongoing, irreparable, and permanent. Indeed, as set forth in paragraph 15 of the '10 CA:

> "Each Party understands and acknowledges that any disclosure or misappropriation of any of the other Party's Confidential Information in

> violation of this Agreement may cause the other Party irreparable harm, the amount of which may be difficult to ascertain and, therefore, agrees that the other Party shall have the right to apply to the aforementioned courts [including the Southern District of New York] for an order restraining any such threatened or further disclosure or misappropriation and for other such relief as the other Party shall deem appropriate, such right to be in addition to the remedies otherwise available to the other Party at law or equity."

233. Based on the foregoing, ScentSational prays that PepsiCo be enjoined from further use and disclosure of ScentSational's Trade Secrets, for any purpose whatsoever, and that ScentSational be awarded damages in an amount that, upon information and belief, exceed $100 million.

**COUNT VI**
**Unfair Competition**
**(Against All Defendants)**

234. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

235. There was a nearly 10 years relationship between the parties, which began a couple of years before the first confidentiality agreement, but was based on an understanding between the parties that ScentSational's Trade Secrets were being disclosed and PepsiCo owed ScentSational a duty to keep those Trade Secrets confidential and not to make improper use of them.

236. This 10 year relationship included over 70 instances in which ScentSational provided PepsiCo with Trade Secret information and Trade Secret aroma samples, as well as many other communications between the parties, and at least one executed Development Agreement for which ScentSational received compensation. As a result, a close working relationship was established between them, which created a legal duty on the part of PepsiCo,

independent of the confidentiality agreements, to guard and not use improperly or misappropriate ScentSational's Trade Secrets.

237. Defendants obtained immediate, direct, and substantial commercial advantages by misappropriating ScentSational's Trade Secrets. These advantages include, but are not limited to, (i) not having to invest extensive time, labor, or skill into developing the Trade Secrets; (ii) preventing PepsiCo's direct competitors from commercializing the Trade Secrets; and (iii) preventing ScentSational from using its Trade Secrets.

238. Upon information and belief, Defendants' misappropriation of ScentSational's Trade Secrets, as described, *supra*, constitutes unfair competition.

239. As a proximate result of the unfair competition engaged in by Defendants, ScentSational was damaged, and continues to be damaged by, for example, cancellation of the Coca-Cola and CSD Projects, and other similarly lucrative opportunities.

240. The damages caused to ScentSational by Defendants' unfair competition are ongoing, irreparable, and permanent.

241. Based on the foregoing, ScentSational prays that Defendants be enjoined from further use and disclosure of ScentSational's Trade Secrets for any purpose whatsoever, and that ScentSational be awarded damages in an amount that, upon information and belief, is in excess of $100 million.

**COUNT VII**
**Unjust Enrichment**
**(Against All Defendants)**

242. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

243. ScentSational, not Defendants, expended substantial time, labor, skill, research and development, and capital to develop ScentSational's Trade Secrets. Indeed, it was only through the parties' confidential and contractual relationships that Defendants passively learned of ScentSational's Trade Secrets.

244. Defendants were enriched by way of their misappropriation of ScentSational's Trade Secrets.

245. Specifically, Defendants obtained immediate, direct, and substantial commercial advantages by misappropriating ScentSational's Trade Secrets. These advantages include, but are not limited to, (i) not having to invest extensive time, labor, or skill into developing the Trade Secrets; (ii) preventing PepsiCo's direct competitors from commercializing the Trade Secrets and confidential information; and (iii) preventing ScentSational from using its Trade Secrets.

246. Defendants' aforementioned unjust enrichment was at the expense of ScentSational.

247. Specifically, as result of Defendants' bad faith misappropriation of ScentSational's Trade Secrets, ScentSational has been damaged, and continues to suffer damages including, but not limited to, cancellation of the Coca-Cola and CSD Projects, and other similarly lucrative opportunities.

248. Accordingly, by misappropriating ScentSational's Trade Secrets at the expense of ScentSational, Defendants have been unjustly enriched.

249. Based on the forgoing, equity and good conscience dictate that Defendants make restitution to ScentSational in an amount that, upon information and belief, is in excess of $100 million.

**COUNT VIII**
**Constructive Trusts**
**(The '549 and '834 Application; the '637 Patent)**

250. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

251. During their confidential relationship, the parties executed the CAs, wherein Defendants expressly promised to, *inter alia*, maintain the confidentiality of ScentSational's Trade Secrets and only use them in furtherance of the goals and/or projects contemplated by the CAs.

252. In addition, Defendants impliedly promised during the parties' confidential relationship to maintain the secrecy of ScentSational's Trade Secrets.

253. In detrimental reliance upon Defendants' express and implied promises, ScentSational transferred its assets (*i.e.*, ScentSational's Trade Secrets) to Defendants.

254. In breach of their duties and promises arising out of the parties' confidential relationship, as well as their contractual duties under the CAs, Defendants misappropriated, and continue to misappropriate, ScentSational's Trade Secrets by filing and continuing to prosecute the '549 and '834 Applications, and obtaining the '637 Patent.

255. For the reasons discussed, *supra*, Defendants have been, and continue to be, unjustly enriched through their misappropriation of ScentSational's Trade Secrets.

256. Based on the foregoing, ScentSational prays that this Court impose constructive trusts upon the '549 and '834 Applications, and the '637 Patent, in favor of ScentSational, awarding ScentSational all benefits realized by Defendants in connection therewith.

**COUNT IX**
**Correction of Inventorship under 35 U.S.C. §256**
**(The '637 Patent)**

257. Plaintiff repeats and realleges paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

258. Landau is the sole inventor, or at least a joint inventor, of at least some of the claims of the '637 Patent.

259. Through omission and error, Landau was not listed on the '637 Patent as the inventor or an inventor of some of the inventions claimed in the '637 Patent.

260. The omission of Landau as an inventor, or joint inventor, on the '637 Patent occurred without any deceptive intent on the part of Landau.

261. Based on the foregoing, ScentSational prays that this Court issue an Order to the Director of the USPTO and Defendants requiring that Landau be listed as the sole inventor of at least some claims, or, in the alternative, a joint inventor, of the '637 Patent.

**PRAYER FOR RELIEF**

**WHEREFORE**, based on the foregoing, Plaintiff prays for judgment against Defendants as follows:

A. An award of actual, consequential, incidental and special damages, plus pre and post-judgment interest thereon, as well as punitive damages and the costs of this action, in an amount to be determined at trial, as a result of Defendants': (i) past and ongoing misappropriation of ScentSational's Trade Secrets in connection with the '549 and '834 Applications, and the '637 Patent; (ii) breach of the '03 CA; (iii) breach of the '04 CA; (iv) breach of the '05 CA; (v) breach of the '10 CA; (vi) unfair competition based upon the acts complained of herein; and (vii) unjust enrichment based upon the acts complained of herein.

B. Constructive trusts placed upon the '549 and '834 Applications, and the '637 Patent, awarding Plaintiff all of the benefits realized by Defendants from the '549 and '834 Applications, and the '637 Patent, as well as the technologies, methods, and the like forming the bases thereof.

C. An order to the Director of the USPTO and Defendants requiring that Landau be listed as the sole inventor or, in the alternative, a joint inventor, of at least some claims of the '637 Patent.

D. An order requiring PepsiCo to assign all right, title, and interest in and to the '637 Patent to Plaintiff, on behalf of Landau.

E. An accounting of all benefits realized by Defendants from the '549 and '834 Applications, and the '637 Patent, as well as the technologies, methods, and the like forming the bases thereof.

F. A permanent injunction against Defendants from further prosecution of the '549 and '834 Applications, or any other patent application that makes use of or discloses ScentSational's Current Trade Secrets or confidential information.

G. A permanent injunction preventing Defendants from making any further use or disclosure of ScentSational's Current Trade Secrets and other confidential information for any purpose whatsoever.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all claims so triable.

//

//

//

Dated: June 27, 2014
    White Plains, New York         Respectfully submitted,

Melvin C. Garner
Peter S. Sloane
Cameron S. Reuber
Lauren B. Sabol
Jonathan W. Thomas
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, New York 10601
Telephone: (914) 288-0022
Facsimile: (914) 288-0023
Email: Garner@LeasonEllis.com
Email: Sloane@LeasonEllis.com
Email: Reuber@LeasonEllis.com
Email: Sabol@LeasonEllis.com
Email: Thomas@LeasonEllis.com

Joel B. Rothman

SCHNEIDER ROTHMAN INTELLECTUAL
PROPERTY LAW GROUP, PLLC
4651 North Federal Highway
Boca Raton, FL 33431
Telephone: (561) 404-4350
Facsimile:  (561) 404-4353
Email: joel.rotham@sriplaw.com

*Attorneys for Plaintiff*

TAB 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

RICKY KAMDEM-OUAFFO,

Plaintiff,

-against- 14 Civ. 227 (KMK)

PEPSI-COLA TECHNICAL OPERATIONS, INC., et al.,

Defendants.

-----------------------------------x

United States Courthouse
White Plains, New York

May 15, 2014

B e f o r e:

HON. KENNETH M. KARAS,
District Court Judge

A P P E A R A N C E S:

RICKY KAMDEM-OUAFFO
*Pro Se*

RICHARD HARPER
ROBERT MAIER
SHANNON TURNER
Attorneys for Defendants

CHARLES BIENER, PepsiCo

ANGELA A. O'DONNELL, RPR
Official Court Reporter

P R O C E E D I N G S

THE CLERK: Kamdem-Ouaffo against PepsiCo, Inc., et al, 14CV227.

MR. GARNER: I think we're technically involved in this case.

THE COURT: I think you are. Do you represent all the defendants?

MR. MAIER: We do, your Honor.

THE CLERK: Please state your appearances.

MR. KAMDEM-OUAFFO: Ricky Kamdem-Ouaffo.

THE COURT: Good afternoon.

MR. KAMDEM-OUAFFO: Good afternoon, your Honor.

THE COURT: You can go back to that table, if you want. There's a microphone there for you to use, okay.

MR. MAIER: Again, your Honor, Robert Maier, Rich Harper, baker Botts for the defendants.

THE COURT: Good afternoon.

MR. KAMDEM-OUAFFO: Melvin Garner, Jonathan Thomas and Lauren Sabol for the parties who are trying to be dragged into this case.

THE COURT: Right. And, as I understand, what plaintiff has requested for is permission to join you all as co-defendants in this case. Is that right? Do I have that right? Is that right, do you want to have them be defendants in this case?

MR. KAMDEM-OUAFFO: If you so determine, your Honor.

THE COURT: But is that your request?

MR. KAMDEM-OUAFFO: I would summarize my request in terms of being able to see the evidence that ScentSational Technology has to --

THE COURT: Well, if you want to get information from a party, you have to be able to state a cause of action. You have to say that the party did something wrong before you can believe you're entitled to get, as you say, evidence or materials from them. Because you have not listed them as a defendant in your case; correct?

MR. KAMDEM-OUAFFO: No, I have not.

THE COURT: Okay.

MR. KAMDEM-OUAFFO: But I have requested that you would allow me to see their evidence because eventually you're going to rule on the same patent, whether you're going to order a correction or whatever is going to happen, we are claiming the same patent.

THE COURT: Well, I think your lawsuits are different. They might relate to the same patent, but they're not bringing a patent claim. Okay? You understand that? Their claim has to do with trade secrets that might relate to a patent or two or more but they're not suing for patent infringement.

MR. KAMDEM-OUAFFO: But they are requesting correction of inventorship, and I'm claiming that I am an inventor on the patent.

THE COURT: That's fine. I understand your claim as to the defendants you have sued, but you haven't sued ScentSational.

MR. KAMDEM-OUAFFO: No.

THE COURT: To the extent that you think that ScentSational has information -- great name by the way -- has information that's relevant to your lawsuit, there are ways you can try to get that information without naming them as defendants. I don't mean to discourage you from naming anybody you think you have a case against as a defendant, but you haven't named them as a defendant and so I'm not sure that they even need to be here. If you want information from them, you can, if we get to the discovery phase, you can try to see if you want to try to get information from them, but for now I'm not sure what it is --

MR. KAMDEM-OUAFFO: I think that would work for me. I'm not necessarily trying to make them a defendant on the case, but in reviewing the laws, I thought I should bring that issue up. Because at the moment I drafted the complaint --

THE COURT: Yes.

MR. KAMDEM-OUAFFO: -- I had no idea who they were. Only accidentally after I filed the complaint that I was on Google and I saw a complaint against PepsiCo, click on it and there you go.

THE COURT: Google appreciates the product plug.

Okay, all right, in the meantime, you can hang out if you want. It sounds to me like right now you're not going to be named as a party. There's no intent to name you as a party and maybe plaintiff will be seeking third-party discovery from you but we're not there, so it's whatever you want to do.

MR. KAMDEM-OUAFFO: We can switch places, but I think we should hang around because there is a set of circumstances where this could come back.

THE COURT: Yes. No, I understand. Why don't you stay there, you can just say there.

All right. And because it was on a roll with its premotion letters, PepsiCo has submitted a letter seeking to dismiss the lawsuit.

Did you see the letter dated March 14 from PepsiCo?

MR. KAMDEM-OUAFFO: Yes, I saw the letters.

THE COURT: So the first claim is that PepsiCo says that your first cause of action for breach of an intellectual property agreement, PepsiCo says that the

agreement itself provides for the assignment of all rights in the intellectual property that you might have had, and that also you received consideration under the agreement, and that, in any event, the claim that you didn't receive sufficient payment doesn't give rise to a breach of contract claim against Pepsi.

Did you see all those arguments?

MR. KAMDEM-OUAFFO: I saw the arguments.

THE COURT: Okay. So do you want to respond to those arguments?

MR. KAMDEM-OUAFFO: Yes, not in -- in their premotion letter they use or they restate the allegation or the cause of action as contract, but the document on which I -- this is going to be base is agreement.

THE COURT: And what's is difference between a written agreement and a contract in your mind?

MR. KAMDEM-OUAFFO: The New York State Law states that an agreement includes undertaking. So there is a number of actions that was going to take place during the time of the agreement.

THE COURT: Okay.

MR. KAMDEM-OUAFFO: And those actions included PepsiCo paying me according to the promise for compensation, and I'm alleging that they did not, they did not fulfill that agreement to the extent of that agreed on.

THE COURT: Yes, well, what they do is they cite the complaint at paragraph or page 11 that says that you acknowledge that you received at least $82,142 for the identified assignment. So is your claim that you were entitled to more compensation?

MR. KAMDEM-OUAFFO: Yes.

THE COURT: Okay. Under the agreement.

MR. KAMDEM-OUAFFO: Yes.

THE COURT: And how much compensation do you think you were entitled to under the agreement?

MR. KAMDEM-OUAFFO: At least $133,000.

THE COURT: How do you get to that number?

MR. KAMDEM-OUAFFO: It's in the PepsiCo books.

THE COURT: Which books are those? Because I don't get their books, so which books are those?

MR. KAMDEM-OUAFFO: Their accounting books.

THE COURT: What, I'm sorry?

MR. KAMDEM-OUAFFO: Accounting books.

THE COURT: Accounting books.

MR. KAMDEM-OUAFFO: Yes, and I have the evidence with me.

THE COURT: You have the evidence with you?

MR. KAMDEM-OUAFFO: Not here but I do have it.

THE COURT: I'm sorry, what kind of accounting books are we talking about here? I don't understand what

you mean by accounting books.

MR. KAMDEM-OUAFFO: What I'm saying is that PepsiCo has the numbers. PepsiCo have those written.

THE COURT: Has what written?

THE WITNESS: The amount of money that was to be paid to me and the amount of money that I actually receive is documented on my tax returns.

THE COURT: Okay. Can I just ask counsel for PepsiCo a question?

MR. MAIER: Yes, your Honor.

THE COURT: Is your argument that the 82,142 is enough?

MR. MAIER: It is, your Honor. There's nothing in that agreement that requires any specific payment of money or any specific amount.

THE COURT: So if you had given him one dollar, would that have been enough?

MR. MAIER: Your Honor, I believe he was paid in accordance with the time during which he was employed by PepsiCo, and so he obtained that consideration. He also obtained consideration in the form of the use of PepsiCo's facilities and so on that basis there was no breach of that contract and we haven't seen --

THE COURT: How do we know from the agreement that 82,142 is the right amount?

MR. MAIER: We don't, your Honor. There's nothing in the agreement that we can see that requires any specific amount, and so that's where we're also at a loss for that information. We don't know what is the basis for the claim that it should have been $130,000.

THE COURT: So you're saying PepsiCo entered into a contract where it agreed to compensation but nobody knows how much?

MR. MAIER: I do have a copy of the contract here, your Honor.

THE COURT: Yes.

MR. MAIER: And, again, there's nothing in it that talks about a specific amount. It's a temporary work assignment. The plaintiff was hired through a staffing company.

THE COURT: Yes.

MR. MAIER: And that was the -- he was an independent contractor, and so, on the basis of that relationship, he was paid hourly. And was paid hourly --

THE COURT: Does it say how much the hourly payment was supposed to be?

MR. MAIER: I don't believe it does here, your Honor. I don't believe we have that.

THE COURT: Man, Jordan, I should have done a different contract with you: Oh, we'll pay you, we'll see

how much.

MR. MAIER: Your Honor, for purposes of the motion to dismiss, the issue is really the assignment of the IP. It's something we need to look at further. But ultimately that's something that we could flesh out as part of the motion to dismiss, some more fulsome briefing, if your Honor --

THE COURT: All right, but meaning what? Meaning that the consideration can go forward, the consideration claim can go forward?

MR. MAIER: Meaning that the breach of contract claim could go forward. There's nothing in the contract we see at this point that suggests to us there was any breach. We just don't see the evidence of that. But it's something, again --

THE COURT: The plaintiff alleges that, and to be fair, at least in his letter dated March 27, $133,007.50 is what he says he was owed and he only got 82,142. So, I mean I just don't know how I would grant a motion to dismiss where you say that's enough when the contract doesn't say how much is enough.

MR. MAIER: Understood, your Honor.

THE COURT: So that's --

MR. MAIER: If we could, your Honor, have the opportunity to brief that in connection with some of these

other counts, that may be something that we can flesh out further.

THE COURT: Okay. All right.

All right. Mr. Kamdem-Ouaffo, the other causes of action that are at issue here, let's start with counts two, three and six. This relates to various documents that you say PepsiCo filed with the patent trademark office, and what PepsiCo says is that, even assuming there are these violations of the Patent Act that there's no cause of action, what they mean by that is you don't get to sue them even if they did violate these provisions of the Patent Act. And your answer is, in your letter what you say is, well, you know, they're liable to the United States because they lied to the government. And assuming that's true, just for the sake of argument, then doesn't the government have to go after them and why do you think you get a cause of action against them?

MR. KAMDEM-OUAFFO: Your Honor, I read in 35 U.S.C., and I think I reference one of those laws or statutes, that even if my IP was 100 percent assigned to PepsiCo, as an assignee, PepsiCo still has an obligation to acknowledge the source of the invention and there is a specific provision in 35 U.S.C. about it. Not only the assignee but also the other coinventors. And in this case, PepsiCo name Dr. Zhang and Dr. Given as inventors on the

patent, which Dr. Zhang should not even be there as an inventor.

So even if I assume that as an assignee PepsiCo could give itself the liberty to do something like that as to naming somebody who was not an inventor, they at least should still acknowledge that I was the source of the invention.

THE COURT: Assuming that's true, what PepsiCo is saying is that the cases that interpret the provision say that the duty that you're describing here is between the applicant and the office, the statute doesn't create a duty between the patent applicant and any inventors. So you understand that's their argument. Even if you're right about what their obligation might be, the obligation isn't to you, it's to the office, and even as the purported inventor, you don't get to sue them for violation of the Patent Act. Do you understand? That's their argument.

MR. KAMDEM-OUAFFO: Yes, and I think that's specifically referring to 35 U.S.C. 115, but I also mentioned in my letters two other provisions that clearly, that makes it very clear that the assignee would file a patent application on behalf of the assignor but they would have to meet a certain number of requirements to prove to the director of the United States Patent Office that they could file on behalf of the assignor.

So, in any case, they are not allowed to leave the name, to intentionally leave the name off the inventor out of the invention.

THE COURT: Okay. The other point --

MR. KAMDEM-OUAFFO: And also --

THE COURT: I'm sorry, go ahead.

MR. KAMDEM-OUAFFO: And, also, there is a provision in 35 U.S.C. that cases of inventorship could be brought to the court. Now, I did specifically call the United States Patent Office on this matter, and they send me -- they said, well, you might have to go to the court.

THE COURT: Well, I don't know who you spoke to there, but there still has to be a basis, there has to be a statute or there has to be some other basis in law, maybe sometimes it's a regulation, sometimes it's a court case that gives somebody a right to enforce certain provisions of the law. So, for example, you cite 18 United States Code, section 3041, which discusses the power of the courts and the magistrates to handle cases that involve offenses against the United States in your letter.

MR. KAMDEM-OUAFFO: Yes.

THE COURT: Perfectly valid citation. But the statute doesn't mean that you get to be the one to bring a lawsuit on behalf of the United States for any wrong that somebody might have done to the United States. I mean,

that's typically done by the Justice Department which is charged with enforcing the laws, and in particular the criminal laws. So, if somebody lies, for example, on a federal form, then that person could be prosecuted for making a false statement, but it would be a prosecutor who would bring that case, a criminal case. You understand?

MR. KAMDEM-OUAFFO: Yes, I understand. And my answer is, I think I mention also, I made reference to one other law, and actually a federal judge has the power to the look into those situations where --

THE COURT: I mean, if I had that power, I should get more money, but I don't. I don't have the authority to initiate or be a prosecutor. In fact, my whole job is to almost be like a referee so the prosecutor sits at one table and says the person sitting at the other table committed a criminal violation, and I might oversee that case, but I don't have the power to be both the prosecutor and the judge. So the case gets brought to me. That's why your citation to that statute is accurate that when a prosecutor accuses somebody of committing a crime, the forum for that is in a court and the statute gives the court the authority to hear such a case but doesn't give the court the authority to initiate such a case.

MR. KAMDEM-OUAFFO: You could take evidence on a case.

THE COURT: I could take evidence on a case that's properly before me, but it seems as though I guess I'm not explaining to you is you're not the one that can bring a case against them for lying to the Patent Trademark Office. It would have to be the government. And I could hear such a case, in theory, but only if it's brought by the right person or right entity. You see what I'm saying?

MR. KAMDEM-OUAFFO: In a way.

THE COURT: You've done some good legal research, I just don't know that all the research in the world is going to change any of that. But I'm just trying to explain that to you so you understand where they're coming from. I do understand where you're coming from. And the same is with respect to your counts four and five which allege larceny and forgery. Again, to the extent that they've committed these crimes, then they would have to be -- if there's forgery of your personnel record, if that's some kind of a crime, then that's not something you get to enforce. That would have to be enforced by a prosecutor. Do you understand?

MR. KAMDEM-OUAFFO: I do.

THE COURT: Okay.

MR. KAMDEM-OUAFFO: But the information, I have the information --

THE COURT: Sure.

MR. KAMDEM-OUAFFO: -- I have the evidence that these things I'm alleging did happen.

THE COURT: Okay. Let me put it to you this way.

MR. KAMDEM-OUAFFO: Okay.

THE COURT: Let's say that I'm a customer at a bank, I have my life savings at a bank and somebody robs the bank. They just rob the bank. They don't just steal my money, but the steal whatever money, whatever cash is at the bank. I don't like the fact that somebody robbed my bank, but I don't get to sue the bank robber and say, you're guilty of committing bank robbery. The prosecutor working with a police officer could bring a case, a criminal case. If it was in federal court, it would be called United States of America versus the name of the bank robber, and maybe I would be a witness, if I saw something, maybe I would want to go watch the trial because it's my bank, but I wouldn't get to sue under the criminal laws the bank robber.

I realize it's not a perfect analogy, but it's the best I can come up with in a moment, but you see the difference?

MR. KAMDEM-OUAFFO: Yeah, yes, I understand.

THE COURT: All right.

MR. KAMDEM-OUAFFO: I understand.

THE COURT: All right. Are there other points PepsiCo wants to make that we need to bring up?

MR. MAIER: One additional point on that count one, on the breach of contract claim.

THE COURT: Yes.

MR. MAIER: In our premotion conference letter, the March 26 letter, we do raise an additional basis for dismissing.

THE COURT: Yes.

MR. MAIER: And that is the *res judicata* issue. The plaintiff brought a breach of contract claim against PepsiCo in state court in Westchester County for breach of that same contract, and so that's another independent basis for dismissal of that claim that we would raise if the court took further --

THE COURT: Right, and the answer that came back was, it's not *res judicata* a because the labor laws are different than the patent laws, that's what the plaintiff says in his letter of March 27.

MR. MAIER: Right. And, your Honor, the point being the *res judicata* applies, it's a claim for breach of the same contract, that's what's being raised here in this case as well. It's a claim for breach of this staffing supply agreement. And so because it is the same contract that *res judicata* would apply for all breach of contract claims arising out of that contract.

THE COURT: Are there any other points that

PepsiCo wants to make?

MR. MAIER: The only other question I had, your Honor, is there are several other counts that are raised in the -- and I don't know if your Honor is working the amended complaint. I think there's an amended complaint as well.

THE COURT: Yes.

MR. MAIER: And we address them in our letter. I don't think there's a need for us to go beyond that unless the Court has any specific questions.

THE COURT: I don't.

MR. MAIER: Okay.

THE COURT: Mr. Kamdem-Ouaffo, is there anything else you wanted to say?

MR. KAMDEM-OUAFFO: Yes. Concerning *res judicata*, there is none, your Honor. The staffing agreement is different from the intellectually property agreement. So there are two documents. Now, the one that PepsiCo is referring to is not the document from which I'm bringing this action. The staffing supply agreement, that was, it's a document that PepsiCo actually use in Labor Law.

And background wise what happened is that the Labor Law was brought on the basis of toxic substances and that has nothing to do with the patent and intellectual property law, it has to do with exposure to toxic substances. And I did submit to the Court a copy of the

 lawsuit and it's posted on the Pacer. There is no reference to the intellectual property agreement in that lawsuit. It's all about exposure to toxic substances.

Now I also did mention in one of my answer to defendant that I actually brought to the Westchester County Judge that I discovered that PepsiCo took my intellectual property and filed a patent, intentionally and willfully removed my name from the patents and credited the work to somebody like Dr. Zhang, who was not even with the company at the time that I was doing the work. And so I brought that to -- I wrote an affidavit and I submitted to the Westchester County Judge --

THE COURT: Yes.

MR. KAMDEM-OUAFFO: -- asking him whether he would want to exercise jurisdiction on that as part of the toxic substance Labor Law complaint. He declined. So from that perspective, I don't see why PepsiCo would be advocating *res judicata*.

I provided a copy of the affidavit to PepsiCo in 2012 asking PepsiCo to make amendment of the inventorship, that was in August 2012, long before the '637, that's how ScentSational Technology call it, the '637 patent that was granted in July last year. A year before that patent was granted, I had requested PepsiCo to make correction on the inventorship, and I had submitted an affidavit to the

Westchester County Supreme Court. The court declined to exercise jurisdiction on it. PepsiCo did not take any action. They did not even answer me. So there is no basis for *res judicata* here.

And I also I submitted the same affidavit that I wrote in 2012 to the Westchester County DA's office, and at the time, and I think that letter is posted on Pacer, the DA looked into my affidavit and concurred that, in fact, there was some kind of patent fraud being committed by PepsiCo but that they had no jurisdiction over it.

So, as it stand now, the United States Courts is the only venue that has accepted to look into the case.

THE COURT: Okay. Is there anything else you want to add to your letter on the other counts?

MR. MAIER: No, your Honor.

THE COURT: I guess the question then is, how long would you like to file this motion to dismiss?

MR. MAIER: Your Honor, if we could have that on a similar timeframe to the other, I think that would make sense.

THE COURT: I've already forgotten maybe.

MR. MAIER: June 6.

THE COURT: June 6, how could I forget that? Mr. Kamdem-Ouaffo. Here's what we're going to do. I'm going to let the defendants file a motion to dismiss, and

what they're going to do is they're going to argue along the same lines that they argued in their letter, and the letter is meant just to be a preview, kind of like a little peek at what they're going to argue in a bigger document explaining why the various counts in your amended complaint should be dismissed. And then, of course, I'll give you a chance to respond. Would a month be long enough for you to respond?

MR. KAMDEM-OUAFFO: If you could add two more weeks, your Honor.

THE COURT: You want six weeks to respond?

MR. KAMDEM-OUAFFO: Yes.

THE COURT: All right. So we'll say July 20th.

MR. KAMDEM-OUAFFO: Yes.

THE COURT: No, I'm sorry, let's say July 18 because the 20th is a Sunday, so let's give you to Friday July 18 to respond. And all they're allowed to do, just so you understand at this stage, they're not allowed to basically provide their own evidence. Okay? The only thing they're allowed to do in this motion is argue that the causes of action that are in your complaint should be dismissed because, even assuming everything you say in there is true, you still haven't stated a cause of action, you've heard either *res judicata* grounds or the claim you're not the right person to bring the certain cause of action, it's a legal doctrine called standing that, even taking the

allegations in your complaint as true, there's no breach of contract, so on and so forth. You have some idea. I just want to make sure you understand. This is not where they get to introduce their own evidence. Okay? They have to accept what's in your complaint as true.

So that's what they're going to do. You can respond however you'd like in writing as to why you think you do state a cause of action, why you think you are the right person to bring these causes of action, why there's no *res judicata*. You've given a preview of what those arguments might be. They'll get to respond. We'll say that the reply will be due August the 8th, and then I will issue an opinion ruling on the motions saying their motion is granted, it's denied, it's denied in part and granted in part. And then we'll see where we are. Okay?

MR. KAMDEM-OUAFFO: Okay.

THE COURT: With respect to ScentSational, you're going to have sit tight on them. Okay? They're not a named defendant in this case. To the extent you want the get to of discovery, we're going to have to resolve these motions first. I think it's appropriate under the circumstances because I think the motions do raise some serious questions about the viability of your causes of action. So I want to resolve those questions first before you go trying to get discovery from an unnamed entity. Okay?

MR. KAMDEM-OUAFFO: Okay. That date is July 18 did you say?

THE COURT: What's that?

MR. KAMDEM-OUAFFO: The date?

THE COURT: Your response is going to be due July 18.

MR. KAMDEM-OUAFFO: Okay.

THE COURT: All right, is there anything else from PepsiCo, et al.?

MR. MAIER: No, your Honor.

THE COURT: Mr. Kamdem-Ouaffo, is there anything else from your perspective?

MR. KAMDEM-OUAFFO: No, your Honor.

THE COURT: All right. Thank you for your patience. Again, I'm sorry to have kept you all waiting I'll bid you a pleasant afternoon.

(Proceedings concluded at 3:51 p.m.)

C E R T I F I C A T E

I, Angela A. O'Donnell, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

________________________________

Angela A. O'Donnell, RPR, Official Court Reporter
United States District Court, Southern District of New York

TAB 4

PRO SE OFFICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

RICKY KAMDEM-OUAFFO, PhD

CIVIL DOCKET #:7:14-CV-00227-KMK

Plaintiff,

**Affidavit Of Ricky Kamdem In Support of Plaintiff's Counterclaim And In Support Of The Denial of the Defendants' Motion To Dismiss**

-against-

PEPSICO INC.,
DR. PETER S. GIVEN JR,
DR. NAIJIE ZHANG,
JOHN DOE AND/OR JANE DOE

Defendants,

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/9/14

I, Ricky KAMDEM-OUAFFO, PhD, being duly sworn, say that:

**ON THE PLAINTIFF'S TECHNICAL BACKGROUND**

**1.** I am the Plaintiff in above captioned Action and a copy of the Amended complaint is shown as EXHBIT I, and was also exhibited to the Defendant Motion to as Exhibit 2.

**2.** The Plaintiff is a PhD in Food Chemistry, Master of Science in Food Technology and Engineering, and Bachelor of Science in Biology and Biochemistry.

**3.** The Plaintiff has many years of experience in the research and development, manufacturing, analysis and application of flavors and aromas.

**4.** The Plaintiff has several years of hands on academia and industry experience in flavor encapsulation, and the use and applications of edible film formers.

**ON THE "FOOD SCIENTIST CONTRACTOR ROLE" AND THE RELATED AGREEMENTS**

**5.** On or around the third week of June 20th 2008, a PepsiCo's business partner named Subex Technologies Inc. contacted the Plaintiff on behalf of PepsiCo Inc. for a Food Scientist Contractor "Role" at the PepsiCo's Research and Development facility in Valhalla, NY [EXHIBIT II(1 & 2)].

**6.** At the time that the PepsiCo business partner contacted the Plaintiff in June 2008, the Plaintiff had been working on joint flavor project for Kemin Industries based in des Moines, IA and Tyson Foods based in Springdale AR and was physically.

**7.** The description of the "Role" was inter alia to "*...Lead product development efforts for new technology Principle Accountabilities Measures. Lead product development in the area of stability § consistency. Project objectives and plans developed and aligned cross functionally prior to initiation of work. Provide technical guidance and bench development for targeted development initiatives and existing brands...* " [EXHIBIT II(1)].

**8.** The ability and required qualifications for the "*Role*" included inter alia "*...Ability to generate and lead state-of-the art development techniques and consumer testing methodologies. Strong working knowledge of experimental design. Outstanding communications skills (verbal and written)...Ability to provide thoughtful leadership on both strategic and tactical aspects of projects...Successful creation and commercialization of products...* " (EXHIBIT II(1).

**9.** The Defendant PepsiCo's job description had the following in the "*Notes*": "*Heads not hands multi-tasker...*". [EXHIBIT II(1)]

**10.** The Plaintiff provided the PepsiCo business partner with a copy of the Plaintiff's resume which was then forwarded submitted to PepsiCo by its business partner Subex Technologies Inc. [EXHIBIT II(2)].

**11.** Shortly after the Plaintiff's resume had been submitted to PepsiCo, the Plaintiff was contacted directly by PepsiCo's personnel named Peg for a phone first phone screening.

**12.** Then Peg recommended the Plaintiff for a second phone interview with another PepsiCo personnel named Marco and the interview took place shortly after.

**13.** On or around June 27th, 2008 the PepsiCo business partner named Subex Technologies then informed the Plaintiff that PepsiCo wanted face to face interview with the Plaintiff at the PepsiCo's Valhalla, NY facility and the Plaintiff consented.

**14.** On around July 1st 2008 at 11:00 the Plaintiff went to the PepsiCo's Valhalla facility in New York for and had face to face interview.

**15.** The PepsiCo personnel who interviewed the Plaintiff included Mike, Marco, Ruowe etc...

**16.** On or around July 8th 2008, following the face to face interview, the Plaintiff was offered the "Role" of "Food Scientist" "contractor" at PepsiCo's facility in Valhalla, New York EXHIBIT II(2).

**17.** Although it had not been part of the interview process, the offer came along with the request from the Defendant PepsiCo that the Plaintiff must sign a perpetual *"Attachment B To The Staffing Supplier Agreement - Supplier Employee Agreement Regarding Confidentiality And Intellectual Property"* in addition to signing other Food Science Contractor "Role" related "Agreements" (EXHIBITS III).

**18.** The "*Agreements*" for the "Food Scientist" "Contractor" "Role" were previously discovered during the May 4th, 2012 Deposition of Peter Given and were identified as "*Attachment B*", "*Attachment C*", "*Attachment D*" in addition to the "Code of Conduct – PepsiCo" (EXHIBIT IV, Peter Given's Deposition Transcript, pp. 36 – 45).

**19.** "*Attachment B to the Staffing Supplier Agreement*" was Titled "*Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property*" (signed by Ricky Kamdem-Ouaffo on July 9, 2008) (IV).

**20.** "*Attachment C to the Staffing Supplier Agreement*" was Titled "*Acknowledgement of Temporary work assignment*" (signed by Ricky Kamdem-Ouaffo on July 9, 2008) [EXHIBIT III(1)].

**21.** "*Attachment D to the Staffing Supplier Agreement*" was Titled "*Communications and Information Systems User Agreement*" (signed by Ricky Kamdem-Ouaffo on July 9, 2008) [EXHIBIT III(2)].

**22.** Code of Conduct – PepsiCo (signed by Ricky Kamdem-Ouaffo on July 9, 2008) [EXHIBIT III(3)].

**23.** The "*Attachment B*" "*Agreement Regarding Confidentiality And Intellectual Property*" (IP &C) [EXHIBIT III(1)] was a provision for the purchase of the Plaintiff's intellectual property created "*during or outside of the Regular work hours*" throughout the duration of the Plaintiff's tenure of the "Food Scientist" "Contractor" "Role"

**24.** The Defendant PepsiCo had willfully and of its own choice delegated[1] to the its business partner named Subex Technologies Inc., the negotiations of the terms of the terms of the

[1] The contract for delegating its human resources needs to Subex Technology are still among discovery documents covered by a Court Ordered Confidentiality Agreement (EXHIBIT XVII) on discovery material for the Westchester County Supreme Court of the State of New York Index No. 22625/10 and has not so far been part of any public

purchase price of the Plaintiff's "Intellectual Property and the Confidentiality" thereof as well as the authority to sign on behalf of PepsiCo for securing the purchase of the Plaintiff's intellectual property.

**25.** The negotiations of the terms and conditions of the purchase of the Plaintiff's intellectual and the confidentiality thereof took place and resulted in the Plaintiff signing the "*Attachment B - Agreement Regarding Confidentiality And Intellectual Property*" proposed by the Defendant PepsiCo Inc. on July 9th 2008 along with the other agreements [EXHIBITS III].

**26.** The "*Attachment B*" "*Agreement Regarding Confidentiality And Intellectual Property*" called for the mechanism of assignment as the material and instrumental mean of the transfer of the Rights, Titles, Interests…of the Plaintiff's intellectual property to the Defendant PepsiCo Inc. along with promise of maintaining confidentiality of the same Plaintiff's IP, "in consideration of payment to" the Plaintiff as negotiated and entered into a separate commercial document called "Purchase Order" to be issued by the Defendant PepsiCo for the Plaintiff (EXHIBIT V).

**27.** No immediate "payment" was made to the Plaintiff for the purchase of the Plaintiff's intellectual and confidentiality thereof at the moment of signing the said The "*Attachment B*" "*Agreement Regarding Confidentiality And Intellectual Property*", and the plaintiff's signature was given on the sole basis of the promises of payment made to the Plaintiff both in verbal and in writing as embodied in the Purchase Order (PO) issued by the Defendant PepsiCo for the Plaintiff under "PepsiCo SAP PO#4100366241, AS PO # PSC01564" (EXHIBIT V).

**28.** The said PO was issued for and Engagement Start Date of 13-JUL-2008 and was updated until 20-OCT-2009, therefore the PO significantly postdated the Food Scientist Contractor Role" related Agreements signed on 09-JUL-2009 (EXHIBIT V).

---

record from which the Plaintiff could make a copy for the United States Court unless the US Court voids the Court Ordered Confidentiality Agreement.

**29.** From the moment of signing the "*Attachment B – Agreement Regarding Confidentiality And Intellectual Property*" and up until September 28th 2009, the Plaintiff effectively performed "*...during and outside of regular work hours...*" and delivered "good" and patentable quality Intellectual Property for the PepsiCo Inc. secured with confidentiality until this date (EXHIBITS III).

**30.** Monetary "...payment..." in US dollars was the only final negotiated means of purchase for the Plaintiff's Intellectual Property and the Confidentiality (IP & C) thereof as can be seen on the "Purchase of Order", and the purchase price for the Plaintiff's IP & C was entered on the "PepsiCo SAP PO # 4100366241, AS PO # PSC01564" (EXHIBIT V).

**31.** Pursuant to "*Attachment B*" "*Agreement Regarding Confidentiality And Intellectual Property*" the Plaintiff diligently worked "*...during and outside of regular work hours...*" and held no other contract with any other company.

**32.** The Plaintiff's diligent daily and nightly effort resulted in the creation of novel, inventive and useful intellectual property both in quantity and quality.

**33.** As of October 20th 2009, the updated "PepsiCo SAP PO # 4100366241, AS PO # PSC01564" purchase price of the Plaintiff's IP&C effectively delivered by the Plaintiff to the Defendant PepsiCo from PO "Engagement Start Date" of 13-Jul-2008 to 05-OCT-2009 (PO End Date) was $133,007.50 (EXHIBIT V).

**34.** For the year 2008, the Plaintiff was issued a W-2 Wage and Tax Statement of $25,938 through the PepsiCo Inc.'s business Partner named Subex Technology Inc., of which $4,542 was withheld for Federal Income Tax, $1,608.00 for Social Security tax, $376.00 for Medicare tax, and $931 for NJ State tax. So the Plaintiff take home pay from PepsiCo was $18,481 [EXHIBIT VI(1)].

**35.** As can be seen on the W-2 Wage and Tax Statement from Subex Technologies Inc. for the year 2008, the Plaintiff did not receive any other form of "*...good or valuable consideration...*" either directly from the defendant PepsiCo Inc. or from its business partner who issued the W-2 Wage and Tax Statement.

**36.** For the year 2008, the Plaintiff also received another W-2 Wage and Tax Statement from Kemin Industries Inc., Des Moines, IA, for an amount of $59,59.930 pre-tax [EXHIBIT VI(2)].

**37.** The 1040 US individual Tax Return 2008 "Line 7 - Total wages, salaries, tips etc..." shows an income of $59,930 + $25,938 = $85,868. [EXHIBIT VI(3)].

**38.** The Plaintiff's 1040 US individual Tax Return 2008 "Line 21 – Other Income" shows that the Plaintiff did not receive any additional income from any source, therefore the Plaintiff did not received any form of tips or any other valuable consideration either from the defendant PepsiCo or from any of its business partners.

**39.** For the year 2009, the Plaintiff's W-2 Wage and Tax Statement through PepsiCo's business Partner named Subex Technology Inc. was $56,204, of which $9,509.00 was withheld for Federal Income Tax, $3,485.00 for Social Security tax, $815.00 for Medicare tax, and $2,246 for NJ State tax, and $2,246 for IL State Income Tax. So the Plaintiff take home pay from PepsiCo was $37,903 [EXHIBIT VII(1)].

**40.** For the Year 2009, the Plaintiff only had one W-2 Wage and Tax Statement which came from Subex Technologies for payment toward the PO issued by PepsiCo Inc. for the purchase of the Plaintiff's IP&C.

**41.** The Plaintiff's 1040 US individual Tax Return 2009 "Line 21 – Other Income" shows that the Plaintiff did not receive any additional income from any other source [EXHIBIT VII(2)].

**42.** As can be seen on the W-2 Wage and Tax Statement from Subex Technologies Inc. for the year 2009 and the accompanying certified Tax Record released by the IRS, the Plaintiff did not receive any other form of "*...good or valuable consideration...*" either directly from the defendant PepsiCo or from its business partner who issued the W-2 Wage and Tax Statement.

**43.** From the above, the Plaintiff's total take home pay for his IP&C was = $18,481 + $37,903 = $56,384.00 out of the $133,007.50 of the "PepsiCo SAP PO # 4100366241, AS PO # PSC01564" purchase price for the Plaintiff's IP&C.

**44.** The Plaintiff's total take home pay for his IP&C was therefore just about 42.39% of the PO purchase price for the Plaintiff's I&C.

**45.** In view of all the above, the plaintiff still has about 57.61% of "Rights, Titles, and Interests" in his IP and the patents thereof.

**46.** The difference between the "PepsiCo SAP PO # 4100366241, AS PO # PSC01564" Purchase price of the Plaintiff's IP&C and the "...Payment..." that the Plaintiff took home was $133,007.50 - $56,384 = $76,623.50.

**47.** The Defendant PepsiCo has at no time either directly or indirectly through any its business partners paid the remaining balance of $76,623.50 of the "PepsiCo SAP PO # 4100366241, AS PO # PSC01564" purchase price for the Plaintiff's IP&C.

**48.** Only during depositions for the Supreme Court of the State Of New York case Index No. 22625/10 did the Plaintiff come into knowledge of the Purchase Order Details, in May 2012, and a true copy of the said PO was actually produced to the Plaintiff only during a defendant's Motion in March 2013, otherwise the Defendant PepsiCo and its business partner Subex Technology Inc. had not released the PO to the Plaintiff directly until recently.

**ON THE INVENTIONS AND INTELLECTUAL PROPERTY CREATED BY THE PLAINTIFF**

**49.** Upon accepting the Food Scientist Contractor Role for the defendant PepsiCo Inc., the Plaintiff immediately started working hard and designing studies and experiments for PepsiCo *"...during and outside of regular work hours..."* and from July 28th, 2008 the Plaintiff started going to the Defendant's facility in Valhalla to carry out experimentation and to present his findings (EXHIBIT VIII).

**50.** During the contract, the Plaintiff was required to log into a website name https//pepsico.procurestaff.com, which upon information and belief was also the website of PepsiCo business partner such as one named "ProcureStaff Inc.", to whom PepsiCo appeared to have delegated some other administrative functions for the Plaintiff's Food Scientist Contract Role in the (EXHIBIT VIII).

**51.** During the Plaintiff's tenure as "Food Scientist" "Contractor" for the Defendant PepsiCo Inc., the Plaintiff pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, methods, and processes, and techniques of significant commercial value that none of Defendant's employees has been able to do prior to the Plaintiff's tenure as testified by Dr. Given and Dr. Zhang during the depositions for Supreme Court of New York Case Index No. 22625/10 (EXHIBITS IV & IX).

**52.** Below is an excerpt of Peter Given May 4th 2012 deposition's in relation to the Plaintiff been the one who came with the aroma project:

> "***Q (Mr. Schatkin, Ex Plaintiff's attorney):*** *And you say he was there for a transfer of the aroma project or coming from the aroma project?*
>
> ***A (Peter Given, PepsiCo Witness)****: I would say he came with the aroma project because he had been working on it*"
>
> [EXHIBIT IV, Peter Given's Deposition Transcript, Page 24 (Lines 21-24)].

**53.** During the Plaintiff's tenure as Food Scientist Contractor for the Defendant PepsiCo, the Plaintiff pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, methods, and processes of significant commercial value and the Plaintiff also taught and trained Defendant's scientists in the same art and skills.

**54.** Below is an excerpt of Naijie Zhang May 29th 2012 deposition transcript in Regard to the Plaintiff as being instrumental "*...in first establishing and bringing for the idea and importance of advanced delivery systems for food packaging at PepsiCo...*"

> "***Q (Mr. Schatkin, Ex Plaintiff's attorney)***: *"Is it correct to state that Dr. Kamdem's work was instrumental in first establishing and bringing for the idea and importance of advanced delivery systems for food packaging at PepsiCo. Is that true?"*
>
> ***A (Naijie Zhang, PepsiCo witness)***: *"Yeah.*
>
> *Q: "And as far as flavor encapsulators go that they should be able to withstand high relative humidity?"*
>
> ***A:*** *"Yeah."*

[EXHIBIT IX, Naijie Zhang's Deposition Transcript p. 54(Line 13 – 25)]

**55.** The Plaintiff's Intellectual property was recorded in several laboratory notebooks, stored on computers, and note pads, all of which the defendant PepsiCo Inc. and its Managers seized from the Plaintiff on 09/28/2009 when they ordered the Plaintiff to leave PepsiCo's facility and not return again.

**56.** The Plaintiff's intellectual property that the Plaintiff created was patentable both within the United States and Internationally as testified by Peter Given (EXHIBIT IV):

**57.** Below is an excerpt of Peter Given May 4th 2012 deposition's in relation to the Plaintiff's patents for his inventions on aroma.

> "***Q (Mr. Schatkin, Ex Plaintiff's attorney):*** *Did Dr. Kamdem ever attempt to patent something, some kind of intellectual property with PepsiCo?*
> *MR. HUNTER: If you know.*

***A (Peter Given, PepsiCo Witness):*** *No. No, no, I do have a somewhat vague recollection that he wanted to patent a device he built for doing release head space measurements.*

***Q:*** *What do you mean by that, head space measurements?*

***A:*** *Its where in a confined space you can release aroma and then take a sample of that and measure it by chromatography as Dr. Kamdem talked about earlier.*

***MR. SCHATKIN:*** *I'd like this marked, please.*
*(A document Bates stamped 302 through311 was marked as Plaintiffs Exhibit B, for identification, as of this date.)*

***MR HUNTER:*** *We've got page 302 consecutively through 311.*

***THE WITNESS:*** *This is incentive to never e-mail again. My God, there's so damn many.* ***MR HUNTER:*** *Is this the e-mail that went around the world?*

***Q:*** *You've seen that before?*

***A:*** *Yeah. Most of it, yes.*

***Q:*** *It has to do with some patent or invention that Dr. Kamdem had, right?*

***A:*** *Had to do with an invention that Dr. Kamdem wanted to be named as an inventor on.*

***Q:*** *And you opposed?*

***A:*** *What's that?*

***Q:*** *It was opposed?*

***A:*** *I opposed it? I don't think—*

***Q:*** *Well let me put it this way, you looked at this series of e-mails and you're familiar with it?*

***A:*** *Intimately maybe, maybe not.*

***Q:*** *He says we will make determinations of inventorship — this is from Carolyn Sloan to Mr. Zhang — until the following claims are drafted. Is that in reference to Dr. Kamdem's claim?*

***A:*** *Can you repeat the Question?"*
[EXHIBIT V, Peter Given Deposition Transcript, Page 96 (Line 7) Page - 97(Line25)]

**58.** The Plaintiff's tenure as Food Scientist Contract for the Defendant PepsiCo started on July 13th 2009 for the next 10 months the Plaintiff produced most of his inventions before Naijie

Zhang joined or become an employee PepsiCo Inc. at a time that Plaintiff had already created and conceptualized his inventions and reduced them to practice.

**59.** The following is a May 29th 2012 Naijie Zhang Deposition's transcript testifying that Dr. Zhang Joined PepsiCo only in May 2009:

> ***Q (Mr. Schatkin, Ex Plaintiff's attorney):*** *Dr. Zhang, this is a deposition. I'll be asking you some questions about Dr. Kamdem and what happened here. It's an information session so there's no personal like dislike or anything like that. Anyhow, where do you work now?*
>
> ***A (Naijie Zhang, PepsiCo witness):*** *Now? Pepsi.*
> ***Q:*** *Yeah.*
> *A: PepsiCo.*
> ***Q:*** *And what do you do there?*
> ***A:*** *We are scientist in research, product development.*
> ***Q:*** *And how long have you been there?*
> *A Since the past three years here. Three Years this month, two weeks ago, yeah".*

[EXHIBIT VIII, Naijie Zhang's Deposition Transcript p. 4(Line 13) – p. 5(Line2)]

**60.** The plaintiff had no intellectual input from Dr. Given at the time the Plaintiff conceptualized his patentable and now patented inventions as the Plaintiff worked mainly independently *"...during and outside of regular working hours..."*

**61.** Shortly after Dr. Zhang joined PepsiCo Inc. around beginning May of 2009, the defendants PepsiCo and its protégés informed the Plaintiff that they wanted to use an alternative approach to the solve a technical challenge that the Plaintiff had discovered earlier during the evaluation of PepsiCo flavor encapsulates.

**62.** At the time in May 2009 the Plaintiff had already been developing a process and method that he had conceptualized to solve the challenge he discovered during the evaluation of PepsiCo aroma encapsulated and the Plaintiff had named his process and method as "*double coating technology*" and which later became the subject matters of US Patent No. 8,474,637 B2 and US Patent Publication "551".

**63.** The alternative technology that the defendants wanted to apply consisted of using formaldehyde aroma capsules in aroma burst product for humans and they wanted the Plaintiff to lead the effort of designing performance evaluation of the formaldehyde aroma capsules for human panels (Defendant's Exhibit 3, Pages 1 - 4[2]).

**64.** Formaldehyde is a well-known human carcinogen of the nose, of the nasal cavity, of the sinus and of the brain.

**65.** On June 30th, 2009, the Plaintiff objected in writing to the use of formaldehyde capsules for human aroma (EXHIBIT X, Defendant's Exhibit 3).

**66.** The Plaintiff was sharply criticized within the company for having formulated and communicated a scientific opinion of his own.

**67.** Finally when the time to renew the Plaintiff's contract came, around Mid-September 2009, the defendants chose to find a replacement for the Plaintiff instead of renewing the Plaintiff's Food Scientist Contract (EXHIBIT XI).

**68.** The matter of whether the Defendant PepsiCo lawfully decided not to renew the Plaintiff's Food Scientist contract and the Plaintiff's exposure by inhalation to the defendant's toxic and hazardous aroma substance from July 29th 2009 to August 3rd, 2009 is currently the subject of an Action in the Westchester County Supreme Court of New York under Index Number 22625/10.

**69.** The Plaintiff is currently sustaining serious health damages as result of exposure to toxic substances at the Defendant's facility from July 29th 2009 to August 3rd, 2009 which occurred when the Defendant deceived the Plaintiff to be exposed by inhalation, without telling the

[2] The Plaintiff cautioned the Court that some of the facts as stated by the Westchester County Supreme Court were not correctly narrated but however the factual background as stated therein at least defined the context of the 22625/10 Action and established very clearly that the subject of the said Action was "Labor Laws and Toxic Substances.

Plaintiff that it was the formaldehyde capsules, until the Plaintiff discovered on August 3rd, 2009 and demanded that the evaluation that was ongoing should be stopped immediately. But nevertheless the damages because the Defendant's substance was substance known since 11/17/2007 to be a substance to "avoid Breathing vapors" (EXHIBIT XII, MSDS Section 7).

**70.** The Plaintiff commenced Labor Law and Toxic Substances Action against the defendant PepsiCo on 9/17/1010 under Supreme Court of the State of New York Index No. 22625/10 (EXHIBIT XIII).

**71.** The Plaintiff causes of Action in the Index No. 22625/10 Action were formulated based on 38 statements of fact, none of which included matters related to the Plaintiff's intellectual property, but the Breach of contract alleged that the Defendant had terminated the Plaintiff's contract "...prior to the end date..." in retaliation for the Plaintiff's disclosure of the defendant's practices that violated the laws and regulations pertaining two work and public safety (EXHIBIT XIII).

**72.** On July 9th, 2013, the Westchester County Court of the Supreme Court of New York granted summary Judgment to Defendant PepsiCo in error and the matter is currently under review at the Appellate Division, Second Judicial department. The parties have submitted their Briefs but Oral arguments have not been scheduled yet (EXHIBIT XIV).

**73.** Nevertheless it should be highlighted that it was during the discovery of the Labor Law and Toxic Substances Action at the Supreme Court of New York, Westchester County, that the Plaintiff found undisputed evidence of the massive intellectual property fraud and theft committed by the Defendants as can be seen in some of the e-mails strings [EXHIBIT XI(2) & EXHIBIT XV].

**74.** The Plaintiff discovered that around the same time that the Defendants decided not to renew the Plaintiff's contract, PepsiCo Inc. and its Managers, Peter Given, Naijie Zhang and with the involvement of John and Jane Doe secretly concerted to expunge the Plaintiff's name from the Plaintiff's Intellectual Property and inventions that he had delivered to PepsiCo during 15 months of contract work (EXHIBIT XV).

**75.** It is undisputed that the order to expunge the Plaintiff's name from the patents of his Intellectual Property came from PepsiCo's Senior Managers such Valerie Jacklin (a PepsiCo Inc. Vice President of R&D) who wrote to Peter Given and Mike Finnerty (Director of the Ingredient Technology Group) saying: *"...Not Sure We Want Ricky On The Invention List ...."* (EXHIBIT XV, PC 0305).

**76.** It is undisputed that the Defendants' decision to let the Plaintiff contract expire appeared to have been at least fueled by the desire to leverage their decision making power to steal and to unlawfully get into possession of the Plaintiff's intellectual property and inventions. Accordingly Peter Given wrote: *"...his contract is terminating Oct 5, and he will be informed this week...more drama! Please do not distribute this info, but may impact our decision on inventorship..."* (EXHIBIT XV, PC 0302).

**77.** Naijie Zhang also wrote: *"Ricky Kamdem is not an inventor...."* Although he knew that the Intellectual property was invented by the Plaintiff before he joined PepsiCo as a PepsiCo employee (EXHIBIT XV, PC 0302)

**78.** On September 23rd, 2009, the Plaintiff was called for a meeting with one of the defendant's manager by the name of Aida Costello in her office, and having closed the doors shoe told the Plaintiff was *"...culturally Unfit..."* in regard to the Plaintiff being a person of the black skin color and independently formulating opinions that was contrary to the opinions of the

defendant PepsiCo protégés and then wrote to the Plaintiff later on that the Plaintiff needed some coaching which the Westchester County Court Judge referred to as "*...stereotyping...*" (defendant's Exhibit 3, Page 11) and "*...racial bias on his culture...*" (defendant's Exhibit 3, page 29).

**79.** Upon expunging the Plaintiff's name from the Plaintiff's inventions, PepsiCo Inc. then colluded with its protégés named Dr. Naijie Zhang and Dr. Peter Given who signed fraudulent "*Patent Application Joint Declaration and Power Of Attorney*" to claim for themselves the inventorship of the Plaintiff's IP and to simultaneously assign the Plaintiff's IP to PepsiCo Inc. their protector, although they did not contribute to the creation of Plaintiff's Intellectual Property that has now been claimed worldwide by PepsiCo Inc. as its personal property (EXHIBIT XVI).

**80.** In return for the Assignment, Peter Given, Naijie Zhang and the Managers who worked to expunge the Plaintiff's name and to push the Plaintiff out received promotions, bonuses, stock options, etc...

**81.** For example Dr. Given became Director at PepsiCo thereafter ([EXHIBIT IV, Peter Given Deposition Transcript, Page 5 (Line 2- 3)].

**82.** A PepsiCo Human Resources Manager, Mrs. Aida Costello, who was involved in the decision of terminating the Plaintiff inter alia so that they could seized the Plaintiff Intellectual property also testified during her May 2012 Deposition[3] that she was promoted to Director of Human Resources for PepsiCo Inc.

**83.** Upon expunging the Plaintiff's name from his patents and Intellectual Property and crediting the same to its protégés, PepsiCo also secretly entered into PepsiCo Inc.'s records that

---

[3] Aida Costello's Deposition Transcript is still among discovery documents covered by a Court Ordered Confidentiality Agreement (EXHIBIT XVII) on discovery material for the Westchester County Supreme Court of the State of New York Index No. 22625/10 and has not so far been part of any public record from which the Plaintiff could make a copy for the United States Court unless the US Court voids the Court Ordered Confidentiality Agreement.

the Plaintiff was an employee with unsatisfactory performance "*Dept. not satisfied*", although they knew well that the Plaintiff's work resulted in good and high quality patentable Intellectual Property (EXHIBIT V).

**84.** The Plaintiff has thus far identified several patent applications and patents thereof of his intellectual property all of which PepsiCo Inc. credited to PepsiCo's protégés, with no mention of the Plaintiff's name anywhere therein.

**85.** At least one patent from the Plaintiff's intellectual property was granted on July 2, 2013 as US Patent No. 8,474,637 B2, initially Published by the USPTO as US Patent Publication No. 2012/0006909 A1 on 01/12/2012.

**86.** The evidence supporting the allegations that defendants did the things alleged above was discovered by the Plaintiff during the discovery of a labor law dispute mentioned earlier between the Plaintiff and the Defendant PepsiCo, the Plaintiff having found among the 2,300 pages documents produced by PepsiCo under the Cover of a Court Ordered Confidentiality (EXHIBIT XVII) that there were some PepsiCo internal communications related to the Plaintiff's IP.

**87.** The Plaintiff having been alerted by the e-mail strings found in the Defendant's discovery documents, the Plaintiff asked Dr. Zhang and Dr. Given some questions about the said communications during their depositions, but they were deliberately vague and denied any impropriety and did not reveal anything about the patents (EXHIBITS IV & IX).

**88.** Nevertheless, in August 2012, the Plaintiff finally found out about a PepsiCo patent publication Published at the United States Patent Office as US Patent Publication No. 2012/0006909 A1 published on 01/12/2012 which was a verbatim embodiment of the Plaintiff's inventions.

**89.** The Plaintiff alerted his attorney and wrote an affidavit and submitted to Hon. Justice Scheinkman of the Supreme Court of New York, the Judge assigned to the Plaintiff's Labor Laws and Toxic Substances lawsuit at the Westchester County Supreme Court (EXHIBIT [XVIII(1) and XVIII(2)].

**90.** Hon. Justice Scheikman declined to give consideration and or to accept jurisdiction over the Plaintiff's intellectual property question (EXHIBIT XIX).

**91.** On October 11, 2012 the Plaintiff through his legal representative resubmitted the Affidavit Materials to Hon. Justice Scheinkman and to PepsiCo Inc. with a request that PepsiCo should make amendment, but the defendant never responded to the Plaintiff nor did the Defendant make the amendment sought (EXHIBIT XX).

**92.** In the request for amendment, the Plaintiff specifically named USPTO Patent Publication No. US 2012/0006909 A1 published on 01/12/2012 and recently granted to PepsiCo and its protégés as US Patent US 8,474,637 B2 on July 2, 2013.

**93.** The Plaintiff's request for amendment was supported by the determination of an attorney practicing in patent laws, who independently evaluated and compared the Plaintiff's documented ideas and work with the content of the PepsiCo USPTO Patent Publication No. US 2012/0006909 A1 which was in still under prosecution at the time [EXHIBIT XVIII(2)].

**94.** PepsiCo did not answer the Plaintiff's request nor did PepsiCo make the amendment requested.

**95.** The Plaintiff then contacted the District Attorney of the Westchester county in the State of New York and submitted a copy the Plaintiff affidavit along with evidence for evaluation and the DA concurred that there was Patent fraud but had no jurisdiction over the matter (EXHIBIT XXI).

**96.** The Plaintiff also contacted the FBI offices in Newark, NJ where he went in person in July 2013 to file a complaint against the defendant PepsiCo Inc. and the FBI having reviewed the Plaintiff's affidavit along with the support e-mails and the Patent attorney evaluation then forwarded the complaint the FBI in Connecticut where the Defendants Dr. Given and Dr. Zhang resided.

**97.** The Plaintiff also inquired if the FBI office in New York about the matter (EXHIBIT XXII).

**98.** A Connecticut based FBI agent subsequently called the Plaintiff from Phone # 1 203 777 6311 to inform the Plaintiff that because there was an "*Intellectual Property Agreement*", the FBI could not initiate any Action against the fraudulent until a Judge who has jurisdiction over the intellectual property matter determine whether the Defendants' actions of expunging the Plaintiff's name of from the Plaintiff's inventions and appropriating the same for themselves was legally justified.

**99.** The Plaintiff also called the Patent Office and was directed to the USPTO Legal Department who then informed the Plaintiff that for allegations of fraud the USPTO would normally not investigate such things and that if the plaintiff was seeking to get remedy for the wrong that has been done to him then the Plaintiff would need to go to a United States Court to take action against the fraudulent applicants in accordance with the MPEP Chapter 1900 to which the Plaintiff was also referred by the USPTO Legal Department (EXHIBIT XXIII).

**100.** A patent from the UPSTO is a government instrument that recognizes an inventor's useful and novel embodiment of the inventor's Intellectual Property and is considered by the 35 U.S.C. §261 as having the attributes of personal property.

**101.** A 35 U.S.C §115 requirement for applying for patent is that the original and first inventor(s) must file an "Inventor's Oath or Declaration" aka "Oath of Applicant" (pre-AIA), punishable under 18 USC§ 1001 if it is found to be false.

**102.** Dr. Naijie Zhang signed several such "Inventor's Oath or Declaration" with the required acknowledgement of 18 USC§1001 pursuant to 35 U.S.C §115(i), to pose himself as the true first inventor of the Plaintiff's patentable and now patented Intellectual Property while he knew that the Plaintiff created, invented, conceptualized, and reduced his inventions to practice prior to his joining PepsiCo (EXHIBIT XVI).

**103.** Dr. Given also signed or cosigned such "Inventor's Oath or Declaration" with the required acknowledgement of 18 USC §1001 pursuant to 35 U.S.C §115(i), to pose as a true joint inventor of the Plaintiff's patentable and now patented Intellectual Property while he knew that the Plaintiff invented, created, conceptualized and reduced his inventions to practice without any supervision or input from him (EXHIBIT XVI).

**104.** One instance of Joint "Inventor's Oath or Declaration" on which Dr. Zhang and Dr. Given falsely posed as the true first and original inventors of the Plaintiff's Intellectual Property claimed by the PepsiCo was signed on 06/21/2010 by Naijie Zhang and by Dr. Given on 06/21/2010 (EXHIBIT XVI).

**105.** The said "Joint Inventor's Declaration" was then filed with the USPTO and with the PCT offices to support the PepsiCo Patent Application under the title "Releasable Entrapment of Aroma Using Polymeric Matrix." Published by the USPTO as US 2012/0006909 A1 on 01/12/2012 and later granted as US Patent US 8,474,637 B2 on July 2, 2013, PepsiCo Inc. being the sole Assignee (EXHIBIT XVI).

**106.** Another instance of joint "Inventor's Oath or Declaration" on which Dr. Zhang and Dr. Give falsely posed as the true first and original inventors of the Plaintiff's Intellectual Property subject matter claimed by the PepsiCo was signed on 08/23/2011 by Naijie Zhang and by Dr. Given on 08/19/2011 for the Patent publication titled "Releasably Encapsulated Aroma" published by the USPTO as Patent Publication No. US 2013/0056551 A1 on 03/07/2013, PepsiCo being the Assignee (EXHIBIT XVI).

**107.** In regard to the above patent applications and patents thereof, Dr. Zhang executed and caused to be filed with the USPTO an assignment of the Plaintiff's Intellectual Property to PepsiCo Inc. on 06/21/2010 and on 08/19/2011, and PepsiCo Inc. accepted the assignment knowing that Dr. Zhang was not the first named and original inventor (EXHIBIT XVI).

**108.** In Regard to the above patent applications and patents thereof, Dr. Given executed and caused to be filed at the USPTO an assignment of the Plaintiff's patented Intellectual Property to PepsiCo Inc. on 06/21/2010 and on 08/19/2011 and PepsiCo Inc. accepted the assignment knowing that Dr. Given was not a true original inventor (EXHIBIT XVI).

**109.** In addition to the two US Patents identified above, namely the US Patent No. 8,474,637 B2 and US Patent Publication No. US 2013/0056551 A1 on published 03/07/2013, three other PepsiCo's patent applications that the Plaintiff recognized from the public domain as being embodiments of his Intellectual properties are:

1) US Patent Publication No: US 2013/0095210 A1; PCT Application No. PCT/US12/59992; WIPO Publication No. WO 2013/056075. **Title: Complex Coacervates and Aqueous Dispersions of Complex Coacervates and Methods of Making Same**.

2) US Patent Publication No: US 2013/0004640 A1; PCT Application No. PCT/US12/43220; WIPO Publication No. WO 2013/006269. **Title: Complex Coacervates, Methods And Food Products**

3) US Patent Publication No: US 2013/0004617 A1; PCT Application No. PCT/US12/4327; WIPO Publication No. WO 2013/006268. **Title: Coacervate Complexes, Methods And Food Products**

**110.** The Defendants have thus far enjoyed within the United States and worldwide the market benefits, recognition, publicity, notoriety, stock market boost, and fame for being granted patents on the Plaintiff's intellectual property (EXHIBIT XXIV).

**111.** The Plaintiff also discovered that the true meaning of Dr. Zhang's statement that "*...Ricky Kamdem is not an inventor...*" was a Defendants' stereotype that they had about the Plaintiff as a black skin color individual of the black race, whom they prejudicially judged by the color of his skin rather than by the content of the intellectual property that he created for PepsiCo and from which PepsiCo has already benefited, Hon. Justice Scheinkman referred to the Defendant's biases as "*...stereotyping...*" (defendant's Exhibit 3, Page 11) and "*...racial bias on his culture...*" (defendant's Exhibit 3, page 29). And for the same reasons of racism and racial biases Valerie Jacklin wrote: "*...Not Sure We Want Ricky On The Invention List ....*" (EXHIBIT XV, PC 0305).

**112.** The Defendant Human resources Manager named Aida Costello also told the Plaintiff on 09/23/2009 that the Plaintiff was "*...culturally unfit...*" in regard to the Plaintiff having expressed an opinion that was contrary to that of the Defendant's protégés who are of the "other race" which is not black skin color and which is presumably supreme.

**113.** The Defendants also elaborated on their racial "*...stereotyping...*" of the Plaintiff in phone and written communications Statement of Position (SOP) submitted to the United States government in answer to the Plaintiff's initial entry of labor law dispute through the Regional OSHA in New York. The Defendant represented in its statement of Position that the Plaintiff could do no work during his contract term except going to the Defendant's facility in Valhalla for predatory sexual intercourse and or rape opportunities presumably with "*white women*" in their offices in the presumed "*white only*" section of the Defendant's facility in Valhalla, NY.

**114.** The Defendant specifically put a face to the racial clichés by specifying a woman by the name Liz Granata[4] as an example of the Plaintiff's sexual target, although the plaintiff would not recognize the said Liz Granata, but who upon information and belief a woman of the "white" race.

**115.** The Defendant's racial stereotyping, racism, and racial bigotry against the Plaintiff appear to be a factor that contributed to the Defendants' actions alleged above. As it is evident even from "*Attachment B - Agreement Regarding Confidentiality And Intellectual Property*" that the Defendant had all time had the option to contact the Plaintiff to request the Plaintiff to sign on his inventions for PepsiCo's benefit and the Plaintiff has at no time objected to been contacted for signing on his inventions, but the defendant chose not to do it because the Defendants would not want the name of the Plaintiff to be named the first inventor for no reason other than the skin color of the Plaintiff which is black.

**116.** The defendants Peter Given and Naijie have nationally and internationally taken credit for the Plaintiff's inventions and have been promoted through the PCT into the 147 countries

---

[4] The PepsiCo's 12/18/2010 Statement of Opinion Written to New York Occupational Safety and Health (OSHA) investigator in which the Defendants provided in detail their well-known race based stereotyping portrait of the Plaintiff is still under an active Court Ordered confidentiality by the Supreme Court of the State Of New York and has not yet been released in the Public.

members of the PCT and have gained notoriety, honor scientific recognition and prestige at the expense of the Plaintiff, for the sole reason that they committed fraud with PepsiCo to expunge the Plaintiff's name from his inventions been recognized in the place of Plaintiff in the Public media and all over the world (EXHIBIT XXIV & XXV).

**ON THE SCENTSATIONAL TECHNOLOGIES LLC'S LAWSUIT AT THE S.D.N.Y CIVIL DOCKET NUMBER: 13 CV 8645 ASSIGNED TO JUDGE KARAS**

**117.** The Plaintiff discovered on 03/11/2014 through Google Search that a company named ScentSational Technologies LLC had sued PepsiCo for some kind of "misappropriation of trade secrets". The complaint at the S.D.N.Y appeared to have been assigned the Docket Number 13 CV 8645 (KMK).

**118.** The heading of Section D(ii) of the ScentSational Technologies LLC's Complaint states: "*PepsiCo Obtained the '637 Patent By Misappropriating and Using ScentSational's Trade Secrets*", as such it appears that ScentSational Technologies is referring to US Patent US 8,474,637 B2 that the Plaintiff is also claiming to be his intellectual property invented independently during Food Science contract work from the Period of July 2008 to October 05th 2009.

**119.** The Plaintiff did not know who ScentSational Technologies LLC was, nor has the Plaintiff ever heard of them or had any intellectual interactions with ScentSational Technologies LLC, be it during the contract work at PepsiCo or somewhere else.

**120.** Paragraph "97" of ScentSational Technologies' statements of facts said: "*Specifically, Peter Given was among those known to be present during the March 25, 2010 Presentation. As discussed, supra, ScentSational's Oil and Water Polymeric Base, Polymer Blend, and Polymer*

*Entrapped Flavor Trade Secrets were among those ScentSational Trade Secrets which ScentSational confidentially disclosed to PepsiCo during the March 25, 2010 Presentation.*"

**121.** It is noteworthy that ScentSational Technologies' alleged date on which technology disclosure to PepsiCo occurred appeared to have been March 25th 2010 and that date would have been long after the Plaintiff had conceptualized and reduced to practice the claims of US Patent No. 8,474,637 B2, and of US Patent Publication No. 2013-0056551 Al.

**122.** Upon reading ScenSational Technologies statement of facts No. 98 to 107 of their lawsuit, the Plaintiff further noticed that ScentSational's allegations focused, as shown by the words outlined in the text of the lawsuit, on some general descriptors commonly used in Chemistry and Physics to characterize material properties such as: "*Hydrophylic*", "*Wax*", "*Polymeric matrix*", "*Blends*", "*polymer*". Therefore as such SentSational has yet to claim any novel process, of method, or any new matter as required for patentability.

**123.** Therefore ScentSational Technologies LLC has not yet disclosed any new process, method or composition of matter which could be subject of a patent invention.

**124.** The Plaintiff claims that the Plaintiff is the true inventor of the claims of US Patent 8,474,637 B2 and the Plaintiff affirms that the claims granted to those named as inventors and to PepsiCo were ideas and work that the Plaintiff independently developed and demonstrated the usefulness of the ideas from scratch, with no knowledge of who ScentSational Technologies LLC was.

**125.** Furthermore The Plaintiff affirms that PepsiCo has the Plaintiff's laboratory notebooks and communication records which PepsiCo could use to challenge ScentSational Technologies' allegations and claims on US Patent No. 8,474,637 B2 and of US Patent publication No. 2013-0056551 Al.

**126.** The EXHIBIT XVIII annexed to these Plaintiff's pleadings provide clear and convincing evidence that as early as 2008 the Plaintiff did an independent work at PepsiCo during which the Plaintiff independently conceptualized and developed his ideas and reduced to practice the ideas that resulted in the US Patent No. 8,474,637 B2 and the US Patent Publication No. 2013-0056551 Al.

**127.** Therefore unless ScentSational Technologies can produce research and development records showing how ScentSational Technologies's independently conceptualized and reduced to practice the novelty and useful ideas that PepsiCo patented and embodied in the claims of US patent No. 8,474,637 B2, then ScentSational allegations and claims for US patent No. 8,474, 637 B2 and of US Patent Publication No. 2013-0056551 Al might not be viable against the voluminous evidence of the Plaintiff independent work.

**128.** Similarly, section D(iii) of SentSational Technologies' lawsuit says: *"PepsiCo Misappropriated and Used ScentSational's Trade Secrets in Connection with the "834 Application"*.

**129.** Paragraph "111" of ScentSational Technologies' lawsuit also says: "*On March 7, 2013, the '834 Application was published, namely, U.S. Patent Application Publication No. 2013-0056551 Al (the '551 Publication"). A true and correct copy of the '551 Publication is attached hereto as Exhibit K.*" As such ScentSational is referring to the one of the patent publication in the Plaintiff's complaint.

**130.** Paragraph "112" of ScentSational Technologies' lawsuit says: "*The chart below (referencing the '551 Publication) includes some of ScentSational's Trade Secrets that PepsiCo misappropriated and used (including those confidentially disclosed during the March 25, 2010*

*Presentation) in violation of its duties under the parties confidential and contractual relationships to file and prosecute the '834 Application:*"

**131.** ScentSational Technologies' statement of facts No. 118 says: "*The Coca-Cola and CSD Projects were extremely important to ScentSational. Indeed, based upon the pre-negotiated, per unit pricing and projected volumes provided to ScentSational by Coca-Cola, the Coca-Cola Project would have resulted in an annual profit for ScentSational of approximately of $18 million, with expectations by both Coca-Cola and ScentSational for future annual revenues to meet or exceed this amount. The CSD Project would have resulted in an annual profit for ScentSational of approximately $3 million.*"

**132.** The Plaintiff does have access to ScentSational Technologies LLC financial projections on its projects with Nestle for the marketing and sale of products based on the processes and methods of US Patent No. 8,474,637 B2 and US Patent publication No. 2013-0056551 Al. Nevertheless the Plaintiff believes that the numbers put forth as potential profit don't sound unreasonable for consumer products distributed to billions of consumers worldwide.

**133.** Although ScentSational Technologies LLC claimed to have been a bedfellow with PepsiCo and its subsidiaries since 2001, it is not clear to the Plaintiff whether ScentSational might just be an impersonator or a PepsiCo puppet because the only date on which ScentSational claimed to have disclosed technically enabling information to PepsiCo and affiliates is March 25, 2010 and that would be long after the Plaintiff's inventions were established and ready for patent applications at PepsiCo.

**134.** In case Landau independently invented any of the claims of the above patents either before or at the same time as the Plaintiff, then Landau and ScentSational Technologies LLC must provide clear and convincing evidence sufficient to prove inventorship and to establish that

there was enough disclosure for enablement either before or during the time that the Plaintiff conceptualized and reduced his inventions to practice.

**135.** "ScentSational stated the following in paragraph "27" of its Complaint: "*At all times relevant to the instant action, ScentSational has maintained extensive safeguards to protect the secrecy of its trade secrets including, but not limited to, requiring third parties to execute detailed confidentiality agreements before disclosing its trade secrets. As such, ScentSational's trade secrets will only be disclosed in the instant action pursuant to a protective order executed by the parties and any agreed-upon third parties, and So Ordered by the Court*".

**136.** In view of the Above, it is not possible for the Plaintiff to determine at this moment why ScentSational Technologies believes that the Court should order the Director of the USPTO to name Landau as the inventor or even a co-inventor on US Patent No. 8,474,637 B2 and U.S. Patent Application No. 13/223,834 aka US Patent Publication No. US 2013/0056551 A1 because the Plaintiff knows beyond reasonable doubt that those patent applications and the patents thereof were the results of the Plaintiff's independent ideas and work.

**137.** The Plaintiff made a phone call to the ScentSational Technologies LLC's legal Counsel on 03/11/2014 around 3:20 PM ET and spoke to Melvin C. Garner, one of the ScentSational Technologies' attorneys, to inform him that the Plaintiff found ScentSational Technologies' Lawsuit on line and that the Plaintiff would be amending this Complaint to acknowledge the ScentSational Technologies' Complaint.

**138.** The Plaintiff informed ScentSational Technologies' attorney Melvin C. Garner that the information in the ScentSational Technologies' Complaint did not provide any support that Landau could be an inventor on the Patents simultaneously claimed by the Parties named herein

and that further information will be needed before the case can be equitably sorted out in the Court of Law.

**139.** Whereas the Plaintiff provided SentSational Technologies' attorney with the information about the Plaintiff's lawsuit and its docket number and the affidavits that were filed in the past with the Westchester County Supreme Court of the State of New York, the ScentSational Technologies' attorney did not provide the plaintiff with any rational as to why ScentSational Technologies believes that Landau met the requirements to be named as the inventor or co-inventor of the patents of the Plaintiff's Intellectual Property that ScentSational Technologies claimed to be embodiments of its trade secrets.

**140.** The Plaintiff did not find any patentable claim in the ScentSational's lawsuit because the Complaint only talked about some scientific descriptors of material properties which are rather common knowledge in the public domain and the complaint did not demonstrate in which way ScentSational Technologies might have further developed or improved on the public domain knowledge into patentable processes, methods, or new matter deserving of patents.

**141.** For all the above reasons and given the fact that PepsiCo did not pay for the Purchase of the Plaintiff's intellectual property as agreed upon with the Plaintiff In July 2008, it is undisputed that the Plaintiff is still the inventor and the legal owner or in the worst case scenario a co-owner with PepsiCo Inc. of the Plaintiff's Intellectual Property.

**142.** Without ruling out the possibility that Mr. Landau could have indeed independently invented the claims of the patents, the Plaintiff feels that in order for the Court to even consider ordering correction of inventorship as sought by Mr. Landau, the Plaintiff must conduct discovery and interrogate them and be in the position to make arguments for or against adding Landau as inventor on the Patents.

**143.** Furthermore if the Court should determine that PepsiCo indeed misappropriated ScentSational Technologies' Trade secrets and therefore must pay money to ScentSational Technologies from commercializing the patents, the money must only come from the PepsiCo's share of ownership of the Patents of the Plaintiff inventions and not from the Plaintiff's share.

**144.** Therefore in other to safeguard the Plaintiff's interest, the Plaintiff must sue ScentSational Technologies LLC because ScentSational Technologies' interest for the U.S. Patent No. 8,474,637 B2 and U.S. Patent Application No. 13/223,834 aka US Patent Publication No. US 2013/0056551 A1 have the potential to directly hurt the Plaintiff's interests in the Patents.

Ricky Kamdem-Ouaffo, PhD

Sworn to before me on this 5 Day of July, 2014

Notary Public

ROBERT ALLEN
Notary Public
State of Idaho

County: Bonneville
Expiration: 8-16-16

TAB 5

# EXHIBIT DMD - II

1) ADDITIONAL INFO: JOB DESCRIPTION. 3 PAGES.

2) VIEW RESUME; CANDIDATE NAME: RICKY KAMDEM;

ID#*****7942. 1 PAGE.

## Additional Info

| | |
|---|---|
| Background Check: | Yes |
| Drug Screening: | Yes |

## Job Description

Business Sector: Scientific

New Job Title Requested

Approve Job Title: ☐ or click here to select an existing Job Title

Job Title: food scientist

High Level Job Description: Product Development background, specifically in the Food Industry. Expertise to develop, plan, conduct and coordinate prototype development initiatives including capability in consumer testing methodology and experimental design. • Conducts appropriate project risk assessments and provides recommendations for integrating program strategies -Generate and lead state-of-the-art developmental techniques and consumer testing methodologies • Outstanding communication skills (verbal and written) • Experienced with emulsion beverages and color stability a plus. Knowledge & Experience • B.S. or M.S. with 8 + years product design experience in consumer products with a proven track record in product development • Ability to provide thought leadership on both strategic and tactical aspects of projects • Outstanding teamwork, communication and leadership skills • Proven track record in maintaining good working relationship with business partners (Marketing, Operations, etc.) • Successful creation and commercialization of products • Lead/influence project teams of 5 or more people

Job Description: ROLE: To lead product development efforts for new technology Principle Accountabilities Measures • Lead product development projects in area of stability & consistency • Project objectives and plans developed and aligned cross functionally prior to initiation of work • Provide technical guidance and bench development for targeted development initiatives and existing brands • Experimental designs and scientific principles leveraged in recommendations and decisions • Ensure completion of development and commercialization success criteria in execution of project work through use of accepted

Poor

Poor Quality

documentation and work processes • Final products meet project objectives and commercial considerations/needs outlined in Field Ready policies • Provide project management insight that creates the foundation for innovative solutions in supporting business partners • Project learning's shared broadly across R&D • Develop and maintain effective working relationships across R&D and non R&D functions as necessary to support business growth initiatives • Critical relationships internal and external to R&D established and maintained • Develop superior new products that meet the project deliverables. • Development leverages sound technical approaches and meet project/program action standards Key Challenges • Managing multiple projects both independently and in a team environment • Influencing activities and project plans across technical and operational functions • Development and motivation of cross functional project team Critical Competencies • Expertise to develop, plan, conduct and coordinate prototype development initiatives including demonstrated capability in consumer testing methodology • Conducts appropriate project risk assessments and provides recommendations for integrating program strategies • Ability to generate and lead state-of-the-art developmental techniques and consumer testing methodologies • Strong working knowledge of experimental design • Outstanding communication skills (verbal and written) Knowledge & Experience • B.S. or M.S. in Food Science or related discipline with at least 5-7 years product design experience in a consumer products company. • A proven track record in product development and interest in hands on bench work • Ability to provide thoughtful leadership on both strategic and tactical aspects of projects • Outstanding teamwork, communication and leadership skills • Ability to analyze emerging consumer trends and develop insights on product solutions or opportunities • Proven track record in maintaining good working relationship with business partners (Marketing, Operations, etc.) • Successful creation and commercialization of products • Experience in leading project teams of 5 or more people Internal positions most typically held prior to being considered for this position: • Research / Food Specialist (Senior) Technologist / Scientist Prepared by: Peg Havekotte Date: 06/18/2008

**Skill Sets:**

**Required:** **Desired:**

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2266

Poor

## Required Qualifications

see above

## Notes

Notes to P|S Rep. heads not hands multi-tasker organized 610

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2267

Poor
Quality

View Resume

**Requisition #:** 1820
**Requisition Submitted Date:** 20-JUN-2008
**Requested Start Date:** 13-JUL-2008
**Available Start Date:** 21-JUL-2008
**Date Posted to Vendor:** 07-JUL-2008
**Date Submitted to MSP:** 08-JUL-2008
**Vendor Name:** Subex Technologies, Inc.
**Vendor Contact Name:** Ajith p s
**Vendor Contact Email:** ajithps@subextechnologies.com
**Vendor Contact Phone:** 732 623 9112
**Candidate Name:** Ricky Kamdem
**ID #:** *****7942
**Authorized to work in the US:** Yes
Has Candidate worked for the client? No
Length of the Candidate's last assignment: month(s)
**FLSA:** Exempt
**Contractor Type:**
**Standard Bill Rate:** $50.00
**Standard Pay Rate:** $40.00
**Standard Markup:** 25.00%
**Offer Rate:** $45.00
**Status:** Purchase Order
**Date Submitted to HM:** 08-JUL-2008
**Date Status Updated:** 08-JUL-2008
**MSP Notes:**
**Vendor Notes:**
Available for an interview ASAP.

Poor Quality

# EXHIBIT DMD - III

1) ATTACHMENT B TO THE STAFFING SUPPLIER AGREEMENT

STAFFING - SUPPLIER EMPLOYEE AGREEMENT REGARDING

CONFIDENTIALITY AND INTELLECTUAL PROPERTY. 2 PAGES.

2) ATTACHMENT C TO THE STAFFING SUPPLIER AGREEMENT

STAFFING - ACKNOWLEDGMENT OF TEMPORARY WORK

ASSIGNMENT. 1 PAGE.

3) ATTACHMENT D TO THE STAFFING SUPPLIER AGREEMENT

STAFFING - COMMUNICATION AND INFORMATION SYSTEMS

USER AGREEMENT. 3 PAGES.

4) PEPSICO CODE OF CONDUCT, SIGNATURE PAGE ONLY. 1 PAGE.

81

**Attachment B**
**to the Staffing Supplier Agreement**

## STAFFING SUPPLIER EMPLOYEE AGREEMENT REGARDING CONFIDENTIALITY AND INTELLECTUAL PROPERTY

In consideration of payment to me by my employer, the Staffing Supplier named below (the "Staffing Supplier") for the performance of work or assignments for PepsiCo, Inc. or any of its affiliates (hereinafter "Company") and other good and valuable consideration, including the use on behalf of Company of its facilities or materials, or of private or proprietary information owned by Company or its suppliers or customers, I agree to the following provisions:

A. I hereby assign and agree to assign to Company all my right, title and interest in and to all inventions, discoveries, improvements, ideas, products, formulae, machines, mask works, designs, methodologies, processes, know-how, research and development, software, source code, computer or other apparatus programs and related documentation, and other works of authorship (collectively, "Intellectual Property"), whether or not patentable, copyrightable or subject to other forms of protection, made, created, developed, written or conceived by me during the period of such work or performance of assignments, whether during or outside of regular working hours, either solely or jointly with another, in whole or in part

1. In the course of such work or assignment, or
2. Which are suggested by or result from any task assigned to me or work performed for or on behalf of Company relating to my assignment, or
3. With the use of Company's time, material, facilities, or private or proprietary information;

B. I will, without charge to Company but at its expense, execute a specific assignment of title to Company and do anything else reasonably necessary to enable Company to secure a patent, copyright registration or other form of protection of said Intellectual Property anywhere in the world;

C. This Agreement does not constitute a contract of employment between Company and me, nor does it confer upon me any rights by license or otherwise in any Intellectual Property to which I may have access;

D. In the event that either my employer or I have previously executed an agreement with Company relating to the work which I am about to undertake, it is understood and agreed that the terms and provisions of this Agreement will supersede any conflicting terms and conditions of such previously executed agreement;

E. I will keep in strict confidence and will not, except as expressly authorized in writing by Company, publish or disclose, either orally or in writing, during and after the period of my work or assignment, any confidential, private or proprietary information of Company or its suppliers or customers (including, but not limited to, specifications, requirements, drawings, sketches, models, designs, methodologies, processes, know-how, research and development, samples, tools, computer or other apparatus programs, software, source code, trade secrets, product plans, projects, inventions, engineering information, hardware configuration information, technical information or data, financial information, business plans, other business information or data, customer information and data, vendor information, market information, or marketing plans, whether written, oral or otherwise) which I may in any way acquire, learn, develop or create by reason of such work or assignment (collectively, "Company Confidential Information"). I will use Company Confidential Information only in connection with my performance of work or assignments for Company; I will not use Company Confidential Information for any other purpose;

DEFENDANT'S EXHIBIT 6 4/30/2012

F. I will not disclose Company Confidential Information to any other employee of my employer unless such other employee has executed a Staffing Supplier Employee Agreement Regarding Confidential Information and Intellectual Property similar to this Agreement and is working on the same project as me;

G. Upon request by Company, I will return to Company all Company Confidential Information received in tangible form or destroy all such Company Confidential Information and certify in writing to such destruction;

H. I will not disclose to Company, its suppliers, customers or any of its employees any information that is or may be proprietary or confidential to any third party, including but not limited to, my current or former employer or any of my current or former employer's other clients, unless I have the right to disclose such information and/or the owner of such information has authorized me to disclose such information and such information is relevant to my work or assignment. Except for the Intellectual Property assigned to the Company under this Agreement, all other specifications, drawings, sketches, models, samples, tools, computer or other apparatus programs, technical or business information or data, written, oral or otherwise, furnished by me to Company under this Agreement or in contemplation of the work or assignment to be performed by me shall not be considered confidential or proprietary;

I. If my work or assignment involves photographic, visual, and/or audio recording of my presentation, lecture, or demonstrations, including my name, picture, likeness, statement, or voice, I agree that it may be used, in whole or part, either alone or in combination with any other material, by Company or anyone acting under Company's authority or permission, whether or not Company has any copyright interest in such recording in accordance with this Agreement, and Company shall have the royalty-free right to copy, perform, edit, combine, distribute, exhibit, broadcast, display, modify and use said recording and any copies made thereof and to permit others to do so;

J. The above terms shall survive termination, cancellation or expiration of this Agreement and the work or assignments for which I was engaged;

K. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 and SECTION 5-1402 OF THE GENERAL OBLIGATIONS OF THE STATE OF NEW YORK. I AGREE TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK.

I acknowledge that I have read, understand and agree to the above terms.

Signature: [signature]

Typed or Printed Name: Ricky Kamdem-Ouaffo

Social Security Number: [redacted]

Date: 07/09/08

Name of Staffing Supplier: Subex Technologies Inc.

Poor Quality

83

**Attachment C**
**to the Staffing Supplier Agreement**

**ACKNOWLEDGEMENT OF TEMPORARY WORK ASSIGNMENT**

I, the undersigned, an employee of the Staffing Supplier named below (the "Staffing Supplier"), acknowledge and agree to the following:

1. I understand that I am an employee of the Staffing Supplier and I am not an employee of PepsiCo, Inc. or any of its affiliates (collectively, "PepsiCo"). I also understand that the Staffing Supplier, and not PepsiCo, is solely responsible for paying my compensation and any other benefits that I may be entitled to as an employee of Staffing Supplier.

2. I understand that Staffing Supplier has assigned me to a temporary work assignment at PepsiCo. I understand that this work assignment is a temporary one for a defined period of time, the length of which may be increased or decreased.

3. I understand that any problems or complaints I may have regarding the work assignment at PepsiCo must be directed to my supervisor at the Staffing Supplier and not to PepsiCo.

4. I understand that my rate of pay from the Staffing Supplier may be more or less than that received by other individuals who are performing similar services for PepsiCo, regardless of whether they are employees of PepsiCo or other agencies.

5. I understand that there have not been and will not be any representations as to any assurance or possibility of my being hired as a regular employee of PepsiCo, and that since I am not an employee of PepsiCo, no promotions or other forms of advancement or transfer by PepsiCo are available now or in the future.

6. I understand that my work assignment at PepsiCo is contingent upon execution of the applicable Confidentiality and Assignment Agreement and I have read and signed same.

7. I understand that PepsiCo is relying on my representations herein, and I agree that if I assert any claim against any party except Staffing Supplier for employee benefits or against any party to enforce any right based on a claim that I am an employee of PepsiCo, and my claim is not successful, I will reimburse such party for all expenses it incurs in defending itself against my claim, including reasonable costs for the time of in-house counsel.

I acknowledge that I have read, understand and agree to the above terms.

Signature: [signature]
Typed or Printed Name: ~~07/09/08~~ Ricky Kaindem-Quaffo
Social Security Number: [redacted]
Date: 07/09/08
Name of Staffing Supplier: Subex Technologies Inc.

84

**Attachment D**
**to the Staffing Supplier Agreement**

**COMMUNICATION AND INFORMATION SYSTEMS USER AGREEMENT**

ProcureStaff, Ltd. (ProcureStaff) confidential information and ProcureStaff's customer's information entrusted to ProcureStaff, if compromised, destroyed or lost, could result in financial loss or disruption of business. Confidential information includes customer, supplier and employee lists; financial information, such as costs, investments, earnings, sales and forecasts; purchase order and bid information, including job descriptions, assignment terms, work locations and bill rates; sales and marketing strategies; wages, salaries and benefits, requests for proposal information; personnel files, including compensation and employee records; business plans and strategic objectives; and, sales, service, recruiting and training plans. Confidential information also includes any information which a reasonable person would recognize as confidential or proprietary to ProcureStaff or the customer, or the disclosure of which could be harmful to ProcureStaff's or the customer's interests.

INFORMATION SYSTEMS

ProcureStaff provides services to its customers mediated through the use of software and data storage systems made available via the internet. ProcureStaff's customer may make e-mail or other data processing systems available for the purpose of performing services for the customer. Any individual who accesses or uses any of ProcureStaff's or the customer's systems, by any means, must agree to comply with these terms of use. ProcureStaff's and its customer's software and data are proprietary, confidential, and intended solely for the business use of ProcureStaff and the customer.

E-mail, Internet and voice mail are intended for business purposes only. Personal use of these communication tools are permissible only within reasonable limits and at the sole discretion of ProcureStaff or the customer. ProcureStaff and the customer reserve the right to monitor any and all aspects of its communications infrastructure and terminate access to and use of such infrastructure at any time without notice. **No user of the ProcureStaff or customer communications infrastructure should have any expectation of privacy when communicating through voice mail, e-mail or the Internet.**

Supplier employees and contractors are permitted to access ProcureStaff's and customer's systems only as necessary to fulfill job or assignment requirements. All data entered into ProcureStaff's or customer's system and e-mail records are ProcureStaff or customer records. They will be used only as needed for business purposes.

Therefore, I agree:

- to safeguard from disclosure all confidential information, including all information contained or transmitted within ProcureStaff's or the customer's systems.
- to use ProcureStaff's and the customer's systems and the information stored in those systems for legitimate business purposes only. I agree specifically that I will not use the systems for personal profit, to maintain a personal or private web site, for bulk e-mailing (including chain letters), for on-line game-playing, for downloading any material unless specifically authorized, or for any illegal or inappropriate activity. This is not an exhaustive list of prohibited activities.

- to treat e-mail and Internet records as official business records which require the same record retention as other written communications, consistent with the customer's e-mail retention policy.
- to ensure that appropriate virus protection and detection software is loaded and working properly on any personal computer I use for downloading information from the Internet. If a virus is detected, to report it immediately to the customer Help Desk or my customer manager.
- to ensure that images, data or documents sent or received via the Internet comply with all applicable copyright laws.
- to protect the integrity of ProcureStaff's and the customer's systems by ensuring secure access to voice mail, e-mail and the Internet. This protection of integrity relies on safe practices including, but not limited to: not sharing passwords or User IDs, logging off the system or locking access before leaving my workstation, and following the customer's procedure for securing physical documents and equipment.
- not to communicate, input or access language or images that may be considered offensive or demeaning to any individual. This includes, but is not limited to: sexually explicit words or images, racial epithets or slurs and demeaning words or images which may be offensive to someone based on race, sex, religion, ethnicity, age, marital status, disability, veteran status or sexual orientation.
- not to download any software via the Internet except for software patches, upgrades, etc. which are pre-approved by ProcureStaff or my customer manager and necessary for adequate job or assignment performance.
- not to transmit confidential information, or any other media not expressly approved by ProcureStaff or my customer manager, via the Internet.
- not to use the Internet for inappropriate purposes including, but not limited to: illegal activity, disrupting other network users or services, entering other computer systems or databases (including ProcureStaff's or the customer's) without authorization.

I fully understand that ProcureStaff and the customer reserve the right to monitor and audit my use of the systems accessed by employees, temporary employees or contractors to ensure the confidentiality, integrity and availability of data. Therefore, I have no expectation of privacy when using any ProcureStaff or customer system.

I fully understand that failure to comply with this policy may result in the termination of my employment or assignment.

The above terms shall survive termination, cancellation or expiration of this Agreement and the work or assignments for which I was engaged.

This Agreement shall be governed by the laws of the State of New York without reference to its conflict of laws principles other than section 5-1401 and section 5-1402 of the General Obligations of The State of New York. I agree to the exclusive jurisdiction and venue of the state or federal courts located in the Southern District of New York.

I have received, read and fully understand ProcureStaff's Communication and Information Systems User Agreement and agree to abide by the policies, procedures and conditions stated herein.

86

Signature: [signature]

Typed or Printed Name: Ricky Kamdem-Ouaffo

Social Security Number: [redacted]

Date: 07/09/08

Name of Staffing Supplier: Subey Technologies . Inc

**Signed Agreement should be filed in the appropriate Staffing Supplier Employee or Contractor file.**

87

# Code of Conduct- Pepsico

I Ricky Kamdem-Ouaffo have read the CODE OF CONDUCT.

DATE: 07/09/08

SIGNATURE: [signature]

# EXHIBIT DMD - IV

DEPOSITIONS TRANSCRIPT, PETER GIVEN, TAKEN MAY 4TH, 2012,

PLEASANTVILLE, NEW YORK. 39 PAGES

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER - CIVIL TERM - PART ADS
---------------------------------------X
RICKY KAMDEM-OUAFFO,

Plaintiff(s),

-against-

Index No.: 22625/2010

PEPSICO, INC.,

Defendant(s).
---------------------------------------X

70 Memorial Plaza
Pleasantville, New York

May 4, 2012
1:17 p.m.

Deposition of PEPSICO, INC., Defendant, by PETER GIVEN, taken by the Plaintiff, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony, and Order, held at the above-noted time and place, before Sarah Satalino, a Stenotype Reporter and Notary Public within and for the State of New York.

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

APPEARANCES:

ANDREW SCHATKIN, ESQ.
Attorney for Plaintiff
350 Jericho Turnpike
Jericho, New York 11753

LUBOJA & THAU, LLP
Attorneys for Defendant
10 East 40th Street
New York, New York 10016
BY: RICHARD M. HUNTER, ESQ.

ALSO PRESENT:
Ricky Kamdem

STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R., and shall be controlled thereby.

The filing of the original of this deposition is waived.

IT IS FURTHER STIPULATED, that a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

PETER GIVEN,
called on behalf of PEPSICO, INC., Defendant, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. SCHATKIN:

Q Please state your name for the record.
A Peter Given.
Q Please state your current business address for the record.
A 3 Skyline Drive, Hawthorne, New York 10532.
Q Dr. Given, I'm going to be asking you some questions. If you need rephrasing or whatever, you want to confer with your lawyer after a question is answered, it's fine with me. As I say to many people, this is not a hostile event, I'm just asking you some questions to get some facts, all right? So anyhow, where do you presently work?
A In -- in a lab in Hawthorn, New York.
Q What is the name of this lab?
A The name of this lab is just PepsiCo.
Q PepsiCo?
A 5Yeah.

Peter Given

Q What is your function in this lab?
A I direct a small group of R and D people.
Q What does R and D mean?
A Research and development.
Q How many people are in this group?
A Four including myself.
Q What are their names presently?
A Daniella White, Stephan Baire, B-A-I-R-E, and Tommy How and myself.
Q Are these people -- as Mr. Hunter said, I'm not a scientist or in the scientific field, are these people in this research lab scientists?
A Two out of -- two out of three in my group are. Third one is a technician.
Q The scientists, do you know the qualifications for being a scientist? Dr. Kamdem as far as I know has a Ph.D, do these three have that degree?
A Well two have Ph.Ds.
Q In what specifically?
A Good question. One may be -- one is in food science and one is in polymer chemistry.
Q And the third individual, what are their particular qualifications that might lead to their

Electronically signed by Sarah Satafino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Poor

Page 6

Peter Given

working in this lab, be qualified to do research in this lab?

MR. HUNTER: Object to the form. Answer the question.

A Well the third person is a technician and he's got a bachelor's degree.

Q The third. I thought there were four people.

A I'm the fourth.

Q Oh, you're the fourth?

A Yeah.

Q You are also a scientist?

A Uh-huh.

Q You have a Ph.D?

A Yes.

Q In what particular area of science?

A In biochemistry.

Q In this lab what is the nature of the research that occurs?

A Well we have two main themes, one is texture and rheology and the other is encapsulation.

Q Can you explain, I am not in this field, can you explain to me what you mean by those things, those fields? I don't know what they are.

Page 7

Peter Given

A Well, okay, texture is the texture when somebody eats a food or drinks a beverage and rheology is a measurment technique used to measure texture.

Q So in other words this research lab has to do with producing flavors, quite frankly, that might have a -- bring sales to this company?

MR. HUNTER: Objection to the form of the question.

Q I mean which is -- I mean no company is not concerned with profits and sales, obviously I'm concerned with it, everybody is concerned with it, I'm saying is this lab in its research focused on producing flavor components that will be successful in the market?

A Not exactly, no. We're not focused on producing flavors.

Q What are you focused on producing?

A Textural properties. I'll give you an example, if we reduce the fat in a snack we need to fix the texture if you will.

Q Does this work have to do with colas or other food products?

A We work across a wide variety of products.

Page 8

Peter Given

Q Could you name some of them?

A Yeah, colas, lemon limes, things like Gatorade, Frito-Lay chips.

Q Chips?

A Yeah, chips, oatmeal, bars, we work -- as I said, we work across the whole portfolio of PepsiCo products.

Q So PepsiCo is not only a company which is concerned with colas but other food products.

A Uh-huh. Yes.

Q And you named some of them, oatmeal, Frito-Lay, any others that you can name?

A That's about the gist of what we work on.

Q Am I accurate in saying that your object in this lab is to produce -- is to improve product texture or flavor to hopefully induce people to like that product and buy it?

MR. HUNTER: Object to the form of the question.

Q Is that a fair statement?

A It's the objective of our lab to develop enabling technologies for a wide variety of product benefits but ultimately to have something with consumer appeal.

Page 9

Peter Given

Q Of course. Okay. So now how long have you worked in that lab?

A I've worked in that lab for a year and a handful of months. It's a new lab.

Q Before that where did you work?

A In the R and D lab in Valhalla.

Q How long were you there?

A I was there 16 plus years.

Q Did you have the same position you have in this other lab you mentioned or a different position in Valhalla?

MR. HUNTER: Object to the form. Answer the question.

A Well positions change over time so I can't say -- I haven't had the same position for 18 years, no.

Q Well let's go back a year and a half, when you were at Valhalla what was your position then?

A My title was research fellow.

Q What does that mean?

A That essentially -- that title means a senior research person.

Q In that title did you supervise people or have people you were associated with?

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Peter Given

A I did.
Q How many?
A Well that time, let's see... I'm thinking, one, two... I'm thinking two full time.
Q And were they also scientists?
A Yes.
Q Were they also research fellows or they have a different title?
A No, they had different titles.
Q What were their titles?
A This may or may not be correct but I'm thinking senior principal scientist.
Q And that was two you said were senior principal scientists?
A Yeah. There's a third, I'm sorry. Another guy who is a scientist 1.
Q And again, what was the nature of your duties in that position?
A That position was focused on microencapsulation and emulsion science.
Q And what does that mean exactly?
A Emulsion science?
Q No, just -- yeah, I'm just trying to understand what those things are, I'm not in that

Peter Given

field so maybe you could explain it to me, what those two things are.
A Well they're -- again, they're technologies to make food and beverage ingredients compatible with a matrix, stable, physically stable, stable over shelf life, what have you.
Q Oh, I see, they are focused on shelf life?
A And quality.
Q Flavors or texture or what?
A Flavors and other materials.
Q And does this cover the gamut of the things you just mentioned, the products you just mentioned, whether Frito-Lay or oatmeal or --
A No. No. In Valhalla we were strictly beverage focused.
Q What beverages?
A All beverages.
Q That are manufactured by --
A -- by PepsiCo, yeah.
Q And that would include what beverages, if you could tell me. I know about Pepsi-Cola and I may know about Gatorade but I don't know about all of them.
A Probably easier if I put them in

Peter Given

categories.
Q Go ahead.
A You have your carbonated soft drinks, you have your noncarbonated drinks which are juice drinks or juice and then you have your hydration, which is water-based products or things like Gatorade.
Q How long were you in that position?
A Well I'm confused by the word position.
Q That particular -- you said you were a research fellow?
A Yeah, so we go by titles.
Q Your title was research fellow?
A Research fellow.
Q How long were you doing that?
A It was probably about two, three years.
Q And before that?
A Just fellow.
Q Just the term fellow?
A Well they changed titles at the same grade along the way, like I can't give you the exact date, but I was brought in at the senior scientific level.
Q And you say the term is fellow, --
A Uh-huh.

Peter Given

Q -- correct?
And what are the duties in that particular position or title?
MR. HUNTER: His duties?
MR. SCHATKIN: Yes, his duties, right, title.
A Pretty much the same as I described before, it's to develop and lead the technical programs.
Q Involved with the same sort of thing you just described?
A Yes.
Q As a fellow did you have people you were working with or better put supervising or whatever you want to term it, people that you were involved with in that work as a fellow?
A Yes.
Q How many?
A Well the same three I mentioned.
Q The same three?
A Yes.
Q Same individuals?
A Not the same as in Skyline but the same individuals as Valhalla.

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Peter Given
Q Okay. That would be I think you defined them as two scientists?
A And a --
Q And a technician.
A Yes.
Q And before that, before you were a fellow did you have any other title or position with PepsiCo?
A I did but I'm trying to remember what it was called because I've been a fellow for the last 10 plus years.
Q So you were 10 years, what were the years that you were a fellow if you could tell me?
A Huh?
Q The years, the exact years, time frame.
A Exact years, I don't --
Q If you remember.
A No, I don't remember. I was brought in at let's say -- let's call it a band 11 and I was a band 11 until I was promoted about say four years ago. I became -- so the title had something with scientist in it and then it became fellow and now it's director.
Q And when did you first start working with

Peter Given
PepsiCo?
A January '94.
Q What was your beginning position at that point?
A It was -- let's call it a senior science position. Senior scientist position.
Q Were you working, supervising or were you working in a group or whatever?
A I was not supervising. It was more of a team culture at that point so you simply worked a little bit cross-functionally with all the different departments.
Q Right, sure, right. And how long were you in that position?
A Pretty much a good -- let's see, I'll do the math. It's a little fuzzier but let's say 10 years.
Q That would be '94 to '04 approximately?
A (Witness nods.)
Q In '04 what was your next position?
A The position didn't change but over time gradually people started to report to me.
Q I see. Okay, so what are the -- obviously you're enlightening me here and everybody in the

Peter Given
room here probably, what are your techniques in doing this research? I mean if you can enlighten me or tell me what exactly is involved in doing this work.
A How much time do you have?
Q Just give me an indication of -- see, I'm trying to understand whether you -- it's a chemistry lab or a -- I don't know.
A Oh, I see. I see what you're after.
Q Yeah.
A How we do it is we essentially follow the scientific method, you know, what's the hypothesis, what are the approaches, go out and do lith and patent searches, understand the field, determine what the gaps are, design the research plan and get the right skilled people to work on it. But in terms of the nature of the lab, it's -- I would say it's a food science lab with a little bit of chemistry.
Q Are the Ph.Ds, the scientists in this lab, is a prerequisite for their getting that position that they have some -- they have some grasp of food science or they be -- specifically is it required their degree be in that field?

Peter Given
A No.
MR. HUNTER: Objection to the form. Answer the question.
Q It isn't?
A No.
Q What can their qualifications be? I mean if they are not really completely specialized in food science when they get into that position what will they be -- what are the qualification guidelines?
MR. HUNTER: Objection to the form.
Q Can they have a Ph.D in chemistry?
A Yes, they could.
Q Is there anything else they might have a specialization in?
A It doesn't even have to be a Ph.D, it could be a master's with X number of years experience, what have you, but definitely technical training, education and technical experience.
Q What does the technicians do? I have some idea what the scientists do; what do the technicians do?
A They pretty much do the hand -- day-to-day hands-on work at the behest and under the

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Page 18

Peter Given

supervision of the scientists.

Q Qualification could be practical, they could be educational whatever, but does a technician have to have some degree of experience to enter that position?

A Yes.

Q They can't just come out of school?

A No.

Q How many years of experience may be required?

A It depends on the exact experience they've had but, you know, it could be anywhere from one to ten.

Q For the technicians and for the scientists, if there's an absolute degree requirement? In other words, some sort of cut off in terms of degrees, whether master's say or whatever?

A Not really because it's dependent on the level at which they are hired at. So certain levels do have certain minimum degree requirements.

Q Okay, and what about the technicians as I said --

A No, --

Page 19

Peter Given

Q No, --

A -- there's no --

Q -- they do not have a degree requirement?

A I don't even know if there's a BS requirement but you'd have to look at our HR paperwork.

Q Whatever is required, you know, could be practical -- like I said, it could be practical or whatever it is so I mean, how many scientists work in this lab?

A Which lab do you mean?

Q The Valhalla lab.

MR. HUNTER: At what point in time just to be clear.

Q Let's say at the present time that you know. When you were last working in the Valhalla lab how many scientists worked there?

A The entire facility?

Q Yeah.

A I'm guessing around 350.

Q Okay. And do you know Dr. Kamdem here?

A Uh-huh. Yes.

Q When did you first get to know him?

A I met Dr. Kamdem when he was working for

Page 20

Peter Given

Peg Havekotte.

Q For who?

A Peg Havekotte.

Q Who is Peg Havekotte?

A She was the -- I guess the group manager of the flavor research group.

Q Was she supervising Dr. Kamdem at that time? Or have some...

A Yeah, she was the hiring manager. The supervision might have been Marco Covarrubias.

Q What was the year you first met Dr. Kamdem?

A To be honest, it could have been -- I don't know, 2008, 2009 time frame.

Q How long while Dr. Kamdem was there did you continue to have some working relationship with him?

MR. HUNTER: Object to the form.

Q Whatever you want to describe it, some collegial or working relationship with this gentleman. While he was there.

MR. HUNTER: Objection to the form. Answer if you can.

A Well until he transferred into my group it

Page 21

Peter Given

was just an acquaintance really.

Q I see. When did he transfer into your group?

A Exactly, dates, I have no idea.

Q Before he transferred to you where was he working? If you know.

MR. HUNTER: Immediately before?

MR. SCHATKIN: Immediately before. His prior position -- his -- prior to this setup.

A He was in Peg Havekotte's lab upstairs.

Q I see. If you know, how many people work, scientists work, in that lab at that time?

A Oh, good question. I think Peg had maybe two or three people reporting to her.

Q Were they all working on the same floor in the same lab?

A I think so.

Q Do you know the names of those people besides Dr. Kamdem?

A Besides Marco, I am not -- I can't really remember who worked for Peg.

Q Who is Marco?

A Marco --

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Page 22

Peter Given

Q Marco have a full name? Is that his full name?

A Covarrubias, yes.

Q Is he also in the scientific field?

A Yes.

Q You don't remember the name of the third person?

A Or the fourth or whatever, no. I know Peg had a group I just -- I can't remember who was in it.

Q At the time of Dr. Kamdem's transfer did this Peg -- what's her name?

A Peg.

Q Did she talk to you about Dr. Kamdem?

MR. HUNTER: Objection to the form.

Q Did you have a conversation about Dr. Kamdem with her?

A Yes. Yes, we talked about Dr. Kamdem.

Q You remember what she said or he said -- she said about him or, you know, I mean. Obviously it's a transfer, I would assume that she would fill you in about the people that are being transferred, did she fill you in about Dr. Kamdem, what she might have known about him?

Page 23

Peter Given

MR. HUNTER: Objection to the repetition of the word transfer, I'm not sure that was his testimony but we understand what --

Q Well whatever, I mean obviously you would want to be informed about the person entering your group, did she inform you about Dr. Kamdem?

A Yes.

Q Do you remember what she said?

A I don't remember any specifics but she gave Dr. Kamdem a good recommendation.

Q Do you remember her indicating that he was a personality problem?

A No. I don't.

Q Do you remember her indicating that he had employment issues of some kind, disagreements on techniques, on things that were occurring under her supervision, did she say anything like that?

MR. HUNTER: Objection to the form. Compound question. You can answer.

A No, I don't remember.

Q At the time of Dr. Kamdem's transfer was anyone else -- I don't know what happened, transfer, how he came to your group for want of a better word,

Page 24

Peter Given

did anyone else join him in your group?

A No.

Q What was the reason for his coming to your group?

A I thought you would ask that. I don't --

Q I might have asked that, I'm sorry.

A I don't -- I don't actually remember whether it was because the project he was working on was transferred into my group or whether Peg ran out of funding and they decided to peck it up in my group because I had more budget. I think it was a project transfer.

Q What do you mean by that, if you could be a little more specific?

A Moving the aroma project into my -- my program if you will.

Q What was your program at that time?

A My program was about -- as I said before, delivery systems and emulsions.

Q And you say he was there for a transfer of the aroma project or coming from the aroma project?

A I would look at it more as he came with the aroma project because he had been working on it.

Q This aroma project, did it encompass all

Page 25

Peter Given

the products you just mentioned or just the beverages?

A Only beverages.

Q Obviously when you say aroma project I think it's fair to say, I mean that the aroma people, you are attempting to possibly improve the aroma of the particular cola to produce a product that people will purchase more?

MR. HUNTER: Objection to the form of the question.

Q Is that a fair statement of the purpose of the project?

A It is to improve consumer appeal.

Q Improve consumer appeal, of course. So how long was Dr. Kamdem with you?

A Well, in the order of about a year.

Q Do you recall, did you work with him professionally in this project for a year?

A I don't know what you mean by professionally.

Q Well I mean were you the supervisor of the project, that particular role you were in?

A I supervised the program on delivery of which aroma was a piece of it.

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Page 26

Peter Given

Q Okay, and would it be fair to say you supervised Dr. Kamdem?
A For a very short time when he first transferred into the group and then I brought Ned Zhang in and then he was working under Ned Zhang more directly.
Q Who is Ned Zhang?
A Ned Zhang is a scientist.
Q How many people worked under Ned Zhang when Dr. Kamdem began working under Ned Zhang?
A No one.
Q So Dr. Kamdem was the only scientist working under the supervision of Ned Zhang?
A That's correct.
Q You say you only briefly supervised Dr. Kamdem?
A Because Ned Zhang came in very shortly after Ricky transferred into my group.
Q Where did Ned Zhang come from?
A He came from IFF which is a flavor company.
Q He was a new hire?
A He was a new hire, yes.
Q It wasn't a transfer situation?

Page 27

Peter Given

A Correct.
Q How long, you said it was briefly, I'm going to respect that answer but how long did you supervise Dr. Kamdem? If you can remember.
A I really can't.
Q Well, let me put it this way, was it less than six months if you recall? Give me a factual answer.
A I'm thinking more in the order of weeks to months, not -- not --
Q Weeks to months. Maybe two months?
A Tops.
Q Do you recall having any difficulties with Dr. Kamdem?
MR. HUNTER: During those two months only?
Q Let me put it this way, do you recall any professional disagreements or issues with Dr. Kamdem?
A Well there was one.
Q What was that?
A Which was Dr. Kamdem was working on a couple of projects for me not just one and we did have some disagreement into project encapsulating

Page 28

Peter Given

orange oil with a protein called zein.
Q What was the nature of this disagreement?
A Well I felt that Dr. Kamdem should be -- should have been using different ratios of ingredients to achieve a successful encapsulation and he disagreed with me.
Q Did you discuss it with him?
A Yes, several times.
Q What was the basis for your scientific conclusion in that respect, was it based on empirical data or simply a verbal disagreement based on reasoning, what was the basis of the disagreement?
MR. HUNTER: Objection to the form of the question. You can answer it.
A It was based on the fact that he was having difficulty encapsulating the orange oil. Lack of progress.
Q Lack of progress. Not doing it -- not showing more results?
A Well he had results but I just didn't think the system was working.
Q Did you write a report about it or some sort of a report to him about it, e-mail or

Page 29

Peter Given

something in writing?
A I don't recall.
Q You don't recall any e-mails concerning this issue?
A We -- we -- we spoke mostly verbally about project progress.
Q Did you feel that he was making some sort of an error of judgment or an error in the work, in his work, in his scientific work?
A That's a difficult question to answer. It's more like a disagreement between scientists on approaches but what I -- what I did -- what I personally felt at the time was almost a refusal to follow instructions.
Q What sort of instructions?
A My instructions on what I felt a better proportion of ingredients and processing method should be.
Q Did you convey these instructions, these rather specific instructions that you're talking about to Dr. Kamdem?
A Yes, several times.
Q But they were not codified in writing or?
A I said they could have been.

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

TAB 6

Peter Given

MR. HUNTER: Objection to the form.
A They could have been, I said I don't remember.
Q You don't remember?
A No.
Q When a scientist works under another scientist such as yourself is he allowed to disagree on approaches in terms of company policy, is there some latitude given to the professional?
A There's no company policy regarding allowable disagreements.
Q Well let me put it this way, is a professional such as this gentleman here and you're a professional, for what it's worth, it's a term, I don't know what that term means, it's a term to define a person in a situation in society, is that whatever -- I mean is -- when there is a disagreement such as this is he as -- you being supervisor, you supervising him, is he given latitude in terms of his decision-making process? Must he follow instructions is what I'm saying.
A Actually I gave Ricky tremendous latitude in this situation and when things weren't working out we talked about the results, we talked about the

Peter Given

formula he was using, the approaches, all that and I said well I think you're using, you know, too much orange oil, what have you and -- but I -- my sense was he was reluctant to try what I was suggesting.
Q Did you have a problem with that?
A I sure do. I have no problem with scientists disagreeing but there was no -- I had a problem with his what I considered inflexibility to consider my point of view.
Q When you discussed it with him did he give you an answer as to his view of things?
A That, I don't remember. I remember him showing me micrographs of the resulting products but I don't remember the discussion. The rationale.
Q You don't remember that?
A No.
Q As a result of this disagreement did you make a negative -- did you give Dr. Kamdem some sort of negative evaluation or critical evaluation?
A I --
MR. HUNTER: Objection to the form of the foundation, if you want to talk about what evaluations --
Q Well let me put it this way, I'm jumping

Peter Given

ahead. Did you give him some discipline -- was disciplinary action taken against him?
A No, no, no.
Q Warning, --
A No.
Q -- counseling memo, --
A No.
Q -- suspension, whatever it is, there was no -- you didn't take -- you didn't recommend that anything -- anything of that nature be imposed on him?
A Not at all. We moved on.
Q He moved on, you people just moved on.
A We moved on. Everybody.
Q Nobody really held -- you didn't hold this against him that he didn't do exactly -- follow your instructions?
A No.
Q Do you remember, were you ever a person involved in a performance evaluation of Dr. Kamdem?
A I don't recall doing a performance evaluation on Dr. Kamdem, I don't -- I don't know that we conduct those for contract employees.
Q Now, when Dr. Kamdem came to you, you say

Peter Given

he was a contract employee?
A Yes.
Q You knew that?
A Yes.
Q Are you a contract employee?
A Not in the sense I'm using the term.
Q At that time.
A No.
Q When Dr. Kamdem worked with you.
A No.
Q What kind of employee were you at that time?
A Full time.
Q Meaning what?
A A PepsiCo employee.
Q Did you have some sort of -- if I understand this employment system here, some sort of tenure there? Job rights of some kind?
MR. HUNTER: Objection to the form of the question.
Q Contractual rights.
A I don't know what you mean by rights.
Q All right, let me put it this way, as a full-time employee is there a labor union there? Is

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Page 34

Peter Given

there a union?
A I do not believe so.
Q Did you have a yearly or multi-yearly contract with this company?
A I do not.
Q Did you sign any sort of contractual agreement concerning your employment?
A I signed a secrecy agreement when I first joined the company. I signed a whole lot of papers when I first joined the company, about 18 years ago, it's pretty hard to put my finger on --
Q Sure, I'm trying to see the distinction between him and you. What's the difference between you if there's -- are you an employee at will there?
MR. HUNTER: Objection to the legal nature of the inquiry.
Q If you know what that means.
MR. SCHATKIN: Okay, that's a legitimate objection. I'll put it more exactly.
Q Can they fire you if they want to?
A Yes.
Q Okay, so what's the difference between Dr. Kamdem and you in terms of his employee

Page 35

Peter Given

relationship?
MR. HUNTER: If you can understand or can answer it, the difference between Subex contract employees and PepsiCo direct employees.
Q Yeah, a contract employee has a relationship as an employee with this company, what's the difference between you and him?
A Well the biggest difference is he's a Subex employee and I'm a PepsiCo employee.
Q What is Subex?
A It's contract employment firm.
Q But isn't it a fact that Dr. Kamdem signed a contract of employment with PepsiCo?
A I don't know if he did or he didn't.
Q There's been some exhibits here, I think I can find this in a minute. I know the contract was --
MR. HUNTER: Yeah, we have that if you're looking at the exhibits.
MR. SCHATKIN: Yeah, I do, I have some other things here but.
MR. HUNTER: I have Exhibit 6.
MR. SCHATKIN: Okay, hold on, I have

Page 36

Peter Given

it here. Yeah, here it is.
MR. HUNTER: Do you want to use the same exhibit? You want him to look at Exhibit 6?
MR. SCHATKIN: Yeah, is this attachment B?
MR. HUNTER: Yeah, it's attachment B and there's a C.
MR. SCHATKIN: Hold on, let me get C.
MR. HUNTER: No, they're all together in the same exhibit.
MR. SCHATKIN: Oh, they're in the same exhibit?
MR. HUNTER: If you've got Exhibit 6 you've got all the documents that we marked at your client's deposition that pertain to his employment.
MR. SCHATKIN: Okay.
MR. HUNTER: I'll give the witness Exhibit 6?
MR. SCHATKIN: Fine, take a look at it.
MR. HUNTER: Have you ever seen this document before? Are you familiar with

Page 37

Peter Given

it?
THE WITNESS: No, I've never seen it.
MR. HUNTER: This is voir dire.
CONTINUED EXAMINATION
BY MR. SCHATKIN:
Q Could you look at?
A Sure.
(Mr. Hunter and the witness quietly talking.)
MR. SCHATKIN: Sir, I would appreciate you not --
MR. HUNTER: There's no question on the floor, you've asked him to look at a document.
MR. SCHATKIN: Yeah, and you're not in a position to explain to him about the document.
MR. HUNTER: I think I can talk to my client and say whatever I care to when you're asking him to look at an exhibit before you have asked him a question.
MR. SCHATKIN: You can talk to him -- there's no question you can talk to him but you can't coach him in terms of how to

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45a9-85e1-0b6ffd34f8f5

Peter Given

answer a question.

MR. HUNTER: You haven't asked him a question, how can I be coaching him how to answer a question you haven't asked?

MR. SCHATKIN: Yeah, you're coaching him in terms -- and put this on the record --

MR. HUNTER: No don't put -- put whatever he says on the record.

MR. SCHATKIN: You are coaching him and discussing him the nature of this exhibit.

MR. HUNTER: You asked him to look at the exhibit, you have not asked him a question --

MR. SCHATKIN: And therefore you don't have to talk to him about it.

MR. HUNTER: Let's take a break, I'll talk to my client for the next 15 to 20 minutes outside where we won't be interrupted.

MR. SCHATKIN: Go ahead. I don't care, go ahead. Talk to him, coach him, whatever -- please don't bring it with

Peter Given

you. I object to you bringing that thing with you.

MR. HUNTER: He's objecting to my witness looking at a document that he asked him to look at.

MR. SCHATKIN: I don't mind him looking at it but he is not going to discuss this with you.

MR. HUNTER: Why not?

MR. SCHATKIN: Because you're not entitled to discuss this exhibit with him.

MR. HUNTER: We're going to do it anyway.

MR. SCHATKIN: If you do it anyway I'll make a record, an adequate record and that's all.

MR. HUNTER: Let the record show that I am talking to my client about a document that's been marked for identification, there's no question --

MR. SCHATKIN: Go ahead, all right, I want you to be present, because this is a sanctionable conduct and I will pursue it, improper that he is coaching his witness

Peter Given

on how to handle this document. Make that clear. They've gone to the other room.

MR. HUNTER: All right, we're done.

MR. SCHATKIN: Fine. Okay, I can ask a question, okay?

THE WITNESS: Okay.

MR. SCHATKIN: I just want to be clear I made a record on that, I don't know if you heard it.

MR. HUNTER: I want to be clear that there's absolutely nothing inappropriate about reviewing a document that was produced months ago and has been identified as an exhibit in a prior deposition in this case with no open question from you on the record for me to speak to my client about this document.

MR. SCHATKIN: You can't do it, sir, I'm sorry. You can't explain to him questioning on an exhibit I presented to him. You know very well, Mr. --

MR. HUNTER: I think you're wrong and I wouldn't do something wrong and I stand by --

Peter Given

MR. SCHATKIN: I don't care whether you do something wrong or not but --

MR. HUNTER: I don't need to explain this to you.

MR. SCHATKIN: Don't do it. I mean I'll raise the issue -- I don't claim anybody's wrong or right, I claim that --

MR. HUNTER: You claim I'm wrong but go ahead.

MR. SCHATKIN: I'm not claiming anybody's wrong, this is a legal proceeding and I'm objecting to your --

MR. HUNTER: You're just being argumentative.

MR. SCHATKIN: Not at all. I'm objecting to your talking to this man without a pending question from me about an exhibit that I haven't begun to question him on.

MR. HUNTER: If there's a pending question I must not talk to the witness; if there's no pending question there is no reason not to talk to him.

MR. SCHATKIN: You can talk to him

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Page 42

Peter Given

about the Yankees but you can't talk --

MR. HUNTER: I can take a half-an-hour break and go over a document --

MR. SCHATKIN: I don't think so. Not if it's a matter of a pending examination but --

MR. HUNTER: But there's no question.

MR. SCHATKIN: Drop it. I made a record and that's it, okay? Let's go on.

Q Look at this long thing, sir. You see that thing?

A Exhibit 6 here?

Q Right, yeah, see that?

A I see it.

Q And he says... Hold on. In this agreement looking at B and C and D... Looking at 6 and 7 on attachment C -- or looking at both, at both B and C --

MR. HUNTER: At the same time?

Q Yeah, look at them both. This is an agreement between apparently a staffing supplier and Mr. Kamdem, correct?

MR. HUNTER: That's not a question.

Page 43

Peter Given

Q Is that correct, sir? Is that a correct statement looking at that?

MR. HUNTER: The witness is not here to interpret the document.

MR. SCHATKIN: He can look at it and say what it says.

MR. HUNTER: He can answer your question.

Q The question is, is this an agreement apparently between Dr. Kamdem and an entity named Subex Technologies?

MR. HUNTER: If you know, answer the question.

A Well, yeah, that's what I'm looking at I think.

Q And it is an agreement that he will be -- work, do work for PepsiCo, correct?

A I don't know that it says he'll do work for PepsiCo, it mostly looks like it's confidentiality and --

Q Let's look at No. 2 on C, "I understand that staffing supplier has assigned me to a temporary work assignment at PepsiCo."

A Okay. Okay.

Page 44

Peter Given

Q Correct?

A Correct.

MR. HUNTER: Reading a document in evidence --

MR. SCHATKIN: It's okay.

MR. HUNTER: You have to get his testimony not --

MR. SCHATKIN: All right, he can look at it, I mean.

MR. HUNTER: We'll stipulate that it says exactly what you say but that's not his testimony, you have to ask him a question.

MR. SCHATKIN: I'm not questioning him to interpret this, I'm questioning as to the words.

MR. HUNTER: You can't just read him a sentence and ask him if that's the sentence that's printed on his copy of the same exhibit.

MR. SCHATKIN: I can ask that. Why couldn't I ask that?

MR. HUNTER: Because that's why we put it in evidence.

Page 45

Peter Given

MR. SCHATKIN: Sir, you can make your objections, you can't stop me questioning him about it. I mean that's my opinion.

Q Anyhow, he is being given a work assignment with PepsiCo, right?

MR. HUNTER: If you know.

A That's what I'm reading in the document.

Q And then it says any problems or complaints has to be directed to staffing supplier not PepsiCo.

MR. HUNTER: Are you asking him if that's what it says?

MR. SCHATKIN: Yeah, that's what it says.

MR. HUNTER: The document's in evidence.

MR. SCHATKIN: Yeah, but I can still ask him that.

MR. HUNTER: You can ask him if it says what you've just read.

MR. SCHATKIN: That's what I said. That's what it says.

MR. HUNTER: These are photocopies, sir, they're exactly the same, they both

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Peter Given

say the same thing.

MR. SCHATKIN: Okay, I'm asking him if it says that.

Q That any problems or complaints are directed to his supervisor at staffing supplier.

A That's what it reads in point 3.

Q But you say you were his supervisor?

MR. HUNTER: Objection. That's not his testimony.

Q You were supervising him as a report?

MR. HUNTER: Objection. And you're being argumentative. You're mischaracterizing his testimony, I will make record of this.

MR. SCHATKIN: Fine.

MR. HUNTER: You can have more than one supervisor.

Q I am not interested in the number of supervisors, I'm interested in the fact that you were his supervisor at one point.

A I said I was his supervisor at one point.

Q If he is entering into no contract with PepsiCo according to this –

MR. HUNTER: You're

Peter Given

mischaracterizing, –

Q If this contract is with Subex –

MR. HUNTER: – you're being argumentative –

THE COURT REPORTER: Sorry, you can't both speak –

MR. HUNTER: I'm going to speak and then you're going to speak.

MR. SCHATKIN: All right.

MR. HUNTER: His testimony is, and you can read it back, that he's supervised him and in that sense was his supervisor. You are taking a word from a contract document which he said he's never read before and has followed you line by line as you read it and asked him if he read the same line that you were reading and now you're asking him if there is –

MR. SCHATKIN: If you have an objection, Mr. Hunter, with all due respect, you can make it. I'm asking him the question.

MR. HUNTER: I was in the middle of making it, now you've interrupted me.

Peter Given

MR. SCHATKIN: And it's a speaking objection. I'm letting you do it, I mean, but if you want to make your objection, make your objection under the rules of evidence, I mean that is how it works here. When I made my objections I didn't do this, okay? Except when I directed him not to answer.

MR. HUNTER: You're mischaracterizing the witness's testimony –

MR. SCHATKIN: Well I can do that –

MR. HUNTER: – and you're being argumentative –

MR. SCHATKIN: Then you make your objection. Now, continuing –

MR. HUNTER: Well you told your client not to answer questions so I think I'm doing a lot better for you.

MR. SCHATKIN: Sir, I'm not fooled by that kind of verbiage, don't do it, okay?

MR. HUNTER: I'm not trying to fool you.

MR. SCHATKIN: I'm used to this kind of work, I been doing it for years, let me

Peter Given

question him, okay?

MR. HUNTER: Go ahead.

MR. SCHATKIN: Okay, and I'm sure I will give you the utmost help to you as you have offered to me in this rather manipulative fashion, let's not do that, okay, let's move on.

MR. HUNTER: I didn't think you were going to give a speaking objection when you're the one doing the examination.

MR. SCHATKIN: No, I'm defining your representations accurately. Let's go on.

Q Let's see now, he's got a work assignment, in – says in 2 he's assigned to a temporary work assignment at PepsiCo, right?

A It does.

Q So if he isn't working for PepsiCo how can anybody supervise him? They have no authority over him, this company.

MR. HUNTER: Do you understand the question?

Q Is that right? Isn't that right, sir?

MR. HUNTER: That's not a question.

Q He has entered into a contract with a

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

Peter Given

Q And in this research what is the purpose of the research? Yes, what's the purpose of the research? I find that interesting, why you doing research on formaldehyde? Why does it need research?

A We weren't researching formaldehyde, --

Q What --

A -- we were researching a polymer made using formaldehyde.

Q Then why were you researching a polymer having some formaldehyde?

A Having some formaldehyde.

MR. HUNTER: Do you understand the question?

Q With the presence of formaldehyde.

MR. HUNTER: With the possible presence.

Q Why were you researching that?

A To conduct proof of purpose or proof of principle.

Q What do you mean by that?

A To understand whether this polymer had properties superior to other materials we were looking at.

Peter Given

Q Superior in what sense?

A Well, we've done this before but to protect aroma when painted and dried on the outside of a bottle.

Q When you were doing this research was part of the research concerned with safety issues?

A The goal of the research had nothing to do with the safety itself, the goal of the research was about aroma release.

Q Right, but whenever you do research of this kind there is always a safety component, right?

A Absolutely, yes.

Q And so part of this research involving this polymer and formaldehyde was to determine safety issues, correct?

A No, that was not the intent of the research.

Q That was part of the research?

A It wasn't part of the research.

MR. HUNTER: He answered the question.

MR. SCHATKIN: I'm finished.

MR. HUNTER: Okay.

MR. SCHATKIN: Got any questions?

Peter Given

MR. HUNTER: No.

(Time Noted: 4:13 p.m.)

________________________

PETER GIVEN

Subscribed and sworn to before me this _____ day of _________, 2012.

________________________

NOTARY PUBLIC

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Peter Given | Mr. Schatkin | 4 |

EXHIBITS

| PLAINTIFFS | DESCRIPTION | PAGE |
|---|---|---|
| A | 18-page document | 68 |
| B | Document Bates stamped 302 through 311 | 96 |

Electronically signed by Sarah Satalino (001-295-256-9479) 9b195dfe-7160-45e9-85e1-0b6ffd34f8f5

CERTIFICATE

I, Sarah Satalino, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of May, 2012.

SARAH SATALINO

Peter Given

MR. HUNTER: No.

(Time Noted: 4:13 p.m.)

PETER GIVEN

Subscribed and sworn to before me this 28 day of January, 2013.

NOTARY PUBLIC

TOMMY HAU
Notary Public - State of New York
No. 01HA6236568
Qualified in Westchester County
My Commission Expires February 28, 2015

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Ricky Kamdem v. Pepsico Inc.
Case Number:
Dep. Date: May 4, 2012
Deponent: Peter Given
Place:

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 4 | 25 | 5Yeah. | Yeah. | typo |
| 5 | 10 | How | Hau | misspelling |
| 16 | 14 | lith | lit. | typo |
| 24 | 11 | peck | pick | typo |
| 94 | 23 | she | he | wrong gender |
| 95 | 2 | she | he | " " |
| 113 | 2 | answer | cancer | wrong word ? |

100 9-10 Regarding patent filing, I signed a power of attorney for a possible patent application, but was not aware of the status of the filing at the time of my deposition

[signature]
Signature of Deponent

1/28/13

# EXHIBIT DMD - V

PEPSICO SAP PO # 4100366241, AS PO NUMBER: PSC01564, FOR

CONTRACTOR NAME: KAMDEM, RICKY ID# *****7942. JOB TITLE

FOOD SCIENTIST. 2 PAGES.

**[illegible]**

| | | | |
|---|---|---|---|
| PepsiCo SAP PO #: | 4100366241 | POID : | 1564 |
| Requisition Number: | 1820 | PO Assigned To: | Christina, McComas |
| AS PO Number: | PSC01564 | PO Status: | Expired |
| PO Version: | 11 | Job Number: | 137323M01564 |
| Division: | PepsiCo | | |

**Vendor**

| | |
|---|---|
| Company Name: | Subex Technologies, Inc. |
| Company Address: | 255 Old New Brunswick Road Suite S 240, Piscataway, NJ, 08854 |
| Remit to Address: | 255 Old New Brunswick Road Suite S 240, Piscataway, NJ, 08854 |

**Contractor Information**

| | |
|---|---|
| Contractor Name: | Kamdem, Ricky |
| ID #: | *****7942 |
| Job Title: | food scientist |

**Purchase Order Information**

| | | | |
|---|---|---|---|
| Hiring Manager: | Given, Peter | Timecard Approver: | Given, Peter |
| Created Date: | 20-OCT-2009 | Bill Rate Change Date: | 14-JUL-2008 |
| Engagement Start Date: | 13-JUL-2008 | PO End Date: | 05-OCT-2009 |
| | | Anticipated Position End Date: | |
| Placement Type: | RFQ | Modification Type: | Administrative Change Order Only |
| Subcontracting: | No | Direct Source: | No |
| Give 36.5 Hours Warning Message: | No | Give Overtime Warning Message: | No |
| | | E Auction Contractor: | No |

**Rate and Expenses Info**

| | | | |
|---|---|---|---|
| Bill Rate: | $45.00 | Bill Rate OT: | $42.75 |
| Pay Rate: | $40.00 | Hours Per Week OT: | 5 |
| Markup: | 12.50% | | |
| PO Limit ST: | $118,800.00 | PO Limit OT: | $14,107.50 |
| Anticipated Schedule: | Typical 8 Hour Work Day | | |
| ~~Expenses Authorized:~~ | ~~Yes~~ | ~~Expenses Amount:~~ | ~~$100.00~~ |
| PO Limit Total: | $133,007.50 | Contractor Type: | W2 |
| FLSA Classification: | Exempt | | |

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2288

Poor Quality

**Projects**

| Project Name / Description | Project Number | Project Type | Department | Project Start Date | Project End Date |
|---|---|---|---|---|---|
| BIG BET PROGRAM 900441 | 310205 | Expense | 310205 | 06-APR-2009 | N/A |

**Work Location**

Address: 100 Stevens Ave
City, State, Zip Code: Valhalla, NY United States, 10595

**Notes**

Notes: Extended per Peg Havekotte- 11/20- CH
orginally presented higher and resubmitted at 45 pay 40 bill 45dl 07/28/08 610
7/30/08-SAP PO for temp CNTR in Peg group Dept.610is 4100271676/1 entered per Elizabeth Werner...CM
1/16/09- upd.PO w/new SAP PO #..CM
4/6/09-contractor transfered to new team, ch. HM & TC Appr. & ext. per MNGR to 10/5/09.. ..
bill Contractors time to MNGR`s big bet program - Phoenix 310205, order # 900441........CM
5/12/ 09-upd. field Contractor type...CM
8/24/09-per HM end date correct, HM will notify if end date changes......CM
9/11/09-per HM & HR end date 10/5/09 is correct and PO is OK to expire......CM
09/28 last date of assignment. Subex notified, dept not satisfied. Subex agrees to pay o40 hours only biil for 20 hours Dl.
Updated 10/20/09 email on file

Poor

Poor

# EXHIBIT DMD - VI

1) 2008 W-2 WAGE AND TAX STATEMENT, ISSUED BY SUBEX

TECHNOLOGIES INC. FOR RICKY KAMDEM-OUAFFO. 1 PAGE.

2) 2008 W-2 WAGE AND TAX STATEMENT, ISSUED BY KEMIN

INDUSTRIES. FOR RICKY KAMDEM-OUAFFO. 1 PAGE.

3) IRS KCSPC CERTIFIED COPY OF RICKY KAMDEM-OUAFFO'S 1040

US INDIVIDUAL TAX RETURN FOR THE YEAR 2008. 1 PAGE.

IRPRT PRINT DO NOT PROCESS

416497942 16221072952869

| 22222 | Void ☐ | a Employee's social security number [redacted] | For Official Use Only ▶ OMB No. 1545-0008 |
|---|---|---|---|

| | | |
|---|---|---|
| b Employer identification number (EIN) 22-3329507 | 1 Wages, tips, other compensation 25,938.00 | 2 Federal income tax withheld 4,542.00 |
| c Employer's name, address, and ZIP code SUBE. SUBEX TECHNOLOGIES INC 255 OLD NEW BRUNSWICK ROAD PISCATAWAY NJ 08854 | 3 Social security wages 25,938.00 | 4 Social security tax withheld 1,608.00 |
| | 5 Medicare wages and tips 25,938.00 | 6 Medicare tax withheld 376.00 |
| | 7 Social security tips | 8 Allocated tips |
| d Control number | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial RICKY EMERY KAMDEM OUAFFO / Last name / Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
| 10 DENNIS STREET 135 NEW BRUNSWICK NJ 08901 | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| f Employee's address and ZIP code | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| IL | 223329307000 | | | | | |
| NJ | | 25,938 | 931 | | | |

Form **W-2** Wage and Tax Statement **2008**

Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

Cat. No. 10134D

W2 Indicator S

**Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page**

.RPRT PRINT DO NOT PROCESS."

416497942 16221072952869

| 22222 | Void ☐ | a Employee's social security number [redacted] | For Official Use Only ▶ OMB No. 1545-0008 |
|---|---|---|---|

| | | |
|---|---|---|
| b Employer identification number (EIN) 42-0886654 | 1 Wages, tips, other compensation 59,930.00 | 2 Federal income tax withheld 11,905.00 |
| c Employer's name, address, and ZIP code KEMI<br>KEMIN INDUSTRIES INC<br>BOX 70 2100 MAURY<br>DES MOINES IA 50301 | 3 Social security wages 62,079.00 | 4 Social security tax withheld 3,849.00 |
| | 5 Medicare wages and tips 62,079.00 | 6 Medicare tax withheld 900.00 |
| | 7 Social security tips | 8 Allocated tips |
| d Control number | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial / Last name / Suff.<br>RICKY EMERY KAHDEH OUAFFO | 11 Nonqualified plans | 12a See instructions for box 12 C 0000 1 |
| 10 DENNIS STREET 135<br>NEW BRUNSWICK NJ 08901 | 13 Statutory employee ☐ Retirement plan ☒ Third-party sick pay ☐ | 12b D 0000 2,148 |
| | 14 Other | 12c |
| f Employee's address and ZIP code | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AR | 420886654 | 41,147 | 2,529 | | | |
| IA | 4208866540010 | 18,783 | 962 | | | |

Form **W-2** Wage and Tax Statement **2008**

Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

Cat. No. 10134D

W2 Indicator S

**Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page**

RPRT PRINT DO NOT PROCESS.

416497942 16221072952869

Form **1040** Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return 2008** (99) IRS Use Only—Do not write or staple in this space.

For the year Jan. 1-Dec. 31, 2008, or other tax year beginning , 2008, ending , 20 OMB No. 1545-0074

**Label** (See instructions on page 14.) Use the IRS label. Otherwise, please print or type.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| RICKY EMERY KAMDEM OUAFFO | OUAF | [redacted] |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| Home address (number and street). If you have a P.O. box, see page 14. 10 DENNIS STREET 135 | Apt. no. | You must enter your SSN(s) above. |
| City, town or post office, state, and ZIP code. If you have a foreign address, see page 14. NEW BRUNSWICK NJ 08901 | | Checking a box below will not change your tax or refund. |

Presidential Election Campaign ▶ Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see page 14) ▶ ☐ You ☐ Spouse

**Filing Status** — Check only one box.

1 ☒ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See page 15.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child (see page 16)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a — Boxes checked on 6a and 6b: 1
b ☐ Spouse
c Dependents:

| (1) First name Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 17) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

No. of children on 6c who: • lived with you ____ • did not live with you due to divorce or separation (see page 18) ____ Dependents on 6c not entered above ____

If more than four dependents, see page 17.

d Total number of exemptions claimed — Add numbers on lines above ▶ 1

Certified Copy By IRS KCSPC
FEB 28 2012 [signature]
Kansas City Submission Processing Center

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 21.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| Line | Description | | Amount |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 85,868 00 |
| 8a | Taxable interest. Attach Schedule B if required | 8a | 100 00 |
| b | Tax-exempt interest. Do not include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | 1,033 00 |
| b | Qualified dividends (see page 21) | 9b 192 00 | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 22) | 10 | 1,929 00 |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | 17,489 00- |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | 2,819 00- |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions 15a | b Taxable amount (see page 23) 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount (see page 24) 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits 20a | b Taxable amount (see page 26) 20b | |
| 21 | Other income. List type and amount (see page 28) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 68,702 00 |

**Adjusted Gross Income**

| Line | Description | | Amount | | Amount |
|---|---|---|---|---|---|
| 23 | Educator expenses (see page 28) | 23 | | | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | | | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | | | |
| 26 | Moving expenses. Attach Form 3903 | 26 | 13,518 00 | | |
| 27 | One-half of self-employment tax. Attach Schedule SE | 27 | | | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | | | |
| 29 | Self-employed health insurance deduction (see page 29) | 29 | | | |
| 30 | Penalty on early withdrawal of savings | 30 | | | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | | | |
| 32 | IRA deduction (see page 30) | 32 | | | |
| 33 | Student loan interest deduction (see page 33) | 33 | | | |
| 34 | Tuition and fees deduction. Attach Form 8917 | 34 | 4,000 00 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | | | |
| 36 | Add lines 23 through 31a and 32 through 35 | | | 36 | 17,518 00 |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income ▶ | | | 37 | 51,184 00 |

DEFENDANT'S EXHIBIT 3 4/30/2012

# EXHIBIT DMD - VII

1) 2009 W-2 WAGE AND TAX STATEMENT, ISSUED BY SUBEX

TECHNOLOGIES INC. FOR RICKY KAMDEM-OUAFFO. 1 PAGE.

2) IRS KCSPC CERTIFIED COPY OF RICKY KAMDEM-OUAFFO'S 1040

US INDIVIDUAL TAX RETURN FOR THE YEAR 2009. 1 PAGE.

**"TRPRT PRINT DO NOT PROCESS."**

416497942

14221053406220

| 22222 | Void ☐ | a Employee's social security number [redacted] | For Official Use Only ▶ OMB No. 1545-0008 |
|---|---|---|---|

| | | |
|---|---|---|
| b Employer identification number (EIN) 22-3329507 | 1 Wages, tips, other compensation 56,204.00 | 2 Federal income tax withheld 9,509.00 |
| c Employer's name, address, and ZIP code SUBE<br>SUBEX TECHNOLOGIES INC<br>255 OLD NEW BRUNSWICK ROAD<br>PISCATAWAY NJ 08854 | 3 Social security wages 56,204.00 | 4 Social security tax withheld 3,485.00 |
| | 5 Medicare wages and tips 56,204.00 | 6 Medicare tax withheld 815.00 |
| | 7 Social security tips | 8 Allocated tips |
| d Control number | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial / Last name / Suff.<br>RICKY EMERY KAHDEM OUAFFO | 11 Nonqualified plans | 12a See instructions for box 12 |
| 10 DENNIS STREET 323<br>NEW BRUNSWICK NJ 08901 | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| f Employee's address and ZIP code | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| IL | 223329507000 | 58,924 | 2,246 | | | |
| NJ | | 58,924 | 2,246 | | | |

Form **W-2** Wage and Tax Statement **2009**

Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

Cat. No. 10134D

W2 Indicator S

**Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page**

...XPRT PRINT DO NOT PROCESS.

416497942 14221053406220

# Form 1040 Department of the Treasury—Internal Revenue Service U.S. Individual Income Tax Return 2009

(99) IRS Use Only—Do not write or staple in this space.

OMB No. 1545-0074

**Label** (See instructions on page 14.) Use the IRS label. Otherwise, please print or type.

For the year Jan. 1–Dec. 31, 2009, or other tax year beginning , 2009, ending , 20

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| RICKY EMERY KAMDEM OUAFFO | OUAF | [redacted] |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| Home address (number and street). If you have a P.O. box, see page 14. 10 DENNIS STREET 323 | Apt. no. | You must enter your SSN(s) above. |
| City, town or post office, state, and ZIP code. If you have a foreign address, see page 14. NEW BRUNSWICK NJ 08901 | | Checking a box below will not change your tax or refund. |

**Presidential Election Campaign** ▶ Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see page 14) ▶ ☐ You ☐ Spouse

**Filing Status** Check only one box.

1 ☒ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See page 15.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child (see page 16)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a — Boxes checked on 6a and 6b: 1
b ☐ Spouse
c Dependents: (1) First name Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 17)

No. of children on 6c who: • lived with you ___ • did not live with you due to divorce or separation (see page 18) ___ Dependents on 6c not entered above ___

If more than four dependents, see page 17 and check here ▶ ☐

Certified Copy By IRS KCSPC [signature] FEB 28 2012 Kansas City Submission Processing Center

d Total number of exemptions claimed — Add numbers on lines above ▶ 1

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| Line | Description | | Amount |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 56,204 00 |
| 8a | Taxable interest. Attach Schedule B if required | 8a | 16 00 |
| b | Tax-exempt interest. Do not include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | 833 00 |
| b | Qualified dividends (see page 22) | 9b 145 00 | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 23) | 10 | 2,336 00 |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | 34,730 00- |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions 15a / b Taxable amount (see page 24) | 15b | |
| 16a | Pensions and annuities 16a / b Taxable amount (see page 25) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation in excess of $2,400 per recipient (see page 27) | 19 | |
| 20a | Social security benefits 20a / b Taxable amount (see page 27) | 20b | |
| 21 | Other income. List type and amount (see page 29) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 24,659 00 |

FEP

**Adjusted Gross Income**

| Line | Description | | Amount |
|---|---|---|---|
| 23 | Educator expenses (see page 29) | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | |
| 26 | Moving expenses. Attach Form 3903 | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | |
| 29 | Self-employed health insurance deduction (see page 30) | 29 | |
| 30 | Penalty on early withdrawal of savings | 30 | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction (see page 31) | 32 | |
| 33 | Student loan interest deduction (see page 34) | 33 | |
| 34 | Tuition and fees deduction. Attach Form 8917 | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 31a and 32 through 35 | 36 | |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income ▶ | 37 | 24,659 00 |

DEFENDANT'S EXHIBIT 4 4/30/2012 PENGAD 800-631-6989

# EXHIBIT DMD - VIII

1) E-MAIL COMMUNICATION BETWEEN AJITH PS AND RICKY KAMDEM. DATED JULY 28TH, 2008. RE: JOINING DETAILS. 2 PAGES.
2) E-MAIL COMMUNICATION BETWEEN AJITH PS AND RICKY KAMDEM. DATED JULY 29TH, 2008. RE: LOGIN CREDENTIALS PASSWORD. 1 PAGE.

# RE: Joining Details

From: Ajith (ajithps@subextechnologies.com)
Sent: Tue 7/29/08 1:22 PM
To: 'Ricky Kamdem' (rickykamdem@hotmail.com)

Congrats Ricky.

Send me your PepsiCo (official) email id and phone number.

Thanks and Regards

**Ajith PS**
Sr.Technical Recruiter

Subex Technologies Inc
255 Old New Brunswick Road, Suite S240
Piscataway, NJ 08854 USA
Tel: 732 823 9112 | Fax: 732 981 1666
E-mail: ajithps@subextechnologies.com

DISCLAIMER: This email is bound by the terms and conditions described at http://www.subextechnologies.com/mail-disclaimer.htm

---

**From:** Ricky Kamdem [mailto:rickykamdem@hotmail.com]
**Sent:** Tuesday, July 29, 2008 4:53 AM
**To:** ajithps@subextechnologies.com
**Subject:** RE: Joining Details

Ajith,

I started today. Everything went well. I had some orientation and we discuss projects ideas.

My cell phone is 848 228 0745.
I will communicate the laboratory phone to you tomorrow.

Do you mean Pepsico ID?

Regards

Ricky

---

From: ajithps@subextechnologies.com

To: rickykamdem@hotmail.com
Subject: Joining Details
Date: Mon, 28 Jul 2008 01:57:26 -0400

Hi Ricky

After reaching office on 28th July 2008 ask for peg Havecotte .

All the best. call me after finishing your joining section.
Dont forget to send me your official ID and Phone number

Thanks
Ajith

---

Keep your kids safer online with Windows Live Family Safety. Help protect your kids.

TAB 7

1274

# Login Credentials Password

From: Ajith (ajithps@subextechnologies.com)
Sent: Tue 7/29/08 8:07 PM
To: rickykamdem@hotmail.com

Hi Ricky Kamdem

Login details
**********

Ricky Kamdem Profile has been created in the HRP application. Please use the following username and password to logon to the Pepsico system.

https://pepsico.procurestaff.com

Contractor temporary HRP password is: r575ggb5

Contractor Login Name: RKamdem

Please let me know if you have any questions.

Have a great day!

Thanks and Regards

Ajith PS
Sr.Technical Recruiter
SUBEX
Subex Technologies Inc
255 Old New Brunswick Road, Suite S240
Piscataway, NJ 08854 USA
Tel: 732 623 9112 | Fax 732 981 1666
E-mail: ajithps@subextechnologies.com

DISCLAIMER: This email is bound by the terms and conditions described at
http://www.subextechnologies.com/mail-disclaimer.htm

# EXHIBIT DMD - IX

DEPOSITIONS TRANSCRIPT; NAIJIE ZHANG'S DEPOSITION TAKEN MAY 29TH, 2012, PLEASANTVILLE, NEW YORK. 33 PAGES.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER - CIVIL TERM - PART ADS
-------------------------------------------x

RICKY KAMDEM-OUAFFO,

Plaintiff,

- against -

Index No. 22625-2010

PEPSICO, INC.,

Defendant.

-------------------------------------------x

70 Memorial Plaza
Pleasantville, New York

May 29, 2012
10:07 a.m.

DEPOSITION of PEPSICO, INC., Defendant, by NED ZHANG, taken by Plaintiff, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony, and Order, held at the above-noted time and place, before Donna C. Gilmore, a Stenotype Reporter and Notary Public within and for the State of New York.

Electronically signed by Donna Gilmore (601-152-379-5964) 53ab33ee-7b7f-4119-839f-35cad2a7120d

APPEARANCES:

ANDREW SCHATKIN, ESQ.
Attorney for Plaintiff
350 Jericho Turnpike
Jericho, New York 11753

LUBOJA & THAU, LLP
Attorneys for Defendant
10 East 40th Street
New York, New York 10016
BY: RICHARD M. HUNTER, ESQ.

ALSO PRESENT:
Ricky Kamdem
Rachel Garber, Esq.
PepsiCo

STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R., and shall be controlled thereby. The filing of the original of this deposition is waived.

IT IS FURTHER STIPULATED, that a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

NED ZHANG,
called on behalf of PEPSICO, Defendant, having first been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY
MR. SCHATKIN:
Q Please state your name for the record.
A Ned Zhang.
Q Where do you reside?
A 31 Charter Oak Court, Ridgefield, Connecticut 06877.
Q Dr. Zhang, this is a deposition. I'll be asking you some questions about Dr. Kamdem and what happened here. It's an information session so there's no personal like dislike or anything like that.
Anyhow, where do you work now?
A Now? Pepsi.
Q Yeah.
A PepsiCo.
Q And what do you do there?
A We are scientist in research, product development.
Q And how long have you been there?
A Since the past three years here. Three

years this month, two weeks ago, yeah.
Q And what, and could you explain in a little detail what your work there is for the past three years so I can understand it?
A Just primary just like research and product development and trouble-shooting and problem-solving.
Q When you say "research and product development," could you be a little more specific and enlighten me as to what this work entails? I mean, I know it's a beverage company and manufactures other things, but what exactly kind of research are you doing?
A We, particularly we're doing ingredient technology in the beverage application.
Q What?
A Ingredients, like anything in the beverages, the ingredients.
Q So would it be fair to say that your research involves an attempt to create flavoring or coloring that will produce product that has a consumer appeal?
MR. HUNTER: Objection to the form of the question. Answer it.

Electronically signed by Donna Gilmore (601-152-379-5964) 53ab33ee-7b7f-4119-839f-35cad2a7120c

Ned Zhang

MR. HUNTER: He's ready.

CONTINUED EXAMINATION
BY MR. SCHATKIN:

Q Did you look through those?

A I looked at them, yes, I did.

Q To make it easier, let's make it easy because it's going to be very time consuming in terms of my orally stating each of these questions, so I want you to look at the first question here where it starts with, "In the meeting minutes," and there are two questions after that. Would you read the first paragraph, silently, because I don't want, it's very time consuming --

MR. HUNTER: But if there's going to be a question asked I will ask you to ask the question.

MR. SCHATKIN: I will ask the question, but this makes it easier than reading out the whole thing.

MR. HUNTER: Got it.

MR. SCHATKIN: It is marked though.

MR. HUNTER: It is, it's marked, it's all on the record, should be easy to follow.

Ned Zhang

Q Okay. So the question is, if you see the first question there, yeah, it's referenced by that first document. See it?

MR. HUNTER: E1, he's talking about.

Q You reviewed that?

A The, you want --

Q I want to ask a question in reference to this document. Okay. The question is, having read that first paragraph, whose work led to the discovery mentioned here?

MR. HUNTER: Mentioned where?

MR. SCHATKIN: It's on the first paragraph.

MR. HUNTER: Is there a discovery?

MR. SCHATKIN: Yeah. If you read that first paragraph there's question number one.

MR. HUNTER: Let's look at the document that he's referring to.

MR. SCHATKIN: That's the document, the first one, right?

MR. HUNTER: This one. The record can reflect it's been marked E1, and it's PepsiCo documents produced at 52, 53.

Ned Zhang

You can ask him about that document.

Q Did you see the question?

A Yeah.

Q Whose work led to discovery?

A I organize this in the meeting and held brainstorm session to see how can we improve current existing technology. So we talk about this material, that the formaldehyde from Appleton, so we address that is material performance, safety and handling in the meeting.

Q Right. Right. But the question that is being asked here is whose work led to discovery stated above? You see what's stated here?

MR. HUNTER: What's stated where?

MR. SCHATKIN: It said, "In the meeting" -- I'll read it out.

Q "In the meeting minutes" -- which are there dated May 15th, you wrote, "Technologies worked well if coated capsule and PET was surrounding under low humidity."

You wrote that?

A Yup.

Q "The performance of encapsulated aroma significantly dropped when the coated PET was stored

Ned Zhang

under high humidity."

And the question is, whose work led to that discovery?

A This is brainstorm.

Q Not Dr. Kamdem, specifically?

A No, he -- no.

Q Okay. Was he involved?

A Yeah, he's at the meeting.

Q Who developed the techniques to test the performance of encapsulate which also led to discovery?

A This time is brainstorm. No material --

Q You don't say it was Dr. Kamdem?

A This is we seated in the conference room, we talk about that, brainstorm how to, what's the existing technology, what's the potential technology. That's when technology we addressed Appleton.

Q I think it's better to read this out.

In the same meeting minutes you stated the following in objectives, quote, "To develop advanced delivery systems to enhance aroma, stability and controlled releasing and food packaging."

MR. HUNTER: Where is that? That's on this document -- okay, the objectives

Electronically signed by Donna Gilmore (601-152-379-5964) 53ab33ee-7b7f-4119-839f-35cad2a7120

Page 54

Ned Zhang

– that is, for the record, this document does have a yellow highlight paragraph that is – may I voir dire quickly with the witness – is that yellow highlighting original? Did you put that there?

DR. KAMDEM: I did.

MR. SCHATKIN: That's Dr. Kamdem's.

MR. HUNTER: So that's been imposed? Now, what's the objective sentence? Maybe the witness can – he could read it.

A Yeah, this is all objective, yeah.

Q Is it correct to state that Dr. Kamdem's work was instrumental in first establishing and bringing forth the idea and importance of developing advanced delivery systems for food packaging application at PepsiCo?

Is that true?

A Yeah.

Q And as far as flavor encapsulators go that they should be able to withstand high relative humidity?

A Yeah. That's the purpose.

Q He did that.

A That's the meeting objective, to find

Page 55

Ned Zhang

robust material.

Q Look at this question.

MR. HUNTER: Now, is that the question?

MR. SCHATKIN: The question, I read it out, but it was long.

Q Look at this question and see if you can answer it?

MR. HUNTER: Which question?

MR. SCHATKIN: The question on the bottom, the very last thing, starting here (indicating).

MR. HUNTER: Is it correct to state that Dr. Kamdem's work was instrumental in first establishing and bringing forth the idea and importance of developing advanced delivery systems" – all caps – "for food packaging application at PepsiCo, and as far as flavor encapsules go that they should be able to withstand higher relative humidity environment?"

I object to the form of the question. If you can answer it, please do.

Q Can you answer it?

Page 56

Ned Zhang

A At that time was just brainstorm talk. We don't, nobody involved any detail.

Q Was he involved?

A He involved, he just the meeting, yeah.

Q I see. Okay.

Let's look at these questions, the following questions in reference to those documents.

Did you give Dr. Kamdem a material called SM-004 from Appleton to work with?

A That's after –

MR. HUNTER: Is there is an exhibit or document –

MR. SCHATKIN: It's the first question on page two. If you want he can look at it, but I'm reading it out, it's easier.

MR. HUNTER: That's fine, but he doesn't have that paper. You only brought one copy.

MR. SCHATKIN: Just the question, no document.

Q Did you give Dr. Kamdem a material called SM-004 from Appleton to work with?

A Yeah.

Page 57

Ned Zhang

Q You did.

A Yeah.

MR. HUNTER: Yes. Next question.

A On July 29, 2009 –

MR. HUNTER: He'll ask the next question. You answer, he asks.

Q Did you write the handwriting on the container?

A Yes.

MR. HUNTER: Do you want to show him the exhibit? Because you have a photograph of that stuff.

MR. SCHATKIN: There is a photograph.

MR. HUNTER: We have it here. Do you want the witness to look at it?

MR. SCHATKIN: It's not important. He answered the question.

MR. HUNTER: As long as you're satisfied –

MR. SCHATKIN: Satisfied.

MR. HUNTER: – go ahead with the next question.

Q Do you remember what you wrote?

A Yeah.

Electronically signed by Donna Gilmore (601-152-379-5964) 53ab33ee-7b7f-4119-839f-35cad2a7120d

Ned Zhang

and bring any further issues --

MR. SCHATKIN: Ms. Walsh, you want me to send --

MS. WALSH: If you want some affirmative relief, Mr. Hunter --

MR. HUNTER: No, I'm not asking for that. The current instruction is absolutely adequate. That is exactly what I called for and requested.

MR. SCHATKIN: Does the Court require that I send a copy of the video to the Court?

MS. WALSH: Well, we don't have to have it yet, unless there's really something that's going --

MR. HUNTER: Okay. At this time your client will surrender any copies to you --

MR. SCHATKIN: Right, and I will keep it.

MR. HUNTER: -- and hold onto it.

MR. SCHATKIN: I will hold onto it.

MS. WALSH: It's just like any other discovery in this case. The Court doesn't need it unless it's going to be used later

Ned Zhang

for something.

MR. SCHATKIN: Thank you.

MR. HUNTER: Appreciate that. Thank you for calling back.

(The call with chambers concluded at 1:25 p.m.)

MS. GARBER: Are you done with Dr. Zhang?

MR. SCHATKIN: Yeah, I'm done.

MR. HUNTER: The record is closed.

(Time noted: 1:25 p.m.)

NED ZHANG

Subscribed and sworn to
before me this day
of , 20

Notary Public

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| NED ZHANG | MR. SCHATKIN | 4 |

EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| E | Seven-page document, "Questions for Ned" | 49 |
| E2 - E14 | Attached documents to Exhibit E | 49 |
| F | Packet of documents, "Questions for Ned" | 49 |
| F2 - F9 | Attached documents to Exhibit F | 49 |

MARKED FOR RULING

| DESCRIPTION | PAGE/LINE |
|---|---|
| Ruling by Law Clerk Walsh | 45/21 - 49/16 |
| Attempt to seek ruling from Chambers | 106/16 - 109/2 |
| Ruling by Law Clerk Walsh | 118/11 - 123/7 |

CERTIFICATION

STATE OF NEW YORK )
) ss
COUNTY OF SUFFOLK )

I, DONNA C. GILMORE, a stenotype reporter and Notary Public within and for the State of New York, do hereby certify;

That the witness whose Examination Before Trial is hereinbefore set forth was duly sworn by me;

That such Examination Before Trial is a true and accurate record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of June, 2012.

Donna C. Gilmore

DONNA C. GILMORE

Electronically signed by Donna Gilmore (601-152-379-5964) 53ab33ee-7b7f-4119-838f-35cad2a7120d

for something.

MR. SCHATKIN: Thank you.

MR. HUNTER: Appreciate that. Thank you for calling back.

(The call with chambers concluded at 1:25 p.m.)

MS. GARBER: Are you done with Dr. Zhang?

MR. SCHATKIN: Yeah, I'm done.

MR. HUNTER: The record is closed.

(Time noted: 1:25 p.m.)

Ned Zhang 8/16/12

NED ZHANG

Subscribed and sworn to before me this 16th day of August, 2012

Notary Public

JENNIFER HORN
Notary Public, State of New York
Qualified in Rockland County
No. 01HO6018757
Commission Expires Jan.19, 2015

# EXHIBIT DMD - X

E-MAIL COMMUNICATION FROM RICKY KAMDEM. DATED JUNE 30H

2009. RE: DELANEY CLAUSE AND USE OF FORMALDEHYDE FOR

APPLICATION ENCAPSULATE. 1 PAGE.

sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Kamdem, Ricky {PCNA}
**Sent:** Tuesday, June 30, 2009 8:40 AM
**To:** Given, Peter {PCNA}
**Cc:** Zhang, Naijie {PCNA}; Havekotte, Peg {PCNA}; Covarrubias, Marco {PCNA}; Jacklin, Valerie {PCNA}; Finnerty, Mike {PCNA}
**Subject:** Delaney Clause and use of formaldehyde for application encapsulate

---

Peter;

I am still reaching the conclusion that formaldehyde cannot be used in the making of flavor encapsulates intended for "Aroma Burst" project. My reasoning is based on the following:

1 - Food, Drugs, and Cosmetic Act of 1958: "the Secretary of the Food and Drug Administration shall not approve for use in food any chemical additive found to induce cancer in man, or, after tests, found to induce cancer in animals."

2 - Formaldehyde is considered in many nations worldwide as a carcinogen. In the US it is classified by the National Cancer Institute (NCI) as probable carcinogen. The NCI considers it a suspect in causing nasal and brain cancers

3 - Formaldehyde is not an approved pesticide: pesticides were granted exception to the Delaney clause in 1996 by the Food Quality Protection Act.

4 - In the context of "Aroma Burst", one could consider that the flavor is ingested through the nose.

5 - On the basis of all this I do not know if we can even attempt a lab experiment for "Aroma Burst" using formaldehyde as cross-linking agent.

Regards

Ricky

# EXHIBIT DMD - XI

1) E-MAIL COMMUNICATION FROM PETER GIVEN. DATED

SEPTEMBER 11, 2009. RE: PO END DATE VERIFY IF STILL

CORRECT. 1 PAGE.

2) E-MAILS DATED SEPTEMBER 16, 2009. RE: DISCLOSURE

SUBMISSION UPDATE. 3 PAGES.

**From:** Given, Peter {PCNA}
**Sent:** Friday, September 11, 2009 11:15 AM
**To:** McComas, Christina {PBSG}
**Subject:** RE: PO END DATE 10/5/09 Verify if still correct

Christina - after discussion with Ned and HR, I have decided to stay with the end date of Oct 5 for Ricky Kamden.

I would like to speak with you first thing next week about starting the search for a replacement (likely lower salary grade).

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

**From:** McComas, Christina {PBSG}
**Sent:** Friday, September 11, 2009 11:00 AM
**To:** Given, Peter {PCNA}
**Subject:** PO END DATE 10/5/09 Verify if still correct

Dear Peter,

Please see PO end date 10/5/09 and verify if PO end date is still correct. If PO end date should be changed please let m know ASAP.

| 1564 | 4100366241 | Given, Peter | Kamdem, Ricky | Subex Technologies, Inc. | 13-JUL-2008 | 05-OCT-2009 |
|---|---|---|---|---|---|---|

Thank you very much,

Christina McComas
Expeditor

PepsiCo MSP 5600 Headquarters Dr., Plano, TX 75024
christina.mccomas@pbsg.com Tel (972) 963-1512

This message may contain confidential information intended only for certain parties. If it is clear to you, or clear from the context in which this e-mail was sent, t you are not an intended recipient, you may not disseminate or act on this e-mail. To do so may be a violation of the law. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free. Theref the sender does not accept any liability for errors or omissions in the contents of this message, or for any malicious software that may be attached to this e-mai any attachment. To the extent this e-mail expresses an opinion, it is the opinion of the sender only and not of any group to which the sender belongs or to the sender's employer, even if the sender is acting in an official capacity. If verification is required please request a hard-copy version.

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 5:16 PM
**To:** Sloane, Carolyn {Quaker}; Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

Another hitch - his contract is terminating Oct 5, and he'll be informed this week.... more drama! Please do not distribute this info, but may impact our decision on inventorship

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 3:41 PM
**To:** Zhang, Naijie {PCNA}; Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

Hi Ned. We wait to make determinations of inventorship until the final claims are drafted. Outside counsel will discuss this issue with you at that time. Thank you.

---

**From:** Zhang, Naijie {PCNA}
**Sent:** Wednesday, September 16, 2009 2:37 PM
**To:** Given, Peter {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Ricky kamdem is not inventor. He is just involved in the project.

Ned

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 3:00 PM
**To:** Sloane, Carolyn {Quaker}
**Cc:** Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

He's the equivalent of a Kelly Temp - we use ProcureStaff... same thing.

But the original question - are there any rules / guidelines about including temps as "inventors" on PepsiCo patents?

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 5:17 PM
**To:** Zhang, Naijie {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Thanks for clarifying.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Zhang, Naijie {PCNA}
**Sent:** Wednesday, September 16, 2009 3:37 PM
**To:** Given, Peter {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Ricky kamdem is not inventor. He is just involved in the project.

Ned

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 3:00 PM
**To:** Sloane, Carolyn {Quaker}
**Cc:** Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

He's the equivalent of a Kelly Temp - we use ProcureStaff... same thing.

But the original question - are there any rules / guidelines about including temps as "inventors" on PepsiCo patents?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563

(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 2:33 PM
**To:** Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

We still need an MCA if he is an independent consultant or working through his own consulting firm. We don't need an MCA if he is a Kelly Temporary employee.

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 1:31 PM
**To:** Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

He's a contract employee (temp) - not an outside research firm.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipien please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 12:30 PM
**To:** Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

Yes we need an MCA and SOW in place wherein it is stated that consultant grants Pepsi the IP ownership. If there is no MCA in place we should get one ir place and to cover prior work let's get a patent assignment in place from the inventor to Pepsi as soon as possible. Who is the consultant?

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 10:06 AM
**To:** Sloane, Carolyn {Quaker}
**Subject:** FW: Disclosure Submission Update

TAB 8

164 APPLETON

What Ideas Can Do

**Extinguishing Media:** Water, foam, carbon dioxide, dry chemical.
**Unusual Fire and Explosion Hazards:** Capsules will burn under fire conditions after water has evaporated. Capsules may release combustible vapors at elevated temperatures. Capsules in aqueous slurry should not present a hazard.
**Special Fire Fighting Procedures:** Wear positive pressure/self-contained breathing apparatus and full protective clothing.
**Hazardous Combustion Products:** Exposure of capsules to fire and heat can create toxic fumes and vapors including carbon dioxide, carbon monoxide, oxides of nitrogen, formaldehyde and hydrocarbon residues.

## Section 6. Accidental Release Measures

Eliminate sources of ignition and ventilate the area. Contain and collect spill with inert materials such as commercial absorbent, sand or earth. Wear protective clothing as needed to avoid eye and skin contact. Avoid contamination of water supplies and environmental releases. Report spills as required to authorities.

Refer to Section 13 for disposal information.

## Section 7. Handling and Storage

**Handling:** Avoid breathing vapors, mists and aerosols. Use with adequate ventilation. Avoid contact with the eyes, skin and clothing. Wear impervious gloves, chemical safety goggles and appropriate protective clothing when handling this material. Wash thoroughly after handling. Do not eat, drink or smoke in the work area. Keep containers closed when not in use. Keep away from heat.

**Storage:** Store at room temperature in cool; dry place that is ventilated. Do not store in direct sunlight. Storage locations may accumulate extremely low amounts of formaldehyde. Allow storage areas to ventilate prior to entering such a location for an extended period.

## Section 8. Exposure Controls / Personal Protection

**Exposure Limits:**

| Component | Exposure Limit | Source |
|---|---|---|
| Essential Oil | None Established | Not Applicable |
| Non-Hazardous Ingredients | None Established | Not Applicable |

**Engineering Controls:** Use with adequate general or local exhaust ventilation to maintain concentration of hazardous constituents below recommended limits.
**Respiratory Protection:** Not necessary if workplace concentrations of hazardous constituents are below recommended limits. If the exposure limit is exceeded, a NIOSH approved respirator should be worn. Respirator selection and use should be based on contaminant type, form and concentration. Follow OSHA 1910.134, ANSI Z88.2 and good Industrial Hygiene practice.
**Eye Protection:** Chemical safety goggles recommended.
**Skin Protection:** Impervious gloves recommended. Wear protective clothing as required to avoid prolonged or repeated skin contact when handling.

## Section 9. Physical and Chemical Properties

**Appearance and Odor:** Milky yellow with a cedar odor.

| | | | |
|---|---|---|---|
| **Solubility in Water:** | Insoluble capsule in a water suspension | **Boiling Point:** | Not Available |
| **pH:** | 8 | **Melting Point:** | Not Available |
| **Specific Gravity:** | Not Available | **Vapor Density:** | Not Available |
| **Evaporation Rate:** | Not Available | **Vapor Pressure:** | Not Available |
| **Partition Coefficient:** | Not Available | **Flash Point:** | >200°F (93.3°C) |
| **Explosive Limits:** | Not Available | **Autoignition** | Not Available |

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0161

| | | Temperature: | |
|---|---|---|---|

## Section 10. Stability and Reactivity

**Stability:** Stable.
**Incompatibility:** Avoid excessive heat, open flames, strong oxidizers, acids, bases.
**Hazardous Decomposition Products:** Products of combustion include carbon dioxide, carbon monoxide, oxides of nitrogen, ammonia, formaldehyde and hydrocarbon residues.
**Hazardous Polymerization:** Will not occur.

## Section 11. Toxicological Information

**Health Hazards**

**Inhalation:** Breathing vapors or mists may cause irritation to the nose, throat and upper respiratory tract.

**Skin Contact:** Capsule contents may cause skin irritation.

**Eye Contact:** May cause irritation.

**Ingestion:** Swallowing may cause gastrointestinal disturbances. Not expected to be acutely toxic.

**Carcinogenicity:** None of the components present at 0.1% or greater is listed as a potential carcinogen by IARC, NTP or OSHA. The slurry may contain a very small amount (less than 0.04%) of formaldehyde.

**Mutagenicity:** This product is not expected to present a risk of genetic damage.

**Reproductive Toxicity:** This product is not expected to present a risk of adverse reproductive or developmental toxicity.

**Acute Toxicity Values:** No data available

## Section 12. Ecological Information

No data is available for the product.

## Section 13. Disposal Considerations

Dispose in accordance with all local, state and federal regulations. Local regulations may be more stringent than regional and national requirements. It is the responsibility of the waste generator to determine the toxicity and physical characteristics of the material to determine the proper waste identification and disposal in compliance with applicable regulations

## Section 14. Transport Information

**Transportation Classification:** Not Regulated for Transportation under USDOT, EUADR, IATA and IMDG.

## Section 15. Regulatory Information

**United States Regulations:**

**OSHA Status:** Hazardous – a MSDS is required for this product.

**EPA SARA Regulations:**

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

APPLETON
What Ideas Can Do
Fragrance Capsules
API-ENT-009

ARA 311/312 Hazard Categories:
- N – Fire Hazard
- N – Sudden Release of Pressure
- N – Reactivity
- Y – Acute Health
- N – Chronic Health

ARA 313: This contains the following chemicals above deminimus concentrations subject to the notification or reporting quirements of SARA 313: None

ERCLA Section 103: The reportable quantity (RQ) for this product is 250,000 lbs based on the RQ for formaldehyde esent at 0.04% of 100 lbs.

CRA Status: This product, as sold, is not regulated under RCRA as a hazardous waste.

SCA Status: All of the components of this product are listed on the EPA TSCA inventory.

alifornia Proposition 65 – This product may contain a small amount (less than 0.04%) of formaldehyde. Formaldehyde known to the State of California to cause cancer.

nternational Regulations:

| | |
|---|---|
|  | Class D - Division 2 - Subdivision B<br>(Toxic material causing other chronic effects)<br>(Eye and Skin Irritant) |

anadian Environmental Protection Act: All of the ingredients are listed on the Domestic Substances List.

his MSDS has been prepared according to the criteria of the Controlled Products Regulation (CPR) and the MSDS ontains all of the information required by the CPR.

C Labeling:

| | |
|---|---|
| <br>Irritant | R36/38 Irritating to eyes and skin<br>S24/25 Avoid contact with skin and eyes.<br>S26 In case of contact with eyes, rinse immediately with plenty of water and seek medical advice.<br>S36/37 Wear suitable protective clothing and gloves.. |

uropean Inventory of Existing Commercial Chemical Substances (EINECS): All of the ingredients are listed on the INECS inventory.

## Section 16. Other Information

| | | | |
|---|---|---|---|
| NFPA RATING (NFPA 704) | FIRE: 1 | HEALTH: 1 | INSTABILITY: 0 |
| HMIS RATING | FIRE: 1 | HEALTH: 2 | REACTIVITY: 0 |

EU Classes and Risk Phrases for Reference (See Sections 2 and 3):
Xi Irritant
R36/38 Irritating to eyes and skin.
R52/53 Harmful to aquatic organisms. May cause long-term adverse effects in the environment.

Effective Date: 11/17/07

Revision Date: 11/17/2007 CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 Page 4 PC

164

APPLETON

What Ideas Can Do

Fragrant Oil Capsules
API-ENT-009

**Supersedes Date:** New MSDS

**Revision to Sections:** Not Applicable

**MSDS Number:** API-ENT-009

---

This information is furnished without warranty, expressed or implied. It is accurate to the best knowledge of Appleton Papers, Inc. The data on this sheet is related only to the specific product designated herein. Appleton Papers, Inc. assumes no legal responsibility for the use or reliance upon these data.

PC 0164

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

Revision Date: 11/17/2007

# EXHIBIT DMD - XIII

VERIFIED COMPLAINT. INDEX NO.:22625/10. DATE PURCHASE: 9/17/10.

20 PAGES,

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-------------------------------------------------------------X

RICKY KAMDEM-OUAFFO,

Plaintiff,

- against -

PEPSICO, INC.,

Defendant.

-------------------------------------------------------------X

Index No.: 22625/10
Date Purchased: 9/17/10

VERIFIED COMPLAINT

Plaintiff RICKY KAMDEM-OUAFFO, by his attorneys, the LAW OFFICES OF ALBERT ADAM BREUD, PLLC, complains of Defendant as follows:

1. Plaintiff is an individual and a resident of the State of New Jersey, residing at 1 Richmond Street, #2080, New Brunswick, NJ 08901.

2. Defendant is a foreign corporation duly licensed and registered to do business in New York State with its principal place of business being 700 Anderson Hill Road, Purchase, NY 10577.

3. Plaintiff holds a PhD in food chemistry, same being obtained from Rutgers University in October 2002.

4. On or about July 28, 2008, plaintiff was retained to work as a full time Food Science chemist at the Defendant Research and Development Facility in Valhalla, New York.

5. One of Plaintiff's duties at Defendant was to evaluate flavor "cocktails" to be used in the manufacture of Defendant's soda products.

6. Plaintiff's contracted employment with Defendant was due to expire on or about October 5, 2009.

7. In September, 2009 Plaintiff met with a hiring manager, William Riha, and was informed that he would be a good fit for a new position in Defendant PepsiCo.

8. Prior to May 2009 Plaintiff had been working on an approach to make flavor encapsulates for a new product line of soda Defendant PepsiCo intended to introduce into the market.

9. Sometime in May, 2009 Plaintiff overhead his supervisors discussing a new technical approach for making flavor capsules because there were some challenges with the first approach that Plaintiff had been working on.

10. Sometime in June, 2009 Plaintiff was advised that it was the intention of Defendant to change the technical approach for the production of the flavor capsules Plaintiff had been evaluating. The production of this particular flavor encapsulate was still in the conceptual stage

11. On or about June 30, 2009 Plaintiff notified his supervisor, Peter Given, by E-mail, as well as Naijie Zhang, Peg Havekotte, Marco Covarrubias, Valerie Jacklin, Mike Finnerty and Mike Hoar that it was his opinion that the encapsulates that were being contemplated would contain formaldehyde and that formaldehyde could not be used to make aroma encapsulates based on the carcinogen nature of formaldehyde and the Federal Food and Drug Act.

12. Formaldehyde has been linked to nasal cancer, brain cancer and leukemia.

13. The Defendant intended the "Aroma Burst" encapsulate contents to be inhaled nasally by the public.

14. Subsequent to Plaintiff's expression of concern, he was not asked to participate in any further meetings regarding the development of the new flavor encapsulate.

15. On or about July 29, 2009, Plaintiff was given a new flavor cocktail to evaluate. Plaintiff was told the new flavor cocktail had "just come in".

16. Plaintiff specifically asked if the flavor cocktail was safe for "sensory" testing. Defendant advised Plaintiff that the "Aroma Burst" encapsulate was safe for "sensory" testing.

17. Plaintiff was not told the "Aroma Burst" encapsulate he was given for testing was, in fact, the formula that contained formaldehyde.

18. The sensory testing required Plaintiff inhale the contents of the encapsulates through his nose.

19. On or about July 29, 2009 through August 3, 2009, Defendant ordered Plaintiff to perform the "sensory" testing on certain "Aroma Burst" encapsulates.

20. On or about August 3, 2009 Plaintiff was told the synthetic capsules contained dangerous levels of formaldehyde, a known carcinogen.

21. At that time, Plaintiff requested the experiment be stopped due to the carcinogenic nature of formaldehyde.

22. The experiment was stopped at that time.

23. Plaintiff was exposed to said formaldehyde for at least four days.

24. Defendant did not post any warning signs with regard to the use of formaldehyde in the workplace, as required by OSHA 29 CFR 1910.1048(e)(1).

25. Defendant did not provide plaintiff with the Material Safety Data Sheet (MSDS) of the formaldehyde containing flavor encapsulate.

26. Defendant did not properly train employees, including Plaintiff, with regard to handling formaldehyde, as required by OSHA 29 CFR 1910.1048(n)(1).

27. Defendant did not label the bottle of "Aroma Burst" as required by law as containing formaldehyde, as required by OSHA 29 CFR 1910.1048(m)(3)(i).

28. On or about September 20, 2009 Plaintiff asked Defendant if Defendant could assure Plaintiff that his exposure to the formaldehyde did not put Plaintiff at risk for cancer.

29. Defendant would not give Plaintiff such assurance.

30. On or about September 23, 2009 Defendants requested any remaining materials from the July/August experiment from Plaintiff.

31. Plaintiff showed Defendants the remaining materials, at which time Defendant took and discarded the materials.

32. On or about September 24, 2009, Plaintiff complained internally to a supervisor at Defendant regarding his concerns over his formaldehyde exposure as well as the potential harm of introducing the product to the public.

33. Plaintiff complained of Defendant's violation of the Occupational Safety and Health Act's (OSHA) Regulation 29 CFR 1910.1048.

34. Defendant did not correct said problems within a reasonable time.

35. Thereafter, Defendant requested that Plaintiff visit Defendant's Human Resources department.

36. On or about September 27, 2009, Plaintiff submitted an official written grievance to Defendant through Peter Given to express safety and health concerns for exposure to formaldehyde.

37. Approximately one day after filing an official grievance, Plaintiff was forcibly removed from Defendant's premises and was terminated.

38. Thereafter, Defendant also refused to consider Plaintiff for the new position within the company.

AS AND FOR
A FIRST CAUSE OF ACTION
Breach of Contract

39. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-38 with the same force and effect as though same were set forth at length herein.

40. Plaintiff and Defendant entered into a contract wherein Defendant hired Plaintiff as an employee for a time certain.

41. Plaintiff duly performed his duties under the contract.

42. Defendant breached the contract by terminating Plaintiff prior to the end date of the contract.

43. As a result of Defendant's breach, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

AS AND FOR
A SECOND CAUSE OF ACTION
Breach of Agreement

44. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-43 with the same force and effect as though same were set forth at length herein.

45. Plaintiff and Defendant entered into an Agreement wherein Defendant agreed to employ Plaintiff for a time certain.

46. Plaintiff duly performed his duties under the Agreement.

47. Defendant breached the Agreement by terminating Plaintiff prior to the end date of the Agreement.

48. As a result of Defendant's breach, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

AS AND FOR
A THIRD CAUSE OF ACTION
Violation of New York State Labor Law, Article 20-C Section 740
Wrongful Discharge

49. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-48 with the same force and effect as though same were set forth at length herein.

50. Plaintiff was an employee of Defendant, as defined by New York State Labor Law, Article 20-C Section 740 (a).

51. Defendant was Plaintiff's employer, as defined by New York State Labor Law, Article 20-C Section 740 (b).

52. The Occupational Safety and Health Act's (OSHA) Regulation 29 CFR 1910.1048 is a law, rule or regulation as defined by New York State Labor Law, Article 20-C Section 740 (c).

53. As stated above, Plaintiff disclosed and/or threatened to disclose a policy or practice of Defendant that was in violation of law, rule or regulation to a supervisor and public body.

54. Defendant's violation of law, rule or regulation created and presented a substantial and specific danger to the public health and safety.

55. As a result of Plaintiff's disclosure, Defendant took an adverse employment action against Plaintiff, to wit: terminating Plaintiff before his contract and/ or Agreement with Defendant expired.

56. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

57. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to payment by Defendant of reasonable costs, disbursements, and attorney's fees.

58. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to the reinstatement to the same position held before the retaliatory personnel action, or to an equivalent position.

59. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to reinstatement of full fringe benefits and seniority rights.

60. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to compensation for lost wages, benefits and other remuneration.

AS AND FOR
A FOURTH CAUSE OF ACTION
Violation of New York State Labor Law, Article 20-C, Section 740
Adverse Employment Action

61. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-60 with the same force and effect as though same were set forth at length herein.

62. Plaintiff was an employee of Defendant, as defined by New York State Labor Law, Article 20-C Section 740 (a).

63. Defendant was Plaintiff's employer, as defined by New York State Labor Law, Article 20-C Section 740 (b).

64. The Occupational Safety and Health Act's (OSHA) Regulation 29 CFR 1910.1048 is a law, rule or regulation as defined by New York State Labor Law, Article 20-C Section 740 (c).

65. As stated above, Plaintiff disclosed and/or threatened to disclose a policy or practice of Defendant that was in violation of law, rule or regulation to a supervisor and public body.

66. Defendant's violation of law, rule or regulation created and presented a substantial and specific danger to the public health and safety.

67. As a result of Plaintiff's disclosure, Defendant took an adverse employment action against Plaintiff, to wit: Defendant refused to consider Plaintiff for a continuing position within the company.

68. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

69. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to compensation for lost wages, benefits and other remuneration.

70. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to payment by Defendant of reasonable costs, disbursements, and attorney's fees.

71. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to the reinstatement of his employment to the same position offered Plaintiff before the retaliatory personnel action, or to an equivalent position.

72. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to reinstatement of full fringe benefits and seniority rights.

73. As a result of Defendant's violation of New York State Labor Law Section 740, Plaintiff is entitled to compensation for lost wages, benefits and other remuneration.

AS AND FOR
A FIFTH CAUSE OF ACTION
Negligent Infliction of Emotional Distress

74. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-73 with the same force and effect as though same were set forth at length herein.

75. Defendant owed Plaintiff a duty of a safe work environment.

76. Defendant knew, or should have known, that the capsules given Plaintiff to work with contained formaldehyde, a known carcinogen.

77. Plaintiff did not know the capsules contained formaldehyde.

78. Defendant had a duty, under OSHA 29 CFR 1910.1048(m)(3)(i) to place warning labels on the capsules or containers that held the capsules. Defendant did not do so.

79. Defendant had a duty to place warning signs in the area that the formaldehyde was being used (OSHA 29 CFR 1910.1048(e)(1)). Defendant did not do so.

80. Defendant had a duty to offer a training program (OSHA 29 CFR 1910.1048(n)(1)) to all employees exposed to formaldehyde. Defendant did not do so.

81. Defendant had a duty to monitor the employees exposed to the formaldehyde to determine the employees' exposure to formaldehyde (OSHA 29 CFR 1910.1048 (d)(l)(i). Defendant did not do so.

82. Defendant's conduct created an immediate, foreseeable unreasonable risk of harm to Plaintiff.

83. Plaintiff, a PhD knows the carcinogen nature of formaldehyde.

84. Formaldehyde can cause cancer years after exposure. OSHA 29 CFR 1910.1048(o)(5) requires an employer to retain medical records of an employee exposed to formaldehyde for a period of at least 30 years.

85. Plaintiff has had to and continues to live with the extreme fear that the exposure to the formaldehyde may or will result in a cancer diagnosis.

86. Defendant's conduct was extreme and outrageous.

87. Defendant disregarded a substantial probability of causing severe emotional stress.

88. As a result of Defendant's reckless conduct, Plaintiff has become tense, nervous, irritable, suffered great mental anguish, anxiety, loss of sleep, loss of weight and other psychological and physical injuries.

89. Plaintiff must continually monitor his health through doctor visits and medical testing.

90. Plaintiff's emotional distress was caused by Defendant's conduct.

91. As a result of Defendant's negligent infliction of emotional distress, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

AS AND FOR
A SIXTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress

92. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-91 with the same force and effect as though same were set forth at length herein.

93. Defendant owed Plaintiff a duty of a safe work environment.

94. Defendant knew, or should have known, that the capsules given Plaintiff to work with contained formaldehyde.

95. Defendant had a duty to Plaintiff to advise him of the contents of the capsules i.e. formaldehyde.

96. Plaintiff worked with the capsules without knowing the large amount of formaldehyde contained therein.

97. Defendant's conduct created a foreseeable unreasonable risk of harm to Plaintiff.

98. Plaintiff, a PhD knows the carcinogen nature of formaldehyde.

99. Formaldehyde can cause cancer years after exposure. OSHA 29 CFR 1910.1048(o)(5) requires an employer to retain medical records of an employee exposed to formaldehyde for a period of at least 30 years.

100. Plaintiff has to live with the extreme fear that the exposure to the formaldehyde may or will result in a cancer diagnosis. This mental distress is of such intensity and duration that no reasonable person should be expected to endure it.

101. As a result of Defendant's reckless conduct, Plaintiff has become tense, nervous, irritable, suffered great mental anguish, anxiety, loss of sleep, loss of weight and other psychological and physical injuries.

102. Plaintiff must monitor his health with doctor visits and medical testing.

103. Defendant's conduct was intentional and reckless.

104. Defendant's conduct was shocking and outrageous.

105. Defendant knew or should have known with substantial certainty, that the Plaintiff would suffer severe emotional distress from said exposure.

106. Defendant showed utter disregard of the consequences of its actions.

107. Plaintiff's emotional distress was caused by Defendant's conduct.

108. As a result of Defendant's intentional infliction of emotional distress, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

AS AND FOR
A SEVENTH CAUSE OF ACTION
Battery

109. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-108 with the same force and effect as though same were set forth at length herein.

110. Defendant intentionally gave Plaintiff capsules containing formaldehyde, without Plaintiff's knowledge or consent.

111. Plaintiff handled the capsules, opened the capsules, and inhaled the contents of the capsules while unaware of the capsules' contents.

112. Defendant's conduct was harmful and offensive to Plaintiff in that formaldehyde is a carcinogen and dangerous to inhale and touch.

113. As a result of Defendant's battery, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

AS AND FOR
AN EIGHTH CAUSE OF ACTION
Negligence

114. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-113 with the same force and effect as though same were set forth at length herein.

115. Defendant had a duty to Plaintiff to provide a safe work environment.

116.  Defendant had a duty, under OSHA 29 CFR 1910.1048(m)(3)(i) to place
      warning labels on the capsules or containers that held the capsules.
      Defendant did not do so.

117.  Defendant had a duty to place warning signs in the area that the
      formaldehyde was being used (OSHA 29 CFR 1910.1048(e)(1). Defendant
      did not do so.

118.  Defendant had a duty to offer a training program (OSHA 29 CFR
      1910.1048(n)(1)) to all employees exposed to formaldehyde. Defendant
      did not do so.

119.  Defendant had a duty to monitor the employees exposed to the
      formaldehyde to determine the employees' exposure to formaldehyde
      (OSHA 29 CFR 1910.1048 (d)(l)(i). Defendant did not do so.

120.  Defendant failed to conform to the required standard of care in giving
      Plaintiff capsules of formaldehyde to handle and work with. At all times
      Plaintiff had no knowledge that the capsules contained large amounts of
      formaldehyde.

121.  Plaintiff's injury was solely caused by the Defendant's breach of duty.

122.  Defendant's breach of duty resulted in Plaintiff sustaining a physical injury
      from the handling and inhalation of formaldehyde.

123.  As a result of Defendant's negligence, Plaintiff suffered damages in excess
      of the monetary limit of the lower courts that would otherwise have
      jurisdiction.

AS AND FOR
A NINTH CAUSE OF ACTION
Negligent Supervision

124. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-123 with the same force and effect as though same were set forth at length herein.

125. Defendant had a duty to supervise and employ safe instrumentalities in its business.

126. Defendant had a duty, under OSHA 29 CFR 1910.1048(m)(3)(i) to place warning labels on the capsules or containers that held the capsules. Defendant did not do so.

127. Defendant had a duty to place warning signs in the area that the formaldehyde was being used (OSHA 29 CFR 1910.1048(e)(1)). Defendant did not do so.

128. Defendant had a duty to offer a training program (OSHA 29 CFR 1910.1048(n)(1)) to all employees exposed to formaldehyde. Defendant did not do so.

129. Defendant had a duty to monitor the employees exposed to the formaldehyde to determine the employees' exposure to formaldehyde (OSHA 29 CFR 1910.1048 (d)(l)(i). Defendant did not do so.

130. As a result of Defendant's negligent supervision, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

AS AND FOR
A TENTH CAUSE OF ACTION
Negligence Per Se

131. Plaintiff repeats and re-alleges the allegations in the Complaint numbered 1-130 with the same force and effect as though same were set forth at length herein.

132. Defendant violated the New York State Labor Law, Article 20-C Section 740 in discriminating against and terminating Plaintiff's employment in retaliation of Plaintiff reporting the unsafe formaldehyde contact to supervisors and OSHA. Said formaldehyde contact was in violation of OSHA rule, 29 CFR 1910.1048.

133. Plaintiff is within the protected class under New York State Labor Law, Article 20-C Section 740 (a), being employed by Defendant and being required to unknowingly work with and handle formaldehyde.

134. Plaintiff was injured by Defendant's negligence per se.

135. As a result of Defendant's negligence per se, Plaintiff suffered damages in excess of the monetary limit of the lower courts that would otherwise have jurisdiction.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

1. For an award of actual damages;
2. For an award of compensatory damages;
3. For an award of emotional damages;
4. For an award of punitive damages;

5. For an award representing back pay;

6. For an award representing front pay;

7. For an award of reasonable attorney's fees and court costs; and,

8. For such other and further relief as the Court may deem just, equitable and proper.

Dated: Commack, New York
December 15 2010

Law Offices of Albert Adam Breud,
P.L.L.C.

By: Albert Adam Breud, II
356 Veterans Memorial Highway
Suite 3
Commack, New York 11725
Telephone: (631) 543-3030, ex. 2
Facsimile: (631) 543-2888
Breudlaw@optonline.net
*Attorneys for Plaintiff*

State of New Jersey
County of Middlesex

**VERIFICATION**

Pursuant to New York Civil Practice Law and Rules Section 3020(a), Ricky Kamdem-Ouaffo, being duly sworn, deposes and says, that I am the Plaintiff in the within action. The allegations in the Verified Complaint are true to my knowledge except as to those matters alleged on information and belief and that to those matters I believe them to be true.

Ricky Kamdem-Ouaffo

Sworn to before me this
11th day of December, 2010.

Notary Public

MANUEL RIOS
Notary Public
State of New Jersey
My Commission Expires Apr 2, 2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------x

RICKY KAMDEM-OUAFFO - Index No. 22625/10

Plaintiff,

-v-

PEPSICO, INC.

Defendant.

---------------------------------------x

# SUMMONS WITH NOTICE AND VERIFIED COMPLAINT

Signature (Rule (130.1.1-a, b)
Albert Adam Breud II
Albert Adam Breud, II, Esq.

**Law Offices of Albert Adam Breud, P.L.L.C.**
**Attorney for: Defendant**
**356 Veterans Memorial Highway**
**Suite 3**
**Commack, NY 11725**
**Tele. (631) 543-3030**

**To:**
**Attorneys For:**

**Service of the Within** **is duly admitted.**
**Dated :**
**Attorneys for:**

**Certification. By**

STATE OF NEW YORK SUPREME COURT WESTCHESTER COUNTY

DOCUMENTS SERVED WITH INDEX#: 22625/10 AND FILED ON 9/17/2010

RICKY KAMDEM — Plaintiff(s)/Petitioner(s)

Vs.

PEPSICO, INC. — Defendant(s)/Respondent(s)

FILED
JUN 16 2011
TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

STATE OF: NEW YORK )
SS
COUNTY OF WESTCHESTER )

The undersigned deponent, being duly sworn deposes and says: Deponent is not a party herein, is over 18 years of age and resides in the State of New York . On 12/30/2010 at 4:05PM , deponent did serve the within process as follows:

Process Served: SUMMONS WITH NOTICE AND VERIFIED COMPLAINT

Party Served: PEPSICO, INC. (herein called recipient) therein named.

At Location: 700 ANDERSON HILL ROAD
PURCHASE NY 10577

By delivering to and leaving with KIMBERLY RIGGINS and that deponent knew the person so served to be the LEGAL ASSISTANT of the corporation and authorized to accept service..

A description of the Defendant, or other person served, or spoken to on behalf of the Defendant is as follows:

Sex FM Color of Skin WH Color of Hair BROWN
Age 45 Height 5'6"
Weight 135 Other Features

Sworn to before me on 12/30/2010

[signature]

GAIL WILLIAMS
Notary Public, State of New York
No. 4665052
Qualified in Westchester County
Commission Expires September 30, 2014

[signature]

BRIAN BLASI
Server's License#:

# EXHIBIT DMD - XV

E-MAIL COMMUNICATIONS AMONG PEPSICO MANAGERS AND

PERSONNEL. DATED SEPTEMBER 16, 2009. PC 0302 – PC 0311. 10

PAGES.

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 5:16 PM
**To:** Sloane, Carolyn {Quaker}; Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

Another hitch - his contract is terminating Oct 5, and he'll be informed this week.... more drama! Please do not distribute this info, but may impact our decision on inventorship

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 3:41 PM
**To:** Zhang, Naijie {PCNA}; Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

Hi Ned. We wait to make determinations of inventorship until the final claims are drafted. Outside counsel will discuss this issue with you at that time. Thank you.

---

**From:** Zhang, Naijie {PCNA}
**Sent:** Wednesday, September 16, 2009 2:37 PM
**To:** Given, Peter {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Ricky kamdem is not inventor. He is just involved in the project.

Ned

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 3:00 PM
**To:** Sloane, Carolyn {Quaker}
**Cc:** Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

He's the equivalent of a Kelly Temp - we use ProcureStaff... same thing.

But the original question - are there any rules / guidelines about including temps as "inventors" on PepsiCo patents?

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 5:17 PM
**To:** Zhang, Naijie {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Thanks for clarifying.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Zhang, Naijie {PCNA}
**Sent:** Wednesday, September 16, 2009 3:37 PM
**To:** Given, Peter {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Ricky kamdem is not inventor. He is just involved in the project.

Ned

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 3:00 PM
**To:** Sloane, Carolyn {Quaker}
**Cc:** Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

He's the equivalent of a Kelly Temp - we use ProcureStaff... same thing.

But the original question - are there any rules / guidelines about including temps as "inventors" on PepsiCo patents?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563

(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 2:33 PM
**To:** Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

We still need an MCA if he is an independent consultant or working through his own consulting firm. We don't need an MCA if he is a Kelly Temporary employee.

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 1:31 PM
**To:** Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

He's a contract employee (temp) - not an outside research firm.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 12:30 PM
**To:** Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

Yes we need an MCA and SOW in place wherein it is stated that consultant grants Pepsi the IP ownership. If there is no MCA in place we should get one in place and to cover prior work let's get a patent assignment in place from the inventor to Pepsi as soon as possible. Who is the consultant?

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 10:06 AM
**To:** Sloane, Carolyn {Quaker}
**Subject:** FW: Disclosure Submission Update

Carolyn - any rules on contract employees being inventors of Pepsi IP?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Jacklin, Valerie {PCNA}
**Sent:** Wednesday, September 16, 2009 10:57 AM
**To:** Given, Peter {PCNA}
**Cc:** Finnerty, Mike {PCNA}
**Subject:** RE: Disclosure Submission Update

much better
thanks, I just approved
not sure we want Ricky on the invention list....do we have criteria for temps/consultants?

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 10:54 AM
**To:** Jacklin, Valerie {PCNA}
**Cc:** Zhang, Naijie {PCNA}; Finnerty, Mike {PCNA}; Sloane, Carolyn {Quaker}; Long, Sandy {Quaker}; Banner & Witcoff; Finnerty, Mike {PCNA}; Banner & Witcoff
**Subject:** RE: Disclosure Submission Update

Valerie - I have worked with Ned to clean up the content and address your comments on the first draft - let us know if this is clear.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Pepsi Portal [mailto:pepsi@bannerwitcoff.com]
**Sent:** Wednesday, September 16, 2009 10:53 AM
**To:** Jacklin, Valerie {PCNA}
**Cc:** Zhang, Naijie {PCNA}; Given, Peter {PCNA}; Finnerty, Mike {PCNA}; Sloane, Carolyn {Quaker}; Long, Sandy {Quaker}; Banner & Witcoff; Finnerty, Mike {PCNA}; Banner & Witcoff
**Subject:** Disclosure Submission Update

A new Invention Disclosure with request for patent application and/or freedom to practice opinion has been submitted for your review and approval on the PepsiCo Portal at Banner & Witcoff Ltd. Please review the Invention Disclosure and provide your approval to proceed.

Additional information and a copy of the completed Invention Disclosure can be accessed via the following link:

https://portal.bannerwitcoff.com/Pepsiworkflow/Default.aspx?StartApp=I isclosures&disclosure_id=692

When you access the Invention Disclosure, buttons are provided at the bottom of the form for you to indicate your approval. Please note that if this is a Big Bets or Project Phoenix matter, all charges will be billed directly to your account.

To access the portal, direct your browser to https://portal.bannerwitcoff.com/pepsico

**PLEASE NOTE**: To request access, send an email to pepsi@bannerwitcoff.com with 'Password Request' in the subject line an your password preference specified in the body. Once your password has been set up, a confirmation e-mail will be sent to you.

Please feel free to contact Kerri Richardson, PepsiCo Patent Administrat at Banner & Witcoff, Ltd. (312.463.5000), with any questions about this automated message.

**From:** Given, Peter {PCNA}
**Sent:** Monday, September 21, 2009 11:48 AM
**To:** Logan, Debra {PBSG}
**Subject:** RE: Info. Needed

Turns out, he is not an inventor, so we don't really need to go down that path. All the questions confused the heck out of Ricky, particularly as they came AFTER I notified him that the contract was expiring on 10/5/09

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Logan, Debra {PBSG}
**Sent:** Monday, September 21, 2009 11:31 AM
**To:** Given, Peter {PCNA}
**Subject:** FW: Info. Needed

Hello,
I received a request for information for Ricky Kamden on Friday fron HR in Chicago as they said they needed it for pater information.

We had his supplier reach out to him and provide the information

That is all we know . See email string below.

Deb

**Debra Logan Relationship Manager**
**PepsiCO MSP**
**1Pepsi Way,Somers NY10589**
**Debra.Logan@pbsg.com**
**914-767-6663**
**Fax 914-767-6629**

---

**From:** Logan, Debra {PBSG}
**Sent:** Friday, September 18, 2009 2:57 PM
**To:** Skwira, Theresa {Quaker}
**Subject:** RE: Info. Needed

His home address & phone number is given as:
Ricky Kamdem Ouaffo
10 Dennis Street #135
New Brunswick, NJ 08901

Ph: 848 228 0745 (Cell)

Ricky has Permanent Resident Card.

Please fell free to ask me, if you need any more details from our end.

Thanks and Regards
**Anil Puthenchira**
Sr. Director - Operations

SUBEX Technologies

**Subex Technologies Inc**
255 Old New Brunswick Road, Suite S240
Piscataway, NJ 08854 USA

He is an employee of Subex Technologies as listed above

Thanks and best regards,

Deb

**Debra Logan Relationship Manager**
**PepsiCO MSP**
**1Pepsi Way,Somers NY10589**
**Debra.Logan@pbsg.com**
**914-767-6663**
**Fax 914-767-6629**

---

**From:** Skwira, Theresa {Quaker}
**Sent:** Friday, September 18, 2009 2:22 PM
**To:** Logan, Debra {PBSG}
**Subject:** RE: Info. Needed

Thank you! I sincerely appreciate your assistance!

*Theresa Skwira*
555 W. Monroe Street | MC 11-12 | Chicago, Illinois 60661
312-821-2327 | 312-821-1869 | theresa_skwira@quakeroats.com

PEPSICO
AMERICAS BEVERAGES

**From:** Logan, Debra {PBSG}
**Sent:** Friday, September 18, 2009 1:20 PM
**To:** Skwira, Theresa {Quaker}
**Subject:** RE: Info. Needed

I have reached out to his supplier and am waiting for their response Upon receipt I will forwar to you

**Debra Logan Relationship Manager**
**PepsiCO MSP**
**1Pepsi Way,Somers NY10589**
**Debra.Logan@pbsg.com**
**914-767-6663**
**Fax 914-767-6629**

---

**From:** Skwira, Theresa {Quaker}
**Sent:** Friday, September 18, 2009 10:12 AM
**To:** Logan, Debra {PBSG}
**Subject:** FW: Info. Needed
**Importance:** High

Hi Deb-

Please see e-mail chain below. Can you assist me, please?

Thanks!
Theresa

*Theresa Skwira*
555 W. Monroe Street |MC 11-12 | Chicago, Illinois 60661
☎ 312-821-2327 | 312-821-1869 | ✉ theresa_skwira@quakeroats.com

---

**From:** Robinson, Andrea {PCNA}
**Sent:** Thursday, September 17, 2009 1:15 PM
**To:** Skwira, Theresa {Quaker}
**Cc:** Sloane, Carolyn {Quaker}; Granata, Liz {PCNA}
**Subject:** FW: Info. Needed
**Importance:** High

Hi Theresa,

Please reach out to Deb from ProcureStaff for the information on Ricky Kamden as we do not have personal information on temps, only employees.

Deb Logan
Relationship Manager
ProcureStaff, Ltd.
One Pepsi Way
Somers, NY 10589
914.767.6663
deb.logan@pbsg.com

Andrea

---

**From:** Misiura, Nicole {Quaker}
**Sent:** Thursday, September 17, 2009 2:03 PM
**To:** Robinson, Andrea {PCNA}
**Subject:** FW: Info. Needed
**Importance:** High

Hey! I hate to add to your work pile but this is a Valhalla temp not Barrington..

**Nicole L. Misiura, PHR**
PepsiCo Global R&D | Human Resources

 Please consider the environment before printing this e-mail

---

**From:** Granata, Liz {PCNA}
**Sent:** Thursday, September 17, 2009 12:22 PM
**To:** Misiura, Nicole {Quaker}
**Subject:** Fw: Info. Needed
**Importance:** High

Hi N. Can you get the information below and review with siva before you send. Thx. L

---

**From**: Skwira, Theresa {Quaker}
**To**: Granata, Liz {PCNA}
**Cc**: Sloane, Carolyn {Quaker}
**Sent**: Thu Sep 17 12:03:04 2009
**Subject**: Info. Needed

Hi Liz-

I was hoping you could assist me with something. Ricky Kamdem may b an inventor on a patent application, so we need him to sign a patent assignment. Since he is an employee of ProcureStaff, his assignment must be to ProcureStaff and then ProcureStaff would assign their rights to Pepsi.

Can you please provide me with Mr. Kamdem's full name, residence and citizenship?

Can you also provide me with the corporate name and address for ProcureStaff?

Thank you!

Theresa

*Theresa Skwira*
555 W. Monroe Street | MC 11-12 | Chicago, Illinois 60661
312-821-2327 | 312-821-1869 | theresa_skwira@quakeroats.com

# EXHIBIT DMD - XVI

1) PATENT APPLICATION JOINT DECLARATION AND POWER OF
ATTORNEY. DATED 6/21/2010. 2 PAGES.

2) PATENT APPLICATION JOINT DECLARATION AND POWER OF
ATTORNEY. DATED 7/28/2011. 2 PAGES.

3) PATENT APPLICATION JOINT DECLARATION AND POWER OF
ATTORNEY. DATED 8/19/2011. 2 PAGES.

4) PATENT APPLICATION JOINT DECLARATION AND POWER OF
ATTORNEY. DATED 8/23/2011. 2 PAGES.

5) PATENT APPLICATION JOINT DECLARATION AND POWER OF
ATTORNEY. DATED 10/04/2011. 2 PAGES.

6) PATENT ASSIGNMENT ABSTRACT OF TITLE. PATENT # 8474635,
PATENT PUBLICATION # 20120006909. RELEASABLE
ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX.
DATED: 06/21/2010. 2 PAGES.

7) PCT REQUEST IN RELATION TO THIS INTERNATIONAL
APPLICATION.VII-3-1(IV) AN ASSIGNMENT FROM ZHANG, NAIJIE
AND FROM GIVEN, PETER TO PEPSICO INC. DATED 21 JUNE 2010
(21.06.2010). 1 PAGE.

# PATENT APPLICATION
# JOINT DECLARATION and POWER OF ATTORNEY

As the below named inventors, we hereby declare that:

Our residence, post office address and citizenship are as stated below next to our names;

We believe we are the original and first inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX, the specification of which is filed herewith unless the following box is checked:

☐ was filed on _____ as U.S. Application No. _____ or PCT International Application No. _____ and which application was amended on _____ (if applicable).

We hereby state that we have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We hereby acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR §1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

## Prior Foreign Applications

We hereby claim foreign priority benefits under 35 USC §119(a)-(d) or (f), or 365(b) of any foreign applications for patent or inventor's or plant breeder's rights certificates or 365(a) of any PCT international application which designated at least one country other than the United States of America, listed below and have also identified below any foreign applications for patent, inventor's or plant breeder's rights certificates, or any PCT international application having a filing date before that of the application on which priority is claimed:

| Country | Application No. | Date of Filing (day month year) | Date of Issue (day month year) | Priority Claimed Under 35 USC §119 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Power of Attorney

And we hereby appoint, both jointly and severally, as our attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the U.S. Patent and Trademark Office connected herewith the practitioners associated with:

## Customer Number: 66811

Please direct all correspondence and telephone communications to the address and telephone number associated with the Customer Number stated above.

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 USC §1001 and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Signature [signature] Date 6/21/2010

Full Name of First Inventor: Naijie Zhang
Residence: Ridgefield, Connecticut 06877
Citizenship: US
Post Office Address: 31 Charter Oak Court, Ridgefield, Connecticut 06877

Signature [signature] Date 6/21/10

Full Name of Second Inventor: Peter Given
Residence: Ridgefield, Connecticut 06877
Citizenship: US
Post Office Address: 16 O'Neill Court, Ridgefield, Connecticut 06877

☐ Additional inventor(s) or legal representative(s) are named on attached sheet(s)

**PATENT APPLICATION**
**JOINT DECLARATION and POWER OF ATTORNEY**

As the below named inventors, we hereby declare that:

Our residence, post office address and citizenship are as stated below next to our names;

We believe we are the original and first inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled COMPLEX COACERVATES, METHODS AND FOOD PRODUCTS, the specification of which is filed herewith unless the following box is checked:

☒ was filed on July 1, 2011 as U.S. Application No. 13/175,508 .

We hereby state that we have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We hereby acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR §1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

**Prior Foreign Application(s)**

We hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application(s) for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| Country | Application No. | Date of Filing (day month year) | Date of Issue (day month year) | Priority Claimed Under 35 USC §119 |
|---|---|---|---|---|
| | | | | |

**Prior United States Provisional Application(s)**

We hereby claim priority benefits under Title 35, United States Code, §119(e)(1) of any U.S. provisional application listed below:

| U.S. Provisional Application No. | Date of Filing (day month year) | Priority Claimed Under 35 USC §119(e)(1) |
|---|---|---|
| | | |

**Prior United States Application(s)**

We hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, we acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| Application Serial No. | Date of Filing (Day, Month, Year) | Status — Patented, Pending, Abandoned |
|---|---|---|
| | | |

**Power of Attorney**

And we hereby appoint, both jointly and severally, as our attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected herewith the practitioners at:

**Customer No. 66811**

Please direct all correspondence and telephone communications to the address and telephone number associated with the Customer Number stated above.

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 USC §1001 and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Signature [signature] Date 7/28/2011
Full Name of First Inventor: ZHANG, Naijie
Residence: Ridgefield, CT
Citizenship: US
Post Office Address: 31 Charter Oak Court, Ridgefield, CT 06877

Signature [signature] Date 7/28/2011
Full Name of First Inventor: MUTILANGI, William
Residence: Peekskill, NY
Citizenship: US
Post Office Address: 43 Bleakley Drive, Peekshill, NY 10566

**PATENT APPLICATION**
**JOINT DECLARATION and POWER OF ATTORNEY**

As the below named inventors, we hereby declare that:

Our residence, post office address and citizenship are as stated below next to our names;

We believe we are the original and first inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled RELEASABLY ENCAPSULATED AROMA, the specification of which is filed herewith unless the following box is checked:

☐ was filed on ____________ as U.S. Application No.______________.

We hereby state that we have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We hereby acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR §1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

**Prior Foreign Application(s)**

We hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application(s) for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| Country | Application No. | Date of Filing (day month year) | Date of Issue (day month year) | Priority Claimed Under 35 USC §119 |
|---|---|---|---|---|
| | | | | |

**Prior United States Provisional Application(s)**

We hereby claim priority benefits under Title 35, United States Code, §119(e)(1) of any U.S. provisional application listed below:

| U.S. Provisional Application No. | Date of Filing (day month year) | Priority Claimed Under 35 USC §119(e)(1) |
|---|---|---|
| | | |

**Prior United States Application(s)**

We hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, we acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| Application Serial No. | Date of Filing (Day, Month, Year) | Status — Patented, Pending, Abandoned |
|---|---|---|
| | | |

**Power of Attorney**

And we hereby appoint, both jointly and severally, as our attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected herewith the practitioners at:

**Customer No. 66811**

Please direct all correspondence and telephone communications to the address and telephone number associated with the Customer Number stated above.

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 USC §1001 and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Signature__________ Date__________
Full Name of First Inventor: ZHANG, Naijie
Residence: Ridgefield, CT
Citizenship: US
Post Office Address: 31 Charter Oak Court, Ridgefield, CT 06877

Signature [signature] Date 8/19/11
Full Name of First Inventor: GIVEN, JR., Peter S.
Residence: Ridgefield, CT
Citizenship: US
Post Office Address: 16 O'Neill Court, Ridgefield, CT 06877

Attorney Docket No. 006943.04476 PATENT

# PATENT APPLICATION
# JOINT DECLARATION and POWER OF ATTORNEY

As the below named inventors, we hereby declare that:

Our residence, post office address and citizenship are as stated below next to our names;

We believe we are the original and first inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled RELEASABLY ENCAPSULATED AROMA, the specification of which is filed herewith unless the following box is checked:

☐ was filed on ____________ as U.S. Application No.______________.

We hereby state that we have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We hereby acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR §1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

**Prior Foreign Application(s)**

We hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application(s) for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| Country | Application No. | Date of Filing (day month year) | Date of Issue (day month year) | Priority Claimed Under 35 USC §119 |
|---|---|---|---|---|
| | | | | |

**Prior United States Provisional Application(s)**

We hereby claim priority benefits under Title 35, United States Code, §119(e)(1) of any U.S. provisional application listed below:

| U.S. Provisional Application No. | Date of Filing (day month year) | Priority Claimed Under 35 USC §119(e)(1) |
|---|---|---|
| | | |

Attorney Docket No. 006943.04476 PATENT

**Prior United States Application(s)**

We hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, we acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| Application Serial No. | Date of Filing (Day, Month, Year) | Status — Patented, Pending, Abandoned |
|---|---|---|
| | | |

**Power of Attorney**

And we hereby appoint, both jointly and severally, as our attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected herewith the practitioners at:

**Customer No. 66811**

Please direct all correspondence and telephone communications to the address and telephone number associated with the Customer Number stated above.

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 USC §1001 and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Signature Naijie Zhang Date 8/23/2011
Full Name of First Inventor: ZHANG, Naijie
Residence: Ridgefield, CT
Citizenship: US
Post Office Address: 31 Charter Oak Court, Ridgefield, CT 06877

Signature__________ Date__________
Full Name of First Inventor: GIVEN, JR., Peter S.
Residence: Ridgefield, CT
Citizenship: US
Post Office Address: 16 O'Neill Court, Ridgefield, CT 06877

Attorney Docket No. 006943.04608 PATENT

**PATENT APPLICATION**
**JOINT DECLARATION and POWER OF ATTORNEY**

As the below named inventors, we hereby declare that:

Our residence, post office address and citizenship are as stated below next to our names;

We believe we are the original and first inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled COMPLEX COACERVATES AND AQUEOUS DISPERSIONS OF COMPLEX COACERVATES AND METHODS OF MAKING SAME, the specification of which is filed herewith unless the following box is checked:

☐ was filed on ____________ as U.S. Application No.________________.

We hereby state that we have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We hereby acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR §1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

**Prior Foreign Application(s)**

We hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application(s) for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| Country | Application No. | Date of Filing (day month year) | Date of Issue (day month year) | Priority Claimed Under 35 USC §119 |
|---|---|---|---|---|
| | | | | |

**Prior United States Provisional Application(s)**

We hereby claim priority benefits under Title 35, United States Code, §119(e)(1) of any U.S. provisional application listed below:

| U.S. Provisional Application No. | Date of Filing (day month year) | Priority Claimed Under 35 USC §119(e)(1) |
|---|---|---|
| | | |

Attorney Docket No. 006943.04608 PATENT

**Prior United States Application(s)**

We hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, we acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| Application Serial No. | Date of Filing (Day, Month, Year) | Status — Patented, Pending, Abandoned |
|---|---|---|
| | | |

**Power of Attorney**

And we hereby appoint, both jointly and severally, as our attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected herewith the practitioners at:

**Customer No. 66811**

Please direct all correspondence and telephone communications to the address and telephone number associated with the Customer Number stated above.

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 USC §1001 and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Signature [signature] Date 10/4/2011
Full Name of First Inventor: ZHANG, Naijie
Residence: Ridgefield, CT
Citizenship: US
Post Office Address: 31 Charter Oak Court, Ridgefield, CT 06877

Signature [signature] Date 10/4/2011
Full Name of First Inventor: MUTILANGI, William
Residence: Peekskill, NY
Citizenship: US
Post Office Address: 43 Bleakley Drive, Peekskill, NY 10566

USPTO Assignments on the Web

United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

***NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.***

**Total Assignments: 1**

**Patent #:** 8474637 **Issue Dt:** 07/02/2013 **Application #:** 12831683 **Filing Dt:** 07/07/2010

**Publication #:** 20120006909 **Pub Dt:** 01/12/2012

**Inventors:** NAIJIE ZHANG, Peter Given

**Title:** RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

**Assignment: 1**

**Reel/Frame:** 024646/0384 **Recorded:** 07/07/2010 **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors:** ZHANG, NAIJIE **Exec Dt:** 06/21/2010

GIVEN, PETER **Exec Dt:** 06/21/2010

**Assignee:** PEPSICO, INC.
700 ANDERSON HILL ROAD
PURCHASE, NEW YORK 10577

**Correspondent:** WILLIAM J. FISHER
10 SOUTH WACKER DR.
SUITE 3000
CHICAGO, IL 60606

Search Results as of: 01/27/2014 12:46 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.4
Web interface last modified: Jul 8, 2013 v.2.3.4

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT



United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > Patent Query

# Patent Assignment Abstract of Title

***NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.***

**Total Assignments: 1**

**Patent #:** 8474637 **Issue Dt:** 07/02/2013 **Application #:** 12831683 **Filing Dt:** 07/07/2010
**Publication #:** 20120006909 **Pub Dt:** 01/12/2012
**Inventors:** NAIJIE ZHANG, Peter Given
**Title:** RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

**Assignment: 1**

**Reel/Frame:** 024646/0384 **Recorded:** 07/07/2010 **Pages:** 3
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignors:** ZHANG, NAIJIE **Exec Dt:** 06/21/2010
GIVEN, PETER **Exec Dt:** 06/21/2010
**Assignee:** PEPSICO, INC.
700 ANDERSON HILL ROAD
PURCHASE, NEW YORK 10577
**Correspondent:** WILLIAM J. FISHER
10 SOUTH WACKER DR.
SUITE 3000
CHICAGO, IL 60606

Search Results as of: 01/27/2014 12:46 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.4
Web interface last modified: Jul 8, 2013 v.2.3.4

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

**PCT REQUEST**

Original (for **SUBMISSION** )

| | | |
|---|---|---|
| VIII-3-1 | **Declaration: Entitlement to claim priority**<br>Declaration as to the applicant's entitlement, as at the international filing date, to claim the priority of the earlier application specified below, where the applicant is not the applicant who filed the earlier application or where the applicant's name has changed since the filing of the earlier application (Rules 4.17(iii) and 51bis.1(a)(iii))<br>Name | In relation to this international application<br><br>PEPSICO, INC.<br>is entitled to claim priority of earlier application No. 12/831,683 by virtue of the following: |
| VIII-3-1(iv) | | an assignment from ZHANG, Naijie to PEPSICO, INC., dated 21 June 2010 (21.06.2010) |
| VIII-3-1(iv) | | an assignment from GIVEN, Peter to PEPSICO, INC., dated 21 June 2010 (21.06.2010) |

# EXHIBIT DMD - XVII

SUPREME COURT OF THE STATE OF NEW YORK; COUNTY OF

WESTCHESTER CONFIDENTIALITY STIPULATION AND ORDER.

INDEX NO. 22625/10. DATED 12/12/11. 4 PAGES.

# EXHIBIT N TO HUNTER AFFIRMATION - CONFIDENTIALITY STIPULATION AND ORDER, DATED NOVEMBER 14, 2011 [386-391]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

RICKY KAMDEM-OUAFFO,
Plaintiff(s)

-against-

PEPSICO, INC
Defendant(s)

Confidentiality Stipulation and ~~(Proposed)~~ Order

Index No. 22625/10

RECEIVED
DEC 07 2011
CHIEF CLERK
WESTCHESTER SUPREME AND COUNTY COURTS

The parties to the captioned action appearing by their attorneys signing below, having served Notice for Discovery and Inspection, including Requests for the Production of Documents, pursuant to CPLR §3120, and for information and Answers to Interrogatories pursuant to CPLR §3102(a), 3132 et. seq. and having stipulated that materials to be disclosed and produced by either party to the other includes Confidential Information, as defined herein, and having agreed and entered into stipulations stated below, it is hereby Ordered that:

1. "Confidential Information" as used herein means any information that could cause competitive injury to a party or would invade the privacy of a natural person if said information were made public or revealed to a competitor, which is designated as "Confidential" by any of the supplying or receiving parties, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in a discovery response, or otherwise.

2. "Qualified Persons" as used herein means:

   (a) Attorneys for the parties and their support staff;

   (b) Actual or potential independent experts or consultants, and their support staff, for the purpose of assisting in the preparation of the case or for the purpose of testifying by deposition or at trial, and who have signed a document, attached hereto as Exhibit A, agreeing to be bound by the terms of this protective order (Counsel seeking to disclose Confidential Information to such person shall be responsible for retaining the executed Exhibit A);

   (c) The parties in this litigation including individuals and employees, personnel and agents of corporate entities named as a party or parties;

   (d) Actual or potential trial or deposition witnesses whose testimony counsel reasonably believes may be aided by the review of Confidential Information;

   (e) The Court and its staff, court reporters, transcribers, videographers, notary publics or stenographers;

RECEIVED
DEC 07 2011
ALAN D. SCHEINKMAN
JUSTICE OF THE
SUPREME COURT

(f) Any mediator or arbitrator appointed by the Court or selected by mutual agreement of the parties and the mediator or arbitrator's secretarial and clerical personnel;

(g) Technical and non-technical jury or trial consulting services retained by counsel of record;

(h) Outside photocopying, translation, document management, litigation support, trial graphics, e-discovery, and exhibit preparation services engaged by a party for purposes of the action; and

(i) Any other person may be designated as a Qualified Person by order of this Court, after notice and hearing to all parties.

3. Documents produced in this action may be designated by any party or parties as Confidential Information.

A party may designate as "Confidential" documents that it produces by marking each page of the document(s) so designated with a stamp stating "Confidential."

A party may designate as "Confidential" documents produced by another party or a third party within thirty (30) days of the date of production, by providing written notice of the designation to the party or nonparty that produced that documents, as well as all other parties to this litigation. Within fifteen (15) days of the written notice, either the designating party or nonparty that produced the documents shall either (A) reproduce each page of the document(s) so designated with a stamp stating "Confidential," or (B) follow the procedure set forth in paragraph 10 for objecting to a designation of a document as "Confidential."

Documents designated as "Confidential" by any party or nonparty shall be treated as "Confidential" from the date written notice of the designation is provided, until the documents are no longer "Confidential" according to the terms of this Order or another Order of the court.

4. Information disclosed at a deposition of: (a) a party or one of its present or former officers, directors, employees, agents, or independent experts retained by counsel for the purpose of this litigation; or (b) a third party (which information pertains to a party) may be designated by any party as Confidential Information by indicating on the record at the deposition that the testimony is Confidential and is subject to the provisions of this Order.

Any party may also designate information disclosed at such deposition as Confidential by notifying all of the parties in writing within fifteen (15) days of receipt of the transcript, of the specific pages and lines of the transcript which should be treated as Confidential. Each party shall attach a copy of such written notice or notices to the face of the transcript and each copy thereof in his possession, custody, or control. All deposition transcripts shall be treated as Confidential.

5. Confidential Information shall be used only in connection with the prosecution or defense of this case and not any other matter or proceeding. Further, Confidential Information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons, except in response to a subpoena, court order or similar demand for production from a court or governmental agency. If a party receives a subpoena or similar demand for production, it shall notify the party who designated the information as Confidential of the request soon as practicable and shall not produce Confidential Information without providing at least five (5) business day's notice to the designating party. The party responsible for the Confidential designation may take reasonable steps to limit or prevent the production of the information it designated as Confidential.

6. Any documents previously produced may be retroactively designated as Confidential by notice in writing, specifying the page number(s) of or otherwise identifying the documents being designated as Confidential, within fifteen (15) days of the entry of this order. Documents unintentionally produced without a designation as "Confidential" may be retroactively designated in the same manner, and shall be treated as Confidential from the date written notice of the designation is provided to the receiving party.

7. If information subject to a claim of attorney-client privilege or work product immunity is inadvertently or mistakenly produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product protection for that or any other information. If a party or nonparty inadvertently or mistakenly produces information subject to a claim of privilege, upon written request made by the producing party or nonparty within fifteen (15) days of being on notice of the inadvertent or mistaken production, the receiving party or parties shall treat the material at issue as Confidential Information.

8. A party shall not be obligated to challenge the propriety of a designation as Confidential at the time it is made, and a failure to do so shall not preclude a subsequent challenge to the designation. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation of any information as Confidential, the parties comply with Rule 14 of the Rules of Practice in the Commercial Division, and in the event that counsel, after good faith consultation, cannot resolve a discovery dispute, counsel shall promptly contact the Court at 914-824-5419 and arrange for either an in-court or telephonic conference. It is understood that the conditions set forth in paragraph 15 of the Preliminary Conference Order, dated September 16, 2011 shall apply.

9. The parties may, by stipulation, provide for exceptions to this order. Any party may seek an order modifying this Protective Order as allowed under the Rules of Practice in the Commercial Division.

10. In the event a party intends to attach, copy or reproduce Confidential Information as defined herein with any filing of papers, motion(s) or correspondence to be submitted to the Court, such party will provide five (5) days' written notice in advance of filing to all other parties, within which time any party may seek an order to file such papers, motion or correspondence with such Confidential Information under seal pursuant to 22 N.Y.C.R.R. § 216.1, and it shall be the burden of the party seeking the order to file under seal to present the underlying grounds to the satisfaction of the court for a finding of "good cause" in accordance with rule 216.1

11. Nothing in this Order shall preclude any person or entity from disclosing or using, in any manner or for any purpose, any information or document if that information or document is lawfully obtained from a publicly available source.

12. Within one hundred twenty (120) days after conclusion of this litigation, including all appeals, upon written request from the producing or designating party, any document and all reproductions of documents produced by a party, in the possession of any Qualified Person, shall be returned to the producing party or destroyed, except as this Court may otherwise order or to the extent such information was used as evidence at trial.

New York, NY
November 14, 2011

Stipulated and Agreed

Albert Adam Breud, II, Esq.
Law Office of Albert Adam Breud, PLLC
*Attorney for plaintiff Ricky Kadem Ouffo*
356 Veterans Memorial Highway, Suite 3
Commack, NY 11725
(631) 543-3030, ex. 2 telephone
(631) 543- 2888 facsimile

Richard M. Hunter, Esq.
Luboja & Thau, LLP
*Attorneys for defendant PepsiCo, Inc.*
10 East 40th Street, 30th Floor
New York, NY 10016
(212) 779-9800 telephone
(212) 252-0457 facsimile

SO ORDERED:

12/12/11
Dated

# EXHIBIT DMD - XIX

LETTER FROM JUSTICE ALAN D. SCHEINKMAN TO RICKY KAMDEM,

DATED AUGUST 31 2012. 1 PAGE.



**SUPREME COURT OF THE STATE OF NEW YORK**
RICHARD J. DARONCO
WESTCHESTER COUNTY COURTHOUSE
111 DR. MARTIN LUTHER KING, JR. BLVD.
WHITE PLAINS, NEW YORK 10601
(914) 824-5419

**ALAN D. SCHEINKMAN**
**JUSTICE OF THE SUPREME COURT**

August 31, 2012

Ricky Kamdem-Ouaffo, PhD
1 Richmond Street #3038
New Brunswick, NJ 08901

Re: Ricky Kamdem-Ouaffo v Pepsico, Inc.
Index No.: 22625/10

Dear Dr. Kamdem-Ouaffo:

I am in receipt of your August 20, 2012 letter and documents. However, because you are represented by counsel, the Court can not accept correspondence and information from you directly. Therefore, your letter and papers, which have not been considered by this Court, are enclosed herewith.

Very truly yours,

ALAN D. SCHEINKMAN
Supreme Court Justice
Commercial Division

ADS:af

cc: Andrew J. Schatkin, Esq.
Richard M. Hunter, Esq.

# EXHIBIT DMD - XX

1) LETTER FROM ANDREW SCHATKIN TO RICKY KAMDEM, DATED

OCTOBER 11, 2012. 1 PAGE

2) LETTER FROM ANDREW SCHATKIN TO MR. RICHARD HUNTER,

DATED OCTOBER 11, 2012. CC: JUSTICE SCHEINKMAN, DR.

KAMDEM. 1 PAGE.

3) LETTER (1) FROM ANDREW SCHATKIN TO JUDGE SCHEINKMAN,

DATED OCTOBER 11, 2012. CC: RICHARD HUNTER, DR. KAMDEM.

1 PAGE.

Law Offices
*Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

October 11, 2012

Via Fax: (978)246-5610

Dr. Ricky Kamdem
1 Richmond Street, # 2080
New Brunswick, NJ 08901

Re: Kamdem-Ouaffo v. PepsiCo. Inc.
Westchester County Index: 22625/2010

Dear Dr. Kamdem:

I am forwarding here the letters I have sent to the Court and Mr. Hunter enclosing the materials you requested me to enclose and forward. There was also a $98.00 copying fee and I would respectfully request that you remit this to my Jericho office at your earliest convenience.

Cordially,

Andrew J. Schatkin

Enc.

Law Offices
*Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

October 11, 2012

VIA PRIORITY MAIL

Richard Hunter, Esq.
Luboja & Thau, LLP
10 East 40th Street
New York, New York 10016

Re: Kamden-Ouaffo v. PepsiCo, Inc.
Westchester County Index No.: 22625/2010

Dear Mr. Hunter:

I am enclosing here Dr. Kamdem's initial request on the patent amendment. Please be informed that I am submitting this on his behalf alone and I am not adopting these requests and additions as his attorney. I do however submit this material to you and the Court at his behest and request.

Respectfully,

Andrew J. Schatkin

Enc.

Cc: Justice Scheinkman
Dr. Kamdem

Law Offices
*Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

October 11, 2012

Hon. Alan D. Scheinkman
Justice, Supreme Court, State of New York
County of Westchester
111 Martin Luther Kings Jr. Boulevard
White Plains, NY 10601

        Re:    Kamden-Ouaffo v. PepsiCo, Inc.
              Westchester County Index No.: 22625/2010

Dear Judge Scheinkman:

I am enclosing here Dr. Kamdem's initial request on the patent amendment. Please be
informed that I am submitting this on his behalf alone and I am not adopting these
requests and additions as his attorney. I do however submit this material to you at his
behest and request.

                    Respectfully,

                    Andrew J. Schatkin

cc:    Richard Hunter, Esq.
       Dr. Kamdem

Law Offices
*Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

October 11, 2012

VIA PRIORITY MAIL

Richard Hunter, Esq.
Luboja & Thau, LLP
10 East 40th Street
New York, New York 10016

Re: Kamden-Ouaffo v. PepsiCo, Inc.
Westchester County Index No.: 22625/2010

Dear Mr. Hunter:

I am enclosing here Dr. Kamdem's initial request on the patent amendment. Please be informed that I am submitting this on his behalf alone and I am not adopting these requests and additions as his attorney. I do however submit this material to you and the Court at his behest and request.

Respectfully,

Andrew J. Schatkin

Enc.

Cc: Justice Scheinkman
Dr. Kamdem

Law Offices
*Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

October 11, 2012

Hon. Alan D. Scheinkman
Justice, Supreme Court, State of New York
County of Westchester
111 Martin Luther Kings Jr. Boulevard
White Plains, NY 10601

Re:    Kamden-Ouaffo v. PepsiCo, Inc.
        Westchester County Index No.: 22625/2010

Dear Judge Scheinkman:

I am enclosing here Dr. Kamdem's supplement to his request on the patent amendment.
Please be informed that I am submitting this on his behalf alone and I am not adopting
these requests and additions as his attorney. I do however submit this material to you at
his behest and request.

Respectfully,

Andrew J. Schatkin

cc:    Richard Hunter, Esq.
        Dr. Kamdem

Law Offices
*Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

October 11, 2012

Hon. Alan D. Scheinkman
Justice, Supreme Court, State of New York
County of Westchester
111 Martin Luther Kings Jr. Boulevard
White Plains, NY 10601

Re: Kamden-Ouaffo v. PepsiCo, Inc.
Westchester County Index No.: 22625/2010

Dear Judge Scheinkman:

I am enclosing here Dr. Kamdem's initial request on the patent amendment. Please be informed that I am submitting this on his behalf alone and I am not adopting these requests and additions as his attorney. I do however submit this material to you at his behest and request.

Respectfully,

Andrew J. Schatkin

cc: Richard Hunter, Esq.
Dr. Kamdem

Gmail

Ricky Kam <rickykamer@gmail.com>

# Inquiry

**Ricky Kam** <rickykamer@gmail.com> Fri, Apr 5, 2013 at 3:14 PM
To: newyork@fbi.gov

Hi,
I am writing to inquire whether the FBI has jurisdiction for enforcing 18 USC 1001 concerning filing a flase Patent declaration with the United States Patent Office.

Regards

Rick Kam
Tel: 1 732 763 8622

Gmail

Ricky Kam <rickykamer@gmail.com>

# Inquiry

NY <AGNY0000@ic.fbi.gov> Fri, Apr 5, 2013 at 3:22 PM
To: Ricky Kam <rickykamer@gmail.com>

Thank you for your submission to the FBI New York Office.

Information concerning patent laws should be directed to the United States Patent and Trademark Office at http://www.uspto.gov/, or 1-800-786-9199, or 571-272-1000.

**Federal Bureau of Investigation -**

**New York Division**

26 Federal Plaza

New York, NY 10278

Phone: (212) 384-1000
Fax: (212) 384-4073 / 4074

E-mail: newyork@fbi.gov

---

**From:** Ricky Kam [rickykamer@gmail.com]
**Sent:** Friday, April 05, 2013 5:14 PM
**To:** NY
**Subject:** Inquiry

Hi,
I am writing to inquire whether the FBI has jurisdiction for enforcing 18 USC 1001 concerning filing a flase Patent declaration with the United States Patent Office.

Regards

Rick Kam
Tel: 1 732 763 8622

Gmail

Ricky Kam <rickykamer@gmail.com>

# Inquiry

**Ricky Kam** <rickykamer@gmail.com> Sat, Apr 6, 2013 at 10:24 AM
To: NY <AGNY0000@ic.fbi.gov>

Hi,

Thank you for your reply. I will need to consult with my attorney next week to see whether he has obtained permission from the Judge to allow me to turn in to the FBI certain documents as I requested. What happened is that during the discovery on an ongoing litigation at a Supreme Court in New York, the Defendant produced some documents. Upon reviewing those documents, I found evidence that they had removed my name from the invention disclosure of my ideas/work prior to filing the application with the United States Patent Office. So far the specific document evidence are covered by a Court Ordered Confidentiality Agreement and I have not yet obtained the Supreme Court Justice's permission to release the evidence to the FBI, but I have requested for the permission already.

The filing of a United States Patent application requires the signing of a document called Patent Declaration. The inventor who signs on the document represents under penalty of 18 USC1001 that providing a false statement is punishable with a maximum of 5 years jail time and/or fines. Like I mentioned earlier, I compiled documents and submitted to a patent attorney for evaluation and he determined that there was some type of "fraud " committed by the company and people involved but since the documents are under Court Ordered Confidentiality I am still waiting for the Justice's reply to my request to waive confidentiality so that I can use the evidence to press charges with the law enforcement authority. Several months ago, I requested the Defendant to contact the patent office to make amendment, but they have not done so, therefore I have concluded that they are not willing to so and most likely will never want to do so and for that reason I am seeking to press charges against them for filing a false patent Declaration with the USPTO.

My allegation is this: the senior management of the company I did the work for for commanded that my name should be removed from the invention disclosure of my ideas/work. They then appointed another person to sign on the Declaration of Patent invention disclosure representing that that they were the true inventors and they filed the Declaration with the USPTO knowing that it was false. All the evidence is available including verbal confirmations obtained during the depositions of some of the people involved, but they are all under Court Ordered confidentiality and I am I will need to talk to my attorney next week to see what progress he has made for the release of those documents.

This being said the Company where my allegation happened was rightfully the Assignee of my intellectual property as per my pre-employment agreement, but the United States patent laws do not allow that the Assignee should pick and choose who to name as inventor on a patent application and a Patent Declaration has to be signed under to affirm of truth telling and if the person signing it is not telling the true then it becomes a type of fraud of lying under oath. Given the fact that the Company was rightfully the Assignee of my IP, but did a wrongful thing against me, it is still not clear to me at this point whether the matter should be simply handled in a civil Court or should go to criminal law enforcement also. I have also requested of the Supreme Court Justice to consider the case in Civil Court also, but I am still waiting for a ruling.

I wasn't sure which law enforcement division within the Country can take my complaint and enforce the law, and in case the FBI can take my complaint then there is plenty of evidence to work with and all I need now is a little time for the Supreme Court Justice to issue an approval to release the evidence to the FBI.

Regards

Rick K.

Tel: 1 732 763 8622

[Quoted text hidden]

Gmail

Ricky Kam <rickykamer@gmail.com>

## Inquiry

**NY** <AGNY0000@ic.fbi.gov> Sat, Apr 6, 2013 at 4:08 AM
To: Ricky Kam <rickykamer@gmail.com>

Thank you for your submission to the FBI New York Office.

Unfortunately, the information you have provided is incomplete. For this reason, we are requesting you provide us with additional information by replying to this email.

In your reply, please include the following information:

(1) Specific allegations of what crimes this person is allegedly responsible for;
(2) The person's name, real or alias;
(3) The person's email address;
(4) Your full name (first name, middle name, last name,);
(5) Your current street address;

**Federal Bureau of Investigation -**

**New York Division**

26 Federal Plaza

New York, NY 10278

Phone: (212) 384-1000
Fax: (212) 384-4073 / 4074

E-mail: newyork@fbi.gov

---

**From:** Ricky Kam [rickykamer@gmail.com]
**Sent:** Friday, April 05, 2013 5:36 PM
**To:** NY
**Subject:** Re: Inquiry

Hi,

Thanks for your reply. I already contacted the patent office. They advuised me about a procedure pre-issuance submission which allows them to review information and determine whether it has impact on iussuing a patent.

Howvever, a "Patent Declaration is a document signed under oath by the inventor who signed the document. A false declaration is punishable by prison terms and fines. The

United States Patent Office informed me that they have authority to deny a patent but they don't have authority to enforce the laws that apply to putting someone in jail or enforcing fines. They suggested to me to handle that at my own level with law enforcement. So I am looking to know who enforces "fraud" laws. I read online that the FBI has a division of Intellectual property and if that is the case then I would like to get in contact with that Division so I can submit to them the evidence of my inventorship. I have all my documents and evidence including inventorship evaluation by a New York patent attorney to submit for review but I still don't know who can take my complaint to enforce fraud laws.

Regards

Rick K.
Tel: 1 732 763 8622

On Fri, Apr 5, 2013 at 3:22 PM, NY <AGNY0000@ic.fbi.gov> wrote:
Thank you for your submission to the FBI New York Office.

Information concerning patent laws should be directed to the United States Patent and Trademark Office at http://www.uspto.gov/, or 1-800-786-9199, or 571-272-1000.

**Federal Bureau of Investigation -**

**New York Division**

26 Federal Plaza

New York, NY 10278

Phone: (212) 384-1000
Fax: (212) 384-4073 / 4074

E-mail: newyork@fbi.gov

---

**From:** Ricky Kam [rickykamer@gmail.com]
**Sent:** Friday, April 05, 2013 5:14 PM
**To:** NY
**Subject:** Inquiry

Hi,

I am writing to inquire whether the FBI has jurisdiction for enforcing 18 USC 1001 concerning filing a flase Patent declaration with the United States Patent Office.

Regards

Rick Kam

Tel: 1 732 763 8622

TAB 9

# EXHIBIT DMD - XXIV

1) PLASTICSNEWS: PEPSI LOOKING TO ADD AROMA TO ITS

PACKAGING. 2 PAGES

2) PEPSI TO ADD AROMA TO PACKAGING. 3 PAGES

3) PACKAGINGNEWS: PEPSICO AIMS TO DELIVER "FAVOURABLE

AROMAS" IN PACKAGING. 2 PAGES.

4) PEPSICO AROMA DELIVERY SYSTEMS PATENT. 2 PAGES.

5) PEPSICO SEEKS US PATENT TO ENCAPSULATE BEVERAGE

AROMAS WITHIN PACKAGING. 3 PAGES.

6) PEPSI'S SCENT-ASTIC CAMPAIGN. 2 PAGES.

Advertisement

KOLCOR
TECHNOLOGIES
Kolcor Manual
Screen Changers
Simple by Design

One Stop
Design, Sales, Service
413-821-8648
Agawam, MA

Article Comments

# Pepsi looking to add aroma to its packaging

PLASTICS & RUBBER WEEKLY

Font size: A A Reprints Print

*Published: September 12, 2013 2:10 pm ET*
*Updated: September 12, 2013 2:11 pm ET*

**Related to this story**

Topics
**Packaging**

Companies & Associations
**PepsiCo. Inc.**

PepsiCo has filed a patent for an "aroma delivery system" for packaging, which the company is looking to adapt for products such as juices and chilled drinks.

The process uses aroma compounds encapsulated in gelatin capsules that are broken when a drinks container is opened, according to inventors Peter Given and Naijie Zhang.

"Research has shown that aromas can in some instances have substantial impact on consumer perception of the taste of a beverage or other food, trigger a favorable emotional response, elicit a favorite memory, and/or otherwise improve overall product performance," claim the inventors.

The encapsulation process includes a secondary protective layer, which can be formed of from a range of materials including a biopolymer film, the pair explained.

## More stories

### Winkler changes its name to Nuconic Packaging, adds equipment

March 5, 2014 12:40 pm ET

Nuconic Packaging LLC became the new identity for Winkler Plastic LLC on March 1. More

### Bottle caps offer a second life as a toy

March 5, 2014 11:30 am ET

Clever Caps bottle-caps, designed by Brazilian packaging company Clever Pack, offer a new environmentally friendly way of reusing caps by ... More

### Sigma Plastics buying assets from Excelsior Packaging

March 4, 2014 5:41 pm ET

Sigma Plastics Group is buying all of the equipment at Excelsior Packaging Group's Yonkers, N.Y., facility as well as all of the printing assets of... More

### Active and intelligent packaging demand

March 4, 2014 9:43 am ET

Active and intelligent packaging demand More

Advertisement

struktol®
One Click | Additive Solutions
www.4struktol.com
Struktol Company of America | Stow, Ohio USA
800-327-8649 | plastics@struktol.com

## Market Reports

### Automotive Market Review and Outlook 2014 – The Americas

This 75-page report features in-depth analysis of the automotive industry for the Americas. It includes discussions of market trends, legislative/regulatory activity impacting production and threats as well as design strategies being implemented by the major automakers. Detailed charts and data tables outline North American automotive production over the last five years.

Learn more

### Plastics Building & Construction Market Review and Outlook 2014 with MS Excel chart data

This report provides in-depth analysis of the plastic building and construction market for North America, including discussions of trends, opportunities, threats and the latest developments in construction trends that impact plastics processors.

Learn more

### Mold Making and Tooling Review and Outlook 2014 – North America

This report provides in-depth analysis of the mold and toolmaking market for North America, including discussion of trends, opportunities, threats, the latest developments in production and labor and equipment trends impacting moldmakers.

Learn more

## Upcoming Plastics News Events

April 1, 2014 - April 2, 2014
Plastics Financial Summit

May 6, 2014 - May 8, 2014

Plastics in Medical Devices 2014

May 13, 2014 - May 14, 2014
Plastics News Brazil Pharma Summit

June 11, 2014 - June 12, 2014
Plastics Building Innovations 2014 Conference

September 10, 2014 - September 12, 2014
Plastics Caps & Closures 2014

More Events

## Bemis Co. closing Ohio manufacturing plant

March 3, 2014 12:37 pm ET

Bemis Co. Inc. is closing a manufacturing plant in Stow, Ohio, a site that makes solvent-based pressure sensitive materials. More

Advertisement

AN
INDUSTRY
FIRST!
PLASTICSFINANCIALSUMMIT

FEATURING

DEBORAH DOUGLAS,
Founder &
Managing
Director,
Douglas Group

BILL STRONG, Attorney,
Huck Bouma PC
LEARN MORE

Plastics News

Entire contents copyright 2014 Crain Communications Inc.
All rights reserved. This material may not be published, broadcast, rewritten or redistributed.
Terms & Conditions | Privacy Policy

**Subscriber Services**
Add/Edit Subscription
Website Registration
Email Newsletter

**Tools & Resources**
Site Map
About Us
Reprints
Media Kit
Processor of the Year Award

**Premium Content**
Resin Pricing
Rankng & Lists

**Data & Products**
Market Reports
Supplier Directory

**Social Media**
On Facebook
On Twitter
On LinkedIn
Google+

**Contact Us**
Editorial
Advertising/Sales
Digital Media Staff

**Affiliates**
Plastics News China
European Plastics News
Plastics & Rubber Weekly
Automotive News
Crain Publications

# Pepsi Looking To Add Aroma To Its Packaging

PepsiCo has filed a patent for an 'aroma delivery system' for packaging, which the company is looking to adapt for products such as juices and chilled drinks.

According to the inventors Peter Given and Naijie Zhang, the process uses aroma compounds encapsulated in gelatin capsules that are broken when a drinks container is opened. "Research has shown that aromas can in some instances have substantial impact on consumer perception of the taste of a beverage or other food, trigger a favorable emotional response, elicit a favorite memory, and/or otherwise improve overall product performance," claim the inventors.

The encapsulation process includes a secondary protective layer, which can be formed of from a range of materials including a biopolymer film, the pair explained.

Posted on September 16, 2013 by admin. This entry was posted in Industry News and tagged drink, juices, Naijie Zhang, pepsi, PepsiCo, peter given. Bookmark the permalink.

You must be logged in to post a comment.

## Profile

You must be logged in to post a comment.

## Categories

Event News
Industry News

## Like Box

PackPlus
Like
2,324 people like PackPlus.
Facebook social plugin

Follow us on Twitter

has followers
naveenay
KellyBec
rushikes
reachneh
mhassan_
AEPLweb
anilaror
Technolo
MohsinDa
kapoorak

## RSS Feeds

APL Machinery Launches Screen Printing Machine
Sonika Graphics Reduces Production Cost With Param ERP Solution
India Gives New Revolutionary Design To Pizza Box
Indian Plastics Sector Seeks More Tariffs
Packaged Milk To Outsell Loose Milk In Developing Countries In 2014

## Recent Posts

APL Machinery Launches Screen Printing Machine
Sonika Graphics Reduces Production Cost With Param ERP Solution
India Gives New Revolutionary Design To Pizza Box
Indian Plastics Sector Seeks More Tariffs

Packaged Milk To Outsell Loose Milk In Developing Countries In 2014

### Archives

- February 2014
- January 2014
- December 2013
- November 2013
- October 2013
- September 2013
- August 2013
- June 2013
- May 2013
- April 2013
- March 2013
- February 2013
- January 2013
- November 2012
- October 2012
- September 2012
- August 2012
- June 2012

### Tags

2012 2013 2014 Automation Business Carton Company Conclave Converting corrugated Corrugation Digital Equipment Event Exhibition Flexo Food Greater Noida HITEX Hyderabad India Industry Install International packaging conclave Label Machine Manufacturer Market Materials pack Packaging packing PackPlus Paper pharmaceutical Plastic Press Print Print-Packaging.com Printing Product Show Supply Chain Technology trade show

### Blogroll

- Automation for Packaging
- Bulk Pack
- Corrupack
- Food Technology Show
- India Aidc show
- India Converting Show
- India Corrugated Show
- India Logistics Show
- India Packaging Show
- Packaging Conclave
- PackPlus
- PackPlus South
- Print Fair

A nice revamping of Sandbox theme for Wordpress

# Pepsi Patents Packaging to Make Your Drink More Fragrant

1.4k
Share on Facebook Share Tweet on Twitter

BY MEG WAGNER / SEP 28, 2013

PepsiCo. has long been in the market of tickling your taste buds with sweet beverages. Now, the company wants to appeal to your sense of smell, too.

A Pepsi patent aims to make its beverages more fragrant by developing a to release favorable aromas as a can or bottle is opened.

**SEE ALSO: 11 Crazy Soda Flavors You Won't Find in the U.S.**

The aroma system uses tiny gelatin capsules that sit underneath beverage caps. The capsules, which are half the width of a human hair, rupture when the drink is opened, releasing the smell, according to *Beverage Daily*. The system can be used in juice and coffee beverages.

The patent, which was filed in 2011, explains how the aroma system could solve two problems.

First, most products smell like their packaging. The capsules could help the drink smell more true to form, rather than like the plastic or aluminum of its container.

Second, even if the packaging's scent was neutral, it's not easy for the smell of the product to escape from the small opening of a bottle or a can. Sometimes, the scent is hidden beneath a safety seal. The capsules would ensure the prominence of the scent of the beverage, regardless of the type of drink container.

No details were released on a timeline for the aroma capsules.

Do you think soda needs a new smell? Sound off in the comments below

*Homepage image: Fernando Leon/Getty Images*

**TOPICS:** BUSINESS, INVENTIONS, MARKETING, PATENT,

3/7/2014 PepsiCo aims to deliver "favourable aromas" in packaging | Packaging News | Jobs | Production | Design | Innovation

Sign up to Packaging News Email Bulletins

ABOUT PN + SUBSCRIBE + DIGITAL EDITIONS AWARDS CONFERENCES + TS & CS LOGIN

PackagingNews Friday 07 March Search here

NEWS JOBS SUPPLIER DIRECTORY DESIGN BLOGS TV MARKETS EQUIPMENT EVENTS DIARY

HOT TOPICS Packaging Innovations 2014 Sign up for email news Consumer IQ – sponsored by Essentra PN Solutions

You are here: Home : Design & Innovation : Closures : PepsiCo aims to deliver "favourable aromas" in packaging

# PepsiCo aims to deliver "favourable aromas" in packaging

Philip Chadwick September 12, 2013 1 Comment »

**PepsiCo in the US is looking into developing beverage packaging that delivers an aroma before consumers drink the product**

The FMCG giant said that the invention can be applied to products including chilled drinks, syrups and carbonates. The aim is to give the consumers "favourable aromas" before they drink.

One of the inventors, Peter Given, said that the aroma delivery system uses one or more compounds encapsulated in gelatine capsules that are broken when the drinks container is opened. The capsules would be 10-50 microns in size with a secondary protective coating to guard against moisture and oxygen ingress.

Aromas could include essential oils, fruit essences or perfumes. Closures can comprise of threaded caps, slide-in closures, snap-on or slide-on caps. Secondary protective layers could include a polysaccharide, synthetic polymer, natural wax or natural biopolymer.

The patent was filed in March last year but was published in March 2013.

Share

Sign up to PN email bulletins

Get the latest news direct to your inbox with PN's daily, weekly and monthly email bulletins.

**Click here to sign up to Packaging News Bulletins**

Today's headlines

Scott Pallets to employ more staff at Huntingdon site

Coca-Cola to spend £52m on UK operations as it reveals economic impact

Record success as Packaging Innovations attracts 6,000 visitors

Tetra Pak acquires Miteco to strengthen carbonated soft drinks business

Saica snaps up Microlan to boost presence in Spanish corrugated

Marden Edwards Ltd
ME
Providing overwrapping solutions

FLEXIBLE

PackagingNewsJobs

Go

**Training Manager**
Salary: Salary commensurable with experience.
Location: Belfast

**Sales & Marketing**
Salary: Salary will not be a barrier to
Location: Belfast

**Sales Director - Packaging Sector**
Salary: £attractive negotiable + bonus
Location: Home/South East Based

**Packaging Project Manager**
Salary: Competitive rates of pay dependent upon
Location: Domestic and overseas travel

**Area Sales Manager | Cartons | South East**
Salary: v£40k-£45k + excellent commission
Location: South East

http://www.packagingnews.co.uk/news/pepsico-in-beverage-pack-aroma-development/ 1/3

With real
people

Design-led packaging solutions for the food, beverage & healthcare markets
Bensongroup

Easypack

FREEMANTLE
www.freemantle.com

Closures Design & Innovation Drinks Markets News

abc1

## RELATED POSTS

### Profile: Pepsi looks to plant-based plastics

July 12, 2011

EXCLUSIVE – PepsiCo says it is on a sustainable packaging journey and wants to reduce its reliance on oil-based plastic....

### Pepsi plans to reduce its reliance on oil-based plastic

July 4, 2011

EXCLUSIVE - PepsiCo's global beverage packaging vice president has revealed to *Packaging News* her views on how the food and...

### PepsiCo turns to SiebertHead for Tropicana lemonade launch

March 21, 2011

Design agency SiebertHead has created bottles for PepsiCo's new Tropicana still lemonade range

### Pepsi unveils PET bottle made from plant materials

March 17, 2011

Drinks giant PepsiCo has introduced its answer to Coca-Cola's PlantBottle – a PET bottle made from plant-based materials. By comparison,...

Comments are closed.
1 Reply
1 Comment
0 Tweets
0 Facebook
0 Pingbacks
Last reply was 5 months ago

The Insider
View 5 months ago
Wasn't this done nearly 20 years ago with coldseal... used specifically on confectionary packaging, favourite and most popular option was chocolate smelling Cold seal....mmmmmmmm

Eddisons
CARTON/LID ERECTORS, FILM INSERTERS, SHRINK TUNNELS ROLLER/BELT CONVEYORS, CHECKWEIGHERS AND LABELLERS

## THE CONVERSATION

**Andy Kilfoyle - Selection Group** on 'Raj Bhardwaj: Calm seas for the UK economy...': **Those Government figures are absolute nonsense Raj. Unemployment is rising,......** Posted on 26 Feb 14

**Flexible Packaging** on 'Medica takes fight to counterfeiters': **The role of packaging isn't just limited to preserving the......** Posted on 24 Feb 14

**Hercule Ondule** on 'Raj Bhardwaj: Calm seas for the UK economy...': **"For once the potential economic headwinds are subdued: the Eurozone......** Posted on 21 Feb 14

Older »

## THE PN POLL

**Should there be a 5p charge on single-use carrier bags?**

- Yes. It's the right thing to do
- Yes but there should be exemptions in some sectors
- No. There should be no charge at all

Vote

View results of this poll

Packaging International News - September 2013

# PepsiCo Aroma Delivery System Patent

Posted by Paul Fiddian - Packaging International's Lead Reporter on 16/09/2013 - 08:30:00

PepsiCo has applied to patent what it terms a packaging-supplied 'aroma delivery system'.

In PepsiCo's sights is a range of products that release a consumer-friendly odour when opened, according to information that's only recently become public knowledge. The aroma delivery system patent was actually filed in March 2012, with details of it published one year later. However, the news seems to have been overlooked until earlier this month, when Beverage Daily reported on PepsiCo patent WO 2013/032631A1.

The aroma release process, says Pepsi, could work for ready-to-drink beverages, syrups, concentrates and many other products. The brainchild of inventors Peter Given and Naijie Zhang, it involves single or multiple aroma compounds encased by gelatine capsules.

Breaking open a drinks container causes these capsules to open, releasing their contents. Each capsule is up to 50 microns in size and boasts a double-layered coating, thereby helping protect it that bit more.

## Pepsi Aroma Patent

Involved in the Pepsi aroma patent are several variations on these capsules with the potential to release a range of aromas including fruit essences, essential oils or perfumes, either singularly or in combination.

'Consumers evaluate many products by the aroma emitted from the product or the container in which the product is made available', say Given and Zhang. 'Edible products, such as juices and coffee, are expected to have a fresh aroma that replicates or evokes memory of the expected flavour of the product. Research has shown that aromas can in some instances have substantial impact on consumer perception of the taste of a beverage or other food, trigger a favorable emotional response, elicit a favorite memory, and/or otherwise improve overall product performance.'

In related news, Coca-Cola Japan is introducing the world's first warm canned drink. A heated version of its Canada Dry Hot Ginger Ale will start to go on sale in Japan from late October onwards. It's the result of a research programme that lasted four years.

### .ong-Term Food Packaging :hemicals Risk Reported

Known toxicants are employed in food packaging in much of the world, experts say, with scarce little knowledge of how they affect people long-term

View More....

### Vew-Look Heinz Spaghetti Cans .aunched

US food processing firm Heinz is launching new pasta product packaging with the aim of winning over new consumers by highlighting the nutritional benefits

View More....

### 'Game-Changing' Food Cooking Bag Launched

Sirane has launched what it claims is the first ever packaging material able to be heat-sealed and flow-wrapped and used as a food cooking bag

View More....

### Genetically-Modified Food Labels Debate Rages On

Farmers in the United States are now rallying alongside the food industry against GMO (genetically modified organism) product labelling

View More....

Your email

Breaking News on Beverage Technology & Markets

NEWS SECTORS TRENDS BIG BRANDS MULTIMEDIA TECHNOLOGY INGREDIENTS JOBS Search

Register Now to attend the free Beverage & Dairy Treatment online event on March 20th

NEWS > PROCESSING & PACKAGING

Subscribe to the Newsletter Text size Print Forward 49 Tweet Like 6 8+1 42 Share

Follow @BeverageDaily 3,012 followers

Like

SMELL...THE NEXT BEVERAGE PACKAGING FRONTIER?

# PepsiCo seeks US patent to encapsulate beverage aromas within packaging

By Ben Bouckley+
10-Sep-2013

Be innovative, be the 1st
VIRUN

Could PepsiCo use its science to enhance the consumer experience of top brands like Tropicana Trop 50?

Related tags: Tropicana trop 50, Pepsi, Juice, Coffee, PepsiCo

Related topics: Smart Packaging, Fizzing-up Carbonates, Future Flavors, Processing & Packaging, Soft Drinks & Water, Energy & Sports, Beer, Wine, Spirits, Cider, Juice Drinks, Dairy Drinks, Hot Drinks, Packaging & Packing Materials, Containers, PepsiCo

**PepsiCo is seeking to patent a method of encapsulating aromas within beverage packaging to entice US consumers with 'favorable aromas' before they drink, say, juices or coffees.**

Filed in March 2012, the patent was published internationally in March 2013, but has escaped the glare of mainstream media – PepsiCo says the invention could be applied to RTD beverages, concentrates, syrups, shelf-stable and chilled drinks, carbonates and non-carbonates.

Explaining the basis for its 'aroma delivery system' – which uses one or more aroma compounds encapsulated in gelatine capsules that are broken when a drinks container is opened – inventors Naijie Zhang and Peter Given note the importance of smell to consumers.

**'Fresh aromas' are expected**

*"Consumers evaluate many products by the aroma emitted from the product or the container in which the product is made available…Edible products, such as juices and coffee, are expected to have a fresh aroma that replicates or evokes memory of the expected*

RELATED NEWS:

**PepsiCo explores smell: the undiscovered drinks frontier...**

**Tropicana's 'pure and natural' OJ headache persists**

**100% OJ and out? Rabobank sees US potential in Trop 50-style nectars**

**'Breakthrough innovation' sees PepsiCo launch Tropicana juices with tea**

MOST POPULAR NEWS

1 'Coke has mediocre PepsiCo on its heels': Peltz's withering verdict
2 Red Bull 'surprised' by Saudi Arabia energy drinks advertising ban
3 AB InBev keen to steal larger 'share of throat' from wine and liquor
4 History of Violence: Why Diageo should ditch cutthroat Captain Morgan
5 Angry TATA Global Beverages instructs lawyers over Tetley tea slavery allegations

BEVERAGE & DAIRY TREATMENT
Online Event
Scanning the Horizon: Beverage and Dairy Processing Technology

Aaron Brody, Ph.D.
Packaging/Brody Inc.



3/7/2014 Case 7:14-cv-00227-KMK Document 43-6 Filed 07/09/14 Page 27 of 35
PepsiCo seeks US patent to encapsulate drinks aromas within packaging

flavour of the product," they write.

Zhang and Given add: *"Research has shown that aromas can in some instances have substantial impact on consumer perception of the taste of a beverage or other food, trigger a favourable emotional response, elicit a favourite memory, and/or otherwise improve overall product performance."*

Brands want consumers to smell products, Zhang and Given say, but they warns that aromas are often lacking because the holes that drinks come out of are too small, or are covered with protective safety films.

CASE STUDY

**A superior hydration and recovery ingredient**
Need an ingredient that can deliver serious hydration, endurance and recovery benefits for your next sports bar or beverage? Vegetarian, tasteless, odorless, highly stable and the only GRAS L-Alanyl-L-Glutamine -- learn about the benefits of Sustamin(r)... Click here

*"Additionally, it is often difficult to deliver adequate aroma to a headspace of a container that comes from the beverage itself, and not from the container,"* the pair write.

'Scratch and sniff' strips or 'overwraps' on the outside of packaging that release aromas are one solution to this problem, Zhang and Given add, but affect packaging appearance once used, while there is a risk of consumers scepticism regarding whether a given aroma belongs to the product.

**Essential oils, fruit essences, perfumes...**

Step forward this invention! Zhang and Given explain that aromas are encapsulated in gelatine capsules (10-50 microns in size) with a secondary protective coating to guard against moisture and oxygen ingress.

When one opens a bottle, say, capsules at the interface of bottle and cap – are ruptured and the aroma material (usually a volatile compound, according to the application) is released.

PepsiCo's patent rehearses numerous methods of forming aroma delivery systems, using gelatin capsules in various permutations.

Secondary protective layers could include a polysaccharide, synthetic polymer, natural wax, natural biopolymer, natural film former or combinations thereof -- and different aroma compounds.

Possible aromas include essential oils, fruit essences, fruit aromas, perfumes and combinations thereof, while closures can comprises threaded caps, slide-in closures, snap-on or slide-on caps.

PepsiCo patent WO 2013/032631A1 is available to read here .

**Copyright** - Unless otherwise stated all contents of this web site are © 2014 - William Reed Business Media SAS - All Rights Reserved - Full details for the use of materials on this site can be found in the Terms & Conditions

**Get more articles like this in your mailbox:**

Your email Sign up

RELATED PRODUCTS

Technical / white paper
**Taking The Mystery Out Of Sugar Reduction** - Steviva Ingredients
01-Nov-2013 - To capture a fickle consumer's attention, and their purchase, food developers should use ingredients that consumers understand. This is especially true when using sweeteners because the category is filled with misconceptions. Sugar, corn syrups and particularly high fructose corn syrups,...

DOWNLOAD NOW!

Steviva

RELATED SUPPLIERS

Joe Whitworth
BeverageDaily.com

Register now FREE
THURSDAY MARCH 20th

KEY INDUSTRY EVENTS
Finished Products Expo 2014 06-May-2014
Geneva / Conference and exhibition
read more
Access all events listing

PRODUCTS
A superior hydration and recovery ingredient
Kyowa Hakko

Taking The Mystery Out Of Sugar Reduction
Steviva Ingredients

View All Products

Live Supplier Webinars
Bottling solution for Liquid dairy products 20-Mar-2014
GEA Process Engineering Inc.

On demand Supplier Webinars
What do the EU Guidance Notes on the Classification of Colouring Foods mean for your products?
GNT

All supplier webinars

TODAY'S HEADLINES

'Ho, ho, ho and a bottle of rum-flavored beer!' from AB InBev

Beverage & Dairy Treatment 2014: Free Online Event!

Should RTD teas pounce on pouches? Analyst says 'Yes!'

Social media 'mobbing' denting whiskey sales in US bars? Brown-Forman glosses Southern Comfort slide

Analyst warns pouches face fight to grab US beer throat share

P.E.T Engineering gives 'imperatives' for packaging firms

WHO recommends halving sugar intake advice

http://www.beveragedaily.com/Processing-Packaging/PepsiCo-seeks-US-patent-to-encapsulate-beverage-aromas-within-packaging 2/3

Ecolean AB | Hilmar Ingredients | Tetra Pak | VIRUN®

WEEKLY / DAILY FREE NEWSLETTER

- FoodNavigator.com
  Food & Beverage Development - Europe
- FoodNavigator-USA.com
  Food & Beverage Development - North America
- FoodNavigator-Asia.com
  Food, Beverage & Supplement Development - Asia Pacific
- NutraIngredients.com
  Supplements & Nutrition - Europe
- NutraIngredients-USA.com
  Supplements & Nutrition - North America
- FoodProductionDaily.com
  Food Processing & Packaging
- FoodQualityNews.com
  Food Safety & Quality Control
- DairyReporter.com
  Dairy Processing & Markets
- BeverageDaily.com
  Beverage Technology & Markets
- ConfectioneryNews.com
  Confectionery & Biscuit Processing
- BakeryAndSnacks.com
  Industrial Baking & Snacks
- GlobalMeatNews.com
  Global Trading and Meat Processing
- FoodManufacture.co.uk
  The Information Resource for Food and Drink Processing
- FeedNavigator.com
  Global Animal Feed Industry

OTHER NEWSLETTERS

- Science & Nutrition Research
- Food legislation
- Food Finance
- Innovations in Food Ingredients
- Innovations in Food Processing and Packaging
- Innovations in Food Safety & Instrumentation
- Food Industry & Consumer Trends
- Food Marketing and Retailing

FREE SUPPLEMENTS

- FoodNavigator Middle East Supplement
  Food & Beverage Development and Processing - Middle East

FREE E-MAIL ALERTS

- Packaging equipment and materials
- Ingredients and additives
- Processing equipment & plant design

**Free subscription now!** Your email

RELATED SITES FROM OUR TEAM

**Food & Beverage:** Food & Beverage Development - Europe | Food & Beverage Development - North America | Food, Beverage & Supplement Development - Asia Pacific | Food Marketing and Retailing | Food and Beverage Processing and Packaging | Food Safety & Quality Control | Industrial Baking & Snacks | Beverage Technology & Markets | Confectionery & Biscuit Processing | Dairy Processing & Markets | Global Trading and Meat Processing | Food jobs - Europe **Nutrition:** Supplements & Nutrition - Europe | Supplements & Nutrition - North America **Feed:** Global Animal Feed **Pharmaceuticals:** Global Pharmaceutical Technology & Manufacturing | Contract Research, Manufacturing & Clinical Trials **Cosmetics:** Cosmetics Formulation & Packaging in North America | Cosmetics Formulation & Packaging in Europe

About us | Site map | All sites | Recommend this Site | Advertise | Contact the Editor | Terms & Conditions | Privacy and Cookie Policy

© William Reed Business Media SAS 2014. All rights reserved.

# BENEATH THE BRAND

Covering the changing world of Branding

Sergio Creative LLC is hiring a Junior Production/Design Contract Position Available next job

## Pepsi's Scent-tastic Campaign

By: Amanda Markell

Scientists say that 70–75% of what we perceive as taste actually comes from our sense of smell. Even more important, smell is closely connected to our mood, behavior, and memory. Pepsi is capitalizing on this science by making their packaging appeal to more than just our taste buds. In March 2013, Pepsi applied for a U.S. Patent for "Releasably Encapsulated Aroma." This invention, created by Naijie Zhang and Peter Given, releases an aroma into the air when a Pepsi container is opened. To do so it uses tiny gelatin capsules that sit underneath beverage caps. The capsules, which are half the width of a human hair, rupture when the drink is opened, releasing the smell and reminding customers how much they want the refreshing taste of a Pepsi. Aromas include essential oils, fruit essences, fruit aromas, perfumes, and combinations.

As the patent describes, research shows the memory-evoking aroma of the expected flavor of the product improves the overall product performance. Now when someone beside you cracks a bottle of Pepsi, you will hear the tempting fizz, smell the familiar scent, see the famous label, and go buy one for yourself.

Smell is one of the strongest and most intimate senses of humans. So how else have marketers succeeded (and failed) to connect with prospects through smell?

In 2012, Dunkin Donuts launched the "Flavor Radio" in South Korea. The device was installed in city busses; when the Dunkin Donuts commercial played, the system released an aroma of fresh brewed coffee into the air. This smelly campaign was said to reach the noses of 350,000 commuters and lift sales 16% in local stores.

Marketing agency Nova Direct frequents the practice of using a type of "scratch and sniff" in their direct mailers using the scent of chocolate, fresh cut grass, bread, pine forest, rainforest, or eucalyptus to instill a brand in the customer's mind. Nova Direct calls this "smellymail."

In 2007, as part of the California Milk Processor Board's "Got Milk?" campaign, the city posted adhesive strips smelling like chocolate chip cookies on their bus shelters. This attempt to go outside of the box failed and the transit ads were only live for one day. San Franciscans' complaints ranged from "I do not like the smell" to health concerns to "it's unfair for the homeless people who cannot afford cookies and milk."

When customers have blocked their auditory and visual senses, is it smell that marketers need to turn to? Have you experienced a smelly marketing campaign firsthand? Tell us @beneaththebrand.

Previous Next

Share Tweet Share

0 Comments TalentZoo.com Login

Sort by Best Share Favorite

Start the discussion...

### About the Author

Amanda Markell is a marketer in the Greater Boston Area with a passion for branding, new media, and customer insights.

TalentZoo.com Like 9,798

Twitter RSS

Advertise on Beneath the Brand

### Newest Jobs on TalentZoo

Agricultural Copywriter
Right Fit Recruiting
Sioux Falls, South Dakota

Senior .NET Developer
Agora, Inc.
Baltimore, Maryland

Account Director (Multicultural)
Rescue Social Change Group
Atlanta, Georgia

Social Media Specialist
Blue Flame Thinking
Chicago, Illinois

Senior Paid Search/Analytics Strategist -...
Kelliher Samets Volk
Burlington, Vermont

Account Supervisor
Carling Communications Inc
San Diego, California

Project Coordinator
Matlock Advertising & Public Relations
Atlanta, Georgia

Creative Project Coordinator
Agora, Inc.
Baltimore, Maryland

Account Supervisor
On Ideas, Inc.
Jacksonville, Florida

Online Marketing Manager
Anonymous Employer
Atlanta, Georgia

Human Experience Associate Media Director
Starcom MediaVest Group
New York, New York

Assistant Account Executive
Ames Scullin O'Haire
Atlanta, Georgia

Be the first to comment.

Subscribe Add Disqus to your site

Sr. Copywriter
Luquire George Andrews (LGA)
Charlotte, North Carolina

Media Manager
Jackson Marketing Group
Greenville, South Carolina

Pharmacutical Instructional Designer/e-Lea...
Meredith
Woodbridge, New Jersey

Advertising Jobs
New Media Jobs
Creative Jobs
Marketing Jobs
Geek Jobs

Follow us on Twitter

2010 TALENT ZOO, INC ALL RIGHTS RESERVED - SOFTWARE © 2001 - 2014 PM TECHNOLOGIES

Return to Top

Advertising Jobs
Marketing Jobs
Media Jobs
Digital Jobs

Employer Sign-Up
Job Seeker Sign-Up

TalentZoo.com Jobs
TalentZoo.com Articles

Contact Us
Twitter: @talentzoo, @talentzoojobs
Facebook Fan Page

Case 7:14-cv-00327-KMK Document 43-6 Filed 07/09/14 Page 21 of 35

# EXHIBI DMD - XXV

INTERNATIONAL STATUS APPLICATION STATUS REPORT.

RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX. 4 PAGES.

Received at International Bureau: 14 July 2011 (14.07.2011)
Information valid as of: 16 December 2011 (16.12.2011)
Report generated on: 04 June 2014 (04.06.2014)

**(10) Publication number:** WO2012/006328

**(43) Publication date:** 12 January 2012 (12.01.2012)

**(26) Publication language:** English (EN)

**(21) Application Number:** PCT/US2011/043042

**(22) Filing Date:** 06 July 2011 (06.07.2011)

**(25) Filing language:** English (EN)

**(31) Priority number(s):** 12/831,683 (US)

**(31) Priority date(s):** 07 July 2010 (07.07.2010)

**(31) Priority status:** Priority document received (in compliance with PCT Rule 17.1)

**(51) International Patent Classification:**
A23L 1/22 (2006.01)

**(71) Applicant(s):**
PEPSICO, INC. [US/US]; 700 Anderson Hill Road Purchase, NY 10577 (US) *(for all designated states except US)*
ZHANG, Naijie [US/US]; 31 Charter Oak Court Ridgefield, CT 06877 (US) *(for US only)*
GIVEN, Peter [US/US]; 16 O'Neill Court Ridgefield, CT 06877 (US) *(for US only)*

**(72) Inventor(s):**
ZHANG, Naijie; 31 Charter Oak Court Ridgefield, CT 06877 (US)
GIVEN, Peter; 16 O'Neill Court Ridgefield, CT 06877 (US)

**(74) Agent(s):**
ROKOS, Rebecca, P.; Banner & Witcoff, LTD. 10 South Wacker Drive Suite 3000 Chicago, IL 60606-7407 (US)

**(54) Title (EN):** RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

**(54) Title (FR):** PIÉGEAGE LIBÉRABLE D'ARÔME À L'AIDE DE MATRICE POLYMÈRE

**(57) Abstract:**
**(EN):** An aroma delivery system comprising aroma compound entrapped in a polymeric matrix.

**(FR):** L'invention porte sur un système de distribution d'arôme qui comporte un composant d'arôme piégé dans une matrice polymère.

**International search report:**
Received at International Bureau: 10 October 2011 (10.10.2011) [EP]

**International Report on Patentability (IPRP) Chapter II of the PCT:**
Not available

**(81) Designated States:**
AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, RO, RS, RU, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TH, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW
European Patent Office (EPO) : AL, AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, RS, SE, SI, SK, SM, TR
African Intellectual Property Organization (OAPI) : BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG

ZM, ZW
Eurasian Patent Organization (EAPO): AM, AZ, BY, KG, KZ, MD, RU, TJ, TM

**Declarations:**

Declaration made as applicant's entitlement, as at the international filing date, to apply for and be granted a patent (Rules 4.17(ii) and 51bis.1(a)(ii)), in a case where the declaration under Rule 4.17(iv) is not appropriate

Declaration made as applicant's entitlement, as at the international filing date, to claim the priority of the earlier application, where the applicant is not the applicant who filed the earlier application or where the applicant's name has changed since the filing of the earlier application (Rules 4.17(iii) and 51bis.1(a)(iii))

Mobile | Deutsch | Español | Français | 日本語 | 한국어 | Português | Русский | 中文 |

WIPO

PATENTSCOPE

Search International and National Patent Collections

WORLD INTELLECTUAL PROPERTY ORGANIZATION

Search Browse Translate Options News Login Help

Home IP Services PATENTSCOPE

1. (WO2012006328) RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

PCT Biblio. Data | Description | Claims | National Phase | Notices | Drawings | Documents

Available information on National Phase entries (more information)

| Office | Entry Date | National Number | National Status |
|---|---|---|---|
| Canada | 04.01.2013 | 2804513 | |
| China | 06.07.2011 | 201180038973.9 | |
| European Patent Office (EPO) | 11.01.2013 | 2011738527 | Published: 15.05.2013 |
| Japan | 07.01.2013 | 2013518800 | |
| Russian Federation | 07.02.2013 | 2013104980 | |

PCT REQUEST

Original (for SUBMISSION )

| | | |
|---|---|---|
| VIII-3-1 | **Declaration: Entitlement to claim priority** Declaration as to the applicant's entitlement, as at the international filing date, to claim the priority of the earlier application specified below, where the applicant is not the applicant who filed the earlier application or where the applicant's name has changed since the filing of the earlier application (Rules 4.17(iii) and 51bis.1(a)(iii)) | In relation to this international application |
| | Name | PEPSICO, INC. is entitled to claim priority of earlier application No. 12/831,683 by virtue of the following: |
| VIII-3-1(iv) | | an assignment from ZHANG, Naijie to PEPSICO, INC., dated 21 June 2010 (21.06.2010) |
| VIII-3-1(iv) | | an assignment from GIVEN, Peter to PEPSICO, INC., dated 21 June 2010 (21.06.2010) |

TAB 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------------------------------X

RICKY KAMDEM-OUAFFO,

Plaintiff

- against-

PEPSICO, INC.,

Defendant

Index No.: 22625/10

Plaintiff's Affidavit to Refute PepsiCo's Inc. Designation of Naijie Zhang and Peter Given as Inventors on the United States Patent Publication No. US 2012/0006909 A1

---------------------------------------------------------------X

RICKY KAMDEM-OUAFFO, PhD, the plaintiff, being duly sworn, respectfully submits the following affidavit to the Supreme Court of New York to Refute PepsiCo's designation of Naijie Zhang and Peter Given as Inventors on the United States Patent Publication No. US 2012/0006909 A1. My affidavit is also in support of my claim that PepsiCo Inc. infringed on my patent inventor rights and committed violations of applicable Federal and State laws, rules, regulations and statutes including 35 U.S.C and has caused me enormous amount of damages.

1. On July 13th, 2008, I was selected by Defendant to work as a Food Scientist in Defendant's Research and Development facility in New York and I worked there until September 28th, 2009.

2. The scope of the work as defined to me by Defendant was to evaluate, develop and implement commercially viable Aroma Technology Delivery System applicable to Defendant's commercial beverages, all brand names included and worldwide.

3. During my work as a Food Scientist on the said Aroma Technology project at Defendant's Research and Development facility in New York, I pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques of significant commercial value in food and beverage applications.

4. During my work as a Food Scientist on the said Aroma Technology project at Defendant's Research and Development facility in Valhalla, I pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques of significant commercial value that none of Defendant's employees has been able to do prior to my work.

5. During my work as a Food Scientist on the Aroma Technology project at Defendant's Research and Development facility in Valhalla, I pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques of significant commercial value and I also taught and trained Defendant's scientists in the same art and skills.

6. I am a skillful Food Scientist with industry track records of successfully developing flavor, aroma, and taste products and technologies for employers and manufacturers, having developed products and technologies valued at several millions of dollars of yearly business potential.

7. My work on the said Aroma Technology project at Defendant's facility was inspired by my personal abilities, talents and gifts in combination with several years of industry experience in the field of food and beverage flavors and aroma technologies during which I developed significant insight to be able to intuitively

look into a flavor related application challenge and have a very well informed and on target assessment of what needs to be done and how to go about it.

8. My personal abilities, talents and skills are unique in the sense that although I might teach another person what I know or what I do, there is no guarantee that when that person makes an assessment for a flavor or an aroma application it will be the same as what I would have done because it does not only take knowledge and skills but also a good amount intuition about how to combine the knowledge and skills to address a flavor related application challenge.

9. It is widely known in the flavor and aroma business that the success of any commercial flavor/aroma technology project depends on the unique ability of those on the project to find the right combination of knowledge and skills to solve an application challenge therefore making it an art.

10. It is very widely known among those experienced and/or skilled in the business of food and beverage flavor/aroma that flavor science and technology is in part art and in part science

11. Given the uniqueness of my abilities, skills, talents, it is an error for anyone to credit a flavor or aroma related work that I have done to another person regardless of whether the person has a doctorate degree like myself, or regardless of whether I have trained the person in the art of flavor and aroma.

12. During my years of experience in the development and commercialization of food and beverage flavor and Aroma, I have seen numerous examples of how two people with similar level of education and seniority would approach an

application challenge in completely different ways, and one would succeed while another person would fail.

13. I personally have been involved in successfully resolving numerous flavor/aroma application challenges that colleagues and supervisors with equivalent level of education and with even more industry seniority than I could not solve. One simple example I would like to mention involved troubleshooting the manufacturing of a cheese flavoring for the International Flavors and Flavors in New Jersey. The problem with that cheese flavoring was that no two manufacturing batches smelled or tasted exactly the same, because of numerous undesirable off-notes, making it a commercially weak product and not viable in the long run should competition find a more consistent way of making a similar item. When manufacturing and quality control engineers contacted Research and Development to look into the issue, the challenge was brought to my attention. My supervisor, a PhD, who had in excess of 28 years of industry experience in the field made an assessment of the problem and I also made my own assessment. We came up with two different approaches of how to solve the problem, but we agreed that we would test his approach first and if it did not work then we would test my approach. We proceeded to testing his approach and surprisingly it did not work, then when we tested my approach it worked beautifully and the new process was adopted and transferred to manufacturing for commercialization. A second simple example from my personal experience is that there was a commercial need to design a certain type of savory flavor derived from chicken egg, but egg has handling and processing challenges due to its thermal behavior.

My supervisor assigned the project to another PhD scientist in the group who spent in excess of six months trying to come up with a successful approach but could not. I even suggested to that scientist some of the things I would try in such in a situation but he did not believe that any of my suggestions would work. Finally, the supervisor asked me to work on the project and when I tested and implemented my approaches I was able to solve the challenge and we were able to make a commercially viable savory product from chicken egg. The main point of these two examples is that it is an error to ascribe the inventorship and/or the authorship of a flavor or aroma design/innovation/invention to another person other than the person who actually invented it.

14. During discovery of the ongoing litigation in which I initially alleged retaliation and wrongful termination in the hands of Defendant, for having expressed safety concerns over my exposure to formaldehyde, I discovered among documents provided by defendant a string of e-mails in which there was communication among Defendant's employees and senior managers concerning removing my name from the invention disclosure of my work. The said string of e-mail is attached to this affidavit in APPENDIX I as can be seen in defendant's discovery documents marked as PC 0301 to PC 0308.

15. During depositions and discovery of this litigation, my attorney directed some questions at Defendant in the subject of patent. The questions were specifically related to defendant's interest for patenting innovations and were necessary to be asked because of the suspicious string of e-mails above mentioned. Defendant

admitted having an interest in patenting innovations but denied having infringed
on my inventor rights.

16. Upon further research, I recently discovered on 08/08/2012 that Defendant
applied for a United States patent stating the following: "The invention relates to
an aroma delivery system. In particular, the invention relates to a water-resistant
aroma delivery system comprising entrapped polar, non-polar, and volatile aroma
compounds." I obtained a copy of the said patent from the United States Patent
and Trademarks Office and it is attached to this affidavit as APPENDIX II.

17. The said patent was applied for by Defendant on 07/07/2010 and appeared to have
been accepted for publication as: United States Patent Publication US
2012/0006909 A1; Class at Publication 239/34;512/4; International class A61L
9/04 (2006.01); A61K008/11 (2006.01).

18. The said patent publication named the following as Inventors: ZHANG; NAIJIE;
(Ridgefield, CT); Given; Peter; (Ridgefield, CT) with Zhang being considered as
the main inventor.

19. The said patent publication named the following as Assignee: PepsiCo Inc.,
Purchase New York.

20. Upon reviewing the publication, more specifically the field of invention and the
corresponding claims, I recognized its content as being 100% of my innovation
and of my pioneer work during my tenure as Food Scientist at Defendant's
facility in its Research and Development in New York and I have concluded that
the United States patent publication US 2012/0006909 A1 is most likely one of
the invention disclosures of my work that Defendant removed my name from as

revealed in the string of e-mail communications I mentioned above and which has been attached as APPENDIX I.

21. During my work as a Food Scientist on the Aroma Technology project at Defendant's Research and Development facility in New York, I pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques of significant commercial value for food and beverage applications, in the field of water-resistant aroma delivery system, at a time when Naijie Zhang was not an employee of PepsiCo Inc. The concept of water resistant aroma delivery system was developed and relevant proof and demonstration of concept was done several months before Naijie Zhang ever joined PepsiCo Inc. Therefore Naijie Zhang should not be ascribed any inventor rights on the United States Patent Publication US 2012/0006909 A1 unless he can prove a level of contribution worthy of an inventor in the designated field of my invention and work, as required by law.

22. During my work as a Food Scientist on the Aroma Technology project at Defendant's Research and Development facility in New York, I pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques of significant commercial value for food and beverage applications, in the field of water-resistant aroma delivery system, at a time when I had no intellectual involvement or input from Peter Given. Although he was PepsiCo employee at the time, he was of no influence in the conceptual stage of my pioneer work in the field of water-resistant aroma delivery system which led to the innovation been claimed in United Patent

Publication No. US 2012/0006909 A1. Therefore his designation as Inventor on the United Patent No. US 2012/0006909 A1 is highly questionable and he should not be ascribed any Inventor designation on United Patent Publication No. US 2012/0006909 A1 unless he proves contribution worthy of an inventor in the designated field of my invention and work, as required by law.

23. In view of all the above, I am submitting this affidavit to refute the Inventor designation for Naijie Zhang and Peter Given on United patent Publication No. US 2012/0006909 A1 because to the best of my knowledge I am the inventor of the claim.

24. In the following paragraphs, I will establish my inventorship beyond doubt by highlighting some details of the content of my work on Aroma Technology and Delivery System project at defendant's facility and by highlighting the timeline of my work at PepsiCo's Research and Development facility in New York which in combination will show that Naijie Zhang cannot correctly be designated Inventor of the claim and that Peter Given might not also qualify as Inventor.

**AROMA TECHNOLOGY PROJECT REPORTS AND DOCUMENTS ESTABLISHING MY INVENTORSHIP IN THE CONTEXT OF USING MOISTURE RESISTANT FILM/ENCAPSULATE FOR APPLICATION IN AROMA TECHNOLOGY**

25. On or the third week of July 2008, upon meeting with Peggy Havekotte and Dr. Covarrubias and upon being informed of what PepsiCo Inc. was trying to achieve in Aroma Technology and of the technological approach that they were

attempting to follow at that time, and on the sole basis of my personal abilities, talents, skills and insights, I prepared a proposal within the week following the meeting and I submitted it to Defendant. The proposal contained details on how I intended to go about assessing whether PepsiCo's approach to beverage/food Aroma Technology was commercially viable. A draft of my proposal and vision for the assessment is contained in Defendant's discovery document PC 1176 to PC 1181 attached to this affidavit as APPENDIX III.

26. Upon meeting with Peggy Havekotte and Dr. Covarrubias and upon being informed of what PepsiCo was trying to achieve in Aroma Technology and of the technological approach that they were following at that time, and within the first week after that meeting, I made a unique insightful assessment that the company needed to consider allowing me to include humidity aka moisture in my evaluation plan even though its scientists had not thought about it before nor did they have any capability or knowledge at the time about how to test for the effects of humidity. My request was granted and I included humidity/moisture in my study plan. Therefore within the Defendant's organization I was the first person to ideate and to actively go about investigating humidity/moisture in relationship to Aroma Technology Delivery System.

27. Appendix III is a set of document marked as PC 1176 to PC 1181 and was provided by Defendant during discovery and it shows one of the early versions of my work proposal in which I included humidity in my plan. Although the document is titled "Draft Proposal", I recognize it to be consistent with my work. The final version of the proposal has not been provided to me by Defendant. But

it can be clearly seen in the draft that humidity aka moisture was included in my work plan and was explicitly highlighted in the following subtitles: 1) Influence of Temperature, Light, and Relative humidity on the Stability of Application Encapsulate - Experimental Design and Data Collection. 2) Influence Of Application Flavor Encapsulate On The Perception Of Pepsi's Beverage During Stability Studies – Effect Of Temperature, Lighting And Humidity.

28. At the time I started work on Aroma Technology Delivery System project, defendant and its scientists had in place the capability and the technology and the know-how to test for the influence of Lighting, and Temperature, but they had no knowledge about the technology and the know-how of testing for humidity/moisture, nor did defendant's scientists even suspect that moisture would be a factor in the intended aroma application.

29. I designed my insightful work approach on the basis of my experience and personal understanding of dry systems and on the basis of my knowledge of the possibility that they might react with environmental moisture and humidity. To the best of my knowledge, none of defendant's project scientists I spoke to seemed to have articulated ideas or done work toward my insight before me on the intended application.

30. APPENDIX IV is a set of document marked PC 1189 to PC 1192 showing example of some preliminary literature and information I collected concerning designing a humidity assessment system for the project. You can see on Document PC 1191 that I focused on a number of compounds that are known in the literature to be used to artificially create specific relative humidity. I selected

those compounds and requested of my supervisor, Peggy Havekotte, to buy them
for the first time for the project. Along with those compounds I requested a
number of glass dessicators in which I would put a saturated solution of one of the
compounds to artificially create a certain level of relative humidity. I also made a
video that clearly shows some of the dessicators that I placed at different locations
in Defendant's Research and Development facility and at different temperatures
in order to create combinations of possibilities according to my study plan.

31. APPENDIX V is a set of document marked PC 1198 to PC 1201 showing
example of some of the sensory evaluation ballots that I designed for gathering
panelists data during the study on the effects of relative humidity.

32. APPENDIX VI is a set of document marked PC 1215 showing the picture of a
more advanced evaluation system that was named Arometer, that I designed and
have built, in which I could artificially create an atmosphere with a given
humidity and pressure in the context of Aroma Technology Delivery System.
Defendant included the Arometer in its senior management document and
subtitled it " A Novel Performance Measurement Approach." The fact that
Defendant used the expression "A Novel Performance Measurement Approach"
to describe the Arometer that I conceptualized, designed and have built is a clear
acknowledgement that Defendant did not have such know-how or capabilities in
house prior to my work.

33. APPENDIX VII is a set of document marked document PC 1464 to 1466 and is
an early version of a report of my work and findings on the effect of
humidity/moisture. In that early version of my Project Report # S3438, I reported

on the: "Influence Of Relative Humidity On The Stability And Shelf Life Of Dry Encapsulate Coatings". I reported for the first time within the PepsiCo Organization that Humidity was going to be a major factor for the stability of Application aroma encapsulate, even more so than what PepsiCo scientists had initially thought concerning Temperature and Lighting, the two factors of which that they had traditionally measured the effects.

34. An updated Project Report # S3438 dated 01/16/2009 and titled "Influence Of Relative Humidity On The Stability And Shelf Life Of Dry Encapsulate Coatings" is shown on discovery document PC 1545 to PC 1551 being marked in the conclusion as "still incomplete" because I considered my work in the specific field to be a work in progress. However it already provides more specific details about my work and findings and the findings themselves already suggested that further work would be needed toward moisture resistant delivery systems and I did not need Naijie Zhang who knew nothing about my work to come to tell me this logical step in the progress of my work. The document is attached in APPENDIX VIII. My laboratory notebooks, all of which are in the possession of PepsiCo Inc., would provide even more details about the work that was captured in the project reports mentioned above. Unfortunately PepsiCo has not provided any copy of my laboratory notebooks during discovery.

35. It should be clear from the information above alone, even in the absence of my laboratory notebooks, that I am the person who first conceptualized and developed the idea of humidity and moisture in the context of Aroma Technology Delivery System and at the time I started that line of development about humidity

and moisture for application encapsulate, Naijie Zhang was not with PepsiCo Inc. nor was I reporting to Peter Given. Therefore none of them had any input into my intellectual work and cannot legitimately claim to be co-inventor with me of my ideas, work, and innovations. In the following paragraphs I will show how this statement is relevant to the inventor designation on United States Patent Publication US 2012/0006909 A1 on which Naijie Zhang and Peter Given wrongfully and unlawfully posed as inventors with the support and under the direction of PepsiCo Inc.

36. One of the direct implications of my findings during my work on humidity/moisture was that I re-oriented the Aroma Technology Delivery System project toward looking for better technologies to address the humidity and moisture challenges that I discovered. At the time I thought that the solution could either be already commercially available from an external source or that I would have to design solutions using my knowledge of moisture resistant materials in Food Science. One of the solution approaches I was exploring came to be referred to in scientific jargon as "Double Coating Technology", which consisted of layering moisture resistant and food grade films to create resistant and impermeable barrier to moisture thereby providing protection to entrapped flavor molecules inside the layers and hindering their escape in high humidity environment. Around the same time that I actively involved in developing my "double coating technology" to solve humidity and moisture issues with application encapsulate, Defendant decided to transfer the supervision of my work to Peter Given's laboratory, to whom I addressed report # 900441 dated

04/27/2009. The said report is attached in APPENDIX IX and was marked as discovery document PC 1572 to PC 1573 with the stated objective being "To Assess The Performance Of Corn Zein And Ethyl Cellulose As Potential Moisture Barrier on Zein-Walled Flavor Encapsulate At High Relative Humidity." And at that time, I had no involvement with Naijie Zhang nor did I know him.

37. The findings of my work on the effect of moisture on flavor coatings were well reported at the senior management level within the company as can be seen in discovery document PC 1616 attached as APPENDIX X.

38. The development ideas originating from my work on the effects of moisture were well reported at the senior Management level as can be seen in discovery document PC 1617 in APPENDIX XI and was part of a document that looks like a report prepared for the senior management. The same document which is subtitled "Action Plan 2009", specifically cited "moisture protective film for existing encapsulation/resistant encapsulation" as one of the Aroma Technology Delivery System approaches being considered and worked on. All these were known from my work when Naijie Zhang was not an employee of PepsiCo and although Peter Given might have learned of my inventions during management meetings, he had no input into my work.

39. Documents PC 1616 to PC 1617 appear to be pages of 2009 Aroma Review, presumably a report for or by the senior management of PepsiCo Inc. The report was dated March 5th, 2009, and at that time Naijie Zhang had not joined the company yet, therefore he could not be the inventor of the idea of moisture protective films for aroma delivery application of the type that could be used to

resolve the challenges I was able to demonstrate through my work. Even though Peter Given had been with the company for a long while by then, it is only through the report of my work that the knowledge of the need for water resistant systems for this type of application came to light. Furthermore, by the time that the company decided to change the supervisory line of my work, I had already started work on moisture resistant coatings and systems and I was actively involved in sourcing and screening food Grade materials that might have the desired functionality of water resistance needed for this type of application. Therefore Peter Given would at best be considered a contributor to be acknowledged and not an inventor as claimed.

40. APPENDIX XII is a document marked PC 1368 taken from PepsiCo senior management document and does not list Naijie Zhang as a contributor in the Aroma Technology Delivery System project either before or as of March 5th, 2009. The document clearly stated that I was the person responsible of "Functionality." Therefore my work was instrumental to literally set the scientific direction to follow and the innovations needed. Clearly Naijie Zhang could not have conceptualized for PepsiCo that moisture resistant coatings and systems were needed when he was working for the International Flavors and Fragrances, and had no dealing with PepsiCo Inc.

41. My first traceable scientific interaction with Naijie Zhang appeared during a meeting and is documented on a meeting minute of May 15th, 2009, shortly after he joined PepsiCo as can be seen in APPENDIX XIII, a discovery document marked PC 0158 to PC 0159. The meeting itself was, to the best of my

recollection, the official introduction of Naijie Zhang as the new Principal Scientist that I was going to be working with on the Aroma Technology Delivery System project, and it was an opportunity for me to officially meet with Naijie Zhang in the context of the project and to share with the participants all the findings of my work and to coordinate efforts for future work. As can be seen on the meeting minutes, it highlighted the issue of humidity and cited water resistance as requirement for potential solutions, and these issues and requirements were all already known from my ongoing work long before he joined the company and I am the person who articulated them. In addition it cited the use of a protective film as one of the approach, an approach that I was already working on at the time and had already issued a report on some of that work on 04/27/2009 as shown above. It is not clear to me on which specific date Naijie Zhang started working for PepsiCo but it would have been around the first week of May 2009, long after I started my work on moisture resistant films and coatings for aroma technology delivery system. Therefore Naijie Zhang is not an inventor of the concept of using moisture resistant coatings and films for this aroma technology application. I am the inventor.

42. United States Patent Publication US 2012/0006909 A1 clearly states that moisture resistant coatings is the field of invention, therefore the moisture resistance is a key feature of the disclosure. And you can now see on the basis of this review of project documents and reports that it is my work that first brought to light and made the case for the need for moisture resistant systems in the intended aroma delivery system, and further more I put forth ideas to solve the challenge and

actively did work toward using moisture resistant coatings/films. I used the best of my intellectual capability, knowledge, logic, and skills in the field to solve a challenge that I knew would be of commercial value to PepsiCo, having already being informed that PepsiCo would determine the freedom to operate and might pursue either a patent or a trade secret if my work was found worthy, something I thought would be good for me and for PepsiCo either way, should my work prove that level of recognition and visibility in the company because that type of recognition consistently comes with promotions and benefits and bonuses. To the best of my knowledge inventorship/authorship in this type of work is not arbitrarily transferable and I never suspected that PepsiCo would behave in such an unlawful way as removing my name from the invention disclosure of my work, unfortunately that it is what occurred. I expected that when my work prove to be worthy of an invention disclosure, I will be recognized accordingly and be rewarded for it as is the case in most of the industry.

43. The scope of my invention and innovations on Aroma Technology project was global, for application in Food and Beverage aroma as clearly stated in discovery document PC 1603 in APPENDIX XIV and this are the applications being claimed in the United States Patent Publication US 2012/0006909 A1.

**E-MAIL COMMUNICATIONS SUPPORTING AND ESTABLISHING MY INVENTORSHIP CLAIM IN THE CONTEXT OF USING MOISTURERESISTANT FILM/ENCAPSULATE FOR APPLICATION IN AROMA TECHNOLOGY**

44. Following the introductory meeting of May 15th, 2009, I continued to provide Naijie Zhang with training about all the methods and techniques and technologies I had developed and implemented for Aroma Technology Delivery System project and had long been using in all my work including work related to humidity and moisture resistant encapsulates, films and coatings etc... I discovered during training that Naijie Zhang did not have knowledge of how to create a control humidity environment and I provided him extensive training and practical skills and concepts. APPENDIX XV an e-mail communication between Zhang and myself on July 1st 2009 (PC 2235 to 2239), in which I summarized what I taught Dr. Zhang and highlighted the recommendations I set for "new encapsulates." As of July 1st, 2009, Naijie Zhang was still learning and gathering information about Aroma Technology project although he had been appointed technical lead, but until that point he had no work nor had he contributed any intellect effort toward my work on moisture resistant aroma encapsulation and delivery systems. Therefore it should be clear that Dr. Zhang could not possibly have conceptualized the notion of moisture resistant film/coatings for application encapsulate when he did not even have knowledge of how to create controlled humidity environment and when I was the person who trained him. It appeared very obvious to me that he did not have previous experience in creating controlled humidity.

45. While I was training Dr. Zhang, I continued in the meantime to conduct my work on moisture resistant films and resistance encapsulation and was screening a

number of food grade materials before I was officially asked to work directly with Dr. Zhang on a day to day basis and to help him also in all his work as needed.

46. APPENDIX XVI is a discovery document marked PC 2050 to PC 2069 and is a string of e-mail in which I was reporting on the performance of Zein based film from the University of Illinois, in high moisture environment. The evaluation was done using the methods I had developed earlier both in dessicator and the Arometer in combination with sensory analysis, all of which neither Dr. Zhang nor Dr. Given contributed any intellectual property.

47. APPENDIX XVII is a discovery document marked PC 2070 and is about a meeting that Dr. Given called to review the methods that I had developed as early as in 2008. Since none of them were involved in the development of my methods I still had to teach them and you can see clearly that he used the expression "Double coating" which referred to the technology I was developing both internally and in collaboration with external sources. I developed methods combining sensory evaluation with instrumental analysis such as Gaz Chromatograhy, Arometer etc...

48. APPENDIX XVIII is a discovery document marked PC 2142 to 2144 and is an e-mail in which I reported my work with using aqueous shellac as a protective film for flavor in high humidity/moisture environment. It was addressed to Peter Given with Cc to others including Naijie Zhang. The subject of the e-mail was: "Aqueous Shellac As Humidity Protective Coating Of Lemon 5X Flavor Encapsulate."

49. APPENDIX XIX is a discovery document marked as PC 2156 and is an e-mail communication in which I reported on the "Influence Of Relative Humidity On The Stability Of Gelatin Based L5X Encapsulate." This was my work, and I did it by myself.

50. APPENDIX XX is a discovery document marked PC 2164 – 2165 in which Dr. Zhang aka Ned acknowledged that I did the work on the effects of humidity, and the string of e-mail also shows that other people who were aware of my work also acknowledged that I did the work even as early as 2008, long time before Zhang was even ever interviewed by PepsiCo.

51. APPENDIX XXI is a discovery document marked as PC 2167, in which Zhang acknowledged my work on "double coating" also document PC 2197 provides additional evidence.

52. APPENDIX XXII is a discovery document marked as PC 2177 in which Peter Given acknowledged my work on edible coatings on July 27, 2009. In response I clearly articulated my thoughts on the technology.

53. Appendix XXIII is a discovery document marked PC 2183 in which an external source named Rashmi was contacted with report of my findings on humidity/moisture in relationship to Aroma Technology Delivery System.

54. APPENDIX XXIV is a discovery document marked PC 2192 in which Zhang was said to be still in training even as of July 21st, 2009.

55. Appendix XXV is a discovery document marked PC 2231 to PC 2234, an e-mail string in which I had questions concerning the University of Illinois work and I

emphasized the "double coating" approach that I have been successfully developing.

56. Appendix XXVI is a discovery document marked PC 2235 and is E-mail communication summarizing what I taught Dr. Zhang and the directives I set for the future and is dated July 1st 2009.

57. APPENDIX XXVII is a discovery document marked as PC 1165 to PC 1667 and it shows the electron microscopy pictures of releasably entrapped/encapsulated flavor molecules that I exposed to high humidity environment and submitted to PepsiCo forensic for characterization and we were able to clearly observe the damages that were done on the releasable entrapped/encapsulated film structure when they were exposed at high humidity.

58. APPENDIX XXVIII is discovery document PC 1668 to PC 1669, and PC 1647, showing electron microscopy picture of releasably entrapped/encapsulated flavor system that were exposed to low relative humidity without suffering any structural damages. A copy of the electron microscopy picture of intact releasably entrapped flavor system was included in the March 5th, 2009, Aroma Technology Review, on page 18 which has been marked PC 1647, on the same page as a chromatogram that I also obtained during instrumental analysis by gas chromatography. I conceptualized all this by myself and did all this work long before Naijie Zhang came to work for PepsiCo Inc.

59. APPENDIX XXIX is the report that PepsiCo electron microscopy technician issued for the analysis of releasable entrapped aroma delivery systems that I kept under different relative humidity conditions and submitted for characterization to

PepsiCo's forensic laboratory. You can see clearly on the report that the report was issued on 2-Dec-2008, six months before Naijie Zhang joined PepsiCo Inc. Therefore Naijie Zhang could not have been inventor of the idea of using moisture resistant aroma delivery systems for PepsiCo's application. I am the inventor, I designed and did the work that uncovered the need for water resistant aroma delivery systems, and I did work toward solving the need by using food grade coatings and films.

60. APPENDIX XXX are discovery documents marked as PC 1675 to PC 1698 and are copies of some of the literature material that I researched and reviewed when I was developing my idea and work on "double coating and moisture resistant" films and encapsulation/entrapment. Of course I started gathering this literature long time before Naijie Zhang ever joined PepsiCo Inc.

61. APPENDIX XXXI are discovery documents marked PC 1699 to PC 1718, and showed examples of some flavor molecules that I looked up on the internet for their physico-chemical properties and behavior in the context of aroma entrapment and moisture resistance coatings, films, and encapsulation for Aroma Technology project. I designed and initiated this line of work and development when I did not know Naijie Zhang and several months before he joined PepsiCo Inc.

62. This review of the limited number of project documents and of some e-mails that became available to me during discovery of the ongoing litigation seems to be largely sufficient to make my point that Naijie Zhang does not qualify to be an

inventor on the United States Publication US 2012/0006909 A1, and that Peter Given will have to provide solid proof of his inventor designation before it can hold. None of them conceptualized the idea of moisture resistant film/coating for Aroma Technology Delivery System, at least not before me, nor did they do anything new from the work that I was doing when my the supervision of my work was transferred to Peter Given's laboratory around April 2009. PepsiCo has refused to produce copies of my laboratory notebooks which altogether would have shown with very many details the amount of work, the dates, and on the logic of reasoning in my inventions and work on Aroma Technology Delivery System which had produced the invention disclosure wrongfully credited by PepsiCo Inc. to Naijie Zhang and Peter Given as can be seen in the United States patent Publication US 2012/0006909 A1.

63. During depositions, my attorney asked Dr. Peter Given some questions about the invention disclosure of my work that they removed my name from. Peter Given mumbled saying that he tried to protect the inventorship of my work within PepsiCo Inc. But unfortunately he failed to inform us that they had actually removed my name and actually filed and applied for a United States Patent. I had to do an extensive research before I finally found the uncontestable evidence of the shameful thing what they did, the United States Patent Publication No. US 2012/0006909 A1 wrongfully credited to Naijie Zhang and Peter Given, all of which is my ideas, my concepts, my invention, and my work.

## CONCLUSION

64. PepsiCo Inc, Naijie Zhang, and Peter Given have willful and deliberately infringed on my patent invention disclosure rights. PepsiCo Inc, Naijie Zhang and Peter Given have willful and deliberately violated the United States patent and invention disclosure laws beginning with removing my name from the invention disclosure of my work, and presumably making false statements under oath to pose as inventors of my ideas and work when they knew well that they had removed my name from the invention disclosure of my work and that they were not the inventors. The order to remove my name from the invention disclosure was initiated at very high level senior management within PepsiCo by Valerie Jacklyn who was then VP in the R&D. Those whose names were fraudulently put on the invention disclosure of my ideas and work also took part in my wrongful termination and have since been given promotions, salary raises, bonuses, stock options, and many more benefits. For example Dr. Given was promoted Director from Research Fellow's position. Dr. Naijie Zhang was promoted Senior Principal Scientist from Principal Scientist's position, and Aida Costello was promoted Director from manager's position. Mike Finnerty has also been given higher management authority. In the meantime I have barely been able to secure a Food Scientist position elsewhere when I should be contending for the position of VP of Research and Development had my invention disclosure been filed truthfully. Truly it is known within the industry that an invention with such a global scope and application in big volume consumer products such as foods and beverages is of significant impact on the professional recognition, advancement, and happiness of the inventor, along with financial rewards. I am hereby challenging PepsiCo,

Naijie Zhang, and Dr. Peter Given to prove their inventor and assignee designation on United States Patent Publication US 2012/0006909 A1 within 15 days from receiving this affidavit. And failure on their part to do so in will trigger actions on my part in all relevant and applicable judiciary and enforcement venues in order to protect my intellectual property and recover the damages done to me.

**APPENDIX**

1. APPENDIX I: Defendant Discovery document PC 0301 to PC 0308. E-mail communication to remove my name from invention disclosure of my work.
2. APPENDIX II: A copy of the United States Patent Publication No. US 2012/0006909 A1. Zhang et al.
3. APPENDIX III: Defendant's discovery document PC 1176 to PC 1181. My work Proposal.
4. APPENDIX IV: Defendant discovery document PC 1189 to PC 1192. Example of some preliminary literature and information on creating controlled humidity environment.
5. APPENDIX V: Defendant discovery document PC 1198 to PC 1201. Examples of some of my sensory evaluation ballots for humidity treatment related sensory evaluated.
6. APPENDIX VI: Defendant discovery document PC 1215. Picture a more advanced evaluation system that I designed which was named Arometer.
7. APPENDIX VII: Defendant discovery document PC 1464 to 1466. An early version of a report of my work and findings on the effect of humidity/moisture on Aroma Technology Delivery Systems.
8. APPENDIX VIII: Defendant discovery document PC 1545 to PC 1551: Project Report # S3438 dated 01/16/2009 and titled "Influence of Relative humidity on the stability and shelf life of dry encapsulate coatings"

9. APPENDIX IX: Discovery document PC 1572 to PC 1573, Report # 900441: The Performance Of Corn Zein And Ethyl Cellulose As Potential Moisture Barrier on Zein-Walled Flavor Encapsulate At High Relative Humidity.

10. APPENDIX X: Discovery document PC 1616. Report of my findings included in PepsiCo Senior management review.

11. APPENDIX XI: Discovery document PC 1617. Statement of ideas for further development work in the context of moisture resistant systems.

12. APPENDIX XII: Discovery document PC 1368. Taken from PepsiCo senior management document and does not list Naijie Zhang as a contributor in the Aroma Technology Delivery System project either before or as of March 5th, 2009.

13. APPENDIX XIII: Discovery document marked PC 0158 to PC 0159. Meeting minutes of May 15th, 2009, shortly after Naijie Zhang joined PepsiCo.

14. APPENDIX XIV: Discovery document PC 1603. The scope of my inventions and innovations on Aroma Technology project was global, for application in Food and Beverage aroma as clearly stated.

15. APPENDIX XV: Document PC 2235 to 2239. An e-mail communication between Zhang and myself on July 1st, 2009, summarizing what I taught Dr. Zhang.

16. APPENDIX XVI: Discovery document PC 2050 to PC 2069. A a string of e-mail in which I was reporting on the performance of Zein based aroma film from the University of Illinois in high moisture environment.

17. APPENDIX XVII: Discovery document PC 2070. E-mail about a meeting that Dr. Given called to review the methods that I had developed.

18. APPENDIX XVIII: Discovery document PC 2142 to 2144. An e-mail report on the use of "Aqueous Shellac As Humidity Protective Coating Of Lemon 5X Flavor Encapsulate."
19. APPENDIX XIX: Discovery document PC 2156. An e-mail communication in which I reported on the "Influence Of Relative Humidity On The Stability Of Gelatin Based L5X Encapsulate."
20. APPENDIX XX: Discovery document PC 2164 – PC 2165. An e-mail in which Dr. Zhang aka Ned acknowledged that I did the work on the effects of humidity. The same string of e-mail also shows that other people who were aware of my work also acknowledged that I did the work even as early as 2008, long time before Zhang was even ever interviewed by PepsiCo.
21. APPENDIX XXI: Discovery document marked as PC 2167 and PC 2197. E-mail in which Zhang acknowledged my work on "double coating."
22. APPENDIX XXII: Discovery document marked as PC 2177 in which Peter Given acknowledged my work on edible coatings on July 27, 2009. In response I articulated my thoughts on the technology.
23. Appendix XXIII: Discovery document PC 2183 in which an external source named Rashmi was contacted with report of my findings on humidity/moisture in relation to Aroma Technology Delivery System.
24. APPENDIX XXIV: Discovery document PC 2192. E-mail in which Zhang was said to be still in training even as of July 21st, 2009.
25. APPENDIX XXV: Discovery document PC 2231 to PC 2234. An e-mail string in which I had questions concerning the University of Illinois' aroma film work and

while emphasizing the "double coating" approach that I have been successfully developing.

26. APPENDIX XXVI: Discovery document PC 2235. E-mail communication summarizing what I taught Naijie Zhang and the recommendations I issued for the future.

27. APPENDIX XXVII: Discovery document marked as PC 1165 to PC 1667 showing the electron microscopy pictures of releasably entrapped/encapsulated flavor molecules that I exposed to high humidity environment and submitted to PepsiCo forensic laboratory for characterization. We were able to clearly observe the damages that occurred on the releasably entrapped/encapsulated film structures when they were exposed at high humidity.

28. APPENDIX XXVIII: Discovery document PC 1668 to PC 1669, and PC 1647, showing electron microscopy picture of releasably entrapped/encapsulated flavor/aroma system that were exposed to low relative humidity without suffering any structural damages.

29. APPENDIX XXIX: The final report that PepsiCo electron microscopy technician issued for the analysis of releasable entrapped aroma delivery systems that I kept under different relative humidity conditions and gave to Dr. Covarrubias for formal submission to PepsiCo's forensic laboratory. You can see clearly on the report that the report was issued on 2-Dec-2008, six months before Naijie Zhang PepsiCo.

30. APPENDIX XXX: Discovery documents marked as PC 1675 to 1698 are copies of some of the literature material that I researched and reviewed when I was

developing my idea and work on "double coating and moisture resistant" films and encapsulation/entrapment.

31. APPENDIX XXXI: Discovery documents marked PC 1699 to PC 1718, showing examples of some flavor molecules that I looked up on the internet for their physic-chemical properties and behavior in the context of aroma entrapment and moisture resistance coatings, films, and encapsulation for Aroma Technology project.

Ricky Kamdem-Ouaffo, PhD

Sworn to before me on this 18th Day of August, 2012

Notary Public

MICHELLE AYRES
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires October 22, 2012

# APPENDIX I

Defendant Discovery document PC 0301 to PC 0308. E-mail communication to remove

my name from invention disclosure of my work.

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Pepsi Portal [mailto:pepsi@bannerwitcoff.com]
**Sent:** Wednesday, September 16, 2009 10:53 AM
**To:** Jacklin, Valerie {PCNA}
**Cc:** Zhang, Naijie {PCNA}; Given, Peter {PCNA}; Finnerty, Mike {PCNA}; Sloane, Carolyn {Quaker}; Long, Sandy {Quaker}; Banner & Witcoff; Finnerty, Mike {PCNA}; Banner & Witcoff
**Subject:** Disclosure Submission Update

A new Invention Disclosure with request for patent application and/or freedom to practice opinion has been submitted for your review and approval on the PepsiCo Portal at Banner & Witcoff Ltd. Please review the Invention Disclosure and provide your approval to proceed.

Additional information and a copy of the completed Invention Disclosure can be accessed via the following link:

https://portal.bannerwitcoff.com/Pepsiworkflow/Default.aspx?StartApp=Disclosures&disclosure_id=692

When you access the Invention Disclosure, buttons are provided at the bottom of the form for you to indicate your approval. Please note that if this is a Big Bets or Project Phoenix matter, all charges will be billed directly to your account.

To access the portal, direct your browser to https://portal.bannerwitcoff.com/pepsico

**PLEASE NOTE:** To request access, send an email to pepsi@bannerwitcoff.com with 'Password Request' in the subject line and your password preference specified in the body. Once your password has been set up, a confirmation e-mail will be sent to you.

Please feel free to contact Kerri Richardson, PepsiCo Patent Administrator at Banner & Witcoff, Ltd. (312.463.5000), with any questions about this automated message.

Carolyn - any rules on contract employees being inventors of Pepsi IP?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Jacklin, Valerie {PCNA}
**Sent:** Wednesday, September 16, 2009 10:57 AM
**To:** Given, Peter {PCNA}
**Cc:** Finnerty, Mike {PCNA}
**Subject:** RE: Disclosure Submission Update

much better
thanks, I just approved
not sure we want Ricky on the invention list....do we have criteria for temps/consultants?

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 10:54 AM
**To:** Jacklin, Valerie {PCNA}
**Cc:** Zhang, Naijie {PCNA}; Finnerty, Mike {PCNA}; Sloane, Carolyn {Quaker}; Long, Sandy {Quaker}; Banner & Witcoff; Finnerty, Mike {PCNA}; Banner & Witcoff
**Subject:** RE: Disclosure Submission Update

Valerie - I have worked with Ned to clean up the content and address your comments on the first draft - let us know if this is clear.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

Case: 16-1668 Document: 28-1 Page: 331 Filed: 04/26/2016

(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 2:33 PM
**To:** Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

We still need an MCA if he is an independent consultant or working through his own consulting firm. We don't need an MCA if he is a Kelly Temporary employee.

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 1:31 PM
**To:** Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

He's a contract employee (temp) - not an outside research firm.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 12:30 PM
**To:** Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

Yes we need an MCA and SOW in place wherein it is stated that consultant grants Pepsi the IP ownership. If there is no MCA in place we should get one in place and to cover prior work let's get a patent assignment in place from the inventor to Pepsi as soon as possible. Who is the consultant?

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 10:06 AM
**To:** Sloane, Carolyn {Quaker}
**Subject:** FW: Disclosure Submission Update

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 5:17 PM
**To:** Zhang, Naijie {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Thanks for clarifying.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Zhang, Naijie {PCNA}
**Sent:** Wednesday, September 16, 2009 3:37 PM
**To:** Given, Peter {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Ricky kamdem is not inventor. He is just involved in the project.

Ned

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 3:00 PM
**To:** Sloane, Carolyn {Quaker}
**Cc:** Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

He's the equivalent of a Kelly Temp - we use ProcureStaff... same thing.

But the original question - are there any rules / guidelines about including temps as "inventors" on PepsiCo patents?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 5:16 PM
**To:** Sloane, Carolyn {Quaker}; Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

Another hitch - his contract is terminating Oct 5, and he'll be informed this week.... more drama! Please do not distribute this info, but may impact our decision on inventorship

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Sloane, Carolyn {Quaker}
**Sent:** Wednesday, September 16, 2009 3:41 PM
**To:** Zhang, Naijie {PCNA}; Given, Peter {PCNA}
**Subject:** RE: Disclosure Submission Update

Hi Ned. We wait to make determinations of inventorship until the final claims are drafted. Outside counsel will discuss this issue with you at that time. Thank you.

---

**From:** Zhang, Naijie {PCNA}
**Sent:** Wednesday, September 16, 2009 2:37 PM
**To:** Given, Peter {PCNA}; Sloane, Carolyn {Quaker}
**Subject:** RE: Disclosure Submission Update

Ricky kamdem is not inventor. He is just involved in the project.

Ned

---

**From:** Given, Peter {PCNA}
**Sent:** Wednesday, September 16, 2009 3:00 PM
**To:** Sloane, Carolyn {Quaker}
**Cc:** Zhang, Naijie {PCNA}
**Subject:** RE: Disclosure Submission Update

He's the equivalent of a Kelly Temp - we use ProcureStaff... same thing.

But the original question - are there any rules / guidelines about including temps as "inventors" on PepsiCo patents?

His home address & phone number is given as:
Ricky Kamdem Ouaffo
10 Dennis Street #135
New Brunswick, NJ 08901

Ph: 848 228 0745 (Cell)

Ricky has Permanent Resident Card.

Please fell free to ask me, if you need any more details from our end.

Thanks and Regards
**Anil Puthenchira**
Sr. Director - Operations

SUBEX

**Subex Technologies Inc**
255 Old New Brunswick Road, Suite S240
Piscataway, NJ 08854 USA

He is an employee of Subex Technologies as listed above

Thanks and best regards,

Deb

**Debra Logan Relationship Manager**
**PepsiCO MSP**
**1Pepsi Way,Somers NY10589**
**Debra.Logan@pbsg.com**
**914-767-6663**
**Fax 914-767-6629**

---

**From:** Skwira, Theresa {Quaker}
**Sent:** Friday, September 18, 2009 2:22 PM
**To:** Logan, Debra {PBSG}
**Subject:** RE: Info. Needed

Thank you! I sincerely appreciate your assistance!

*Theresa Skwira*
555 W. Monroe Street | MC 11-12 | Chicago, Illinois 60661
☎ 312-821-2327 | 312-821-1869 | ✉ theresa_skwira@quakeroats.com



**From:** Given, Peter {PCNA}
**Sent:** Monday, September 21, 2009 11:48 AM
**To:** Logan, Debra {PBSG}
**Subject:** RE: Info. Needed

Turns out, he is not an inventor, so we don't really need to go down that path. All the questions confused the heck out of Ricky, particularly as they came AFTER I notified him that the contract was expiring on 10/5/09

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

**From:** Logan, Debra {PBSG}
**Sent:** Monday, September 21, 2009 11:31 AM
**To:** Given, Peter {PCNA}
**Subject:** FW: Info. Needed

Hello,
I received a request for information for Ricky Kamden on Friday fron HR in Chicago as they said they needed it for patent information.

We had his supplier reach out to him and provide the information

That is all we know . See email string below.

Deb

**Debra Logan Relationship Manager**
**PepsiCO MSP**
**1Pepsi Way,Somers NY10589**
**Debra.Logan@pbsg.com**
**914-767-6663**
**Fax 914-767-6629**

---

**From:** Logan, Debra {PBSG}
**Sent:** Friday, September 18, 2009 2:57 PM
**To:** Skwira, Theresa {Quaker}
**Subject:** RE: Info. Needed

# APPENDIX II

A copy of the United States Patent Publication No. US 2012/0006909 A1. Zhang et

al.

US 20120006909A1

(19) United States
(12) Patent Application Publication
(10) Pub. No.: US 2012/0006909 A1
(43) Pub. Date: Jan. 12, 2012

ZHANG et al.

(54) RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

(75) Inventors: NAIJIE ZHANG, Ridgefield, CT (US); Peter Given, Ridgefield, CT (US)

(73) Assignee: PepsiCo, Inc., Purchase, NY (US)

(21) Appl. No.: 12/831,683

(22) Filed: Jul. 7, 2010

Publication Classification

(51) Int. Cl.
*A61L 9/04* (2006.01)
*A61K 8/11* (2006.01)

(52) U.S. Cl. .............................................. 239/34; 512/4

(57) ABSTRACT

An aroma delivery system comprising aroma compound entrapped in a polymeric matrix.





FIG. 1A



FIG. 1B



FIG. 1C



FIG. 2A



FIG. 2B



FIG. 2C

# RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX

## FIELD OF THE INVENTION

[0001] The invention relates to an aroma delivery system. In particular, the invention relates to a water-resistant aroma delivery system comprising entrapped polar, non-polar, and volatile aroma compounds.

## BACKGROUND OF THE INVENTION

[0002] Consumers evaluate many products by the aroma emitted from the product or the container in which the product is made available. Both edible and inedible products are evaluated in the way. Edible products such as juices and coffee are expected to have a fresh aroma that replicates or evokes memory of the expected flavor of the product. Inedible consumer products such as personal care products also are evaluated by the aroma. For example, consumers seek mouthwashes that provide a 'fresh' aroma and deodorants, for example, that provide a selected effect, such as 'fresh' or 'sport'. Also, laundry detergents and fabric softeners also may provide such an effect.

[0003] Consumer satisfaction with edible products often rests on the aroma perceived when a package is first opened. For example, a consumer expects a strong aroma of coffee when a package is opened, whether the package is opened for the first time and is full, or has been opened before and is not full. Typically, the intensity of the aroma decreases as a container is emptied of product. However, consumers prefer to perceive a characteristic odor each time the package is opened.

[0004] The food industry, and particularly the beverage segment of that industry, is highly competitive. Manufacturers take great care and make substantial efforts to formulate their products for quality, to differentiate their products from one another, and to make consumption of a given beverage more enjoyable for their consumers.

[0005] An important contribution to the overall beverage experience is the taste of the beverage. Consumers' judgments about taste often are influenced by a beverage's aroma. When a beverage container is first opened and the beverage is poured or consumed from a container, the consumer perceives the aroma of the beverage. Because a beverage's ingredients usually determine its aroma, those ingredients are selected to provide a pleasant aroma, as well as the desired taste characteristics.

[0006] Although aroma can have a tremendous impact on the sensation of flavor, it often is difficult to make use of this phenomenon without modifying the ingredients to include aromatic compounds. However, such compounds often adversely affect the taste of the beverage. Therefore, packagers have attempted to design containers that, for example, release an aromatic substance when the container is opened.

[0007] Packaging for edible products that release aroma is subject to limitations, including inability to retain the aroma for the life of the package or to design a secure package. For example, aroma delivery systems often preclude incorporation of tamper-resistant features, add significant expense to typical container cost, and do not resist conditions in the retail and consumers' environments that degrade the packaging.

[0008] Similarly, other consumer products require adequate aroma release. For example, because the aroma of the product is a significant factor used by consumers when selecting personal care products, consumers commonly attempt to open personal care products to smell the fragrance of the product before deciding to purchase. The quality or impression created often leads to an immediate decision on whether to purchase a product.

[0009] However, aroma released from the product typically is the sole source of fragrance experienced by the consumer when opening the cap. The aroma of a product often is not revealed when the consumer opens the container because the orifice through which a product is dispensed is small, or a safety film is used under the cap to protect the integrity of the product. Additionally, it often is difficult to deliver adequate aroma that comes from the beverage itself, and not from the container, to the headspace of a container.

[0010] Therefore, overwraps that release aroma and strips on the outside of the container that release aroma, also known as 'scratch and sniff' strips, have been used to deliver aroma. Overwraps, once breached, may present an unsatisfactory appearance to the consumer. Also, a breached overwrap typically is not effective in retaining an aroma.

[0011] Repeated use of 'scratch-and-sniff' devices results in decreased efficacy. Also, consumers often do not have confidence that these and other devices accurately portray the aroma of the product. Therefore, consumers tend to open the cap to determine the actual aroma. Also, devices placed on the outside of packages are also not adequate for a consumer who expects to perceive the aroma when the container is opened and that the aroma emanate from the vicinity of the product in the container, and not from the outside of the container.

[0012] Typically, these devices are more suitable for inedible items for which the consumer seeks to evaluate a fragrance. Solutions that are suitable for inedible items often are not suitable for edible items, however. In particular, opening the cap cannot reasonably be used to evaluate edible products. Similarly, open overwrap presents a shopworn appearance and will cause a consumer to question the safety or quality of a product.

[0013] Providing aroma in a headspace inside a container also does not been satisfactory. Previous attempts to provide closures that release aroma into the headspace have resulted in cumbersome, costly, and aesthetically unattractive executions while failing to meet the needs of either manufacturers or consumers. Additionally, many products have little or no headspace in the container. This lack of headspace greatly reduces the opportunities to use such an aroma delivery system.

[0014] Many of these devices and methods rely on microcapsulation technologies, such as gelatin or melamine/formaldehyde microcapsules. However, such devices and methods, and particularly microcapsulation technologies, are suitable only for microcapsulation of non-polar, hydrophobic, or non-volatile aroma material.

[0015] Thus, there exists a need for an aroma delivery system for consumer products of diverse types. In particular, there exists a need form an aroma delivery system for delivery of aroma materials that are polar or hydrophilic, or more volatile than materials that can be microcapsulated.

## BRIEF SUMMARY OF THE INVENTION

[0016] A first embodiment of the invention is directed to an aroma delivery system. Another embodiment of the invention is directed to a water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In

other embodiments of the invention, the polymeric matrix is covered by a secondary protecting film.

[0017] Embodiments of the invention are directed to a water-resistant aroma delivery system for volatile, hydrophobic, and hydrophilic aromas. Embodiments of the invention also are directed to containers comprising the delivery system.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0018] FIG. 1 shows embodiments of the invention on a threaded closure.

[0019] FIG. 2 shows embodiments of the invention on a snap closure.

## DETAILED DESCRIPTION OF THE INVENTION

[0020] A first embodiment of the invention is directed to an aroma delivery system. Another embodiment of the invention is directed to a water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In other embodiments of the invention, the polymeric matrix is covered by a secondary protecting film.

[0021] Embodiments of the invention are directed to a durable, water-resistant aroma delivery system comprising aroma compound entrapped in a polymeric matrix. In embodiments of the invention, the aroma delivery system typically is applied on the outside of a container in the area under the closure of the container. In particular embodiments of the invention, the system is not exposed, but rather is disposed in a protected area under the closure. In other embodiments of the invention, the aroma delivery system is placed in a location in the container that is torn, broken, or abraded when the container is opened.

[0022] Embodiments of the system of the invention are applied in a manner that causes release of aroma compound, and hence the desired aroma, essentially each time the package is opened. In embodiments of the invention, aroma is released when the polymer matrix and the secondary protecting film, if present, are breached or broken and aroma compound in the matrix is exposed to the atmosphere. Thus, embodiments of the invention can be applied to a screw-top container, to a flip-top container, or to any friction-type closure that, upon opening, will breach or break the polymer matrix and the secondary film, if present, expose the aroma compound, and allow release of aroma.

[0023] Certain exemplary embodiments of the beverage package products include ready-to-drink beverages, beverage concentrates, syrups, shelf-stable beverages, refrigerated beverages, frozen beverages, and the like; carbonated and non-carbonated soft drinks, liquid concentrates, fruit juice and fruit juice-flavored drinks, sports drinks, energy drinks, fortified/enhanced water drinks, soy drinks, vegetable drinks, grain-based drinks (e.g., malt beverages), fermented drinks (e.g., yogurt and kefir), coffee beverages, tea beverages, dairy beverages, and mixtures thereof. Beverage package products include bottle, can, and carton products and fountain syrup applications. Embodiments of the invention can be useful for food packages for foods other than beverages including snacks, cakes, cookies, baked goods, fermented food products, yogurt, sour cream, cheese, salsa, ranch dip, fruit sauces, fruit jellies, fruit jams, and fruit preserves.

[0024] Any aroma compound suitably is entrapped in polymeric matrix. The aroma compound typically is selected to provide the aromatic experience expected by the user by

providing an aroma that is representative of and congruent with the product in the container. The polymeric matrix is selected to entrap the aroma compound, protect the aroma compound from degradation and premature or unintended release, yet release aroma when the polymeric matrix is breached or broken.

[0025] The precise aroma used with a product will vary. For example, products that have a manufactured aroma, such as a 'fresh' or 'sport' aroma, likely will have that aroma entrapped for delivery from a delivery system embodiment of the invention. Similarly, edible products typically will have an aroma delivery system that enhances or compliments the natural aroma, such as a coffee aroma, a fresh fruit aroma, or a beverage flavor aroma.

[0026] Any aroma compound that is sufficiently volatile to release an aroma or scent upon exposure to the atmosphere is suitably used in embodiments of the invention. Embodiments of the invention are directed to delivery of aroma compounds that are more volatile than materials that can be delivered by known techniques, such as encapsulation in gelatin or melamine/formaldehyde microcapsules.

[0027] Both polar and non-polar aroma compounds can be entrapped in delivery system embodiments of the invention. Embodiments of the invention are directed to an aroma delivery system in which the aroma compound is polar, hydrophilic, non-polar, hydrophobic, or volatile. The skilled practitioner recognizes that an aroma delivery system capable of delivering polar, hydrophilic, and more volatile compounds also is capable of delivering a non-polar or hydrophobic aroma compound. Other embodiments of the invention are directed to release of aroma from volatile or polar (or hydrophilic) aroma compounds. Still other embodiments of the invention are directed to aroma delivery systems applied to containers used for food and beverage packaging applications. Typically, embodiments are directed to entrapment of volatile polar aroma compounds.

[0028] Suitable aroma compounds include perfumes of any type, including natural perfumes such as, for example, frankincense, and manufactured perfumes. Embodiments of the invention incorporate essential oils, such as valencia, lemon, lime, grapefruit, tangerine, orange, and sandalwood. Suitable aroma compounds also are selected from components of essential oils, such as limonene, citral, furaneol, vanillin, and other terpenes, sesquiterpenes, diterpenes, and oxygenated forms of these terpene compounds. Other fruit essences or aromas, such as cherry, pineapple, apple, and mango also are suitable for use in embodiments of the invention.

[0029] Similarly, embodiments of the invention incorporate aroma compound that provides coffee aroma, including any of the many aliphatic, acyclic, aromatic benzenoids, heterocyclics, and other compound types known to be present in coffee or coffee aroma.

[0030] Aroma compounds can be used in combination. If the delivery system is used for an edible product, each of the components must be food-safe.

[0031] With the guidance provided herein, the skilled practitioner will be able to identify and select suitable aroma compound to be incorporated into polymeric matrix for use with various products.

[0032] In embodiments of the invention, aroma compound is entrapped in polymeric matrix. The polymeric matrix protects the aroma compound from degradation and premature release. The polymeric matrix releases aroma in response to a breach or breaking of the polymeric matrix, most typically

TAB 11

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

# Technology Overview: Composition & Novel Measuring Approach

***Off-Shelf Encapsulation Technology to Enable Screening***

- ***Preliminary Composition Only***
  - Gelatin
  - Water
  - Binder (adhere to package)
  - pH=~5
  - Preservation
    - heat process
    - storage: refrigerated
    - preservatives used by some vendors

**Applied Coating**

- *Novel Performance Measuring Approach*

**Arometer**

# APPENDIX VII

Defendant discovery document PC 1464 to 1466. An early version of a report

of my work and findings on the effect of humidity/moisture on Aroma

Technology Delivery Systems.



**Pepsi-Cola Interoffice Memo - CONFIDENTIAL**

**To:** Recipient
**From:** Owner of findings
**Date:** XYZ
**Subject:** Project # S3438, Influence of Relative Humidity on the stability and shelf life of dry encapsulate coatings.

---

**Overall Project Objectives:**

- To determine how and to what extend relative humidity affects stability of dry flavor encapsulate coatings once applied to glass bottle.

**Executive Summary**

-

**Business Implications**

- xyz

**Background:**

The commpany does not have at this location a control environment where both humidity and temperature can be simultaneously studied. However using a dessicator and a selection of saturated salts solution, it is possible to control humidity at small scale and expose at the desired temperature.

**Experimental:**

**- Analytical method approach**

1. Coat bottle with a flvor encapsulate slurry
2. Allow the bottle to dry at room temperature
3. Prepare saturated slat solutions with known relative humidity and put them in desicators
4. This is a list of salt used: RH~0% (Calcium sulfate), RH = 33% Magnesium chloride; RH = 55-60%; RH = 97% cupper sulfate.
5. Once the bottles are dried, put them in desicator an let them stand for three days
6. Open desiccators and determine if there is aroma coming out of the desiccators

**- Sensory method approach**

**Results and discussion:**

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1464

sensory evaluation on Lemon 5X coatings under different relative humidity and temperature conditions.

1 - Lemon 5X coatings stored at high relative humidity (97%) and high temperature (110oF) lost significant amount of flavor after 3 days, but did not show any drastic change in flavor character when compared side by side with a fresh Lemon 5X coating. These were still better than in product stability. I think your paragraph below #3 should be with this sample..no??

2 - Lemon 5X coating stored at in dry heat at 110oF was very similar in in flavor profile and intensity to a fresh coating.

3 - Lemon 5X coating stored at 33% relative humidity at room temperature was similar in flavor profile and intensity to a fresh lemon 5X coating.

These data suggest that a combination of high humidity and high temperature will accelerate escape of flavor from encapsulates. In the case of lemon 5X the flavor character slightly changed from lemon candy type to lemon peely, this type of change is still acceptable for lemon and is not bad when considering the fact that lemon would have turned cherry in a beverage under similar conditions. It is not clear at this moment what the critical RH and temperature is for these encapsulates, however it appears that the low RH might not significantly affect stability of coatings. Also it is clear that a certain combination of heat and relative humidity is require to catalyzed flavor escape from encapsulates.

4 - Next Steps:
- Perform a similar experiment at 90oF for seven days, RH = 33%, and RH = 97%, etc...
- Establish a sorption isotherm of encapsulate: consider RH ~0%, RH = 33%, RH~50-60%, and RH = 97% as study points.

I placed coated bottles in three desiccators having the following RH: 0%, 33%, and 97% all at room temperature approx. 22oC, on a lab bench top. After one day, I opened each desiccators to investigate whether any Lemon 5X aroma was released into desiccators' headspaces. This is what I found:

1 -RH = 0%: No perceivable aroma when the dedicator was opened
2 - RH = 33%: No perceivable aroma when the dedicator was opened
3 - RH = 97%; a strong Lemon aroma escaped from the dedicator when it was opened.

On the basis of these observations, one can now confidently say that Relative humidity/water activity is going to play a major role on the stability and shelf life of application encapsulate. Taking into account our observations made last Tuesday in a similar experiment, they seem to suggest that in the case of Lemon 5X encapsulate, relative humidity will play a more important role on encapsulate stability than temperature.

In this set of experiment, a water sorption isotherm for Orange four Fold encapsulate will be established across three manufacturers. This experiment might help us to begin to gain some insight about the physical resilience and stability of encapsulates from RD Dodge, Lipo and Microtek.

**Summary and Conclusions**
**XYZ**

**Recommendation:**
XYZ

cc:  XYZ

*data attached*

# APPENDIX VIII

Defendant discovery document PC 1545 to PC 1551: Project Report # S3438

dated 01/16/2009 and titled "Influence of Relative humidity on the stability and

shelf life of dry encapsulate coatings"



**Pepsi-Cola Interoffice Memo - CONFIDENTIAL**

**To:** Peggy Havekotte
**From:** Ricky Kamdem-Ouaffo
**Date:** 01/16/09
**Subject:** Project # S3439 - Influence Of Relative Humidity On The Stability And Shelf Life Of Dry Encapsulate Coatings.

---

**Overall Project Objectives:**

- To determine how and to which extend relative humidity (RH) affects the stability of dry flavor encapsulate coatings applied in the tamper band area of a glass bottle. To determine the moisture content of dry flavor encapsulates at various relative humidity in order to assess risk for microbial growth.

**Executive Summary**

- Orange flavor encapsulates from three different vendors had equilibrium moisture content of less than 5.0% at relative humidity below or equal to 75%, and aroma released during storage in this RH range seems negligible. However at 97% relative humidity the behavior encapsulates toward moisture sorption was completely different across vendors. On the one hand, orange flavor encapsulates made by RT Dodge consistently lost matter whereas those made by Microtek had an erratic behavior going through a cycle of moisture gain and loss. On the other hand, orange flavor encapsulates made by Lipo Technologies Inc maintained a consistent moisture gain at 97%. With respect to aroma character intensity, the stability of flavor encapsulates at 97% RH was flavor-dependant: Lemon 5X flavor encapsulate significantly lost more than 50% of its character intensity in three days, whereas orange flavor encapsulate was more stable with less than 30% loss.

**Business Implications**

- Dry flavor encapsulates from three different vendors, but made using the same batch of orange oil behaved very differently when exposed to high relative humidity. Therefore flavor encapsulates are not all equal even if they contain the same flavor. It is critical that quality control criteria be developed to assess the performance of encapsulates from potential vendors before decision is made on whom to choose as a suppliers.

**Background**

Pepsi's Flavor Research Lab is developing a new application technology for flavor encapsulates with intent to enhance consumer's experience with a beverage. This new technology consists of applying a dry coating of flavor encapsulates in the tamper band area of a beverage bottle. The flavor encapsulates will be subsequently broken and the flavor release when a consumer will turn the cap to open the bottle. There is possibility that the dry encapsulate coating will not be 100% isolated from contact with environmental air. Presumably, a dry organic coating is susceptible to moisture absorption and even microbial growth when a certain moisture and temperature

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1545

combinations exist. Therefore it is important to gain clear understanding of how environmental humidity affect flavor encapsulates in an application such as the one currently in development. The company does not have at this location a controlled environment where both humidity and temperature can be simultaneously adjust to cover all possible range of interest. However using a desiccator and a selection of saturated salts solution, it is possible to control humidity at small scale at the desired temperature.

**Experimental**

*Materials*

*Chemicals:* Magnesium Chloride, Calcium nitrate, sodium chloride, cupper sulfate, Calcium sulfate all purchased from Sigma-Aldrich.

*Flavor Encapsulates: RT Dodge* Lemon 5X encapsulate, RT Dodge Orange Four Fold Encapsulate, Microtek Orange Four Fold Encapsulate, Lipo Technologies Orange Four Fold Encapsulate.

*Others:* Four desiccators, 10oz glass bottles, critical swabs, teflon caps, sample vials, microscopy slides

**Methods**

*Constant Relative Humidity Vessels: 250 grams of a* saturated salt solution having a known relative humidity was prepared and poured into the bottom of a desiccator to fill more than half of the volume below the ceramic plate. The following saturated salt solutions were made to create specific humidity at room temperature according to data found in the literature: Saturated solutions of Magnesium Chloride (RH = 33%), Calcium Nitrate (RH = 55%-60%), Sodium Chloride (RH = 75%), Calcium sulfate (RH = 97%).

*Influence of Relative Humidity and Temperature alone on the Stability of Lemon 5X Encapsulates:* This experiment was designed to compare the relative importance of Temperature and Relative Humidity on the stability of dry Lemon 5X encapsulate. Nine 10 oz glass bottles were manually coated with a slurry of Lemon 5X encapsulate so as to form a uniform coating in the tamper band area of the bottle using a critical swabs. The bottles were allowed to dry at room temperature on a lab bench overnight. Three of the bottles were then transferred into a 97% relative humidity vessel, and three other coated bottles were transferred to a laboratory oven set at 110°F and allowed to equilibrate for three days. The three remaining bottles were left on the lab bench next to the desiccator. After three days, the bottles in the desiccator and those in the oven were pulled and allowed to equilibrate at room temperature until next day. All nine bottles were then capped using Teflon caps, several four hours before sensory evaluation. Sensory evaluation ballots were made and printed for data collection during each evaluation. The evaluation consisted of holding a capped bottle in one hand, opening it with the other hand and sniffing the tamper band area. A panel of three (Peggy Havekotte, Marco Covarrubias, Ricky Kamdem) conducted sensory evaluation and reported data on consensus. Attached below is a template of sensory evaluation ballot used during evaluation.

Lemon#5 Sensory
Data.doc

*Influence of 97% Relative Humidity on the Stability of Orange Four Fold Encapsulates made by Three Different Vendors:*

This experiment was designed to investigate whether any of the three vendors, either Lipo Technologies or RT Dodge or Microtek may have the technology to manufacture encapsulates with better shelf life at 97% relative humidity. Each of the three manufacturers was provided with one kilogram of Orange Four Fold oil from the same batch. Each of them made an encapsulate slurry using its own proprietary technology. Each slurry was then used to coat six bottles using critical swabs. The bottles were allowed to dry at room temperature overnight. The next day three bottles from each set were transferred into the 97% relative humidity dessicator and allowed to equilibrate for seven days. The remaining three bottles in a set were left at room temperature on a lab bench. After seven days the bottles were removed from the desiccators and allowed to equilibrate at room temperature overnight along the other bottles which have been at room temperature and humidity from the time of coating. Then all bottles were capped with Teflon caps several hours before sensory evaluation.

*Sensory Evaluation*

In general sensory evaluation consisted of holding a capped bottle in one hand, opening it with the other hand and sniffing the tamper band area. A panel of three (Peggy Havekotte, Marco Covarrubias, Ricky Kamdem) conducted sensory evaluation and reported data on consensus. Attached below is a template of sensory evaluation ballot used during evaluation.

All Vendors OFF Sensory.doc

*Equilibrium Moisture Content Of Dry Flavor Encapsulate From Three Vendors At Various Relative Humidity*

This experiment was designed in an attempt to address the question whether a dry encapsulate still holds an amount of moisture sufficient to promote microbial growth. Given the fact that the current project intent is to deliver application encapsulate as a dry coating, the influence of relative humidity becomes very important. One approach to address this question would be to expose dry flavor encapsulate to various relative humidity and monitor weight over time. In this experiment equilibrium moisture content of Orange Four Fold encapsulates from three vendors was determined at four relative humidity conditions: 33%, 60%, 75%, and 97%. For each relative humidity, slurry was applied around a glass sample-vial, at three separate locations so as to deliver an approximate total of 0.3 grams of slurry on a vial. The vials were coated in triplicate and allowed to dry on a lab bench at room temperature until constant weight. Each vial was weighed before coating, after coating, and two times during drying at room temperature. Then they were transferred into relative humidity vessels. Each relative humidity vessel contained three weighed vials for each vendor, so in total there were nine vials in a vessel with constant relative humidity. The vials were weighed again after five, ten and eighteen days equilibration in the vessels, the weights were recorded and moisture contents calculated.

*Influence Of Relative Humidity On The Physical Appearance Of Dry Flavor Encapsulate As Observed Under Scanning Electron Microscopy*

In the course of this study, I noticed earlier that when a bottle coated with Lemon 5X flavor encapsulate was exposed to 97% relative humidity, an overpowering citrus type aroma was released into the vessel and could be perceived upon opening the vessel. However there was no

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1547

perceivable flavor release when a coated bottle was exposed to 33% relative humidity. The question then arose about what is causing the flavor to be released when the coating is exposed to 97% relative humidity. In this experiment, a microscopy slide was manually coated with RT Dodge Lemon 5X, another one with Lipo Technologies Orange Four Fold, and a third one with RT Dodge Orange Four Fold encapsulate. Slides were made in duplicate and allowed to dry at room temperature overnight. They were then observed under electron microscope. One slide form each slurry was place at 97% relative humidity and the second slide at 33% relative humidity. All slides were removed after one week and observed again under electron microscope.

*Immersion Experiment:* This experiment was design to determine whether a dry flavor encapsulate in the tamper band area to a beverage bottle would survive washing with water as would be the case on the production line. Six 10 oz bottles were coated with Lemon 5X and allowed to dry at room temperature. Then three of them were immerse in reverse osmosis water for about two seconds and allowed to dry again at room temperature. All six bottles were then capped and submitted for sensory evaluation as in the other experiments.

**Results and discussion**

*Influence of Relative Humidity and Temperature alone on the Stability of Lemon 5X Encapsulates*: Lemon 5X coatings stored at high relative humidity (97%) at room temperature lost more than 50% of flavor character intensity after 3 days but did not show any drastic change in flavor character itself when compared side by side with a fresh Lemon 5X coating. Lemon 5X coating stored at 110°F in dry heat was very similar in flavor profile and intensity to a fresh coating. The panelists commented that Lemon 5X would have gone completely bad at this temperature and time if it had been added directly to a soda beverage. Lemon 5X coating stored at 33% relative humidity at room temperature was similar in flavor profile and intensity to a fresh lemon 5X coating. Therefore relative humidity has an effect on the stability of a dry flavor encapsulate. The flavor character of Lemon 5X encapsulate slightly changed from lemon candy type to lemon peely, this type of change was determined to be still acceptable for lemon and was not considered bad when considering the fact that lemon would have turned cherry in a beverage under similar conditions. It is not clear at this moment what the critical RH and temperature is for these encapsulates, however it appears that low RH might not significantly affect stability of coatings. Also it is possible that a certain combination of heat and relative humidity might be required to catalyzed flavor escape from encapsulates. These data suggest that a combination of high humidity and high temperature will accelerate escape of flavor from encapsulates. Attached is a summary of sensory data collected during evaluation. However, when considered individually relative humidity appeared to influence stability more than temperature.

Lemon 5X
Encapsulate 33%97%

*Influence Of 97% Relative Humidity On The Stability Of Orange Four Fold Encapsulates Made By Three Different Vendors*

Results of sensory evaluation showed that there was reduction in flavor intensity in general after one week exposure of flavor encapsulates at 97% relative humidity. For Microtek and RT Dodge Orange Four Fold encapsulates, flavor intensity loss was approximately 30% or less. Lipo Technologies encapsulates was soapy and the loss of flavor intensity was more than 50%. Bottles

with coatings from all three manufacturers were stored in the same relative humidity vessel. The vessel emitted a strong citrus aroma when it was opened at the end of storage time, indicating that Orange flavor escaped from encapsulate during storage. Attached are the data collected during evaluation. In additional verification experiments, coatings stored at relative humidity equal to or below 75% did not release any significant or perceivable amount of citrus aroma in the vessels.

Orange 4X Encapsulates RH97%

*Equilibrium Moisture Content Of Dry Flavor Encapsulate From Three Vendors At Various Relative Humidity*

When dry Orange Four Fold flavor coatings were exposed to relative humidity below 75% for 18 days, they gained less than 5%. RT Dodge Orange Four Fold encapsulate gained less than 1% moisture, followed by Microtek with 1-2%, and Lipo Technologies gained 2-5% moisture. Physically, the coatings appeared dry and no moisture could be observed. It can be said that within an acceptable experimental error margin of 5%, dry flavor encapsulate achieved moisture equilibrium and constant weight at relative humidity equal to or below 75%. However at relative 97% humidity, the same Orange Four Fold encapsulates from the three vendors behaved completely differently both across vendors and overtime. Samples were weighed at day 5, 10 and 18 during equilibration. RT Dodge consistently lost matter during this time frame. Encapsulate from Microtek went though a cycle of weight gain and loss: On day 5 it had gained 17% moisture, but on days 10 and 18 it had lost 9.6% and 4.9% moisture respectively. Encapsulates did not achieve weight equilibrium after 18 days at 97% relative humidity at room temperature. The figure below shows a moisture content chart for Orange Four Fold encapsulates from all three vendors at different RH and over a period of 18 days.

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1549



60
50
40
30
20
10
0
-10
-20
-30
-40
-50
Moisture Content (%)
10
20
30
40
50
60
70
80
90
100
Relative Humidity (%)
RTD5-day H2O (%)
RTD 10-day H2O (%)
RTD 18-day H2O (%)
Lipo 5-day H2O (%)
Lipo 10-day H2O (%)
Lipo 18-day H2O (%)
Micro 5-day H2O (%)
Micro 10-day H2O (%)
Micro 18-day H2O (%)

**Figure 1:** Equilibrium Moisture Content of Dry Flavor Encapsulates At Different Relative Humidity.

Also attached below is the spreadsheet containing all weights and calculations in the course of this experiment.

Moisture Content
Data.xls

From a microbiology point of view, it can be said that at relative humidity less than 75%, a moisture content of less than 5% will significant reduced the risk of microbial growth. Calculations on the data obtained during this experiment showed that moisture had completely evaporated from RT Dodge and Microtek Orange Four Fold encapsulates at the time that they were transferred in to relative humidity vessels. For example product specifications from RT Dodge disclosed moisture content of 70%, and after drying a room temperature, I found that the coating lost 72% of its weight so practically all the moisture has evaporated. Similarly Microtek disclosed a moisture content of 65% and I found that 66% moisture had evaporated before transfer to humidity vessels.

*__Influence Of Relative Humidity On The Physical Appearance Of Dry Flavor Encapsulate As Observed Under Scanning Electron Microscopy__*

Electron microscopy observations revealed that Lipo Technologies Orange Four Fold encapsulates were mainly open spheres after they dried whereas RT Dodge Lemon 5X and

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1550

Orange Four Four Fold encapsulates were closed spheres of various sizes. Additional observations on the same batch of liquid slurry that was used to prepare Lipo Technologies slide indicated that encapsulates were in the form of closed spheres in the slurry, but upon drying the spheres were broken. Nancy Hirdt had initially suggested the theory that excess surface tension might be causing Lipo Technologies encapsulates to break down during drying.

Below are representative pictures of encapsulate before they transferred to RH = 97%.

Lipo R&D-2008-0264 OFF log04.tif    Lipo R&D-2008-0264 OFF log03.tif    RT Dodge Lemon 5X R&D-2008-0264 Lem    RT Dodge Lemon 5X R&D-2008-0264 Lem

**THIS SECTION IS INCOMPLETE EXPERIMENT STILL ONGOING**

*Immersion Experiment:* Sensory evaluation showed that there was less than 30% loss in flavor intensity when a dry coating of Lemon 5X was immersed in water for two seconds. There was no noticeable change in flavor profile.

**Summary and Conclusions**

This study demonstrated that dry flavor encapsulate are sensitive to relative humidity. The technology used to manufacture a flavor encapsulate is important for its stability life as well as the type of flavor, therefore one should expect variability across manufacturers. Lower relative humidity could help keeping the moisture content of flavor encapsulate below 5%, therefore would not favor microbial growth. The impact of high relative humidity on a flavor encapsulate was vendor-dependent and flavor-dependent. Relative humidity seemed to be of stronger impact on the stability of a flavor encapsulate than temperature when considered individually, but presumably a certain combination of high temperature and relative humidity would be devastating on a flavor encapsulate. STILL INCOMPLETE

**Recommendation:**

On the basis of this study there will be a need to develop internal quality control criteria for flavor encapsulates to help screen or validate vendors to be considered for application encapsulate technology. The most important of such criteria should be the resilience of a dry flavor encapsulate to high relative humidity followed by temperature. **STILL INCOMPLETE**

Cc: Marco Covarrubias; Michael Hoar.

***Data Attached***



**Pepsi-Cola Interoffice Memo - CONFIDENTIAL**

**To:** Recipient
**From:** Owner of findings
**Date:** XYZ
**Subject:** Project # S3441, Disclosure of an Aroma Release Device for Capturing Flavor Molecule and Quantifying Consumer Experience of Application Encapsulate

---

**Overall Project Objectives:**
- xyz

**Executive Summary.**
-

**Business implications**
- xyz

**Background:**

Xyz

**Experimental:**

**Results and discussion:**

XYZ

**Summary and Conclusions**
XYZ

**Recommendation:**
XYZ

cc: XYZ

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1552

# APPENDIX IX

Discovery document  PC 1572 to PC 1573, Report # 900441: The Performance

Of Corn Zein And Ethyl Cellulose As Potential Moisture Barrier on Zein-Walled

Flavor Encapsulate At High Relative Humidity.



**Pepsi-Cola Interoffice Memo - CONFIDENTIAL**

**To:** Peter Given
**From:** Ricky Kamdem-Ouaffo
**Date:** 04/27/09
**Subject:** Project #900441

---

**Overall Project Objectives:**

- The objective is to assess the performance of corn zein and ethyl-cellulose as potential moisture barrier on zein-walled-flavor encapsulates at high relative humidity.

**Executive Summary.**

- Corn zein and ethyl cellulose significantly slowed down humidity-driven flavor release from gelatine-walled flavor encapsulate.

**Business implications**

- Corn zein or ethyl cellulose applied as a protective film on top gelatin-walled encapsulate help resolve the problem of negative perception associated with gelatin potential indirect contact with gelatin and to significantly improve the shelf life of flavor encapsulate.

**Background:**

- Shelf life studies indicated that gelatin-walled-flavor encapsulates were unstable at 97% relative humidity. I found that at such a high RH, gelatin encapsulate released flavor. Electron Microscopy Observation of dry encapsulates exposed at 97% RH for one week showed that encapsulates wall material was damaged suggesting that flavor was release by a Burst mechanism at high relative humidity.

**Experimental:**

**Results and discussion:**

XYZ

**Summary and Conclusions**
XYZ

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1572

**Recommendation:**
XYZ

cc: XYZ

*data attached*

# APPENDIX X

Discovery document PC 1616. Report of my findings included in PepsiCo Senior management review.

# Flavor Experience: 2009 Aroma Technology Review

March 5th, 2009

1

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 1630

Rickys Sent Items

Valhalla, NY 10595
TeL: 1 914 831 4225

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 11:18 AM
To: Zhang, Naijie {PCNA}
Subject: RE: Aroma Technology

you are welcome.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, July 01, 2009 11:18 AM
To: Kamdem, Ricky {PCNA}
Subject: RE: Aroma Technology

Ricky,

Thank you for the summary.

Ned

---

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 10:12 AM
To: Zhang, Naijie {PCNA}
Cc: Havekotte, Peg {PCNA}; Covarrubias, Marco {PCNA}; Given, Peter {PCNA}
Subject: RE: Aroma Technology

Ned;

1 - This is e-mail is for sake of summarizing some background information. I think the suggestion by Peter and Peg to meet in group maybe more helpful in getting clearer understanding of flavor formulas. Last year, my focus on the project was "Stability of Encapsulates" and so far I have shown and trained you on all that I learned in terms of stability and what I think would be needed in order to design a "new encapsulate" that can survive the market place. In case something is lacking on concerning stability piece, please let's revisit that work again.

2 - Concerning flavors encapsulate and the specific types of flavors, I do NOT have access to those information. I did some analytical development work on encapsulates but it did not go to the level of knowing the specific composition of oils. So Marco and Peg will be more helpful to you on this. I also communicated to you the conversation I had with Winsome concerning the possibility of making stronger orange flavors. She indicated that it is possible and that there might be some flavors in the system already, but she needed a more formal request. So please consider following up with Winsome.

3 - I also informed you that a number of consumer tests were done last year and returned very positive results. IN this context we also met with Marco about and he indicated to us that it is difficult to get the flavor refer to as "Trump" which is what I think Peg is referring to as "Sweet".

4 - I also mentioned to you recently that Karnav informed that flavors encapsulates were damaged by heat when the FR refrigerator broke down. So at this point we may have to request new encapsulates again. The damaged encapsulate were moved to the 40oF room on the first floor, but I don't think they will be of any more use since they seemed completely denatured. The only encapsulates left are the small amounts of OFF and L5X encapsulates we have in the

refrigerator in the ADS lab. Karnav may still have a little of Trump in the FR lab, but this I need to check with him.

Regards

Ricky

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, July 01, 2009 9:19 AM
To: Kamdem, Ricky {PCNA}
Subject: FW: Aroma Technology

Ricky,

Please follow Peg's message. I don't know these information. Where are these samples? Would you please bring all the capsule slurry to the lab. We need these samples frequently.

Thanks,

Ned

---

From: Havekotte, Peg {PCNA}
Sent: Wednesday, July 01, 2009 7:56 AM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Aroma Technology

Hi Ned, No we had all our success with an oil we called sweet that was encapsulated by RT Dodge. Additionally we had a valencia mixture that has not yet been encapsulated . It however was placed on outside of bottle as a liquid and was also successful regarding multi experience..

---

From: Zhang, Naijie {PCNA}
Sent: Tuesday, June 30, 2009 4:38 PM
To: Havekotte, Peg {PCNA}; Given, Peter {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Aroma Technology

Peg-

You mean 4-fold orange aroma.

---

From: Havekotte, Peg {PCNA}
Sent: Tuesday, June 30, 2009 4:01 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Re: Aroma Technology

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2236

Rickys Sent Items

lets use what worked in recent CPD please

---

From: Given, Peter {PCNA}
Sent: Tuesday, June 30, 2009 12:16 PM
To: Zhang, Naijie {PCNA}
Cc: Covarrubias, Marco {PCNA}; Havekotte, Peg {PCNA}
Subject: RE: Re: Aroma Technology

Ned - I think it was the 4-fold orange or even "Trump" that the OJ people liked so much - not sure a lemon would be the most appropriate!

Marco/Peg - what would you suggest (or does it matter)?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Zhang, Naijie {PCNA}
Sent: Tuesday, June 30, 2009 12:14 PM
To: Rivera, Ted {Quaker}; McCafferty, Scott O {Quaker}
Cc: Given, Peter {PCNA}; Parshall, Kristin {Quaker}; Havekotte, Peg {PCNA}
Subject: Re: Aroma Technology

Scott and Ted:

My name is Ned Zhang in Peter Given group. I am responsible for aroma release project technically. I will be sending the aroma coated glass bottles to you for the evaluation. Can I send Lemon 5 fold aroma coated bottles to you? So far, lemon aroma performed well. Please let me know if you have any questions.

Ned Zhang, Ph.D.
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)831-4210
(914)742-4937 fax
Email: naijie.zhang@pepsi.com

Rickys Sent Items

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 11:18 AM
To: Zhang, Naijie {PCNA}
Subject: RE: Aroma Technology

Let me check how often Karnav will need it.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, July 01, 2009 11:16 AM
To: Kamdem, Ricky {PCNA}
Subject: RE: Aroma Technology

Can you bring to the LAB?

---

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 11:04 AM
To: Zhang, Naijie {PCNA}
Cc: Havekotte, Peg {PCNA}; Covarrubias, Marco {PCNA}; Given, Peter {PCNA}
Subject: RE: Aroma Technology

There is still a little bit of "Trump" encapsulate left, Karnav has it in the FR lab on second floor.

---

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 10:12 AM
To: Zhang, Naijie {PCNA}
Cc: Havekotte, Peg {PCNA}; Covarrubias, Marco {PCNA}; Given, Peter {PCNA}
Subject: RE: Aroma Technology

Ned;

1 - This is e-mail is for sake of summarizing some background information. I think the suggestion by Peter and Peg to meet in group maybe more helpful in getting clearer understanding of flavor formulas. Last year, my focus on the project was "Stability of Encapsulates" and so far I have shown and trained you on all that I learned in terms of stability and what I think would be needed in order to design a "new encapsulate" that can survive the market place. In case something is lacking on concerning stability piece, please let's revisit that work again.

2 - Concerning flavors encapsulate and the specific types of flavors, I do NOT have access to those information. I did some analytical development work on encapsulates but it did not go to the level of knowing the specific composition of oils. So Marco and Peg will be more helpful to you on this. I also communicated to you the conversation I had with Winsome concerning the possibility of making stronger orange flavors. She indicated that it is possible and that there might be some flavors in the system already, but she needed a more formal request. So please consider following up with Winsome.

3 - I also informed you that a number of consumer tests were done last year and returned very positive results. IN this context we also met with Marco about and he indicated to us that it is difficult to get the flavor refer to as "Trump" which is what I think Peg is referring to as "Sweet".

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2238

Rickys Sent Items

4 - I also mentioned to you recently that Karnav informed that flavors encapsulates were damaged by heat when the FR refrigerator broke down. so at this point we may have to request new encapsulates again. The damaged encapsulate were moved to the 40oF room on the first floor, but I don't think they will be of any more use since they seemed completely denatured. The only encapsulates left are the small amounts of OFF and L5X encapsulates we have in the refrigerator in the ADS lab. Karnav may still have a little of Trump in the FR lab, but this I need to check with him.

Regards

Ricky

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, July 01, 2009 9:19 AM
To: Kamdem, Ricky {PCNA}
Subject: FW: Aroma Technology

Ricky,

Please follow Peg's message. I don't know these information. Where are these samples? Would you please bring all the capsule slurry to the lab. We need these samples frequently.

Thanks,

Ned

---

From: Havekotte, Peg {PCNA}
Sent: Wednesday, July 01, 2009 7:56 AM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Aroma Technology

Hi Ned, No we had all our success with an oil we called sweet that was encapsulated by RT Dodge. Additionally we had a valencia mixture that has not yet been encapsulated . It however was placed on outside of bottle as a liquid and was also successful regarding multi experience..

---

From: Zhang, Naijie {PCNA}
Sent: Tuesday, June 30, 2009 4:38 PM
To: Havekotte, Peg {PCNA}; Given, Peter {PCNA}
CC: Covarrubias, Marco {PCNA}
Subject: RE: Aroma Technology

Peg-

You mean 4-fold orange aroma.

---

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2239

# APPENDIX XVI

Discovery document PC 2050 to PC 2069. A a string of e-mail in which I was reporting on the performance of Zein based aroma film from the University of Illinois in high moisture environment.

Case 7:14-cv-06827-KMK Document 43-P Filed 07/09/14 Page 20 of 88

Rickys Sent Items
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein smell…

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Rickys Sent Items

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 4:03 PM
To: Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

ok.

---

From: Given, Peter {PCNA}
Sent: Friday, September 11, 2009 3:49 PM
To: Kamdem, Ricky {PCNA}
Subject: RE: U. of Illinois samples

Love to see / try one on Monday.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 3:46 PM
To: Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Yes, very well dried. There are extra bottles left.

---

From: Given, Peter {PCNA}

Rickys Sent Items
Sent: Friday, September 11, 2009 3:45 PM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Is the coating completely dry when you do the sniff testing?

I think the issue may be two-fold (after discussions here):

1. the zein particles are too hard to rupture with cap 'wings'
2. the coating is too thick, therefore too much - can be diluted with alcohol for a thinner & reduced amount binder.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 3:26 PM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

We evaluated the bottles this afternoon. Results are same as yesterday: a distinctive zein smell was perceived from bottles coated with the Univ. of IL orange flavor encapsulate whereas the bottles coated with RT Dodge Orange flavor encapsulate released a good orange flavor burst.

Regards

Ricky

---

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 11:25 AM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

RT Dodge slurry has 30% solids content. This

Rickys Sent Items

morning I made a blend of 0.3 gram (I used all that was left) of Univ. of IL encapsulate with 0.7 grams glue solution and I applied the resulting mixture on glass bottles for sensory evaluation. Our first observation is that the mixture still had a distinctive zein smell, hopefully it would disappear upon drying. The mixture was rather very thick, it didn't look something that one could think of spray coating, so with this technology we definitely need to load less encapsulate to have a better chance for being able to spray it. This afternoon will evaluate for sensory, hopefully we find some good orange burst.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 11:05 PM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

It's probably because there is an abundance of the "glue" component which is made of zein. If there are enough capsules, AND they are releasing enough, zein odor should not be an issue! I'm surprised since U of I is using the "good" zein from Showa???

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 5:55 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

I will update you tomorrow on this. The major problem might be zein smell, it is very distinctive.

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 4:24 PM
To: Kamdem, Ricky {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

The other question I have is, was the test

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2053

done on a more-or-less constant flavor load basis? Otherwise cannot compare RTDodge to U of Ill.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein smell…'

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Rickys Sent Items
Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 3:46 PM
To: Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Yes, very well dried. There are extra bottles left.

---

From: Given, Peter {PCNA}
Sent: Friday, September 11, 2009 3:45 PM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Is the coating completely dry when you do the sniff testing?

I think the issue may be two-fold (after discussions here):
1. the zein particles are too hard to rupture with cap 'wings'
2. the coating is too thick, therefore too much - can be diluted with alcohol for a thinner & reduced amount binder.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2055

Case 7:14-cv-00227-KMK Document 43-8 Filed 07/09/14 Page 37 of 88

Rickys Sent Items

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 3:26 PM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

We evaluated the bottles this afternoon. Results are same as yesterday: a distinctive zein smell was perceived from bottles coated with the Univ. of IL orange flavor encapsulate whereas the bottles coated with RT Dodge Orange flavor encapsulate released a good orange flavor burst.

Regards

Ricky

---

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 11:25 AM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

RT Dodge slurry has 30% solids content. This morning I made a blend of 0.3 gram (I used all that was left) of Univ. of IL encapsulate with 0.7 grams glue solution and I applied the resulting mixture on glass bottles for sensory evaluation. Our first observation is that the mixture still had a distinctive zein smell, hopefully it would disappear upon drying. The mixture was rather very thick, it didn't look something that one could think of spray coating, so with this technology we definitely need to load less encapsulate to have a better chance for being able to spray it. This afternoon will evaluate for sensory, hopefully we find some good orange burst.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 11:05 PM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

It's probably because there is an abundance of the "glue" component which is made of zein. If there are enough capsules, AND they are releasing enough, zein odor should not be an issue! I'm surprised since U of I is using the "good" zein from Showa???

Case 7:14-cv-00327-KMK Document 43-8 Filed 07/09/14 Page 26 of 88

Rickys Sent Items

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 5:55 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

I will update you tomorrow on this. The major problem might be zein smell, it is very distinctive.

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 4:24 PM
To: Kamdem, Ricky {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

The other question I have is, was the test done on a more-or-less constant flavor load basis? Otherwise cannot compare RTDodge to U of Ill.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein

smell…

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL

Rickys Sent Items

information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 3:26 PM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

We evaluated the bottles this afternoon. Results are same as yesterday: a distinctive zein smell was perceived from bottles coated with the Univ. of IL orange flavor encapsulate whereas the bottles coated with RT Dodge Orange flavor encapsulate released a good orange flavor burst.

Regards

Ricky

---

From: Kamdem, Ricky {PCNA}
Sent: Friday, September 11, 2009 11:25 AM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

RT Dodge slurry has 30% solids content. This morning I made a blend of 0.3 gram (I used all that was left) of Univ. of IL encapsulate with 0.7 grams glue solution and I applied the resulting mixture on glass bottles for sensory evaluation. Our first observation is that the mixture still had a distinctive zein smell, hopefully it would disappear upon drying. The mixture was rather very thick, it didn't look something that one could think of spray coating, so with this technology we definitely need to load less encapsulate to have a better chance for being able to spray it. This afternoon will evaluate for sensory, hopefully we find some good orange burst.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 11:05 PM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

It's probably because there is an abundance of the "glue" component which is made of zein. If there are enough capsules, AND they are releasing enough, zein odor should not be an issue! I'm surprised since U of I is using the "good" zein from Showa???

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595

Rickys Sent Items
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 5:55 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

I will update you tomorrow on this. The major problem might be zein smell, it is very distinctive.

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 4:24 PM
To: Kamdem, Ricky {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

The other question I have is, was the test done on a more-or-less constant flavor load basis? Otherwise cannot compare RTDodge to U of Ill.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein smell…

---

From: Kamdem, Ricky {PCNA}

Rickys Sent Items
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}

Rickys Sent Items

Sent: Friday, September 11, 2009 11:25 AM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

Peter,

RT Dodge slurry has 30% solids content. This morning I made a blend of 0.3 gram (I used all that was left) of Univ. of IL encapsulate with 0.7 grams glue solution and I applied the resulting mixture on glass bottles for sensory evaluation. Our first observation is that the mixture still had a distinctive zein smell, hopefully it would disappear upon drying. The mixture was rather very thick, it didn't look something that one could think of spray coating, so with this technology we definitely need to load less encapsulate to have a better chance for being able to spray it. This afternoon will evaluate for sensory, hopefully we find some good orange burst.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 11:05 PM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

It's probably because there is an abundance of the "glue" component which is made of zein. If there are enough capsules, AND they are releasing enough, zein odor should not be an issue! I'm surprised since U of I is using the "good" zein from Showa???

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 5:55 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

I will update you tomorrow on this. The major problem might be zein smell, it is very distinctive.

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 4:24 PM
To: Kamdem, Ricky {PCNA}; Zhang, Naijie

Rickys Sent Items

{PCNA}

Subject: RE: U. of Illinois samples

The other question I have is, was the test done on a more-or-less constant flavor load basis? Otherwise cannot compare RTDodge to U of Ill.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein smell…

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Rickys Sent Items

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 9:06 PM
To: 'Laszlo Pokorny'
Subject: Emailing: SOPCuSO4.pdf

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 5:55 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

I will update you tomorrow on this. The major problem might be zein smell, it is very distinctive.

---

From: Given, Peter {PCNA}
Sent: Thursday, September 10, 2009 4:24 PM
To: Kamdem, Ricky {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

The other question I have is, was the test done on a more-or-less constant flavor load basis? Otherwise cannot compare RTDodge to U of Ill.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company

Rickys Sent Items

100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein smell…

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Rickys Sent Items

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:13 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

it should read …panelists panels sensed zein smell…

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated). The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed ZEIN smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

Rickys Sent Items
From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 4:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: U. of Illinois samples

Dry Orange Four Fold encapsulate from the Univ. of IL. was mixed with the glue solution and manually applied to the tamper band are of 10 oz glass bottle (six bottles were coated), The bottles were equilibrated at room temperature until the coatings were completely dried. The bottles were capped and their aroma burst intensity was compared to RT Dodge Orange Four Fold Encapsulate coated on glass bottle as well. Three panelists took part in the evaluation. All panelists sensed seen smell from bottles coated with the Univ. of IL material which apparently completely masked any trace of orange flavor burst. Bottles coated with RT Dodge encapsulate emitted desirable orange aroma burst.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2067

Rickys Sent Items

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 12:49 PM
To: Zhang, Naijie {PCNA}
Subject: RE: Data

GC samples have not been run yet.

---

From: Zhang, Naijie {PCNA}
Sent: Thursday, September 10, 2009 11:53 AM
To: Kamdem, Ricky {PCNA}
Subject: Data

Ricky,

Please send today results to me after you process data. Do you have GC data that is correlated today' sensory.

Thanks,

Ned

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Thursday, September 10, 2009 10:28 AM
To: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois samples

ok, we can evaluate this afternoon against RT dodge material

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 8:51 PM
To: Kamdem, Ricky {PCNA}

Rickys Sent Items
Subject: FW: U. of Illinois samples

Ricky,

Please do this and send the results to Peter by Thursday afternoon.

Thanks,

Ned

---

From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 5:49 PM
To: Zhang, Naijie {PCNA}
Subject: U. of Illinois samples

Ned - I'm at U. of Illinois Thursday and Friday, and have not heard from you or Ricky regarding the U. of Ill samples - did they perform dried on bottles?

Please send me an e-mail early AM, and maybe also leave me a voicemail on my cell phone (914)844-1385

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, September 09, 2009 1:54 PM
To: Given, Peter {PCNA}
Subject: Accepted: Aroma Release Project Status Meeting

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, September 09, 2009 1:52 PM
To: Given, Peter {PCNA}
Subject: RE: To finalize a routine Method for instrumental and sensory evaluation of application flavor encapsulates

Ned Just sent me a meeting for next week, Tuesday. For some reasons the recurring meeting was not showing on my calendar.

-----Original Appointment-----
From: Given, Peter {PCNA}
Sent: Wednesday, September 09, 2009 1:50 PM
To: Kamdem, Ricky {PCNA}
Subject: Declined: To finalize a routine Method for instrumental and sensory evaluation of application flavor encapsulates
When: Monday, September 14, 2009 10:30 AM-11:30 AM (GMT-05:00) Eastern Time (US & Canada).
Where: Peter's office

# APPENDIX XVII

Discovery document  PC 2070. E-mail about a meeting that Dr. Given called to review the methods that I had developed.

Rickys Sent Items

Let's use the time scheduled for our biweekly meetings (Ned mentioned Sept 15th)
From: Kamdem, Ricky {PCNA}
Sent: Wednesday, September 09, 2009 12:38 PM
To: Zhang, Naijie {PCNA}
Subject: Accepted: Update

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, September 09, 2009 12:36 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: RE: To finalize a routine Method for instrumental and sensory evaluation of application flavor encapsulates

Would you send me a request to that meeting, I don't see it on my calendar.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, September 09, 2009 12:33 PM
To: Kamdem, Ricky {PCNA}; Given, Peter {PCNA}
Subject: RE: To finalize a routine Method for instrumental and sensory evaluation of application flavor encapsulates

Ricky,

We will have the project update on Sept. 15 between 9-10 in Peter office. You can talk about the analytical work.

-----Original Appointment-----
From: Kamdem, Ricky {PCNA}
Sent: Wednesday, September 09, 2009 12:24 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: To finalize a routine Method for instrumental and sensory evaluation of application flavor encapsulates
When: Monday, September 14, 2009 10:30 AM-11:30 AM (GMT-05:00) Eastern Time (US & Canada).
Where: Peter's office

It should be a short meeting, maybe just about 30 min unless other items are added to agenda.
We will review the recent GC data for double coatings and SM-004 encapsulates, and also the overall analytical and sensory approach to evaluation of encapsulates.
Then we should agree on a routine approach that any scientist could use to come to a strong and conclusive evaluation of the performance of an application flavor encapsulate.
On the basis of our discussion I will then draft a report with all procedures agreed upon, and data collected to this date.

Subject: To finalize a routine Method for instrumental and sensory evaluation of application flavor encapsulates
Location: Peter's office

Start: Mon 9/14/2009 10:30 AM
End: Mon 9/14/2009 11:30 AM
Show Time As: Tentative

Recurrence: (none)

Meeting Status: Not yet responded.

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011. PC 2070

# APPENDIX XVIII

Discovery document PC 2142 to 2144. An e-mail report on the use of "Aqueous

Shellac As Humidity Protective Coating Of Lemon 5X Flavor Encapsulate."

Rickys Sent Items

From: Kamdem, Ricky {PCNA}
Sent: Tuesday, August 18, 2009 11:32 AM
To: Given, Peter {PCNA}
Subject: Accepted: Lab organizational meeting

From: Kamdem, Ricky {PCNA}
Sent: Tuesday, August 18, 2009 11:32 AM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Cc: Havekotte, Peg {PCNA}; Covarrubias, Marco {PCNA}
Subject: FW: Aqueous Shellac Protection, 4 weeks at 97% RH _ Sensory in correlation with Instrumental
Attachments: Document.pdf

Peter,

Attached is the outcome of a sensory exercise we did this morning with a panel of four. The bottles evaluated were pulled from the 97% RH vessel at the same time as the ones I used to collect GC data. There were four bottles in this set. Two positive controls, one negative control (97% RH treatment for 4 weeks, NO protective Shellac on L5X coating), and on treated sample (1 coat of protective shellac, 97% RH treatment for 4 weeks). Positive control with code 1278 was 1 coat of L5X encapsulate stored in 70oF room without protective shellac coating. Positive control with code 1320 was also stored in 70oF room, but it had a protective shellac coating (I will be running GC on this today).

My reading of these data is that Shellac provided some protection at 97% RH, but overall aroma burst/flavor intensity is still less than a coating that has been kept at ambient conditions. In this sensory exercise, we came to consensus almost unanimously, there were just four bottles. But more than four would have been difficult to evaluate, most of the time we got saturated and the numbers become confusing. So maybe we should make GC analysis an integral part of screening this. From what I am seeing, it maybe that we should be able to determine the amount of GC signal that would translate into a descent aroma burst. I started doing GC on synthetic encapsulates of Orange four fold as well and I m getting good signals, I will be submitting a summary soon,

Regards

Ricky

-----Original Message-----
From: Kamdem, Ricky {PCNA} [mailto:Ricky.Kamdem@pepsi.com]
Sent: Tuesday, August 18, 2009 11:04 AM
To: Kamdem, Ricky {PCNA}
Subject: Aqueous Shellac Protection, 4 weeks at 97% RH

Please open the attached document. This document was digitally sent to you using an HP Digital Sending device.
From: Kamdem, Ricky {PCNA}
Sent: Tuesday, August 18, 2009 8:47 AM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Cc: Covarrubias, Marco {PCNA}; Havekotte, Peg {PCNA}
Subject: RE: Aqueous shellac as humidity protective coating of gelatin lemon 5X flavor encapsulate

Peter,

I would say the same from reading the GC data. Blocking of aroma release seems to be an important factor with a protective coating. There may be an optimum application method and rate that would deliver just enough coating to provide sufficient

protection during the course of shelf life. My thoughts is that for this is that we would need to have a way to be consistent in application, I am still thinking a spray device. We could purchase a small pressure vessel of the type that is used for pressure reaction (500-1000ml capacity), stainless steel, but we will still need someone to connect to the spray nozzle etc...

Another way I looked at the "double coating" data is that it emphasizes the need for more potent aroma. If we would be delivering 1/3 of the original aroma with double coating, then we need an aroma 3X more potent to begin with.

We are having difficult times to obtain consistent sensory data by sniffing, very easy to get saturated and then all smelled the same. So it seems like we might rely a lot on GC for screening and used sensory to confirmed important GC where we see something promising. For even when that GC showed 1/3 of the original aroma when a protective coating was applied, the burst was still perceivable and good.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Tuesday, August 18, 2009 8:23 AM
To: Kamdem, Ricky {PCNA}; Zhang, Naijie {PCNA}
Cc: Covarrubias, Marco {PCNA}; Havekotte, Peg {PCNA}
Subject: RE: Aqueous shellac as humidity protective coating of gelatin lemon 5X flavor encapsulate

Ricky - if I interpret the results correctly, it appears that shellac protects lemon aroma against loss due to moisture, retaining roughly 1/3 of the positive control level of aroma. I'm assuming the negative control was exposed to humidity?

I guess we still don't know if protective layers are partially holding in the aroma, or partially blocking aroma release! Either way, you get roughly 1/3 of the original amount.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA} 1
Sent: Monday, August 10, 2009 11:44 AM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Cc: Covarrubias, Marco {PCNA}; Havekotte, Peg {PCNA}
Subject: Aqueous shellac as humidity protective coating of gelatin lemon 5X flavor encapsulate

Attached are a chromatograms and signal areas for gelatin-Lemon 5X encapsulate after four weeks storage. The study design included two

blanks, one positive control, one negative control and a treated sample. Sampling time in Aroma release device was 100 seconds. all bottles were opened with two turns of the knob. The fiber was Manual black: 75 micro Carboxen-PDMS. I will be putting these data in an official PepsiCo report format with detail experimental methods. I will be applying this method on other encapsulates.

<< File: Aqueous shellac as protective coating.pdf >> << File: Signal Sample description.doc >>

Regards

Ricky

From: Kamdem, Ricky {PCNA}
Sent: Tuesday, August 18, 2009 8:28 AM
To: Given, Peter {PCNA}
Subject: Accepted: Lab organizational meeting

From: Kamdem, Ricky {PCNA}
Sent: Monday, August 17, 2009 9:02 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: FW: Industrial Workshop on Microencapsulation of Flavors and Bioactives for Functional Food Applications

FYI, just in case.

From: Ricky Kamdem [mailto:rickykamdem@hotmail.com]
Sent: Monday, August 17, 2009 7:58 PM
To: Kamdem, Ricky {PCNA}
Subject: FW: Industrial Workshop on Microencapsulation of Flavors and Bioactives for Functional Food Applications

---

Date: Mon, 17 Aug 2009 10:59:18 -0700
From: nutra@bioactivesworld.com
To: rickykamdem@hotmail.com
Subject: Industrial Workshop on Microencapsulation of Flavors and Bioactives for Functional Food Applications

microban<http://www.bioactivesworld.com/images/microban.jpg>

Microencapsulation Workshop
www.bioactivesworld.com
<http://server1.streamsend.com/newstreamsend/clicktracker.php?cd=550&ld=49&md=208&ud=8c879381cebeb01161a5cc322b0dcf1e&url=http://www.bioactivesworld.com>
Tel: 979 - 764 - 8360
Fax: 979 - 694 - 7031

Pilot Plant and Laboratory Demonstrations at University of Minnesota and Avéka Inc., Facilities

Carbohydrate Extrusion Encapsulation Demo
Coacervation of Flavors Demo
Alginate Beadlet - Flavor in the Core Demo, By Dr. Bob Sobel, FONA International

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2144

# APPENDIX XIX

Discovery document PC 2156. An e-mail communication in which I reported on the "Influence Of Relative Humidity On The Stability Of Gelatin Based L5X Encapsulate."

Rickys Sent Items

>
>

---

Express your personality in color! Preview and select themes for Hotmail®. Try it now.
<http://www.windowslive-hotmail.com/LearnMore/personalize.aspx?ocid=PID23391::T:WLMTAGL:ON:WL:en-US:WM_HYGN_express:082009>

From: Kamdem, Ricky {PCNA}
Sent: Friday, August 07, 2009 5:03 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Subject: Influence of RH on the stability of gelatin based L5x encapsulate

GC data showed that after four weeks at 97%, the negative control has no aroma left. So we could adopt 2 to 4 weeks for accelerated shelf life testing at high RH. I will submit more comments next week. But it is very clear that we should able to study the stability of any kind of encapsulate instrumentally while we look for approach for sensory. The analytical method is returning consistent data so far.
From: Kamdem, Ricky {PCNA}
Sent: Friday, August 07, 2009 9:07 AM
To: Zhang, Naijie {PCNA}
Subject: RE: Orange Oil

Ok. I think we still have enough oil for this time. After I weighed the two kilos I will see how much is left, then we can determine if we need more.

From: Zhang, Naijie {PCNA}
Sent: Friday, August 07, 2009 9:00 AM
To: Kamdem, Ricky {PCNA}
Subject: FW: Orange Oil

Ricky,

Please send OFF oil to Appleton. Do we need to order more OFF oil?

Thanks,

Ned

From: jdebraal@appletonideas.com [mailto:jdebraal@appletonideas.com]
Sent: Friday, August 07, 2009 8:08 AM
To: Zhang, Naijie {PCNA}
Subject: Orange Oil

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2156

# APPENDIX XX

Discovery document PC 2164 – PC 2165. An e-mail in which Dr. Zhang aka Ned acknowledged that I did the work on the effects of humidity. The same string of e-mail also shows that other people who were aware of my work also acknowledged that I did the work even as early as 2008, long time before Zhang was even ever interviewed by PepsiCo.

Rickys Sent Items

So far all indications are that high relative humidity above 75% would cause gelatin encapsulated flavors to be released within 48 hours. The specific mechanism of failure at high RH depends on the manufacturer. I documented this in a report for "influence of relative humidity....". This study did not consider aroma molecules alone as a factor, but microscopy examination showed that damaged encapsulates became smeared etc...In a recent experiment, there was no damage on a dry coating of flavor encapsulates stored in a vessel saturated with orange aroma alone, so high relative humidity still seems to be shelf life factor No.1 for gelatin encapsulated aromas.

Regards

Ricky

---

From: Zhang, Naijie {PCNA}
Sent: Monday, August 03, 2009 10:50 AM
To: Covarrubias, Marco {PCNA}; Havekotte, Peg {PCNA}; Given, Peter {PCNA}; Kamdem, Ricky {PCNA}
Subject: RE: Does aroma vapor accelerate the aroma release from the gelatin capsule?

Ricky,

I understand you did the study of the moisture effect in the closed container on gelatin capsule (great work). Have you done the study of the aroma vapor effect on leaking? If so, please send us the results.

Regards,

Ned

---

From: Covarrubias, Marco {PCNA}
Sent: Monday, August 03, 2009 10:16 AM
To: Havekotte, Peg {PCNA}; Zhang, Naijie {PCNA}; Given, Peter {PCNA}; Kamdem, Ricky {PCNA}
Subject: RE: Does aroma vapor accelerate the aroma release from the gelatin capsule?

I think this was tested by Ricky last year right?

---

From: Havekotte, Peg {PCNA}
Sent: Monday, July 27, 2009 12:16 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}; Kamdem, Ricky {PCNA}; Covarrubias, Marco {PCNA}
Subject: RE: Does aroma vapor accelerate the aroma release from the gelatin capsule?

Hi Ned, please check out Rick's report on humidity effects on gelatin capsules ..

---

From: Zhang, Naijie {PCNA}

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2165

Rickys Sent Items
Sent: Monday, July 27, 2009 12:06 PM
To: Given, Peter {PCNA}; Havekotte, Peg {PCNA}; Kamdem, Ricky {PCNA}; Covarrubias, Marco {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: Does aroma vapor accelerate the aroma release from the gelatin capsule?

To all,

Based on the hypothesis of the effect of organic vapor on aroma leakage from last email , I conducted the following experiments. The results are shown below.

1. Gelatin capsule partially damaged after stored in a closed desaturator for 2 days in the presence of water (microscope 1)

2. Gelatin capsule highly damaged after stored in a closed desaturator with a dish of orange oil in the presence of water for 2 days (microscope 2).

3. Gelatin capsule coated with polyvinyl acetate had no damage after stored in a closed desaturator in the presence of water for 2 days (microscope 3).

The results indicated that organic vapor combined with moisture did accelerate the aroma leaking from gelatin capsule. If this is true, we should see longer stability for storing the gelatin samples under the natural environment (not in the closed container). The results also clearly showed that double-coating technology improved gelatin water-proof and the performance.

1. In the absence of OFF oil
2. In the presence of OFF oil
3. Coated with PVAc

<< OLE Object: Microsoft Photo Editor 3.0 Picture >> << OLE Object: Microsoft Photo Editor 3.0 Picture >> << OLE Object: Microsoft Photo Editor 3.0 Picture >>

Regards,

Ned

---

From: Zhang, Naijie {PCNA}
Sent: Thursday, July 16, 2009 2:46 PM
To: Given, Peter {PCNA}; Havekotte, Peg {PCNA}
Cc: Kamdem, Ricky {PCNA}
Subject: Does aroma vapor accelerate the aroma release from the gelatin capsule?

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2166

# APPENDIX XXI

Discovery document marked as PC 2167 and PC 2197. E-mail in which Zhang

acknowledged my work on "double coating."

Rickys Sent Items

Peter and Peg,

The gelatin performance stability is monitored by storing coated bottle in a sealed desaturator for a period of time under 90% RH. Gelatin capsule collapsed in 2days under high humidity. Gelatin capsule broke and aroma released inside of desaturator. The cumulated organic vapor combined the high moisture in the desaturator could accelerate the aroma release from the capsule. This could be why the capsule lost performance in 2 days stored in the sealed container. However, Ricky showed that gelatin capsule coated with shellac exhibited good aroma performance after a double coated bottle was soaked into water (not in sealed container) for 16 hours. The results indicated that organic aroma vapor could affect the capsule degradation. Therefore, we need to do reality study for gelatin performance stability. Do you know and have the connection with Pepsi location in southern area with 80% humidity. We can send coated bottles with different technology to there and monitor the performance stability. By this way, we should obtain real data for gelatin capsule stability.

Regards,

Ned

From: Kamdem, Ricky {PCNA}
Sent: Monday, August 03, 2009 3:03 PM
To: Zhang, Naijie {PCNA}
Subject: RE: SM-004 Encapsulate from Appleton

ok.

---

From: Zhang, Naijie {PCNA}
Sent: Monday, August 03, 2009 2:25 PM
To: Kamdem, Ricky {PCNA}
Subject: RE: SM-004 Encapsulate from Appleton

Ricky,

Please don't sniff or smell the M-F capsule. I will get the data or the facts before doing any sensory.

Ned

---

From: Kamdem, Ricky {PCNA}
Sent: Monday, August 03, 2009 12:12 PM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: SM-004 Encapsulate from Appleton

I can start looking into headspace analysis.

---

From: Given, Peter {PCNA}
Sent: Monday, August 03, 2009 11:43 AM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2167

could affect the capsule degradation. Therefore, we need to do reality study for gelatin performance stability. Do you know and have the connection with Pepsi location in southern area with 80% humidity. We can send coated bottles with different technology to there and monitor the performance stability. By this way, we should obtain real data for gelatin capsule stability.

Regards,

Ned

From: Kamdem, Ricky {PCNA}
Sent: Thursday, July 16, 2009 3:05 PM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}; Havekotte, Peg {PCNA}
Subject: RE: Does aroma vapor accelerate the aroma release from the gelatin capsule?

We might be able to check the influence of organic vapor on flavor encapsulate by placing a dry coating of flavor encapsulate in a vessel saturated with vapors of flavor oil. Microscopy observation or sensory evaluation would then help to determine if organic vapors alone is really a factor. Then one may consider combining organic vapor and humidity. It seems however that real life study may return different data than from a closed vessel.

---

From: Zhang, Naijie {PCNA}
Sent: Thursday, July 16, 2009 2:46 PM
To: Given, Peter {PCNA}; Havekotte, Peg {PCNA}
CC: Kamdem, Ricky {PCNA}
Subject: Does aroma vapor accelerate the aroma release from the gelatin capsule?

Peter and Peg,

The gelatin performance stability is monitored by storing coated bottle in a sealed desaturator for a period of time under 90% RH. Gelatin capsule collapsed in 2days under high humidity. Gelatin capsule broke and aroma released inside of desaturator. The cumulated organic vapor combined the high moisture in the desaturator could accelerate the aroma release from the capsule. This could be why the capsule lost performance in 2 days stored in the sealed container. However, Ricky showed that gelatin capsule coated with shellac exhibited good aroma performance after a double coated bottle was soaked into water (not in sealed container) for 16 hours. The results indicated that organic aroma vapor could affect the capsule degradation. Therefore, we need to do reality study for gelatin performance stability. Do you know and have the connection with Pepsi location in southern area with 80% humidity. We can send coated bottles with different technology to there and monitor the performance stability. By this way, we should obtain real data for gelatin capsule stability.

Regards,

Ned

From: Kamdem, Ricky {PCNA}
Sent: Thursday, July 16, 2009 9:13 AM
To: Zhang, Naijie {PCNA}
Subject: RE: Exp design draft

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2197

# APPENDIX XXII

Discovery document marked as PC 2177 in which Peter Given acknowledged my work on edible coatings on July 27, 2009. In response I articulated my thoughts on the technology.

Rickys Sent Items

1. Oil #1 Slurry, ID# 3398; Batch # 57-081

2. Oil #A (17131 OFF-Pepsi) slurry; ID# 3403; Batch# 57-095

What type of the binder did you add into the slurry? Does the binder work for PET bottle?

Thanks,

Ned Zhang

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 29, 2009 8:04 AM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: Critical Reviews in Food Science and Nutrition - informaworld new issue alert

Very interesting abstract, a good summary of all the challenges we have encountered so far in trying to waterproof flavor encapsulates.
The non-linearity of the influence of relative humidity of flavor encapsulate (at least for gelatin based) is a major problem, it makes it quite complicated to model it. But at this point we can at least say that we need hydrophobic films for double coating, then upon application we will select the ones with better physico-mechanical properties. Is it possible we can get a copy of this article?

-----Original Message-----
From: Given, Peter {PCNA}
Sent: Tuesday, July 28, 2009 4:14 PM
To: Zhang, Naijie {PCNA}; Kamdem, Ricky {PCNA}
Subject: FW: Critical Reviews in Food Science and Nutrition - informaworld new issue alert

check out article on edible moisture barriers - maybe something new or interesting pertaining to your moisture barrier film work???? PS - I don't have the article, just the link to the abstract herein.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

# APPENDIX XXIII

Discovery document PC 2183 in which an external source named Rashmi was contacted with report of my findings on humidity/moisture in relation to Aroma Technology Delivery System.

Rickys Sent Items

From: Kamdem, Ricky {PCNA}
Sent: Monday, July 27, 2009 9:35 AM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Subject: RE: PhD - One on One

I took classes from Prof. Ludescher, excellent Physical Chemist. Students voted him best teacher I think a couple of times, I probably know Rashmi or heard of him, but at this moment I can not remember the face.

---

From: Given, Peter {PCNA}
Sent: Monday, July 27, 2009 8:36 AM
To: Zhang, Naijie {PCNA}; Kamdem, Ricky {PCNA}
Subject: FW: PhD - One on One

FYI - we'll meet with Rashmi when she returns from bus travel - I just found out she did her PhD on related topics to gelatin encapsulation.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Tiwari, Rashmi {PCNA}
Sent: Monday, July 27, 2009 7:38 AM
To: Given, Peter {PCNA}
Cc: Havekotte, Peg {PCNA}; Brand-Levine, Dalit {PCNA}
Subject: RE: PhD - One on One

Peter

Will be more than happy to discuss this topic.

The gelatin films for aroma coated outside of a package would definitely be affected by RH due to glass transition of amorphous gelatin films causing the breaking of the film and losing the aroma.

Are these films cold-cast or hot-cast, my guess based on what I have seen these are cold-cast films to what I know hot-cast films have slightly better barrier. Composite films with sugars/gums/fat also give better barrier. Solutions to humidity exposure might be viable but direct water immersion extremely challenging situation. My PhD advisor Dr Richard Ludescher focuses on this kind of research.

I am traveling until Wednesday will touch base once I get back.

Best Regards
Rashmi

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2183

# APPENDIX XXIV

Discovery document PC 2192. E-mail in which Zhang was said to be still in training even as of July 21st, 2009.

Rickys Sent Items

It would be good to meet soon.

-----Original Appointment-----
From: Given, Peter {PCNA}
Sent: Tuesday, July 21, 2009 8:31 AM
To: Zhang, Naijie {PCNA}; Kamdem, Ricky {PCNA}
Subject: Canceled: Aroma Release Project Status Meeting
When: Tuesday, July 21, 2009 9:00 AM-10:00 AM (GMT-05:00) Eastern Time (US & Canada).
Where: Peter's Office
Importance: High

Ned is in training today, so I'll reschedule - we need to catch up sometime this week!

From: Kamdem, Ricky {PCNA}
Sent: Monday, July 20, 2009 4:29 PM
To: 'kevin.brownrigg@gcs.com'
Subject: RE: Request for Teflon caps

Kevin,

Thanks very much for sending me one box of Teflon caps. I received it and we are using them at a very fast pace, please would you be kind to send me another box.

Regards

Please ship to

Ricky Kamdem
Scientist, Pepsi
100 Stevens Avenue
Valhalla, NY 10595
TeL: 1 914 831 4225

---

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 3:07 PM
To: 'kevin.brownrigg@gcs.com'
Subject: Request for Teflon caps

Kevin,

Please would you send me a case of Teflon Caps. I am not sure if you have any other name for it but typically they are a little bit stronger than other plastic caps and the teeth in the tamper band area are also stronger. These caps have 60 serrations. If you want me to send you a sample, please let me know.

Please ship to

Ricky Kamdem
Scientist, Pepsi
100 Stevens Avenue
Valhalla, NY 10595
TeL: 1 914 831 4225

From: Kamdem, Ricky {PCNA}
Sent: Monday, July 20, 2009 2:32 PM
To: 'jack sniado'
Subject: RE: Request for a sample of diacetyl

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2192

# APPENDIX XXV

Discovery document PC 2231 to PC 2234. An e-mail string in which I had questions concerning the University of Illinois' aroma film work and while emphasizing the "double coating" approach that I have been successfully developing.

Rickys Sent Items
Subject: RE: Informal Project Update

now?

---

From: Hoar, Michael {PCNA}
Sent: Thursday, July 02, 2009 2:33 PM
To: Kamdem, Ricky {PCNA}
Subject: RE: Informal Project Update

let's meet in the cafeteria-- coffee break

-----Original Appointment-----
From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 4:45 PM
To: Kamdem, Ricky {PCNA}; Hoar, Michael {PCNA}
Subject: Informal Project Update
When: Thursday, July 02, 2009 4:00 PM-4:30 PM (GMT-05:00) Eastern Time (US & Canada).
Where: Mike's office

From: Kamdem, Ricky {PCNA}
Sent: Thursday, July 02, 2009 2:33 PM
To: Hoar, Michael {PCNA}
Subject: RE: Informal Project Update

now?

---

From: Hoar, Michael {PCNA}
Sent: Thursday, July 02, 2009 2:33 PM
To: Kamdem, Ricky {PCNA}
Subject: RE: Informal Project Update

let's meet in the cafeteria-- coffee break

-----Original Appointment-----
From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 4:45 PM
To: Kamdem, Ricky {PCNA}; Hoar, Michael {PCNA}
Subject: Informal Project Update
When: Thursday, July 02, 2009 4:00 PM-4:30 PM (GMT-05:00) Eastern Time (US & Canada).
Where: Mike's office:

From: Kamdem, Ricky {PCNA}
Sent: Thursday, July 02, 2009 12:14 PM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois

Peter,

You will find in red a brief Engineering analysis of the Univ. of IL's proposed zein

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 2231

based microencapsulation process as I understand it and imagine it to flow in a manufacturing environment. Number one problem is solvent handling, evaporation, concentration, low temperature evaporation.

I understand this could be contract manufactured, but when put side by side with double coating technology the proposal looks very demanding and might be expected to cost significantly more.
Now these are questions we had:
what unique advantage would it offer?
Does it even work at lab level when put in application?
I'm wondering if so far the Univ of IL sent you any data showing that it worked in their hands?
In my years of industry experience, every new technology is always introduced though prototypes and samples. That is to say, when I succeed I will show something tangible to taste, smell, and sniff. How come the Univ. of IL has not considered this even after you the sponsor explicitly made a request for prototype sample. So this makes me doubt if they are sincere on this or not especially given the fact that they know we are struggling with this.

I will re-prioritize this and begin work on it to see if I can reach same as they claim.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, July 02, 2009 10:40 AM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois

I'll see if I can get them to send us a couple bottles using this approach. If they can't or won't, then I suggest we at least give it a try - we have $ invested in U. of Ill, so we really owe it to ourselves to at minimum test in-house, whatever they come up with.

I would like to know precisely what the cost & technology reservations are - don't need a "thesis" - just a couple bullet points.

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

---

From: Kamdem, Ricky {PCNA}
Sent: Thursday, July 02, 2009 10:19 AM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois

Rickys Sent Items

Peter,

I was just about to come to talk to you about this. I reviewed the process completely and I had a conversation with Ned a it about. Neither Ned nor myself believed that the process as presented to us has any commercial viability as an industrial process in our application, because of cost and technology reasons. So that's why we requested that the University of Illinois would courteously send us a prototype before we commit much time and investment in this. I intended to follow up with you today. Now if you feel that we should do the experiment anyway, then I will prioritize it right away, but at this point frankly neither Ned nor myself see any future for it. So we have been focusing more on developing and establishing the double coating technology which seems to be our best bet for the short run.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, July 02, 2009 10:08 AM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: U. of Illinois

Ricky - I have not heard much about zein recently - have you 1) tried to reproduce U. of Ill work with zein, and 2) any success (or flops)?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

From: Kamdem, Ricky {PCNA}
Sent: Thursday, July 02, 2009 10:19 AM
To: Given, Peter {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: RE: U. of Illinois

Peter,

I was just about to come to talk to you about this. I reviewed the process completely and I had a conversation with Ned a it about. Neither Ned nor myself believed that the process as presented to us has any commercial viability as an industrial process in our application, because of cost and technology reasons. So that's why we requested that the University of Illinois would courteously send us a prototype before we commit much time and investment in this. I intended to follow up with you today. Now if you feel that we should do the experiment anyway, then I will prioritize it right away, but at this point frankly neither Ned nor myself see any

future for it. So we have been focusing more on developing and establishing the double coating technology which seems to be our best bet for the short run.

Regards

Ricky

---

From: Given, Peter {PCNA}
Sent: Thursday, July 02, 2009 10:08 AM
To: Kamdem, Ricky {PCNA}
Cc: Zhang, Naijie {PCNA}
Subject: U. of Illinois

Ricky - I have not heard much about zein recently - have you 1) tried to reproduce U. of Ill work with zein, and 2) any success (or flops)?

Peter Given, Ph.D.
Senior Research Fellow
Pepsi-Cola Company
100 Stevens Avenue
Valhalla, NY 10595
(914)742-4563
(914)742-4937 fax
peter.given@pepsi.com

This message may contain CONFIDENTIAL information. If you are not the intended recipient, please DO NOT READ this message. Notify the sender by replying to the message and then DELETE THIS MESSAGE from your system. Your cooperation is appreciated.

Subject: Informal Project Update
Location: Mike's office

Start: Thu 7/2/2009 4:00 PM
End: Thu 7/2/2009 4:30 PM
Show Time As: Tentative

Recurrence: (none)

Meeting Status: Not yet responded

Organizer: Kamdem, Ricky {PCNA}
Required Attendees: Hoar, Michael {PCNA}

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 3:07 PM
To: 'kevin.brownrigg@gcs.com'
Subject: Request for Teflon caps

Kevin,

Please would you send me a case of Teflon Caps. I am not sure if you have any other name for it but typically they are a little bit stronger than other plastic caps and the teeth in the tamper band area are also stronger. These caps have 60 serrations. If you want me to send you a sample, please let me know.

Please ship to

Ricky Kamdem
Scientist, Pepsi
100 Stevens Avenue

# APPENDIX XXVI

Discovery document   PC 2235. E-mail communication summarizing what I

taught Naijie Zhang and the recommendations I issued for the future.

Rickys Sent Items

Valhalla, NY 10595
TeL: 1 914 831 4225

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 11:18 AM
To: Zhang, Naijie {PCNA}
Subject: RE: Aroma Technology

you are welcome.

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, July 01, 2009 11:18 AM
To: Kamdem, Ricky {PCNA}
Subject: RE: Aroma Technology

Ricky,

Thank you for the summary.

Ned

---

From: Kamdem, Ricky {PCNA}
Sent: Wednesday, July 01, 2009 10:12 AM
To: Zhang, Naijie {PCNA}
Cc: Havekotte, Peg {PCNA}; Covarrubias, Marco {PCNA}; Given, Peter {PCNA}
Subject: RE: Aroma Technology

Ned;

1 - This is e-mail is for sake of summarizing some background information. I think the suggestion by Peter and Peg to meet in group maybe more helpful in getting clearer understanding of flavor formulas. Last year, my focus on the project was "Stability of Encapsulates" and so far I have shown and trained you on all that I learned in terms of stability and what I think would be needed in order to design a "new encapsulate" that can survive the market place. In case something is lacking on concerning stability piece, please let's revisit that work again.

2 - Concerning flavors encapsulate and the specific types of flavors, I do NOT have access to those information. I did some analytical development work on encapsulates but it did not go to the level of knowing the specific composition of oils. So Marco and Peg will be more helpful to you on this. I also communicated to you the conversation I had with Winsome concerning the possibility of making stronger orange flavors. She indicated that it is possible and that there might be some flavors in the system already, but she needed a more formal request. So please consider following up with Winsome.

3 - I also informed you that a number of consumer tests were done last year and returned very positive results. IN this context we also met with Marco about and he indicated to us that it is difficult to get the flavor refer to as "Trump" which is what I think Peg is referring to as "Sweet".

4 - I also mentioned to you recently that Karnav informed that flavors encapsulates were damaged by heat when the FR refrigerator broke down. so at this point we may have to request new encapsulates again. The damaged encapsulate were moved to the 40oF room on the first floor, but I don't think they will be of any more use since they seemed completely denatured. The only encapsulates left are the small amounts of OFF and LSX encapsulates we have in the

refrigerator in the ADS lab. Karnav may still have a little of Trump in the FR lab, but this I need to check with him.

Regards

Ricky

---

From: Zhang, Naijie {PCNA}
Sent: Wednesday, July 01, 2009 9:19 AM
To: Kamdem, Ricky {PCNA}
Subject: FW: Aroma Technology

Ricky,

Please follow Peg's message. I don't know these information. Where are these samples? Would you please bring all the capsule slurry to the lab. We need these samples frequently.

Thanks,

Ned

---

From: Havekotte, Peg {PCNA}
Sent: Wednesday, July 01, 2009 7:56 AM
To: Zhang, Naijie {PCNA}; Given, Peter {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Aroma Technology

Hi Ned, No we had all our success with an oil we called sweet that was encapsulated by RT Dodge. Additionally we had a valencia mixture that has not yet been encapsulated . It however was placed on outside of bottle as a liquid and was also successful regarding multi experience..

---

From: Zhang, Naijie {PCNA}
Sent: Tuesday, June 30, 2009 4:38 PM
To: Havekotte, Peg {PCNA}; Given, Peter {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Aroma Technology

Peg-

You mean 4-fold orange aroma.

---

From: Havekotte, Peg {PCNA}
Sent: Tuesday, June 30, 2009 4:01 PM
To: Given, Peter {PCNA}; Zhang, Naijie {PCNA}
Cc: Covarrubias, Marco {PCNA}
Subject: RE: Re: Aroma Technology

# APPENDIX XXVII

Discovery document marked as PC 1165 to PC 1667 showing the electron microscopy pictures of releasably entrapped/encapsulated flavor molecules that I exposed to high humidity environment and submitted to PepsiCo forensic laboratory for characterization. We were able to clearly observe the damages that occurred on the releasably entrapped/encapsulated film structures when they were exposed at high humidity.

CL

TAB 12

# EXHIBIT DMD – XVIII(2)

# IN SUPPORT OF PLAINTIFF'S COUNTERCLAIM AND IN SUPPORT OF THE DENIAL OF THE DEFENDANTS' MOTION TO DISMISS

SUPPLEMENT TO PLAINTIFF'S AFFIDAVIT TO REFUTE PEPSICO INC.'S DESIGNATION OF NAIJIE ZHANG AND PETER GIVEN AS INVENTORS ON UNITED STATES PATENT PUBLICATION NO. 2012/0006909 A1. 137 PAGES.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---------------------------------------------------------------X

RICKY KAMDEM-OUAFFO,

Plaintiff

- against-

PEPSICO, INC.,

Defendant

---------------------------------------------------------------X

Index No.: 22625/10

Supplement To Plaintiff's Affidavit to Refute PepsiCo's Inc. Designation of Naijie Zhang and Peter Given as Inventors on the United States Patent Publication No. US 2012/0006909 A1

RICKY KAMDEM-OUAFFO, PhD, the plaintiff, being duly sworn, respectfully submits to the Supreme Court of the State of New York, the following supplement to an initial affidavit in which I sought to Refute PepsiCo's designation of Naijie Zhang and Peter Given as Inventors on the United States Patent Publication No. US 2012/0006909 A1. The necessity of preparing this supplement recently arose from: 1) a recent discovery that PepsiCo had applied for patent internationally under the Patent Cooperation Treaty (PCT) using the same currently pending patent application at the United States Patent Trademarks Office (USPTO), 2) the necessity to add more appendix to my initial affidavit including a determination of inventorship from an expert patent attorney, 3) the necessity to address and to provide affirmations by way of affidavit to some inventorship questions that the expert patent attorney could not resolve during his analysis of the very limited number of project related documents that have been so far released by the Defendant. This supplement to my initial affidavit also serves to maintain and strengthen my claims that the Defendant infringed on my patent inventor rights in violations of an

active pre-employment "Attachment B to the Staffing Supplier Agreement: Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property." The Defendant and the named inventors also committed violations of applicable Federal, State, and even international laws, rules, regulations and statutes including 35 U.S.C. Defendant's actions has thus far caused me enormous amount of damages for which I am seeking relief. Recently, I also discovered that the Defendant has applied for International Patents under the International Application Number PCT/US2011/043042. This application was filed with the World Intellectual Property Organization which is currently composed of about 146 countries and nations.

The paragraph and page numbering of this supplement will continue according to my initial affidavit on this matter, therefore the body of the Affidavit Supplement will continue with page 32 and paragraph 65 while the Appendix Supplement will continue with APPENDIX XXXII. This supplement should not be considered alone unless it is appended to my initial affidavit.

65. APPENDIX XXXII aka PC 1146 – 1147 is a "Meeting Minutes – "Aroma Experience – Quality Workstrea..., Date August 14, 2008, Prepared by Mike Hoar." Mike Hoar was a project Manager, and had no intellectual domination over my work. Peg was the lab supervisor, and Marco was a coworker on the project and both of these were responsible for reviewing my scientific and intellectual work. I was fully responsible for "Task definition and Timeline adjustment" during my work although subject to approval by project manager and scientific reviewers, but when it came to generating my ideas I had intellectual domination.

66. APPENDIX XXXIII aka PC 1174-1175, PC 1135-1140 are "Application Flavor Encapsulate Milestones" and "Deliverables" that I independently developed and submitted to PepsiCo manager and scientists for approval in the month of July 2008 before commencing testing. The Milestones and Deliverables were in complement to the project proposal that I also wrote in the same time period as can be seen in APPENDIX III. In my project proposal, I already developed the idea of having flavor molecules in a slurry and letting them dried as can be seen in the following statement that I wrote: "Conceptually, the liquid slurry may have some free flavor molecules in the liquid phase. When the slurry dries around the bottle, the molecules may either volatilize of be entrapped in the dry layer depending on their boiling point..." (APPENDIX III, PC 1181). Claim 1 of US Patent Publication 2012/0006909 A1 states the following: "…An aroma delivery system comprising a film of aroma compound releasably entrapped in a polymeric matrix." As you can see claim 1 is a mere rephrasing of what I conceptualized and wrote in my proposal very early on.

67. APPENDIX XXXIV aka PC 0481 - 0510, PepsiCo-Cola Interoffice Memo – Confidential. "Project # S3441: Sampling and Measurement Of Aroma Release From Application Encapsulates Using Versatile Aroma Release Device." This document shows additional innovation that I conceptualized, designed, and reduced to practice for the Defendant during my work. The Defendant had clearly informed me that the job expectation was that I should innovate, create, invent, conceptualize etc… and I performed accordingly. The Defendant has not this far released the job description that had for my role, nor has the Defendant released

the interview records that was produced during my interview for the role, but those records do exist an could be of good use in resolving questions related to who was coming up with the ideas I used in my work.

68. APPENDIX XXXV aka PC 0604 – 0605, "PepsiCo-Cola Interoffice Memo – Confidential. "Project # 900441 – Performance of Edible Films as Relative Humidity Barriers for Lemon 5X Gelatin Flavor Encapsulate." Is a draft of project report in which I was using edible films to solve the problem of moisture challenges I discovered earlier.

69. APPENDIX XXXVI: This is a report from Michael J. Feigin, Esq, a New York and New Jersey Patent Attorney on his "Determination of Inventorship" on PepsiCo Patent Publication 2012/0006909 A1 in which he found that Naijie Zhang could not be an inventor on the said patent publication and that the inventors and the assignee willfully committed fraud. The expert could not reach the positive conclusion that I was the inventor because of lack of very many project related documents that Defendant has not released so far. For example my laboratory notebooks, and other note pads, meeting minutes etc….However the patent expert has reached the determination that **"….Pepsi Co., Inc. knew that inventorship was an issue and made a willful choice in improperly naming the inventors."**

70. APPENDIX XXXVII aka PC 0081 -0082, "Attachment B to the Staffing Supplier Agreement: Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property. Signed on 07/09/08 by Ricky Kamdem-Ouaffo. This is a pre-employment agreement that I entered with the Defendant prior to starting

my role on the Aroma delivery project. This was an Inventor – Assignee agreement as can be seen in the agreement language itself: "A. ...I hereby assign and agree to assign to Company...all inventions...whether or not patentable...B. I will ... execute a specific assignment of title to company and do anything else ...to enable the Company to secure a patent, copyright registration or other form of protection of said intellectual property anywhere in the world." As you can see from the language of this agreement, there was a reasonable expectation on my part that in case any of my work should be deemed worthy by the Defendant of any form of protection that the Defendant wanted to pursue outside of the Company, then the Defendant will perform honestly and acknowledge me as the inventor or as the potential inventor of whatever the Defendant desired to seek protection for from my work.

71. APPENDIX XXXVIII: "PATENT APPLICATION JOINT DECLARATION and POWER OF ATTORNEY" executed by Naijie Zhang and Peter Given on 06/21/10. On the basis of Michael J. Feigin's determination, the defendant and the named inventors committed fraud because at the time of signing the oath of declaration they knew that they had used at least some of my work, they based their inventorship decision on illegal standards, they willfully removed my name from the invention disclosure, and they knew that I conceptualized and did the work claimed long before Naijie Zhang joined PepsiCo therefore the attorney reached the following determination that **"....PepsiCo., Inc. knew that inventorship was an issue and made a willful choice in improperly naming the inventors."**

72. APPENDIX XXXIX: PCT REQUEST Original (for Submission) International Application No. PCT/US11/43042. RELESABLY ENTRPAMENT OF AROMA USING A POLYMERIC MATRIX. This is evidence that PepsiCo is seeking an international and worldwide reach for the same US Patent Publication 2012/0006909 A1. I am not surprised by the fact the application of my work/idea would have a worldwide reach because so was also the scope of the Aroma Delivery Systems project that they contracted me to work on and I designed all my work accordingly: The project had a global reach.

73. APPENDIX XL: PCT NOTIFICATION OF THE INTERNATIONAL APPLICATION NUMBER AND OF THE INTERNATIONAL FILING DATE AND PCT NOTIFICATION OF RECEIPT OF RECORD COPY. This is evidence that PepsiCo is seeking an international and worldwide reach for the same US Patent Publication 2012/0006909 A1. I am not surprised by the fact the application of my work/idea would have a worldwide reach because so was also the scope of the Aroma delivery Systems that they contracted me to work on and I designed all my work accordingly: The project had a worldwide reach.

74. XLI: WORLD INTELECTUAL PROPERTY ORGANIZATION. DOCUMENT MADE AVAILABLE UNDER THE PATENT COOPERATION TREATY (PCT). INTERNATIONAL APPLICATION NUMBER PCT/US2011/043042. This is evidence that PepsiCo is seeking an international and worldwide reach for the same US Patent Publication 2012/0006909 A1. I am not surprised by the fact the application of my work/idea would have a worldwide reach because so was also the scope of the Aroma delivery Systems that they contracted me to work on

and I designed all my work accordingly. The project had a global and worldwide reach.

## PLAINTIFF AFFIRMATIONS CONCERNING INVENTORSHIP QUESTIONS THAT NEED TO BE ADDRESSED THROUGH TESTIMONIES IN COURT PROCEEDINGS AND/OR FURTHER DOCUMENT DISCOVERY

75. **Concerning Legal Standard Inventorship - Conception and Reduction to Practice**

    a. I am claiming that to the best of my knowledge, the genesis of claim 1 on the US Patent Publication 2012/0006909 A1 was already documented in my "Draft Proposal" dated 07/28/2008 in the following statement: "Conceptually, the liquid slurry may have some free flavor molecules in the liquid phase. When the slurry dries around the bottle, the molecules may either volatilize of be entrapped in the dry layer depending on their boiling point..." (APPENDIX III, PC 1181.) Claim 1 of US Patent Publication 2012/0006909 A1 states the following: "…An aroma delivery system comprising a film of aroma compound releasably entrapped in a polymeric matrix." As you can see claim one is a mere rephrasing of what I wrote in my proposal very early on.

    b. I am claiming that to the best of my knowledge, I am the person who conceptualized the idea and wrote it in my work proposal to be approved by Defendant's scientists, therefore at least within the PepsiCo

Organization and within the Aroma Delivery Systems project I am the Inventor unless the Defendant can prove otherwise.

c. Claim 2 of US Patent Publication 2012/0006909 A1 states: "The aroma delivery system of claim 1, wherein the matrix has a surface and further comprising a secondary covering film covering the surface." APPENDIX IX aka discovery document PC 1572 to PC 1573, "Report # 900441: The Performance Of Corn Zein And Ethyl Cellulose As Potential Moisture Barrier on Zein-Walled Flavor Encapsulate At High Relative Humidity" establishes very clearly that I was already reducing to practice the idea of "Double Coating" technology before Naijie Zhang joined the company. It is also my work in the preceding months that led me to conceptualize the idea of using moisture resistance films and encapsulation and which was approved and adopted within PepsiCo long before Naijie Zhang came on board or before I was transferred to Peter Given Laboratory. Therefore I either conceptualized or at least contributed to the conceptualization of claim 2 and I also reduced it to practice. Therefore I am an inventor of claim 2. All other claims seemed to be derived from claims 1 and 2, therefore I contributed to all those claims as well, at least within the PepsiCo organization.

d. During my employment I filled out several laboratory notebooks and note pads all of which are in the Defendant's possession. The Defendant has refused to produce copies of those laboratory notebooks and note pads, all

of which could be a good source of information on this case to help resolve questions related to ideas and the timing thereof.

**76. Concerning Legal Standard Inventorship - Intellectual Domination/Joint Inventorship**

a. For the least to speak I had and I exercised intellectual domination on my work and ideas during the duration of my contract work at PepsiCo. I was not at any time considered a mere technician nor did I operate as a mere lab technician as can be seen even in my scientific reports in which I clearly highlighted some of my designs and concepts. The Defendant has not thus far released the job description that was written and presented to me for my role as a contract Food Scientist. But the document does exist and is the Defendant's possession.

b. Concerning joint inventorship, I do not see the possibility for Naijie Zhang being a co-inventor with me because I had already formulated the ideas without knowing of him. Also only until April 2009 that I was transferred to Peter Given laboratory and started interacting with him. However, I am not ruling out the possibility that Peter Given could be co-inventor but he will need to provide evidence, I do not have any at this point. This being said Peter Given partook of the invention disclosure fraud with the Defendant in consenting to removing my name from the invention disclosure when he knew well that it was the wrong thing to do and he also willfully co-signed a false US patent declaration. Therefore he should be held accountable of his actions in the scheme. During

depositions, we asked Peter Given questions about this matter, he seemed to suggest that he tried to protect my inventorship at the time they were discussing the matter among themselves within PepsiCo, but the string of e-mail shows that he ended up agreeing with everyone else and co-signed for the fraud.

**77. Concerning Prosecution History Of The Patent**

In spite of whatever questions experts may have to say concerning the prosecution history of the patent application itself, whether at national or International stages, I only became aware of the fact that the Defendant actually filed Patent application on 08/08/2012 and I have not at any time contacted the United States Patent Office or the PCT office about what I perceived as infringements of my Inventor's rights. I have nothing to do with any setback that the Defendant might face in the Patent Office. The Defendant and its own experts attorneys made the determination that they needed to seek protection for my work and ideas and I have no reason to doubt that they sincerely believed that my ideas and work were worthy of some form of protection. Even after being wrongfully discharged from the company, I was available at all time to execute all the "…specific assignment of Title to Company and to do anything else reasonably necessary to enable the company to secure a patent…" according to the pre-employment staffing agreement. I have not at any time refused to comply to the agreement, therefore the fact that the Company decided to knowingly remove my name from the invention disclosure of my work and ideas was a violation of the agreement we had in place, regardless of the outcome of the Patent application in the United

States and abroad. And in doing so, the Defendant fraudulently published the names of Naijie Zhang and Peter Given worldwide instead of my name, and gave them a most desired scientific recognition using my work and ideas, regardless of whether the claims will be granted or not. As a matter of fact, the Defendant gave Naijie Zhang and Peter Given pay raises and promotions after crediting them with my ideas and work. I believe that PepsiCo has more than one way of successfully defending the patent publication claims both nationally and internationally if they so choose to do and have competent scientists handling on my ideas. However as far as I am concerned, the Defendant breached an Inventor – Assignee agreement that they themselves recently sought to use against me during the course of this litigation when they went to Court to obtain an Order from the Judge that I should return any PepsiCo material in my possession or else face penalties including criminal penalty.

**SUPPLEMENT CONCLUSION**

78. The Defendant infringed on my patent invention dislcosure rights in violations of an active pre-employment "Attachment B to the Staffing Supplier Agreement: Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property." PepsiCo Inc, Naijie Zhang, and Peter Given have willful and deliberately infringed on my patent invention disclosure rights. PepsiCo Inc., Naijie Zhang and Peter Given willful and deliberately violated the United States patent and invention disclosure laws beginning with removing my name from the invention disclosure of my ideas and work, and willfully making false statements

under oath to pose as inventors of my ideas and work when they knew well that they had removed my name from the invention disclosure of my ideas and work and that they were not the true inventors, reason why a Patent Expert reached the determination saying "….Pepsi Co., Inc. knew that inventorship was an issue and made a willful choice in improperly naming the inventors."

## SUPPLEMENT APPENDIX

32. APPENDIX XXXII: Meeting Minutes – "Aroma Experience – Quality Workstrea…, Date August 14, 2008"
33. APPENDIX XXXIII: "Application Flavor Encapsulate Milestones" and "Deliverables"
34. APPENDIX XXXIV: PepsiCo-Cola Interoffice Memo – Confidential. "Project # S3441: Sampling and Measurement Of Aroma Release From Application Encapsulates Using Versatile Aroma Release Device."
35. APPENDIX XXXV: PepsiCo-Cola Interoffice Memo – Confidential. "Project # S900441 – Performance of Edible Films as Relative Humidity Barriers for Lemon 5X Gelatin Flavor Encapsulate."
36. APPENDIX XXXVI: An New York and New Jersey Patent Attorney "Determination of Inventorship" on PepsiCo Patent Publication 2012/0006909 A1 by MICHAEL J. FEIGIN, ESQ.
37. APPENDIX XXXVII: "Attachment B to the Staffing Supplier Agreement: Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property. Signed on 07/09/08 by Ricky Kamdem-Ouaffo.
38. APPENDIX XXXVIII: "PATENT APPLICATION JOINT DECLARATION and POWER OF ATTORNEY" executed by Naijie Zhang and Peter Given on 06/21/10.
39. APPENDIX XXXIX: PCT REQUEST Original (for Submission) International Application No. PCT/US11/43042. RELESABLY ENTRPAMENT OF AROMA USING A POLYMERIC MATRIX.

40. APPENDIX XL: PCT NOTIFICATION OF THE INTERNATIONAL APPLICATION NUMBER AND OF THE INTERNATIONAL FILING DATE and PCT NOTIFICATION OF RECEIPT OF RECORD COPY.

41. XLI: WORLD INTELECTUAL PROPERTY ORGANIZATION. DOCUMENT MADE AVAILABLE UNDER THE PATENT COOPERATION TREATY (PCT). INTERNATIONAL APPLICATION NUMBER PCT/US2011/043042.

Ricky Kamdem-Ouaffo, PhD

Sworn to before me on this 1st Day of October, 2012

MICHELLE AYRES
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires October 22, 2012

Notary Public

# APPENDIX XXXII

Meeting Minutes – "Aroma Experience – Quality Workstrea..., Date August 14, 2008"

# Meeting Minutes

**Subject** Aroma Experience – Quality Workstrea

**Date** August 14, 2008

**Present** Mike, Peg, Marco, Ricky

**Key Notes:**

- Aroma Science workstream roles:
  - Y work – Marco is the lead and will define the work and outputs
  - SOW/Encapsulation research (Polar/Etching)- Mike has the lead but will consistently communicate with Marco as technical details will be vital to ensure properly defined SOW
  - External Research (Nizo)- Peg will lead and will define the workstreams & get to Mike
- Timeline & Workstream discussion (based on Ricky's outlined timeline)
  - Mike and Ricky will meet on Friday the 15th to discuss review the timeline, define the milestones, and capture all the associated tasks in order to validate a realistic timeline
    - Timeline was a good starting point, but needs to be further defined and detailed
    - 1. Quality of Methods – Analytical Bucket
      - 2 approaches that will run a parallel path (headspace evaluation & extraction)
    - 2. Quality of Materials
      - Consistency of Mfg (4x orange) defined/measured batch-to-batch & across mfgs (RT Doge, Lipo, Microtek)
        - To be done at zero-time
        - We will measure 3 batches from each mfg
        - Sensory evaluation (aroma) will be part of the workstream to validate the consistency. If the aroma is different, then we will do a taste evaluation.
      - Stability of slurry- across mfgs
        - 1 batch from each mfg
        - Stability from aged product
        - Temperature stability
        - Sensory evaluation (aroma) will be part of the workstream to validate the consistency. If the aroma is different, then we will do a taste evaluation.
      - Stability of applied slurry- 1 mfg only (RT Dodge), w/ multiple flavors
        - Age testing
        - Temperature testing
        - Effects of light
        - Effect of humidity (1 time point)

# Meeting Minutes

**New Action Items / Next Steps**

| # | Item | Responsible | Due Date |
|---|---|---|---|
| 1 | Task definition and timeline adjustment | Mike/Ricky | 8.15.08 |
| 2 | Define Y-Work | Marco | 8.22.08 |
| 3 | Define/outline External Research work | Peg | 8.22.08 |
| 4 | Review/Align on workstreams | Team | 8.22.08 |
| 5 | | | |

Prepared by:
Mike Hoar 8.15.08

# APPENDIX XXXIII

"Application Flavor Encapsulate Milestones" and "Deliverables"

| | Application Flavor Encapsulate Milestones | Start Date | End Date |
|---|---|---|---|
| 1 - | Project Definition: Scope, Goals, and Success Criteria of the Project Defined and Aligned. | 7/21/2006 | |
| 1.1 | Critical parameters for quality - consistency and stability- defined as followed | | |
| 1.1.1 | Consistency of manufacturing: Same flavor profile and amount delivered made from batch to batch | | |
| 1.1.2 | Consistency of application technology procedure: same amount of coating delivered onto the bottle during coating | | |
| 1.1.3 | Stability of encapsulation slurries determined: Over time, at different temperature | | |
| 1.1.4 | Stability of application encapsulates once coated on the bottles: Over time, at different temperature | | |
| 1.2 | Proposal and milestone write up completed | 7/25/2006 | |
| 1.2.1 | Project Proposal drafted | | |
| 1.2.2 | Proposal reviewed and critiqued by Peggy, Marco, Mike | | |
| 1.2.3 | Proposal Updated | | |
| 1.2.4 | Draft milestone prepared and submitted to Marco for review | | |
| 1.2.5 | Feedback from Marco received | | |
| 1.2.6 | Milestone reviewed in a meeting with Peggy, Mike, Marco and Ricky | | |
| 1.2.7 | Milestone corrected and updated as per suggestions during meting | | |
| 1.2.8 | Proposal and project milestones adopted | | |
| 2- | Quality (stability and consistency) of slurries and coatings | 8/14/2006 | |
| 2.1 | Lab survey of project supplies, materials, equipment | | |
| 2.2 | Method of application of encapsulate coatings around the bottles and drying parameters defined | | |
| 2.3 | Quality (stability and consistency) of slurries: Red Flag assessment of application encapsulates in dry and liquid forms | | |
| 2.3.1 | Consistency of manufacturing across manufacturers and among batches defined | | |
| 2.3.1.1 | Oils sent to manufacturers for encapsulation (RT Dodge, Lipo, Microtek) | | |
| 2.3.1.2 | Oils encapsulated | | |
| 2.3.1.3 | Encapsulates received and refrigerated (time Zero) | | |
| 2.3.1.4 | Encapsulates of various oils (specifically 4X Orange) from different manufacturers weighed (10 grams) into sample vials and put for Red flag assessment (110 °F for one week) | | |
| 2.3.1.5 | Thermally aged encapsulate slurries coated onto bottles | | |
| 2.3.1.6 | Fresh encapsulate slurries coated onto bottles | | |
| 2.3.1.7 | Aroma of thermally aged encapsulate evaluated against fresh encapsulate | | |
| 2.3.1.8 | Data reported and analyzed to determine consistency and stability across manufacturers and flavors. | | |
| 2.3.1.9 | Report written and communicated | | |
| 2.3.1.10 | Fresh encapsulate slurries coated onto bottles | | |
| 2.3.1.11 | Coated bottles subjected to Red flag assessement, 110oF for one week | | |
| 2.3.1.12 | Bottles pulled | | |
| 2.3.1.13 | Bottles evaluate for sensory vs blank and control | | |
| 2.3.1.14 | Report written and communicated | | |
| 2.4 | Instrumental analysis of aroma compounds remaining in aged encapsulates (slurries and coatings) | 8/25/2006 | |
| 2.4.1 | Thermally aged encapsulates harvested from the bottles and extratcted with solvent | | |
| 2.4.2 | Freshly coated and dry encapsulates harvested from the bottle and extratcted with solvent | | |
| 2.4.3 | Aroma extract analyzed using GC MS | | |
| 2.4.4 | Compounds identified | | |
| 2.4.5 | Report written and communicated | | |
| 2.5 | Instrumental quantitation of Aroma release | | |
| 1.3.1 | Thermally aged bottles capped | | |
| 1.3.2 | Capped bottles placed into aroma release device | | |
| 1.3.3 | Headspace sampled using a gas tight syringe or SPME fiber | | |
| 1.3.4 | Samples analyzed using GC MS | | |
| 1.3.5 | Compounds identified | | |
| 1.3.6 | Report written and communicated | | |
| 3 - | Instrumental methods standardized | 8/14/2006 | |
| 3.1 | Headspace sampling Model chamber for assessing aroma release rate developped | | |
| 3.1.1 | A a closed vessel for encapsulation aroma release conceptualize and design | | |
| 3.1.2 | Parts for the vessel sourced form suppliers | | |
| 3.1.3 | A machinist Contracted to build the aroma release vessel | | |
| 3.1.4 | Aroma release vessel received and tested | | |
| 3.1.5 | A coated bottlePlaced in the device | | |
| 3.1.6 | Coated bottle opened using aroma release device | | |
| 3.1.7 | Headspace sampled | | |
| 3.1.8 | Headspace sample analyzed using GC MS | | |
| 3.1.9 | Compound identified | | |
| 3.1.10 | Report written and communicated | | |
| 3.2 | Solvent extraction method developed | 8/18/2006 | |
| 3.2.1 | Liquid extraction of slurry | | |
| 3.2.1.1 | One gram of slurry weighed into a sample vial | | |
| 3.2.1.2 | 10 ml of solventadded into the vial | | |
| 3.2.1.3 | Sample sonicated for 5 minutes | | |
| 3.2.1.4 | Sample centrifuged for 10 min at 2000 rpm | | |
| 3.2.1.5 | Supernatant collected | | |
| 3.2.1.6 | Supernatant filtered | | |
| 3.2.1.7 | Supernatant diluted | | |
| 3.2.1.8 | Extract analyzed using GC MS | | |
| 3.2.1.9 | Compounds identified | | |
| 3.2.1.10 | Report written and communicated | | |

3.3 Liquid extraction of application encapsulate — 8/18/2008
- 3.3.1 Bottles coated and stored under predefined storage conditions
- 3.3.2 Bottles pulled according to schedule
- 3.3.3 Dry encapsulate harvested from the bottles
- 3.3.4 Dry encapsulate extracted using a solvent according to protocole 2.2.1
- 3.3.5 Extract analyzed
- 3.3.6 Compounds identified
- 3.3.7 Report written and communicated

4 - Stability across flavors (Stability of applied slurry - 1 manufacturer only (RT Dodge with multiple flavors)) — 9/2/2008
- 4.1 Selected slurries coated onto bottles
- 4.2 coated bottles placed under predifined storage conditions
  - 4.2.1 40°F (1 year)
  - 4.2.2 70°F (6-12 months)
  - 90°F (2-3 months)
- 4.3 Bottles pulled according to schedule
- 4.4 Aroma evaluated by sensory evaluation vs control and blank
- 4.5 Aroma release measured by Headspace GS MS
- 4.6 Aroma compounds identified
- 4.7 Data analyzed
- 4.8 Report written and communicated

5 - Aroma evaluation standardized - sensory evaluation — 8/25/2008
- 5.1 Terminology defined
- 5.2 Test ballot prepared
- 5.3 Rehearsal

6 - Influence of the age of application encapsulate on the perception of beverage matrix evaluated — 9/9/2008
- 7.1 Bottles coated
- 7.2 Storage test started
- 7.3 Aroma evaluation samples pulled according to schedule
- 7.4 Aroma evaluated
- 7.5 Data reported and analyzed
- 7.6 Report written an communicated

7 - Knowledge captured sustained and communicated — Weekly
- 7.1 Progress report communicated
- 7.2 Monthly report

MILESTONES

| | |
|---|---|
| **1** | **Planning** |
| **2** | **Methodologies- How to measure success** |
| 2.1 | Building analytical methodology to determine flavor quality |
| **2.1.1** | **Analytical methodologies for slurries** |
| **2.1.1.1** | **Liquid extraction** |
| 2.1.1.1.1 | One gram of slurry weighed into a sample vial |
| 2.1.1.1.2 | 10 ml of solventadded into the vial |
| 2.1.1.1.3 | Sample sonicated for 5 minutes |
| 2.1.1.1.4 | Sample centrifuged for 10 min at 2000 rpm |
| 2.1.1.1.5 | Supernatant collected |
| 2.1.1.1.6 | Supernatant filtered |
| 2.1.1.1.7 | Supernatant diluted |
| 2.1.1.1.8 | Extract analyzed using GC MS |
| 2.1.1.1.9 | Compounds identified |
| 2.1.1.1.10 | Report written and communicated |
| **2.1.2** | **Analytical methodologies for coatings** |
| **2.1.2.1** | **Headspace sampling Model chamber for assessing aroma release rate de** |
| 2.1.2.1.1 | Find contractor to build |
| 2.1.2.1.2 | Parts for the vessel sourced form suppliers |
| 2.1.2.1.3 | Build the vessel |
| 2.1.2.1.4 | Aroma release vessel received and tested |
| 2.1.2.1.5 | A coated bottle Placed in the device |
| 2.1.2.1.6 | Coated bottle opened using aroma release device |
| 2.1.2.1.7 | Headspace sampled |
| 2.1.2.1.8 | Headspace sample analyzed using GC MS |
| 2.1.2.1.9 | Compound identified |
| 2.1.2.1.10 | Report written and communicated |
| **2.1.2.2** | **Liquid extraction (1 slurry, 1 mfg)** |
| 2.1.2.2.1 | Bottles coated and stored under predefined storage conditions |
| 2.1.2.2.2 | Bottles pulled according to schedule |
| 2.1.2.2.3 | Dry encapsulate harvested from the bottles |
| 2.1.2.2.4 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 2.1.2.2.5 | Extract analyzed |
| 2.1.2.2.6 | Compounds identified |
| 2.1.2.2.7 | Report written and communicated |
| **2.1.3** | **Sensory evaluations for coatings and slurries** |
| 3 | Quality |
| 3.1 | Slurry Stability over time, temperature, & light |
| 3.1.1 | Oils sent to manufacturers for encapsulation (RT Dodge, Lipo, Microtek) |
| 3.1.2 | Oils encapsulated |
| 3.1.3 | Encapsulates received and refrigerated (time Zero) |
| 3.1.4 | weighed (10 grams) into sample vials and put for Red flag assessment (110oF f |
| 3.1.5 | Thermally aged encapsulate slurries coated onto bottles |
| 3.1.6 | Fresh encapsulate slurries coated onto bottles |
| 3.1.7 | Aroma of thermally aged encapsulate evaluated against fresh encapsulate |
| 3.1.8 | Data reported and analyzed to determine consistency and stability across manu |
| 3.1.9 | Report written and communicated |

| | |
|---|---|
| 3.1.10 | Slurry stability validated through internal sensory |
| **3.2** | **Slurry Consistency from batch-to-batch (across mfg, 2 batches each)** |
| 3.2.1 | Batch 1 |
| 3.2.1.1 | Oils sent to manufacturers for encapsulation (RT Dodge, Lipo, Microtek) |
| 3.2.1.2 | Oils encapsulated |
| 3.2.1.3 | Encapsulates received and refrigerated (time Zero) |
| 3.2.1.4 | weighed (10 grams) into sample vials and put for Red flag assessment (110oF f |
| 3.2.1.5 | Thermally aged encapsulate slurries coated onto bottles |
| 3.2.1.6 | Fresh encapsulate slurries coated onto bottles |
| 3.2.1.7 | Aroma of thermally aged encapsulate evaluated against fresh encapsulate |
| 3.2.1.8 | Data reported and analyzed to determine consistency and stability across manuf |
| 3.2.1.9 | Report written and communicated |
| 3.2.2 | Batch 2 |
| 3.2.2.1 | Oils sent to manufacturers for encapsulation (RT Dodge, Lipo, Microtek) |
| 3.2.2.2 | Oils encapsulated |
| 3.2.2.3 | Encapsulates received and refrigerated (time Zero) |
| 3.2.2.4 | weighed (10 grams) into sample vials and put for Red flag assessment (110oF f |
| 3.2.2.5 | Thermally aged encapsulate slurries coated onto bottles |
| 3.2.2.6 | Fresh encapsulate slurries coated onto bottles |
| 3.2.2.7 | Aroma of thermally aged encapsulete evaluated against fresh encapsulate |
| 3.2.2.8 | Data reported and analyzed to determine consistency and stability across manuf |
| 3.2.2.9 | Report written and communicated |
| 3.2.3 | Sensory evaluation between batch 1 and batch 2 |
| 3.2.4 | Consistency of slurries batch-to-bach across mfg, 2 batches each test results co |

| | |
|---|---|
| **4** | **Coatings- Stability and Consistency** |
| **4.1** | **Slurry stability across mfg at zero time (1 batch per mfg)** |
| 4.2 | Coating stability across mfg at zero time (1 batch per mfg) |
| 4.3 | Consistency & stability across flavor slurries over time (Red flag assessment 11( |
| 4.4 | Stabilityy of coatings over time (1 mfg- 4x fold) |
| 4.4.1 | Coat bottles with 4x fold orange oil |
| 4.4.2 | Bottle Pull #1 @ 90 deg |
| 4.4.2.1 | Dry encapsulate harvested from the bottles |
| 4.4.2.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.2.3 | Extract analyzed |
| 4.4.2.4 | Compounds identified |
| 4.4.2.5 | Report written and communicated |
| 4.4.3 | Bottle Pull #2 @ 90 deg |
| 4.4.3.1 | Dry encapsulate harvested from the bottles |
| 4.4.3.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.3.3 | Extract analyzed |
| 4.4.3.4 | Compounds identified |
| 4.4.3.5 | Report written and communicated |
| 4.4.4 | Bottle Pull #3 @ 90 deg |
| 4.4.4.1 | Dry encapsulate harvested from the bottles |
| 4.4.4.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.4.3 | Extract analyzed |
| 4.4.4.4 | Compounds identified |
| 4.4.4.5 | Report written and communicated |

| | |
|---|---|
| 4.4.5 | Bottle Pull # 4 @ 90 deg |
| 4.4.5.1 | Dry encapsulate harvested from the bottles |
| 4.4.5.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.5.3 | Extract analyzed |
| 4.4.5.4 | Compounds identified |
| 4.4.5.5 | Report written and communicated |
| 4.4.6 | Consistency & stability of coating over time (90deg) testing complete |
| 4.4.7 | Bottle Pull #1 @ 70deg |
| 4.4.7.1 | Dry encapsulate harvested from the bottles |
| 4.4.7.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.7.3 | Extract analyzed |
| 4.4.7.4 | Compounds identified |
| 4.4.7.5 | Report written and communicated |
| 4.4.8 | Bottle Pull #2 @70 deg |
| 4.4.8.1 | Dry encapsulate harvested from the bottles |
| 4.4.8.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.8.3 | Extract analyzed |
| 4.4.8.4 | Compounds identified |
| 4.4.8.5 | Report written and communicated |
| 4.4.9 | Bottle Pull #3 @ 70deg |
| 4.4.9.1 | Dry encapsulate harvested from the bottles |
| 4.4.9.2 | Dry encapsulate extracted using a solvent according to protocola 2.2.1 |
| 4.4.9.3 | Extract analyzed |
| 4.4.9.4 | Compounds identified |
| 4.4.9.5 | Report written and communicated |
| 4.4.10 | Bottle Pull # 4 @70 deg |
| 4.4.10.1 | Dry encapsulate harvested from the bottles |
| 4.4.10.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.10.3 | Extract analyzed |
| 4.4.10.4 | Compounds identified |
| 4.4.10.5 | Report written and communicated |
| 4.4.11 | Bottle Pull #1 @ 90 deg |
| 4.4.11.1 | Dry encapsulate harvested from the bottles |
| 4.4.11.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.11.3 | Extract analyzed |
| 4.4.11.4 | Compounds identified |
| 4.4.11.5 | Report written and communicated |
| 4.4.12 | Bottle Pull #1 @ 90 deg |
| 4.4.12.1 | Dry encapsulate harvested from the bottles |
| 4.4.12.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.12.3 | Extract analyzed |
| 4.4.12.4 | Compounds identified |
| 4.4.12.5 | Report written and communicated |
| 4.4.13 | Consistency & stability of coating over time (70deg) testing complete |
| 4.4.14 | Bottle Pull #1 @ 40 deg |
| 4.4.14.1 | Dry encapsulate harvested from the bottles |
| 4.4.14.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.14.3 | Extract analyzed |
| 4.4.14.4 | Compounds identified |
| 4.4.14.5 | Report written and communicated |
| 4.4.15 | Bottle Pull #2 @ 40 deg |
| 4.4.15.1 | Dry encapsulate harvested from the bottles |

| | |
|---|---|
| 4.4.15.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.15.3 | Extract analyzed |
| 4.4.15.4 | Compounds identified |
| 4.4.15.5 | Report written and communicated |
| 4.4.16 | Bottle Pull #3 @ 40 deg |
| 4.4.16.1 | Dry encapsulate harvested from the bottles |
| 4.4.16.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.16.3 | Extract analyzed |
| 4.4.16.4 | Compounds identified |
| 4.4.16.5 | Report written and communicated |
| 4.4.17 | Bottle Pull #4 @ 40 deg |
| 4.4.17.1 | Dry encapsulate harvested from the bottles |
| 4.4.17.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.17.3 | Extract analyzed |
| 4.4.17.4 | Compounds identified |
| 4.4.17.5 | Report written and communicated |
| 4.4.18 | Bottle Pull #5 @ 40 deg |
| 4.4.18.1 | Dry encapsulate harvested from the bottles |
| 4.4.18.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.18.3 | Extract analyzed |
| 4.4.18.4 | Compounds identified |
| 4.4.18.5 | Report written and communicated |
| 4.4.19 | Bottle Pull #6 @ 40 deg |
| 4.4.19.1 | Dry encapsulate harvested from the bottles |
| 4.4.19.2 | Dry encapsulate extracted using a solvent according to protocole 2.2.1 |
| 4.4.19.3 | Extract analyzed |
| 4.4.19.4 | Compounds identified |
| 4.4.19.5 | Report written and communicated |
| 4.4.20 | Consistency & stability of coating over time (70deg) testing complete |

**DELIVERABLES**

**Project proposal filed**
**Project milestone filed**

**A liquid extraction method applicable to encapsulated slurries d**

**velopped** **Aroma release device built and tested**

**A liquid extraction method applicable to dry coating harvested f**

**Sensory evaluation method for collect data**

**Stability of application encapsulates determined across flavors under accelerated condtions (110oF 3 days)**

**or one week)**

**facturers and flavors.**

**Batch to batch consistency of manfacturing determined**

or one week)

facturers and flavors.

or one week)

facturers and flavors.

mplete

**Long term stability of application encapsulates determined at 4(**

) deg for 2-3d)

# APPENDIX XXXIV

PepsiCo-Cola Interoffice Memo – Confidential. "Project # S3441: Sampling and Measurement Of Aroma Release From Application Encapsulates Using Versatile Aroma Release Device."



**Pepsi-Cola Interoffice Memo - CONFIDENTIAL**

**To:** Peggy Havekotte
**From:** Ricky Kamdem-Ouaffo
**Date:** 01/23/09
**Subject:** Project # S3441: Sampling And GC Measurement Of Aroma Release From Application Encapsulates Using A New Versatile Aroma Release Device

---

**Overall Project Objectives**

- To design and have built a device to collect and measure volatiles released from a bottle for a more realistic and instrumental quantification of consumer's experience with aroma molecule.
- The device should make it possible to open a bottle and to collect aroma simultaneously in a way that simulates real life experience, in the same way a consumer would be experiencing a drink from a bottle.
- The device should offer the possibility to open a bottle in a closed, inert, and humidity-controlled environment, and to simultaneously collect aroma molecule while opening a bottle.

**Executive Summary**

- Aroma Release Device can be used to sample flavor molecules released from a flavor encapsulate in a way simulating what would happen at the point of consumption when a customer is about to experience his/her drink from a bottle. In addition it provides the ability to measure performance of application encapsulates from manufacturers and under different environmental conditions.

**Business implications**

- Aroma Release Device enables quantification and performance evaluation of new encapsulation technology. It provides analytical measure of technology quality, consistency and stability.

**Background**

One of the challenges of Flavor Experience Big Bet was about how to measure what the consumer perceives at the instant that a bottle is opened in her/his hand. This challenge became even more complicated during the course of studying the stability of application encapsulates when I found that humidity was causing loss of Lemon 5X flavor through an escape mechanism. So it became very important to address the challenge of being able to monitor and quantify the release of flavor from an encapsulate after it's coated onto a bottle, for shelf life purpose and also to qualify and quantify consumer's experience at the point of consumption. In this context, the idea of Aroma Release Device was born and matured to fruition. The device and examples for its used are described in the sections below.

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0481

*Description of Aroma Release Device*

Aroma Release Device (ARD) is a Jacketed, closed chamber with a removable cover made of stainless steel. The cover is equipped with a shaft having a replaceable chuck mounted to its lower end in order to be able to uncap a bottle from outside simply by rotating the shaft. Inside the vessel is a bottle clamping mechanism which prevents the bottle from moving while its cap is being removed by the chuck assembly. An outside latch on the shaft allows rotating the chuck until the cap is removed from the bottle. Internal temperature of the vessel is controlled by circulating a fluid into a jacket around the vessel. A sampling port on the cover allows introducing either a SPME fiber or a Syringe needle to collect volatiles from the headspace as they are released while opening the bottle. The vessel also has designated spots to hold media controlling humidity in the chamber. Two other inlets on the cover allow flushing of volatiles from the vessel with an inert gas, such as Nitrogen. Pepsi's Flavor Research Lab in Valhalla contracted Barnes Technical Products, LLC (West Haven, CT 06516) to build the device herein described.

*Technical Diagrams of Aroma Release Device*

Anatomy of ARD PE-01-000.pdf

ARD Engineering Details.pdf

*Benefits of Aroma Release Device*

1. A device to collect and measure volatiles released from bottle in order to enable a more realistic and instrumental quantification of consumer's experience with aroma molecule.
2. The novelty of this device is that it opens and collects aroma simultaneously in a way that simulates real life experience in the same way a consumer would be experiencing a drink from a bottle.
3. Existing technologies DO NOT offer the possibility to open a bottle in a closed, inert, and humidity-controlled environment, and they DO NOT offer the possibility of simultaneously collecting aroma molecule while opening a bottle.
4. Sources of aroma from a beverage bottle could be: Beverage contained inside the bottle, dry flavor-encapsulate coating, packaging material, paint and ink from labels etc...
5. Knowledge of key aroma compounds experienced by consumers when the bottle is being opened can be practically utilized for continuous development/optimization of aroma and scent formulations.
6. Identification and measurement of volatiles released from packaging materials and labels is useful in determining whether contaminants released from bottle packaging/label materials interfere with consumer's experience.

**Experimental**

*Materials*

SPME Fiber, Lemon 5X encapsulate slurry (RT Dodge), Orange Four Fold encapsulate slurry (RT Dodge consistency batch B), Critical swabs, Aroma Release Device, GC/FID, 10-oz glass bottles, Teflon caps, Tropicana Orange Juice (Lot # 0858WH092385; Exp. March 22, 09).

*Methodology*

*Proof of concept 1:* The objective of this first proof of concept was to show that ARD makes it possible to sample aroma released from flavor encapsulates by friction at the opening of a bottle. The flavor encapsulate was coated in the tamper band area of the bottle. This proof of concept

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0482

Case: 16-1668 Document: 28-1 Page: 450 Filed: 04/29/2016

will be considered successful if it is shown that an uncoated bottle will release little to no aroma when opened using ARD whereas a coated bottle will release the main volatile compounds expected from the core of the flavor encapsulates used. This first proof concept of Aroma device was demonstrated in a three-step experiment designed as follows:

1. A SPME Fiber was baked for an hour at 250°C. It was then exposed to a GC injection port and desorbed at 250°C for 5 minutes. The GC method used to analyze the sample was Back Beverage Method in a splitless mode.
2. The same SPME fiber was baked for another hour. An empty and uncoated 10 oz bottle was capped with a Teflon cap and placed in the bottle clamping mechanism. The ARD was then closed and the SPME fiber was inserted in the sampling port. The bottle was then opened by rotating the chuck removal assembly two complete turns. The fiber was allowed to collect volatile released from the bottle for one hour. After which the fiber was removed and brought to GC for 5 minutes injection/desorbtion followed by analysis using Back Beverage Method.
3. The third experiment was very similar to the second one except that, the 10 oz bottle placed in the clamping mechanism has been coated in its tamper band with a smooth layer of dry Lemon 5X flavor encapsulate. The SPME was also baked for an hour prior to exposure in the ARD. SPME sampling time from ARD with the coated bottle in it was also one hours.

Proof of Concept 2: The intent in this second proof of concept was to show that when a bottle coated with a flavor encapsulate is filled with a beverage and capped, there will be a measurable aroma released upon opening the bottle, and the aroma profile will be different in profile and abundance when compared to that which is release from a bottle which has been filled without being coated with a flavor encapsulate. In this experiment a 10 oz bottle was coated with RT Dodge OFF (Batch B) flavor encapsulate, in the tamper band area. The bottle was allowed to dry at room temperature. Once the coating was dried, it was filled with Tropicana orange juice and capped with a Teflon cap. Another 10 oz bottle, uncoated, was also filled with the batch or Tropicana orange juice (Lot # 0858WH092385; Exp. March 22, 09) and capped with a Teflon cap. These are the three steps of GC sample preparation and analysis used to further establish this proof concept.

1. A SPME fiber was baked for one hour at 250°C and analyzed on a GC (Orion) using Back Beverage Method.
2. The same SPME fiber was baked again, the uncoated bottle containing orange juice was placed in the clamping mechanism of ARD. The device was covered, the bottle was opened by rotating the knob of the chuck assembly three full turns. The headspace in the vicinity of the tamper band was sampled for 60 minutes using the same SPME fiber. After sampling the SPME was analyzed on a GC using Back Beverage Method.
3. The same SPME fiber was baked again, and step two was repeated with the only difference that this time the bottle containing orange juice has been coated with orange four fold flavor-encapsulate from RT Dodge (Batch B). The rest of the procedure remained the same as in the second step.

Proof of Concept 3

............

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0483

Case 7:14-cv-06827-KMK Document 43-1 Filed 07/09/14 Page of 95

**Results and discussion:**

*Proof of Concept 1*

On the basis of total area count, there was just residuals peak on a chromatogram obtained from a baked SPME and a baked SPME exposed for 60 minutes to an uncoated for bottled enclosed in ARD. But when the SPME was exposed to a coated bottle enclosed in ARD, its chromatogram was showed many more peaks and a significant total area count. The chromatogram had had compounds in the range expected for orange Lemon 5X. No specific identification was done on the compounds. However it is safe to say on the basis of these three chromatograms that ARD enabled a successful sampling of aroma release from Lemon 5X encapsulate coated in the tamper band area of a bottle. Presumably the chromatogram indicated what a consumer might perceive at the point of consumption.

SPME-Blank Dec 08.pdf　ARD-SPME Blank Dec 08.pdf　ARD-SPME-Coated-Lemon 5X Dec 08.pdf

*Proof of concept 2*

This experiment has shown that ARD enabled sampling of aroma molecules released by friction when a coated bottle containing an orange juice was opened. The chromatograms showed that there was very little flavor released from an uncoated bottle even though it contained orange juice. But when a similar bottled had been coated with orange flavor encapsulate prior to filling it with orange juice, a more complex and intense flavor was released at the opening of the coated bottle, as can be seen by the predominance of peaks as well as the total area of the corresponding chromatogram. This also indicated that at the point of consumption the consumer will perceive a stronger and a more complex flavor profile than what is normally perceive from a regular orange juice bottle. Therefore it is safe to say that this proof of concept was successful and that ARD will indeed help to simultaneously sample aroma released both from beverage and from a flavor encapsulate coating in the tamper band area. Below are chromatograms obtained during experimentation and a the table with some keys to understanding them.

| File name | Experimental | Signal |
|---|---|---|
| ARD-Uncted Btle-SPME | SPME fiber was exposed to an empty uncoated bottle for 1 hr in ARD | O081224R\SIG20002.D |
| ARD-SPME-Bottle-OJ-Uncoated Jan 09 | SPME fiber was exposed to an uncoated bottle containing orange juice for 1 hr in ARD | O090120R\SIG20003.D |
| ARD-SPME-Bottle-OJ-Coated Jan 09 | SPME fiber was exposed to a coated bottle containing orange juice for 1 hr in ARD | O090120R\SIG20004.D |
| Overlaid Separated | All three chromatograms the same page but separated | |
| Overlaid Same Scale | All three chromatograms the same page on the same graph | |

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011　PC 0484


ARD-Uncted
Btle-SPME.pdf

ARD-SPME-Bottle-OJ
-Uncoated Jan 09.pdi

ARD-SPME-Bottle-OJ
-coated Jan 09.pdf

Overlaid
Separated.pdf

Overlaid Same
Scale.pdf

**Proof of Concept 3**

Confidential Page 6
CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0486

**Summary and Conclusions**

An Aroma Release Device was designed and built in the FR Lab for the purpose of being able to sample and to instrumentally quantify consumer's experience with application encapsulate technology. The device was successfully tested and proven to be working. In this study, I established that the headspace of a coated beverage bottle had a profile characteristic of the flavor encapsulates used. In addition flavor strength, as measured by peak intensity, was much more pronounced as compared to an uncoated bottle regardless of whether the bottle contained a juice or not. The two proofs of concept demonstrated in this study served the purpose of showing that the device worked. Otherwise it is anticipated that ARD can be very useful in studying the shelf life of application encapsulates under different temperature and relative humidity. Such a body of knowledge will be needed to improve the design and improvement of flavor encapsulates.

**Recommendations**

More studies will be needed to gain mechanistic understanding of the influence of temperature and relative humidity of the shelf life of flavor encapsulate. Aroma Release Device offers the flexibility of simultaneously controlling relative humidity and temperature inside the vessel. Therefore it makes it possible to simulate environmental conditions to which applications will be subjected to either on the shelf or in transit.

Cc: Marco Covarrubias; Michael Hoar.

*Data attached*





EXTENTENSION SPRING STAINLESS STEEL
LEE SPRING LEM080C 08 S
.248 O.D .031WIRE DIA 1.378 FREE LENGTH
MAX LOAD 4.6 LB MAX LENGTH 2.4
(OR EQUIVALENT)
(4) REQ'D
2.610
ø2.570
BARNES TECHNICAL PRODUCTS, L.L.C.
15 High Street
West Haven, Connecticut 06516
Clamp Assembly
Aroma Release Device— Pepsi
PE-01-200
REVISIONS

PARTS LIST

| ITEM | QTY. | DESCRIPTION | PART NUMBER | MANUFACTURER |
|---|---|---|---|---|
| 1 | 1 | Clamp | PE-01-201 | - |
| 2 | 1 | Housing, Clamp | PE-01-202 | - |
| 3 | 1 | Cap, Clamp | PE-01-203 | - |
| 4 | 1 | Base | PE-01-204 | - |
| 5 | 2 | Lock/Release Pin | PE-01-205 | - |
| 6 | 2 | Lock/Release Handle | PE-01-206 | - |
| 7 | 3 | Bracket | PE-01-207 | - |
| 8 | 3 | Holder | PE-01-208 | - |
| 9 | - | - | - | - |
| 10 | - | - | - | - |

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0489

Data File D:\HPCHEM\ORION\DATA\O081223R\SIG20001.D Sample Name: SPME Fiber Baked

SPME Fiber, Baked for Aroma Release Device Validation

```
=====================================================================
Injection Date  : 12/23/2008 12:08:13 PM
Sample Name     : SPME Fiber Baked                Location : Vial 1
Acq. Operator   : RK                                   Inj :   1
Acq. Instrument : Orion                         Inj Volume : Manually
Acq. Method     : C:\HPCHEM\ORION\METHODS\BACK_BEV.M
Last changed    : 12/23/2008 12:07:12 PM by RK
Analysis Method : C:\HPCHEM\ORION\METHODS\BACK_BEV.M
Last changed    : 12/23/2008 1:28:11 PM by RK
                  (modified after loading)
```

SPME, baked.

no Exposure

Orion 12/23/2008 1:28:23 PM RK Page 1 of 5

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0490

Data File D:\HPCHEM\ORION\DATA\O081223R\SIG20001.D Sample Name: SPME Fiber Baked

FID2 B, (O081223R\SIG20001.D)
pA
min
6.570
8.087
9.056
11.217
12.174
13.075
15.200
19.221
21.028
22.824
23.716
24.686
25.488
26.790
28.240
29.603
30.363
30.555
31.647
32.080
32.976
33.631
33.949
35.000
35.733
36.305
36.706
37.918
38.919
40.155
40.906
41.681

Orion 12/23/2008 1:28:23 PM RK Page 2 of 5

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0491

Case: 16-1668 Document: 28-1 Page: 459 Filed: 04/26/2016

Data File D:\HPCHEM\ORION\DATA\O081223R\SIG20001.D Sample Name: SPME Fiber Baked

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 119 | 37.182 | VV | 0.0573 | 3.14220 | 7.66689e-1 | 0.24884 |
| 120 | 37.542 | VP | 0.0496 | 4.63544e-1 | 1.58496e-1 | 0.03671 |
| 121 | 37.720 | VV | 0.0452 | 7.89459 | 2.73042 | 0.62518 |
| 122 | 37.918 | VB | 0.0431 | 13.03611 | 4.66348 | 1.03235 |
| 123 | 38.072 | BV | 0.0429 | 4.02087 | 1.47278 | 0.31842 |
| 124 | 38.148 | VB | 0.0434 | 11.81127 | 4.12196 | 0.93535 |
| 125 | 38.919 | BV | 0.0555 | 1.87943 | 5.04093e-1 | 0.14884 |
| 126 | 39.065 | VP | 0.0467 | 2.43601e-1 | 6.90347e-2 | 0.01929 |
| 127 | 39.693 | BB | 0.0540 | 5.30061 | 1.52694 | 0.41976 |
| 128 | 40.155 | BP | 0.0557 | 8.77293 | 2.16783 | 0.69474 |
| 129 | 40.715 | PB | 0.0621 | 4.01577 | 1.01600 | 0.31801 |
| 130 | 40.905 | BP | 0.0569 | 4.23239e-1 | 9.89745e-2 | 0.03352 |
| 131 | 41.469 | BV | 0.0792 | 2.63538 | 4.50757e-1 | 0.20870 |
| 132 | 41.681 | VP | 0.0649 | 5.03533 | 1.22583 | 0.39875 |

Totals : 1262.76228 241.77925

Results obtained with enhanced integrator!

*** End of Report ***

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0492

Data File D:\HPCHEM\ORION\DATA\O081224R\SIG20002.D Sample Name: SPME, Blk Bottle

SPME Fiber, Baked, then Blank of bottle in Aroma Releas
e Device

```
========================================================================
Injection Date  : 12/24/2008 9:46:06 AM
Sample Name     : SPME, Blk Bottle                  Location : Vial 1
Acq. Operator   : RK                                     Inj :   1
Acq. Instrument : Orion                           Inj Volume : Manually
Method          : C:\HPCHEM\ORION\METHODS\BACK_BEV.M
Last changed    : 12/24/2008 9:36:35 AM by RK
                  (modified after loading)
```

SPME ARD Blank.

1Hr trap
5 min desorption

No beverage in bottle

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0493

Data File D:\HPCHEM\ORION\DATA\O081224R\SIG20002.D Sample Name: SPME, Blk Bottle

FID2 B, (O081224R\SIG20002.D)
pA
0
10
20
30
40
50
60
70
80
90
5
15
25
35
45
min
3.428
4.178
5.329
6.567
7.853
9.521
10.292
11.019
11.520
11.981
12.861
13.917
15.240
15.962
17.132
18.222
19.227
20.685
22.828
23.927
25.529
26.798
28.036
28.977
30.104
31.231
32.740
33.647
34.817
35.746
37.735
39.388
40.171

Orion 12/24/2008 10:31:29 AM RK

Page 2 of 4

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0494

Data File D:\HPCHEM\ORION\DATA\O081224R\SIG20002.D Sample Name: SPME, Blk Bottle

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 54 | 18.222 | BB | 0.0564 | 2.25159e-1 | 5.43114e-2 | 0.13656 |
| 55 | 18.702 | BB | 0.0362 | 4.78961e-1 | 1.98436e-1 | 0.29048 |
| 56 | 19.227 | BP | 0.0348 | 7.28500e-1 | 3.17581e-1 | 0.44183 |
| 57 | 20.412 | PP | 0.0724 | 3.43403e-1 | 5.85341e-2 | 0.20827 |
| 58 | 20.685 | BB | 0.0454 | 4.71130e-1 | 1.32768e-1 | 0.28573 |
| 59 | 20.918 | BP | 0.0354 | 2.41210e-1 | 1.06780e-1 | 0.14629 |
| 60 | 22.389 | BB | 0.0413 | 2.32196e-1 | 8.39076e-2 | 0.14082 |
| 61 | 22.828 | BP | 0.0426 | 7.05652e-1 | 2.52600e-1 | 0.42797 |
| 62 | 23.181 | PB | 0.0371 | 4.68035e-1 | 2.01851e-1 | 0.28386 |
| 63 | 23.927 | BB | 0.0474 | 4.56067e-1 | 1.25455e-1 | 0.27660 |
| 64 | 25.529 | PB | 0.0497 | 8.50732e-1 | 2.38114e-1 | 0.51596 |
| 65 | 26.051 | BV | 0.0352 | 3.43802e-1 | 1.47665e-1 | 0.20851 |
| 66 | 26.116 | VB | 0.0356 | 2.47464e-1 | 1.04536e-1 | 0.15008 |
| 67 | 26.798 | BB | 0.0382 | 9.39411e-1 | 3.62741e-1 | 0.56974 |
| 68 | 28.036 | PB | 0.0431 | 4.53223e-1 | 1.70109e-1 | 0.27487 |
| 69 | 28.489 | PB | 0.0412 | 4.24979e-1 | 1.49118e-1 | 0.25774 |
| 70 | 28.839 | PP | 0.0332 | 2.37174e-1 | 1.09876e-1 | 0.14384 |
| 71 | 28.977 | VB | 0.1159 | 1.52319 | 1.77804e-1 | 0.92379 |
| 72 | 29.731 | BB | 0.0453 | 1.15921 | 3.62120e-1 | 0.70304 |
| 73 | 30.104 | PB | 0.0372 | 2.89986 | 1.19787 | 1.75873 |
| 74 | 30.414 | PB | 0.0666 | 4.88744e-1 | 9.10857e-2 | 0.29642 |
| 75 | 31.231 | PB | 0.0467 | 3.53213e-1 | 1.12377e-1 | 0.21422 |
| 76 | 31.342 | BP | 0.0405 | 2.79756e-1 | 9.73279e-2 | 0.16967 |
| 77 | 32.263 | BB | 0.0487 | 2.31692e-1 | 6.04301e-2 | 0.14052 |
| 78 | 32.740 | PV | 0.0487 | 1.21287 | 3.47839e-1 | 0.73559 |
| 79 | 32.842 | VP | 0.0471 | 5.24502e-1 | 1.52754e-1 | 0.31810 |
| 80 | 33.141 | PB | 0.0395 | 7.71172e-1 | 2.85807e-1 | 0.46771 |
| 81 | 33.647 | PB | 0.0463 | 3.28833e-1 | 1.05684e-1 | 0.19943 |
| 82 | 34.817 | BP | 0.0938 | 3.10814 | 4.27574e-1 | 1.88504 |
| 83 | 35.746 | BB | 0.0386 | 5.13629e-1 | 2.02478e-1 | 0.31151 |
| 84 | 37.735 | PB | 0.0454 | 1.13331 | 3.62868e-1 | 0.68734 |
| 85 | 39.388 | BB | 0.2197 | 12.42557 | 6.69009e-1 | 7.53595 |
| 86 | 40.171 | BP | 0.0545 | 1.66344 | 4.08676e-1 | 1.00885 |

Totals : 164.88404 34.64080

Results obtained with enhanced integrator!

=================================================================

*** End of Report ***

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0495

Data File D:\HPCHEM\ORION\DATA\O081223R\SIG20002.D Sample Name: SPME Sample 1236

SPME Fiber, 1 Hr sampling adsorption from Aroma Release Device on Sample 1236 coated on 12/22/08. 5 min desorp tion.

| | | | |
|---|---|---|---|
| Injection Date | : 12/23/2008 1:42:06 PM | | |
| Sample Name | : SPME Sample 1236 | Location | : Vial 1 |
| Acq. Operator | : RK | Inj | : 1 |
| Acq. Instrument | : Orion | Inj Volume | : Manually |
| Method | : C:\HPCHEM\ORION\METHODS\BACK_BEV.M | | |
| Last changed | : 12/23/2008 1:28:11 PM by RK (modified after loading) | | |

SPME; 1236

RT Dodge Lemon 5X Coating.

No beverage in bottle

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0496

Data File D:\HPCHEM\ORION\DATA\O081223R\SIG20002.D Sample Name: SPME Sample 1236

FID2 B, (O081223R\SIG20002.D)
pA
min
3.415
4.815
4.977
5.239
5.934
7.330
8.429
9.130
10.014
10.537
10.674
11.979
12.525
13.354
13.995
14.285
15.676
16.255
16.900
17.498
18.368
19.123
19.917
20.698
21.467
22.390
23.176
23.921
24.655
25.521
26.793
28.483
30.097
31.338
32.232
33.135
34.789
35.740
37.197
38.359
39.432
40.157

Orion 12/23/2008 2:38:59 PM RK Page 2 of 6

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0497

Data File D:\HPCHEM\ORION\DATA\O081223R\SIG20002.D Sample Name: SPME Sample 1236

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 184 | 32.733 | PB | 0.0481 | 2.38848 | 7.51727e-1 | 0.00738 |
| 185 | 33.135 | BV | 0.0513 | 2.95163 | 8.13993e-1 | 0.00912 |
| 186 | 33.328 | VP | 0.1569 | 7.78956 | 6.02263e-1 | 0.02407 |
| 187 | 33.642 | VV | 0.0351 | 3.41147e-1 | 1.46999e-1 | 0.00105 |
| 188 | 33.688 | VP | 0.0340 | 3.54831e-1 | 1.65700e-1 | 0.00110 |
| 189 | 34.484 | PV | 0.1133 | 4.00795 | 4.27627e-1 | 0.01239 |
| 190 | 34.789 | VP | 0.1095 | 24.59144 | 2.91334 | 0.07600 |
| 191 | 35.740 | BB | 0.0395 | 6.18708e-1 | 2.36888e-1 | 0.00191 |
| 192 | 36.413 | PP | 0.0840 | 4.72255e-1 | 6.97772e-2 | 0.00146 |
| 193 | 37.197 | PB | 0.0407 | 3.93405e-1 | 1.44594e-1 | 0.00122 |
| 194 | 37.727 | BP | 0.0580 | 1.61330 | 3.84459e-1 | 0.00499 |
| 195 | 37.927 | BP | 0.0442 | 2.75852e-1 | 9.70455e-2 | 0.00085 |
| 196 | 38.359 | BP | 0.0950 | 2.89223 | 3.97118e-1 | 0.00894 |
| 197 | 39.432 | BP | 0.1119 | 10.62780 | 1.17046 | 0.03284 |
| 198 | 40.157 | BB | 0.0603 | 1.87170 | 4.71915e-1 | 0.00578 |
| Totals : | | | | 3.23583e4 | 5971.45976 | |

Results obtained with enhanced integrator!

*** End of Report ***

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0498

Data File D:\HPCHEM\ORION\DATA\O081224R\SIG20002.D Sample Name: SPME, Blk Bottle

SPME Fiber, Baked, then Blank of bottle in Aroma Releas
e Device

```
=================================================================================
Injection Date   : 12/24/2008 9:46:06 AM
Sample Name      : SPME, Blk Bottle                    Location : Vial 1
Acq. Operator    : RK                                       Inj :    1
Acq. Instrument  : Orion                             Inj Volume : Manually
Method           : C:\HPCHEM\ORION\METHODS\BACK_BEV.M
Last changed     : 12/24/2008 9:36:35 AM by RK
                   (modified after loading)
```

SPME ARD Blank.

1Hr trap
5 min desorption

No beverage in bottle

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0499

Data File D:\HPCHEM\ORION\DATA\O081224R\SIG20002.D Sample Name: SPME, Blk Bottle

FID2 B, (O081224R\SIG20002.D)
pA
min
3.428
4.178
5.329
6.567
7.653
9.521
10.292
11.019
11.520
11.981
12.861
13.917
15.240
15.962
17.132
18.222
19.227
20.685
22.828
23.927
25.529
26.798
28.036
28.977
30.104
31.231
32.740
33.647
34.817
35.746
37.735
39.388
40.171

Orion 12/24/2008 10:31:29 AM RK Page 2 of 4

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0500

Data File D:\HPCHEM\ORION\DATA\0081224R\SIG20002.D Sample Name: SPME, Blk Bottle

=====================================================================
Area Percent Report
=====================================================================

Sorted By : Signal
Multiplier : 1.0000
Dilution : 1.0000
Use Multiplier & Dilution Factor with ISTDs

Signal 1: FID2 B,

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 1 | 3.428 | BP | 0.0372 | 2.94694e-1 | 1.12101e-1 | 0.17873 |
| 2 | 4.178 | VV | 0.0493 | 1.81043 | 5.30601e-1 | 1.09800 |
| 3 | 4.298 | VV | 0.1410 | 3.65395 | 3.19206e-1 | 2.21607 |
| 4 | 4.744 | VV | 0.0550 | 5.79640e-1 | 1.28760e-1 | 0.35154 |
| 5 | 4.827 | VV | 0.0410 | 1.03790 | 3.66440e-1 | 0.62947 |
| 6 | 4.931 | VB | 0.0681 | 8.15376e-1 | 1.46223e-1 | 0.49452 |
| 7 | 5.329 | BB | 0.0348 | 7.35320e-1 | 3.14652e-1 | 0.44596 |
| 8 | 5.520 | PP | 0.0278 | 2.45730e-1 | 1.37945e-1 | 0.14903 |
| 9 | 5.808 | VV | 0.1179 | 7.72636e-1 | 8.12629e-2 | 0.46859 |
| 10 | 5.865 | VB | 0.0447 | 2.44547e-1 | 7.01136e-2 | 0.14831 |
| 11 | 6.502 | VV | 0.0377 | 6.66878e-1 | 2.66166e-1 | 0.40445 |
| 12 | 6.567 | VV | 0.0677 | 3.09190 | 5.84590e-1 | 1.87520 |
| 13 | 6.675 | VV | 0.0384 | 7.76905e-1 | 2.59951e-1 | 0.47118 |
| 14 | 6.741 | VB | 0.0391 | 3.73970e-1 | 1.24164e-1 | 0.22681 |
| 15 | 7.029 | PV | 0.0392 | 4.75037e-1 | 1.71930e-1 | 0.28810 |
| 16 | 7.087 | VB | 0.0506 | 6.23838e-1 | 1.51237e-1 | 0.37835 |
| 17 | 7.541 | PV | 0.0773 | 6.55310e-1 | 1.02183e-1 | 0.39744 |
| 18 | 7.653 | VV | 0.0410 | 1.40304 | 4.88821e-1 | 0.85093 |
| 19 | 7.693 | VB | 0.1558 | 5.58821 | 4.31032e-1 | 3.38918 |
| 20 | 9.135 | BB | 0.1443 | 2.41807 | 2.01800e-1 | 1.46653 |
| 21 | 9.521 | BV | 0.0768 | 2.07864 | 3.37624e-1 | 1.26067 |
| 22 | 9.603 | VV | 0.1005 | 2.73264 | 3.25315e-1 | 1.65731 |
| 23 | 9.791 | VV | 0.0832 | 2.42818 | 3.79160e-1 | 1.47266 |
| 24 | 10.031 | VV | 0.1095 | 4.29577 | 4.93927e-1 | 2.60533 |
| 25 | 10.292 | VV | 0.0956 | 6.91064 | 9.20364e-1 | 4.19121 |
| 26 | 10.480 | VB | 0.0884 | 2.54242 | 3.69094e-1 | 1.54194 |
| 27 | 10.871 | PV | 0.0831 | 9.24487e-1 | 1.32971e-1 | 0.56069 |
| 28 | 11.019 | VV | 0.1028 | 1.47247 | 1.73932e-1 | 0.89303 |
| 29 | 11.286 | VV | 0.0844 | 29.88301 | 5.09820 | 18.12365 |
| 30 | 11.520 | VV | 0.0503 | 18.92463 | 5.47216 | 11.47754 |
| 31 | 11.877 | VV | 0.0815 | 1.83201 | 3.21477e-1 | 1.11109 |
| 32 | 11.981 | VP | 0.0624 | 6.95677e-1 | 1.41366e-1 | 0.42192 |
| 33 | 12.486 | PV | 0.0628 | 4.92739e-1 | 1.20322e-1 | 0.29884 |
| 34 | 12.584 | VV | 0.0559 | 5.04248e-1 | 1.22725e-1 | 0.30582 |
| 35 | 12.715 | VP | 0.0491 | 3.24019e-1 | 9.41998e-2 | 0.19651 |
| 36 | 12.861 | VB | 0.0599 | 13.03202 | 2.98782 | 7.90375 |
| 37 | 13.094 | BP | 0.0386 | 7.12005e-1 | 2.71331e-1 | 0.43182 |
| 38 | 13.561 | PV | 0.0608 | 6.32347e-1 | 1.48112e-1 | 0.38351 |
| 39 | 13.662 | VV | 0.0516 | 3.93540e-1 | 1.05350e-1 | 0.23868 |
| 40 | 13.729 | VB | 0.0498 | 6.80071e-1 | 1.99364e-1 | 0.41245 |
| 41 | 13.917 | PV | 0.0376 | 9.33854e-1 | 3.80730e-1 | 0.56637 |
| 42 | 13.982 | VB | 0.0352 | 2.22456e-1 | 8.59622e-2 | 0.13492 |
| 43 | 14.308 | BP | 0.0502 | 2.60674e-1 | 6.43746e-2 | 0.15810 |
| 44 | 14.416 | VB | 0.0756 | 1.85134 | 3.50796e-1 | 1.12282 |
| 45 | 14.821 | PB | 0.0375 | 5.19283e-1 | 2.12368e-1 | 0.31494 |
| 46 | 15.240 | BP | 0.0356 | 2.13167 | 9.35840e-1 | 1.29283 |
| 47 | 15.575 | BP | 0.0381 | 3.37155e-1 | 1.30550e-1 | 0.20448 |
| 48 | 15.962 | PB | 0.0355 | 2.50330e-1 | 1.06026e-1 | 0.15182 |
| 49 | 16.300 | BB | 0.0592 | 3.59290e-1 | 7.58786e-2 | 0.21790 |
| 50 | 17.132 | BV | 0.0558 | 2.41729 | 6.29058e-1 | 1.46605 |
| 51 | 17.236 | VV | 0.0377 | 6.90472e-1 | 2.62388e-1 | 0.41876 |
| 52 | 17.278 | VB | 0.0294 | 3.45501e-1 | 1.72462e-1 | 0.20954 |
| 53 | 17.421 | PB | 0.0331 | 3.45564e-1 | 1.54287e-1 | 0.20958 |

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0501

Data File D:\HPCHEM\ORION\DATA\O081224R\SIG20002.D Sample Name: SPME, Blk Bottle

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 54 | 18.222 | BB | 0.0564 | 2.25159e-1 | 5.43114e-2 | 0.13656 |
| 55 | 18.702 | BB | 0.0362 | 4.78961e-1 | 1.98436e-1 | 0.29048 |
| 56 | 19.227 | BP | 0.0348 | 7.28500e-1 | 3.17581e-1 | 0.44183 |
| 57 | 20.412 | PP | 0.0724 | 3.43403e-1 | 5.85341e-2 | 0.20827 |
| 58 | 20.685 | BB | 0.0454 | 4.71130e-1 | 1.32768e-1 | 0.28573 |
| 59 | 20.918 | BP | 0.0354 | 2.41210e-1 | 1.06780e-1 | 0.14629 |
| 60 | 22.389 | BB | 0.0413 | 2.32196e-1 | 8.39076e-2 | 0.14082 |
| 61 | 22.828 | BP | 0.0426 | 7.05652e-1 | 2.52600e-1 | 0.42797 |
| 62 | 23.181 | PB | 0.0371 | 4.68035e-1 | 2.01851e-1 | 0.28386 |
| 63 | 23.927 | BB | 0.0474 | 4.56067e-1 | 1.25455e-1 | 0.27660 |
| 64 | 25.529 | PB | 0.0497 | 8.50732e-1 | 2.38114e-1 | 0.51596 |
| 65 | 26.051 | BV | 0.0352 | 3.43802e-1 | 1.47665e-1 | 0.20851 |
| 66 | 26.116 | VB | 0.0356 | 2.47464e-1 | 1.04536e-1 | 0.15008 |
| 67 | 26.798 | BB | 0.0382 | 9.39411e-1 | 3.62741e-1 | 0.56974 |
| 68 | 28.036 | PB | 0.0431 | 4.53223e-1 | 1.70109e-1 | 0.27487 |
| 69 | 28.489 | PB | 0.0412 | 4.24979e-1 | 1.49118e-1 | 0.25774 |
| 70 | 28.839 | PP | 0.0332 | 2.37174e-1 | 1.09876e-1 | 0.14384 |
| 71 | 28.977 | VB | 0.1159 | 1.52319 | 1.77804e-1 | 0.92379 |
| 72 | 29.731 | BB | 0.0453 | 1.15921 | 3.62120e-1 | 0.70304 |
| 73 | 30.104 | PB | 0.0372 | 2.89986 | 1.19787 | 1.75873 |
| 74 | 30.414 | PB | 0.0666 | 4.88744e-1 | 9.10857e-2 | 0.29642 |
| 75 | 31.231 | PB | 0.0467 | 3.53213e-1 | 1.12377e-1 | 0.21422 |
| 76 | 31.342 | BP | 0.0405 | 2.79756e-1 | 9.73279e-2 | 0.16967 |
| 77 | 32.263 | BB | 0.0487 | 2.31692e-1 | 6.04301e-2 | 0.14052 |
| 78 | 32.740 | PV | 0.0487 | 1.21287 | 3.47839e-1 | 0.73559 |
| 79 | 32.842 | VP | 0.0471 | 5.24502e-1 | 1.52754e-1 | 0.31810 |
| 80 | 33.141 | PB | 0.0395 | 7.71172e-1 | 2.85807e-1 | 0.46771 |
| 81 | 33.647 | PB | 0.0463 | 3.28833e-1 | 1.05684e-1 | 0.19943 |
| 82 | 34.817 | BP | 0.0938 | 3.10814 | 4.27574e-1 | 1.88504 |
| 83 | 35.746 | BB | 0.0386 | 5.13629e-1 | 2.02478e-1 | 0.31151 |
| 84 | 37.735 | PB | 0.0454 | 1.13331 | 3.62868e-1 | 0.68734 |
| 85 | 39.388 | BB | 0.2197 | 12.42557 | 6.69009e-1 | 7.53595 |
| 86 | 40.171 | BP | 0.0545 | 1.66344 | 4.08676e-1 | 1.00885 |
| Totals : | | | | 164.88404 | 34.64080 | |

Results obtained with enhanced integrator!

*** End of Report ***

Data File D:\HPCHEM\ORION\DATA\O090120R\SIG20003.D Sample Name: SPME, Blk Fiber

SPME Fiber, Orange JUice, No coating, 5 min desoprtion

```
=======================================================================
Injection Date   : 1/20/2009 1:11:42 PM
Sample Name      : SPME, Blk Fiber              Location : Vial 1
Acq. Operator    : RK                                Inj :    1
Acq. Instrument  : Orion                      Inj Volume : Manually
Acq. Method      : C:\HPCHEM\ORION\METHODS\BACK_BEV.M
Last changed     : 1/20/2009 1:36:39 PM by RK
                   (modified after loading)
Analysis Method  : C:\HPCHEM\ORION\METHODS\BACK_OIL.M
Last changed     : 1/22/2009 2:56:19 PM by RK
                   (modified after loading)
```

SPME Fiber, baked 10 min and exposed 1Hr, to a bottle containing Orange juice, in ARD, three turns to open juice.

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0503

Data File D:\HPCHEM\ORION\DATA\O090120R\SIG20003.D

Sample Name: SPME, Blk Fiber

Orion 1/22/2009 2:57:51 PM RK

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

Data File D:\HPCHEM\ORION\DATA\O090120R\SIG20003.D Sample Name: SPME, Blk Fiber

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 184 | 38.441 | VV | 0.0910 | 3.32371 | 4.58852e-1 | 0.15296 |
| 185 | 38.665 | VP | 0.0917 | 1.01599 | 1.35856e-1 | 0.04676 |
| 186 | 38.973 | VV | 0.1045 | 1.38966 | 1.58236e-1 | 0.06395 |
| 187 | 39.504 | PB | 0.1167 | 6.72137 | 6.86871e-1 | 0.30932 |
| 188 | 40.198 | BB | 0.0581 | 5.13593 | 1.31306 | 0.23636 |

Totals : 2172.94317 606.07441

Results obtained with enhanced integrator!

*** End of Report ***

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

Data File D:\HPCHEM\ORION\DATA\O090120R\SIG20004.D Sample Name: SPME, Orange Jui

SPME Fiber, Orange JUice, RT Dodge Batch A coating, 5 m
in desoprtion

```
=====================================================================
Injection Date  : 1/20/2009 3:26:27 PM
Sample Name     : SPME, Orange Jui            Location : Vial 1
Acq. Operator   : RK                               Inj :    1
Acq. Instrument : Orion                     Inj Volume : Manually
Acq. Method     : C:\HPCHEM\ORION\METHODS\BACK_BBV.M
Last changed    : 1/20/2009 1:36:39 PM by RK
                  (modified after loading)
Analysis Method : C:\HPCHEM\ORION\METHODS\BACK_OIL.M
Last changed    : 1/22/2009 2:56:19 PM by RK
                  (modified after loading)
```

SPME Baked 1Hr at 250°C,
Exposed one hour to a
Coated bottle containing
Orange Juice as
Same blank, Capped opened
in three turns, 5 min
desorption @ 250°C.

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

Data File D:\HPCHEM\ORION\DATA\O090120R\SIG20004.D Sample Name: SPME, Orange Jui

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0507



Data File D:\HPCHEM\ORION\DATA\O090120R\SIG20004.D Sample Name: SPME, Orange Jui

| Peak # | RetTime [min] | Type | Width [min] | Area [pA*s] | Height [pA] | Area % |
|---|---|---|---|---|---|---|
| 249 | 31.243 | PV | 0.0306 | 2.62717e-1 | 1.07277e-1 | 0.00050 |
| 250 | 31.356 | VP | 0.0461 | 1.39300 | 4.10190e-1 | 0.00264 |
| 251 | 31.693 | BV | 0.0338 | 1.75846e-1 | 6.34275e-2 | 0.00033 |
| 252 | 32.287 | VV | 0.0645 | 3.44727e-1 | 6.54301e-2 | 0.00065 |
| 253 | 32.683 | VP | 0.0347 | 1.27311e-1 | 4.46974e-2 | 0.00024 |
| 254 | 32.762 | VB | 0.0413 | 1.47291 | 4.73174e-1 | 0.00279 |
| 255 | 33.164 | BV | 0.0470 | 1.32420 | 3.63754e-1 | 0.00251 |
| 256 | 33.433 | VV | 0.1479 | 6.98399 | 5.62125e-1 | 0.01323 |
| 257 | 33.662 | VP | 0.0351 | 9.35819e-1 | 3.62227e-1 | 0.00177 |
| 258 | 34.861 | VV | 0.0485 | 1.75806 | 4.60441e-1 | 0.00333 |
| 259 | 34.873 | VB | 0.0767 | 2.13149 | 4.63277e-1 | 0.00404 |
| 260 | 35.592 | VV | 0.0293 | 1.97730e-1 | 8.59626e-2 | 0.00037 |
| 261 | 35.765 | VV | 0.0545 | 2.06333 | 4.81340e-1 | 0.00391 |
| 262 | 35.987 | VV | 0.0369 | 1.50773e-1 | 5.04721e-2 | 0.00029 |
| 263 | 36.041 | VV | 0.0268 | 1.45236e-1 | 6.70074e-2 | 0.00028 |
| 264 | 36.098 | VV | 0.0248 | 2.00813e-1 | 1.00712e-1 | 0.00038 |
| 265 | 36.128 | VV | 0.0143 | 1.24486e-1 | 1.13517e-1 | 0.00024 |
| 266 | 36.148 | VV | 0.0466 | 4.54243e-1 | 1.23067e-1 | 0.00086 |
| 267 | 36.986 | VV | 0.0424 | 2.11638e-1 | 6.03190e-2 | 0.00040 |
| 268 | 37.221 | BB | 0.0324 | 2.07520e-1 | 7.97167e-2 | 0.00039 |
| 269 | 37.751 | BV | 0.0453 | 1.70282 | 4.86824e-1 | 0.00323 |
| 270 | 37.797 | VV | 8.01e-3 | 1.62426e-1 | 2.90899e-1 | 0.00031 |
| 271 | 37.854 | VV | 0.1121 | 4.05043 | 4.27079e-1 | 0.00767 |
| 272 | 38.110 | VV | 0.0402 | 1.34218e-1 | 4.10087e-2 | 0.00025 |
| 273 | 38.186 | VV | 0.0344 | 3.74272e-1 | 1.32884e-1 | 0.00071 |
| 274 | 39.214 | PV | 0.0636 | 4.21746e-1 | 7.92581e-2 | 0.00080 |
| 275 | 39.268 | VP | 0.0428 | 2.60531e-1 | 7.35936e-2 | 0.00049 |
| 276 | 39.503 | PV | 0.0984 | 8.19218 | 9.86208e-1 | 0.01552 |
| 277 | 40.205 | PV | 0.0477 | 9.56083e-1 | 2.55050e-1 | 0.00181 |
| 278 | 40.329 | VV | 0.0343 | 1.27033e-1 | 4.65848e-2 | 0.00024 |

Totals : 5.27887e4 9940.38596

Results obtained with enhanced integrator!

*** End of Report ***

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0508

Print of all graphic windows

Current Chromatogram(s)
FID2 B, (O081224R\SIG20002.D)
FID2 B, (O090120R\SIG20003.D)
FID2 B, (O090120R\SIG20004.D)
pA
min

Orion 1/26/2009 9:56:02 AM KO

Page 1 of 1

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011

PC 0509



Print of all graphic windows

Current Chromatogram(s)
FID2 B, (O081224R\SIG20002.D)
FID2 B, (O090120R\SIG20003.D)
FID2 B, (O090120R\SIG20004.D)
pA
90
80
70
60
50
40
30
20
10
0
0
10
20
30
40
min
9.987
10.883
15.587
9.453
34.879
13.298
14.289
8.437
4.933
16.584
15.245
13.989
10.292
4.178
17.462
18.222
19.227
20.885
22.828
23.927
25.529
26.798
27.797
28.977
30.104
31.231
32.740
34.847
36.474
37.735
39.388

Orion 1/26/2009 10:11:46 AM KO

Page 1 of 1

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0510

# APPENDIX XXXV

PepsiCo-Cola Interoffice Memo – Confidential. "Project # 900441 – Performance of Edible Films as Relative Humidity Barriers for Lemon 5X Gelatin Flavor Encapsulate."



1/6

**Pepsi-Cola Interoffice Memo - CONFIDENTIAL**

**To:** Naijie Zhang; Peter Given
**From:** Ricky Kamdem-Ouaffo
**Date:** 08/10/09.
**Subject:** Project # 900441 – Performance of Edible Films as Relative Humidity Barriers for Lemon 5X Gelatin-Flavor Encapsulate

---

**Overall Project Objectives:**

- To study the performance of natural and synthetic films as relative humidity barriers for protecting gelatin - flavor encapsulates.

**Executive Summary**

-

**Business Implications**

- Dry flavor encapsulates to be used for "Aroma Burst" application were shown to be stable at relative humidity below 75%. Above 75%, gelatin flavor encapsulates were damaged and aroma was released.

, how from three different vendors, all of them made using the same batch of orange oil behaved very differently when exposed to high relative humidity. Therefore flavor encapsulates are not all equal even if they contain the same flavor. It is critical that quality control criteria be developed to assess the performance of encapsulates from potential vendors before decision is made on whom to choose as a suppliers.

**Background**

- Pepsi's Flavor Research Lab is developing a new application technology for flavor encapsulates with intent to enhance consumer's experience with a beverage. This new technology consists of applying a dry coating of flavor encapsulates in the tamper band area of a beverage bottle. The flavor encapsulates will be subsequently broken by friction of the tamper band and the encapsulated flavor released when a consumer turns the cap to open the bottle at the point of consumption. There is possibility that the dry encapsulate coating will not be 100% isolated from contact with environmental air. Presumably, a dry organic coating is susceptible to moisture absorption and even microbial growth when a certain moisture and temperature combinations exist. Therefore it is important to gain some understanding of how environmental humidity affect flavor encapsulates in an application such as the one currently envisioned.

**Experimental**

***Materials***

*Chemicals:* cupper sulfate ( from Fluka).

*Flavor Encapsulates: RT Dodge* Lemon 5X encapsulate, RT Dodge Orange Four Fold Encapsulate, Microtek Orange Four Fold Encapsulate, Lipo Technologies Orange Four Fold Encapsulate.

*Others:* Four desiccators, 10oz glass bottles, critical swabs, Teflon caps, sample vials, microscopy slides, calibrated hygrometers

**Methods**

*Constant Relative Humidity Vessels: 250 grams of a* saturated salt solution having a known relative humidity was prepared and poured into the bottom of a desiccator to fill more than half of the volume below the ceramic plate. The following saturated salt solutions were made to create specific humidity at room temperature according to data found in the literature: Cupper sulfate (RH = 97%).

*Influence of Relative Humidity and Temperature Separately on the Stability of Lemon 5X Encapsulates:*

*Sensory Evaluation*

In general sensory evaluation consisted of holding a capped bottle in one hand, opening it with the other hand and sniffing the tamper band area. A panel of three (Peggy Havekotte, Marco Covarrubias, Ricky Kamdem) conducted sensory evaluation and reported data on consensus. Attached below is a template of sensory evaluation ballot used during evaluation.

**Results and discussion**

*Influence of Relative Humidity and Temperature alone on the Stability of Lemon 5X Encapsulates:*

*Influence Of 97% Relative Humidity On The Stability Of Orange Four Fold Encapsulates From Three Different Vendors*

*Equilibrium Moisture Content Of Dry Flavor Encapsulate From Three Vendors At Various Relative Humidity*

**Summary and Conclusions**

**Recommendation:**

**Cc:**

***Data Attached***

CONFIDENTIAL INFORMATION Sup. Ct. NY, Westchester Index No. 22625/2011 PC 0605

# APPENDIX XXXVI

An New York and New Jersey Patent Attorney "Determination of Inventorship"

on PepsiCo Patent Publication 2012/0006909 A1 by MICHAEL J. FEIGIN, ESQ.

**MICHAEL J. FEIGIN, ESQ.**
FEIGIN & ASSOCATES, LLC
*103 The Circle • Passaic, NJ 07055*
*PHONE (212) 316-0381 • FAX (973) 767-1292*
*E-MAIL:* michael@PatentLawNY.com • *WEB:* PatentLawNY.com
LICENSED TO PRACTICE IN NEW YORK, NEW JERSEY, AND BEFORE THE U.S. PATENT OFFICE

**September 28, 2012**

**VIA: E-MAIL ONLY**
Ricky Kamdem-Ouaffo, PHD.
1 Richmond St
Suite 3038
New Brunswick, NJ 08901

Subject: U.S. Patent Publication Serial No. 2012/0006909 A1
Title: **Determination of Inventorship**
Our File: KDM001

Dear Dr. Kamdem,

Thank you for engaging my firm to make a determination as to whether you, Ricky Kamdem-Ouaffo (herein, "plaintiff"), are an inventor of the technology disclosed in U.S. Patent Publication 2012/0006909 A1 (herein, "patent application"), entitled "Releasably Entrapment of Aroma Using a Polymetric Matrix," assigned to PepsiCo, Inc.

My detailed report follows.

**CONTENTS**

| | |
|---|---|
| Summary / Conclusion | 3 |
| Documents Reviewed | 5 |
| Legal Standard | 7 |
| Relevant Quotations in the Provided Documents | 9 |
| Comparison of Plaintiff-Provided Documents to the Patent Application | 12 |
| Prosecution History of the Patent Application | 13 |
| APPENDIX A: Inventorship | 14 |
| APPENDIX B: Comparison of Patent Application to Plaintiff Disclosure | 19 |

**Summary / Conclusion**

The documents provided to me (as outlined below) have been reviewed to determine inventorship. For purposes of the analysis thereof, we have assumed the documents provided to be true and accurate copies thereof, and have found no reason to suspect that any of the documents lack authenticity.

In short, while the evidence highly suggests that Najie Zhang is improperly listed as an inventor, to prove that Plaintiff is the inventor, two steps still need to be overcome:

1) It must be shown, by the preponderance of the evidence, that Plaintiff conceived of some new and unobvious technology;
2) It must be shown that such new and unobvious technology is claimed in the patent application.

Based on our review of the documents, it is unclear who is the inventor. There is not enough evidence to show that Plaintiff is the inventor, though more data may be able to establish this one way or the other. On the other hand, Najie Zhang (a named inventor) was hired by Pepsi during or after the reduction to practice of the invention, and so it is, at least, fairly clear that the inventors named are improper.

That being said, the review itself presents a great deal of difficulty, as the claims in U.S. Patent Publication 2012/0006909 A1 are vague and overly broad as to constitute an "invention".

More details are provided below.

**Documents Reviewed**

The documents reviewed, with comments on the relevance in italics.

1) "Application Encapsulate Technology – Feasibility, Stability and Performance of Application Flavor Encapsulates," dated July 28, 2008, by Ricky Kamdem.

*This document shows, at least, the knowledge known to plaintiff as of July 28, 2008, and information about its conception.*

2) "Ricky's Sent Items," e-mails, dated approximately July 1, 2009, to Naijie Zhang, and others.

*This document shows that Zhang (named as inventor) joined the project only later and was not the inventor of anything disclosed, earlier, such as in document 1. While this document supports that both Plaintiff and Zhang may have reduced the invention to practice, it is silent as to who conceived of the concept and new parts thereof.*

3) "RE: Does aroma vapor accelerate the aroma release from the gelatin capsule?", e-mail from Naijie Zhang, stating, "I understanding you did the study of the moisture effect in the closed container on gelatin capsule . . ."

*Shows that Zhang was not the inventor of the quoted concept.*

4) "RE: Disclosure Submission Update" - e-mail from Valerie Jacklin to Peter Given, September 16, 2009, stating, "not sure we want Ricky on the invention list... do we have criteria for temps/consultants?"

*Shows improper understanding of method for determining inventorship, on the part of PepsiCo.*

5) Interoffice Memo - "Project #S3439, Influence of Relative Humidity on the stability and shelf life of dry encapsulate coatings," dated January 16, 2009, by Rick Kamdem.

*Shows tests performed per outline of Document 1.*

6) "Technology Risks & Challenges," dated March 5, 2009, unlisted author.

*Unknown author, and does not show inventorship.*

7) "Flavor Experience: 2009 Aroma Technology Review," dated March 5, 2009, specifically, see "Team Members & Roles" listing "Ricky Kamdem" as "Functionality."

*Does not discuss who conceived of the idea.*

8) "Rickys Sent Items," dated approximately July 7, 2009, August 18, 2009, and September 10, 2009.

*Tends to show reduction to practice, but is silent as to plaintiff's inventorship.*

9) "Brainstorming for Enhancing Aroma Performance / Meeting Minutes" -

*While "Ricky Kamdem" is present, does not disclose who conceived of the idea.*

10) "Meeting Minutes: Aroma Experience – Quality Workstrea" - dated August 14, 2008

*Task definition and timeline showing that Plaintiff likely, at least, reduced to practice*

11)    "Interoffice Memo: Project #S3441: Sampling and GC Measurement of Aroma Release From Application Encapsulates Using a New Versatile Aroma Release Device"

Other documents, not cited above, are considered less relevant or duplicative of the above-listed documents.

**Legal Standard**

I. Inventorship

A. Conception versus Reduction to Practice

Quoting from the latest available July 2010 revision of the Manual of Patent Examination Procedure (MPEP), at section 2137.1:

> The threshold question in determining inventorship is who conceived the invention. Unless a person contributes to the conception of the invention, he is not an inventor. . Insofar as defining an inventor is concerned, reduction to practice, *per se*, is irrelevant [except for simultaneous conception and reduction to practice, *Fiers v. Revel*, 984 F.2d 1164, 1168, 25 USPQ2d 1601, 1604-05 (Fed. Cir. 1993)].

For purposes of this discussion, it is important to determine emphasis: 1) In the United States, an inventor is one who conceived of the idea; and 2) reduction to practice (that is, conducting tests to carry out a conceived invention) does not make one an inventor, except in rare circumstances.

B. Intellectual Domination

Further, the following further excerpt from MPEP 2137.1 appears relevant to this matter:

> In arriving at conception [the inventor] may consider and adopt ideas and materials derived from many sources [such as] a suggestion from an employee, or hired consultant so long as he maintains intellectual domination of the work of making the invention down to the successful testing, selecting or rejecting as he goes even if such suggestion [or material] proves to be the key that unlocks his problem." *Morse v. Porter*, 155 USPQ 280, 283 (Bd. Pat. Inter. 1965).

The concept of "intellectual domination" says, in layman's terms, that if one is in charge of a project, but is directing another to do further testing, the one doing the work is not the inventor.

C. Joint Inventorship

> Each joint inventor must generally contribute to the conception of the invention. A coinventor need not make a contribution to every claim of a patent. A contribution to one claim is enough. "The contributor of any disclosed means of a means-plus-function claim element is a joint inventor as to that claim, unless one asserting sole inventorship can show that the contribution of that means was simply a reduction to practice of the sole inventor's broader concept." Ethicon Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460-63, 45 USPQ2d 1545, 1548-1551 (Fed. Cir. 1998) (The electronics technician who contributed to one of the two alternative structures in the specification to define "the means for detaining" in a claim limitation was (.held to be a joint inventor

Thus, to be an inventor, where there is more than one inventor, one must have conceived of at least one of the claims.

II. Enablement

MPEP 2174 states in regards to Enablement:

> The purpose of the requirement that the specification describe the invention in such terms that one skilled in the art can make and use the claimed invention is to ensure that the invention is communicated to the interested public in a meaningful way.

Thus, if a disclosure does not show how one can make and use what is claimed, it is non-enabling.

**Relevant Quotations in the Provided Documents**

Before discussing the patent application, it is important to determine what each party did or did not do in terms of conception of the invention. As noted above under the heading, "Legal Standard," to be an inventor, one must be a) the original progenitor of an idea, b) have intellectual domination over the idea, and c) contribute to at least one claim of a patent.

A. Discussion of Document 1, dated July 28, 2008

Based on Plaintiff's assertion that he was a contract employee of PepsiCo Inc. whose contract ran from July 13, 2008, to September 28, 2009 (which is supported by the documentary evidence to or from PepsiCo, Inc. in this time frame), and the documents provided, Document 1 (see above), the "Proof of Concept and Screening for Target Flavor" which appears to have been written by the Plaintiff is the first relevant document. This document, dated July 28, 2008, discloses:

> Proof of Concept and Screening for Target Flavor / *The proof of concept appears to be well established in prior Pepsi research work, at bench level.* The experiment conducted for proof of concept will be standardized and used for routine screening, and taste test in the laboratory. [Italics added]
>
> . . .
>
> In this context flavor means a recognizable aroma. The objective is to identify commercially viable targets to be delivered through encapsulate technology, their intensity and stability over the shelf life of sugar-sweetened beverage. / Examples of target flavor under consideration are: Orange, coffee, grapefruit, lemon, vanilla . . . An accelerated shelf life study will be done on slurries from different manufacturers . . .

Thus, it appears, based on Plaintiff's own admission, that at least some conception took place at PepsiCo, Inc. before Plaintiff joined. It is unclear who is the inventor of the "well established" work but it appears that Plaintiff's job was to "identify commercially viable" flavors. That being said, if, during Plaintiff's period of employment, Plaintiff made a determination, without intellectual domination by another (see "Legal Standard"), then Plaintiff is an inventor of such elements of the technology.

B. Discussion of Document 5, dated January 16, 2009

Document 5 appears to be the result, in the form of an interoffice memo, of that which is outlined in Document 1. The document concludes:

> "Summary and Conclusions / This study demonstrated that dry flavor encapsulates are sensitive to relative humidity . . . lower relative humidity could help keeping the moisture content of flavor encapsulate below 5%, therefore would not favor microbial growth . . ."

These conclusions, on this document drafted by Plaintiff, seem to be novel over the task originally set out to be tested. However, it is unclear, from the documents, if the discovery of humidity being a function of shelf-life is known in the prior art, and if this idea was conceived of by Plaintiff, under the intellectual domination of another, or entirely by another. More data is needed.

C. E-Mails Tend to Show Improper Procedure, Zhang Not an Inventor

In an email chain with a subject, "RE: Disclosure Submission Update" an e-mail from Valerie Jacklin to Peter Given on September 16, 2009, states, "not sure we want Ricky on the invention list... do we have criteria for temps/consultants?"

Peter Given added, "his [Plaintiff's] contract is terminating Oct 5, and he'll be informed this week.... more drama! Please do not distribute this info, but may impact our decision on inventorship"

As noted above, the legal standard for who is an inventor has nothing to do with whether one is a temporary worker or consultant. It appears that PepsiCo, Inc. was guided by employment concerns and fear of difficulty obtaining Plaintiff's signature.

Naijie Zhang adds, "Ricky kamdem is not inventor. He is just involved in the project."

The record provided to me is silent as to any discussion on whether Mr. Zhang is an inventor. Based on the evidence provided, namely that the project began well before Mr. Zhang's date of hiring, it appears highly improbable that Mr. Zhang is an inventor.

Carolyn Sloane adds, "We wait to make determinations of inventorship until the final claims are drafted. Outside counsel will discuss this issue with you at that time" showing that employees at Pepsi Co., Inc. knew that inventorship was an issue

and made a willful choice in improperly naming the inventors.

The e-mail chain provided to me ends at this point.

**Comparison of Plaintiff-Provided Documents to the Patent Application**

To be an inventor, one must conceive of at least one element of the claimed technology (see "Legal Standard"). As best can be determined, based on the disclosure discussed above, Plaintiff's contribution, if any, would be his contribution to humidity as a function of shelf-life. While humidity is disclosed in the patent application, it is not claimed. Thus, it appears to be, even viewing the patent application in a light most favorable to Plaintiff, that it was correct to *not* name Plaintiff as an inventor.

That being said, and although beyond the scope of this research, it is further unclear that Mr. Zhang is an inventor. Based on the project time-line (Document 10), the project was well underway and being reduced to practice when Mr. Zhang was hired. Thus, absent Mr. Zhang conceiving of at least one limitation of the claims, Mr. Zhang is not an inventor. If this proves to be correct, his signature on the Declaration submitted with the patent application is fraudulent.

A chart is provided, in Appendix B, comparing language of the patent application to the Plaintiff's disclosure. While a claim chart is typically sufficient, in the present case, the claims are very poorly drafted, so the comparison has been extended to the entire application. However, one is named as an inventor only if he or she contributes to the claim language. While it appears, as shown in the claim chart, that some of Plaintiff's work was used in the patent application, no evidence

has been located showing that Plaintiff is the inventor of what is claimed.

**Prosecution History of the Patent Application**

It should further be noted that the prosecution history of the patent application, as of September 11, 2012, shows that every claim has been rejected by the U.S. Patent Office for failing to be new over the prior art. While such rejections are typical and often overcome, in the present case, PepsiCo. Inc. gave up ground on the claims, only to receive what, in my professional opinion, will prove to be a fatal second rejection. In the second rejection by the U.S. Patent Office, the claims have failed to meet the "enablement" requirement (see "Legal Standard") and as such, do not meet the basic requirements of obtaining a patent.

If the technology, as drafted in the patent application, does not meet the requirements for patentability, then no one can be said to be an "inventor" and no rights stemming from the patent application will ever develop.

# APPENDIX A

## Manual of Patent Examination Procedure

Chapter 2100 – Patentability

Section 2107.01 - Inventorship

### *2137.01 Inventorship [R-3]*

The requirement that the applicant for a patent be the inventor is a characteristic of U.S. patent law not generally shared by other countries. Consequently, foreign applicants may misunderstand U.S. law regarding naming of the actual inventors causing an error in the inventorship of a U.S. application that may claim priority to a previous foreign application under 35 U.S.C. 119. A request under 37 CFR 1.48(a) is required to correct any error in naming the inventors in the U.S. application as filed.MPEP § 201.03. Foreign applicants may need to be reminded of the requirement for identity of inventorship between a U.S. application and a 35 U.S.C. 119 priority application. MPEP § 201.13.

If a determination is made that the inventive entity named in a U.S. application is not correct, such as when a request under 37 CFR 1.48(a) is not granted or is not entered for technical reasons, but the admission therein regarding the error in inventorship is uncontroverted, a rejection under 35 U.S.C. 102(f) should be made.

### I. EXECUTORS OF OATH OR DECLA-RATION UNDER 37 CFR 1.63 ARE PRE-SUMED TO BE THE INVENTORS

The party or parties executing an oath or declaration under 37 CFR 1.63 are presumed to be the inventors. *Driscoll v. Cebalo*, 5 USPQ2d 1477, 1481 (Bd. Pat. Inter. 1982);*In re DeBaun*, 687 F.2d 459, 463, 214 USPQ 933, 936 (CCPA 1982) (The inventor of an element, *per se*, and the inventor of that element as used in a combination may differ. "The existence of combination claims does not evidence inventorship by the patentee of the individual elements or subcombinations thereof if the latter are not separately claimed apart from the combination." (quoting *In re Facius*, 408 F.2d 1396, 1406, 161 USPQ 294, 301 (CCPA 1969) (emphasis in original)); *Brader v. Schaeffer*, 193 USPQ 627, 631 (Bd. Pat. Inter. 1976) (in regard to an inventorship correction: "[a]s between inventors their word is normally taken as to who are the actual inventors" when there is no disagreement).

### II. AN INVENTOR MUST CONTRIBUTE TO THE CONCEPTION OF THE INVENTION

The definition for inventorship can be simply stated: "The threshold question in determining inventorship is who conceived the invention. Unless a person contributes to the conception of the invention, he is not an inventor. . Insofar as

defining an inventor is concerned, reduction to practice, *per se*, is irrelevant [except for simultaneous conception and reduction to practice, *Fiers v. Revel*, 984 F.2d 1164, 1168, 25 USPQ2d 1601, 1604-05 (Fed. Cir. 1993)]. One must contribute to the conception to be an inventor." *In re Hardee*, 223 USPQ 1122, 1123 (Comm'r Pat. 1984). See also *Board of Education ex rel. Board of Trustees of Florida State Univ. v. American Bioscience Inc.*, 333 F.3d 1330, 1340, 67 USPQ2d 1252, 1259 (Fed. Cir. 2003) ("Invention requires conception." With regard to the inventorship of chemical compounds, an inventor must have a conception of the specific compounds being claimed. "[G]eneral knowledge regarding the anticipated biological properties of groups of complex chemical compounds is insufficient to confer inventorship status with respect to specifically claimed compounds."); *Ex parte Smernoff*, 215 USPQ 545, 547 (Bd. App. 1982) ("one who suggests an idea of a result to be accomplished, rather than the means of accomplishing it, is not an coinventor"). See MPEP § 2138.04 - § 2138.05 for a discussion of what evidence is required to establish conception or reduction to practice.

## III. AS LONG AS THE INVENTOR MAINTAINS INTELLECTUAL DOMINATION OVER MAKING THE INVENTION, IDEAS, SUGGESTIONS, AND MATERIALS MAY BE ADOPTED FROM OTHERS

"In arriving at . conception [the inventor] may consider and adopt ideas and materials derived from many sources . [such as] a suggestion from an employee, or hired consultant . so long as he maintains intellectual domination of the work of making the invention down to the successful testing, selecting or rejecting as he goes.even if such suggestion [or material] proves to be the key that unlocks his problem." *Morse v. Porter*, 155 USPQ 280, 283 (Bd. Pat. Inter. 1965). See also *New England Braiding Co. v.A.W. Chesterton Co.*, 970 F.2d 878, 883, 23 USPQ2d 1622, 1626 (Fed. Cir. 1992) (Adoption of the ideas and materials from another can become a derivation.).

## IV. THE INVENTOR IS NOT REQUIRED TO REDUCE THE INVENTION TO PRACTICE

Difficulties arise in separating members of a team effort, where each member of the team has contributed something, into those members that actually contributed to the conception of the invention, such as the physical structure or operative steps, from those members that merely acted under the direction and supervision of the conceivers.*Fritsch v. Lin*, 21 USPQ2d 1737, 1739 (Bd. Pat. App. & Inter. 1991) (The inventor "took no part in developing the procedures.for expressing the EPO gene in mammalian host cells and isolating the resulting EPO product." However, "it is not essential for the inventor to be personally involved in carrying out process steps.where implementation of those steps does not require the exercise of inventive skill."); *In re DeBaun*, 687 F.2d 459, 463, 214 USPQ 933, 936 (CCPA 1982) ("there is no requirement that the inventor be the one to reduce the invention to practice so long as the reduction to practice was done on his behalf").

See also *Mattor v. Coolegem*, 530 F.2d 1391, 1395, 189 USPQ 201, 204 (CCPA 1976) (one following oral instructions is viewed as merely a technician); *Tucker v. Naito*, 188 USPQ 260, 263 (Bd. Pat. Inter. 1975) (inventors need not "personally construct and test their invention"); *Davis v. Carrier*, 81 F.2d 250, 252, 28 USPQ 227, 229 (CCPA 1936) (noninventor's work was merely that of a skilled mechanic carrying out the details of a plan devised by another).

## V. REQUIREMENTS FOR JOINT INVENTORSHIP

The inventive entity for a particular application is based on some contribution to at least one of the claims made by each of the named inventors. "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. 116. "[T]he statute neither states nor implies that two inventors can be 'joint inventors' if they have had no contact whatsoever and are completely unaware of each other"s work." What is required is some "quantum of collaboration or connection." In other words, "[f]or persons to be joint inventors under Section 116, there must be some element of joint behavior, such as collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting." *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 916-17, 23 USPQ2d 1921, 1925-26 (Fed. Cir. 1992); *Moler v. Purdy*, 131 USPQ 276, 279 (Bd. Pat. Inter. 1960) ("it is not necessary that the inventive concept come to both [joint inventors] at the same time").

Each joint inventor must generally contribute to the conception of the invention. A coinventor need not make a contribution to every claim of a patent. A contribution to one claim is enough. "The contributor of any disclosed means of a means-plus-function claim element is a joint inventor as to that claim, unless one asserting sole inventorship can show that the contribution of that means was simply a reduction to practice of the sole inventor's broader concept." *Ethicon Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460-63, 45 USPQ2d 1545, 1548-1551 (Fed. Cir. 1998) (The electronics technician who contributed to one of the two alternative structures in the specification to define "the means for detaining" in a claim limitation was held to be a joint inventor.).

## VI. INVENTORSHIP IS GENERALLY "TO ANOTHER" WHERE THERE ARE DIFFERENT INVENTIVE ENTITIES WITH AT LEAST ONE INVENTOR IN COMMON

"[A] joint application or patent and a sole application or patent by one of the joint inventors are [by] different legal entities and accordingly, the issuance of the earlier filed application as a patent becomes a reference for everything it discloses" (*Ex parte Utschig*, 156 USPQ 156, 157 (Bd. App. 1966)) except where:

(A) the claimed invention in a later filed application is entitled to the benefit of an earlier filed application under 35 U.S.C. 120 (an overlap of inventors rather than an

identical inventive entity is permissible). In this situation, a rejection under 35 U.S.C. 102(e) is precluded. See *Applied Materials Inc. v. Gemini Research Corp.*, 835 F.2d 279, 281, 15 USPQ2d 1816, 1818 (Fed. Cir. 1988) ("The fact that an application has named a different inventive entity than a patent does not necessarily make that patent prior art."); and

(B) the subject matter developed by another person and the claimed subject matter were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person >or involved in a joint research agreement which meets the requirements of 35 U.S.C. 103(c)(2) and (c)(3)<. In this situation, a rejection under 35 U.S.C. 102(f)/103 or 102(g)/103, or 102(e)/ 103 for applications filed on or after November 29, 1999 >or pending on or after December 10, 2004<, is precluded by 35 U.S.C. 103(c) >once the required evidence has been made of record in the application<. See MPEP § 706.02(l) and § 706.02(l)(1).

For case law relating to inventorship by "another" involving different inventive entities with at least one inventor in common see *Ex parte DesOrmeaux*, 25 USPQ2d 2040 (Bd. Pat. App. & Inter. 1992) (the presence of a common inventor in a reference patent and a pending application does not preclude the determination that the reference inventive entity is to "another" within the meaning of 35 U.S.C. 102(e)) and the discussion of prior art available under 35 U.S.C. 102(e) in MPEP § 2136.04.

**APPENDIX B**

**Comparison of Patent Application to Plaintiff Disclosure**

*The following is a partial list, and is not meant to be exhaustive. Where duplicative, generally, only one reference is cited to Plaintiff's disclosure.*

*Begins on next page.*

| *Patent Application* | *Plaintiff Disclosure* |
|---|---|
| In claim 1: "An **aroma delivery system** comprising a film of aroma compound releasably entrapped in a polymeric matrix, wherein the aroma is released upon breach of the polymeric matrix." | Appendix III, page 1: "**Application Encapsulate Technology**"<br><br>"a method and a standard operating procedure to consistently apply an encapsulate slurry externally around the bottle's neck ... the consumer twist opens a cap from the bottle, the encapsulate is broken by friction and a stimulating and perceivable flavor is released to enhance customer's experience with Pepsi beverage." |
| In claim 1: "An **aroma** delivery system comprising a film of **aroma** compound releasably entrapped in a polymeric matrix, wherein the **aroma** is released upon breach of the polymeric matrix." | Appendix III, page 1: "...the encapsulate is broken by friction and a **stimulating and perceivable flavor** is released to enhance customer's experience with Pepsi beverage."<br><br>Appendix III, page 2:"...the result is reported as pass or fail. Pass when an **aroma** is smelled from the bottle..."<br><br>the plaintiff defines "**aroma**" as taste or character loss by more than 30%. |
| In claim 1: "An aroma delivery system comprising **a film of aroma compound** releasably entrapped in a polymeric matrix, wherein the aroma is released upon breach of the polymeric matrix." | Appendix III, page 1: "...encapsulate slurry externally around the bottle's neck..." |
| In claim 1: "An aroma delivery system comprising a film of aroma compound **releasably** entrapped in a polymeric matrix, wherein the aroma **is released** upon breach of the polymeric matrix." | Appendix III, page 1: "...the encapsulate is broken by friction and a stimulating and perceivable flavor **is released** to enhance customer's experience with Pepsi beverage." |
| ~~In claim~~ 1: "An aroma delivery system comprising a film of aroma compound releasably entrapped in a polymeric matrix, wherein the aroma is released upon breach of the **polymeric matrix**." | Appendix III, page 1: "...the **encapsulate** is broken by friction and a stimulating and perceivable flavor..."<br><br>(Encapsulation is the immobilization of active ingredients in a polymer matrix) |
| Claim 2: "... wherein the matrix has a surface and further comprising **a secondary covering film** covering the | Appendix XXV, title - "...while emphasizing the **"double coating " approach** that I have been successfully |

| | |
|---|---|
| surface..." | developing"<br><br>In appendix XI, Project # 900441, the plaintiff discloses "Executive Summary - Corn Zein and Ethyl cellulose applied as a protective film on top gelatin-walled encapsulate help resolve the problem...and significantly improved the shelf life of flavor encapsulate."<br><br>In appendix III, page 6 - the plaintiff discloses "the capsule around the flavor molecule is most likely insoluble in organic solvent since it is probably a hydrocolloid, so a simple solvent extraction might successfully recover an important portion of encapsulated flavor molecule, while the hydrocolloid is precipitated." |
| Claim 3: "The aroma delivery system of claim 1, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a **hydrophilic** compound, and blends thereof." | In appendix III, page 6 the plaintiff discloses the "flavor" already defined as "...a recognizable aroma" in page 2 of the same APPENDIX III, PC 1177. An aroma is by definition a volatile compound. Furthermore the said flavor or aroma can be extracted by a strong solvent such as methanol and/or ethanol which are both well-known to extract polar and non-polar aroma compounds. Therefore the aroma compound disclosed could be polar, and could also be soluble in water and therefore hydrophilic. The aroma could also be a mixture of volatile and hydrophilic compounds.<br>In appendix III, page 6 - the plaintiff also discloses "the capsule around the flavor molecule is most likely insoluble in organic solvent since it is probably a hydrocolloid. Hydrocolloids are by nature water loving therefore hydrophilic. |
| Claim 4: "The aroma delivery system of claim 2, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a **hydrophilic** compound, and blends | In appendix III, page 6, the plaintiff discloses the "flavor" already defined as "...a recognizable aroma" in page 2 of the same APPENDIX III, PC 1177. An aroma is by definition a volatile compound. |

| | |
|---|---|
| thereof. | Furthermore the said flavor or aroma can be extracted by a strong solvent such as methanol and/or ethanol which are both well-known to extract polar and non-polar aroma compounds. Therefore the aroma compound disclosed could be polar, and could also be soluble in water and therefore hydrophilic. The aroma could also be a mixture of volatile and hydrophilic compounds. In appendix III, page 6 - the plaintiff also discloses "the capsule around the flavor molecule is most likely insoluble in organic solvent since it is probably a hydrocolloid. Hydrocolloids are by nature water loving therefore hydrophilic. |
| Claim 15: "The container of claim 13, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a **hydrophilic** compound, and blends thereof. | In appendix III, page 6, the plaintiff discloses the "flavor" already defined as "...a recognizable aroma" in page 2 of the same APPENDIX III, PC 1177. An aroma is by definition a volatile compound. Furthermore the said flavor or aroma can be extracted by a strong solvent such as methanol and/or ethanol which are both well-known to extract polar and non-polar aroma compounds. Therefore the aroma compound disclosed could be polar, and could also be soluble in water and therefore hydrophilic. The aroma could also be a mixture of volatile and hydrophilic compounds. In appendix III, page 6 - the plaintiff also discloses "the capsule around the flavor molecule is most likely insoluble in organic solvent since it is probably a hydrocolloid. Hydrocolloids are by nature water loving therefore hydrophilic. |
| Claim 16: The container of claim 14, wherein the aroma compound is selected from the group consisting of a volatile compound, a polar compound, a **hydrophilic** compound, and blends thereof. | In appendix III, page 6, the plaintiff discloses the "flavor" already defined as "...a recognizable aroma" in page 2 of the same APPENDIX III, PC 1177. An aroma is by definition a volatile compound. Furthermore the said flavor or aroma can be extracted by a strong solvent such as methanol and/or ethanol which are both |

| | |
|---|---|
| | well-known to extract polar and non-polar aroma compounds. Therefore the aroma compound disclosed could be polar, and could also be soluble in water and therefore hydrophilic. The aroma could also be a mixture of volatile and hydrophilic compounds.<br>In appendix III, page 6 - the plaintiff also discloses "the capsule around the flavor molecule is most likely insoluble in organic solvent since it is probably a hydrocolloid. Hydrocolloids are by nature water loving therefore hydrophilic. |
| | |
| Claim 3: "The aroma delivery system of claim 1, wherein the **aroma compound** is selected from the group consisting of **a volatile compound**, a polar compound, a hydrophilic compound, and blends thereof. " | Appendix IX, page 1: "... to assess the performance of Corn zein and ethyl cellulose significantly slowed down humidity **driven flavor** release from gelatine walled flavor encapsulate." |
| Claim 3: "The aroma delivery system of claim 1, wherein the aroma compound is selected from the group consisting of a volatile compound, **a polar compound**, a hydrophilic compound, and blends thereof. " | Appendix XIII, page 1: "solution – encapsulate aroma by yeast cell combined with a binder such as **PVOH** or polyvinyl acetate"<br>[PVOH (=Polyvinyl Alcohol) is polar compound.]<br>polyvinyl acetate is non polar. |
| Claim 5: The aroma delivery system of claim 1, wherein the polymer matrix is selected from the group consisting of a **natural wax**, a natural biopolymer, a natural polymer, a synthetic polymer, and blends thereof. | Appendix XIII, page 1 – Approach/solution: "protect the capsule from the moisture penetration by a coated hydrophobic film such **as wax**, hydrophobic synthetic polymer."<br><br>Appendix IX, page 1: "... to assess the performance of Corn zein and ethyl cellulose significantly slowed down humidity **driven flavor** release from gelatine walled flavor encapsulate." Corn Zein is a natural Biopolymer. Ethyl cellulose is a synthetic polymer.<br><br>Appendix XIII, title: "aqueous shellac as humidity protective coating..." Shellac is |

| | |
|---|---|
| | a natural biopolymer. |
| Claim 5: The aroma delivery system of claim 1, wherein the polymer matrix is selected from the group consisting of a natural wax, **a natural biopolymer**, a natural polymer, a synthetic polymer, and blends thereof. | Plaintiff's research<br><br>(zein protein is a natural biopolymer; is often coated on conventional synthetic plastic films)<br>Appendix IX, page 1: "... to assess the performance of **Corn zein** and ethyl cellulose significantly slowed down humidity driven flavor release from gelatine walled flavor encapsulate."<br>Appendix XIII, page 1 – Approach/solution: "optimize zein capsule formulation." |
| Claim 5: The aroma delivery system of claim 1, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a **natural polymer**, a synthetic polymer, and blends thereof. | Appendix XIII, page 1 - Approach/solution: "Blending...hydrophobic **oil** (vegetable **oil**) into aroma core. |
| Claim 5: The aroma delivery system of claim 1, wherein the polymer matrix is selected from the group consisting of a natural wax, a natural biopolymer, a natural polymer, **a synthetic polymer**, and blends thereof. | Appendix XIII, page 1 - Approach/solution: "protect the capsule from the moisture penetration by coated a hydrophobic film such us wax, hydrophobic **synthetic polymer**." |
| From the description, paragraph [34]: "Polymer matrix also is selected to protect the aroma compound entrapped therein against **heat**, **moisture**, **light**, especially ultraviolet light, and other deleterious conditions."<br>and paragraph [58]: "the aroma delivery system can be applied to other closures of any type, including a threaded closure having the threads on the inside of the neck of the bottle; a slide-in closure such as a cork or a stopper of metal, glass, or rubber, and including a stopper retained by a bail (a "**Lightning**" closure)." | Appendix III, page 5: Influence of application Flavor encapsulate on consumer's perception of Pepsi beverage during stability studies – effect of **temperature, lighting and humidity**.<br>Appendix VII, title: "...the effect of **humidity/moisture** on aroma technology delivery system"<br><br>Appendix VIII, title:"Influence of relative **humidity** on the stability and shelf life of dry encapsulate coating"<br><br>Appendix XXVII shows "...the electron microscopy pictures of releasably entrapped/encapsulated flavor molecules that I exposed to high **humidity** environment..." |

| | |
|---|---|
| | Appendix XXIX shows "...the electron microscopy technician issued for the analysis of releasably entrapped aroma delivery system that I kept under **different relative humidity** conditions..." |
| In the description, Paragraph[2]: "Edible products such as juices and coffee are expected to have a fresh aroma that replicates or evokes memory of the expected **flavor** of the product." Paragraph [6]: "Although aroma can have a tremendous impact on the sensation of **flavor**, it often is difficult to make use of this phenomenon without modifying the ingredients to include aromatic compounds." Paragraph [25]: "edible products typically will have an aroma delivery system that enhances or compliments the natural aroma, such as a **coffee** aroma, **a fresh fruit** aroma, or a beverage **flavor** aroma." | In appendix III, Ricky discloses his **Flavor Research**, which means feasibility, stability and performance of application **flavor** encapsulates. In plaintiff's research, target flavor are: **orange**, **vanilla**, **coffee**. |
| Description paragragh [26]; "Embodiments of the invention are directed to delivery of aroma compounds that are more volatile than materials that can be delivered by known techniques, such as **encapsulation** in gelatin or melamine/formaldehyde microcapsules." | Plaintiff discloses in appendix III the application **encapsulate** technology. |

# APPENDIX XXXVII

"Attachment B to the Staffing Supplier Agreement: Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property. Signed on 07/09/08 by Ricky Kamdem-Ouaffo.

**Attachment B**
**to the Staffing Supplier Agreement**

**STAFFING SUPPLIER EMPLOYEE AGREEMENT**
**REGARDING CONFIDENTIALITY AND INTELLECTUAL PROPERTY**

In consideration of payment to me by my employer, the Staffing Supplier named below (the "Staffing Supplier") for the performance of work or assignments for PepsiCo, Inc. or any of its affiliates (hereinafter "Company") and other good and valuable consideration, including the use on behalf of Company of its facilities or materials, or of private or proprietary information owned by Company or its suppliers or customers, I agree to the following provisions:

A. I hereby assign and agree to assign to Company all my right, title and interest in and to all inventions, discoveries, improvements, ideas, products, formulae, machines, mask works, designs, methodologies, processes, know-how, research and development, software, source code, computer or other apparatus programs and related documentation, and other works of authorship (collectively, "Intellectual Property"), whether or not patentable, copyrightable or subject to other forms of protection, made, created, developed, written or conceived by me during the period of such work or performance of assignments, whether during or outside of regular working hours, either solely or jointly with another, in whole or in part

   1. In the course of such work or assignment, or
   2. Which are suggested by or result from any task assigned to me or work performed for or on behalf of Company relating to my assignment, or
   3. With the use of Company's time, material, facilities, or private or proprietary information;

B. I will, without charge to Company but at its expense, execute a specific assignment of title to Company and do anything else reasonably necessary to enable Company to secure a patent, copyright registration or other form of protection of said Intellectual Property anywhere in the world;

C. This Agreement does not constitute a contract of employment between Company and me, nor does it confer upon me any rights by license or otherwise in any Intellectual Property to which I may have access;

D. In the event that either my employer or I have previously executed an agreement with Company relating to the work which I am about to undertake, it is understood and agreed that the terms and provisions of this Agreement will supersede any conflicting terms and conditions of such previously executed agreement;

E. I will keep in strict confidence and will not, except as expressly authorized in writing by Company, publish or disclose, either orally or in writing, during and after the period of my work or assignment, any confidential, private or proprietary information of Company or its suppliers or customers (including, but not limited to, specifications, requirements, drawings, sketches, models, designs, methodologies, processes, know-how, research and development, samples, tools, computer or other apparatus programs, software, source code, trade secrets, product plans, projects, inventions, engineering information, hardware configuration information, technical information or data, financial information, business plans, other business information or data, customer information and data, vendor information, market information, or marketing plans, whether written, oral or otherwise) which I may in any way acquire, learn, develop or create by reason of such work or assignment (collectively, "Company Confidential Information"). I will use Company Confidential Information only in connection with my performance of work or assignments for Company; I will not use Company Confidential Information for any other purpose;

F. I will not disclose Company Confidential Information to any other employee of my employer unless such other employee has executed a Staffing Supplier Employee Agreement Regarding Confidential Information and Intellectual Property similar to this Agreement and is working on the same project as me;

G. Upon request by Company, I will return to Company all Company Confidential Information received in tangible form or destroy all such Company Confidential Information and certify in writing to such destruction;

H. I will not disclose to Company, its suppliers, customers or any of its employees any information that is or may be proprietary or confidential to any third party, including but not limited to, my current or former employer or any of my current or former employer's other clients, unless I have the right to disclose such information and/or the owner of such information has authorized me to disclose such information and such information is relevant to my work or assignment. Except for the Intellectual Property assigned to the Company under this Agreement, all other specifications, drawings, sketches, models, samples, tools, computer or other apparatus programs, technical or business information or data, written, oral or otherwise, furnished by me to Company under this Agreement or in contemplation of the work or assignment to be performed by me shall not be considered confidential or proprietary;

I. If my work or assignment involves photographic, visual, and/or audio recording of my presentation, lecture, or demonstrations, including my name, picture, likeness, statement, or voice, I agree that it may be used, in whole or part, either alone or in combination with any other material, by Company or anyone acting under Company's authority or permission, whether or not Company has any copyright interest in such recording in accordance with this Agreement, and Company shall have the royalty-free right to copy, perform, edit, combine, distribute, exhibit, broadcast, display, modify and use said recording and any copies made thereof and to permit others to do so;

J. The above terms shall survive termination, cancellation or expiration of this Agreement and the work or assignments for which I was engaged;

K. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 and SECTION 5-1402 OF THE GENERAL OBLIGATIONS OF THE STATE OF NEW YORK. I AGREE TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK.

I acknowledge that I have read, understand and agree to the above terms.

Signature: [signature]

Typed or Printed Name: Ricky Kamdem-Ouaffo

Social Security Number: 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

Date: 07/09/08

Name of Staffing Supplier: Subex Technologies Inc.

# APPENDIX XXXVIII

"PATENT APPLICATION JOINT DECLARATION and POWER OF ATTORNEY" executed by Naijie Zhang and Petr Given on 06/21/10.

# PATENT APPLICATION
# JOINT DECLARATION and POWER OF ATTORNEY

As the below named inventors, we hereby declare that:

Our residence, post office address and citizenship are as stated below next to our names;

We believe we are the original and first inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX, the specification of which is filed herewith unless the following box is checked:

☐ was filed on _____ as U.S. Application No. _____ or PCT International Application No. _____ and which application was amended on _____ (if applicable).

We hereby state that we have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

We hereby acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR §1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

## Prior Foreign Applications

We hereby claim foreign priority benefits under 35 USC §119(a)-(d) or (f), or 365(b) of any foreign applications for patent or inventor's or plant breeder's rights certificates or 365(a) of any PCT international application which designated at least one country other than the United States of America, listed below and have also identified below any foreign applications for patent, inventor's or plant breeder's rights certificates, or any PCT international application having a filing date before that of the application on which priority is claimed:

| Country | Application No. | Date of Filing (day month year) | Date of Issue (day month year) | Priority Claimed Under 35 USC §119 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Power of Attorney

And we hereby appoint, both jointly and severally, as our attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the U.S. Patent and Trademark Office connected herewith the practitioners associated with:

**Customer Number: 66811**

Please direct all correspondence and telephone communications to the address and telephone number associated with the Customer Number stated above.

Client No. 3534US Attorney Docket No. 056943.00808

We hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 USC §1001 and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Signature [signature] Date 6/21/2010
Full Name of First Inventor: Naijie Zhang
Residence: Ridgefield, Connecticut 06877
Citizenship: US
Post Office Address: 31 Charter Oak Court, Ridgefield, Connecticut 06877

Signature [signature] Date 6/21/10
Full Name of Second Inventor: Peter Given
Residence: Ridgefield, Connecticut 06877
Citizenship: US
Post Office Address: 16 O'Neill Court, Ridgefield, Connecticut 06877

☐ Additional inventor(s) or legal representative(s) are named on attached sheet(s)

PTO/SB/14 (07-07)
Approved for use through 06/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 056943.00808 |
|---|---|---|
| | Application Number | |

| Title of Invention | RELEASABLE ENTRAPMENT OF AROMA USING A POLYMERIC MATRIX |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Applicant Information:

**Applicant 1**

| Applicant Authority | ◉ Inventor | ○ Legal Representative under 35 U.S.C. 117 | ○ Party of Interest under 35 U.S.C. 118 |
|---|---|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Naijie | | ZHANG | |

| Residence Information (Select One) | ◉ US Residency | ○ Non US Residency | ○ Active US Military Service |
|---|---|---|---|

| City | Ridgefield | State/Province | CT | Country of Residence | US |
|---|---|---|---|---|---|

| Citizenship under 37 CFR 1.41(b) | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 31 Charter Oak Court |
|---|---|
| Address 2 | |

| City | Ridgefield | State/Province | CT |
|---|---|---|---|
| Postal Code | 06877 | Country | US |

**Applicant 2**

| Applicant Authority | ◉ Inventor | ○ Legal Representative under 35 U.S.C. 117 | ○ Party of Interest under 35 U.S.C. 118 |
|---|---|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Peter | | GIVEN | |

| Residence Information (Select One) | ◉ US Residency | ○ Non US Residency | ○ Active US Military Service |
|---|---|---|---|

| City | Ridgefield | State/Province | CT | Country of Residence | US |
|---|---|---|---|---|---|

| Citizenship under 37 CFR 1.41(b) | |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 16 O'Neill Court |
|---|---|
| Address 2 | |

| City | Ridgefield | State/Province | CT |
|---|---|---|---|
| Postal Code | 06877 | Country | US |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. Add

## Correspondence Information:

**Enter either Customer Number or complete the Correspondence Information section below. For further information see 37 CFR 1.33(a).**

☐ **An Address is being provided for the correspondence Information of this application.**

TAB 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICKY KAMDEM-OUAFFO,

                  Plaintiff,

    v.

PEPSICO, INC., DR. PETER S. GIVEN, JR.,
DR. NAIJIE ZHANG, JOHN DOE, and/or
JANE DOE,

                  Defendants.

Case No. 14-CV-227 (KMK)

OPINION & ORDER

Appearances:

Ricky Kamdem-Ouaffo
New Brunswick, NJ
*Pro se Plaintiff*

Robert Lawrence Maier
Jennifer Cozeolino Tempesta
Richard Benjamin Harper
Baker Botts LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

    Pro se Plaintiff Ricky Kamdem-Ouaffo ("Plaintiff") filed this Action in January 2013

against Defendants Pepsico, Inc. ("PepsiCo"), Dr. Peter S. Given, Jr. ("Dr. Given"), Dr. Naijie

Zhang ("Dr. Zhang"), John Doe, and/or Jane Doe in January 2013. (Dkt. No. 1). Plaintiff

alleges several causes of action arising out of his employment at PepsiCo, arguing principally

that PepsiCo employees fraudulently commandeered his intellectual property. Before the Court

is Defendants' Motion to Dismiss Plaintiff's First Amended Complaint. For the foregoing

reasons, Defendants' Motion is granted, and Plaintiff's First Amended Complaint is dismissed.

# I. BACKGROUND

## A. Factual Background[1]

Plaintiff, a resident of New Brunswick, New Jersey, has "professional experience" in the "research and development, manufacturing, analysis[,] and application of flavors and aromas," as well as "flavor encapsulation[] and the use applications of edible film formers." (Pl.'s Mem. of Law in Supp. of Pl.'s Countercl. and in Supp. of Denial of Defs.' Mot. To Dismiss ("Pl.'s Opp'n") Ex. 1 ("SAC") ¶¶ 1, 3–4 (Dkt. No. 43) (Plaintiff's proposed Second Amended Complaint).) From July 14, 2008 to September 28, 2009, Plaintiff worked as a "Food Scientist contractor at PepsiCo's Research and Development facility in Valhalla, New York." (*Id.* ¶ 22.) In that capacity, Plaintiff was tasked with "provid[ing] leadership and strategy for developing [and] evaluating commercially viable Aroma Technology Delivery System[s] applicable to PepsiCo's commercial items." (*Id.* ¶ 27.)

Prior to starting with PepsiCo, Plaintiff was required to sign a "Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property" ("Agreement") "with Pepsico through Subex Technologies, Inc." ("Subex"), the "contract [s]taffing [a]gency." (*Id.* ¶ 23.) Plaintiff signed the Agreement on July 8, 2008, at which time a Subex manager "explained to . . . Plaintiff . . . that the [A]greement . . . meant that . . . Plaintiff in principle consented to assigning his future intellectual property to PepsiCo for commercial use in

---

[1] The factual allegations that follow are derived from Plaintiff's proposed Second Amended Complaint (Dkt. No. 43), as discussed below. While the Court will sometimes refer to Plaintiff's contentions as "alleged," the Court treats them as true for purposes of the instant Motion.

This section omits facts and allegations that pertain to ScentSational Technologies LLC, Steven M. Landau, and/or their pending lawsuit against PepsiCo, *see Scentsational Techs., LLC*, No. 13-CV-8645 (S.D.N.Y. filed Dec. 5, 2013), because, Plaintiff's request that they be joined as necessary parties notwithstanding, (*see, e.g.*, SAC ¶ 123), neither has been joined as a party in this Action as of the date of this Opinion.

exchange for payment to be made to . . . Plaintiff during the course of the contract." (*Id.* ¶¶ 23–24.) At the same time, Plaintiff alleges that there was a "common understanding" that if Plaintiff created intellectual property during the period of his contract that was patentable, "PepsiCo would . . . credit . . . Plaintiff" as the inventor. (*Id.* ¶ 25.)

During the period of Plaintiff's employment, Plaintiff "pioneered, conceptualized, designed, demonstrated, proved, executed, and implemented aroma concepts, technologies, and techniques . . . that none of [PepsiCo's] employees [had] been able to do prior to Plaintiff's work." (*Id.* ¶ 29.) Plaintiff also "filled up five to seven [l]aboratory [n]otebooks," and created "scientific reports and . . . computer data" pertaining to his inventions. (*Id.* ¶ 85.) Plaintiff received $82,142 in compensation for his work, or $56,384 in take-home pay, which amounted to only a percentage of the $133,007.50 Plaintiff alleges he is owed under an unsigned purchase order ("Purchase Order"). (*Id.* ¶¶ 52–53, 186–87.)[2]

At some point prior to or on September 16, 2009, Defendants, at the direction of PepsiCo senior managers, "removed . . . Plaintiff's name from" intellectual property Plaintiff created during his period of employment at PepsiCo. (*Id.* ¶¶ 32, 34.) In subsequent patent applications, PepsiCo credited the inventions to Dr. Given and Dr. Zhang, despite the fact that they allegedly did not "contribute to the creation" of that property. (*Id.* ¶ 32.) Plaintiff alleges that Dr. Zhang was not an employee of PepsiCo when Plaintiff "created and conceptualized his

[2] Plaintiff alleges that he received only 42.39% of the amount he alleges he is owed under the Purchase Order, but by the Court's calculation, Plaintiff received 61.76%, as Plaintiff does not allege that the Purchase Order indicated that Plaintiff was to receive $133,007.50 *after* taxes. (SAC ¶ 53.) Nonetheless, Plaintiff alleges that he is the owner of the remaining percentage of his intellectual property. (*Id.*)

inventions and reduced them to practice," and that Dr. Given provided "no intellectual input or supervision" during that time. (*Id.* ¶ 33.)

Plaintiff further alleges that the removal of his name from his inventions was part of a coordinated attempt by PepsiCo to distance itself from Plaintiff. On the same day that PepsiCo managers removed Plaintiff's name, Dr. Given allegedly sent an email to his colleagues which said: "'Another hitch – [Plaintiff's] contract is terminating Oct. 5, and he'll be informed this week . . . more drama! Please do not distribute this info, but [it] may impact our decision on inventorship.'" (*Id.* ¶ 8 (second alteration in original) (italics omitted).)[3] Dr. Zhang allegedly sent a similar email, stating that "'Ricky Kamdem is not [the] inventor. He is just involved in the project . . . .'" (*Id.* ¶ 9 (second alteration in original) (italics omitted).) PepsiCo's Vice President of Research and Development, Valerie Jacklin, allegedly wrote to Dr. Given and the Director of the Ingredient Technology group, echoing Dr. Zhang's sentiment when noting that she was "'[n]ot [s]ure [they] [w]ant [Plaintiff] [o]n [t]he [i]nvention [l]ist.'" (*Id.* ¶ 255 (italics omitted).) An unnamed PepsiCo employee also allegedly entered a notation in Plaintiff's personnel file reading "Dept. not satisfied," suggesting Plaintiff's work was unsatisfactory. (*Id.* ¶ 38 (italics omitted).)

On or around September 23, 2009, five days before the expiration of Plaintiff's contract, Plaintiff alleges that he was told by an unnamed human resources manager that he was "'culturally unfit'" for employment because he was "a black male [with] an opinion on scientific matters that was contrary to that of his peers of [another] skin color," and that he "needed to be

[3] As outlined below, Plaintiff's contract was scheduled to terminate on September 28, rather than on October 5. (*See id.* ¶¶ 35–36.)

coached." (*Id.* ¶ 64–66.)[4] Plaintiff likewise alleges that PepsiCo's decision not to credit Plaintiff for his alleged inventions stemmed from "stereotypes and racial clichés about . . . Plaintiff as a person of . . . black skin." (*Id.* ¶ 257.) A few months later, on December 18, 2009, Plaintiff alleges that Defendants wrote in a "Statement of Position" made to a United States government agency that "Plaintiff was not able to do work, and was not creative . . . by comparison to [his] counter parts [sic] of . . . other . . . race[s]." (*Id.* ¶¶ 67, 257.) Plaintiff claims that Defendants "represent[ed] that . . . Plaintiff went to work only to look for opportunities for predatory sexual intercourse activity on women." (*Id.* ¶ 258; *see also id.* ¶ 68.)

On September 28, 2009, Plaintiff's employment contract ended and was not renewed. (*Id.* ¶¶ 35–36.)[5] At the expiration of his contract, Plaintiff sent a letter to PepsiCo management in which he made an "'authorship claim on any current or future work resulting in . . . flavor encapsulates or . . . aroma delivery systems because [he] single-handedly demonstrated the need for [them] when no one at PepsiCo had [them] in mind . . . ." (*Id.* ¶ 62 (first and second alterations in original) (italics omitted).) Thereafter, PepsiCo filed for five patents with the United States Patent and Trademark Office ("USPTO") based on the intellectual property at issue, one of which, a patent application for "Releasable Entrapment of Aroma Using Polymeric Matrix," was granted on July 2, 2013 (US Patent No. 8,474,637 B2). (*See id.* ¶¶ 41, 47, 60.)[6] In

---

[4] Plaintiff does not specify whether the human resources manager was employed by PepsiCo or Subex.

[5] Plaintiff alleges that his contract was allowed to expire "for no reason other than to seize the Plaintiff's intellectual property." (SAC ¶ 116.) However, as outlined above, Plaintiff suggests that there may have been a race-based motive, and Plaintiff also implies in his Affidavit that his contract was allowed to expire because of his criticism of the use of "formaldehyde aroma capsules." (Pl.'s Aff. ¶¶ 63–68, 71 (Dkt. No. 42).)

[6] The other patent applications are as follows: one for "Releasably Encapsulated Aroma" (US Patent App. No. US 13/56,551 A1), one for "Complex Coacervates and Aqueous Dispersion

connection with the patent applications, Dr. Given and Dr. Zhang allegedly each signed or cosigned "Inventor's Oath[s] or Declaration[s]," including a "Joint Inventor's Declaration," for the granted patent. (*Id.* ¶¶ 44–48.) Dr. Given and Dr. Zhang each also allegedly executed and filed an assignment of the relevant intellectual property to PepsiCo. (*Id.* ¶¶ 49–50.)

On October 11, 2012, Plaintiff submitted a request to PepsiCo, asking that it amend the patent applications at issue "from which [it] . . . expunged . . . Plaintiff's name" to include his name. (*Id.* ¶ 55.) PepsiCo did not reply to this request, nor did it make the desired amendment. (*Id.* ¶ 59.)[7] Nonetheless, Plaintiff alleges that he is the "true inventor" of both the patented property and the property described in the four pending patent applications. (*Id.* ¶¶ 60, 91, 106.)

B. Procedural History

Plaintiff filed the instant Action on January 31, 2014. (Dkt. No. 1.) On March 14, 2014, the same day that Defendants first requested a pre-motion conference, (Dkt. No. 8), Plaintiff filed his First Amended Complaint, alleging thirteen causes of action, namely "breach of intellectual property agreement," "wrongful appropriation of plaintiff's intellectual property," "fraudulent obtaining of signature," "correction of inventorship," "unjust enrichment," "the necessity of constructive trusts," a "request for subpoenas," three causes of action relating to alleged false statements made to the USPTO, and three causes of actions relating to other alleged criminal conduct. (*See* Dkt. No. 9.) On March 26, 2014, Defendants filed two letters requesting a pre-motion conference. (Dkt Nos. 19, 20.) The Court granted Defendants' request, (Dkt. No. 21),

---

of Complex Coacervates and Methods of [M]aking Same" (US Patent App. No. 13/272,270), and two for "Coacervates Complex, Methods [a]nd Food [P]roducts" (US Patent App. Nos. 13/175,508 and 13/175,451). (SAC ¶¶ 48, 60.)

[7] Plaintiff alleges that he also contacted the Westchester County District Attorney and the FBI about this matter. (*See* Pl.'s Aff. ¶¶ 95–98.)

and at the pre-motion conference held on May 15, 2014, the Court set a briefing schedule for Defendants' Motion to Dismiss, (*see* Dkt. (minute entry for May 15, 2014)). Defendants filed their Motion To Dismiss and Memorandum of Law on June 6, 2014, (Dkt. Nos. 34, 35), and an associated Declaration on June 9, 2014, (Dkt. No. 37). On July 9, 2014, Plaintiff submitted a "Notice of Counterclaim . . . in Support of the Denial of the Defendants' Motion to Dismiss," and an Affidavit and Memorandum of Law in support of that submission. (Dkt. Nos. 41, 42, 43.)[8] Plaintiff also filed a "Proposed Order [G]ranting . . . Plaintiff's Counterclaim" on July 10, 2014. (Dkt. No. 44.) Defendants filed their Reply on August 8, 2014. (Dkt. No. 46.)

Plaintiff has also filed a number of letters and requests, particularly during the two-month period preceding the pre-motion conference on Defendants' Motion To Dismiss. On March 18, 2014, Plaintiff filed a letter in response to Defendants' requests for a pre-motion conference, contesting Defendants' claims and requesting that the Court "allow the [j]udicial process to continue its normal course to the next step of discovery." (Dkt. No. 14 at 10). On March 21, 2014, Plaintiff filed a letter identifying alleged inaccuracies on the docket. (*See* Dkt. No. 16.) On March 24, 2014, Plaintiff filed a letter requesting permission to join ScentSational Technologies LLC and Steven M. Landau as co-defendants. (*See* Dkt. No. 18.) On March 27, 2014, Plaintiff filed a "Supplemental Answer" to Defendants' requests for a pre-motion conference, making similar arguments to those in his March 18 letter, (*see* Dkt. No. 22), and to which Defendants replied on April 3, 2014, (Dkt. No. 25). On March 31, 2014, Plaintiff filed a letter seeking to introduce "[a]ccusatory [e]vidence" for the arrest of Defendants Dr. Given and Dr. Zhang. (Dkt. No. 24 at 1.) On April 7, 2014, Plaintiff filed a letter requesting that the Court

---

[8] Plaintiff requested permission to file his Affidavit on July 2, 2014, (*see* Dkt. No. 39), which the Court granted, (*see* Dkt. No. 40).

assign a magistrate judge to adjudicate Plaintiff's criminal allegations. (*See* Dkt. No. 26.) On April 14, 2014, Plaintiff filed a letter contending that Defendants could not make any res judicata arguments in connection with a related case pending in New York Supreme Court. (*See* Dkt. No. 28.)[9] Plaintiff made additional arguments in support of this claim in a letter filed on April 16, 2014. (*See* Dkt. No. 29.) On April 24, 2014, Plaintiff filed what he termed his "Pre-Motion Conference Concluding Remarks" three weeks before the pre-motion conference was held. (Dkt. No. 30.) Later, on August 14, 2014, after Defendants' Motion To Dismiss was fully briefed, Plaintiff filed a letter containing proposed talking points for oral argument on his Counterclaim. (*See* Dkt. No. 47.) Finally, in late November 2014, Plaintiff sent a letter to the Court disclosing

---

[9] In September 2010, Plaintiff filed a similar lawsuit in New York Supreme Court, Westchester County. *See Kamdem-Ouaffo v. PepsiCo, Inc.*, No. 22625/2010 (N.Y. Sup. Ct. 2010). (*See also* Mem. of Law in Supp. of Defs.' Motion To Dismiss 5 (Dkt. No. 34) (acknowledging lawsuit).) Defendants assert that while the court in that case granted judgment in Defendants' favor on July 8, 2013, "a defense based on res judicata may be premature because the judgment in [that] action is not yet final" due to a pending appeal. (*Id.* at 10 n.6 (italics omitted); *see also* Decl. of Jennifer C. Tempesta in Supp. of Defs.' Mot. To Dismiss Ex. 3, at 40 (Dkt. No. 37) (N.Y. Supreme Court decision granting summary judgment); Dkt. for *Kamdem-Ouaffo v. PepsiCo, Inc.*, No. 22625/2010 (N.Y. Sup. Ct. 2010) (noting that judgment for Defendants was granted).) While the Court's Opinion here does not rest on res judicata grounds, it is worth noting that lower court orders have res judicata effect when they are issued, regardless of whether they are appealed. *See Arnold v. Beth Abraham Health Servs., Inc.*, No. 09-CV-6049, 2009 WL 5171736 , at *4 (S.D.N.Y. Dec. 30, 2009) ("Under New York law, the pendency of an appeal does not deprive a challenged judgment of preclusive effect."), *aff'd on other grounds sub nom. Arnold v. 1199 SEIU*, 420 F. App'x 48 (2d Cir. 2011); *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 737 (S.D.N.Y. 2007) ("Courts long have held that the pendency of an appeal ordinarily does not suspend the preclusive effect of an otherwise final judgment."), *aff'd sub nom. Bondi v. Capital & Fin. Asset Mgmt. S.A.*, 535 F.3d 87 (2d Cir. 2008); *Aaron v. Aaron*, 768 N.Y.S.2d 739, 741 (App. Div. 2003) ("[A]bsent a stay, the pendency of an appeal from [a] judgment does not alter the finality or enforceability of that judgment."); *cf. DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Under New York law, the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." (internal quotation marks omitted)).

the name of an FBI investigator allegedly assigned to his case; the Court docketed a redacted version of this letter on December 1, 2014. (*See* Dkt. No. 48.)

Together with the Memorandum of Law that Plaintiff submitted in response to Defendants' Motion To Dismiss, Plaintiff included a proposed Second Amended Complaint. (*See* SAC.) While the conduct Plaintiff alleges in his Second Amended Complaint is almost entirely identical to that in Plaintiff's First Amended Complaint, a few differences are worth noting. First, Plaintiff added ScentSational Technologies LLC and Steven M. Landau as Defendants—two parties Plaintiff previously requested permission to join—and included allegations against them. (*See id.*) Second, Plaintiff withdrew his second, third, and sixth causes of action, which pertained to false statements allegedly made to the USPTO, and his fourth, fifth, and ninth causes of action, which pertained to alleged criminal conduct, instead requesting the "[i]nitiation [o]f [a] [s]eparate [c]riminal [c]omplaint [a]gainst . . . Defendants" PepsiCo, Dr. Zhang, and Dr. Given. (*See id.* at 25–26, 28.)[10] Third, Plaintiff withdrew his thirteenth cause of action, his request for subpoenas, and instead requested joinder of ScentSational Technologies LLC and Steven M. Landau. (*See id.* at 32.) Fourth, Plaintiff added fifteen new causes of action, including a number of claims based on the New York Uniform Commercial Code. (*Id.* at 32–49.)

Defendants reviewed and responded to Plaintiff's proposed Second Amended Complaint in their Reply. (Defs.' Reply Mem. of Law in Further Supp. of Defs.' Mot. To Dismiss ("Defs.' Reply") 8–10 (Dkt. No. 46).) Therefore, without accepting the proposed Second Amended

---

[10] Claim numbers in this Opinion are the numbers Plaintiff assigned them in his proposed Second Amended Complaint.

Complaint for filing, the Court will consider the allegations and claims contained in the proposed Second Amended Complaint together with those contained in First Amended Complaint.[11]

## II. DISCUSSION

### A. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014). In reviewing a complaint, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted). Moreover, along with the Complaint itself, the Court "may consider . . . any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."

[11] The Court notes that "[i]t is within [its] discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss." *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013). Indeed, Defendants argue that Plaintiff may not amend his pleadings in his brief at all. (Defs.' Reply 8 (citing *Jacobson v. Peat, Marwick, Mitchell & Co*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977)).) However, where new allegations in a pro se plaintiff's responsive memoranda "are consistent with the allegations contained" in the complaint, they may be read "as supplements to th[e] pleadings." *Boyer v. Channel 13, Inc.*, Nos. 04-CV-2137, et al., 2005 WL 2249782, at *6 (S.D.N.Y. Mar. 9, 2005); *see also Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (considering "factual allegations made by [the] pro se [p]laintiff in [the plaintiff's] opposition papers" because they were "consistent with those in the initial complaint and amended complaints" (italics omitted)); *Gertskis v. U.S. E.E.O.C.*, No. 11-CV-5830, 2013 WL 1148924, at *1 (S.D.N.Y. Mar. 20, 2013) (considering allegations from the plaintiff's opposition memoranda "to the extent they are consistent with the [a]mended [c]omplaint"), *aff'd sub nom. Gertskis v. E.E.O.C.*, — F. App'x —, 2014 WL 6865499 (2d Cir. Dec. 8, 2014); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012) ("[B]ecause a pro se plaintiff's allegations must be construed liberally[,] it is appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint." (italics omitted)). It is this approach that the Court adopts here.

*ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 715 (2014).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))). Where, as here, a complaint was filed pro se, it must be construed liberally with "special solicitude" and interpreted to raise the strongest claims that it suggests. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted).

B. Analysis

Plaintiff's claims, in large part, turn on the validity and meaning of the Agreement, particularly the provisions concerning (a) with whom Plaintiff formed an employer-employee relationship, and (b) the assignment of Plaintiff's intellectual property rights. Not unexpectedly, nearly the entirety of Defendants' Motion is therefore based on assertions about one, or both, of these provisions. (*See* Defs.' Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 6–10, 12–13, 14–16 (Dkt. No. 34.) The Court will therefore begin its analysis by evaluating the relevant provisions of the Agreement, and the claims based on the interpretation of these provisions.

1. Dismissal of Plaintiff's Withdrawn Claims

The Court, as an initial matter, dismisses a number of Plaintiff's claims. First, Plaintiff's second, third, and sixth causes of action, relating to false statements allegedly made to the USPTO, are dismissed because Plaintiff has voluntarily withdrawn them, (*see* Pl.'s Opp'n 12 ("The Plaintiff has conceded that criminal allegations for the offenses committed by Defendants at the United States Patent Office should be dismissed into a separate criminal proceeding."); *see also* SAC 25–26), and because no private right of action lies to correct false statements made to the USPTO under 35 U.S.C. § 115, the statute Plaintiff cites in support of his second and third claims, (*see* First Am. Compl. 26 (Dkt. No. 9)). *See also Wise v. Hubbard*, 769 F.2d 1, 3 (1st Cir. 1985) (noting that § 115 "creates no duty between the patent applicant and the purported inventor. Instead, because the [USPTO's] interest is in rewarding the true inventor with the issuance of a letter patent, the sole duty created is between the applicant and the Office."); *Newberg v. Schweiss*, No. 08-CV-4681, 2009 WL 3202380, at *6 (D. Minn. Sept. 30, 2009) ("Under 35 U.S.C. § 115, . . . . [t]he duty to disclose all inventors . . . is a duty owed to the

USPTO, not to potential co-inventors. Indeed, breach of that statutory duty merely results in the patent being 'unauthorized by law and void.'" (quoting *Wise*, 769 F.2d at 3)). Second, Plaintiff's fourth, fifth, and ninth claims, relating to alleged criminal conduct, are dismissed because Plaintiff has voluntarily withdrawn them, (*see* SAC 26, 28), and because "crimes . . . do not give rise to civil causes of action," *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002). The Court likewise declines to grant Plaintiff leave to file a separate criminal complaint containing these dismissed claims because "the law is well settled that no private citizen has a constitutional right to bring a criminal complaint against another individual." *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316 (W.D.N.Y. 2004); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Third and finally, Plaintiff's thirteenth cause of action, relating to a request for subpoenas, is dismissed because Plaintiff voluntarily withdrew this claim, (*see* SAC 32), and because subpoenas are a discovery tool such that a request for them does not constitute a cause of action, *see* Fed. R. Civ. P. 45.

The Court declines to rule on Plaintiff's request to join Defendants ScentSational Technologies LLC and Steven M. Landau. The Court's dismissal of Plaintiff's First Amended Complaint, however, as discussed below, is without prejudice to Plaintiff renewing his request to join these Defendants or alleging additional claims against them.

2. Plaintiff's Employer-Employee Relationship

The terms of Plaintiff's employment are provided by Attachments B and C (collectively, the "Attachments") of the Agreement, (*see* SAC Ex. DMD III ("Attachments") at unnumbered

1–3).[12] Both Attachments appear to bear Plaintiff's signature, (*see id.* at unnumbered 2–3; *see also* Pl.'s Opp'n 4 (admitting Plaintiff signed Attachment B), and are governed by New York law, (*see* Defs.' Mem. 8 n.5 ("The [P]arties agree that New York law applies to the IP agreement."); *see also* Attachment B ¶ K ("THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK . . . ."")). Attachment B, the "Staffing Supplier Employee Agreement Regarding Confidentiality and Intellectual Property" characterizes the payment Plaintiff was to receive as being made "by [the] employer, the Staffing Supplier," and specifically explains that "[t]his Agreement does not constitute a contract of employment between [PepsiCo] and [the signatory]." (Attachment B at unnumbered 1, ¶ C.) Attachment C, the "Acknowledgment of Temporary Work Assignment," likewise includes a provision which provides that Plaintiff "understand[s] that [he is] an employee of the Staffing Supplier and . . . not an employee of PepsiCo[,]" and that "the Staffing Supplier, and not PepsiCo, is solely responsible for paying [his] compensation and any other benefits that [he] may be entitled to as an employee of Staffing Supplier." (Attachment C ¶ 1.) Attachment C also provides that Plaintiff "understand[s] that Staffing Supplier has assigned [him] to a temporary work assignment at PepsiCo . . . . for a defined period of time, the length of which may be increased or decreased." (*Id.* ¶ 2)[13]

---

[12] The first two pages of the exhibit contain Attachment B, while the third page contains Attachment C. (*See* Attachments.) The Court will hereinafter cite the individual Attachments as "Attachment B" and "Attachment C."

[13] The Court considers Attachments B and C of the Agreement, as well as the Purchase Order, when evaluating Defendants' Motion because they are attached to, and referenced in, the proposed Second Amended Complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . ."); *ASARCO*, 756 F.3d at 198 (noting that the Court "may consider . . . any written instrument attached to the complaint as an

On the basis of the plain language of the Agreement, Plaintiff's breach of contract claim (claim 1) is dismissed. *See Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 129 (S.D.N.Y. 2014) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss."). It is hornbook law that an entity must be a party to a contract for a claim of breach of that contract to lie, unless the entity has assumed or been assigned the contract. *See La Barte v. Seneca Res. Corp.*, 728 N.Y.S.2d 618, 620 (App. Div. 2001) ("[The] [p]laintiffs may not maintain a cause of action for breach of contract against those parties with whom [he or she] [was] not in privity."); *see also Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12-CV-1416, 2014 WL 3874193, at *12 (S.D.N.Y Aug. 5, 2014) (dismissing breach of contract claim because plaintiff failed to "establish the first element of [a] breach of contract claim, . . . the existence of a contract between [the plaintiff] and [the defendant]"); *Keywell L.L.C. v. Pavilion Building Installation Sys., Ltd.*, 861 F. Supp. 2d 120, 128 (S.D.N.Y. Mar. 12, 2012) ("In New York, privity is essential to a contract claim." (footnote omitted)); *Hotel Acquarius B.V. v. PRT Corp.*, No. 92-CV-4498, 1992 WL 391264, at *6 (S.D.N.Y. Dec. 22, 1992) ("[I]f an entity is not a party to a contract, no valid breach of contract claim exists against that entity."); *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has

---

exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies" (internal quotation marks omitted)); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (alteration and internal quotation marks omitted)); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

thereafter assumed or been assigned the contract."). Under the Agreement, Plaintiff was clearly an employee of Subex, and not of PepsiCo.[14] Plaintiff recognizes this fact in his submissions, (Pl.'s Opp'n 21 ("Plaintiff has at no time alleged that he was a PepsiCo employee . . . .")), and acknowledges that Subex, and not PepsiCo, was responsible for his payment, (*id.* at 18 (noting that "PepsiCo . . . had indeed willfully delegated duties to its business partner [Subex]," and that "PepsiCo did not have to delegate payment for . . . Plaintiff's IP to Subex")). In fact, Plaintiff included a 2008 W-2 as an exhibit to his proposed Second Amended Complaint which identifies Subex, rather than PepsiCo, as Plaintiff's employer. (*See* SAC Ex. DMD VI at unnumbered 1.) Therefore, under the plain terms of the Agreement, PepsiCo cannot be liable for any breach of contract under the Agreement, to which it was not a party.

Potentially in response to this issue, Plaintiff suggests that the "Purchase Order . . . issued on July 13th, 2008" modified Attachment B by "defin[ing] the specific terms of the payment for . . . Plaintiff's [i]ntellectual [p]roperty and . . . confidentiality." (Pl.'s Opp'n 7–8, 17.)[15] Plaintiff alleges that the Purchase Order at issue "was updated until October 20th 2009 and specifically identified the amount of money to be paid by . . . PepsiCo . . . to . . . Plaintiff and . . . established that . . . Plaintiff had indeed delivered the [i]ntellectual property [at issue] to Defendant," (*id.* at 17), and that Defendants "breach[ed] and fail[ed] to perform according to the

---

[14] In his Memorandum of Law, Plaintiff argues that the Agreement constituted a "delegation" of payment. (Pl.'s Opp'n 18.) This argument is contradicted by the plain language of the Agreement. (*See, e.g.*, Attachment B ¶ C ("This Agreement does not constitute a contract of employment between [PepsiCo] and [the signatory.").) PepsiCo therefore had no responsibilities to Plaintiff under the Agreement which it could delegate.

[15] Plaintiff's allegations regarding misconduct stemming from a "failure to produce . . . the . . . Purchase Order," (Pl.'s Opp'n 22), or other information relating to Plaintiff's tenure at PepsiCo, (*see id.* at 9), are premature because they pertain to discovery.

payment terms set forth in. . . [the] Purchase Order," (*id.* at 7). In support of this claim, Plaintiff cites § 3-119 of the New York Uniform Commercial Code, which provides that "'[a]s between the obligor and his immediate obligee or any transferee[,] the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction.'" (Pl.'s Opp'n 17 (italics omitted) (quoting N.Y. U.C.C. § 3-119).)

Contract modifications, like any contract, require offer, acceptance, and valid consideration. *See Estate of Anglin ex rel. Dwyer v. Estate of Kelley ex rel. Kelley*, 705 N.Y.S.2d 769, 772 (App. Div. 2000) ("[A] change in an existing contract must have new consideration to support it." (internal quotation marks omitted)); *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (App. Div. 1980) ("Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms."); *see also AIU Ins. Co. v. TIG Ins. Co.*, 934 F. Supp. 2d 594, 602 (S.D.N.Y. 2013) ("A valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration." (alterations and internal quotation marks omitted)), *aff'd*, 577 F. App'x 24 (2d Cir. 2014). Under this standard, the Purchase Order does not constitute a valid modification of the Agreement for two reasons. First, Plaintiff, by his own admission, was unaware of the Purchase Order until May 2012, meaning it was impossible for him to have "accepted" any modifications of the Agreement contained therein prior to the termination of his employment. (*See* Pl.'s Aff. ¶ 48 (Dkt. No. 42) ("Only during depositions for the Supreme Court of the State of New York case . . . did the Plaintiff come into knowledge of the Purchase Order [d]etails, in May 2012 . . . .").) Second, the modification was not supported by adequate consideration. Plaintiff's obligations under the Agreement—namely his employment and the assignment of his intellectual property—were the

same as those under the purported modified contract, and thus they could not have served as consideration for the modification. *See Tierney v. Capricorn Investors, L.P*, 592 N.Y.S.2d 700, 703 (App. Div. 1993) ("Neither a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration.").

The Purchase Order may also be interpreted, however, not as a contract modification, but rather as memorializing promises that were part of the Agreement itself, i.e., that Plaintiff would remain the named inventor of certain intellectual property and that PepsiCo would pay him the amount outlined in the Purchase Order. (*See* SAC ¶ 25 (referencing a "common understanding" that PepsiCo would credit Plaintiff's inventions to him); Pl.'s Aff. ¶ 27 (averring that "[P]laintiff's signature was given [on Attachment B] on the sole basis of the promises of payment made to the Plaintiff both . . . verbal[ly] and in writing as embodied in the Purchase Order").) There are several fatal flaws with such an interpretation. First, as an initial matter, no part of the Purchase Order suggests that Plaintiff was entitled to have his name remain on his intellectual property. Second, the Agreement contains a clause in Attachment B which provides that "[i]n the event that either [Plaintiff's] employer or [Plaintiff] has previously executed an agreement with [PepsiCo] relating to the work which [Plaintiff is] about to undertake, it is understood and agreed that the terms and provision of this Agreement will supersede any terms and conditions of such previously executed agreement." (Attachment B ¶ D.) This term, on its face, forecloses the applicability of any prior agreement that Plaintiff's name would remain on his inventions after their assignment, that he was PepsiCo's employee, or that he would receive certain compensation. Third, New York's parol evidence rule provides that "evidence outside the four corners of the document" is admissible to modify or contradict a written agreement "only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 986

N.E.2d 430, 436 (N.Y. 2013); *see also Polygram Holding, Inc. v. Cafaro*, 839 N.Y.S.2d 493, 493 (App. Div. 2007) ("Absent fraud or mutual mistake, the parol evidence rule precludes a party from offering evidence to contradict or modify an unambiguous contract."); *Telemundo Grp., Inc. v. Alden Press, Inc.*, 580 N.Y.S.2d 999, 1000 (App. Div. 1992) ("Extrinsic or parol evidence is admissible . . . where it would not modify or contradict the terms of the contract, but would explain ambiguities in the contract."(internal quotation marks omitted)). Because the Agreement is unambiguous as to Plaintiff's assignment of his intellectual property unconditionally, and as to the fact that Subex, and not PepsiCo, is Plaintiff's employer, parol evidence is not admissible to suggest that PepsiCo promised that Plaintiff's name would remain on his inventions, or that PepsiCo owed him compensation *as his employer*.

Giving Plaintiff the benefit of the doubt, the Court could construe the Purchase Order as explaining another otherwise ambiguous term in the contract, namely the reference in Attachment B to "payment to [Plaintiff] by [his] employer, the Staffing Supplier," such that the parol evidence rule would not bar consideration of the Purchase Order. (Attachment B at unnumbered 1).[16] However, even if the Purchase Order is relevant to the terms of the

---

[16] On its face, the Purchase Order identifies Subex as the "vendor," while the notes section indicates that Subex billed PepsiCo for Plaintiff's work, suggesting that the Purchase Order reflected an agreement between Subex and PepsiCo involving PepsiCo's payment to Subex for contract work, rather than an agreement with Plaintiff himself. (*See* Pl.'s Opp'n Ex. DMD V (Purchase Order).)

The Court is also skeptical that PepsiCo would have agreed to pay a six-figure sum to Plaintiff for his intellectual property, and then, instead of including such figure in the employment agreement, only ambiguously mentioned such sum in an unsigned purchase order. Indeed, the New York Court of Appeals rejected a similar claim (albeit on a motion for summary judgment) that an employment contract contained an implied term that provided a $170,000 bonus, noting that the parties "would be expected to make reference to such a large sum of money in the agreement with particularity." *Namad v. Salomon, Inc.*, 543 N.E.2d 722, 723 (N.Y. 1989). In any event, the Court rejects Plaintiff's claim here on the grounds discussed above.

Agreement, it does not suggest that Plaintiff was entitled to the $133,007.50 he claims. Indeed, the Purchase Order suggests that Plaintiff received hourly pay, rather than a fixed fee, and that his pay rate was $40 per hour. (Pl.'s Opp'n Ex. DMD V (Purchase Order); *see also id.* Ex. DMD II at unnumbered 4 (job description, indicating a "pay rate" of $40.00).) The $133,007.50 figure that Plaintiff cites is labeled as a "PO Limit Total," which reflects the combined total of two separate pay limits in the Purchase Order for standard and overtime work of $118,800 and $14,107.50, respectively. (*Id.* Ex. DMD V.) While Plaintiff argues, in his August 11, 2014 letter to the Court, that "limit" in this case means a "lower limit," that interpretation contradicts the plain meaning and regular usage of such term. *See Brooke Grp. Ltd. v. JCH Syndicate 488,* 663 N.E.2d 635, 638 (N.Y. 1996) ("The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning."); *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (App. Div. 1990) ("Words and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement." (citations omitted)); *cf. Liberty Mut Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05-CV-217, 2008 WL 190310, at *15 (S.D.N.Y. Jan. 16, 2008) ("Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." (internal quotation marks omitted)). Had PepsiCo intended Plaintiff's interpretation of the contract, it would have used the word "minimum," which implies a lower limit, rather than "limit," which implies a ceiling.[17] Moreover, it strains reason to believe that PepsiCo would ever

[17] The dictionary definition of "limit" is "[a] point or level beyond which something does not or may not extend or pass." Limit, Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/limit (last accessed Jan. 6, 2015). Construing "limit" in the Purchase Order as an upper limit would set definite bounds, consistent with this definition of the term, whereas interpreting the term as a minimum payment "delimits" Plaintiff's pay altogether, as any amount higher than the amount specified in the Purchase Order would be permissible under the Agreement according to such an interpretation.

issue an unsigned purchase order for *minimum* compensation, never mind one that specifies an hourly salary that a minimum compensation provision would render superfluous, especially given that it is Subex, and not PepsiCo, which was required to pay Plaintiff. *See Am. Express Bank*, 562 N.Y.S.2d at 614 ("A contract should be construed so as to give full meaning and effect to all of its provisions."). Therefore, the Court finds no support on the face of the Purchase Order for Plaintiff's contention that he is owed $133,007.50 under the Agreement, such that payment of less than that amount would constitute a breach. Rather, the Purchase Order provides, at most, a *maximum* amount that Plaintiff may receive under the Agreement.[18]

Plaintiff admits that he received $82,142, which amounted to $56,384 after taxes, as compensation. (*See* SAC ¶ 52.) Though Plaintiff alleges that he received "[n]o other valuable consideration," (Pl.'s Opp'n 4), Plaintiff does not allege that he was deprived of "the use of [PepsiCo's] facilities or materials, or of private or proprietary information," as promised in the Agreement, (Attachment B at unnumbered 1). Plaintiff appears to suggest instead that he simply received no other *monetary* compensation for his property. (*See* Pl.'s Aff. ¶¶ 35, 42 (citing W-2 statement as evidence that Plaintiff received no other compensation); *id.* ¶ 38 (noting that Plaintiff "did not receive any additional income from any source").) Therefore, there is no reason to doubt that Plaintiff received the consideration that he was promised on the face of the Agreement, or as suggested by the Purchase Order. On that basis, and because Plaintiff was an

---

[18] Plaintiff fails to explain why he is entitled to an interest in the intellectual property he transferred that is proportionate to the amount of compensation he alleges is owed. (*See* SAC ¶ 238). Even if Plaintiff could recover from Subex, because Plaintiff's contract was with Subex for the *benefit* of PepsiCo, rather than with PepsiCo itself, he is not entitled to restitution. *Cf. U.S. E. Telecomms. Inc. v. US W. Commc'ns Servs., Inc.*, 38 F.3d 1289, 1297 (2d Cir. 1994) ("A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of the performance of the third person." (quoting Restatement of Restitution § 110 (1937)).)

employee of Subex, and not of PepsiCo, Plaintiff's breach of contract claim against PepsiCo is dismissed.

3. Intellectual Property Provision

For purposes of Plaintiff's assignment of intellectual property, the pertinent portion of the Agreement is Attachment B. Attachment B provides, in relevant part, that:

> In consideration of payment to me by my employer, the Staffing Supplier . . . for the performance of work or assignments for PepsiCo, Inc. . . . and other good and valuable consideration, including the use on behalf of Company of its facilities or materials, or of private or proprietary information owned by [PepsiCo] or its suppliers or customers, I agree to the following provisions:
>
> A. I hereby assign and agree to assign to [PepsiCo] all my right, title and interest in and to all inventions, discoveries, improvements, ideas, products, formulae, machines, mask works, designs, methodologies, processes, know-how, research and development, software, source code, computer or other apparatus programs and related documentation, and other works of authorship . . . whether or not patentable, copyrightable or subject to other forms of protection, made created, developed, written or conceived by me during the period of such work or performance of assignments, whether during or outside of regular working hours, either solely or jointly with another, in whole or in part
>
> 1. In the course of such work assignment, or
> 2. Which are suggested by or result from any task assigned to me or work performed for or on behalf of Company relating to my assignment, or
> 3. With the use of Company's time, material, facilities, or private or proprietary information;
>
> B. I will . . . execute a specific assignment of title to Company and do anything else reasonably necessary to enable company to secure a patent . . .
>
> C. This Agreement does not . . . confer upon me any rights by license or otherwise in my Intellectual Property to which I may have access . . .
>
> D. The above terms shall survive termination, cancellation or expiration of this Agreement and the work or assignments for which I was engaged . . .
>
> K. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK . . . .

(Attachment B at unnumbered 1–2.) While the Agreement, as noted above, is governed by New York law, the operation of the assignment of rights is governed by Federal Circuit law. *See Picture Patents LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 135 (S.D.N.Y. 2011) ("[T]he question of whether contractual language effects a present assignment of patent rights, or an agreement to assign rights in the future, is resolved by Federal Circuit Law." (internal quotation marks omitted)), *aff'd* 469 F. App'x 912 (Fed. Cir. 2012).

On its face, Attachment B is a clear and explicit assignment of all intellectual property from Plaintiff to PepsiCo. The "I hereby assign . . . my right title and interest" clause contained in the Attachment B "indicate[s] a present assignment of a future invention," meaning all of the intellectual property that Plaintiff created during the period of his employment was automatically transferred to PepsiCo as soon as it was invented. *Id.* at 135–36 (noting that "[t]he present assignment of a future invention divests the inventor-assignor of ownership of the invention and automatically vests ownership of the invention, when invested, to the assignee" (internal quotation marks omitted)); *see also Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) ("Because the assignment clause . . . states that the employee agrees to 'hereby assign' all 'Intellectual Property,' it is an express assignment of rights in future inventions that automatically assigned rights . . . without the need for any additional act.").

The fact that Plaintiff contractually transferred his intellectual property to PepsiCo undermines a number of Plaintiff's claims. The Court considers them in the order that Plaintiff alleges them in his proposed Second Amended Complaint. First, in order to claim wrongful appropriation of intellectual property (claims 7 and 24), Plaintiff "must establish some wrongful appropriation or use of [*his*] intellectual property." *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 302 (2d Cir. 2006); *see also Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp.

2d 293, 297–98 (S.D.N.Y 2008) (citing *Dow Jones* for this proposition, and granting summary judgment on the plaintiffs' wrongful appropriation claim because they "failed to establish that they have an intellectual property right that has been misappropriated"). While Plaintiff argues that the Defendants are not "holders in due course of" the intellectual property at issue because "the Purchase Order . . . has not been honored," (SAC ¶ 228), as discussed above, the Purchase Order is not a valid modification of the Agreement nor a contract in its own right, and does not entitle Plaintiff to the compensation he alleges, create an employment agreement with PepsiCo, or entitle Plaintiff to rescind the assignment of his intellectual property rights, which assignment vested upon invention. Therefore, Plaintiff has no contractual or residual right to his inventions, and his wrongful appropriation claims are dismissed. For the same reason, Plaintiff's joint owners claim (claim 25) is dismissed. Plaintiff does not retain an interest in his inventions "in proportion to the [Purchase Order] proportion that the Defendant[s] did not honor" such that Plaintiff is a joint owner or has any remaining interest in his inventions at all. (*Id.* ¶ 238.)

Second, Plaintiff makes two fraud-based claims, "fraudulent obtaining of signature" (claim 8), and "fraudulent intent breach of agreement for assignment of intellectual property" (claim 14). These claims, which allege that "[D]efendants used fraudulent means to take away from him his intellectual property," (Pl.'s Opp'n 7), are dismissed because Plaintiff fails to allege, in either case, a cause of action upon which relief can be granted.

It long has been clear that "[a]llegations of fraud are subject to a heightened pleading standard." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "When alleging fraud, a party

must state with particularity the circumstances constituting fraud, . . . requir[ing] the plaintiff to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata*, 723 F.3d at 197 (citation and internal quotation marks omitted). Plaintiff fails to satisfy the fourth prong of the pleading standard because he does not specify any federal or state law that Defendants have violated. Moreover, even if Plaintiff intended to allege common law fraud under New York law, he fails to allege facts that establish the elements of a common law fraud claim: "(1) a misrepresentation of material fact, (2) made with fraudulent intent, (3) upon which the plaintiff reasonably relies to his (4) economic detriment." *Nirvana Int'l., Inc. v. ADT Sec. Servs., Inc.*, 881 F. Supp. 2d 556, 563 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 12 (2d Cir. 2013).

Plaintiff's first fraud-based claim, "[f]raudulent [o]btaining [o]f [s]ignature" rests only on the conclusory allegation that the signatures on PepsiCo's patent applications were fraudulent because Defendants "were not the inventors of the Plaintiff's intellectual property." (SAC ¶¶ 139–140.) Plaintiff does not explain how PepsiCo's actions were fraudulent given that an assignee of intellectual property is permitted to make a patent application. *See* 35 U.S.C. § 118 ("A person to whom the inventor has assigned . . . the invention may make an application for patent."); *cf. id.* § 115 (providing that an inventor's declaration is only required for those applications commenced "under section 111(a)" or those that "commence[] the national stage under section 271"); *Deere & Co. v. Van Natta*, 660 F. Supp. 433, 436 (M.D.N.C. 1986) (noting that, because the plaintiff could file a patent application as an assignee, there was no need to order the defendant inventor to sign a declaration indicating there were no bars to the patent applications at issue). Plaintiff also does not allege that he relied on any fraudulently-obtained

signature, *cf. Nirvana Int'l*, 881 F. Supp. 2d at 563 ("[The] [p]laintiff did not rely on his forged signature so [the] [p]laintiff has no claim for fraud."), nor does he explain why, given that Plaintiff assigned his intellectual property rights to PepsiCo, any fraudulently-obtained signature caused him economic harm.

Plaintiff's second fraud-based claim, "[f]raudulent [i]ntent [b]reach [o]f [a]greement [f]or [a]ssignment [o]f [i]ntellectual [p]roperty," rests on the allegation that "[t]he order to expunge . . . [P]laintiff's name from his inventions" was improper. (SAC ¶ 169.) Like Plaintiff's first fraud claim, this claim also fails to include any allegations of reliance on a misrepresentation of material fact or resulting economic detriment. Moreover, as discussed above, even if the Parties had come to some "understanding" that Plaintiff was to remain a named inventor, (*see id.* ¶ 25), Plaintiff does not allege that such understanding was a valid contract modification, nor can an oral agreement provide additional terms under New York's parol evidence rule, given that the Agreement *unambiguously* indicates that Plaintiff agreed to assign his intellectual property rights to PepsiCo without condition. *See Schron*, 986 N.E.2d at 433 (noting that New York's parol evidence rule provides that "evidence outside the four corners of the document" is admissible to alter or add a provision to a written agreement "only if a court finds an ambiguity in the contract"). Plaintiff's fraud claims are therefore dismissed.

Third, Plaintiff's unjust enrichment claim (claim 11) is dismissed. Plaintiff alleges that Defendants were "unjustly enriched through their wrongful appropriation of . . . Plaintiff's [i]ntellectual [p]roperty and have wrongfully secured for their own benefit valuable utility patents of commercial value that PepsiCo's competitors would be interested in using [in] the market place." (SAC ¶ 154.) While this claim appears to be a species of Plaintiff's wrongful appropriation claims, which the Court has already dismissed, the existence of a valid contract

also renders unjust enrichment unavailable as a remedy. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *see also Arbitron, Inc. v. Kiefl*, No. 09-CV-4013, 2010 WL 3239414, at *7 (S.D.N.Y. Aug. 13, 2010) ("Unjust enrichment is not available where there is a valid contract between the parties covering the same subject matter."); *AngioDynamics, Inc. v. Biolitec, Inc.*, 606 F. Supp. 2d 300, 305 (N.D.N.Y. 2009) ("Because the dispute is covered by [a] contract, a claim in unjust enrichment cannot proceed."); *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-CV-2800, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) ("[D]ecisions both in New York state courts and in [the Southern District of New York] have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute . . . .").

The Court recognizes that, under Federal Rule of Civil Procedure 8(d), a plaintiff can plead in the alternative such that he can challenge the validity of the contract *and* allege unjust enrichment. *See Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir.1999) ("[Rule 8(d)] offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss."). However, where a plaintiff, as here, fails to challenge the validity of a contract that governs the subject matter at issue, and instead alleges breach of said otherwise enforceable contract, under New York law he or she cannot plead unjust enrichment in the alternative. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006) (noting that an unjust enrichment claim cannot be plead in the alternative when there is a "valid and enforceable contract governing . . . [the] subject matter");

*King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, No. 09-CV-3980, 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009) ("Unjust enrichment may be plead in the alternative where the plaintiff challenges the validity of the contract; it may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract."), *aff'd sub nom. Kings Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, 396 F. App'x 736 (2d Cir. 2010); *see also Sikarevich Family L.P. v. Nationwide Mut. Ins. Co.*, No. 13-CV-5564, 2014 WL 3127729, at *4 (E.D.N.Y. July 3, 2014) (dismissing unjust enrichment claim, plead in the alternative with a breach of contract claim, because the plaintiff did not challenge the insurance policy at issue); *AngioDynamics*, 606 F. Supp. 2d at 305 (dismissing unjust enrichment counterclaim, plead in the alternative, "[b]ecause the dispute [at issue] [was] covered by the [undisputed] contract, [meaning] a claim in unjust enrichment [could not] proceed"); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (dismissing unjust enrichment claim, plead in the alternative, noting that "[Plaintiff's] failure to allege that the contracts at issue are invalid or unenforceable precludes it . . . from seeking quasi-contractual recovery for events arising out of the same subject matter."). *But see St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 184 (E.D.N.Y. 2010) ("Though some cases suggest that a plaintiff's mere allegation of an enforceable contract is enough to prevent him from even *pleading* an alternative claim for unjust enrichment, that position cannot be reconciled with the text of Rule 8(d), and is unpersuasive to this court's analysis." (footnote omitted)). Because Plaintiff does not challenge the validity of the Agreement (its exact terms, as allegedly modified by the Purchase Order, notwithstanding), and the Agreement governs Plaintiff's rights to the intellectual property at issue, Plaintiff's unjust enrichment claim is dismissed.

Fourth, Plaintiff's correction of inventorship claim (claim 10), made purportedly under 35 U.S.C. § 256 and presumably for the five patents (included the granted patent) Plaintiff outlined in his Amended Complaint, is dismissed. (*See* SAC 28.) The Federal Circuit has made clear that while 35 U.S.C. § 256 "provides a private right of action to challenge inventorship" for issued patents, 35 U.S.C. § 116, which governs inventions, "does not provide a private right of action to challenge inventorship of a pending patent application." *HIF Bio., Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010). Thus, Plaintiff cannot bring a cause of action for a correction of inventorship for the four pending patent applications. As far as correction of inventorship for the single issued patent is concerned, while a private right of action may exist, because Plaintiff assigned his intellectual property rights to PepsiCo, he lacks standing to make such a claim. Plaintiff has no remaining ownership interest in the patents, and he has alleged no other financial or reputational interest on which to base standing. *See Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1325–27 (Fed. Cir. 2009) (noting that for a plaintiff to have standing to correct inventorship, the plaintiff must allege facts sufficient to show an "ownership interest" or a "concrete financial interest" in the patent at issue, and finding no standing for such claim because the plaintiff "affirmatively transferred title to the patents to [defendant]" and thus could not stand to gain from them unless he "obtain[ed] rescission of the patent assignments" (internal quotation marks omitted)); *see also Vita-Herb Nutriceuticals, Inc. v. Probiohealth, LLC*, No. 11-CV-1463, 2013 WL 1182992, at *4 (C.D. Cal. Mar. 20, 2013) (finding no standing for a correction of inventorship claim because the plaintiff was "barred by the terms of [a release] from pursuing any claim for co-ownership" and thus lacked a financial interest); *Swanson v. ALZA Corp.*, No. 12-CV-4579, 2013 WL 968275, at *4 (N.D. Cal. Mar. 12, 2013) ("Where an inventor assigns all of his interest in an invention to others, he retains no

financial interest in the patents and therefore no interest sufficient for him to have standing to pursue a § 256 claim." (internal quotation marks omitted)). For these reasons, Plaintiff's correction of inventorship claim is dismissed.

Fifth, Plaintiff's constructive trust claim (claim 12) is dismissed. "Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment." *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 646 (2d Cir. 2004); *see also Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011) (same); *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976) (same). However, "these elements are not talismanic; a court may impose a constructive trust in the absence of some of the factors." *A. Brod, Inc. v. SK&I Co.*, 998 F. Supp. 314, 327 (S.D.N.Y. 1998). In this context, under New York law, a constructive trust cannot be imposed when the party seeking it is not in possession of any indicia of ownership. *See Bontecou v. Goldman*, 477 N.Y.S.2d 192, 194 (App. Div. 1984) ("Generally, a constructive trust may be imposed when property has been acquired under such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest therein."); *cf. A. Brod*, 998 F. Supp. at 327–28 (noting, in a case concerning a motion for summary judgment on a copyright claim, that a constructive trust is only appropriate if the holder of the property at issue is "not a bona fide purchaser"); *Majer v. Schmidt*, 564 N.Y.S.2d 722, 725 (App. Div. 1991) ("[I]f a constructive trust is otherwise appropriate, it will be imposed unless the party who received the property is a bona fide purchaser, i.e., one who took without notice that it had been wrongfully obtained." (italics omitted)). Because, by operation of

Attachment B, Plaintiff has no remaining ownership interest in the intellectual property at issue, he cannot seek a constructive trust.

Likewise, "[i]t is well-established under New York law" that, as an equitable remedy, constructive trusts are inappropriate "where there is an adequate remedy at law," namely one under contract law. *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) (internal quotation marks omitted); *see also United States v. Ribadeneira*, 920 F. Supp. 553, 556 (S.D.N.Y. 1996) (finding that because the petitioners had "an adequate remedy at law, it would be inappropriate to afford [them] equitable relief in the form of a constructive trust), *aff'd*, 105 F.3d 833 (2d Cir. 1997); *Cuomo v. Uppal*, 892 N.Y.S.2d 49, 50 (App. Div. 2009) (noting that because the appellant had "adequate legal remedies" it was "not necessary to impose a constructive trust"); *Bertoni v. Catucci*, 498 N.Y.S.2d 902, 905 (App. Div. 1986) ("As an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate."). While Plaintiff claims that Defendants breached the employment contract by failing to adequately compensate Plaintiff, Plaintiff does not contest that the Agreement, as allegedly modified by the Purchase Order, governs his rights to the intellectual property at issue and any compensation related thereto. (*See*, *e.g.*, SAC ¶ 238 (arguing that Plaintiff retains an interest in his intellectual property in proportion to the amount of the Purchase Order he has not been paid); Pl.'s Aff. ¶ 27 (averring that "[P]laintiff's signature was given [on Attachment B] on the sole basis of the promises of payment made to . . . Plaintiff both in verbal and in writing as embodied in the Purchase Order").) Therefore, the equitable remedy of a constructive trust is unavailable. *See Islip U-Slip LLC v. Gander Mountain Co.*, 2 F. Supp. 3d 296, 308 (N.D.N.Y. 2014) (dismissing constructive trust claim because the plaintiff alleged the existence of a contract and breach of that contract, and did not allege that a "legal remedy—

i.e., monetary damages—would be inadequate" (italics omitted)); *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) (rejecting constructive trust claim because "[i]t is well established that the existence of a contract precludes a claim for a constructive trust"). For these reasons, Plaintiff's constructive trust claim is dismissed.

Sixth, Plaintiff's wrongful course of dealing claims (claims 21 and 22) are dismissed. Plaintiff cites N.Y. U.C.C. Law § 1-205(2) (§ 1-303(c)), which describes usage of trade as "any practice or method of dealing having such regularity . . . as to justify an expectation that it will be observed with respect to the transaction in question," in support of these claims.[19] However, Plaintiff fails to allege how usage of trade is relevant to the Agreement. Rather, Plaintiff only makes conclusory allegations that Defendants "did not follow the [c]ourse of [d]ealing" and that Defendants Dr. Given and Dr. Zhang "knew [that] Plaintiff's work and inventions . . . [were] conceptualized and reduced to practice" before they became involved with their parent projects. (SAC ¶¶ 212, 217–18.) Even if the Court assumes that Plaintiff intended to cite § 1-205(1) (§ 1-303(b)), which defines "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction . . . [that] establish[es] a common basis of understanding for interpreting their expressions and other conduct," Plaintiff still fails to allege how such "course of conduct" was established, how Defendants failed to follow it, how it trumps the Agreement, and how it would constitute a cause of action. In fact, construing Plaintiff's claim liberally, it appears to be a species of Plaintiff's breach of contract claim, in which Plaintiff alleges that that he only signed the Agreement on the basis of certain oral

[19] Some of the provisions of the N.Y. Uniform Commercial Code that Plaintiff cites have been reorganized and renumbered. *See* 2014 N.Y. Sess. Laws ch. 505 (A. 9933) (McKinney). When applicable, the Court includes parenthetical citations to the current Code for ease of reference. All quotations are from the current Code.

understandings that Defendants have not honored. The Court has, however, already dismissed this claim.

Plaintiff also cites 35 U.S.C. §§ 116 (inventors) and 118 (filing by other than inventor) in support of his wrongful course of dealing claims. (*See* SAC ¶¶ 211, 216.) Plaintiff does not, however, allege that his intellectual property was "made by two or more persons jointly," such that he would be considered an "omitted inventor" under the statute. 35 U.S.C. § 116. Indeed, because Plaintiff assigned his intellectual property to PepsiCo, § 118 provides that PepsiCo was permitted to make an application for patent. *Cf. Deere*, 660 F. Supp. at 436 (noting that, because the plaintiff could file a patent application as an assignee, there was no need to order the defendant inventor to sign a declaration indicating there were no bars to the patent applications at issue). Moreover, as discussed above, 35 U.S.C. § 115 creates "no duty between the patent applicant and the purported inventor," but rather "the sole duty created is between the applicant and the office." *Wise*, 769 F.2d at 3; *Newberg*, 2009 WL 3202380, at *6 ("Under 35 U.S.C. § 115 . . . . [t]he duty to disclose all inventors . . . is a duty owed to the USPTO, not to potential co-inventors. Indeed, a breach of that statutory duty merely results in the patent being 'unauthorized by law and void.'" (citation omitted) (quoting *Wise*, 769 F.2d at 3)). Therefore, Plaintiff's wrongful course of dealing claims are dismissed.[20]

[20] The Court notes that Plaintiff is correct that, after publication, the USPTO does not permit a protest of a patent application without the consent of the applicant. *See* Manual of Patent Examining Procedure 1901.6(V)(A), U.S. Patent and Trademark Office, available at http://www.uspto.gov/web/offices/pac/mpep/s1901.html#d0e194658 (last accessed Feb. 18, 2015). (*See also* Pl.'s Opp'n 10.) However, the fact that Defendants are unlikely to consent to such a protest does not mean Plaintiff has a cause of action based on the same claim in federal court.

Seventh, Plaintiff's claim, that PepsiCo "acted in bad faith" in not honoring the Purchase Order "by subsequently ordering . . . Plaintiff's name to be expunged from his inventions" and "by not answering . . . Plaintiff's request for amendment" (claim 23), is dismissed. (SAC ¶ 223.) In support of this claim, Plaintiff cites N.Y. U.C.C. Law § 1-203 (§ 1-304), which provides that "[e]very contract or duty . . . imposes an obligation of good faith in its performance and enforcement." However, this statute "does not support an independent cause of action." *Id.* Official Comment; *see also J.C. Penny Corp. v. Carousel Ctr. Co.*, 306 F. Supp. 2d 274, 281 (N.D.N.Y. 2004) (same), *aff'd*, 160 F.3d 97 (2d Cir. 1998); *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 792 (S.D.N.Y. 1997) (same). Moreover, even if there were a cause of action under § 1-203 (§ 1-304), Plaintiff fails to allege that PepsiCo was party to a contract that could have imposed such a duty. As discussed above, the Purchase Order was not a valid modification to the Agreement, nor was it a contract in its own right, and therefore PepsiCo could not have acted in bad faith by failing to honor it.[21] For these reasons, Plaintiff's claim that PepsiCo violated the "[o]bligation [o]f [g]ood [f]aith [a]nd [l]ack [o]f [s]atisfaction" is dismissed.

Eighth and finally, Plaintiff's negligence claim (claim 27) is dismissed. Plaintiff's claim is based solely on the allegation that Defendants' negligence resulted in their "wrongfully claim[ing] the ownership and inventorship of . . . Plaintiff's intellectual property." (SAC ¶ 251.) The Court has already found that Defendants' actions in filing for the patents at issue were not wrongful. *See* 35 U.S.C. § 118 ("A person to whom the inventor has assigned . . . the invention may make an application for patent."). Moreover, Plaintiff has failed to allege any elements of the negligence, e.g., a duty and breach thereof, *see, e.g., In re MS Angeln GmbH & Co. KG*, 10

[21] Even if the Purchase Order created a contract between PepsiCo and Plaintiff, the Court has already found that Plaintiff received what he was promised under that document.

F. Supp. 3d 424, 430 (S.D.N.Y. 2014) (noting that the elements of common law negligence are "duty of care, breach of duty, causation, and damages"), and "[a] contract action cannot be converted into one arising in tort 'merely by alleging that the contracting party did not intend to meet its contractual obligations,'" *Aniero Concrete Co. v. N.Y.C. Const. Auth.*, No. 94-CV-3506, 2000 WL 863208, at *32 (S.D.N.Y. June 27, 2000) (quoting *Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994)). Plaintiff's negligence claim is therefore dismissed.

4. Remaining Claims

The dismissal of the above claims notwithstanding, Plaintiff makes additional claims that pertain to conduct outside the context of the Agreement itself. These claims are equally without merit.

First, Plaintiff makes a number of claims (claims 15, 16, 17, 18, 19, 20, and 26) based principally on Article 3 of the New York Uniform Commercial Code, which governs commercial paper, i.e., negotiable instruments. *See* N.Y. U.C.C. Law § 3-101; *id.* cmt. ("This Article represents a complete revision and modernization of the Uniform Negotiable Instruments Law."). Indeed, each of the provisions on which Plaintiff relies refers to negotiable instruments. *See id.* §§ 3-105 (conditionality of instruments), 3-303 (taking of instruments for value), 3-304 (notice of claim or defense to instrument), 3-404 (unauthorized signatures on instruments), 3-405 (impostor signatures on instruments), 3-406 (negligence altering instrument), 3-408 (consideration to become a holder in due course of an instrument), 3-507 (dishonored instrument), 3-603 (payment or satisfaction or an instrument). (*See also* SAC 33–39, 45–46

(citing these provisions).)[22] While Plaintiff characterizes Attachment B and the Purchase Order as commercial paper, (*see* Pl.'s Opp'n 12), the contracts at issue in this Action are not negotiable instruments, and therefore the cited provisions of New York law do not apply, *see* N.Y. U.C.C. Law § 3-104 ("Any writing to be a negotiable instrument within this Article must [be] . . . . .(a) a 'draft' ('bill of exchange') if it is an order; (b) a 'check' if it is a draft drawn on a bank and payable on demand; (c) a 'certificate of deposit' if it is an acknowledgment by a bank of a receipt of money with an engagement to repay it; (d) a 'note' if it is a promise other than a certificate of deposit"); *Stroll v. Epstein*, 818 F. Supp. 640, 643 n.4 (S.D.N.Y. 1993) ("[T]he present contract is not a negotiable instrument because it is not payable to order or to bearer." (internal quotation marks omitted) (citing N.Y. U.C.C. Law § 3-104)); *President, etc. of Manhattan Co. v. Morgan*, 210 N.Y.S. 460, 462 (App. Div. 1925) ("Written contracts are not negotiable, because by their terms, they are payable or insure to the benefit of the bearer."), *aff'd*, 150 N.E. 594 (N.Y. 1926). Likewise, the Purchase Order is not a negotiable instrument because it is signed by neither the alleged maker, PepsiCo, nor the alleged drawer, Plaintiff. *See* N.Y. U.C.C. Law § 3-104 (providing that to be "a negotiable instrument," a writing must "be signed by the maker or drawer"). Therefore, these claims are dismissed as without merit because they have no basis in law, nor any application to this case.[23]

---

[22] Claim 17 also makes reference to N.Y. U.C.C. Law § 1-201(32) (§ 1-201(b)(29)), which defines "Purchase." Though Plaintiff cites this provision as proof of the meaning of "purchase order," (*see, e.g.*, Dkt. No. 47 at 1), the provision has no relevance to the claims at issue in this case.

[23] Moreover, insofar as Plaintiff alleges that "[o]nly the inventor can authorize a patent application to be made," this claim, as discussed above, is contradicted by 35 U.S.C. § 118, which provides that the assignee of an invention may file for a patent application, and contains no provision requiring authorization by the inventor.

Second, Plaintiff alleges "[r]acism, [r]acial [d]iscrimination, [h]umiliation, [i]nsults [a]nd [d]enigration" (claim 28). (SAC 47.) Plaintiff's support for this claim is (a) his allegation that PepsiCo's Vice President for Research and Development, Valerie Jacklin, sent an email to Dr. Given and the Director of the Ingredient Technology group indicating that she was "not sure [they] want[ed] [Plaintiff] [o]n [t]he [i]nvention [l]ist," and that this was because of unspecified "stereotypes and racial clichés about . . . Plaintiff as a person of . . . black skin;" (b) Plaintiff's allegation that Defendants articulated this position to the U.S. government, together with the "representation that . . . Plaintiff was not able to do any work and . . . went to work only to look for opportunities for predatory sexual intercourse activity on women;" and (c) Plaintiff's allegation that he was told by an unnamed human resources manager that he was "'culturally unfit'" for employment because he was "a black male [with] an opinion on scientific matters that was contrary to that of his peers of [another] skin color." (*Id.* ¶¶ 65, 255, 257–58 (italics omitted).)[24] While Defendants' conduct, if truthfully alleged, would be reprehensible, it is nonetheless facially insufficient to state a claim. Plaintiff does not allege what law, state or federal, Defendants have violated. Moreover, the claim lacks specific factual allegations, and instead rests on the conclusory allegation that Defendants' actions, both in taking credit for Plaintiff's inventions and terminating his employment, were motivated by racial animus. Such allegation fails to state a claim for racial discrimination. *See Phifer ex rel. Phifer v. City of New York*, No. 99-CV-4422, 2003 WL 1878418, at *6 (S.D.N.Y. Apr. 15, 2003) (dismissing racial discrimination claim because, inter alia, "[t]he complaint sets forth only conclusory assertions . .

---

[24] Plaintiff also alleges that Defendants' "legal counsel made comments in the presence of Plaintiff that 'justice . . . is . . . a hater of the black people aka nigga behind closed doors.'" (SAC ¶ 261 (alterations in original) (italics omitted).) Additionally, in his Affidavit, Plaintiff names a PepsiCo employee that he alleges PepsiCo thought was a target of his sexual advances. (*See* Pl.'s Aff. ¶ 114.)

. and fails to specifically allege the circumstances giving rise to a plausible inference of racially discriminatory intent" (internal quotation marks omitted)); *cf. Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of the elements of a cause of action, supported by mere conclusory statements"); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (affirming the district court's rejection of affidavits that made only "bald assertions and legal conclusions" of "racism and a racially hostile working environment"). Plaintiff's racism-based claim is therefore dismissed because the allegations are "simply too thin and conclusory to support a facially plausible claim." *Doner-Hendrick v. N.Y. Inst. of Tech.*, No. 11-CV-121, 2011 WL 2652460, at *7 (S.D.N.Y. July 6, 2011).

III. CONCLUSION

For the foregoing reasons, Defendants' Motion To Dismiss is granted. Plaintiff's First Amended Complaint is dismissed without prejudice. Plaintiff may file a Second Amended Complaint within thirty days that specifically addresses the deficiencies identified in this Opinion. Also, Plaintiff may renew his request to join Scentsational Technologies LLC and Steven M. Landau and file claims against them. The Clerk of the Court is respectfully requested to terminate the pending Motion (Dkt. No. 34).

SO ORDERED.

DATED: March 9, 2015
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE